**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

CASE NO. _____

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SPARTAN SECURITIES GROUP, LTD., | ) |
| ISLAND CAPITAL MANAGEMENT LLC, | ) |
| CARL E. DILLEY, | ) |
| MICAH J. ELDRED, and | ) |
| DAVID D. LOPEZ, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

<u>**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**</u>

Plaintiff Securities and Exchange Commission ("Plaintiff" or the "Commission") alleges:

## I. <u>INTRODUCTION</u>

1.      The Commission brings this action to enjoin Defendants Spartan Securities Group, Ltd. ("Spartan Securities"), Island Capital Management LLC, d/b/a Island Stock Transfer ("Island Stock Transfer"), Carl E. Dilley ("Dilley"), Micah J. Eldred ("Eldred"), and David D. Lopez ("Lopez") (collectively, "Defendants") from violating the provisions of the federal securities laws described herein.

2.      Spartan Securities, a registered broker-dealer, and Island Stock Transfer, a registered transfer agent, are commonly owned and tout their "one-stop shop" services provided

in tandem to issuers of microcap securities.  At material times to this Complaint, Dilley, Eldred, and Lopez were common owners of the parent of both Spartan Securities and Island Stock Transfer, and principals of both Spartan Securities and Island Stock Transfer.

3.     This action involves Defendants' roles in one or two separate fraudulent schemes from approximately December 2009 through August 2014 to manufacture at least 19 public companies for sale fundamentally premised on a deceptive public float of purportedly "free-trading" securities:   14 by Alvin Mirman and Sheldon Rose (the "Mirman/Rose Companies," identified in paragraph 30 below) and five by Michael Daniels, Andy Fan, and Diane Harrison (the "Daniels Companies," identified in paragraph 102 below).

4.     The fraudulent schemes depended on misrepresentations and omissions to, among others, the Commission, the Financial Industry Regulatory Authority ("FINRA"), and the Depository Trust Company ("DTC") that the Mirman/Rose and Daniels Companies were legitimate small businesses with independent management and shareholders.  In reality, both the management and shareholders were nothing more than nominees for control persons who always intended merely to sell all the securities of the companies privately in bulk for their own benefit.  The essential value of these securities (each bulk sale realized proceeds of hundreds of thousands of dollars) was their false designation as "free-trading" with the ability to be sold immediately on the public market.  If the truth had been known to the public, the securities would have been restricted from such sales and would have had little value.

5.     Dilley and Eldred knew or were reckless in not knowing from the onset that the Mirman/Rose Companies and Daniels Companies, respectively, were pursuing their stated plans under false pretenses and instead being packaged for sale as public vehicles, and that the

shareholders were mere nominees for the control persons. Nonetheless, Defendants took critical steps to advance the frauds.

6. Dilley schemed with Mirman and Rose, and Eldred schemed with Daniels, Fan and Harrison, to defraud the public that the Mirman/Rose Companies and Daniels Companies were operating businesses with independent management and shareholders, rather than undisclosed "blank check" companies (sometimes referred to as "shells" or "vehicles") for sale. In furtherance of the Mirman/Rose scheme, Dilley signed false Form 211 applications submitted to FINRA, contributed to false DTC applications, found potential shell buyers, signed an escrow agreement and false attestation letters for shell buyers, and effectuated the bulk transfer of the entire deceptive public float of Mirman/Rose Companies to shell buyers. Eldred similarly schemed with Daniels, Fan and Harrison by filing false Forms 211 with FINRA, signing false securities deposit forms and executing trades in Spartan Securities' proprietary account, all in support of the manufacture of undisclosed public vehicles – one of which Eldred expressly proposed to acquire himself while its Form 211 was pending.

7. A necessary step in both fraudulent schemes was for the issuer's stock to be eligible for public quotation, which requires a broker-dealer to file a Form 211 application with FINRA to demonstrate compliance with Rule 15c2-11 under the Securities Exchange Act of 1934 ("Exchange Act"). FINRA typically raises specific concerns or seeks further information from the broker-dealer in one or more deficiency letters before clearing the application. Meanwhile, transfer agents perform a number of roles for issuers pertaining to their securities and shareholders, including recording changes of ownership, maintaining the issuer's security

holder records, canceling and issuing certificates, and resolving problems arising from lost, destroyed or stolen certificates.

8.      Spartan Securities and Island Stock Transfer acted in tandem to provide these various services which were critical to the Mirman/Rose and Daniels/Fan/Harrison shell factories.  For example, Spartan Securities filed the Form 211 application with FINRA in order for the securities of these 19 issuers to be publicly quoted.  Spartan Securities, Dilley, and Eldred made materially false statements and omissions to FINRA regarding the purpose, management and shareholders of the Mirman/Rose Companies and Daniels Companies. Spartan Securities and its principals also had information that undermined any reasonable basis that the information required by Rule 15c2-11 was materially accurate and from a reliable source.  Spartan Securities then initiated unpriced quotations for all the Mirman/Rose Companies and Daniels Companies (except PurpleReal) upon FINRA's clearance of the Form 211.

9.      Lopez was a Spartan Securities principal who, with Dilley and Eldred's knowledge, personally undertook responsibility for much of the Form 211 process on at least four Mirman/Rose Companies.  In addition, Lopez was Spartan Securities' Chief Compliance Officer and the principal responsible for effectuating its extensive written policies and procedures applicable to Form 211 applications.  Nonetheless, Lopez knowingly or recklessly ignored those procedures and the other requirements inherent in Rule 15c2-11, including failing to conduct any investigation or inquiry into red flags raised by FINRA in the deficiency letters and other adverse information in Spartan Securities' possession, or even to familiarize himself with the issuers.  As a result, Lopez was a substantial factor in Spartan Securities'

4

failure to have a reasonable basis for believing that required information about those four Mirman/Rose Companies was accurate and from a reliable source.

10.     After obtaining Form 211 clearance for the Mirman/Rose Companies, Spartan Securities and Island Stock Transfer then initiated and provided false information for applications filed with DTC through which the securities became eligible for electronic clearance.  Island Stock Transfer also effectuated both the bulk issuance and transfer of the Mirman/Rose Company securities without restriction despite Dilley's knowing (or recklessly not knowing) and numerous red flags that the securities were in the hands of affiliates and therefore restricted, while Spartan Securities effectuated the unlawful deposit and open-market sales of some Daniels Company shares by signing false deposit requests and entering pre-arranged trades through a proprietary account.

11.     As a result of the conduct alleged in this Complaint:

(a)     Defendant Spartan Securities violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(3), and Sections 10(b) and 15(c)(2) and Rules 10b-5 and 15c2-11 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c)(2) and 17 C.F.R. §§ 240.10b-5, 240.15c2-11; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5;

(b)     Defendant Island Stock Transfer violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(3), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R.

§ 240.10b-5; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5;

(c)     Defendant Dilley violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(3), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Sections 10(b) and 15(c)(2) and Rules 10b-5 and 15c2-11 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c)(2), and 17 C.F.R. §§ 240.10b-5, 240.15c2-11;

(d)     Defendant Eldred violated Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(3), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Sections 10(b) and 15(c)(2) and Rules 10b-5 and 15c2-11 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c)(2), and 17 C.F.R. §§ 240.10b-5, 240.15c2-11;

(e)     Defendant Lopez aided and abetted violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2) and 17 C.F.R. § 240.15c2-11; and

(f)     Unless enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

12.     The Commission therefore respectfully requests the Court enter an order: (i) permanently enjoining Defendants from violating the federal securities laws; (ii) directing Island Stock Transfer to pay disgorgement with prejudgment interest; (iii) directing Defendants

to pay civil money penalties; and (iv) imposing penny stock bars against Spartan Securities, Dilley, Eldred and Lopez.

## II.  DEFENDANTS AND OTHER RELEVANT PERSONS

### A.  DEFENDANTS

13.     **Spartan Securities** has been registered with the Commission as a broker-dealer since 2001, with its principal place of business in Clearwater, Florida.  Spartan Securities is a Florida limited partnership wholly owned by Connect X Capital Markets LLC ("Connect X"), whose managing member is Eldred and shareholders have included Dilley, Eldred and Lopez. Between 2009 and 2018, Spartan Securities has been the subject of at least 10 disciplinary actions by FINRA or the NASDAQ Stock Market.

14.     **Island Stock Transfer** has been registered with the Commission as a transfer agent since 2003, with its principal place of business in Clearwater, Florida.  Island Stock Transfer is a Florida limited liability company wholly owned by Connect X that shares office space, computer systems, officers and employees with Spartan Securities.

15.     **Dilley**, a resident of Seminole, Florida, was a registered principal and representative of Spartan Securities from 2004 to 2015.  Dilley was also the President of Island Stock Transfer from 2004 until January 2018.  Dilley is presently the Vice President of another registered transfer agent owned by Connect X and of which Eldred and Lopez are also officers.

16.     **Eldred**, a resident of Seminole, Florida, has been a registered principal and representative of Spartan Securities and the Chief Executive Officer of Island Stock Transfer from 2001 to the present.

17.   **Lopez**, a resident of St. Petersburg, Florida, has been a registered principal and Chief Compliance Officer of Spartan Securities from March 2001 to the present and the Chief Compliance Officer of Island Stock Transfer from August 2006 to the present.

**B.  <u>OTHER RELEVANT PERSONS</u>**

18.   **Alvin Mirman**, of Sarasota, Florida, was the undisclosed control person of Changing Technologies, Inc. ("Changing Technologies") and an undisclosed control person, along with Rose, of On the Move Systems Corp. ("On the Move"), Rainbow Coral Corp. ("Rainbow Coral"), First Titan Corp. ("First Titan"), Neutra Corp. ("Neutra"), Aristocrat Group Corp. ("Aristocrat"), First Social Networx Corp. ("First Social"), Global Group Enterprises Corp. ("Global Group"), E-Waste Corp. ("E-Waste") and First Independence Corp. ("First Independence").  Mirman was a defendant in <u>SEC v. McKelvey et al.</u>, Case No. 15-cv-80496 (S.D. Fla. 2015), in which the Court entered, by consent, a judgment of permanent injunction, officer and director bar and penny stock bar against Mirman.  On August 19, 2016, Mirman pled guilty to a one-count Information charging him with conspiracy to commit securities fraud.  <u>U.S. v. Mirman et al.</u>, Case No. 16-cr-20572 (S.D. Fla.).  Both the Commission and criminal actions included his misconduct in connection with the Mirman/Rose Companies.  In 2007, without admitting or denying wrongdoing, Mirman consented to being barred by FINRA from association with any FINRA member.

19.   **Sheldon Rose**, of Sarasota, Florida, was the undisclosed control person of Kids Germ Defense Corp. ("Kids Germ"), Obscene Jeans Corp. ("Obscene Jeans"), Envoy Group Corp. ("Envoy") and First Xeris Corp. ("First Xeris") and an undisclosed control person, along with Mirman, of On the Move, Rainbow Coral, First Titan, Neutra, Aristocrat, First Social,

8

Global Group, E-Waste and First Independence.  The Commission entered, by consent, a cease-and-desist order, officer and director bar and penny stock bar against Rose.  In re Sheldon Rose et al., Exch. Act Rel. No. 78894 (Sept. 21, 2016).  The Commission later ordered Rose to pay disgorgement and prejudgment interest in the amount of $2,973,916.18.  In re Sheldon Rose, Exch. Act Rel. No. 80301 (Mar. 23, 2017).  On November 9, 2016, Rose pled guilty to a one-count Information charging him with conspiracy to commit securities fraud.  U.S. v. Kass et al., Case No. 16-cr-20706 (S.D. Fla.).  Both the Commission and criminal actions included his misconduct in connection with the Mirman/Rose Companies.

20.     **Michael Daniels**, of Palmetto, Florida, was the undisclosed control person of Dinello Restaurant Ventures, Inc., n/k/a AF Ocean Investment Management Co. ("Dinello/AF Ocean"), President, Chief Executive Officer, Chief Financial Officer, Treasurer and Chairman of the Board of Court Document Services, Inc., n/k/a ChinAmerica Andy Movie Entertainment Media Co. ("Court/ChinAmerica"), Principal Executive Officer, Secretary, Treasurer, Chairman of the Board and Chief Financial Officer of Quality Wallbeds, Inc., n/k/a Sichuan Leaders Petrochemical Co. ("Wallbeds/Sichuan"), Secretary, Chief Financial Officer, Treasurer, Director, and Chairman of the Board of Top to Bottom Pressure Washing, Inc., n/k/a Ibex Advanced Mortgage Technology Co. ("TTB/Ibex"), and undisclosed control person of PurpleReal.com Corp. ("PurpleReal").  On April 25, 2018, the Commission filed a Complaint against Daniels related to his conduct in connection with the Daniels Companies.  SEC v. Harrison, et al., No. 8:18-cv-01003 (M.D. Fla.).

21.     **Diane Harrison**, of Palmetto, Florida, was the Chief Financial Officer, Secretary, Treasurer and Director of Dinello/AF Ocean, Treasurer, Principal Accounting

Officer and Director of Wallbeds/Sichuan, Director and Secretary of TTB/Ibex, and President, Director, and Chairman of the Board of PurpleReal.  Harrison, an attorney, is the owner of the law firm Harrison Law, PA, which is based in Florida.  Harrison, who is Daniels' wife, is a defendant in the <u>SEC v. Harrison</u> case based on her conduct with respect to the Mirman/Rose Companies and the Daniels Companies.

22.     **Andy Fan**, of Las Vegas, Nevada, was the President, Treasurer, Chief Executive Officer, Chief Financial Officer and Director of Dinello/AF Ocean and Court/ChinAmerica, and was the President and Director of Wallbeds/Sichuan and TTB/Ibex. The Commission entered, by consent, a cease-and-desist order, officer and director bar and penny stock bar against Fan, and ordered him to pay a civil money penalty of $140,000.  <u>In re Andy Z. Fan</u>, Securities Act Rel. No. 10487 (Apr. 25, 2018).  The Commission's action related to Fan's conduct with respect to certain of the Daniels Companies.

### III.  <u>JURISDICTION AND VENUE</u>

23.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a); and Sections 21(d), 21(e) and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a).

24.     The Court has personal jurisdiction over Defendants and venue is proper in this District because, among other things, some or all of the Defendants reside or transact business in this District and/or participated in the offer, purchase, or sale of securities in this District, and many of the acts and transactions constituting the violations alleged in this Complaint occurred in this District.  In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Commission's claims occurred here.

25.     In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, have made use of the means or instrumentalities of interstate commerce, the means or instruments of transportation or communication in interstate commerce, and of the mails.

## IV.  FACTUAL ALLEGATIONS

### A.     The Mirman/Rose Shell Factory

26.     Mirman and Rose, alone or together, manufactured at least 14 undisclosed "blank check" companies in assembly-line fashion in order to sell in bulk the entire deceptive float of purportedly unrestricted securities.

27.     Mirman and Rose manufactured each Mirman/Rose Company in a similar fashion.   Mirman and Rose recruited a sole officer, director, employee, and majority shareholder (the "sole officer") to act in name only.  Mirman and Rose prepared and filed false and misleading registration statements with the Commission (the "Forms S-1") misrepresenting that the sole officer was pursuing a specific business plan (versus Mirman and Rose controlling mere shells to sell all the securities in bulk) and would be solely responsible to solicit investors for the company (versus Mirman and Rose using similar rosters of friends and family to "invest" in name only).

28.     After the Form S-1 became effective, Mirman and Rose solicited the same or virtually the same number of friends and family as shareholders while maintaining complete control through stock certificates with blank stock powers, which are signed by the named shareholder and entitle whoever holds the stock certificate to sell or transfer it.

11

29.     Mirman and Rose directed Spartan Securities and Island Stock Transfer to prepare applications with FINRA and DTC that contained materially false and inaccurate information in order to make the Mirman/Rose Companies marketable as public vehicles. Specifically, Mirman and Rose needed the purportedly public float of securities available for immediate public quotation and sale through DTC electronic clearance.  Mirman and Rose then effectuated the bulk sale of the shares of the issuer for a single cash price by delivering all the stock certificates with blank stock powers to a single buyer group.  Mirman and Rose split the net proceeds after paying a nominal amount to their straw sole officer and shareholders.

30.     Mirman and Rose, alone or together, created and developed the following Mirman/Rose Companies:

| Mirman/Rose Company | Control Person(s) | Effective Date of Form S-1 | Date of Change of Control | Time Between Form S-1 and Change of Control |
|---|---|---|---|---|
| Kids Germ | Rose | 12/2009 | 2/2010 | 3 months |
| Obscene Jeans | Rose | 8/2010 | 12/2010 | 4 months |
| On the Move | Mirman/Rose | 12/2010 | 6/2011 | 6 months |
| Rainbow Coral | Mirman/Rose | 1/2011 | 10/2011 | 9 months |
| First Titan | Mirman/Rose | 2/2011 | 9/2011 | 7 months |
| Neutra | Mirman/Rose | 4/2011 | 11/2011 | 7 months |
| Aristocrat | Mirman/Rose | 11/2011 | 7/2012 | 8 months |
| First Social | Mirman/Rose | 3/2012 | 2/2013 | 11 months |
| Global Group | Mirman/Rose | 3/2012 | 4/2013 | 13 months |
| E-Waste Corp. | Mirman/Rose | 6/2012 | 4/2013 | 10 months |

| Mirman/Rose Company | Control Person(s) | Effective Date of Form S-1 | Date of Change of Control | Time Between Form S-1 and Change of Control |
|---|---|---|---|---|
| First Independence | Mirman/Rose | 8/2012 | 5/2013 | 9 months |
| Envoy Group | Rose | 9/2013 | 4/2014 | 7 months |
| Changing Technologies | Mirman | 10/2013 | 6/2014 | 8 months |
| First Xeris | Rose | 1/2014 | N/A | N/A |

31.     Mirman and Rose never intended to take any step to advance the purported business plan stated in the Form S-1.  Rather, as evidenced in part by the short amount of time between Form S-1 effectiveness and the change of control, Mirman and Rose solely sought to manufacture a public vehicle in assembly-line fashion, and sell all its securities in bulk once obtaining the necessary clearances from the Commission, FINRA, and DTC.

32.     Mirman and Rose retained Spartan Securities and Island Stock Transfer for a number of critical steps to develop the Mirman/Rose Companies in quick succession from Form S-1 effectiveness to public vehicles with securities eligible for public quotation and electronic clearance.

33.     Mirman and Rose routinely contacted Dilley to simultaneously start broker services through Spartan Securities and transfer agent services through Island Stock Transfer. Mirman or Rose emailed Dilley stating that the issuer's Form S-1 recently had gone effective and "[w]e want to start a 15c211" and have Island Stock Transfer act as transfer agent.  Dilley instructed Spartan Securities and Island Stock Transfer employees to send the materials for, respectively, the Form 211 application and transfer agent services to Mirman or Rose.

34.     Spartan Securities and Island Stock Transfer, which share office space, computer systems, officers and employees, acted in tandem for the Mirman/Rose Companies. For example, Island Stock Transfer prepared certified shareholder lists at the request and upon the approval of Mirman and Rose.  Spartan Securities then submitted those shareholder lists to FINRA as part of the Form 211 applications.

35.     Spartan Securities and Island Stock Transfer's actions allowed Mirman and Rose to sell the Mirman/Rose Companies via the bulk sale of all the issued securities to a small buyer group generating combined proceeds totaling at least $3.7 million:

| Mirman/Rose Company | Spartan Securities Form 211 Signatory | Island Stock Transfer Original Issuance | FINRA Form 211 Clearance | DTC Filing | Island Stock Transfer Bulk Transfer To Buyer Group |
|---|---|---|---|---|---|
| Kids Germ | Dilley | 12/2009 | 1/2010 | 1/2010 | 2/2010 |
| Obscene Jeans | Dilley | 8/2010 | 9/2010 | 10/2010 | 12/2010 |
| On The Move | Dilley | 1/2011 | 2/2011 | 4/2011 | 6/2011 |
| Rainbow Coral | Dilley | 2/2011 | 3/2011 | 7/2011 | 10/2011 |
| First Titan | Dilley | 4/2011 | 5/2011 | 7/2011 | 9/2011 |
| Neutra | Dilley | 6/2011 | 7/2011 | 8/2011 | 11/2011 |
| Aristocrat Group | Dilley | 12/2011 | 12/2011 | 2/2012 | 7/2012 |
| First Social Networx | Dilley | 3/2012 | 4/2012 | 7/2012 | 2/2013 |
| Global Group | Dilley | 4/2012 | 5/2012 | 8/2012 | 4/2013 |
| E-Waste | Dilley | 7/2012 | 8/2012 | 9/2012 | 4/2013 |
| First Independence | Dilley | 2/2013 | 3/2013 | 4/2013 | 5/2013 |
| Envoy Group | Dilley | N/A | 12/2013 | N/A | N/A |
| Changing Technologies | Dilley | 11/2013 | 1/2014 | 4/2014 | 6/2014 |
| First Xeris | Dilley | 1/2014 | 3/2014 | 4/2014 | N/A (SEC stop order) |

**Dilley's Knowledge of/Participation in the Mirman/Rose Fraud**

36.     Dilley, a registered principal of Spartan Securities and Island Stock Transfer, knew or was reckless in not knowing that Mirman and Rose were manufacturing the Mirman/Rose Companies to control and sell a deceptive float of purportedly unrestricted securities (versus the material misrepresentations in the Forms 211 and Commission filings that the issuers were legitimate startups controlled by the nominee sole officer with an independent shareholder base).

37.     Dilley knew or was reckless in not knowing of Mirman and Rose's undisclosed control of and intent for the Mirman/Rose Companies with the earliest issuer, Kids Germ.  Rose solicited Dilley to have Spartan Securities file the Kids Germ Form 211.  On January 4, 2010 – the same day FINRA cleared the Form 211 – Rose emailed Dilley: "What do you recommend [Kids Germ] do with the DTC, know[ing] the route it is taking?  Do you want to speak to the attorney interested in the company, or do you want me to call him?  If you want me to call him, please forward telephone number."  By email that same day, Dilley responded: "We should apply for DTC eligibility.  Let me call you on this once I talk to [the attorney]."

38.     On January 13, 2010, Island Stock Transfer initiated the DTC application for Kids Germ misrepresenting "the company is not a shell" despite Dilley knowing or recklessly not knowing it was a shell because of, among other things, its lack of assets or revenues and knowing "the route it is taking."  One month later, Island Stock Transfer transferred the Kids Germ shares from Rose's friends and family in bulk without a restrictive legend stamped on the certificate to indicate that the shares are restricted from transfer or sale.  Dilley knew or was reckless in not knowing that these shareholders were affiliates of Kids Germ because of

Rose's control over all their shares to effectuate a bulk sale of Kids Germ and therefore, the shares should have been restricted from transfer or sale.

39.     For the second Mirman/Rose Company, Obscene Jeans, Dilley signed the Form 211.  On September 3, 2010 (the day FINRA cleared the Form 211), at Rose's request, Dilley contacted a DTC participant firm to file a DTC application for Obscene Jeans.  By email dated October 4, 2010, Dilley's assistant forwarded to Rose (copying Dilley) the DTC participant firm's refusal to file the application because it was "looking to sponsor operating companies. We understand that having a shell DTC eligible raises its price but we are just not interested in the risk that the company falls into the wrong people's hands."  The following week, despite this admonition, Dilley's assistant asked the firm to reconsider filing the application.  The firm agreed, and Spartan Securities re-initiated the DTC application at the behest of Dilley.

40.     In the meantime, by email dated October 5, 2010, Rose sent Dilley a term sheet for the sale of Obscene Jeans making no mention of the sole officer or purported business plan and focusing largely on the share structure and tradeability status (for example, the shares were quoted with one market maker, which was Spartan Securities).  The term sheet also listed that Obscene Jeans had no liabilities and only $20,000 in assets (all cash).

41.     On October 22, 2010, a buyer emailed Dilley (copying Rose) that "we are closing on [Obscene Jeans] – can you post a bid-ask today?"  The following day, Dilley emailed Rose: "I have to have someone open an account and deposit shares and offer some for sale. . . . I have never seen this to be a requirement from anyone wanting a shell."

42.     On October 25, 2010, Rose emailed Dilley: "I told our mutual friend ???? today to F off, respectfully.  Thanks for your effort."

43.     These various documents and events involving Dilley in September and October 2010 were clear signs that Obscene Jeans was a blank check company and Rose controlled all shares of Obscene Jeans for sale in bulk.

44.     One month later, Rose asked Dilley for Island Stock Transfer to act as escrow agent for the sale of Obscene Jeans.  At Rose's request, Dilley signed an escrow agreement on behalf of Island Stock Transfer by which all of the shares of Obscene Jeans (both the control block and all purportedly unrestricted shares in the names of the 24 nominee shareholders) were being sold pursuant to one stock purchase agreement for $440,000.   All of these documents and communications received by Dilley were clear signs that Obscene Jeans was a blank check company and Rose controlled all shares of Obscene Jeans for sale in bulk.

45.     Dilley communicated exclusively with Mirman and Rose, and was aware that they directed the finances across the Mirman/Rose Companies.  For example, by email dated September 19, 2011, Mirman told an Island Stock Transfer employee: "We spoke to Carl [Dilley] and told him we will pay [the Rainbow Coral invoice] through the Neutra account," despite Rainbow Coral and Neutra purportedly being unrelated companies with separate management.  Dilley told that same employee (copying Mirman): "We went through what was supposed to happen with this."  The following month (and on the same day) Dilley signed the stock certificates by which all the shares of both Rainbow Coral and Neutra were sold to the same buyers represented by the same counsel, demonstrating Dilley knew or was reckless in not knowing that Mirman and Rose controlled all shares of both issuers.

46.     Dilley knew or was reckless in not knowing that Mirman and Rose similarly manufactured E-Waste and Global Group for sale.  By email dated December 4, 2012, Mirman

wrote Dilley: "We [Mirman and Rose] are in the process of selling E-Waste and the attorney wants," among other things, "[c]onfirmation from the T[ransfer] A[gent] that it has not put restrictions on any free trading shares."  Dilley responded "will do," and instructed Island Stock Transfer's Director of Operations to prepare the letter.  Dilley signed the requested letter, and was copied on the transmittal of the letter exclusively to Mirman.  The Director of Operations soon thereafter signed the stock certificates transferring all of E-Waste's issued shares per the buyer's counsel's instructions.

47.     By email dated January 1, 2013, Rose wrote Dilley: "Please send [the] same letter [as E-Waste] but for Global [Group] and e-mail to me ASAP."  Dilley signed that requested letter as well at Rose's request.

48.     On January 16, 2013, the buyer's counsel for E-Waste sent an instruction letter to Island Stock Transfer enclosing a stock purchase agreement expressly stating that "all of the free trading shares of the Company consisting of an aggregate of 3,000,000 shares" were simultaneously being purchased pursuant to stock purchase agreements "of like tenor" with Rose as "Seller's Representative," evidencing that Rose, from whom Island Stock Transfer had exclusively taken instructions to date, controlled the bulk sale of all the "free-trading" shares.

49.     By email dated February 27, 2013, Mirman asked Dilley how to handle a lost certificate of one of the "free-trading" shareholders because "Sheldon [Rose] is in New York today closing Global."  Dilley instructed Island Stock Transfer's Director of Operations to respond to Mirman's request.  Island Stock Transfer effectuated the bulk transfer of virtually

all shares of Global Group to the same exact small group of buyers as E-Waste represented by the same counsel.

50.     Dilley also assisted Rose's efforts to sell the last Mirman/Rose Company, First Xeris.  Soon after FINRA's clearance of Spartan Securities' Form 211 for First Xeris in March 2014, a shell finder emailed Dilley: "I understand Sheldon Rose is trying to contact you regarding his new company [First Xeris] being dropped to Pink[] [Sheet] from QB based on the new bid/ask rules.  I have a buyer for it, but not as a pink."  Dilley then placed daily bids in the open market at Rose's request.  Accordingly, Dilley knew or was reckless in not knowing that First Xeris was a company that Rose controlled and was looking to sell.

### Spartan Securities' Involvement in the Mirman/Rose Fraud

51.     With Dilley's knowing or reckless involvement, Spartan Securities made crucial contributions to the Mirman/Rose fraud.

52.     Dilley's assistant as of 2012 prepared the Form 211 and all related documents based on templates.  The assistant was instructed that a Spartan Securities' principal would review the assistant's draft and revise it to match the facts particular to each issuer.  Dilley's assistant submitted the Form 211 only upon Dilley's approval.  The assistant would similarly draft responses to FINRA deficiency letters for review by a Spartan Securities principal (Lopez from early 2013 onward), and only sent the responses to FINRA upon that principal's (usually Lopez) express approval.

53.     Dilley signed the Forms 211 for the Mirman/Rose Companies but was largely uninvolved in responding to FINRA's deficiency letters or investigating any red flags identified by FINRA.

54.     By letter dated February 8, 2013, the Commission's examination staff identified deficiencies and weaknesses in Spartan Securities' compliance with certain federal securities laws, including (1) Spartan Securities' possible violation of Rule 15c2-11 by failing to adequately address numerous red flags and provide material information to FINRA in connection with an unrelated Form 211 application, and (2) Lopez's failure to adequately implement Spartan Securities' written procedures regarding Forms 211 which required Lopez to review the information outlined in Rule 15c2-11 together with any supplemental information obtained and to be alert to red flags.

55.     As of 2013, Dilley and Eldred instructed the assistant to send draft responses to the FINRA deficiency letters to Lopez for review and approval.  For example, by email dated October 18, 2013, the assistant wrote Eldred: "I know that Dave [Lopez] looks at these [draft deficiency responses] now, but he's been slammed . . . . Any chance you can make an exception and review this one?"  Dilley tasked Lopez with that responsibility, for example, when Dilley was unavailable or because Lopez "has got a lot more experience."

56.     Mirman and Rose were Spartan Securities' primary source of information throughout the Form 211 process.  Mirman and Rose would provide Spartan Securities with documents in the name of the sole officer and many documents they prepared themselves, including spreadsheets detailing who solicited the shareholders and the relationship between the solicitor and shareholder.  There were substantial similarities in these shareholders lists, including the sole officer of First Social appearing as a shareholder of 10 other Mirman/Rose Companies.

57.    The assistant sent FINRA deficiency letters to Mirman and Rose without confirming or inquiring into the authority of Mirman and Rose to act for the Mirman/Rose Companies (i.e. if they were a reliable source of information), despite the fact that Mirman and Rose were not officers, directors or even named shareholders of any of the Mirman/Rose Companies.

58.    Sometimes within one week of Mirman and Rose's solicitation, Spartan Securities submitted the Form 211 and a cover letter (with exhibits) to FINRA.  However, Spartan Securities consistently misrepresented that: (1) the sole officer – not Mirman or Rose – called Dilley based on a referral (often from an attorney); (2) Spartan Securities agreed to file the Form 211 after "months" of due diligence; and (3) Spartan Securities had no prior relationship with the issuer or any of its "representatives" (despite repeatedly filing Forms 211 at Mirman and Rose's request).

59.    For example, by email dated November 6, 2013, Rose solicited Dilley to file a Form 211 for Envoy Group and told Dilley:  "We know the process, included is some due dil[igence] per our conversation" including a chart listing the Form S-1 shareholders and their purported relationships with each other.  Spartan Securities filed the Envoy Group Form 211 five days later, misrepresenting that Envoy Group's sole officer contacted Dilley (with no mention of Rose), Spartan Securities had conducted due diligence over the past month, and Spartan Securities had no other relationship with Envoy Group's "representatives."

60.    Each Form 211 cover letter also misrepresented that the issuer was "not working with any consultants" despite Dilley knowing or being reckless in not knowing that

Mirman and Rose had no publicly disclosed association with the Mirman/Rose Companies yet took various critical actions on their behalf.

61.     Each Form 211 cover letter also misleadingly stated that "there are no other companies that the current officers or directors have requested a listing quotation on," despite Dilley knowing or being reckless in not knowing that Mirman or Rose, who acted as de facto officers and directors, had requested all Forms 211 for the Mirman/Rose Companies.

62.     Each Form 211 cover letter also misrepresented that the issuer was not in negotiations for any actual or potential merger or acquisition, despite Dilley knowing or being reckless in not knowing that the first Mirman/Rose Company had been available for sale upon Form 211 clearance by FINRA and his involvement in numerous other sales by Mirman and Rose shortly after Form 211 clearance.

63.     Each cover letter also attached a shareholder chart stating that the sole officer had solicited each shareholder as a "friend" and that no other people had been solicited to invest, when in fact Mirman and Rose had solicited the shareholders and reused many of the same shareholders across up to 12 Mirman/Rose Companies.  Dilley knew or was reckless in not knowing that Mirman and Rose controlled all the shares given, among other things, the substantial similarities across the shareholder lists.

64.     Each Form 211 cover letter also misrepresented that the Mirman/Rose Company was following a specific business plan, despite Dilley knowing or being reckless in not knowing that the issuer was merely a public vehicle being packaged for sale and controlled by Mirman and Rose.

65.     Each Form 211 also misrepresented that Spartan Securities was not aware or in possession of any material information, including adverse information, regarding the Mirman/Rose Company, despite Dilley knowing or being reckless in not knowing that Mirman and Rose were undisclosed control persons developing the Mirman/Rose Company as a mere public vehicle to be sold as a shell.

66.     No one at Spartan Securities questioned the accuracy of the Rule 15c2-11(a) information for any of the Mirman/Rose Companies.   The Forms S-1 described start-up companies run exclusively by the sole officer with no mention of Mirman or Rose.   Dilley did not even review (but "just kept on file") the Forms S-1 which were strikingly similar across the Mirman/Rose Companies, including: (1) the same number of issued shares; (2) similar annual budgets (purportedly for effectuation of vastly different business plans); (3) the same small offering size (dwarfed by the annual budgets); and (4) similar assets (all cash and substantially the same amount):

## MIRMAN/ROSE COMPANY FORM S-1 DISCLOSURES

| Mirman/Rose Company | Form S-1 Shares | Form S-1 Offering Size | # Of Shares In Name Of Sole Officer | Total Assets (All Cash) | Operating Budget (Duration) | Sole Officer # of Hours Work Week |
|---|---|---|---|---|---|---|
| **Kids Germ** | 3,000,000 | $30,000 | 9,000,000 | $5,351 | $400,000 (18 months) | 10-25 hours |
| **Obscene Jeans** | 3,000,000 | $52,500 | 9,000,000 | $9,000 | $500,000 (18 months) | 10-25 hours |
| **On The Move** | 3,500,000 | $52,500 | 9,000,000 | $9,000 | $477,500 (12 months) | 10-25 hours |
| **Rainbow Coral** | 2,500,000 | $31,250 | 9,000,000 | $8,912 | $500,000 (18 months) | 10-25 hours |
| **First Titan** | 3,000,000 | $37,500 | 9,000,000 | $8,922 | $587,500 (18 months) | 10-25 hours |
| **Neutra** | 3,000,000 | $42,000 | 9,000,000 | $8,900 | $425,000 (12 months) | 10-25 hours |
| **Aristocrat** | 3,900,000 | $39,000 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| **First Social** | 3,000,000 | $45,000 | 9,000,000 | $8,900 | $475,000 (18 months) | 10-25 hours |
| **Global Group** | 3,000,000 | $34,500 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| **E-Waste** | 3,000,000 | $36,000 | 9,000,000 | $8,301 | $600,000 (18 months) | 10-25 hours |
| **First Independence** | 3,000,000 | $34,500 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| **Envoy Group** | 3,000,000 | $37,500 | 9,000,000 | $8,908 | $612,500 (18 months) | 10-25 hours |
| **Changing Technologies** | 3,000,000 | $30,000 | 9,000,000 | $8,900 | $339,000 (18 months) | 10-25 hours |
| **First Xeris** | 3,000,000 | $39,000 | 9,000,000 | $8,976 | $650,000 (18 months) | 10-25 hours |

67.     Moreover, many Mirman/Rose Companies publicly filed periodic reports with the Commission prior to Form 211 clearance which reported no assets, revenues, or expenses other than professional fees.

68.     In at least 7 deficiency letters (including those for First Independence, Changing Technologies and First Xeris), FINRA requested detailed information with respect to the circumstances surrounding the registered offering per the Form S-1, including how many persons were solicited and ultimately invested.   Spartan Securities submitted shareholder charts stating that the sole officer had solicited each shareholder as a "friend," and reported the same solicitation success rate (24 solicited, 24 invested).   The lists had remarkably similar features, including the same number of shares and shareholders, and overlapping rosters (some shareholders were the sole officer of other Mirman/Rose Companies and appeared on up to 12 lists).

69.     In at least 12 deficiency letters (including those for First Independence, Envoy Group and First Xeris), FINRA specifically inquired whether anyone other than the named shareholders had control over any aspect of the shares, including "any past, present, or future arrangements."   Spartan Securities conducted no inquiry despite, among other things, the striking similarities across rosters that contained the same shareholder names, Dilley's involvement in bulk sales of all shares by Mirman and Rose, and Island Stock Transfer's bulk issuance and transfer of all shares of Mirman/Rose Companies.

70.     Spartan Securities also failed to inquire regarding numerous red flags as required by Rule 15c2-11, which requires a broker-dealer to evaluate any "adverse information" in its possession when determining whether it has a reasonable basis for the

25

accuracy of information and reliability of its source.  For Spartan Securities, such red flags included the substantial similarities in the Forms S-1, the substantially similar shareholder rosters, the use of sole officers who were related to each other and appeared as shareholders on other Mirman/Rose Companies, and Mirman and Rose as the same solicitors and sources of information across the Mirman/Rose Companies.

71.     FINRA also posed several other issuer-specific questions or concerns in its deficiency letters.  In responding to FINRA's deficiency letters, Spartan Securities did not follow its own written policies and procedures which required that the assistant "together with the CCO or other designated officer gather information from the issuer to respond to the FINRA comments" in deficiency letters and investigate red flags.  Spartan Securities' procedures further required the designated officer to initial each page of correspondence to FINRA evidencing that review and investigation.  None of Spartan Securities' correspondence to FINRA in connection with the Mirman/Rose Companies contained any such initials.

72.     Lopez cursorily reviewed and approved Spartan Securities' responses to at least the following deficiency letters for the Forms 211 of First Independence, Envoy Group, Changing Technologies and First Xeris:

| Mirman/Rose Company | Date of FINRA Deficiency Letter | Date of Spartan Response | Number of Questions from FINRA |
|---|---|---|---|
| First Independence | 2/27/2013 | 3/12/2013 | 7 |
| Envoy Group | 11/21/2013 | 11/25/2013 | 6 |
| Envoy Group | 12/5/2013 | 12/9/2013 | 1 |
| Envoy Group | 12/17/2013 | 12/18/2013 | 1 |
| Changing Technologies | 12/3/2013 | 12/17/2013 | 4 |
| First Xeris | 2/7/2014 | 2/13/2014 | 5 |

73.     Lopez approved each response within an hour of the assistant's request, making no inquiry into FINRA's questions (or the issuer more generally) despite FINRA raising at least 24 questions about these four issuers.

74.     For example, FINRA questioned whether First Independence was a "shell company" despite its non-shell designation in periodic reports.  Despite understanding that any shell issue should be investigated by asking the issuer basic questions about its business operations to see whether it is a "blank check company, that there's an ongoing effort to further the business plan," Lopez made no such investigation or inquiry with respect to First Independence's business operations or purpose.

75.     Spartan Securities (including Lopez) failed to review Rule 15c2-11 information or inquire further regarding red flags that were expressly raised by FINRA on the subsequently filed Forms 211.  On the Envoy Group Form 211, in its deficiency letter dated November 21, 2013, FINRA asked Spartan Securities for detailed descriptions of the relationships between: (1) Envoy Group, Jocelyn Nicholas (Envoy Group's sole officer) and Mark Nicholas (Kids Germ's sole officer); (2) Envoy Group, Jocelyn Nicholas, Mark Nicholas, and Kids Germ; and (3) Mark Nicholas and Spartan Securities.  By email dated November 22, 2013, Dilley's assistant forwarded this letter to Dilley and Lopez, and alerted them to the facts that "Shelly [Rose] sent us this one" and that Spartan Securities had filed the Form 211 for Kids Germ. Dilley and Lopez conducted no investigation into the two issuers (including whether Rose was a reliable source for Envoy Group) or Spartan Securities' relationship with either of them. Specifically, Lopez merely told the assistant that "I am not familiar with any of those people or that company," and Dilley instructed the assistant simply to rely on Envoy Group's

response.  Lopez then approved the deficiency response, which misrepresented that the only relationship among all the identified parties was the spousal relationship between Jocelyn and Mark Nicholas, Envoy Group's sole officer had "no participation in any way with Kids Germ," and Spartan Securities had no relationship with Kids Germ "and/or any of its representatives."

76.     In its deficiency letter dated November 25, 2013, FINRA inquired a second time for details of any relationship between Envoy Group's sole officer and Kids Germ.  Lopez approved the deficiency response, which misrepresented that Envoy Group's sole officer's only relationship with Kids Germ was as a 0.42% shareholder despite the fact that she was also an officer of Kids Germ.

77.     Dilley and Lopez had numerous facts readily in their possession contradicting these representations and the Rule 15c2-11 information, including: (1) Spartan Securities through Dilley filed both the Envoy Group and Kids Germ Form 211, and Kids Germ's DTC application, at Rose's request; (2) Spartan Securities possessed numerous documents showing that Envoy Group's sole officer had become a Kids Germ officer per Spartan Securities' advice to Rose to obtain DTC eligibility; (3) Lopez acted on Rose's authorization to speak with an auditor for Kids Germ despite Rose not being an officer, director, or authorized person on Kids Germ's Corporate Authorization Form; (4) Envoy Group and Kids Germ had 11 shareholders in common (including the sole officers of two other Mirman/Rose Companies) and the same capitalization structure (9,000,000 share control block, 3,000,000 Form S-1 shares among 24 shareholders); and (5) Dilley attempted to arrange a sale of Kids Germ for Rose.

78.     On November 6, 2013, Mirman told Dilley "I need to file a 211 through your firm" for Changing Technologies.  That same day, Rose had solicited Dilley to file the Form

211 for Envoy Group.  Dilley told Mirman:  "Funny you guys called me within a few minutes of each other."  Dilley then put Spartan Securities and Island Stock Transfer employees in contact with Mirman, who in turn approved the certified shareholder list for Changing Technologies which Spartan Securities submitted to FINRA with the Form 211.

79.    Dilley drafted the portion of the Form 211 representing that Mirman had referred Changing Technologies to Spartan Securities, but that Spartan Securities "does not have any other relationship with Al Mirman."  Dilley knew or was reckless in not knowing that this statement was false given the fact that Spartan Securities filed this and other Forms 211 at Mirman's request.

80.    By deficiency letter dated December 3, 2013, FINRA asked Spartan Securities for a "detailed explanation of the Issuer's relationship with Al Mirman."  Spartan Securities sent FINRA's deficiency letter only to <u>Mirman</u> to address this and other questions.  Spartan Securities misrepresented to FINRA that the sole officer approached Mirman, a social acquaintance, for a broker-dealer recommendation and "Mirman has no relationship with Changing Technologies."  Lopez authorized this response despite Mirman having solicited Spartan Securities, sent Spartan Securities a series of documents for the Form 211, and approved the certified shareholder list which Spartan Securities submitted to FINRA with the Form 211.  Moreover, no one at Spartan Securities (including Lopez) conducted any investigation into Mirman's disciplinary history, including his being barred by FINRA in 2007 from association with any FINRA member.

**Island Stock Transfer's Involvement in the Mirman/Rose Fraud**

81.     Mirman and Rose retained Island Stock Transfer as the transfer agent for at least 12 of the Mirman/Rose Companies at or around the same time as retaining Spartan Securities to file the Form 211.  For example, by email dated June 29, 2012, Dilley instructed an employee from each of Spartan Securities and Island Stock Transfer to "send [Rose] 211 docs.  [Transfer agent] agreement same terms as last deal they sent us."

82.     Dilley, Island Stock Transfer's president, originated each relationship and personally took a number of steps on behalf of Island Stock Transfer for Mirman and Rose. Island Stock Transfer's employees also ignored a host of red flags indicating that Mirman and Rose controlled the issuers as blank check companies and sold all the securities of those issuers owned by affiliates.

83.     Island Stock Transfer has extensive written policies and procedures, which it largely ignored in its various transfer agent functions for the Mirman/Rose Companies.  Island Stock Transfer's policies and procedures contained many provisions intended to ensure that Island Stock Transfer employees communicated only with authorized persons as identified in writing by the issuer clients.  As part of the initial "client" package (sent to Mirman or Rose), Island Stock Transfer requested the issuer to complete a "Corporate Authorization Form" to identify those persons with whom Island Stock Transfer could communicate about the issuer. Mirman or Rose was named as an authorized person for only two of the 12 Mirman/Rose Companies for which Island Stock Transfer acted as transfer agent, yet for all 12 companies Island Stock Transfer took directions exclusively from Mirman and Rose.

84.    Island Stock Transfer's policies and procedures also required the issuer to provide a "list of insiders/control persons" at the onset of the relationship.  Island Stock Transfer's employees requested such lists from Mirman and Rose (not the sole officer), but never received one for any of the Mirman/Rose Companies.

85.    According to Island Stock Transfer's policies and procedures, all transfer records and shareholder lists are the "highly confidential" property of the issuer, and "shall not be given to unauthorized parties under any circumstances."  Moreover, Island Stock Transfer's policies and procedures stated that "[s]hareholders may inquire about shares they own personally, but may not be provided with information concerning any other shareholder."  Nonetheless, Island Stock Transfer employees consistently provided both issuer and shareholder information to Mirman and Rose without inquiry.

86.    At Dilley's instruction, Island Stock Transfer employees exclusively communicated with and took direction from Mirman and Rose – and not the sole officer or shareholders – regarding both the issuers and the shares in the names of the friends and family.  Island Stock Transfer first prepared a certified shareholder list with personal information provided by Mirman and Rose.  Island Stock Transfer employees (some of whom were also employees of Spartan Securities, which used the lists for the pending Forms 211) requested and acted on Mirman and Rose's approval of the list.  Also, by email dated February 8, 2013, Rose instructed Dilley to make changes to the certified shareholder list of a Mirman/Rose Company.

87.    Mirman and Rose then requested Island Stock Transfer to prepare stock certificates without a restrictive legend (stamped on the certificate to indicate that the shares

31

are restricted from transfer or sale) in the names of the same number of friends-and-family shareholders (24).  Island Stock Transfer's policies and procedures provided that shares without restrictive legend "can NOT be issued in the name of an insider" (emphasis in original).  Island Stock Transfer training materials reiterated that "Insiders ALWAYS have restricted stock" (emphasis in original).  Island Stock Transfer's Director of Operations, who trained the lower-level employees, knew that "insider" included "affiliates" as defined in Rule 144 of the Securities Act.  Despite the "affiliate" definition including those controlled by or together with an issuer, the Director of Operations only looked to see if the shareholder was a named officer or 15%+ shareholder (or spouse of either one) to determine the "insider" or "affiliate" status.  Even so, Island Stock Transfer issued unlegended certificates in the name of the spouse of the sole officer for at least 4 Mirman/Rose Companies.

88.    Island Stock Transfer delivered all 24 certificates to Mirman and Rose (who were not named shareholders), despite Island Stock Transfer's policies and procedures that shareholder information could only be provided to the shareholders themselves.  For example, on February 14, 2013, Island Stock Transfer asked Rose for delivery instructions for "each certificate" of First Independence stock.  Rose directed Island Stock Transfer to "mail all of the certificates to me as always in the past."

89.    Shortly after the clearance of Spartan Securities' Form 211, Mirman and Rose requested Island Stock Transfer's assistance with DTC applications premised on the securities being unrestricted.  Island Stock Transfer submitted at least 12 DTC transfer agent attestation forms (6 signed by Dilley) attesting that it would comply with DTC's operational requirements, including exercising diligence in the related securities transactions and providing DTC with

complete and accurate information about the securities.  Island Stock Transfer also received $7,500 from Envoy Group in connection with a DTC "services agreement."

90.     Island Stock Transfer, at the direction of Mirman or Rose, routinely transferred an unlegended certificate in the name of one friend-and-family shareholder to Cede & Co. in order to secure DTC eligibility.  Dilley and other Island Stock Transfer employees also fielded Rose's frequent urgent requests for updates on the DTC applications.

91.     Island Stock Transfer then effectuated the bulk transfer of all or virtually all the securities (both the control block in the name of the sole officer and the friends-and-family shares) of at least 12 Mirman/Rose Companies through the preparation and delivery of unlegended stock certificates to a small buyer group.  The same or substantially similar groups (represented by the same counsel) purchased multiple Mirman/Rose Companies.

92.     Island Stock Transfer received instruction letters from buyer's counsel who presented Island Stock Transfer with blank stock powers (sometimes dated months earlier) for the entire set of certificates that Island Stock Transfer had originally delivered to Mirman or Rose.  The instruction letters detailed how all the shares would be transferred.  For some issuers, there was a single instruction letter indicating that all shares were simultaneously being purchased pursuant to attached stock purchase agreements "of like tenor" with Rose identified as "Seller's Representative."  For other issuers, Island Stock Transfer received 5-6 instruction letters from the same counsel in a short period of time with a series of stock purchase agreements with the same effective date and purchase price.

93.     Island Stock Transfer received a legal opinion letter for only two of the 12 bulk transfers (First Independence and First Social).  Those two letters were from the same lawyer

(Harrison) on the same day with obvious misstatements that First Independence was not a "shell" company and First Social's sole officer's spouse was not an "affiliate" of First Social.

94.     Shortly after the bulk transfers, Island Stock Transfer continued to support the small buyer groups in transferring their certificates into Cede & Co. and broker positions by which the buyer groups publicly traded shares of the Mirman/Rose Companies.  For example, First Independence became the subject of a fraudulent pump-and-dump in public trading shortly after FINRA's clearance of Spartan Securities' Form 211 and Island Stock Transfer's bulk transfer of First Independence securities.

95.     Island Stock Transfer routinely processed the bulk transfers without restrictive legend solely on the basis of the instruction letters and blank stock powers, and despite knowing or recklessly not knowing – and ignoring red flags – that the bulk transfers involved affiliates.  The bulk nature of the sale itself was indicative of the affiliate status of the sellers – i.e. the fact that all shares were being sold at the same time to a small group of buyers indicated common control over all such shares.

96.     For example, in October 2011, Island Stock Transfer transferred all the securities of two Mirman/Rose Companies (Rainbow Coral and Neutra) to the same buyers' counsel.  Dilley had recently signed the Forms 211 for both issuers upon Mirman and Rose's request.  Dilley was also aware that in September 2011 Mirman had ordered Island Stock Transfer to pay a Rainbow Coral invoice out of funds attributed to Neutra.  Also in September 2011, Rose requested that Island Stock Transfer transfer the certificate of one Neutra shareholder to a buyer who, two weeks later, was part of the bulk transfer of all other Neutra

securities.  Dilley signed unlegended certificates for both the Neutra and Rainbow Coral bulk transfers on the same day.

97.    Similarly, in December 2012 and January 2013, Dilley signed letters on behalf of Island Stock Transfer at Mirman and Rose's request expressly in furtherance of Mirman and Rose's selling E-Waste and Global Group.  In January and February 2013, Island Stock Transfer received instructions from the same buyers' counsel for the transfer of virtually all the securities of E-Waste and Global Group to the same group of five buyers (including an entity in the counsel's name).  Island Stock Transfer also received a stock purchase agreement providing that "all of the free trading shares" of E-Waste were being purchased pursuant to stock purchase agreements "of like tenor" with Rose as "Seller's Representative."

98.    Later in 2013, Island Stock Transfer similarly delivered all the shares of two other Mirman/Rose Companies (First Independence and First Social) to the same buyer's counsel based on instructions to transfer all the "free-trading" securities at the same time as the control block.

99.    In June and July 2014, Island Stock Transfer effectuated the bulk transfer of all the securities of Changing Technologies per instruction letters and blank stock powers on behalf of the same or substantially similar buyer group represented by the same counsel as at least four other Mirman/Rose Companies.  Island Stock Transfer's "batch" (the set of documents reviewed for the transfer requests) included an email exchange dated June 3, 2014, between Mirman and the buyer's counsel with respect to the stock certificate of one of the friends-and-family shareholders for whom Island Stock Transfer had already issued a new certificate in the name of Cede & Co.  The buyer's counsel told Mirman that it was missing

35

that shareholder's certificate.  Mirman responded: "His stock was deposited with [a broker] for DTC purposes.  You have to have someone open an account with [the broker] and purchase the stock at a nominal amount."  Despite these indications of Mirman's control over the bulk transfer of all the "free-trading" shares of Changing Technologies to one buyer group, Island Stock Transfer delivered unlegended certificates for all of the other outstanding shares to the buyer's counsel.

### B.   The Daniels/Fan/Harrison Shell Factory

100.   Daniels, Fan and Harrison manufactured undisclosed blank check companies based on a deceptive public float of purportedly unrestricted shares.  Other than PurpleReal, Daniels acquired a small local business and filed a Form S-1 secondary offering for shares he had gifted to approximately 30 friends and family.  Daniels and Harrison then orchestrated Form 211 and DTC applications for the float to be eligible for open-market trading and clearing.

101.   Daniels and Harrison sold their first company, Dinello/AF Ocean, to Fan for approximately $500,000 in Fan's endeavor to amass a roster of public companies for later reverse mergers with Chinese companies.  Daniels and Fan then agreed to create three more public vehicles from scratch:  Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex.

102.   Daniels and Harrison retained Spartan Securities to file the following Forms 211:

| Daniels Company | Form 211 Filing Date | Form 211 Clearance Date | Form 211 Signatory |
|---|---|---|---|
| Dinello/AF Ocean | 5/20/2011 | 06/14/2011 | Dilley |
| Court/ChinAmerica | 7/24/2012 | 8/30/2012 | Eldred |
| Wallbeds/Sichuan | 10/25/2012 | 11/30/2012 | Eldred |
| TTB/Ibex | 9/6/2013 | 10/29/2013 | Eldred |

| PurpleReal | 7/31/2014 | N/A (stop order) | Eldred |

**Eldred's Knowledge of/Participation in the Daniels/Fan/Harrison Fraud**

103.    Daniels and Harrison have been friends with Eldred for at least 10 years.
Harrison and Eldred's wife had each been the sole officer of an issuer which had been acquired
by reverse merger or other change-in-control transaction.  Harrison and Daniels had assisted
with the registration and sale of the issuer associated with Eldred's wife.  Eldred had offered
that issuer to a prospective buyer performing a "shell search" in October 2009, and Daniels
referred to that issuer as a "vehicle" in March 2010.

104.    By email dated November 30, 2010, Eldred asked Harrison if regulators would
have concern if his wife "creates another public company."  Harrison responded that she and
Daniels "are filing [Dinello/AF Ocean] under my name and it has been two years since
[Harrison's other public company's] acquisition."

105.    Eldred otherwise understood Daniels to be a principal (albeit undisclosed) of
Dinello/AF Ocean.  In April 2011, Daniels requested that Eldred prepare an Island Stock
Transfer transfer agent agreement for Dinello/AF Ocean.  In return for waiving Island Stock
Transfer's normal $7,500 setup fee, Eldred asked Harrison to modify Island Stock Transfer's
form contract by "put[ting] a paragraph in the contract that if the company does a reverse
merger or there is a change of control then . . . there is a $5,000 termination fee," a red flag
that the issuer was intended to be sold from the onset.

106.    Spartan Securities then filed Dinello/AF Ocean's Form 211 in May 2011
misrepresenting that the current and future business plan was the operation of a pizzeria, there
was no present or future arrangement with respect to the transfer of any shares, and Spartan

Securities was not aware or in possession of any material or adverse information about Dinello/AF Ocean.  Spartan Securities also misrepresented that Eldred was contacted by the named officer (other than Harrison) of Dinello/AF Ocean, whose identity Daniels and Harrison used to create the façade of independent management and who never communicated with and had not even heard of Spartan Securities or Eldred.

107.   Soon after Form 211 clearance, by email dated July 20, 2011, Daniels asked Eldred if he knew whether a law firm was "doing any [reverse mergers] that they may need a shell for?"  Two days later, Eldred referred that law firm to Daniels for "an OTCBB vehicle that [Daniels] would like to do something with."  On August 18, 2011, Daniels again asked Eldred about "available vehicles for a [reverse merger]" with Dinello/AF Ocean.

108.   Eldred also assisted Daniels with DTC eligibility for Dinello/AF Ocean.  In June 2011, Spartan Securities initiated the DTC application misrepresenting that Dinello/AF Ocean was "not a shell" and otherwise eligible for electronic clearance.  The application was granted in July 2011, but revoked because there was no subsequent deposit of shares into the DTC system.  By email dated October 10, 2011, Eldred told Daniels "I'm working on getting it fixed for you" and discussed internally that an "x-clear transaction needs to take place" for DTC eligibility to be reinstated.

109.   That same day, Eldred signed securities deposit forms misrepresenting that Daniels was never an "affiliate" of Dinello/AF Ocean.  Specifically, in signing the forms, Eldred misrepresented to Spartan Securities' clearing firm that he had "carefully reviewed" the request and supporting documents, and to his "best knowledge the information is true and

correct and is made in compliance with all applicable federal and state securities laws" – despite knowing or being reckless in not knowing that Daniels controlled Dinello/AF Ocean.

110.     On October 12, 2011, Eldred was copied on an email confirming that Spartan Securities was putting in an order to sell Dinello/AF Ocean shares on Daniels' behalf.  In fact, a Spartan Securities proprietary account purchased Daniels' shares.  Eldred confirmed with Daniels that this trade "has your problem worked out as long as DTC cooperates with our plan."

111.     As early as October 2011, Eldred knew or was reckless in not knowing that Daniels and Harrison had sold Dinello/AF Ocean to Fan.  In or about June 2012, Eldred first negotiated with Fan to use Dinello/AF Ocean as a "public shell" for a potential reverse merger with Spartan Securities and Island Stock Transfer's parent company.  By email dated July 11, 2012, Eldred wrote Fan (copying Daniels and Harrison):  "The net result is that you and your investors get an equity interest in our business, and you end up with the same basic public OTCBB shell that you have now."

112.     Eldred also became aware that Daniels and Fan were manufacturing Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex for Fan as public vehicles.  On July 24, 2012, Spartan Securities filed the Form 211 for Court/ChinAmerica with Eldred signing as the principal responsible for all related submissions to FINRA.  On July 30, 2012, Daniels told Eldred "Don't forget that Andy [Fan] has three companies that he is doing registrations on including the 211 we filed on Court.  So there should be plenty of room for you to have a meeting of the minds with [Fan].  Court is a super clean company that is a non-shell and the assets are fully depreciated so there can be a disposal of assets for a real clean deal."  By email

dated July 30, 2012, Eldred responded "I would be happy to use Court as a vehicle" while its Form 211 was pending.

113.    Eldred took further actions for Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex knowing or being reckless in not knowing that both Fan's involvement in and the purpose of the issuers were undisclosed.  On September 5, 2012, Eldred received an email (with the subject "AF Ocean Investment") from an Island Stock Transfer employee to sign up Wallbeds/Sichuan as "yet another company with [Island Stock Transfer]."  Eldred forwarded the message to Daniels and asked him to "call me."

114.    In October 2012, Eldred approved Spartan Securities' submission of a price quote to FINRA for Court/ChinAmerica per the request of an employee of Dinello/AF Ocean, which Eldred himself had referred to as a "public OTCBB shell that [Fan has] now."  In January 2013, Eldred was forwarded a request from an AF Ocean employee for a transfer agent agreement for TTB/Ibex.  Eldred then sent Daniels the TTB/Ibex agreement with the same terms as Dinello/AF Ocean, including the waiver of all upfront fees in favor of a fee in the event of a reverse merger.

115.    Despite knowing or recklessly not knowing that these issuers were being developed as public vehicles for Fan, Eldred signed the three Forms 211 misrepresenting that each issuer was pursuing local business operations with no plans for mergers or changes of control despite, for example, Eldred himself proposing to "use [Court/ChinAmerica] as a vehicle" while its Form 211 was pending.  The three Forms S-1 (part of the Rule 15c2-11(a) information) made these same misrepresentations, and also omitted any reference to Fan.  The

three Forms 211 also misrepresented that Spartan Securities had no other material or adverse information in its possession.

116.    In these three Forms 211, Spartan Securities also misrepresented that it had no relationship with any officer or representative, despite (1) Daniels assisting the Eldreds with the sale of the prior public company in the name of Eldred's wife; (2) Daniels being a customer with whom Spartan Securities entered open-market trades, (3) Eldred assisting Daniels with a shell buyer for Dinello/AF Ocean, and (4) Daniels assisting Spartan Securities in finding a potential reverse merger candidate (including all three Fan issuers).

117.    Spartan Securities also misrepresented the manner in which it was solicited to file the Form 211.  On Wallbeds/Sichuan and TTB/Ibex, Spartan Securities misrepresented that Eldred had been telephonically contacted by a "friend" (a Dinello/AF Ocean employee), and had no relationship with any of their representatives (e.g. Daniels).  FINRA then asked for more detail on the manner of solicitation in its first Wallbeds/Sichuan deficiency letter.  The assistant sent Eldred the portion of the Form 211 on the manner of solicitation:  "Am I missing something here, or did I do something wrong?"  Eldred told the preparer just to "remove the friend part," which remained in the later Form 211 for TTB/Ibex.

118.    Spartan Securities also failed to inquire further regarding the presence of other red flags.  For example, on both Court/ChinAmerica and Wallbeds/Sichuan, by letters dated July 27, 2012 and November 5, 2012, respectively, FINRA noted that numerous shareholders purportedly purchased shares with sequentially numbered cashier's checks (a potential sign of someone other than the shareholder paying for the shares).  Spartan Securities' own policies and procedures (and SEC guidance) identify the "transfer of shares by control persons, as gifts,

to third persons in order to help create a public market" as a red flag.  Without any further inquiry into the information containing red flags, Spartan Securities simply cut-and-pasted responses received on behalf of the issuers (from Harrison and a Dinello/AF Ocean employee) that one shareholder obtained the checks with cash gathered from the others, when in fact it was Daniels who provided all of the cash for the purchase of the cashier's checks.

119.    Spartan Securities ignored other red flags, including the fact that the same officers and shareholders were involved (up to 26 of the 29 shareholders overlapped on substantially similar "regression diagrams" of the history of share transfers) and each Form S-1 was for a secondary offering by which a small company was not raising any money yet incurring all the expenses related to the offering.  Eldred did not review the Forms S-1 in connection with the Forms 211 as required by Rule 15c2-11.

120.    Eldred later signed the Form 211 and received draft deficiency letter responses for TTB/Ibex.  FINRA's deficiency letter raised eight detailed questions, including inquiries into: (1) all relationships among the shareholders and officers; (2) present or future arrangements by which any person other than the named shareholder had control over the Form S-1 shares; (3) confirmation of the Form 211's representation that TTB/Ibex had no intent either to effect a sale of shares or engage in change-of-control transaction; and (4) TTB/Ibex's shell company status.  Spartan Securities cut-and-pasted a response letter drafted by a Dinello/AF Ocean employee which listed Fan merely as an officer of TTB/Ibex as of September 2013 and the shareholders (the vast majority of which were shareholders of Dinello/AF Ocean, Court/ChinAmerica, and Wallbeds/Sichuan) as friends of Daniels. However, Spartan Securities failed to disclose any aspect of the Daniels/Fan/Spartan Securities

relationship.  Specifically, Spartan Securities stated that TTB/Ibex had no intent to engage in a change-of-control transaction and that the purported business objective (local pressure washing services) would be followed for at least one year, despite Eldred knowing or being reckless in not knowing of Daniels and Fan's manufacture of public shells for Fan without regard to the purported local business operations.

121.   Beyond the initial Forms 211 (and Spartan Securities' initiation of unpriced quotations), Eldred approved submissions of priced quotations to FINRA pursuant to Rule 15c2-11 for Court/ChinAmerica, TTB/Ibex, and Wallbeds/Sichuan in December 2013, January 2014 and May 2014, respectively – just prior to the public trading in those stocks initiated by Daniels and the Dinello/AF Ocean employee.  FINRA rejected the initial $0.10 quote on TTB/Ibex given the Form S-1 offering price of $0.01.  By email dated January 6, 2014, Eldred acted upon the authorization of Daniels, who was no longer an officer of TTB/Ibex, to lower the quote to that price.

122.   In July 2014, Harrison contacted Eldred to file a Form 211 for PurpleReal.  FINRA requested proof of payment by the shareholders (many of whom were shareholders of the other Daniels Companies).  Eldred learned that Daniels and Harrison had paid for all the shares, but by email approved Spartan Securities' response to FINRA misrepresenting that the shareholders had purchased their shares.

## COUNT I

### Violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act

#### (Against Spartan Securities)

123.   The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

124.   From at least as early as January 2010 through at least May 2014, Spartan Securities published quotations for securities or, directly or indirectly, submitted quotations for publication, in any quotation medium without having a reasonable basis for believing, based on a review of the documents and information required by Rule 15c2-11(a)(1) through (a)(5) ("paragraph (a) information") together with other documents and information required by Rule 15c2-11(b), that the paragraph (a) information was accurate in all material respects and that the sources of that information were reliable.

125.   By reason of the foregoing, Spartan Securities violated, and, unless enjoined, is reasonably likely to continue to violate, Section 15(c)(2) of the Exchange Act, 15 U.S.C. 78o(c)(2), and Rule 15c2-11, 17 C.F.R. § 240.15c2-11.

## COUNT II

### Aiding and Abetting Violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act

#### (Against Dilley, Eldred, and Lopez)

126.   The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

127.    From at least as early as January 2010 through at least May 2014, Spartan Securities published quotations for securities or, directly or indirectly, submitted quotations for publication, in any quotation medium without having a reasonable basis for believing, based on a review of the paragraph (a) information together with other documents and information required by Rule 15c2-11(b), that the paragraph (a) information was accurate in all material respects and that the sources of that information were reliable, and by reason of the foregoing, violated Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11.

128.    From at least as early as January 2010 through at least March 2014, Dilley knowingly or recklessly provided substantial assistance to Spartan Securities' violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11, and is deemed to be in violation of this provision to the same extent as Spartan Securities.

129.    From at least as early as June 2011 through at least May 2014, Eldred knowingly or recklessly provided substantial assistance to Spartan Securities' violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11, and is deemed to be in violation of this provision to the same extent as Spartan Securities.

130.    From at least as early as March 2013 through at least March 2014, Lopez knowingly or recklessly provided substantial assistance to Spartan Securities' violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R.

§ 240.15c2-11, and is deemed to be in violation of this provision to the same extent as Spartan Securities.

131.    By reason of the foregoing, Dilley, Eldred, and Lopez aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11.

## COUNT III

### Violations of Section 17(a)(1) of the Securities Act

132.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

133.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly or recklessly employed any device, scheme or artifice to defraud.

**(Against Spartan Securities and Eldred – Daniels Companies)**

134.    From at least as early as May 2011 through at least August 2014, Spartan Securities and Eldred, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed any device, scheme or artifice to defraud.

135.   By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT IV

### Violations of Section 17(a)(3) of the Securities Act

136.   The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)

137.   From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer and Dilley, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

### (Against Spartan Securities and Eldred – Daniels Companies)

138.   From at least as early as May 2011 through at least August 2014, Spartan Securities and Eldred, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

139.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT V

### Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act

140.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

141.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

**(Against Spartan Securities and Eldred – Daniels Companies)**

142.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

143.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

## COUNT VI

### Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act

144.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)

145.    From at least as early as December 2009 through at least April 2014, Spartan Securities, Island Stock Transfer, and Dilley, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities.

### (Against Spartan Securities and Eldred – Daniels Companies)

146.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities.

147.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

## COUNT VII

### Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act

148.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)

149.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of securities.

### (Against Spartan Securities and Eldred – Daniels Companies)

150.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of securities.

151.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

## COUNT VIII

### Aiding and Abetting Violations of Section 17(a)(1) of the Securities Act

152.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities and Eldred – Daniels Companies)

153.    From at least as early as July 2010 through at least August 2014, Daniels, Fan and Harrison, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud, and by reason of the foregoing, violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

154.    From at least as early as May 2011 through at least August 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan, and Harrison's violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), and are deemed to be in violation of this provision to the same extent as Daniels, Fan, and Harrison.

### (Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)

155.    From at least as early as January 2009 through at least July 2014, Mirman and Rose, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud, and by reason of the foregoing, violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

156.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial

assistance to Mirman and Rose's violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), and are deemed to be in violation of this provision to the same extent as Mirman and Rose.

157.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT IX

### Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act

158.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities and Eldred – Daniels Companies)

159.    From at least as early as July 2010 through at least May 2014, Daniels, Fan, and Harrison, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and by reason of the foregoing, violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

160.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan, and Harrison's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and are deemed to be in violation of this provision to the same extent as Daniels, Fan, and Harrison.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

161.    From at least as early as January 2009 through at least July 2014, Mirman and Rose, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and by reason of the foregoing, violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

162.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and are deemed to be in violation of this provision to the same extent as Mirman and Rose.

163.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## COUNT X

### Aiding and Abetting Violations of Section 17(a)(3) of the Securities Act

164.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**(Against Spartan Securities and Eldred – Daniels Companies)**

165.     From at least as early as July 2010 through at least August 2014, Daniels, Fan and Harrison, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities, and by reason of the foregoing, violated Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

166.     From at least as early as May 2011 through at least August 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3), and are deemed to be in violation of this provision to the same extent as Daniels, Fan, and Harrison.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

167.     From at least as early as January 2009 through at least July 2014, Mirman and Rose, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities, and by reason of the foregoing, violated Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

168.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3), and are deemed to be in violation of this provision to the same extent as Mirman and Rose.

169.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

## COUNT XI

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(a) of the Exchange Act

170.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities and Eldred – Daniels Companies)

171.    From at least as early as July 2010 through at least May 2014, Daniels, Fan and Harrison, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

172.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C.

§ 78j(b) and 17 C.F.R. § 240.10b-5(a), and are deemed to be in violation of these provisions to the same extent as Daniels, Fan and Harrison.

**(Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)**

173.    From at least as early as January 2009 through at least July 2014, Mirman and Rose, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

174.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a), and are deemed to be in violation of these provisions to the same extent as Mirman and Rose.

175.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

## COUNT XII

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(b) of the Exchange Act

176.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

#### (Against Spartan Securities and Eldred – Daniels Companies)

177.    From at least as early as July 2010 through at least May 2014, Daniels, Fan and Harrison, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

178.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b), and are deemed to be in violation of these provisions to the same extent as Daniels, Fan and Harrison.

#### (Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)

179.    From at least as early as January 2009 through at least July 2014, Mirman and Rose directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted

to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

180.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b), and are deemed to be in violation of these provisions to the same extent as Mirman and Rose.

181.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

## COUNT XIII

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(c) of the Exchange Act

182.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

### (Against Spartan Securities and Eldred – Daniels Companies)

183.    From at least as early as July 2010 through at least May 2014, Daniels, Fan and Harrison, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in

connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

184.    From at least as early as May 2011 through at least May 2014], Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c), and are deemed to be in violation of these provisions to the same extent as Daniels, Fan and Harrison.

### (Against Spartan Securities, Island Stock Transfer, and Dilley – Mirman/Rose Companies)

185.    From at least as early as January 2009 through at least July 2014, Mirman and Rose, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

186.    From at least as early as December 2009 through at least July 2014], Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c), and are deemed to be in violation of these provisions to the same extent as Mirman and Rose.

187.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and

abet, violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

## COUNT XIV

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against Spartan Securities, Island Stock Transfer, and Dilley)

188.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

189.    From at least as early as December 2009 until at least July 2014, Spartan Securities, Island Stock Transfer and Dilley, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, when no registration statement was in effect with the Commission as to such securities, and have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities when no registration statement had been filed with the Commission as to such securities.

190.    There were no applicable exemptions from registration.

191.    By reason of the foregoing, Spartan Securities, Island Stock Transfer and Dilley violated, and unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a), (c).

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests the Court find the Defendants committed the violations alleged, and:

## I.

### Permanent Injunction

Issue a Permanent Injunction restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating the federal securities laws alleged in this Complaint.

## II.

### Disgorgement

Issue an Order directing Island Stock Transfer to disgorge ill-gotten gains received within the applicable statute of limitations (including the time during which the statute of limitations was tolled by agreement with Island Stock Transfer), including prejudgment interest, resulting from the acts or courses of conduct alleged in this Complaint.

## III.

### Penalties

Issue an Order directing Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## IV.

### Penny Stock Bar

Issue an Order, pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6), barring Spartan Securities, Dilley, Eldred and Lopez from participating in any future offering of a penny stock.

## V.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.

## VI.

### Retention of Jurisdiction

Further, the Commission respectfully requests that the Court retain jurisdiction over this action and over Defendants in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Dated: February 20, 2019

By:s/Wilfredo Fernandez
Wilfredo Fernandez
Senior Trial Counsel
Fla. Bar No. 142859
Telephone: (305) 982-6376
Facsimile: (305) 536-4154
E-mail: fernandezw@sec.gov

Christine Nestor
Senior Trial Counsel
Fla. Bar No. 597211
Telephone: (305) 982-6367
Facsimile: (305) 536-4154
E-mail: nestorc@sec.gov

ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
801 Brickell Avenue, Suite 1800
Miami, Florida 33131
Telephone: (305) 982-6300