**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**CASE NO.  19-CV-00448-VMC-CPT**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **SPARTAN SECURITIES GROUP, LTD.,** | ) |
| **ISLAND CAPITAL MANAGEMENT LLC,** | ) |
| **CARL E. DILLEY, MICAH J. ELDRED, and** | ) |
| **DAVID D. LOPEZ,** | ) |
| | ) |
| **Defendants.** | ) |

## DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF AND DEMAND FOR JURY TRIAL

Defendants Spartan Securities Group, LTD., Island Capital Management, Carl E. Dilley, Micah J. Eldred and David D. Lopez hereby answer Plaintiffs' Complaint by correspondingly numbered paragraphs as set forth herein.  Except for those allegations specifically admitted herein, Defendants deny each and every allegation of the Complaint.  Defendants state as follows:[1]

## I. INTRODUCTION

1.     The Commission brings this action to enjoin Defendants Spartan Securities Group, Ltd. ("Spartan Securities"), Island Capital Management LLC, d/b/a Island Stock Transfer ("Island Stock Transfer"), Carl E. Dilley ("Dilley"), Micah J. Eldred ("Eldred"), and David D. Lopez ("Lopez") (collectively, "Defendants") from violating the provisions of the federal securities laws described herein.

**ANSWER:**   **Defendants admit only that the Commission purports to bring this action for purported violations of federal securities laws.  Defendants deny that they violated any securities laws. Defendants any remaining allegations of Paragraph 1.**

---

[1] The Complaint contains several headings and subheadings, preserved here for organization. Defendants deny any and all allegations contained in those headings or subheadings.

2.      Spartan Securities, a registered broker-dealer, and Island Stock Transfer, a registered transfer agent, are commonly owned and tout their "one-stop shop" services provided in tandem to issuers of microcap securities. At material times to this Complaint, Dilley, Eldred, and Lopez were common owners of the parent of both Spartan Securities and Island Stock Transfer, and principals of both Spartan Securities and Island Stock Transfer.

**ANSWER:    Defendants admit that Spartan Securities is currently a registered broker-dealer.   Defendants admit that Island Stock Transfer is currently registered as a transfer agent.   Defendants admit that at all times referenced in the Complaint, Dilley, Eldred, and Lopez were owners of the parent of both Spartan Securities and Island Stock Transfer, and principals of Spartan Securities.   Defendants deny they were "principals" of Island Stock Transfer.   To the extent this paragraph purports to quote or characterize a particular statement by Defendants, that statement must be considered in the context where such statement was made. Defendants deny any remaining allegations contained in this Paragraph.**

3.      This action involves Defendants' roles in one or two separate fraudulent schemes from approximately December 2009 through August 2014 to manufacture at least 19 public companies for sale fundamentally premised on a deceptive public float of purportedly "free-trading" securities: 14 by Alvin Mirman and Sheldon Rose (the "Mirman/Rose Companies," identified in paragraph 30 below) and five by Michael Daniels, Andy Fan, and Diane Harrison (the "Daniels Companies," identified in paragraph 102 below).

**ANSWER:    Denied.**

4.      The fraudulent schemes depended on misrepresentations and omissions to, among others, the Commission, the Financial Industry Regulatory Authority ("FINRA"), and the Depository Trust Company ("DTC") that the Mirman/Rose and Daniels Companies were legitimate small businesses with independent management and shareholders. In reality, both the management and shareholders were nothing more than nominees for control persons who always intended merely to sell all the securities of the companies privately in bulk for their own benefit. The essential value of these securities (each bulk sale realized proceeds of hundreds of thousands

of dollars) was their false designation as "free-trading" with the ability to be sold immediately on the public market. If the truth had been known to the public, the securities would have been restricted from such sales and would have had little value.

**ANSWER:**   **Denied.**

5.      Dilley and Eldred knew or were reckless in not knowing from the onset that the Mirman/Rose Companies and Daniels Companies, respectively, were pursuing their stated plans under false pretenses and instead being packaged for sale as public vehicles, and that the shareholders were mere nominees for the control persons. Nonetheless, Defendants took critical steps to advance the frauds.

**ANSWER:**   **Denied.**

6.      Dilley schemed with Mirman and Rose, and Eldred schemed with Daniels, Fan and Harrison, to defraud the public that the Mirman/Rose Companies and Daniels Companies were operating businesses with independent management and shareholders, rather than undisclosed "blank check" companies (sometimes referred to as "shells" or "vehicles") for sale. In furtherance of the Mirman/Rose scheme, Dilley signed false Form 211 applications submitted to FINRA, contributed to false DTC applications, found potential shell buyers, signed an escrow agreement and false attestation letters for shell buyers, and effectuated the bulk transfer of the entire deceptive public float of Mirman/Rose Companies to shell buyers. Eldred similarly schemed with Daniels, Fan and Harrison by filing false Forms 211 with FINRA, signing false securities deposit forms and executing trades in Spartan Securities' proprietary account, all in support of the manufacture of undisclosed public vehicles - one of which Eldred expressly proposed to acquire himself while its Form 211 was pending.

**ANSWER:**   **Denied.**

7.     A necessary step in both fraudulent schemes was for the issuer's stock to be eligible for public quotation, which requires a broker-dealer to file a Form 211 application with FINRA to demonstrate compliance with Rule 15c2-11 under the Securities Exchange Act of 1934 ("Exchange Act"). FINRA typically raises specific concerns or seeks further information from the broker-dealer in one or more deficiency letters before clearing the application. Meanwhile, transfer agents perform a number of roles for issuers pertaining to their securities and shareholders, including recording changes of ownership, maintaining the issuer's security holder records, canceling and issuing certificates, and resolving problems arising from lost, destroyed or stolen certificates.

**ANSWER:     Denied.**

8.     Spartan Securities and Island Stock Transfer acted in tandem to provide these various services which were critical to the Mirman/Rose and Daniels/Fan/Harrison shell factories. For example, Spartan Securities filed the Form 211 application with FINRA in order for the securities of these 19 issuers to be publicly quoted. Spartan Securities, Dilley, and Eldred made materially false statements and omissions to FINRA regarding the purpose, management and shareholders of the Mirman/Rose Companies and Daniels Companies. Spartan Securities and its principals also had information that undermined any reasonable basis that the information required by Rule 15c2-11 was materially accurate and from a reliable source. Spartan Securities then initiated unpriced quotations for all the Mirman/Rose Companies and Daniels Companies (except PurpleReal) upon FINRA's clearance of the Form 211.

**ANSWER:     Defendants admit Spartan filed Forms 211 for the 19 companies identified in the Complaint.  Defendants deny all remaining allegations of Paragraph 8.**

9.     Lopez was a Spartan Securities principal who, with Dilley and Eldred's knowledge, personally undertook responsibility for much of the Form 211 process on at least four

Mirman/Rose Companies. In addition, Lopez was Spartan Securities' Chief Compliance Officer and the principal responsible for effectuating its extensive written policies and procedures applicable to Form 211 applications. Nonetheless, Lopez knowingly or recklessly ignored those procedures and the other requirements inherent in Rule 15c2-11, including failing to conduct any investigation or inquiry into red flags raised by FINRA in the deficiency letters and other adverse information in Spartan Securities' possession, or even to familiarize himself with the issuers. As a result, Lopez was a substantial factor in Spartan Securities' failure to have a reasonable basis for believing that required information about those four Mirman/Rose Companies was accurate and from a reliable source.

**ANSWER:   Defendants admit Lopez is a principal of Spartan Securities.   Defendants admit that the Chief Compliance officer of Spartan Securities has been delegated responsibilities through the firm's extensive written policies and procedures.   In that this paragraph purports to characterize or summarize those procedures, those allegations are denied.   Defendants deny all remaining allegations of Paragraph 9.**

10.    After obtaining Form 211 clearance for the Mirman/Rose Companies, Spartan Securities and Island Stock Transfer then initiated and provided false information for applications filed with DTC through which the securities became eligible for electronic clearance. Island Stock Transfer also effectuated both the bulk issuance and transfer of the Mirman/Rose Company securities without restriction despite Dilley's knowing (or recklessly not knowing) and numerous red flags that the securities were in the hands of affiliates and therefore restricted, while Spartan Securities effectuated the unlawful deposit and open-market sales of some Daniels Company shares by signing false deposit requests and entering prearranged trades through a proprietary account.

**ANSWER:   Defendants admit Island effectuated stock transfers at the direction of shareholders.   Defendants deny the remaining allegations of Paragraph 10.**

11.    As a result of the conduct alleged in this Complaint:

(a)      Defendant Spartan Securities violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(3), and Sections 10(b) and 15(c)(2) and Rules 10b-5 and 15c2-11 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c)(2) and 17 C.F.R. §§ 240.10b-5, 240.15c2-11; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5;

(b)      Defendant Island Stock Transfer violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(3), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5;

(c)      Defendant Dilley violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(3), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Sections 10(b) and 15(c)(2) and Rules 10b-5 and 15c2-11 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c)(2), and 17 C.F.R. §§ 240.10b-5, 240.15c2-11;

(d)      Defendant Eldred violated Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(3), and Section 10(b) and Rule 10b-5 of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5; and aided and abetted violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77e(a), and Sections 10(b) and 15(c)(2) and Rules 10b-5 and 15c2-11 of the Exchange Act, 15 U.S.C. §§ 78j(b), 78o(c)(2), and 17 C.F.R. §§ 240.10b-5, 240.15c2-11;

(e)     Defendant Lopez aided and abetted violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2) and 17 C.F.R. § 240.15c2-11; and

(f)     Unless enjoined, Defendants are reasonably likely to continue to violate the federal securities laws.

**ANSWER:     Denied.**

12.     The Commission therefore respectfully requests the Court enter an order: (i) permanently enjoining Defendants from violating the federal securities laws; (ii) directing Island Stock Transfer to pay disgorgement with prejudgment interest; (iii) directing Defendants to pay civil money penalties; and (iv) imposing penny stock bars against Spartan Securities, Dilley, Eldred and Lopez.

**ANSWER:     The information contained in this Paragraph is not an allegation to which a response is required. In the event a response is deemed necessary, Defendants deny the allegations contained in this Paragraph.**

## II. DEFENDANTS AND OTHER RELEVANT PERSONS

### A. DEFENDANTS

13.     **Spartan Securities** has been registered with the Commission as a broker-dealer since 2001, with its principal place of business in Clearwater, Florida. Spartan Securities is a Florida limited partnership wholly owned by Connect X Capital Markets LLC ("Connect X"), whose managing member is Eldred and shareholders have included Dilley, Eldred and Lopez. Between 2009 and 2018, Spartan Securities has been the subject of at least 10 disciplinary actions by FINRA or the NASDAQ Stock Market.

**ANSWER:     Admitted.**

14.     **Island Stock Transfer** has been registered with the Commission as a transfer agent since 2003, with its principal place of business in Clearwater, Florida. Island Stock Transfer is a

Florida limited liability company wholly owned by Connect X that shares office space, computer systems, officers and employees with Spartan Securities.

**ANSWER:     Admitted.**

15.    **Dilley**, a resident of Seminole, Florida, was a registered principal and representative of Spartan Securities from 2004 to 2015. Dilley was also the President of Island Stock Transfer from 2004 until January 2018. Dilley is presently the Vice President of another registered transfer agent owned by Connect X and of which Eldred and Lopez are also officers.

**ANSWER:     Defendants admit that Mr. Dilley is a resident of Seminole, Florida and that he was a registered principal and registered representative of Spartan Securities from 2004-2015.  Defendants admit Dilley was the president of Island Stock Transfer from 2004 to January 2-18.  Defendants deny that Mr. Dilley is presently the Vice President of another registered transfer agent owned by Connect X.  Defendants deny that Connect X owns another transfer agency. Defendants deny that Mr. Eldred and Mr. Lopez are officers of the other registered transfer agent referred to in Paragraph 15.**

16.    **Eldred**, a resident of Seminole, Florida, has been a registered principal and representative of Spartan Securities and the Chief Executive Officer of Island Stock Transfer from 2001 to the present.

**ANSWER:     Admitted.**

17.    **Lopez**, a resident of St. Petersburg, Florida, has been a registered principal and Chief Compliance Officer of Spartan Securities from March 2001 to the present and the Chief Compliance Officer of Island Stock Transfer from August 2006 to the present.

**ANSWER:     Admitted.**

## B. OTHER RELEVANT PERSONS

18.    **Alvin Mirman**, of Sarasota, Florida, was the undisclosed control person of Changing Technologies, Inc. ("Changing Technologies") and an undisclosed control person, along with Rose, of On the Move Systems Corp. ("On the Move"), Rainbow Coral Corp. ("Rainbow Coral"), First Titan Corp. ("First Titan"), Neutra Corp. ("Neutra"), Aristocrat Group Corp.

("Aristocrat"), First Social Networx Corp. ("First Social"), Global Group Enterprises Corp. ("Global Group"), E-Waste Corp. ("E-Waste") and First Independence Corp. ("First Independence"). Mirman was a defendant in <u>SEC v. McKelvey et al.</u>, Case No. 15-cv-80496 (S.D. Fla. 2015), in which the Court entered, by consent, a judgment of permanent injunction, officer and director bar and penny stock bar against Mirman. On August 19, 2016, Mirman pled guilty to a one-count Information charging him with conspiracy to commit securities fraud. <u>U.S. v. Mirman et al.</u>, Case No. 16-cr-20572 (S.D. Fla.). Both the Commission and criminal actions included his misconduct in connection with the Mirman/Rose Companies. In 2007, without admitting or denying wrongdoing, Mirman consented to being barred by FINRA from association with any FINRA member.

**ANSWER:   Defendants admit that Mirman was a defendant in <u>SEC v. McKelvey et al.</u>, Case No. 15-cv-80496 (S.D. Fla. 2015).  The actions of the Court in that action speak for themselves and do not require a response. Defendants admit that Mirman pled guilty to a one-count Information charging him with conspiracy to commit securities fraud. <u>U.S. v. Mirman et al.</u>, Case No. 16-cr-20572 (S.D. Fla.).  Defendants admit that the actions by the Commission and the criminal actions involved alleged misconduct in connection with the Mirman/Rose Companies.  Finally, Defendants admit that in 2007, without admitting or denying wrongdoing, Mirman consented to being barred by FINRA from association with any FINRA member.  Defendants lack sufficient information to form a belief as to whether Alvin Mirman, of Sarasota, Florida, was an undisclosed control person of the entities listed in Paragraph 18, and therefore deny the same.   Defendants deny any remaining allegations contained in this Paragraph.**

19.   **Sheldon Rose**, of Sarasota, Florida, was the undisclosed control person of Kids Germ Defense Corp. ("Kids Germ"), Obscene Jeans Corp. ("Obscene Jeans"), Envoy Group Corp. ("Envoy") and First Xeris Corp. ("First Xeris") and an undisclosed control person, along with Mirman, of On the Move, Rainbow Coral, First Titan, Neutra, Aristocrat, First Social, Global Group, E-Waste and First Independence. The Commission entered, by consent, a cease-and-desist order, officer and director bar and penny stock bar against Rose. <u>In re Sheldon  Rose et al.</u>, Exch. Act Rel. No. 78894 (Sept. 21, 2016). The Commission later ordered Rose to pay disgorgement and

prejudgment interest in the amount of $2,973,916.18. <u>In re Sheldon  Rose</u>, Exch. Act Rel. No. 80301 (Mar. 23, 2017). On November 9, 2016, Rose pled guilty to a one-count Information charging him with conspiracy to commit securities fraud. <u>U.S. v.  Kass et al.</u>, Case No. 16-cr-20706 (S.D. Fla.). Both the Commission and criminal actions included his misconduct in connection with the Mirman/Rose Companies.

**ANSWER:    Defendants admit that the Commission entered, by consent, a cease-and-desist order, officer and director bar and penny stock bar against Rose captioned <u>In re Sheldon Rose et al.</u>, Exch. Act Rel. No. 78894 (Sept. 21, 2016). Defendants admit that the Commission later ordered Rose to pay disgorgement and prejudgment interest in the amount of $2,973,916.18 captioned <u>In re Sheldon  Rose</u>, Exch. Act Rel. No. 80301 (Mar. 23, 2017). Defendants admit that on November 9, 2016, Rose pled guilty to a one-count Information charging him with conspiracy to commit securities fraud, captioned <u>U.S. v.  Kass et al.</u>, Case No. 16-cr-20706 (S.D. Fla.).  Defendants lack sufficient information to form a belief as to whether Sheldon Rose, of Sarasota, Florida, was the undisclosed control person of the entities listed in Paragraph 19, and therefore deny the same.  Defendants deny any remaining allegations contained in this Paragraph.**

20.    **Michael Daniels**, of Palmetto, Florida, was the undisclosed control person of Dinello Restaurant Ventures, Inc., n/k/a AF Ocean Investment Management Co. ("Dinello/AF Ocean"), President, Chief Executive Officer, Chief Financial Officer, Treasurer and Chairman of the Board of Court Document Services, Inc., n/k/a ChinAmerica Andy Movie Entertainment Media Co. ("Court/ChinAmerica"), Principal Executive Officer, Secretary, Treasurer, Chairman of the Board and Chief Financial Officer of Quality Wallbeds, Inc., n/k/a Sichuan Leaders Petrochemical Co. ("Wallbeds/Sichuan"), Secretary, Chief Financial Officer, Treasurer, Director, and Chairman of the Board of Top to Bottom Pressure Washing, Inc., n/k/a Ibex Advanced Mortgage Technology Co. ("TTB/Ibex"), and undisclosed control person of PurpleReal.com Corp. ("PurpleReal"). On April 25, 2018, the Commission filed a Complaint against Daniels related to his conduct in connection with the Daniels Companies. <u>SEC v.  Harrison, et al.</u>, No. 8:18-cv-01003 (M.D. Fla.).

**ANSWER:**   Defendants admit that on April 25, 2018, the Commission filed a Complaint against Daniels related to his conduct in connection with the Daniels Companies captioned <u>SEC v. Harrison, et al.</u>, No. 8:18-cv-01003 (M.D. Fla.).   Defendants lack sufficient information to form a belief as to whether Michael Daniels, of Palmetto, Florida, was the undisclosed control person of Dinello Restaurant Ventures, Inc., n/k/a AF Ocean Investment Management Co. ("Dinello/AF Ocean") or<u>PurpleReal.com</u> Corp. ("PurpleReal") and therefore deny the same.   Defendants admit that Michael Daniels held certain roles with the entities in Paragraph 20 to the extent those roles were disclosed in each entities public filings. Defendants deny any remaining allegations contained in this Paragraph.

21.     Diane Harrison, of Palmetto, Florida, was the Chief Financial Officer, Secretary, Treasurer and Director of Dinello/AF Ocean, Treasurer, Principal Accounting Officer and Director of Wallbeds/Sichuan, Director and Secretary of TTB/Ibex, and President, Director, and Chairman of the Board of PurpleReal. Harrison, an attorney, is the owner of the law firm Harrison Law, PA, which is based in Florida. Harrison, who is Daniels' wife, is a defendant in the <u>SEC v. Harrison</u> case based on her conduct with respect to the Mirman/Rose Companies and the Daniels Companies.

**ANSWER:**     Admitted.

22.     Andy Fan, of Las Vegas, Nevada, was the President, Treasurer, Chief Executive Officer, Chief Financial Officer and Director of Dinello/AF Ocean and Court/ChinAmerica, and was the President and Director of Wallbeds/Sichuan and TTB/Ibex. The Commission entered, by consent, a cease-and-desist order, officer and director bar and penny stock bar against Fan, and ordered him to pay a civil money penalty of $140,000. <u>In re  Andy Z. Fan</u>, Securities Act Rel. No. 10487 (Apr. 25, 2018). The Commission's action related to Fan's conduct with respect to certain of the Daniels Companies.

**ANSWER:**     Admitted.

### III.  JURISDICTION AND VENUE

23.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and

22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d)(1) and 77v(a); and Sections 21(d), 21(e)

and 27(a) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e) and 78aa(a).

**ANSWER:**     **Defendants do not contest jurisdiction or venue.**

24.     The Court has personal jurisdiction over Defendants and venue is proper in this

District because, among other things, some or all of the Defendants reside or transact business in

this District and/or participated in the offer, purchase, or sale of securities in this District, and many

of the acts and transactions constituting the violations alleged in this Complaint occurred in this

District. In addition, venue is proper in this District under 28 U.S.C. § 1391 because a substantial

part of the events giving rise to the Commission's claims occurred here.

**ANSWER:**     **Defendants do not contest jurisdiction or venue.**

25.     In connection with the conduct alleged in this Complaint, Defendants, directly and

indirectly, singly or in concert with others, have made use of the means or instrumentalities of

interstate commerce, the means or instruments of transportation or communication in interstate

commerce, and of the mails.

**ANSWER:**     **Defendants do not contest jurisdiction or venue.**

### IV.  FACTUAL ALLEGATIONS

#### A.  The Mirman/Rose Shell Factory

26.     Mirman and Rose, alone or together, manufactured at least 14 undisclosed "blank

check" companies in assembly-line fashion in order to sell in bulk the entire deceptive float of

purportedly unrestricted securities.

**ANSWER:**     **Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph and therefore deny the same.**

27.     Mirman and Rose manufactured each Mirman/Rose Company in a similar fashion. Mirman and Rose recruited a sole officer, director, employee, and majority shareholder (the "sole officer") to act in name only. Mirman and Rose prepared and filed false and misleading registration statements with the Commission (the "Forms S-1") misrepresenting that the sole officer was pursuing a specific business plan (versus Mirman and Rose controlling mere shells to sell all the securities in bulk) and would be solely responsible to solicit investors for the company (versus Mirman and Rose using similar rosters of friends and family to "invest" in name only).

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph and therefore deny the same.**

28.     After the Form S-1 became effective, Mirman and Rose solicited the same or virtually the same number of friends and family as shareholders while maintaining complete control through stock certificates with blank stock powers, which are signed by the named shareholder and entitle whoever holds the stock certificate to sell or transfer it.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph and therefore deny the same.**

29.     Mirman and Rose directed Spartan Securities and Island Stock Transfer to prepare applications with FINRA and DTC that contained materially false and inaccurate information in order to make the Mirman/Rose Companies marketable as public vehicles. Specifically, Mirman and Rose needed the purportedly public float of securities available for immediate public quotation and sale through DTC electronic clearance. Mirman and Rose then effectuated the bulk sale of the shares of the issuer for a single cash price by delivering all the stock certificates with blank stock powers to a single buyer group. Mirman and Rose split the net proceeds after paying a nominal amount to their straw sole officer and shareholders.

**ANSWER:     Defendants admit that Spartan Securities and Island Stock Transfer prepared Form 211 Applications and submitted them to FINRA using the public information available in the effective registration statements of each underlying company for which that**

**application was filed.  Defendants deny that Spartan or Defendant Island filed applications with DTC.   Defendants deny that the published a quotation for any of the shares held as part of the public float. Defendants deny that the sales or transfers of securities at issue in this case took place through or required DTC electronic clearance.  Further answering, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this Paragraph and therefore deny the same.**

30.    Mirman and Rose, alone or together, created and developed the following

Mirman/Rose Companies:

| Mirman/Rose Company | Control Person(s) | Effective Date of Form S-1 | Date of Change of Control | Time Between Form S-1 and Change of Control |
|---|---|---|---|---|
| Kids Germ | Rose | 12/2009 | 2/2010 | 3 months |
| Obscene Jeans | Rose | 8/2010 | 12/2010 | 4 months |
| On the Move | Mirman/Rose | 12/2010 | 6/2011 | 6 months |
| Rainbow Coral | Mirman/Rose | 1/2011 | 10/2011 | 9 months |
| First Titan | Mirman/Rose | 2/2011 | 9/2011 | 7 months |
| Neutra | Mirman/Rose | 4/2011 | 11/2011 | 7 months |
| Aristocrat | Mirman/Rose | 11/2011 | 7/2012 | 8 months |
| First Social | Mirman/Rose | 3/2012 | 2/2013 | 11 months |
| Global Group | Mirman/Rose | 3/2012 | 4/2013 | 13 months |
| E-Waste Corp. | Mirman/Rose | 6/2012 | 4/2013 | 10 months |

| Mirman/Rose Company | Control Person(s) | Effective Date of Form S-1 | Date of Change of Control | Time Between Form S-1 and Change of Control |
|---|---|---|---|---|
| First Independence | Mirman/Rose | 8/2012 | 5/2013 | 9 months |
| Envoy Group | Rose | 9/2013 | 4/2014 | 7 months |
| Changing Technologies | Mirman | 10/2013 | 6/2014 | 8 months |

| First Xeris | Rose | 1/2014 | N/A | N/A |
|---|---|---|---|---|

**ANSWER:     Defendants admit the effective dates of the S-1s identified in Paragraph 30. Defendants deny that Mirman and/or Rose were disclosed or known control persons of the companies at the time of the S-1 or Form 211.  Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this Paragraph and therefore deny the same.**

31.     Mirman and Rose never intended to take any step to advance the purported business plan stated in the Form S-1. Rather, as evidenced in part by the short amount of time between Form S-1 effectiveness and the change of control, Mirman and Rose solely sought to manufacture a public vehicle in assembly-line fashion, and sell all its securities in bulk once obtaining the necessary clearances from the Commission, FINRA, and DTC.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph and therefore deny the same.**

32.     Mirman and Rose retained Spartan Securities and Island Stock Transfer for a number of critical steps to develop the Mirman/Rose Companies in quick succession from Form S-1 effectiveness to public vehicles with securities eligible for public quotation and electronic clearance.

**ANSWER:     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph and therefore deny the same.**

33.     Mirman and Rose routinely contacted Dilley to simultaneously start broker services through Spartan Securities and transfer agent services through Island Stock Transfer. Mirman or Rose emailed Dilley stating that the issuer's Form S-1 recently had gone effective and "[w]e want to start a 15c211" and have Island Stock Transfer act as transfer agent. Dilley instructed Spartan Securities and Island Stock Transfer employees to send the materials for, respectively, the Form 211 application and transfer agent services to Mirman or Rose.

**ANSWER:     To the extent that Paragraph 33 purports to quote a particular email or series of emails, the allegation lacks specificity sufficient to identify that email, thereby preventing**

**Defendants from formulating a response.  Responding further, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph and therefore deny the same.**

34.     Spartan Securities and Island Stock Transfer, which share office space, computer systems, officers and employees, acted in tandem for the Mirman/Rose Companies. For example, Island Stock Transfer prepared certified shareholder lists at the request and upon the approval of Mirman and Rose. Spartan Securities then submitted those shareholder lists to FINRA as part of the Form 211 applications.

**ANSWER:     Defendants admit that Spartan Securities and Island Stock Transfer share office space as well as certain systems, officers, and employees.  Defendants admit that Island Stock Transfer prepared and Spartan Securities submitted shareholder lists to FINRA as part of the Form 211 application process at the request of each underlying company. Defendants deny any remaining allegations contained in this Paragraph.**

35.     Spartan Securities and Island Stock Transfer's actions allowed Mirman and Rose to sell the Mirman/Rose Companies via the bulk sale of all the issued securities to a small buyer group generating combined proceeds totaling at least $3.7 million:

| Mirman/Rose Company | Spartan Securities Form 211 Signatory | Island Stock Transfer Original Issuance | FINRA Form 211 Clearance | DTC Filing | Island Stock Transfer Bulk Transfer To Buyer Group |
|---|---|---|---|---|---|
| Kids Germ | Dilley | 12/2009 | 1/2010 | 1/2010 | 2/2010 |
| Obscene Jeans | Dilley | 8/2010 | 9/2010 | 10/2010 | 12/2010 |
| On The Move | Dilley | 1/2011 | 2/2011 | 4/2011 | 6/2011 |
| Rainbow Coral | Dilley | 2/2011 | 3/2011 | 7/2011 | 10/2011 |
| First Titan | Dilley | 4/2011 | 5/2011 | 7/2011 | 9/2011 |
| Neutra | Dilley | 6/2011 | 7/2011 | 8/2011 | 11/2011 |
| Aristocrat Group | Dilley | 12/2011 | 12/2011 | 2/2012 | 7/2012 |
| First Social Networx | Dilley | 3/2012 | 4/2012 | 7/2012 | 2/2013 |
| Global Group | Dilley | 4/2012 | 5/2012 | 8/2012 | 4/2013 |
| E-Waste | Dilley | 7/2012 | 8/2012 | 9/2012 | 4/2013 |

| First Independence | Dilley | 2/2013 | 3/2013 | 4/2013 | 5/2013 |
|---|---|---|---|---|---|
| Envoy Group | Dilley | N/A | 12/2013 | N/A | N/A |
| Changing Technologies | Dilley | 11/2013 | 1/2014 | 4/2014 | 6/2014 |
| First Xeris | Dilley | 1/2014 | 3/2014 | 4/2014 | N/A (SEC stop order) |

**ANSWER:** **Defendants admit that Mr. Dilley signed the Forms 211 for the entities listed in Paragraph 35. Defendants admit the dates each Form 211 was cleared by FINRA. Defendants admit the date of the original issuance by Island Stock Transfer with regard to all companies except for with regard to Envoy Group and First Social Networx. The allegations relating to Envoy Group and First Social Networks are denied. For the remaining allegations in Paragraph 35, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in this Paragraph and the chart contained therein, and therefore deny the same.**

### Dilley's Knowledge of/Participation in the Mirman/Rose Fraud

36.     Dilley, a registered principal of Spartan Securities and Island Stock Transfer, knew or was reckless in not knowing that Mirman and Rose were manufacturing the Mirman/Rose Companies to control and sell a deceptive float of purportedly unrestricted securities (versus the material misrepresentations in the Forms 211 and Commission filings that the issuers were legitimate startups controlled by the nominee sole officer with an independent shareholder base).

**ANSWER:** **Defendants admit Mr. Dilley was a "registered principal" of Spartan. Defendants deny that Mr. Dilley was a registered principal of Island. Defendants deny any remaining allegations contained in Paragraph 36.**

37.     Dilley knew or was reckless in not knowing of Mirman and Rose's undisclosed control of and intent for the Mirman/Rose Companies with the earliest issuer, Kids Germ. Rose solicited Dilley to have Spartan Securities file the Kids Germ Form 211. On January 4, 2010 - the same day FINRA cleared the Form 211 - Rose emailed Dilley: "What do you recommend [Kids Germ] do with the DTC, know[ing] the route it is taking? Do you want to speak to the attorney interested in the company, or do you want me to call him? If you want me to call him, please forward telephone number." By email that same day, Dilley responded: "We should apply for DTC eligibility. Let me call you on this once I talk to [the attorney]."

**ANSWER:   Defendants admit the existence of a January 4, 2010 email between Rose and Dilley containing an unmodified version of the language contained in Paragraph 37. Defendants deny any remaining allegations contained in Paragraph 37.**

38.     On January 13, 2010, Island Stock Transfer initiated the DTC application for Kids Germ misrepresenting "the company is not a shell" despite Dilley knowing or recklessly not knowing it was a shell because of, among other things, its lack of assets or revenues and knowing "the route it is taking." One month later, Island Stock Transfer transferred the Kids Germ shares from Rose's friends and family in bulk without a restrictive legend stamped on the certificate to indicate that the shares are restricted from transfer or sale. Dilley knew or was reckless in not knowing that these shareholders were affiliates of Kids Germ because of Rose's control over all their shares to effectuate a bulk sale of Kids Germ and therefore, the shares should have been restricted from transfer or sale.

**ANSWER:   To the extent this paragraph repeats the allegations in Paragraph 37, Defendants incorporate their Answer to Paragraph 37 as though set forth fully herein. Defendants admit Island Stock Transfer transferred shares of Kids Germ as directed by its shareholders.  Further answering, Defendants deny the remaining allegations contained in Paragraph 38.**

39.     For the second Mirman/Rose Company, Obscene Jeans, Dilley signed the Form 211. On September 3, 2010 (the day FINRA cleared the Form 211), at Rose's request, Dilley contacted a DTC participant firm to file a DTC application for Obscene Jeans. By email dated October 4, 2010, Dilley's assistant forwarded to Rose (copying Dilley) the DTC participant firm's refusal to file the application because it was "looking to sponsor operating companies. We understand that having a shell DTC eligible raises its price but we are just not interested in the risk that the company falls into the wrong people's hands." The following week, despite this admonition, Dilley's assistant asked the firm to reconsider filing the application. The firm agreed, and Spartan Securities re-initiated the DTC application at the behest of Dilley.

**ANSWER:    Defendants admit that Dilley signed the Form 211 filed on behalf of Obscene Jeans.  Defendants admit the Form 211 for Obscene Jeans was cleared by FINRA on September 3, 2010.  Defendants admit the existence of a September 3, 2010 email between Dilley and a DTC clearing firm containing the language quoted in paragraph 39 but deny that the email identified in Paragraph 39 mentions an application for Obscene Jeans.   To the extent that this paragraph purports to characterize or summarize an email or series of emails, Defendants deny those allegations.  Defendants deny any remaining allegations contained in this Paragraph.**

40.     In the meantime, by email dated October 5, 2010, Rose sent Dilley a term sheet for the sale of Obscene Jeans making no mention of the sole officer or purported business plan and focusing largely on the share structure and tradeability status (for example, the shares were quoted with one market maker, which was Spartan Securities). The term sheet also listed that Obscene Jeans had no liabilities and only $20,000 in assets (all cash).

**ANSWER:    Defendants admit the existence of the October 5, 2010 email between Rose and Dilley.  To the extent that this paragraph purports to characterize or summarize the content or context of that email, Defendants deny those allegations.  Defendants deny any remaining allegations contained in this Paragraph.**

41.     On October 22, 2010, a buyer emailed Dilley (copying Rose) that "we are closing on [Obscene Jeans] - can you post a bid-ask today?" The following day, Dilley emailed Rose: "I have to have someone open an account and deposit shares and offer some for sale. . . . I have never seen this to be a requirement from anyone wanting a shell."

**ANSWER:     Defendants admit that Dilley received an email, copying Rose on October 22, 2010 that included an unmodified version of the language quoted in Paragraph 41.  Defendants admit that Dilley sent an email in response that contained the language quoted in Paragraph 41.  To the extent that this paragraph purports to characterize or summarize the content or context of that email, Defendants deny those allegations.  Defendants deny any remaining allegations contained in this Paragraph.**

42.     On October 25, 2010, Rose emailed Dilley: "I told our mutual friend ???? today to F off, respectfully. Thanks for your effort."

**ANSWER:    Admitted.**

43.     These various documents and events involving Dilley in September and October 2010 were clear signs that Obscene Jeans was a blank check company and Rose controlled all shares of Obscene Jeans for sale in bulk.

**ANSWER:     Denied.**

44.     One month later, Rose asked Dilley for Island Stock Transfer to act as escrow agent for the sale of Obscene Jeans. At Rose's request, Dilley signed an escrow agreement on behalf of Island Stock Transfer by which all of the shares of Obscene Jeans (both the control block and all purportedly unrestricted shares in the names of the 24 nominee shareholders) were being sold pursuant to one stock purchase agreement for $440,000. All of these documents and communications received by Dilley were clear signs that Obscene Jeans was a blank check company and Rose controlled all shares of Obscene Jeans for sale in bulk.

**ANSWER:     Defendants admit that Rose sent Dilley an escrow agreement between Obscene Jeans, the Buyer, and Island Stock Transfer as Escrow Agent. Defendants admit that the Escrow Agreement recites the existence of a Stock Purchase Agreement between Buyer and Obscene Jeans, pursuant to which Obscene Jeans agreed to transfer 12 million shares of its common stock to Buyer for a price of $440,000.   Defendants deny any remaining allegations contained in this Paragraph.**

45.     Dilley communicated exclusively with Mirman and Rose, and was aware that they directed the finances across the Mirman/Rose Companies. For example, by email dated September 19, 2011, Mirman told an Island Stock Transfer employee: "We spoke to Carl [Dilley] and told him we will pay [the Rainbow Coral invoice] through the Neutra account," despite Rainbow Coral and Neutra purportedly being unrelated companies with separate management. Dilley told that same employee (copying Mirman): "We went through what was supposed to happen with this." The following month (and on the same day) Dilley signed the stock certificates by which all the shares of both Rainbow Coral and Neutra were sold to the same buyers represented

by the same counsel, demonstrating Dilley knew or was reckless in not knowing that Mirman and Rose controlled all shares of both issuers.

**ANSWER:     Defendants admit the existence of a September 19, 2011 email chain between Mirman, Dilley, and an Island Stock Transfer employee containing an unmodified version of the language in Paragraph 45.   To the extent that this paragraph purports to characterize or summarize the content or context of that email, Defendants deny those allegations. Defendants deny any remaining allegations contained in this Paragraph.**

46.     Dilley knew or was reckless in not knowing that Mirman and Rose similarly manufactured E-Waste and Global Group for sale. By email dated December 4, 2012, Mirman wrote Dilley: "We [Mirman and Rose] are in the process of selling E-Waste and the attorney wants," among other things, "[c]onfirmation from the T[ransfer] A[gent] that it has not put restrictions on any free trading shares." Dilley responded "will do," and instructed Island Stock Transfer's Director of Operations to prepare the letter. Dilley signed the requested letter, and was copied on the transmittal of the letter exclusively to Mirman. The Director of Operations soon thereafter signed the stock certificates transferring all of E-Waste's issued shares per the buyer's counsel's instructions.

**ANSWER:     Defendants admit Mirman sent a December 4, 2012 email to Dilley containing an unmodified version of the language quoted in paragraph 46.   Defendants deny that this Paragraph accurately characterizes the context of the email and/or subsequent email chain which includes the December 4, 2012 email referenced above.   The remaining allegations lack sufficient specificity to allow Defendants to form a belief as to the truth or falsity of the allegations and therefore denies the same. Defendants deny any remaining allegations contained in this Paragraph.**

47.     By email dated January 1, 2013, Rose wrote Dilley: "Please send [the] same letter [as E-Waste] but for Global [Group] and e-mail to me ASAP." Dilley signed that requested letter as well at Rose's request.

**ANSWER:     Defendants admit the existence of a January 1, 2013 email containing an unmodified version of the language quoted in paragraph 47. To the extent that this paragraph purports to characterize or summarize the content or context of that email, Defendants deny those allegations.   Defendants deny any remaining allegations contained in this Paragraph.**

48.     On January 16, 2013, the buyer's counsel for E-Waste sent an instruction letter to Island Stock Transfer enclosing a stock purchase agreement expressly stating that "all of the free trading shares of the Company consisting of an aggregate of 3,000,000 shares" were simultaneously being purchased pursuant to stock purchase agreements "of like tenor" with Rose as "Seller's Representative," evidencing that Rose, from whom Island Stock Transfer had exclusively taken instructions to date, controlled the bulk sale of all the "free-trading" shares.

**ANSWER:     Defendants admit Island Stock Transfer received a January 16, 2013 letter including the language quoted in in paragraph 48.   Defendants deny any remaining allegations contained in this Paragraph.**

49.     By email dated February 27, 2013, Mirman asked Dilley how to handle a lost certificate of one of the "free-trading" shareholders because "Sheldon [Rose] is in New York today closing Global." Dilley instructed Island Stock Transfer's Director of Operations to respond to Mirman's request. Island Stock Transfer effectuated the bulk transfer of virtually all shares of Global Group to the same exact small group of buyers as E-Waste represented by the same counsel.

**ANSWER:     Defendants admit the existence of an email dated February 27, 2013 between Mirman and Dilley that includes the unmodified language quoted in paragraph 49. Defendants admit Mr. Dilley asked someone at Island Stock Transfer to respond to Mirman's inquiry. Defendants deny any remaining allegations contained in this Paragraph.**

50.     Dilley also assisted Rose's efforts to sell the last Mirman/Rose Company, First Xeris. Soon after FINRA's clearance of Spartan Securities' Form 211 for First Xeris in March 2014, a shell finder emailed Dilley: "I understand Sheldon Rose is trying to contact you regarding his new company [First Xeris] being dropped to Pink[] [Sheet] from QB based on the new bid/ask rules. I have a buyer for it, but not as a pink." Dilley then placed daily bids in the open market at Rose's request. Accordingly, Dilley knew or was reckless in not knowing that First Xeris was a company that Rose controlled and was looking to sell.

**ANSWER:**   **Defendants admit the existence of an email from June 2014 containing an unmodified version of the language quoted in Paragraph 50.  Defendants deny any remaining allegations contained in this Paragraph.**

### Spartan Securities' Involvement in the Mirman/Rose Fraud

51.     With Dilley's knowing or reckless involvement, Spartan Securities made crucial contributions to the Mirman/Rose fraud.

**ANSWER:    Denied.**

52.     Dilley's assistant as of 2012 prepared the Form 211 and all related documents based on templates. The assistant was instructed that a Spartan Securities' principal would review the assistant's draft and revise it to match the facts particular to each issuer. Dilley's assistant submitted the Form 211 only upon Dilley's approval. The assistant would similarly draft responses to FINRA deficiency letters for review by a Spartan Securities principal (Lopez from early 2013 onward), and only sent the responses to FINRA upon that principal's (usually Lopez) express approval.

**ANSWER:    Defendants admit to utilizing form documents in connection with the Form 211 process. Defendants admit that a Spartan Securities assistant often prepared draft Forms and responses to deficiency letters which were reviewed, revised, and approved by a principal.  Defendants deny any remaining allegations contained in this Paragraph.**

53.     Dilley signed the Forms 211 for the Mirman/Rose Companies but was largely uninvolved in responding to FINRA's deficiency letters or investigating any red flags identified by FINRA.

**ANSWER:    To the extent this paragraph realleges the allegations contained in Paragraph 35, Defendants incorporate their Answer to Paragraph 53 as though set forth fully herein. Defendants deny the remaining allegations of Paragraph 53.**

54.     By letter dated February 8, 2013, the Commission's examination staff identified deficiencies and weaknesses in Spartan Securities' compliance with certain federal securities laws, including (1) Spartan Securities' possible violation of Rule 15c2-11 by failing to adequately

address numerous red flags and provide material information to FINRA in connection with an unrelated Form 211 application, and (2) Lopez's failure to adequately implement Spartan Securities' written procedures regarding Forms 211 which required Lopez to review the information outlined in Rule 15c2-11 together with any supplemental information obtained and to be alert to red flags.

**ANSWER:**     **Defendants admit receipt of the letter dated February 8, 2013 and its contents, although Defendants deny that Paragraph 54 accurately characterizes that letter. Defendants deny all remaining allegations of this paragraph.**

55.     As of 2013, Dilley and Eldred instructed the assistant to send draft responses to the FINRA deficiency letters to Lopez for review and approval. For example, by email dated October 18, 2013, the assistant wrote Eldred: "I know that Dave [Lopez] looks at these [draft deficiency responses] now, but he's been slammed . . . . Any chance you can make an exception and review this one?" Dilley tasked Lopez with that responsibility, for example, when Dilley was unavailable or because Lopez "has got a lot more experience."

**ANSWER:**     **Defendants admit the existence and of October 18, 2013 email.  Defendants state that the allegations in Paragraph 55 contain ellipses or otherwise modify the language of communication and deny the same.  Defendants deny any remaining allegations of this paragraph.**

56.     Mirman and Rose were Spartan Securities' primary source of information throughout the Form 211 process. Mirman and Rose would provide Spartan Securities with documents in the name of the sole officer and many documents they prepared themselves, including spreadsheets detailing who solicited the shareholders and the relationship between the solicitor and shareholder. There were substantial similarities in these shareholders lists, including the sole officer of First Social appearing as a shareholder of 10 other Mirman/Rose Companies.

**ANSWER:**     **Denied.**

57.     The assistant sent FINRA deficiency letters to Mirman and Rose without confirming or inquiring into the authority of Mirman and Rose to act for the Mirman/Rose Companies (i.e. if they were a reliable source of information), despite the fact that Mirman and Rose were not officers, directors or even named shareholders of any of the Mirman/Rose Companies.

**ANSWER:     Denied.**

58.     Sometimes within one week of Mirman and Rose's solicitation, Spartan Securities submitted the Form 211 and a cover letter (with exhibits) to FINRA. However, Spartan Securities consistently misrepresented that: (1) the sole officer - not Mirman or Rose - called Dilley based on a referral (often from an attorney); (2) Spartan Securities agreed to file the Form 211 after "months" of due diligence; and (3) Spartan Securities had no prior relationship with the issuer or any of its "representatives" (despite repeatedly filing Forms 211 at Mirman and Rose's request).

**ANSWER:     Defendants admit that Spartan Securities submitted the Forms 211 for the Companies, and incorporates its Answer to Paragraph 35 as though set forth fully herein. Beyond that, Defendants deny any remaining allegations of Paragraph 58.**

59.     For example, by email dated November 6, 2013, Rose solicited Dilley to file a Form 211 for Envoy Group and told Dilley: "We know the process, included is some due dil[igence] per our conversation" including a chart listing the Form S-1 shareholders and their purported relationships with each other. Spartan Securities filed the Envoy Group Form 211 five days later, misrepresenting that Envoy Group's sole officer contacted Dilley (with no mention of Rose), Spartan Securities had conducted due diligence over the past month, and Spartan Securities had no other relationship with Envoy Group's "representatives."

**ANSWER:     Defendants admit the existence of an email dated November 6, 2013 email containing the language quoted in paragraph 59.  Defendants deny that this paragraph accurately characterizes or paraphrase a series of communications.  Defendants admit Spartan Securities filed a Form 211 for Envoy Group.  Defendants deny any remaining allegations contained in this Paragraph.**

60.     Each Form 211 cover letter also misrepresented that the issuer was "not working with any consultants" despite Dilley knowing or being reckless in not knowing that Mirman and Rose had no publicly disclosed association with the Mirman/Rose Companies yet took various critical actions on their behalf.

**ANSWER:     Denied.**

61.     Each Form 211 cover letter also misleadingly stated that "there are no other companies that the current officers or directors have requested a listing quotation on," despite Dilley knowing or being reckless in not knowing that Mirman or Rose, who acted as de facto officers and directors, had requested all Forms 211 for the Mirman/Rose Companies.

**ANSWER:     Denied.**

62.     Each Form 211 cover letter also misrepresented that the issuer was not in negotiations for any actual or potential merger or acquisition, despite Dilley knowing or being reckless in not knowing that the first Mirman/Rose Company had been available for sale upon Form 211 clearance by FINRA and his involvement in numerous other sales by Mirman and Rose shortly after Form 211 clearance.

**ANSWER:     Denied.**

63.     Each cover letter also attached a shareholder chart stating that the sole officer had solicited each shareholder as a "friend" and that no other people had been solicited to invest, when in fact Mirman and Rose had solicited the shareholders and reused many of the same shareholders across up to 12 Mirman/Rose Companies. Dilley knew or was reckless in not knowing that Mirman and Rose controlled all the shares given, among other things, the substantial similarities across the shareholder lists.

**ANSWER:     Defendants admit that the Form 211 application included a shareholder chart provided by the issuer along with the issuer's description or narrative as to each individual's**

26

**connection to the issuer. Defendants deny any remaining allegations contained in this Paragraph.**

64.     Each Form 211 cover letter also misrepresented that the Mirman/Rose Company was following a specific business plan, despite Dilley knowing or being reckless in not knowing that the issuer was merely a public vehicle being packaged for sale and controlled by Mirman and Rose.

**ANSWER:     Defendants admit that the Form 211 cover letter included the issuer's stated business plan as it appeared in that entity's public securities filings.   Any remaining allegations of Paragraph 64 are denied.**

65.     Each Form 211 also misrepresented that Spartan Securities was not aware or in possession of any material information, including adverse information, regarding the Mirman/Rose Company, despite Dilley knowing or being reckless in not knowing that Mirman and Rose were undisclosed control persons developing the Mirman/Rose Company as a mere public vehicle to be sold as a shell.

**ANSWER:     Denied.**

66.     No one at Spartan Securities questioned the accuracy of the Rule 15c2-11(a) information for any of the Mirman/Rose Companies. The Forms S-1 described start-up companies run exclusively by the sole officer with no mention of Mirman or Rose. Dilley did not even review (but "just kept on file") the Forms S-1 which were strikingly similar across the Mirman/Rose Companies, including: (1) the same number of issued shares; (2) similar annual budgets (purportedly for effectuation of vastly different business plans); (3) the same small offering size (dwarfed by the annual budgets); and (4) similar assets (all cash and substantially the same amount):

## MIRMAN/ROSE COMPANY FORM S-1 DISCLOSURES

| Mirman/Rose Company | Form S-1 Shares | Form S-1 Offering Size | # Of Shares In Name Of Sole Officer | Total Assets (All Cash) | Operating Budget (Duration) | Sole Officer # of Hours Work Week |
|---|---|---|---|---|---|---|
| **Kids Germ** | 3,000,000 | $30,000 | 9,000,000 | $5,351 | $400,000 (18 months) | 10-25 hours |
| **Obscene Jeans** | 3,000,000 | $52,500 | 9,000,000 | $9,000 | $500,000 (18 months) | 10-25 hours |
| **On The Move** | 3,500,000 | $52,500 | 9,000,000 | $9,000 | $477,500 (12 months) | 10-25 hours |
| **Rainbow Coral** | 2,500,000 | $31,250 | 9,000,000 | $8,912 | $500,000 (18 months) | 10-25 hours |
| **First Titan** | 3,000,000 | $37,500 | 9,000,000 | $8,922 | $587,500 (18 months) | 10-25 hours |
| **Neutra** | 3,000,000 | $42,000 | 9,000,000 | $8,900 | $425,000 (12 months) | 10-25 hours |
| **Aristocrat** | 3,900,000 | $39,000 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| **First Social** | 3,000,000 | $45,000 | 9,000,000 | $8,900 | $475,000 (18 months) | 10-25 hours |
| **Global Group** | 3,000,000 | $34,500 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| **E-Waste** | 3,000,000 | $36,000 | 9,000,000 | $8,301 | $600,000 (18 months) | 10-25 hours |
| **First Independenc** | 3,000,000 | $34,500 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| **Envoy Group** | 3,000,000 | $37,500 | 9,000,000 | $8,908 | $612,500 (18 months) | 10-25 hours |
| **Changing Technologies** | 3,000,000 | $30,000 | 9,000,000 | $8,900 | $339,000 (18 months) | 10-25 hours |
| **First Xeris** | 3,000,000 | $39,000 | 9,000,000 | $8,976 | $650,000 (18 months) | 10-25ours |

**ANSWER:**   Defendants admit the chart in Paragraph 66 accurately summarizes the information contained in the Forms S-1 filed by each respective  entity and made effective by the Securities and Exchange Commission.  Defendants deny any remaining allegations of this paragraph.

67.     Moreover, many Mirman/Rose Companies publicly filed periodic reports with the Commission prior to Form 211 clearance which reported no assets, revenues, or expenses other than professional fees.

**ANSWER:     Defendants admit that some of the Companies filed periodic reports with the Securities and Exchange Commission prior to initiation of the Form 211 process wherein those companies made disclosures about the company and its operations and affirmed the truth and accuracy of the same.  Those public filings speak for themselves but, in that this paragraph only refers to "many" reports, without identification of the company, time period or type of report, Defendants lack sufficient information in order to form a belief as to the truth or falsity of the allegations and therefore deny the same. Defendants deny any remaining allegations contained in this Paragraph.**

68.     In at least 7 deficiency letters (including those for First Independence, Changing Technologies and First Xeris), FINRA requested detailed information with respect to the circumstances surrounding the registered offering per the Form S-1, including how many persons were solicited and ultimately invested. Spartan Securities submitted shareholder charts stating that the sole officer had solicited each shareholder as a "friend," and reported the same solicitation success rate (24 solicited, 24 invested). The lists had remarkably similar features, including the same number of shares and shareholders, and overlapping rosters (some shareholders were the sole officer of other Mirman/Rose Companies and appeared on up to 12 lists).

**ANSWER:     Defendants admits receiving deficiency letters from FINRA in connection with Form 211 applications, including with regard to First Independence, Changing Technologies and First Xeris.  The contents of each letter speaks for itself and Defendants deny that this Paragraph accurately characterizes the documents contained in Paragraph 68.  Defendants admit that Spartan Securities submitted shareholder charts to FINRA.  The contents of those charts speak for themselves and Defendants deny that this Paragraph accurately characterizes the documents contained in Paragraph 68.    Any remaining allegations of Paragraph 68 are denied.**

69.     In at least 12 deficiency letters (including those for First Independence, Envoy Group and First Xeris), FINRA specifically inquired whether anyone other than the named shareholders had control over any aspect of the shares, including "any past, present, or future arrangements." Spartan Securities conducted no inquiry despite, among other things, the striking

similarities across rosters that contained the same shareholder names, Dilley's involvement in bulk sales of all shares by Mirman and Rose, and Island Stock Transfer's bulk issuance and transfer of all shares of Mirman/Rose Companies.

**ANSWER:     Defendants admit receiving deficiency letters from FINRA in connection with Form 211 applications, including with regard to First Independence, Envoy Group and First Xeris.  The contents of each letter speaks for itself and Defendants deny the characterization of those documents contained in Paragraph 69.  Any remaining allegations of Paragraph 69 are denied.**

70.     Spartan Securities also failed to inquire regarding numerous red flags as required by Rule 15c2-11, which requires a broker-dealer to evaluate any "adverse information" in its possession when determining whether it has a reasonable basis for the accuracy of information and reliability of its source. For Spartan Securities, such red flags included the substantial similarities in the Forms S-1, the substantially similar shareholder rosters, the use of sole officers who were related to each other and appeared as shareholders on other Mirman/Rose Companies, and Mirman and Rose as the same solicitors and sources of information across the Mirman/Rose Companies.

**ANSWER:     Denied.**

71.     FINRA also posed several other issuer-specific questions or concerns in its deficiency letters. In responding to FINRA's deficiency letters, Spartan Securities did not follow its own written policies and procedures which required that the assistant "together with the CCO or other designated officer gather information from the issuer to respond to the FINRA comments" in deficiency letters and investigate red flags. Spartan Securities' procedures further required the designated officer to initial each page of correspondence to FINRA evidencing that review and investigation. None of Spartan Securities' correspondence to FINRA in connection with the Mirman/Rose Companies contained any such initials.

**ANSWER:     Defendants admit that FINRA posed questions in deficiency letters. Defendants admit that Spartan Securities responded to those letters.   The contents of each**

letter speaks for itself and Defendants deny the characterization of those documents contained in Paragraph 71.  Any remaining allegations of Paragraph 71 are denied.

72.     Lopez cursorily reviewed and approved Spartan Securities' responses to at least the following deficiency letters for the Forms 211 of First Independence, Envoy Group, Changing Technologies and First Xeris:

| Mirman/Rose Company | Date of FINRA Deficiency Letter | Date of Spartan Response | Number of Questions from FINRA |
|---|---|---|---|
| First Independence | 2/27/2013 | 3/12/2013 | 7 |
| Envoy Group | 11/21/2013 | 11/25/2013 | 6 |
| Envoy Group | 12/5/2013 | 12/9/2013 | 1 |
| Envoy Group | 12/17/2013 | 12/18/2013 | 1 |
| Changing Technologies | 12/3/2013 | 12/17/2013 | 4 |
| First Xeris | 2/7/2014 | 2/13/2014 | 5 |

**ANSWER:**     **Defendants admit that the dates of the FINRA Deficiency letters and Spartan's responses set forth in the Chart contained in paragraph 72 are accurate.  Defendants admit that the number of questions posed by FINRA is accurate.  Defendants deny any remaining allegations in paragraph 72.**

73.     Lopez approved each response within an hour of the assistant's request, making no inquiry into FINRA's questions (or the issuer more generally) despite FINRA raising at least 24 questions about these four issuers.

**ANSWER:     Denied.**

74.     For example, FINRA questioned whether First Independence was a "shell company" despite its non-shell designation in periodic reports. Despite understanding that any shell issue should be investigated by asking the issuer basic questions about its business operations to see whether it is a "blank check company, that there's an ongoing effort to further the business plan," Lopez made no such investigation or inquiry with respect to First Independence's business operations or purpose.

**ANSWER:**   **Defendants admit FINRA questioned whether First Independence's SEC filings should be amended to indicate that the issuer is a shell company.   Defendants deny any remaining allegations of this paragraph.**

75.     Spartan Securities (including Lopez) failed to review Rule 15c2-11 information or inquire further regarding red flags that were expressly raised by FINRA on the subsequently filed Forms 211. On the Envoy Group Form 211, in its deficiency letter dated November 21, 2013, FINRA asked Spartan Securities for detailed descriptions of the relationships between: (1) Envoy Group, Jocelyn Nicholas (Envoy Group's sole officer) and Mark Nicholas (Kids Germ's sole officer); (2) Envoy Group, Jocelyn Nicholas, Mark Nicholas, and Kids Germ; and (3) Mark Nicholas and Spartan Securities. By email dated November 22, 2013, Dilley's assistant forwarded this letter to Dilley and Lopez, and alerted them to the facts that "Shelly [Rose] sent us this one" and that Spartan Securities had filed the Form 211 for Kids Germ. Dilley and Lopez conducted no investigation into the two issuers (including whether Rose was a reliable source for Envoy Group) or Spartan Securities' relationship with either of them. Specifically, Lopez merely told the assistant that "I am not familiar with any of those people or that company," and Dilley instructed the assistant simply to rely on Envoy Group's response. Lopez then approved the deficiency response, which misrepresented that the only relationship among all the identified parties was the spousal relationship between Jocelyn and Mark Nicholas, Envoy Group's sole officer had "no participation in any way with Kids Germ," and Spartan Securities had no relationship with Kids Germ "and/or any of its representatives."

**ANSWER:**     **Defendants admit they received a deficiency letter relating to the Envoy Group Form 211 dated November 21, 2013.   Defendants admit the contents of that letter but deny the characterization contained in Paragraph 75.   Defendants admit the existence of a November 22, 2013 email forwarded by Dilley's assistant to Dilley and Lopez containing an unmodified version of the language quoted in paragraph 75.   Defendants admit Lopez responded to that email including the quotation attributed to him in Paragraph 75. Defendants admit Mr. Lopez told the assistant the response he had prepared "[l]ooks good to me."   Defendants deny any remaining allegations of this paragraph.**

76.     In its deficiency letter dated November 25, 2013, FINRA inquired a second time for details of any relationship between Envoy Group's sole officer and Kids Germ. Lopez approved the deficiency response, which misrepresented that Envoy Group's sole officer's only relationship with Kids Germ was as a 0.42% shareholder despite the fact that she was also an officer of Kids Germ.

**ANSWER:     Denied.**

77.     Dilley and Lopez had numerous facts readily in their possession contradicting these representations and the Rule 15c2-11 information, including: (1) Spartan Securities through Dilley filed both the Envoy Group and Kids Germ Form 211, and Kids Germ's DTC application, at Rose's request; (2) Spartan Securities possessed numerous documents showing that Envoy Group's sole officer had become a Kids Germ officer per Spartan Securities' advice to Rose to obtain DTC eligibility; (3) Lopez acted on Rose's authorization to speak with an auditor for Kids Germ despite Rose not being an officer, director, or authorized person on Kids Germ's Corporate Authorization Form; (4) Envoy Group and Kids Germ had 11 shareholders in common (including the sole officers of two other Mirman/Rose Companies) and the same capitalization structure (9,000,000 share control block, 3,000,000 Form S-1 shares among 24 shareholders); and (5) Dilley attempted to arrange a sale of Kids Germ for Rose.

**ANSWER:     Defendants admit that Mr. Dilley filed the Envoy Group and Kids Germ Forms 211. The Shareholder lists provided by Envoy and Kids Germ speak for themselves, do to require a response from Defendants and Defendants deny the same. In that this paragraph purports to paraphrase or characterize the content of various documents, without proper context, Defendants deny those allegations. Defendants deny all remaining allegations of this paragraph.**

78.     On November 6, 2013, Mirman told Dilley "I need to file a 211 through your firm" for Changing Technologies. That same day, Rose had solicited Dilley to file the Form 211 for Envoy Group. Dilley told Mirman: "Funny you guys called me within a few minutes of each

other." Dilley then put Spartan Securities and Island Stock Transfer employees in contact with

Mirman, who in turn approved the certified shareholder list for Changing Technologies which

Spartan Securities submitted to FINRA with the Form 211.

**ANSWER:   Defendants admit receiving a November 6, 2013 from Mirman to Dilley but Defendants deny that the quotation attributed to that email is accurate.  Defendants admit receipt of a November 6, 2013 email from Rose to Dilley regarding filing a Form 211 for Envoy Group containing the language quoted in Paragraph 78.   Defendants admit submitting a certified shareholder list to FINRA as part of the Form 211.   Defendants deny any remaining allegations of paragraph 78.**

79.     Dilley drafted the portion of the Form 211 representing that Mirman had referred

Changing Technologies to Spartan Securities, but that Spartan Securities "does not have any other

relationship with Al Mirman." Dilley knew or was reckless in not knowing that this statement was

false given the fact that Spartan Securities filed this and other Forms 211 at Mirman's request.

**ANSWER:     Denied.**

80.     By deficiency letter dated December 3, 2013, FINRA asked Spartan Securities for

a "detailed explanation of the Issuer's relationship with Al Mirman." Spartan Securities sent

FINRA's deficiency letter only to <u>Mirman</u> to address this and other questions. Spartan Securities

misrepresented to FINRA that the sole officer approached Mirman, a social acquaintance, for a

broker-dealer recommendation and "Mirman has no relationship with Changing Technologies."

Lopez authorized this response despite Mirman having solicited Spartan Securities, sent Spartan

Securities a series of documents for the Form 211, and approved the certified shareholder list which

Spartan Securities submitted to FINRA with the Form 211. Moreover, no one at Spartan Securities

(including Lopez) conducted any investigation into Mirman's disciplinary history, including his

being barred by FINRA in 2007 from association with any FINRA member.

**ANSWER:     Defendant admits receiving a letter from FINRA dated December 3, 2010 asking about the Issuer's relationship with Mirman.  Defendant admits sending the letter from FINRA to Mirman but denies Mirman was the only one to receive it.  Defendants received a response to FINRA's letter from the CEO of Changing Technologies providing**

the "detailed explanation" requested, including the representation that "Mr. Mirman has no relationship with Changing Technologies." Defendants admit Spartan Securities transmitted this response to FINRA. Defendants admit that Mr. Lopez reviewed the response. Defendants deny the remaining allegations of Paragraph 80.

### Island Stock Transfer's Involvement in the Mirman/Rose Fraud

81.     Mirman and Rose retained Island Stock Transfer as the transfer agent for at least 12 of the Mirman/Rose Companies at or around the same time as retaining Spartan Securities to file the Form 211. For example, by email dated June 29, 2012, Dilley instructed an employee from each of Spartan Securities and Island Stock Transfer to "send [Rose] 211 docs. [Transfer agent] agreement same terms as last deal they sent us."

**ANSWER:**     **Defendants admit the existence of a June 29, 2012 email from Dilley to an employee of Spartan Securities and Island Stock Transfer containing an unmodified version of the language quoted in Paragraph 81. Defendants admit that Island was the stock transfer agent for certain entities identified in the complaint that also filed Forms 211 through Spartan and, in responding to those allegations, incorporate their response to Paragraph 35 as though set forth fully herein. Beyond that, Defendants deny the allegations of Paragraph 81.**

82.     Dilley, Island Stock Transfer's president, originated each relationship and personally took a number of steps on behalf of Island Stock Transfer for Mirman and Rose. Island Stock Transfer's employees also ignored a host of red flags indicating that Mirman and Rose controlled the issuers as blank check companies and sold all the securities of those issuers owned by affiliates.

**ANSWER:**     **Denied.**

83.     Island Stock Transfer has extensive written policies and procedures, which it largely ignored in its various transfer agent functions for the Mirman/Rose Companies. Island Stock Transfer's policies and procedures contained many provisions intended to ensure that Island Stock Transfer employees communicated only with authorized persons as identified in writing by the issuer clients. As part of the initial "client" package (sent to Mirman or Rose), Island Stock

Transfer requested the issuer to complete a "Corporate Authorization Form" to identify those persons with whom Island Stock Transfer could communicate about the issuer. Mirman or Rose was named as an authorized person for only two of the 12 Mirman/Rose Companies for which Island Stock Transfer acted as transfer agent, yet for all 12 companies Island Stock Transfer took directions exclusively from Mirman and Rose.

**ANSWER:    Defendants admit the Island has extensive written policies and procedures but deny the characterization of those documents in Paragraph 83.  Defendants admit that Island Stock Transfer sent a "Corporate Authorization Form" as part of its initial "client package." Defendants deny the remaining allegations of this paragraph.**

84.    Island Stock Transfer's policies and procedures also required the issuer to provide a "list of insiders/control persons" at the onset of the relationship. Island Stock Transfer's employees requested such lists from Mirman and Rose (not the sole officer), but never received one for any of the Mirman/Rose Companies.

**ANSWER:    Defendants admit that Island Stock Transfer has policies and procedures including the requirement that the issuer provide Island Stock Transfer with a list of the issuer's insiders or control persons.   Defendants deny the characterization of those procedures set forth in this paragraph.   Defendants deny any remaining allegations of Paragraph 84.**

85.    According to Island Stock Transfer's policies and procedures, all transfer records and shareholder lists are the "highly confidential" property of the issuer, and "shall not be given to unauthorized parties under any circumstances." Moreover, Island Stock Transfer's policies and procedures stated that "[s]hareholders may inquire about shares they own personally, but may not be provided with information concerning any other shareholder." Nonetheless, Island Stock Transfer employees consistently provided both issuer and shareholder information to Mirman and Rose without inquiry.

**ANSWER:    Defendants admit that Island Stock Transfer has policies and procedures including the language quoted in Paragraph 85.  Defendants deny the characterization of those procedures set forth in this paragraph. Defendants deny any remaining allegations in Paragraph 85.**

86.     At Dilley's instruction, Island Stock Transfer employees exclusively communicated with and took direction from Mirman and Rose - and not the sole officer or shareholders - regarding both the issuers and the shares in the names of the friends and family. Island Stock Transfer first prepared a certified shareholder list with personal information provided by Mirman and Rose. Island Stock Transfer employees (some of whom were also employees of Spartan Securities, which used the lists for the pending Forms 211) requested and acted on Mirman and Rose's approval of the list. Also, by email dated February 8, 2013, Rose instructed Dilley to make changes to the certified shareholder list of a Mirman/Rose Company.

**ANSWER:    Defendants admit the existence of a February 8, 2013 email from Rose to Dilley.  The remaining allegations lack sufficient specificity to allow Defendants to form a belief as to the truth or falsity of the allegation, and Defendants deny the same. Defendants deny any remaining allegations of Paragraph 86.**

87.     Mirman and Rose then requested Island Stock Transfer to prepare stock certificates without a restrictive legend (stamped on the certificate to indicate that the shares are restricted from transfer or sale) in the names of the same number of friends-and-family shareholders (24). Island Stock Transfer's policies and procedures provided that shares without restrictive legend "can NOT be issued in the name of an insider" (emphasis in original). Island Stock Transfer training materials reiterated that "Insiders ALWAYS have restricted stock" (emphasis in original). Island Stock Transfer's Director of Operations, who trained the lower-level employees, knew that "insider" included "affiliates" as defined in Rule 144 of the Securities Act. Despite the "affiliate" definition including those controlled by or together with an issuer, the Director of Operations only looked to see if the shareholder was a named officer or 15%+ shareholder (or spouse of either one) to determine the "insider" or "affiliate" status. Even so, Island Stock Transfer issued unlegended certificates in the name of the spouse of the sole officer for at least 4 Mirman/Rose Companies.

**ANSWER:    Defendants admit that Island has policies and procedures including the language quoted in Paragraph 87.    Defendants deny that the allegations contained in**

**Paragraph 87 accurately characterize those procedures. Defendants deny the remaining allegations of Paragraph 87.**

88.     Island Stock Transfer delivered all 24 certificates to Mirman and Rose (who were not named shareholders), despite Island Stock Transfer's policies and procedures that shareholder information could only be provided to the shareholders themselves. For example, on February 14, 2013, Island Stock Transfer asked Rose for delivery instructions for "each certificate" of First Independence stock. Rose directed Island Stock Transfer to "mail all of the certificates to me as always in the past."

**ANSWER:     Defendants admit that on February 14, 2013 Island requested delivery instructions for the outstanding shares of First Independence stock.  Defendants admit they were instructed to deliver all certificates to Rose.   Defendants deny the remaining allegations of this paragraph.**

89.     Shortly after the clearance of Spartan Securities' Form 211, Mirman and Rose requested Island Stock Transfer's assistance with DTC applications premised on the securities being unrestricted. Island Stock Transfer submitted at least 12 DTC transfer agent attestation forms (6 signed by Dilley) attesting that it would comply with DTC's operational requirements, including exercising diligence in the related securities transactions and providing DTC with complete and accurate information about the securities. Island Stock Transfer also received $7,500 from Envoy Group in connection with a DTC "services agreement."

**ANSWER:     Defendants admit Island submitted at least 12 DTC transfer agent attestation forms and admit to the contents of those forms.  To the extent this paragraph characterizes or summarizes those forms, Defendants deny those allegations.   Defendants deny the remaining allegations of paragraph 89.**

90.     Island Stock Transfer, at the direction of Mirman or Rose, routinely transferred an unlegended certificate in the name of one friend-and-family shareholder to Cede & Co. in order to secure DTC eligibility. Dilley and other Island Stock Transfer employees also fielded Rose's frequent urgent requests for updates on the DTC applications.

**ANSWER:**   **Defendants admit to responding to requests from the companies identified in the complaint, or their agents, asking for updates on DTC applications.  Defendants deny the remaining allegations of paragraph 90.**

91.     Island Stock Transfer then effectuated the bulk transfer of all or virtually all the securities (both the control block in the name of the sole officer and the friends-and-family shares) of at least 12 Mirman/Rose Companies through the preparation and delivery of unlegended stock certificates to a small buyer group. The same or substantially similar groups (represented by the same counsel) purchased multiple Mirman/Rose Companies.

**ANSWER:**   **Defendants admit that Island Stock Transfer effectuated certain share transfers for the companies identified in the complaint but denies "effectuating" "bulk transfers."  Defendants deny the remaining allegations in this Paragraph.**

92.     Island Stock Transfer received instruction letters from buyer's counsel who presented Island Stock Transfer with blank stock powers (sometimes dated months earlier) for the entire set of certificates that Island Stock Transfer had originally delivered to Mirman or Rose. The instruction letters detailed how all the shares would be transferred. For some issuers, there was a single instruction letter indicating that all shares were simultaneously being purchased pursuant to attached stock purchase agreements "of like tenor" with Rose identified as "Seller's Representative." For other issuers, Island Stock Transfer received 5-6 instruction letters from the same counsel in a short period of time with a series of stock purchase agreements with the same effective date and purchase price.

**ANSWER:**   **Defendants admit to receiving instruction letters from buyers' counsel in connection with providing transfer services, but, given the lack of specificity in this paragraph as to which entity or which transfer the allegations relate, Defendants lack sufficient knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph and therefore denies the same.**

93.     Island Stock Transfer received a legal opinion letter for only two of the 12 bulk transfers (First Independence and First Social). Those two letters were from the same lawyer

(Harrison) on the same day with obvious misstatements that First Independence was not a "shell"

company and First Social's sole officer's spouse was not an "affiliate" of First Social.

**ANSWER:** **Defendants admit Island Stock Transfer received a legal opinion letter for certain shares of First Independence and First Social. The content of the documents speak for themselves, do not require a response from Defendants, and Defendants deny the same. Defendants deny the remaining allegations contained in this paragraph.**

94.    Shortly after the bulk transfers, Island Stock Transfer continued to support the small

buyer groups in transferring their certificates into Cede & Co. and broker positions by which the

buyer groups publicly traded shares of the Mirman/Rose Companies. For example, First

Independence became the subject of a fraudulent pump-and-dump in public trading shortly after

FINRA's clearance of Spartan Securities' Form 211 and Island Stock Transfer's bulk transfer of

First Independence securities.

**ANSWER:** **Given the lack of specificity in this paragraph as to what entity is being referred to, what "bulk transfers" it refers to, and what "small buyer groups" it "continued to support," Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph, and therefore deny the same. Defendants also lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegation that First Independence later became the subject of "a fraudulent pump and dump," And therefore deny the same. Defendant deny all remaining allegations contained in this paragraph.**

95.    Island Stock Transfer routinely processed the bulk transfers without restrictive

legend solely on the basis of the instruction letters and blank stock powers, and despite knowing

or recklessly not knowing - and ignoring red flags - that the bulk transfers involved affiliates. The

bulk nature of the sale itself was indicative of the affiliate status of the sellers - i.e. the fact that all

shares were being sold at the same time to a small group of buyers indicated common control over

all such shares.

**ANSWER:** **Denied.**

96.    For example, in October 2011, Island Stock Transfer transferred all the securities

of two Mirman/Rose Companies (Rainbow Coral and Neutra) to the same buyers' counsel. Dilley

had recently signed the Forms 211 for both issuers upon Mirman and Rose's request. Dilley was also aware that in September 2011 Mirman had ordered Island Stock Transfer to pay a Rainbow Coral invoice out of funds attributed to Neutra. Also in September 2011, Rose requested that Island Stock Transfer transfer the certificate of one Neutra shareholder to a buyer who, two weeks later, was part of the bulk transfer of all other Neutra securities. Dilley signed unlegended certificates for both the Neutra and Rainbow Coral bulk transfers on the same day.

**ANSWER:   Defendants admit that Island Stock Transfer effectuated share transfers for shareholders of both Neutra and Rainbow Coral in October 2011.  Defendants deny that Dilley had "recently" signed the Forms 211.  Given the lack of specificity in this paragraph as to the underlying transaction, Defendants lack sufficient knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph and therefore denies the same.  Defendants deny any remaining allegations contained in this paragraph.**

97.     Similarly, in December 2012 and January 2013, Dilley signed letters on behalf of Island Stock Transfer at Mirman and Rose's request expressly in furtherance of Mirman and Rose's selling E-Waste and Global Group. In January and February 2013, Island Stock Transfer received instructions from the same buyers' counsel for the transfer of virtually all the securities of E-Waste and Global Group to the same group of five buyers (including an entity in the counsel's name). Island Stock Transfer also received a stock purchase agreement providing that "all of the free trading shares" of E-Waste were being purchased pursuant to stock purchase agreements "of like tenor" with Rose as "Seller's Representative."

**ANSWER:   Defendants admit that across January and February of 2013, Island Stock Transfer received separate instructions to transfer outstanding shares of E-Waste, on the one hand, and Global on the other.  Defendants admit Island Stock Transfer received a stock purchase agreement as referenced in Paragraph 97.  Defendants deny the remaining allegations of Paragraph 97.**

98.     Later in 2013, Island Stock Transfer similarly delivered all the shares of two other Mirman/Rose Companies (First Independence and First Social) to the same buyer's counsel based on instructions to transfer all the "free-trading" securities at the same time as the control block.

**ANSWER:      Defendants lack sufficient knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph and therefore denies the same.  Defendants deny any remaining allegations contained in this paragraph.**

99.      In June and July 2014, Island Stock Transfer effectuated the bulk transfer of all the securities of Changing Technologies per instruction letters and blank stock powers on behalf of the same or substantially similar buyer group represented by the same counsel as at least four other Mirman/Rose Companies. Island Stock Transfer's "batch" (the set of documents reviewed for the transfer requests) included an email exchange dated June 3, 2014, between Mirman and the buyer's counsel with respect to the stock certificate of one of the friends-and-family shareholders for whom Island Stock Transfer had already issued a new certificate in the name of Cede & Co. The buyer's counsel told Mirman that it was missing that shareholder's certificate. Mirman responded: "His stock was deposited with [a broker] for DTC purposes. You have to have someone open an account with [the broker] and purchase the stock at a nominal amount." Despite these indications of Mirman's control over the bulk transfer of all the "free-trading" shares of Changing Technologies to one buyer group, Island Stock Transfer delivered unlegended certificates for all of the other outstanding shares to the buyer's counsel.

**ANSWER:      Defendants admit that the June 3, 2013 email is included amongst the transfer documents Island received for Changing Technologies, but deny the characterization of that email contained in paragraph 99.  Defendants deny the remaining allegations of paragraph 99.**

### B.  The Daniels/Fan/Harrison Shell Factory

100.      Daniels, Fan and Harrison manufactured undisclosed blank check companies based on a deceptive public float of purportedly unrestricted shares. Other than PurpleReal, Daniels acquired a small local business and filed a Form S-1 secondary offering for shares he had gifted to approximately 30 friends and family. Daniels and Harrison then orchestrated Form 211 and DTC applications for the float to be eligible for open-market trading and clearing.

**ANSWER:**   **Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph relating to what Daniels, Fan and/or Harrison did or intended to do, and therefore deny the same. Defendants deny any remaining allegations of paragraph 100.**

101.     Daniels and Harrison sold their first company, Dinello/AF Ocean, to Fan for approximately $500,000 in Fan's endeavor to amass a roster of public companies for later reverse mergers with Chinese companies. Daniels and Fan then agreed to create three more public vehicles from scratch: Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex.

**ANSWER:**   **Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in this Paragraph relating to what Daniels, Fan and/or Harrison did or intended to do, and therefore deny the same. Defendants deny any remaining allegations of paragraph 101.**

102.     Daniels and Harrison retained Spartan Securities to file the following Forms 211:

| Daniels Company | Form 211 Filing | Form 211 Clearance | Form 211 |
|---|---|---|---|
| Dinello/AF Ocean | 5/20/2011 | 06/14/2011 | Dilley |
| Court/ChinAmerica | 7/24/2012 | 8/30/2012 | Eldred |
| Wallbeds/Sichuan | 10/25/2012 | 11/30/2012 | Eldred |
| TTB/Ibex | 9/6/2013 | 10/29/2013 | Eldred |
| PurpleReal | 7/31/2014 | N/A (stop order) | Eldred |
|  |  |  |  |

**ANSWER:**   **Defendants admit that the companies listed in the above chart retained Spartan Securities to assist in filing Forms 211.  Defendants admit to the dates of filing and clearance of the Forms 211 as set forth in Paragraph 102.  Defendants admit to the signatory of each Form 211 as set forth in Paragraph 102.  Defendants deny the remaining allegations of this paragraph.**

### Eldred's Knowledge of/Participation in the Daniels/Fan/Harrison Fraud

103.     Daniels and Harrison have been friends with Eldred for at least 10 years. Harrison and Eldred's wife had each been the sole officer of an issuer which had been acquired by reverse merger or other change-in-control transaction. Harrison and Daniels had assisted with the registration and sale of the issuer associated with Eldred's wife. Eldred had offered that issuer to

a prospective buyer performing a "shell search" in October 2009, and Daniels referred to that issuer

as a "vehicle" in March 2010.

**ANSWER:**   **Defendants admit Daniels and Harrison have been friends with Eldred for at least 10 years.  Defendants admit that both Eldred's wife and Harrison have been a sole officer of an issuer that was later acquired.  Defendants admit that Eldred's wife retained Harrison and her law firm to assist with the registration of Eldred's wife's company and, later, the sale of that company.  Defendants admit Eldred had offered his wife's company for sale, including to an individual who was performing a "shell search" but Defendants deny that the entity was a shell.  Defendants deny the remaining allegations contained in this paragraph.**

104.    By email dated November 30, 2010, Eldred asked Harrison if regulators would have

concern if his wife "creates another public company." Harrison responded that she and Daniels

"are filing [Dinello/AF Ocean] under my name and it has been two years since [Harrison's other

public company's] acquisition."

**ANSWER:**   **Admitted.**

105.    Eldred otherwise understood Daniels to be a principal (albeit undisclosed) of

Dinello/AF Ocean. In April 2011, Daniels requested that Eldred prepare an Island Stock Transfer

transfer agent agreement for Dinello/AF Ocean. In return for waiving Island Stock Transfer's

normal $7,500 setup fee, Eldred asked Harrison to modify Island Stock Transfer's form contract

by "put[ting] a paragraph in the contract that if the company does a reverse merger or there is a

change of control then . . . there is a $5,000 termination fee," a red flag that the issuer was intended

to be sold from the onset.

**ANSWER:**   **Defendants admit Daniels transmitted the request that Eldred prepare a transfer agent agreement for Dinello.  Defendants deny that they have a "normal" set up fee. Defendants admit Harrison was retained to revise the form agreement.  Defendants deny the remaining allegations contained in this paragraph.**

106.    Spartan Securities then filed Dinello/AF Ocean's Form 211 in May 2011

misrepresenting that the current and future business plan was the operation of a pizzeria, there was

no present or future arrangement with respect to the transfer of any shares, and Spartan Securities

was not aware or in possession of any material or adverse information about Dinello/AF Ocean.

Spartan Securities also misrepresented that Eldred was contacted by the named officer (other than

Harrison) of Dinello/AF Ocean, whose identity Daniels and Harrison used to create the façade of

independent management and who never communicated with and had not even heard of Spartan

Securities or Eldred.

**ANSWER:    Defendants admit Spartan Securities filed the Form 211 for Dinello in May 2011.  Defendants deny the remaining allegations of this paragraph.**

107.    Soon after Form 211 clearance, by email dated July 20, 2011, Daniels asked Eldred

if he knew whether a law firm was "doing any [reverse mergers] that they may need a shell for?"

Two days later, Eldred referred that law firm to Daniels for "an OTCBB vehicle that [Daniels]

would like to do something with." On August 18, 2011, Daniels again asked Eldred about

"available vehicles for a [reverse merger]" with Dinello/AF Ocean.

**ANSWER:    Defendants admit the existence of the emails referenced in Paragraph 107.  In that this paragraph purports to paraphrase, summarize, or characterize this communication, its context, or its importance, Defendants deny those allegations. Defendants deny the remaining allegations of this paragraph.**

108.    Eldred also assisted Daniels with DTC eligibility for Dinello/AF Ocean. In June

2011, Spartan Securities initiated the DTC application misrepresenting that Dinello/AF Ocean was

"not a shell" and otherwise eligible for electronic clearance. The application was granted in July

2011, but revoked because there was no subsequent deposit of shares into the DTC system. By

email dated October 10, 2011, Eldred told Daniels "I'm working on getting it fixed for you" and

discussed internally that an "x-clear transaction needs to take place" for DTC eligibility to be

reinstated.

**ANSWER:    Defendants admit the existence of the October 10, 2011 email.  In that this paragraph purports to paraphrase, summarize, or characterize this communication, its context, or its importance, Defendants deny those allegations. Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained**

in this Paragraph  relating to the DTC application and therefore deny the same.  Defendants deny the remaining allegations of this paragraph.

109.     That same day, Eldred signed securities deposit forms misrepresenting that Daniels was never an "affiliate" of Dinello/AF Ocean. Specifically, in signing the forms, Eldred misrepresented to Spartan Securities' clearing firm that he had "carefully reviewed" the request and supporting documents, and to his "best knowledge the information is true and correct and is made in compliance with all applicable federal and state securities laws" - despite knowing or being reckless in not knowing that Daniels controlled Dinello/AF Ocean.

**ANSWER:     Defendants admit that Eldred signed the securities deposit forms.  Defendants deny the remaining allegations of this paragraph.**

110.     On October 12, 2011, Eldred was copied on an email confirming that Spartan Securities was putting in an order to sell Dinello/AF Ocean shares on Daniels' behalf. In fact, a Spartan Securities proprietary account purchased Daniels' shares. Eldred confirmed with Daniels that this trade "has your problem worked out as long as DTC cooperates with our plan."

**ANSWER:     Defendants admit the existence of the October 12, 2011 email.  In that this paragraph purports to paraphrase, summarize, or characterize this communication, its context, or its importance, Defendants deny those allegations. Defendants deny the remaining allegations of this paragraph.**

111.     As early as October 2011, Eldred knew or was reckless in not knowing that Daniels and Harrison had sold Dinello/AF Ocean to Fan. In or about June 2012, Eldred first negotiated with Fan to use Dinello/AF Ocean as a "public shell" for a potential reverse merger with Spartan Securities and Island Stock Transfer's parent company. By email dated July 11, 2012, Eldred wrote Fan (copying Daniels and Harrison): "The net result is that you and your investors get an equity interest in our business, and you end up with the same basic public OTCBB shell that you have now."

**ANSWER:     Defendants admit that more than a year after the Dinello Form 211 was cleared by FINRA, Mr. Eldred sent an email, dated July 11, 2012, to Fan, copying Daniels**

and Fan, which included the language quoted in Paragraph 111.  In that this paragraph purports to paraphrase, summarize, or characterize this communication, its context, or its importance, Defendants deny those allegations.   Defendants deny the remaining allegations of this paragraph.

112.   Eldred also became aware that Daniels and Fan were manufacturing Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex for Fan as public vehicles. On July 24, 2012, Spartan Securities filed the Form 211 for Court/ChinAmerica with Eldred signing as the principal responsible for all related submissions to FINRA. On July 30, 2012, Daniels told Eldred "Don't forget that Andy [Fan] has three companies that he is doing registrations on including the 211 we filed on Court. So there should be plenty of room for you to have a meeting of the minds with [Fan]. Court is a super clean company that is a non-shell and the assets are fully depreciated so there can be a disposal of assets for a real clean deal." By email dated July 30, 2012, Eldred responded "I would be happy to use Court as a vehicle" while its Form 211 was pending.

**ANSWER:**   **Defendants admit that Spartan Securities filed the Form 211 for Court/Chin America on July 24, 2012.  Defendants admit Mr. Eldred is the signatory.  Defendants admit that Eldred and Daniels exchanged emails dated July 30, 2012 containing an unmodified version of the language quoted in Paragraph 112.  In that this paragraph purports to paraphrase, summarize, or characterize that correspondence, Defendants deny those allegations.  Defendants deny all remaining allegations in this Paragraph.**

113.   Eldred took further actions for Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex knowing or being reckless in not knowing that both Fan's involvement in and the purpose of the issuers were undisclosed. On September 5, 2012, Eldred received an email (with the subject "AF Ocean Investment") from an Island Stock Transfer employee to sign up Wallbeds/Sichuan as "yet another company with [Island Stock Transfer]." Eldred forwarded the message to Daniels and asked him to "call me."

**ANSWER:**   **Defendants admit that Eldred received an email dated September 5, 2012 from and Island employee containing an unmodified version of the language quoted in Paragraph 113.  Defendants admit that Mr. Eldred forwarded that email to Daniels in an email that includes the phrase "call me."  In that this paragraph purports to paraphrase, summarize,**

or characterize this correspondence, Defendants deny those allegations.  Defendants deny all remaining allegations in this Paragraph.

114.    In October 2012, Eldred approved Spartan Securities' submission of a price quote to FINRA for Court/ChinAmerica per the request of an employee of Dinello/AF Ocean, which Eldred himself had referred to as a "public OTCBB shell that [Fan has] now." In January 2013, Eldred was forwarded a request from an AF Ocean employee for a transfer agent agreement for TTB/Ibex. Eldred then sent Daniels the TTB/Ibex agreement with the same terms as Dinello/AF Ocean, including the waiver of all upfront fees in favor of a fee in the event of a reverse merger.

**ANSWER:    Defendants admit the October 2012 submission of a price quote by Spartan Securitiesfor Court/ChinAmerica. Defendants admit receipt of the January 2013 request for a transfer agent agreement for TTB/Ibex.  Defendants deny the remaining allegations of this paragraph.**

115.    Despite knowing or recklessly not knowing that these issuers were being developed as public vehicles for Fan, Eldred signed the three Forms 211 misrepresenting that each issuer was pursuing local business operations with no plans for mergers or changes of control despite, for example, Eldred himself proposing to "use [Court/ChinAmerica] as a vehicle" while its Form 211 was pending. The three Forms S-1 (part of the Rule 15c2-11(a) information) made these same misrepresentations, and also omitted any reference to Fan. The three Forms 211 also misrepresented that Spartan Securities had no other material or adverse information in its possession.

**ANSWER:    Denied.**

116.    In these three Forms 211, Spartan Securities also misrepresented that it had no relationship with any officer or representative, despite (1) Daniels assisting the Eldreds with the sale of the prior public company in the name of Eldred's wife; (2) Daniels being a customer with whom Spartan Securities entered open-market trades, (3) Eldred assisting Daniels with a shell

buyer for Dinello/AF Ocean, and (4) Daniels assisting Spartan Securities in finding a potential reverse merger candidate (including all three Fan issuers).

**ANSWER:     Denied.**

117.     Spartan Securities also misrepresented the manner in which it was solicited to file the Form 211. On Wallbeds/Sichuan and TTB/Ibex, Spartan Securities misrepresented that Eldred had been telephonically contacted by a "friend" (a Dinello/AF Ocean employee), and had no relationship with any of their representatives (e.g. Daniels). FINRA then asked for more detail on the manner of solicitation in its first Wallbeds/Sichuan deficiency letter. The assistant sent Eldred the portion of the Form 211 on the manner of solicitation: "Am I missing something here, or did I do something wrong?" Eldred told the preparer just to "remove the friend part," which remained in the later Form 211 for TTB/Ibex.

**ANSWER:     Defendants admit receipt of correspondence from FINRA regarding Wallbeds/Sichuan.  Defendants admit the contents of the email communications quoted in paragraph 117.  Defendants deny the remaining allegations of this paragraph.**

118.     Spartan Securities also failed to inquire further regarding the presence of other red flags. For example, on both Court/ChinAmerica and Wallbeds/Sichuan, by letters dated July 27, 2012 and November 5, 2012, respectively, FINRA noted that numerous shareholders purportedly purchased shares with sequentially numbered cashier's checks (a potential sign of someone other than the shareholder paying for the shares). Spartan Securities' own policies and procedures (and SEC guidance) identify the "transfer of shares by control persons, as gifts, to third persons in order to help create a public market" as a red flag. Without any further inquiry into the information containing red flags, Spartan Securities simply cut-and-pasted responses received on behalf of the issuers (from Harrison and a Dinello/AF Ocean employee) that one shareholder obtained the checks with cash gathered from the others, when in fact it was Daniels who provided all of the cash for the purchase of the cashier's checks.

**ANSWER:**    Defendants admit that Spartan's policies and procedures include the language quoted in Paragraph 118.  In that Paragraph 118 purports to summarize or characterize those procedures, Defendants deny those allegations.   Defendants admit the receipt of the FINRA deficiency letters dated July 27, 2012 (Court/ChinAmerica) and November 5, 2012 (Wallbeds).  The content of those letters speak for themselves and do not require a response from Defendants, and Defendants deny the same.  Defendants admit Spartan responded to FINRA's inquiry providing the responses it received from the issuers.  Defendants deny the remaining allegations of this paragraph.

119.    Spartan Securities ignored other red flags, including the fact that the same officers and shareholders were involved (up to 26 of the 29 shareholders overlapped on substantially similar "regression diagrams" of the history of share transfers) and each Form S1 was for a secondary offering by which a small company was not raising any money yet incurring all the expenses related to the offering. Eldred did not review the Forms S-1 in connection with the Forms 211 as required by Rule 15c2-11.

**ANSWER:    Denied.**

120.    Eldred later signed the Form 211 and received draft deficiency letter responses for TTB/Ibex. FINRA's deficiency letter raised eight detailed questions, including inquiries into: (1) all relationships among the shareholders and officers; (2) present or future arrangements by which any person other than the named shareholder had control over the Form S-1 shares; (3) confirmation of the Form 211's representation that TTB/Ibex had no intent either to effect a sale of shares or engage in change-of-control transaction; and (4) TTB/Ibex's shell company status. Spartan Securities cut-and-pasted a response letter drafted by a Dinello/AF Ocean employee which listed Fan merely as an officer of TTB/Ibex as of September 2013 and the shareholders (the vast majority of which were shareholders of Dinello/AF Ocean, Court/ChinAmerica, and Wallbeds/Sichuan) as friends of Daniels. However, Spartan Securities failed to disclose any aspect of the Daniels/Fan/Spartan Securities relationship. Specifically, Spartan Securities stated that TTB/Ibex had no intent to engage in a change-of-control transaction and that the purported

business objective (local pressure washing services) would be followed for at least one year, despite Eldred knowing or being reckless in not knowing of Daniels and Fan's manufacture of public shells for Fan without regard to the purported local business operations.

**ANSWER:**    **Defendants admit that Eldred signed the Form 211 deficiency letter responses for TTB/Ibex.  Defendants admit that FINRA sent a deficiency letter with regard to the TTB/Ibex Form 211).  The content of those letters speak for themselves and do not require a response from Defendants, and Defendants deny the same.  Defendants admit that Spartan Securities sent a response letter to FINRA based upon the information provided by the company, which listed Fan as an officer of TTB/Ibex as of September 2013 and the shareholders as friends of Daniels.  TTB/Ibex informed Spartan Securities that it had no intent to engage in a change-of-control transaction and that the purported business objective (local pressure washing services) would be followed for at least one year.  Defendants deny that Eldred knew or was reckless in not knowing of Daniels and Fan's manufacture of public shells for Fan.  Defendants deny any remaining allegations contained in this Paragraph.**

121.    Beyond the initial Forms 211 (and Spartan Securities' initiation of unpriced quotations), Eldred approved submissions of priced quotations to FINRA pursuant to Rule 15c2-11 for Court/ChinAmerica, TTB/Ibex, and Wallbeds/Sichuan in December 2013, January 2014 and May 2014, respectively - just prior to the public trading in those stocks initiated by Daniels and the Dinello/AF Ocean employee. FINRA rejected the initial $0.10 quote on TTB/Ibex given the Form S-1 offering price of $0.01. By email dated January 6, 2014, Eldred acted upon the authorization of Daniels, who was no longer an officer of TTB/Ibex, to lower the quote to that price.

**ANSWER:**    **Defendants admit that Spartan Securities submitted price quotations to FINRA for Court/ChinAmerica, TTB/Ibex, and Wallbeds/Sichuan in December 2013, January 2014 and May 2014, respectively. Defendants admit that FINRA rejected the initial price quote for TTB/Ibex.  Defendants admit receipt of the January 6, 2014 email but deny any allegation contained in the characterization or summary of that email.   Defendants deny all remaining allegations of this paragraph.**

122.    In July 2014, Harrison contacted Eldred to file a Form 211 for PurpleReal. FINRA requested proof of payment by the shareholders (many of whom were shareholders of the other Daniels Companies). Eldred learned that Daniels and Harrison had paid for all the shares, but by

email approved Spartan Securities' response to FINRA misrepresenting that the shareholders had

purchased their shares.

**ANSWER:    Defendants admit that on or about July 2014, Harrison contacted Eldred regarding the filing of a Form 211 for PurpleReal and that FINRA had requested certain documentation in response to the filing of the Form 211, including information relating to the manner shareholders paid for their shares.  Defendants deny any remaining allegations contained in this Paragraph.**

## COUNT I

### Violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act

#### (Against Spartan Securities)

123.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:    Defendants restate their responses to Paragraphs 1 through 122 as though fully set forth herein.**

124.    From at least as early as January 2010 through at least May 2014, Spartan Securities

published quotations for securities or, directly or indirectly, submitted quotations for publication,

in any quotation medium without having a reasonable basis for believing, based on a review of the

documents and information required by Rule 15c2-11(a)(1) through (a)(5) ("paragraph (a)

information") together with other documents and information required by Rule 15c2-11(b), that

the paragraph (a) information was accurate in all material respects and that the sources of that

information were reliable.

**ANSWER:    Denied.**

125.    By reason of the foregoing, Spartan Securities violated, and, unless enjoined, is

reasonably likely to continue to violate, Section 15(c)(2) of the Exchange Act, 15 U.S.C. 78o(c)(2),

and Rule 15c2-11, 17 C.F.R. § 240.15c2-11.

**ANSWER:    Denied.**

## COUNT II

## Aiding and Abetting Violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act

### (Against Dilley, Eldred, and Lopez)

126.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:**    **Denied.**

127.    From at least as early as January 2010 through at least May 2014, Spartan Securities published quotations for securities or, directly or indirectly, submitted quotations for publication, in any quotation medium without having a reasonable basis for believing, based on a review of the paragraph (a) information together with other documents and information required by Rule 15c2-11(b), that the paragraph (a) information was accurate in all material respects and that the sources of that information were reliable, and by reason of the foregoing, violated Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11.

**ANSWER:**    **Denied.**

128.    From at least as early as January 2010 through at least March 2014, Dilley knowingly or recklessly provided substantial assistance to Spartan Securities' violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11, and is deemed to be in violation of this provision to the same extent as Spartan Securities.

**ANSWER:**    **Denied.**

129.    From at least as early as June 2011 through at least May 2014, Eldred knowingly or recklessly provided substantial assistance to Spartan Securities' violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11, and is deemed to be in violation of this provision to the same extent as Spartan Securities.

**ANSWER:**    **Denied.**

130.     From at least as early as March 2013 through at least March 2014, Lopez knowingly or recklessly provided substantial assistance to Spartan Securities' violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11, and is deemed to be in violation of this provision to the same extent as Spartan Securities.

**ANSWER:     Denied.**

131.     By reason of the foregoing, Dilley, Eldred, and Lopez aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, 15 U.S.C. § 78o(c)(2), and 17 C.F.R. § 240.15c2-11.

**ANSWER:     Denied.**

## COUNT III

## Violations of Section 17(a)(1) of the Securities Act

132.     The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:     Defendants restate their responses to Paragraphs 1 through 122 as though fully set forth herein.**

### (Against Spartan Securities, Island Stock Transfer, and Dilley - Mirman/Itose Companies)

133.     From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly knowingly or recklessly employed any device, scheme or artifice to defraud.

**ANSWER:     Denied.**

### (Against Spartan Securities and Eldred - Daniels Companies)

134.     From at least as early as May 2011 through at least August 2014, Spartan Securities and Eldred, in the offer or sale of any securities by the use of any means or instruments of

transportation or communication in interstate commerce or by use of the mails, directly or

indirectly, knowingly or recklessly employed any device, scheme or artifice to defraud.

**ANSWER:**   **Denied.**

135.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and

Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(1)

of the Securities Act, 15 U.S.C. § 77q(a)(1).

**ANSWER:**    **Denied.**

## COUNT IV

### Violations of Section 17(a)(3) of the Securities Act

136.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:**    **Defendants restate their responses to Paragraphs 1 through 122 as though
fully set forth herein.**

 **(Against Spartan Securities, Island Stock Transfer, and Dilley - Mirman/Itose Companies)**

137.    From at least as early as December 2009 through at least July 2014, Spartan

Securities, Island Stock Transfer and Dilley, in the offer or sale of securities by the use of any

means or instruments of transportation or communication in interstate commerce or by use of the

mails, directly or indirectly, negligently engaged in transactions, practices and courses of business

which operated or would have operated as a fraud or deceit upon the purchasers and prospective

purchasers of such securities.

**ANSWER:**   **Denied.**

  **(Against Spartan Securities and Eldred - Daniels Companies)**

138.    From at least as early as May 2011 through at least August 2014, Spartan Securities

and Eldred, in the offer or sale of securities by the use of any means or instruments of transportation

or communication in interstate commerce or by use of the mails, directly or indirectly, negligently

engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities.

**ANSWER:** **Denied.**

139. By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

**ANSWER:** **Denied.**

## COUNT V

### Violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act

140. The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:** **Denied.**

### (Against Spartan Securities, Island Stock Transfer, and Dilley - Mirman/Rose Companies)

141. From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

**ANSWER:** **Denied.**

### (Against Spartan Securities and Eldred - Daniels Companies)

142. From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities.

**ANSWER:** **Denied.**

143.     By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

**ANSWER:     Denied.**

## COUNT VI

### Violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act

144.     The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:     Defendants restate their responses and objections to Paragraphs 1 through 122 as though fully set forth herein.**

**(Against Spartan Securities, Island Stock Transfer, and Dilley - Mirman/Rose Companies)**

145.     From at least as early as December 2009 through at least April 2014, Spartan Securities, Island Stock Transfer, and Dilley, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities.

**ANSWER:     Denied.**

**(Against Spartan Securities and Eldred - Daniels Companies)**

146.     From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities.

**ANSWER:     Denied.**

147.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

**ANSWER:     Denied.**

## COUNT VII

### Violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act

148.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:     Denied.**

**(Against Spartan Securities, Island Stock Transfer, and Dilley - Mirman/Rose Companies)**

149.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of securities.

**ANSWER:     Denied.**

**(Against Spartan Securities and Eldred - Daniels Companies)**

150.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of securities.

**ANSWER:     Denied.**

151.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred violated, and, unless enjoined, are reasonably likely to continue to violate, Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

**ANSWER:    Denied.**

## COUNT VIII

### Aiding and Abetting Violations of Section 17(a)(1) of the Securities Act

152.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:    Defendants restate their responses and objections to Paragraphs 1 through 122 as though fully set forth herein.**

### (Against Spartan Securities and Eldred - Daniels Companies)

153.    From at least as early as July 2010 through at least August 2014, Daniels, Fan and Harrison, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud, and by reason of the foregoing, violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

**ANSWER:    Denied.**

154.    From at least as early as May 2011 through at least August 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan, and Harrison's violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), and are deemed to be in violation of this provision to the same extent as Daniels, Fan, and Harrison.

**ANSWER:    Denied.**

### (Against Spartan Securities, Island Stock Transfer, and Dilley - Mirman/Rose Companies)

155.    From at least as early as January 2009 through at least July 2014, Mirman and Rose, in the offer or sale of any securities by the use of any means or instruments of transportation or

communication in interstate commerce or by use of the mails, directly or indirectly, knowingly or recklessly employed devices, schemes or artifices to defraud, and by reason of the foregoing, violated Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

**ANSWER:     Denied.**

156.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1), and are deemed to be in violation of this provision to the same extent as Mirman and Rose.

**ANSWER:     Denied.**

157.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

**ANSWER:     Denied.**

## COUNT IX

### Aiding and Abetting Violations of Section 17(a)(2) of the Securities Act

158.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:     Defendants restate their responses and objections to Paragraphs 1 through 122 as though fully set forth herein.**

### (Against Spartan Securities and Eldred - Daniels Companies)

159.    From at least as early as July 2010 through at least May 2014, Daniels, Fan, and Harrison, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state

material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and by reason of the foregoing, violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

**ANSWER:**   **Denied.**

160.    From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan, and Harrison's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and are deemed to be in violation of this provision to the same extent as Daniels, Fan, and Harrison.

**ANSWER:**   **Denied.**

**(Against Spartan Securities, Island Stock Transfer, and Dilley - Mirman/Rose Companies)**

161.    From at least as early as January 2009 through at least July 2014, Mirman and Rose, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently obtained money or property by means of untrue statements of material facts or omissions to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and by reason of the foregoing, violated Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

**ANSWER:**   **Denied.**

162.    From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), and are deemed to be in violation of this provision to the same extent as Mirman and Rose.

**ANSWER:**   **Denied.**

163.    By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

**ANSWER:    Paragraph 163 sets forth a legal conclusion to which no answer is required. To the extent an answer is required, Defendants deny the allegations of Paragraph 163.**

## COUNT X

### Aiding and Abetting Violations of Section 17(a)(3) of the Securities Act

164.    The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:    Defendants restate their responses and objections to Paragraphs 1 through 122 as though fully set forth herein.**

### (Against Spartan Securities and Eldred - Daniels Companies)

165.    From at least as early as July 2010 through at least August 2014, Daniels, Fan and Harrison, in the offer or sale of securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities, and by reason of the foregoing, violated Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

**ANSWER:    Denied.**

166.    From at least as early as May 2011 through at least August 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3), and are deemed to be in violation of this provision to the same extent as Daniels, Fan, and Harrison.

**ANSWER:    Denied.**

**(Against Spartan Securities, Island Stock Transfer, and Dilley - Mirman/Rose Companies)**

167.     From at least as early as January 2009 through at least July 2014, Mirman and Rose, in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, negligently engaged in transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon the purchasers and prospective purchasers of such securities, and by reason of the foregoing, violated Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

**ANSWER:     Denied.**

168.     From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3), and are deemed to be in violation of this provision to the same extent as Mirman and Rose.

**ANSWER:     Denied.**

169.     By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 17(a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(3).

**ANSWER:     Denied.**

## COUNT XI

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(a) of the Exchange Act

170.     The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:     Defendants restate their responses and objections to Paragraphs 1 through 122 as though fully set forth herein.**

**(Against Spartan Securities and Eldred - Daniels Companies)**

171.     From at least as early as July 2010 through at least May 2014, Daniels, Fan and Harrison, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

**ANSWER:**     **Denied.**

172.     From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15  U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a), and are deemed to be in violation of these provisions to the same extent as Daniels, Fan and Harrison.

**ANSWER:**     **Denied.**

**(Against Spartan Securities, Island Stock Transfer, and Dilley - Mirman/Rose Companies)**

173.     From at least as early as January 2009 through at least July 2014, Mirman and Rose, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly employed devices, schemes or artifices to defraud in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

**ANSWER:**     **Denied.**

174.     From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(a) of the Exchange

Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a), and are deemed to be in violation of these provisions to the same extent as Mirman and Rose.

**ANSWER:**   **Denied.**

175.   By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) and Rule 10b-5(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(a).

**ANSWER:**   **Denied.**

## COUNT XII

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(b) of the Exchange Act

176.   The Commission repeats and re-alleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:**   **Defendants restate their responses and objections to Paragraphs 1 through 122 as though fully set forth herein.**

#### (Against Spartan Securities and Eldred - Daniels Companies)

177.   From at least as early as July 2010 through at least May 2014, Daniels, Fan and Harrison, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

**ANSWER:**   **Denied.**

178.   From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's

violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(b), and are deemed to be in violation of these provisions to the same extent as Daniels, Fan and Harrison.

**ANSWER:   Denied.**

**(Against Spartan Securities, Island Stock Transfer, and Dilley - Mirman/Rose Companies)**

179.   From at least as early as January 2009 through at least July 2014, Mirman and Rose directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

**ANSWER:   Denied.**

180.   From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b), and are deemed to be in violation of these provisions to the same extent as Mirman and Rose.

**ANSWER:   Denied.**

181.   By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) and Rule 10b-5(b) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(b).

**ANSWER:   Denied.**

## COUNT XIII

### Aiding and Abetting Violations of
### Section 10(b) and Rule 10b-5(c) of the Exchange Act

182. The Commission repeats and realleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:** **Defendants restate their responses and objections to Paragraphs 1 through 122 as though fully set forth herein.**

#### (Against Spartan Securities and Eldred - Daniels Companies)

183. From at least as early as July 2010 through at least May 2014, Daniels, Fan and Harrison, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

**ANSWER:** **Denied.**

184. From at least as early as May 2011 through at least May 2014, Spartan Securities and Eldred knowingly or recklessly provided substantial assistance to Daniels, Fan and Harrison's violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c), and are deemed to be in violation of these provisions to the same extent as Daniels, Fan and Harrison.

**ANSWER:** **Denied.**

#### (Against Spartan Securities, Island Stock Transfer, and Dilley - Mirman/Rose Companies)

185. From at least as early as January 2009 through at least July 2014, Mirman and Rose, directly and indirectly, by use of any means or instrumentality of interstate commerce, or of the mails, knowingly or recklessly engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon any person in connection with the purchase or

sale of securities, and by reason of the foregoing, violated Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

**ANSWER:     Denied.**

186.     From at least as early as December 2009 through at least July 2014, Spartan Securities, Island Stock Transfer, and Dilley knowingly or recklessly provided substantial assistance to Mirman and Rose's violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c), and are deemed to be in violation of these provisions to the same extent as Mirman and Rose.

**ANSWER:     Denied.**

187.     By reason of the foregoing, Spartan Securities, Island Stock Transfer, Dilley and Eldred aided and abetted and, unless enjoined, are reasonably likely to continue to aid and abet, violations of Section 10(b) and Rule 10b-5(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5(c).

**ANSWER:     Denied.**

## COUNT XIV

### Violations of Sections 5(a) and 5(c) of the Securities Act

**(Against Spartan Securities, Island Stock Transfer, and Dilley)**

188.     The Commission repeats and re-alleges Paragraphs 1 through 122 of its Complaint.

**ANSWER:     Defendants restate their responses and objections to Paragraphs 1 through 122 as though fully set forth herein.**

189.     From at least as early as December 2009 until at least July 2014, Spartan Securities, Island Stock Transfer and Dilley, directly or indirectly, have made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, when no registration statement was in effect with the Commission as to such securities, and have made

use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities when no registration statement had been filed with the Commission as to such securities.

**ANSWER:**   **Denied.**

190.    There were no applicable exemptions from registration.

**ANSWER:**   **Denied.**

191.    By reason of the foregoing, Spartan Securities, Island Stock Transfer and Dilley violated, and unless enjoined, are reasonably likely to continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. § 77e(a), (c).

**ANSWER:**   **Denied.**

**Defendants deny each and every allegation set forth in the Complaint that is not expressly admitted.**


## JURY DEMAND

Defendants hereby demands a trial by jury on all issues so triable.


## AFFIRMATIVE DEFENSES

### First Affirmative Defense

Plaintiff's claims and recovery are barred by the applicable statute of limitations including the limitations period set forth in 28 U.S.C. §2462.  No relief may be sought for allegations arising out of activities that occurred more than five years prior to the institution of this proceeding.

### Second Affirmative Defense

Plaintiff has waived and/or is estopped from asserting that the Defendants improperly relied upon the information contained in the registration statements filed with and made effective

by the Securities and Exchange Commission. The Commission was aware, at all times, of the information it now alleges to be fraudulent or indicative of fraudulent conduct in that it reviewed, commented and made effective the registration statements of each company at identified in the Complaint.  Defendants relied upon the Commission's review and its decision to make effective each registration statements.

### Third Affirmative Defense

Plaintiff's claims are barred by the doctrine of unclean hands and/or bad faith.   The Commission was aware, at all times, of the information it now alleges to be fraudulent or indicative of fraudulent conduct in that it reviewed, commented and made effective the registration statements of each company at identified in the Complaint.   Defendants relied upon the Commission's review and its decision to make effective each registration statements.

### Fourth Affirmative Defense

Plaintiff's request for disgorgement is not a proper remedy.

### Fifth Affirmative Defense

Defendants relied upon, in good faith, the requirements of Rule 15c2-1, laws governing transfer agents, as well as their own written policies and procedures put in place to ensure compliance with the federal securities laws. Any alleged violation or failure to comply with this rule was a bona fide error and not the result of negligence, recklessness, or intent.

### Sixth Affirmative Defense

Defendants expressly reserve the right to add additional affirmative defenses as may be revealed through investigation, preparation or discovery and to amend this Answer accordingly.

## **PRAYER FOR RELIEF**

WHEREFORE, Defendants respectfully request that this Court: find that the Plaintiff takes nothing on its claims against Defendants; dismiss Plaintiff's Complaint with prejudice and deny any and all relief requested in the Complaint; enter judgment in favor of Defendants;  and award any other such relief that this Court deems appropriate.

Respectfully submitted this 14th day of June, 2019.

*/s/Alan M. Wolper*_____
Alan M. Wolper (FL Bar No. 61524)
Heidi E. VonderHeide (admitted *pro hac vice*)
**ULMER & BERNE LLP**
500 W. Madison, Suite 3600
Chicago, Illinois 60661
awolper@ulmer.com
Tel: (312) 658-6500
Fax: (312) 658-6501

*Trial Counsel for Defendants*

Anna Patricia Morales Christiansen
(FL Bar. No. 27634)
**SPARTAN SECURITIES GROUP, LTD.,**
15500 Roosevelt Blvd, Suite 303
Clearwater, FL 33760
Tel: 727-502-0508
Fax: 727-502-0858
pmorales@spartansecurities.com

*Local counsel for Defendants.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY THAT** on June 14, 2019, I electronically filed the foregoing document via the Court's CM/ECF electronic filing system, which provides notice to all counsel of record.

*/s/Alan M. Wolper*_____