**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF FLORIDA
 3
 4   SECURITIES AND EXCHANGE      )
     COMMISSION,                  )
 5                                )
          Plaintiff,              )
 6   vs.                         ) CASE NO.:
                                  ) 19-CV-00448-VMC-CPT
 7                                )
     SPARTAN SECURITIES GROUP,    )
 8   LTD., ISLAND CAPITAL         )
     MANAGEMENT, LLC, CARL E.     )
 9   DILLEY, MICAH J. ELDRED and  )
     DAVID D. LOPEZ,              )
10                                )
          Defendants.             )
11   _____)
12
13
14
15
16        DEPOSITION OF MARK HARMON
17           VIA VIDEOCONFERENCE
18          Wednesday, July 29, 2020
19
20
21
22
23   Reported by:
24   Brigitte Rothstein, Stenographer
25   JOB NO. 200729BGR
```

**Page 2**

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF FLORIDA
 3
 4   SECURITIES AND EXCHANGE      )
     COMMISSION,                  )
 5                                )
          Plaintiff,              )
 6   vs.                         ) CASE NO.:
                                  ) 19-CV-00448-VMC-CPT
 7                                )
     SPARTAN SECURITIES GROUP,    )
 8   LTD., ISLAND CAPITAL         )
     MANAGEMENT, LLC, CARL E.     )
 9   DILLEY, MICAH J. ELDRED and  )
     DAVID D. LOPEZ,              )
10                                )
          Defendants.             )
11   _____)
12
13
14
15
16
17
18      Videoconference deposition of MARK HARMON taken
19   on behalf of the Plaintiff beginning at 9:01 a.m. and
20   ending at 11:11 a.m., on Wednesday, July 29th, 2020,
21   before Brigitte Rothstein, Stenographer Court Reporter.
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES:
     For the Plaintiff:
 2   UNITED STATES SECURITIES AND EXCHANGE
 3     COMMISSION
 4   BY:  WILFREDO FERNANDEZ (by VTC)
       Senior Trial Counsel
 5     -and-
       CHRISTINE NESTOR (by VTC)
 6     Senior Trial Counsel
       -and-
 7     ALISE M. JOHNSON (by VTC)
       Senior Trial Counsel
 8     -and-
       JED A. FORET (by VTC)
 9     Senior Paralegal - Trial Unit
       Miami Regional Office
10     801 Brickell Avenue, Suite 1800
       Miami, Florida 33131
11     (305) 982-6376
       nestorc@sec.gov; johnsonali@sec.gov;
12     fernandezw@sec.gov; foretj@sec.gov
13   WILDCAT CONSULTING, INC.
     BY:  JAMES M. CANGIANO (by VTC)
14     President
       20250 Golden Panther Drive
15     Suite 2
       Estero, Florida 33928
16     (239) 405-1471
17
18   For the Defendants:
19     NEW CIVIL LIBERTIES ALLIANCE
       CALEB KRUCKENBERG (by VTC)
20     Counsel
       -and-
21     KARA MCKENNA ROLLINS (by VTC)
       Counsel
22     1225 19th Street Northwest
       Suite 450
23     Washington, DC 20036
       (202) 869-5217
24     caleb.kruckenberg@ncla.legal;
       kara.rollins@ncla.legal
25
```

**Page 4**

```
 1        ALSO PRESENT:
 2          TIMOTHY HUNTER (by VTC)
             Videographer
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

EXHIBIT

2

```
                    INDEX
WITNESS              EXAMINATION
MARK HARMON
     BY MS. FERNANDEZ          8

              EXHIBITS
NUMBER       DESCRIPTION       PAGE
Exhibit 282    Complaint       91
Previously marked exhibit:
Exhibit 188    Island Capital Management,
          LLC Policies & Procedures    42
```

```
1  participating in this deposition acknowledge that I,
2  the Court Reporter, am not present with the Witness,
3  and that I will be reporting the proceedings and
4  administering the oath remotely.  This arrangement is
5  pursuant to the Florida Supreme Court Administrative
6  Order No. AOSC-20-16 (and extended by AOSC-20-32).
7  The parties and their Counsel consent to this
8  arrangement and waive any objections to this manner
9  of reporting.
10        Counsel, please indicate your
11 agreement by stating your name and your agreement
12 on the record.
13        MR. FERNANDEZ:  Wilfred Fernandez.  We
14 agree.
15        MR. KRUCKENBERG:  And Caleb Kruckenberg.
16 We agree.
17        THE COURT REPORTER:  Mr. Harmon, go a
18 head and raise your right hand.
19        Do you swear or affirm that the
20 testimony you're about to give is the truth, the
21 whole truth, and nothing but the truth?
22        THE WITNESS:  Yes.
23 WHEREUPON:
24             MARK HARMON
25 having been first duly sworn, was examined and
```

```
1            Wednesday, July 29th 2020
2            9:01 a.m. - 11:11 a.m.
3                 --oOo--
4        THE VIDEOGRAPHER:  Good morning.  Here
5  begins the videotaped deposition of Mark Harmon in
6  the matter of SEC versus Spartan Securities, et al.
7  This case is being heard in the United States
8  District Court, Middle District of Florida, case
9  number 19-CV-00448-VMC-CPT via Webex.  Today's date
10 is July 29th, 2020.  The time on the record is 9:01.
11        My name is Timothy Hunter.  I'm a
12 videographer with Gradillas Court Reporting.  Also,
13 with us is Brigitte Rothstein with Gradillas Court
14 Reporting.
15        Counsel, would you please introduce
16 yourself, starting with defense counsel, and then
17 the Witness will be sworn.
18        MR. KRUCKENBERG:  Good morning.  This is
19 Caleb Kruckenberg.  I represent the Defendants in
20 this matter.
21        MR. FERNANDEZ:  Good morning.  This is
22 Willy Fernandez from the Securities and Exchange
23 Commission.  And I'm joined by Christine Nestor and
24 Alise Johnson.
25        THE COURT REPORTER:  The attorneys
```

```
1  testified as follows:
2            EXAMINATION
3  BY MR. FERNANDEZ:
4     Q    Okay.  Good morning, Mr. Harmon.  Thank
5  you for joining us in this ungodly hour.
6     A    No problem.
7     Q    I appreciate that you're an attorney, and
8  I apologize for these rudimentary remarks, but remember
9  that the Court Reporter needs us to speak a little
10 slowly, to not interrupt each other and let each other
11 finish our questions and answers, and she needs a
12 verbal response to all the questions.  You can't just
13 say uh-huh or nod.  And I'm sure you know all that.
14        And the standard rudimentary question, are
15 you under the influence of any medication or substance
16 that would prevent you from testifying this morning?
17     A    No.
18     Q    Okay.
19        So good morning again.  You are an
20 attorney with the firm of Hodgson & Russ, correct?
21     A    Hodgson Russ, yes.
22     Q    Hodgson Russ.
23        Can you tell me a little bit about the
24 firm.  Where is it located?
25     A    The firm's largest office is in Buffalo,
```

1 New York where it began. It also has offices in
2 Toronto, Albany, New York City, Saratoga, and one in
3 Florida, I think in West Palm.
4    Q    Okay.
5       And where are you based?
6    A    New York City.
7    Q    Okay.
8       Can you describe your practice for us. Is
9 it transactional, litigation? What do you do exactly?
10   A    I would call myself a business litigator
11 who developed a counseling practice as an adjunct to my
12 litigation practice.
13   Q    Okay.
14      What kind of clients do you counsel?
15   A    Good ones. Businesses, individuals. It
16 runs the gamut.
17   Q    Okay.
18      Do you work with a lot of transfer agents?
19   A    I do.
20   Q    Okay.
21      What percentage of your practice do you
22 think consisting of transfer agents?
23   A    So that's a difficult question to answer
24 whether you mean dollars or hours, but best guess, I'm
25 going to say in the range of forty percent of my day on

9

1 correct?
2    A    I have not been retained for that purpose.
3    Q    Who is paying your fee?
4    A    Who's paying our -- my invoices go to
5 Mr. Kruckenberg's firm.
6    Q    Okay.
7       MR. FERNANDEZ: Jim, can you mute your
8 speaking. Apparently, there's some background static
9 that's coming.
10      MR. CANGIANO: Okay.
11      MR. FERNANDEZ: Is that better,
12 Brigitte?
13      THE COURT REPORTER: Yes. Thank you.
14      MR. FERNANDEZ: Okay. Thank you.
15 BY MR. FERNANDEZ:
16   Q    How much have you been paid so far?
17   A    So I will tell you I don't know, and I can
18 also tell you that I can find out if you want to give
19 me under a minute to look it up.
20   Q    That's all right.
21      You said in your report that you were
22 charging about six hundred and fifty dollars an hour.
23   A    That's for my time. I think four hundred
24 and thirty dollars for my colleague's time.
25   Q    Okay.

11

1 an average.
2    Q    And if you had to estimate, how many
3 transfer agents do you represent at any given time?
4    A    Currently?
5    Q    Yes.
6    A    Currently, active; that is, fielding calls
7 from them on a regular basis, nine, let's say, on a
8 current basis.
9    Q    Okay.
10      And you've been retained by counsel for
11 Island Transfer and asked to provide an opinion as to
12 whether this transfer agent acted reasonably and
13 generally in accordance with accepted practices and
14 procedures; is that correct?
15   A    I think that's basically correct, yes.
16   Q    And you've been retained by counsel for
17 Island, correct?
18   A    That's correct.
19   Q    All right. So you're here to provide an
20 opinion on any actions taken by Spartan or their
21 employees?
22   A    I am not.
23   Q    Okay.
24      And you're not retained to provide an
25 opinion on what our expert has already produced,

10

1       Let me ask you, who's the other attorney
2 who's assisting you in preparing this testimony?
3    A    Erin, E-R-I-N, Teske, T-E-S-K-E.
4    Q    Okay. I'm sorry. Is that a man or a
5 woman?
6    A    That is a woman.
7    Q    A woman.
8       What is her background? What are her
9 qualifications?
10   A    She has -- she's a partner at Hodgson
11 Russ. She has about -- I'm not sure whether it's eight
12 or nine years of experience, and has worked with me on
13 virtually all of my transfer agent matters during the
14 time that she's been at the firm.
15   Q    Okay.
16      And how much of the report is written by
17 her and how much is written by you?
18   A    Again, that's a really difficult question
19 to answer. So the report is a collaboration. It
20 involves our joint discussions and analysis of the
21 issues. I would say that she did the first drafting of
22 the report, and I did the editing, revising, and
23 commenting.
24   Q    Okay.
25      And did you review all those documents

12

1 that you listed in your report, or did Erin?
2      A     I did.  She may have reviewed many of
3 them, as well, but everything listed in the report, I
4 reviewed.
5      Q     Is your six hundred and fifty dollars, is
6 that your standard rate?
7      A     Yes.
8      Q     Okay.
9            Is there a different rate for litigation
10 if this matter was to go to court?
11      A     No.  Once it goes to court next year.
12      Q     Have you ever testified in court before?
13      A     Yes.
14      Q     Okay.
15            And have you been qualified as an expert
16 the times you testified?
17      A     No.
18      Q     Can you describe generally the nature of
19 the testimony you've given.
20      A     I testified once in a bankruptcy action
21 regarding actions I had taken on behalf a client who
22 was not a party to the bankruptcy proceeding, but
23 who's -- who was involved.  And I testified twice
24 regarding the fairness of fees that my firm was
25 charging.

                          13

1      Q     Okay.
2      A     I think that's it in court.
3      Q     Have you ever failed to qualify as an
4 expert in any sort of proceeding?
5      A     No.
6      Q     Have you represented Island for any other
7 case, other than what we're here for today?
8      A     I believe that I was asked a discrete
9 question once about -- not about a litigation, but
10 about a matter affecting transfer agents, so I believe
11 that there was one instance where I was asked to
12 provide them some advice.
13      Q     Okay.
14            But you don't consider yourself their
15 regular lawyer, so to speak?
16      A     I did not count them among the nine when I
17 gave you that number earlier of the transfer agents I
18 regularly represent.
19      Q     Have you ever represented any clients with
20 the SEC?
21      A     I'm not sure I understand what you mean.
22      Q     Have you ever represented a client who had
23 an issue with the Securities and Exchange Commission?
24      A     Yes.
25      Q     Okay.

                          14

1            And what did that consist of?
2      A     There've been several.
3      Q     Okay.
4            Did you accompany a witness to an
5 investigative testimony?
6      A     Yes.
7      Q     Did you write a letter?
8      A     Yes.
9      Q     Tell me the type of work that you do.
10      A     I have represented transfer agents in
11 investigations that were conducted into various aspects
12 of their practices and conduct.  On many occasions,
13 I've accompanied witnesses who gave testimony.  I've
14 produced documents.  I attended settlement conferences
15 and meetings.  I negotiated settlement documents.  All
16 administratively, none that I can recall actually in
17 actual court proceedings.
18      Q     And which offices of the SEC was that you
19 had to --
20      A     Florida, Los Angeles, New York.  I'm
21 thinking maybe Denver.  I've dealt with the
22 Philadelphia office.  I've dealt with the Chicago
23 office.  I've dealt with the Boston office.  I would
24 also say I've dealt with many instances with subpoena
25 compliance when the Commission serves subpoenas on

                          15

1 transfer agents, not regarding the transfer agent, but
2 in order to obtain information regarding issuers for
3 whom they're acting.  So there's been an awful lot of
4 that, as well.
5      Q     Okay.
6            Have you done the same type of work with
7 FINRA at all?
8      A     Never with FINRA.
9      Q     Never with FINRA.
10            You said that about forty percent of your
11 work, and we're estimating, obviously, forty percent of
12 your work involves transfer agents.  What is the other
13 sixty percent consist of?
14      A     I regularly represent accounting firms in
15 defending audit malpractice actions and in connection
16 with SEC testimony.  And beyond that, I would not say
17 there's an area of specialization so much as that I
18 have been a business litigator for more than forty
19 years and have a wide range of -- being involved in a
20 wide range of litigation matters, all business related
21 and trust and estate generally.
22      Q     Let me ask you briefly about your
23 educational background.  Where did you go to college
24 and lawsuit?
25      A     I went to the state University of New York

                          16

1  at Buffalo for my undergraduate degree, and I attended
2  Brooklyn Law School.  I graduated from Brooklyn Law
3  School.
4     Q     Okay.
5         Do you hold any licenses within the
6  securities industry?
7     A     I do not.
8     Q     Are you admitted in Florida?
9     A     I am admitted in New York State and in
10  various federal courts around the country, circuit
11  courts.  For a time, I was admitted to the Colorado
12  District Court.  And I have a number of pro hoc
13  admissions throughout the country, as well.
14     Q     But do you know if you're admitted in the
15  Middle District of Florida?
16     A     I do not think I've ever practiced in the
17  Middle District.  In Miami.
18     Q     Tampa, actually.
19     A     No.  No.  I've been admitted pro hoc in
20  Miami.
21     Q     In Miami.  Okay.  Good.
22         Your resume says that you haven't
23  testified in four years, but the last time you
24  testified was the ones you mentioned, bankruptcy and --
25     A     Yes.

17

1     Q     You did a bankrupt case and one other
2  case, I think it was.
3     A     Well, I think the four years had to do
4  with as an expert.
5     Q     Okay.
6     A     I didn't answer that question in mind with
7  when the last time I testified was.  But I believe the
8  last time that I actually testified would've been going
9  back eight to ten years.
10     Q     Okay.
11         Have you ever been sued for malpractice?
12     A     That's a good question.  I would say --
13     Q     Only if the answer's no, right?
14     A     Well, you know, I've been practicing for
15  forty-two years.  So my firm has been sued for
16  malpractice, but I do not believe that I personally
17  have ever been sued for malpractice.
18     Q     Okay.  Fair enough.
19         Do you have any disciplinary history with
20  the Bar, any Bar?
21     A     So by disciplinary history, you mean
22  adverse rulings or just --
23     Q     Sure.
24     A     -- complaints filed?  Which do you mean?
25     Q     No.  No.  Disciplinary rulings.

18

1     A     No, none.
2     Q     Have you ever worked for the federal
3  government?
4     A     No.
5     Q     Okay.
6         Have you ever worked at a broker/dealer?
7     A     No.
8     Q     Investment bank?
9     A     No.
10     Q     Have you ever worked as a regulator with
11  the SEC or FINRA?
12     A     No.
13     Q     Okay.
14         So I'm looking at your report, and you've
15  been retained to provide opinion as to whether Island
16  Stock has acted reasonably and generally in accordance
17  with accepted practices and procedures of transfer
18  agents and in the fulfillment of its legal obligations
19  pursuant to UCC 8-401 and 17 CFR 240.17, and this is in
20  connection with its issuance of shares and the
21  registration of transfer of shares in response to
22  requests made to it by or on behalf the issuers and
23  registered shareholders of those shares.  Is that
24  accurate?
25     A     I think you read the statement of

19

1  assignment from my report, yes.
2     Q     Right.
3         So you're not opining -- I just wanted to
4  confirm something.  You're not opining on whether
5  Island violated Section 5A or 5C of the Securities Act?
6     A     No.  I think that would require a legal
7  opinion.  I'm not providing a legal opinion.
8     Q     Right.  Right.
9         Or Section 17(a)(1) or (a)(3)?  I'm
10  talking about the charges in our complaint.
11     A     I'd be happy to discuss that, but, no, I
12  don't think that's part of my opinion.
13     Q     Okay.
14         Or 10(b) and 10(b)(5), either, correct?
15     A     Same answer.  Same response.
16     Q     You're also not opining as to the state of
17  mind of any of the agents or representatives of Island?
18     A     I am not.
19     Q     Okay.
20         Or whether the Commission's actions
21  against Island are supported by the evidence, that's
22  not part of your analysis?
23     A     Well, I think that's a more difficult
24  question because my opinion, clearly, I think says that
25  I do not believe that Island deviated from practices

20

1  and procedures and appropriate conduct based upon the
2  documents on which it issued shares and the documents
3  on which it transferred registered ownership of shares.
4      Q     Okay.  But that's not really a comment on
5  whether the evidence -- the Commission's charges are
6  supported by the evidence, right?
7      A     I don't mean to spar with you.
8      Q     That's okay.
9      A     I find that a difficult question to answer
10  the way you've asked it because of the opinion that
11  gave and because of the opinions that I'm not giving.
12      Q     Okay.
13          You're also not opining as to whether
14  Island was a necessary participant or a substantial
15  factor in the unregistered distribution of stock?
16      A     Again, I think that those are legal
17  conclusions drawn from the facts, and, no, I'm not
18  providing a legal opinion.
19      Q     Okay.
20          And you're not providing an opinion as to
21  whether Island or any of its agents knowingly violated
22  the federal securities laws?
23      A     I am not.
24      Q     Okay.
25          Or that Island or any of its agents

21

1  recklessly violated federal securities laws?
2      A     Except to the extent that conclusions can
3  be drawn from my opinion, no.
4      Q     I understand.
5          And then finally that Island or its agent
6  aided and abetted the violations of anyone else?
7      A     Same response.
8      Q     Okay.
9          I want to ask you a little bit because
10  you're an expert about some of the --
11      A     Thank you.
12      Q     -- assumptions you made in forming your
13  opinion.  The documents provided -- you assume that the
14  documents provided to Island were authentic; is that
15  fair?
16      A     Yes.  Yes, that's very fair.
17      Q     Okay.
18          And that the documents provided to Island
19  came from the issuer or shareholder or what have you,
20  it's one of the assumptions that you made in looking at
21  this stuff, I assume?
22      A     I don't think that I assumed anything
23  about where the documents came from.
24      Q     Okay.
25      A     Other than that -- other than that they

22

1  were produced in the course of the investigation or
2  proceedings with the SEC.
3      Q     And did you assume that the documents
4  provided to Island were accurate?
5      A     I don't know how to answer that question.
6      Q     Okay.  Fair enough.
7          The documents provided to Island were
8  reliable?
9      A     I assumed that the documents that were
10  provided to Island were authentic and examined the
11  documents for their contents.  So I think that's what I
12  can say.  I mean, somebody gives me a photocopy of a
13  driver's license, I'm assuming it's a photocopy of the
14  driver's license --
15      Q     Was legitimate, right.
16      A     -- and that the license was copied and
17  sent to Island.
18      Q     Exactly.  Okay.
19          You also, in reaching your opinion, you
20  assumed that Island and its employees were unaware of
21  any adverse information about the issuer?
22      A     I did not make any assumptions on that one
23  way or the other.  I issued an opinion based upon the
24  documents presented and the actions that were asked to
25  be taken based upon the documents presented.

23

1      Q     Okay.
2          Did you review the documents for Island
3  with an eye towards whether Mr. Eldred was unaware that
4  he was participating in a fraudulent scheme?
5      A     I don't want -- I'm really not trying to
6  spar with you, but I think I'm going to go back to what
7  I said.  I reviewed the documents for the contents of
8  the documents and with an eye towards whether the
9  documents that were presented supported the actions
10  that were taken based upon the documents presented.
11      Q     Right.
12          But in looking at it, you didn't have an
13  opinion of whether Mr. Eldred knew or didn't know --
14      A     I have -- I'm sorry to interrupt.  I have
15  no opinion on that.
16      Q     That's right.  Okay.  That's what I was
17  asking.
18          And what about Mr. Daniels, do you have
19  any --
20      A     I have no opinion.
21      Q     Okay.
22          Or Ms. Harrison?
23      A     No opinion on that.
24      Q     Okay.
25          Andy Fan?

24

1    **A**    Again, I looked at the documents and
2  relied on the authenticity of the documents and their
3  contents, not on anything beyond that.
4    **Q**    Okay.
5         Section three of your report talks about
6  the documents that you've reviewed prior to issuing
7  your report.  Have you looked at any documents since
8  you issued the report?
9    **A**    Other than the ones that I listed?
10   **Q**    Listed.
11   **A**    The only document I've looked at that's
12 not listed on there was your expert's report.
13   **Q**    Okay.
14        So you have reviewed the expert report?
15   **A**    I have read your expert's report, yes.
16   **Q**    Why did you think -- why did you think to
17 Review the Motion to Dismiss in this case?
18        THE COURT REPORTER:  I'm sorry, Willy.
19 I lost the question there.  Could you repeat that?
20        MR. FERNANDEZ:  Okay.  Sure.
21 BY MR. FERNANDEZ:
22   **Q**    Why did you think it was important to
23 review the Motion to Dismiss in this case?
24   **A**    So I'm going to take issue first of all
25 with the question.  I don't say that it was important

25

1  for me to review the Motion to Dismiss.
2    **Q**    Fair enough.
3    **A**    Sorry.  I can't help myself, so --
4    **Q**    No, but why did you review it?
5    **A**    Yeah.  So I'm a litigator.  I was asked to
6  look at this.  I tried to read what I could, what was
7  available in order to get my hands around what the
8  issues were in the case to see what I could opine on,
9  what I could not opine on, and what I would need to
10 look at in order to render an opinion.  So I probably
11 looked at lots of things that were unnecessary, but I
12 was trying to do my best to understand the environment
13 in which I was being asked to work.
14   **Q**    Did you review any of the testimony that
15 was taken in the investigative phase of this case or
16 discovery phase, if you will?
17   **A**    I did read some transcripts.
18   **Q**    Can you tell us which ones?
19   **A**    Not without looking at my notes.
20   **Q**    Okay.
21        You don't remember off the top of your
22 head if you looked at Mr. Eldred's testimony or
23 Mr. Dilley's testimony?
24   **A**    If I were making my best guess, I would
25 say it was Mr. Eldred's, Mr. Lopez's, and Mr. Dilley's.

26

1    **Q**    Okay.
2         Now, in your section four of your report,
3  you state that the issuance of transfer requests were
4  based on the filing of registration statements that had
5  been approved by the SEC.  Can you tell us what you
6  mean by that?
7    **A**    So when I looked at the underlying
8  documents request, some of certain of which were for
9  the issuance of shares, what I call the batch
10 documents; that is, the documents which make up the
11 request and action, included notices from the SEC that
12 the registration statements had been declared
13 effective.
14   **Q**    Okay.
15        But being declared effective is a little
16 different than being approved, would you agree?
17   **A**    I would say that we're going to have a
18 semantic discussion about what the SEC does.  So I will
19 say that if that's an issue for you, what I looked at
20 were the declarations from the SEC that the
21 registration statements had been declared effective.
22 In my mind, that means that they'd been reviewed at the
23 SEC and that any questions that were posed were
24 answered to the satisfaction of the SEC prior to the
25 declaration that the registration was effective.

27

1  That's my understanding of the process, but I'm not an
2  SEC lawyer, and I do not engage in the filing or
3  approval process of registration statements.  That's
4  just my general understanding.
5    **Q**    But you would agree with me if the SEC
6  thought that any of the information in an S-1 was
7  false, they wouldn't, quote, approve the S-1, correct?
8    **A**    I would hope not.
9    **Q**    Right.
10        So declaring an S-1 effective essentially
11 is, you filled out all the right boxes and you filled
12 out the form satisfactorily, would you agree with that.
13   **A**    I cannot agree with that.  I'm not saying
14 you're wrong, but I'm saying that that's not my
15 understanding of what a declaration that it's effective
16 means.
17   **Q**    Okay.
18        Your opinion in the remaining paragraphs
19 that Island relied on appropriate documentation,
20 including medallion signature guarantees doesn't
21 mention the source of the information --
22   **A**    I'm sorry.  Doesn't mention the source
23 of the --
24   **Q**    Of that information, correct?  You're
25 looking at the medallion signature guarantees and

28

1 taking it at face value that that's accurate, the
2 person signing it is authorized to do so?
3      A    Well, that is the purpose of the medallion
4 signature guarantee.  It is what the program was
5 designed for.  It's specifically designed for transfer
6 agents to be able to rely on them and permit paperless
7 transfers.  So, yes, I'm assuming that when a reputable
8 institution attaches its medallion signature guarantee,
9 that the institute has done what it needs to do to
10 satisfy itself that the person whose signature they are
11 guaranteeing and assuming liability for is the person
12 who says that they're signing it.
13      Q    Okay.
14           But what if the medallion signature
15 guarantee came from a person who had no authority to
16 sign on behalf of the company?
17      A    You mean the guarantor?
18      Q    If the transfer agent knew that the person
19 signing the medallion signature guarantee was not
20 authorized to do so on behalf of an issuer, let's
21 say --
22      A    Okay.  So --
23      Q    Wait.  Wait.  Wait.  Let me finish my
24 question -- is the transfer agent obligated to accept
25 the medallion signature guarantee if it has information

29

1 that that person is not authorized?
2      A    So your question, your first part of your
3 question before I interrupted you talked about the
4 issuer's signature, but the medallion guarantee is not
5 of the issuer's signature.  It's of the shareholder's
6 signature.
7      Q    I realize that, yes.
8      A    Okay.  So you're asking me whether I
9 believe I think that the transfer agent is obligated to
10 accept the medallion signature guarantee?  My answer to
11 that is, yes.  Then you're going to say, what if the
12 transfer agent has actual knowledge that the
13 shareholder didn't sign it and that the medallion
14 signature was forged, is that your question?
15      Q    In part, sure.
16      A    I would say that actual knowledge of
17 that -- I mean, it's a hypothetical question.  I think
18 the possibilities and probabilities of that ever coming
19 up are remote at best, but with that caveat, I would
20 say actual knowledge -- actual knowledge by the
21 transfer agent itself, not just somebody making a
22 demand or sending a letter to the transfer agent
23 questioning it, actual knowledge would trump the
24 guarantee.
25      Q    Okay.

30

1           Your fourth paragraph of your opinion
2 states that UCC Section 8-401 compels the transfer
3 agent to register shares as requested in the event that
4 certain conditions are met.
5      A    Register a transfer, yes.
6      Q    Right.
7           Do you know if there's any reference to
8 the UCC violation in the complaint filed in this case?
9      A    I don't know.
10      Q    Okay.
11           But you reviewed the complaint?
12      A    I did, but you're asking me whether it
13 contains a specific allegation regarding the Uniform
14 Commercial Code.  I haven't looked at the complaint in
15 a very long time.  I don't know.
16      Q    Okay.
17           Other than the statutes you noted in your
18 opinion, can a transfer agent violate any other federal
19 securities laws?
20      A    Can he?
21      Q    Yes.
22      A    And you say, other than the statute that
23 I -- that I referenced --
24      Q    You referenced the UCC and 17 CFR.
25      A    Yes.  Because those provide the framework

31

1 of regulatory and statutory constraints on a transfer
2 agent's duties.
3      Q    Okay.  But Island didn't have that
4 constraint here.  No one is suing them.  No shareholder
5 is suing them for not acting fast enough under the UCC
6 or violating their -- they transferred everything they
7 were asked to transfer.
8      A    Sure.  And if they hadn't transferred it,
9 they would've been subject to liability.  That's what
10 causes the conundrum, because you're presenting with
11 documents in good order with a medallion signature
12 guarantee.  You're under an obligation to process
13 within a certain amount of time if it's a routine item.
14 So the conundrum is, you know, unless you -- unless you
15 follow the statutory and regulatory guidelines, you
16 expose yourself to some very substantial liability.
17      Q    But there's no conundrum in this case in
18 the sense that Island isn't charged with that.  That's
19 not what they're accused of doing.
20      A    It is not charged with violating 8-401
21 because it did what it was supposed to do when
22 presented with certificates that were properly
23 presented in good order for transfer.
24      Q    And your position is that transfer agents
25 don't have the authority to inquire beyond the basic

32

1 presentment of documents -- of supporting documents,
2 which satisfy the UCC?
3    A    I don't know that I said that they don't
4 have the authority.  There is certainly no guidance
5 that provides transfer agents with investigatory
6 powers.  So if you ask a question, there's no
7 obligation on anybody's part to provide an answer.
8 So -- and the transfer agent's job and the -- again,
9 the statutory and regulatory guidelines that define its
10 conduct promote the efficient transfer of securities,
11 prompt and efficient transfer of securities, and so if
12 we're talking about the registration of transfer, which
13 is part of what Island did here, Island is presented
14 with certificates properly endorsed with evidence that
15 the signature is genuine, they are obligated to -- in
16 my view, obligated to process based on the face of that
17 presentment, and if they don't, they could be violating
18 various SEC regulations, as well as their duties under
19 state law.
20    Q    Okay.
21        Do you believe that transfer agents have
22 any sort of gatekeeping function?
23    A    Me personally?
24    Q    Well, based on your career representing
25 transfer agents.  They didn't pluck you off the street.

33

1    A    No.  No.  No.  I understand.  You know,
2 it's a -- obviously, the SEC believes that transfer
3 agents have gatekeeper responsibilities, and it's been
4 my experience with at least the transfer agents that I
5 represent that they make reasonable efforts to ensure
6 that they do not knowingly violate federal securities
7 laws in the issuance and transfer of securities.
8    Q    Okay.  So they do have -- it's not
9 strictly a purely administerial function?  They do have
10 an obligation to note fraud or take steps to prevent
11 fraud?
12    A    I wouldn't say that.  I would say it's a
13 purely administerial function, and at the same time,
14 transfer agents are guided by the SEC's potential and
15 litigant's potential to bring actions against them if
16 their conduct does not comply with what might be legal
17 obligations in connection with the issuance and
18 transfer of shares.  It's one of the reasons transfer
19 agents seek opinions of counsel when they remove
20 legends from restricted securities.  They do not have
21 the power to investigate.  They're not -- they do not
22 have the power to compel people to provide them
23 information.  So in order to avoid being charged with
24 violations, most transfer agents in that process will
25 request an opinion of counsel on which they will rely.

34

1 I think we all know, however, that that reliance is not
2 a safe harbor.  I wish it were.  And that's a
3 discussion that I think that the SEC has been
4 undertaking in its rule making for quite sometime.
5    Q    Have any of your clients been charged by
6 the SEC with -- your transfer agent clients, have they
7 been charged by the SEC for any sort of violation of
8 these rules?
9    A    I have represented transfer agent clients
10 in defending claims that they violated Section 5 in the
11 issuance and transfer of securities, yes.
12    Q    So this isn't the first time you've heard
13 about this issue, correct?
14    A    No, it's not.
15    Q    Okay.
16        This is something the SEC does fairly
17 routinely, I guess, correct?
18    A    I don't know that I would say that they do
19 it routinely, but it's certainly something that the SEC
20 does in connection with its regulation of transfer
21 agents.
22    Q    Okay.
23    A    As the transfer agent's efforts to avoid
24 being charged.
25    Q    Right.

35

1    A    But unlike broker/dealers, I would say,
2 unlike broker/dealers there are no KYC obligations or
3 other regulatory-imposed obligations.  It's strictly a
4 question of not violating the statute.
5    Q    Well, but it's more than that, isn't it?
6 I mean, it's also a function of not facilitating fraud,
7 if you have knowledge of fraud, not facilitating it?
8    A    Right.  That would be not violating the
9 statute.
10    Q    Right.
11    A    You don't want to facilitate 10(b)(5)
12 violation or Section 5 violations.  You certainly don't
13 want to do that.
14    Q    Are you familiar with Alvin Mirman or
15 Sheldon Rose?
16    A    I know the names from this proceeding.  I
17 don't think I've ever run across them, other than --
18    Q    Not personally.  I didn't think so.  I
19 didn't think you had gone to dinner with them, but my
20 question was:  Did you review the proceedings, any of
21 the transcripts of their testimony in this case?
22    A    I did not read their testimony.  And what
23 I meant by that -- my prior answer is, I don't think
24 that I've run across them in connection with my
25 representation of other agents, either.

36

1    Q    Well, that's good, I suspect.
2    A    Yes.
3    Q    But did you read their testimony in this
4  case?
5    A    I did not.
6    Q    Okay.
7         Were you aware that they both went to
8  prison for their conduct in this case?
9    A    I know -- I know that they went to prison.
10  I don't know much about it.
11   Q    Okay.
12        In your representations of transfer
13  agents, do you have many of them that had -- that are
14  both associated -- that are associated with a
15  broker/dealers as intimately as Island was?
16   A    So the only thing -- I don't know about
17  the word intimate.  It's my understanding that there
18  was common ownership between Island and Spartan.
19   Q    Well, wait.  There was common ownership.
20  They were located in the same place and the principals
21  were the same.
22   A    See now, you've done all this
23  investigation.  I just represent transfer agents, so I
24  don't have investigatory authority.  So I'm aware that
25  Spartan and Island had common ownership.  I don't know

37

1  that they were in the same offices, so I leave that to
2  you.  I have not represented any other transfer agents
3  of which -- well, that's not true.  So there are very
4  large transfer agents that have affiliates that are
5  broker/dealers, I believe.
6    Q    Give me an example, if you can.
7    A    I think Computershare, for example, has a
8  broker/dealer.  I would -- I believe that Wells Fargo,
9  when it was Wells Fargo, had a broker/dealer.  I don't
10  know whether EQ, which acquired Wells Fargo maintains
11  its own broker/dealer.  My understanding is that
12  Broadridge may have an affiliate that's a
13  broker/dealer.  I'm not certain about that.  So -- but
14  other than -- other than the four largest transfer
15  agents, so that's Broadridge, EQ, American Stock, and
16  Computershare, I have not represented any other
17  transfer agent that I know has any affiliation with a
18  broker/dealer.
19   Q    If someone came to you and said, we'd like
20  to start a transfer agency and associate with a
21  broker/dealer using the same principals in the same
22  location, what advice would you give them?  Do you see
23  any sort of conflict in that?
24        MR. KRUCKENBERG:  Willy, I'm going to
25  object at this point.  That's really not what the

38

1  testimony is, but -- about the shared offices, but --
2  so I'm just putting that on the record.
3  BY MR. FERNANDEZ:
4    Q    You can answer, Mr. Harmon.
5    A    All right.  My advice would be for them to
6  seek counsel from somebody who's vassal with
7  broker/dealer obligations.  I'm not.
8    Q    Okay.  That's not your area?
9    A    I have not -- I do not do broker/dealer
10  representation.
11   Q    Okay.
12        In your experience representing transfer
13  agents, do they all have written policies and
14  procedures?
15   A    Yes.
16   Q    Okay.
17        Why is that, if you know?
18   A    Well, I think there are a lot of reasons
19  for having written policies and procedures.  One of
20  them is not that they're required to because I do not
21  believe that there's any regulatory requirement for a
22  transfer agent to have policies and procedures.  So
23  that said, I believe that transfer agents have policies
24  and procedures if they're large -- on a larger side in
25  order to ensure that the employees know what their

39

1  duties and responsibilities are and that they follow
2  policies -- these policies and procedures when issuing
3  shares, registering transfer of ownership of shares, or
4  acting in any of the other capacities that transfer
5  agents act.
6         I think transfer agents have written
7  policies and procedures because the SEC probably
8  examines for it on a regular basis and asks to see
9  them, not withstanding that there's no obligation to
10  have them.  And I think that they have policies and
11  procedures to protect them from claims that might be
12  made against them that they didn't know what they were
13  doing.
14   Q    Okay.
15        Do you think it's a good idea to have a
16  written set of policies and procedures?
17   A    I do.
18   Q    Okay.
19        Have you ever drafted a set of policies
20  and procedures for a transfer agent?
21   A    Not a complete set.
22   Q    Okay.
23        Tell me what you've done.
24   A    I've drafted portions of policies and
25  procedures and advised regarding transfers of

40

| | |
|---|---|
| 1  restricted securities. And I have drafted policies and | 1  substantive nature of these policies just generally? |
| 2  procedures for wire transfer in order to try to avoid | 2  Do they look -- how do they rank compared to other |
| 3  claims of fraudulent -- to avoid problems, especially | 3  company policies you've reviewed? |
| 4  today with fraudulent wire transfers. | 4     **A**   I haven't reviewed other company policies |
| 5     **Q**   Is there -- I know this sounds weird, but | 5  and procedures. I did not look at these policies and |
| 6  is there like a standard set of policies and procedures | 6  procedures for that purpose. I believe the only reason |
| 7  that you would look to if you were advising a transfer | 7  that I looked at the policies and procedures was to |
| 8  agent whether their policies and procedures were enough | 8  ensure that there was a policy and procedure regarding |
| 9  or accurate? | 9  the acceptance of medallion signature guarantees. |
| 10     **A**   I don't know the answer to that question. | 10     **Q**   Okay. |
| 11  I would say that my first go to would be the STA, | 11  Can we go to page four of the company |
| 12  Security Transfer Association, website. And if that | 12  policies. |
| 13  failed, there are two persons that I generally | 13     **A**   The one beginning, Employee Titles and |
| 14  recommend that transfer agents retain in order to | 14  Duties? |
| 15  develop policies and procedures if they don't have | 15     **A**   Yes. |
| 16  them. | 16     **A**   Yes. |
| 17     **Q**   Have you had a chance to look at Island's | 17     **Q**   The first category, if you will, is |
| 18  policies and procedures? | 18  Director of Operations. Do you know who that is at |
| 19     **A**   Not completely, no. | 19  Island? |
| 20     **Q**   Okay. | 20     **A**   I do not. |
| 21     MR. FERNANDEZ: Can we call up Exhibit | 21     **Q**   Okay. |
| 22  282. | 22  And the Director of Operations is required |
| 23     THE VIDEOGRAPHER: One second. | 23  to review -- I'm looking at Subsection D, "Review all |
| 24     THE WITNESS: The complaint? | 24  transfers and new issues to ensure legal and procedural |
| 25 | 25  compliance." |
| <div align="center">41</div> | <div align="center">43</div> |
| 1  BY MR. FERNANDEZ: | 1     Is that something you've seen in other |
| 2     **Q**   No. The company policies and procedures. | 2  transfer agent policies? |
| 3     **A**   You say 282. | 3     **A**   I have not made a study of other transfer |
| 4     **Q**   I believe so, unless I wrote it down wrong | 4  agent policies and procedures. Depending upon the size |
| 5  in my notes. | 5  of a company, I think -- and how many items are |
| 6     **A**   282 I have is the complaint. | 6  processed on a given day, I would doubt that in the |
| 7     **Q**   Okay. So let's do 281. | 7  larger agents that a single person reviews everything |
| 8     **A**   281 I have is my opinion. I have 188 here | 8  that goes on. That's just unwielding. |
| 9  as the policies and procedures. | 9     **Q**   Would you think that the person should |
| 10     (Plaintiff's Exhibit 188 was previously | 10  have some sort of legal background? |
| 11     marked for identification.) | 11     **A**   No. I think you'll find that, other than |
| 12     THE WITNESS: And if you don't mind, I | 12  the big four that I've identified, that virtually none |
| 13  know you've called it up, but I have it on another | 13  of the other agents have legal backgrounds, people |
| 14  screen now, and it makes it difficult for me to see | 14  working with them with legal backgrounds, and that |
| 15  you, Mr. Fernandez, which I prefer to be able to see | 15  their compliance officers generally do not have legal |
| 16  you when I answer your questions, if that's possible. | 16  backgrounds, either, but yet function effectively in |
| 17  BY MR. FERNANDEZ: | 17  this field. |
| 18     **Q**   Okay. That's okay. Whatever works for | 18     **Q**   And if they don't have legal backgrounds, |
| 19  you. Whatever's easier for you. | 19  how is anybody expected to understand what the law in |
| 20     **A**   It's a top and bottom screen, so I have | 20  this area is? How does a compliance officer comply |
| 21  them open. And I thank you for providing them to me in | 21  with law without any sort of legal training, if you |
| 22  that format. | 22  know? |
| 23     **Q**   No problem. | 23     **A**   So I mean, I could give you a course on |
| 24  Now, given your background in representing | 24  this. You know, I went to law school. I didn't study |
| 25  transfer agents, did you have an opinion on the | 25  transfer agent law and I never heard of Rule 144 when I |
| <div align="center">42</div> | <div align="center">44</div> |

1  was in law school.  I didn't take a securities law
2  class when I was in law school.  But I understand Rule
3  144 now, and I understand how it works in conjunction
4  with Section 4(a)(1) and the myriad of other, for
5  example, exemptions that are available for
6  registration, and that's what good compliance officers
7  do.  They read the guidance sets available, understand
8  it, and seek outside counsel when issues come up on
9  which they feel they need guidance.  And I would say
10  that that is what every transfer agent that I
11  represent, other than work I may have done for the big
12  four, does.
13      Q    Okay.
14           And you haven't run across -- in your
15  work, you haven't run across a lot of lawyers working
16  for transfer agents?
17      A    Like me?
18      Q    Sure.
19      A    No.
20      Q    Okay.
21      A    Thankfully.
22      Q    And have you worked -- have you run across
23  transfer agents where the people are trained in legal
24  concept relating to their work?
25      A    Yes.  And a lot of transfer agents hire

45

1  someone to provide that training to their staff, but
2  for the most part, everything a transfer agent does is
3  administerial and just about everything is a data entry
4  and stamping process, except for issuance of free
5  trading stock and removal of legends.  And in those
6  areas, transfer agents that are operating with any kind
7  of staff typically have one or more persons, who I call
8  Chief Compliance Officer, but who have gained knowledge
9  about those areas and know what to look for and know
10  what to look for in opinions on removal of legend in
11  order to ensure that an exemption is available.
12      Q    And do you recommend a course of study or
13  any sort of educational plan for transfer agents when
14  you're asked to represent them?
15      A    I'm not aware of any such plan.  I believe
16  that for the most part people train their successors,
17  and they gain their experience working, and they gain
18  their experience by reaching out to somebody who may
19  know more than them about the question -- the issues
20  when those issues arise.
21      Q    Have you ever had a case of a transfer
22  agent who made a mistake because they weren't up on the
23  law?
24      A    Yes.
25      Q    Okay.

46

1           And as part of your recommendation, you
2  don't tell them you need to train?
3      A    I didn't say I didn't.
4      Q    Oh, okay.  So is that one of your
5  recommendations?
6      A    I mean, I had lot of recommendations in
7  that instance.
8      Q    Tell me some of them.
9      A    Well, I recommended that they convey a
10  better understanding of the exemption from registration
11  process, that they appoint an individual to be
12  responsible for the group of people who were asked to
13  work in that area, that they limit the number of people
14  who had access to restricted securities, and that the
15  person who was going to be responsible be given my
16  phone number.
17      Q    Okay.
18           Do you put that sort of advice in writing?
19      A    I gave it once.  I doubt that I gave it in
20  writing.  I mean, we had a lot of conversations.
21      Q    Okay.  But that's generally the advice you
22  would give a transfer agent that made a mistake or was
23  on the verge of making a mistake?
24      A    It depends what the mistake was and how
25  the mistake came about.  So I don't think we can

47

1  generalize about mistakes.  You asked me about an
2  instance involving the lack of training and one in
3  particular came to mind.
4      Q    If you look down with me on page four,
5  section seven that says, Client Services.
6      A    Yeah.
7      Q    Section B says, "Offer ongoing guidance
8  concerning 144 rules, general transfer procedures,
9  proxy solicitations, and other types of transactions
10  that may involve the transfer agent in some way."
11           Do you know if Island did something like
12  that?
13      A    I do not.
14      Q    Okay.
15           Is that good advice generally -- as a
16  transfer agent attorney, is that good advice to give to
17  a transfer agent?
18      A    I'm having -- you know, I have not seen --
19  I've seen the policies and procedures.  I haven't read
20  before, so I'm reading them with you now for the first
21  time.
22      Q    Okay.
23      A    Can you give me some guidance -- this is
24  under client services.  Are we talking about offering
25  ongoing guidance to the clients of the transfer agent?

48

1   **Q**    It sounds like it's their office policy
2   that they should both give advice and get advice.
3   That's my read of it.
4       **A**    Okay.
5       **Q**    I defer to you.  You're the expert.
6       **A**    I'm not the expert on their policies and
7   procedures.  So are you -- if you ask me do I think
8   it's a good idea for transfer agents to try to educate
9   the issuers that they represent what limitations there
10  are?  Of course, I think that's a good idea because
11  issuers should know what they can or cannot do.
12      **Q**    Okay.
13          And you don't know if Island did any of
14  that during your review of --
15      **A**    I don't know one way or the other.  I
16  don't know one way or the other.
17      **Q**    Okay.
18          Under the next paragraph is, Business
19  Development.  And it says, "Up sell additional
20  services, such as EDGARization and ESOP administration
21  to existing clients."
22          Can you tell me -- I think I know what
23  EDGARization is.  I've never seen it like that way, but
24  what does that mean?
25      **A**    EDGARization?

49

1       **Q**    EDGARization.
2       **A**    I believe it's a process you go through in
3   order to make your document fileable on EDGAR.
4       **Q**    On EDGAR, right.  Okay.
5       **A**    Yeah, on the EDGAR system for the
6   Commission.
7       **Q**    Why would that be something a transfer
8   agent that does administerial tasks be involved with,
9   if you know?
10      **A**    Yeah.  So the business model for transfer
11  agents involves broadening the scope of ancillary
12  services that they provide.  So if you look at
13  Computershare or American Stock Transfer or Equinti or
14  even below that, Continental Stock Transfer, you will
15  find that one of the ways that the transfer agent
16  community, especially of any size, tries to enhance its
17  revenue is by offering ancillary services.
18          So there are lots of services that
19  transfer agent can provide that are not administerial,
20  like proxy solicitation.  And Computershare has a proxy
21  affiliate.  I believe so does American Stock Transfer.
22  Broadridge certainly has tentacles beyond the transfer
23  agent business.  That is a business model.  It doesn't
24  mean that the base transfer agent services that you're
25  providing become non-administerial in nature.  It means

50

1   that you may be providing ancillary services that are
2   non-administerial, but I don't think that any of these
3   services for Island are implicated in this case.  This
4   case involves issuance and transfer.
5       **Q**    Well, I'm going to beg to disagree with
6   you on that.  But I guess I'm wrestling with -- and I'm
7   not trying to pick a fight, but I guess I'm wrestling
8   with, the transfer agent has only administerial sort of
9   duties, and we just stamp and remove legends and
10  process paper, and we have to do it quickly, and we
11  don't look beyond anything that's presented to us, and
12  then being involved in business development and doing
13  things like EDGARization and getting involved in the
14  work of the issuers and then not appreciating that
15  there might be fraud, like there's no connection.  If
16  you learn of fraud during your business process, you're
17  not required to say anything.  You're just processing
18  the shares.
19      **A**    No, I never said that if you know of
20  fraud, you're not supposed to say anything.  And I also
21  want to take issue with the notion that removal of a
22  legend is something that has to be done quickly,
23  because a legend removal request is nonroutine item,
24  which does not have to be processed in seventy-two
25  hours.  It only requires constant and continual

51

1   attention.  And you can take as long you as need as
2   long you're providing that attention to obtain the
3   documentation that you think you need in order to
4   establish the availability of an exception from
5   registration --
6       **Q**    And you can sued for that, right?
7       **A**    I'm sorry?
8       **Q**    You can be sued for not taking the legend
9   off or taking it off when you're not supposed to,
10  right?
11      **A**    Everybody in the world wants what they
12  want and wants the transfer agent to do it for them or
13  get sued.  And part of the reason that I'm able to pay
14  my mortgage and feed my family is because issuers and
15  shareholders are constantly at odds, especially in
16  microcap companies, as to whether or not shareholders
17  are entitled to sell their stock into the market, and
18  each of them puts the transfer agent in the middle.
19  That happens all the time.  Walking those through is
20  something that I try to do on a daily basis.
21      **Q**    Okay.  Fair enough.
22          Would you turn to page five, the next
23  page, section ten, Maintain Client Records.  In A says,
24  "Ensure that client records are properly maintained and
25  that documents and storage are properly safeguarded and

52

1  cataloged for future reference."
2      Now, Mr. Harmon, if you were advising --
3  if one of your transfer agent clients came to you and
4  said, how do I maintain client records, what would your
5  advice be?
6      A    That's a broad question.  So first of all,
7  there are several regulations in 17Ad that prescribe --
8  prescribe, I should say, the types of records that need
9  to be maintained, for how long they need to be
10  maintained, and in certain instances whether they have
11  to be readily available.
12      Q    Okay.  Can we break it down for a second
13  because I'm interested in this?
14      A    Okay.  One second.  I'm going to lose my
15  train of thought, so make a note and let me finish my
16  answer.
17      Q    Okay.  Go ahead.
18      A    Is that fair?
19      Q    Fair.
20      A    Okay.
21      So I would first tell the transfer agent
22  that they have to be mindful of what those regulations
23  require in terms of general type of record, length of
24  time record need to be maintained, and whether they
25  have to be readily available.  There is nothing,

53

1  however, in the regulations which say how those records
2  need to be maintained.  There's no requirement that
3  they be electronic or that they be computerized.  You
4  can have a ledger on a scratch of paper as long as it
5  has the information that you need.
6      That said, there are a number of -- a
7  decreasing number of software companies that provide
8  software to transfer agents that assist them in
9  maintaining records.  Generally, those software
10  companies are compliant with federal regulations, and
11  to my knowledge, many transfer agents rely upon the
12  compliant nature of that software and the people who
13  provide that software.  And I would tell them to get
14  advice from somebody who provides advice in that area
15  that would not -- in terms of actual record keeping,
16  which would not be me.
17      Q    Okay.  That would be, perhaps, an IT
18  person in terms of software and commuter storage?
19      A    An IT person, another transfer agent who,
20  I believe, understands and follows the rules, and a
21  former SEC examiner --
22      Q    Okay.
23      A    -- now in private practice.
24      Q    Now I know what to do when I leave the
25  SEC.

54

1      There's no specific -- you said there's a
2  variety of rules that dictate how long you have to keep
3  records.
4      A    Yes.
5      Q    Approximately, how long are you
6  required -- just as a general matter -- I read seven
7  years at one point, but I don't know if that's typical,
8  or --
9      A    You know, I haven't memorized the
10  regulations.  I believe that typically it's six years.
11      Q    Six years.  Okay.
12      A    For some records, yes.
13      Q    Okay.
14      Do you know if Island kept any sort of
15  records for six years?
16      A    I don't know for how long they maintain
17  records.
18      Q    Okay.
19      Would you encourage a transfer agent to
20  keep written records of conversations it had with
21  issuers or shareholders or what have you to memorialize
22  that in some way?
23      A    No, I would not.
24      Q    Why not?
25      A    Because I don't think there's any

55

1  requirement or obligation to maintain records of
2  conversations.  There's no regulations that requires
3  you to maintain your Emails for any period of time.  If
4  you have an Email destruction policy that permits you
5  to destroy Emails annually or semiannually, that would
6  not violate any SEC rule or regulation.
7      I do think it's important to maintain
8  written records regarding all actions that you're asked
9  to take and that you take.  So if there are
10  communications asking the transfer agent to do
11  something, I believe those should be in writing, but
12  beyond that, I don't have an upon as to whether or not
13  every conversations or all conversations or even most
14  conversations need to be memorialized.
15      Q    Okay.  Well, spoken as a litigator, I find
16  that advice to be scary, that you have no records of
17  your -- if someone comes and sues you later and you
18  have no records of any conversations or notes or
19  anything to document what you did or didn't do.  You
20  don't find that odd?
21      A    No.  I think that you're missing the end
22  part of what I said where I said that it's important
23  that there be written communications for everything
24  that you're asked to do that -- that anything you're
25  asked to do be documented.  But on the other hand,

56

1  issuers call transfer agents all the time to ask them
2  questions, and those do not have to be documented.
3     Q     Right.
4        I guess it's not a function of having --
5  being required statutorily, but do you think it's a
6  good business practice to keep track of your
7  conversations with clients and potential lawsuits is
8  what I'm thinking?
9     A     I don't see a necessity to make a note of
10  every oral conversation.  I would agree that in my own
11  practice important written conversations are preserved.
12     Q     Right.  Okay.
13        If you would look down to section twelve,
14  same page, Internal Controls.  Section B says,
15  "Maintain internal procedures manual and ensure that
16  the policies and procedures outlined therein are
17  adhered to."
18        Do you know if Island Stock did that?
19     A     I do not.
20     Q     Okay.
21        What about section G under that same
22  section twelve, "Conduct ongoing employee training and
23  testing to ensure that all involved parties are
24  thoroughly versed and understood the procedures to be
25  followed in conducting their duties."

57

1        Did you see any evidence that they did
2  training, any sign-in sheets, outlines, anything like
3  that in your review of whatever you looked at for this?
4     A     I didn't look for any of that, and those
5  weren't the types of documents that I was asking to
6  review in order to issue an opinion.
7     Q     Okay.
8        Section thirteen says, "All employees
9  processing transfers or other stock certificate related
10  duties should be thoroughly familiar with the
11  following," and it goes on to list a series of, I
12  guess, documents and procedures and what have you.
13        What is the STAI manual?
14     A     I'm going to guess that that is the
15  Security Transfer Association manual.
16     Q     Okay.  You're not familiar with it?
17     A     Well, I think I referenced it before in
18  answer to one of your questions where you asked what I
19  would recommend to a transfer agent, and I said that I
20  believe that the STA has policies or a manual or
21  information and guidance available.  So that is what I
22  think I was referencing.
23     Q     Okay.
24        And have you ever seen that manual?
25     A     I've certainly seen portions of it, and

58

1  I've assisted in drafting portions of it.
2     Q     Okay.
3        And you never read the whole manual even
4  though you drafted portions of it?
5     A     I only read the portions I'm getting paid
6  to read.
7     Q     All right.  That's pretty funny.
8        And did you review whether or not Island
9  had copies of the manual or trained its employees on
10  these documents?
11     A     I don't know.
12     Q     Okay.
13        It's 10:07.  Do you want to take a
14  five-minute break?
15     A     I'm just sitting here answering questions,
16  so I'm happy to do whatever pleases you.
17     Q     My colleagues always want a break after
18  the first hour, so how about we take a ten-minute
19  break?
20     A     That's fine.
21        MR. FERNANDEZ:  Is that all right,
22  Caleb?
23        MR. KRUCKENBERG:  Yes.
24        THE WITNESS:  I'm just going to put my
25  phone on mute, and I'll come back.

59

1        MR. FERNANDEZ:  Okay.  Thank you.
2        THE VIDEOGRAPHER:  And we're going off
3  the record at 10:07 a.m.
4        (Whereupon, at 10:07 a.m., a short recess
5        was taken.)
6        THE VIDEOGRAPHER:  We're back on the
7  record at 10:17 a.m.
8  BY MR. FERNANDEZ:
9     Q     Mr. Harmon, just some follow-up questions
10  from earlier this morning.  During a break, can you get
11  us the amounts that you've actually billed and the
12  amount your colleague has billed on this case so far?
13     A     Sure.  Do you want it right now?
14     Q     No.  During a break, during the next break
15  or afterwards.
16        Another follow-up question.  You spoke
17  about a malpractice action against your firm.  Was that
18  based on advice you provided the client or someone else
19  provided to the client?
20     A     Not -- no.  You know, I've been practicing
21  for a long time, so there have been cases brought --
22  there's never been a case brought that I can recall
23  based upon any actions that I did or didn't take.
24     Q     And you're mentioning it because you're a
25  partner at the firm and the firm was sued, right?

60

```
 1    A    Yes.  Yes.
 2         So the answer to your question is that
 3  we've billed twenty-six thousand, three hundred and
 4  seventy-three dollars to date.
 5    Q    Okay.
 6         The other times you served as an expert,
 7  did you wind up -- can you tell us like where -- what
 8  kind of cases those were, what kind of expert opinion
 9  you provided?  Because that wasn't on your resume, so I
10  don't --
11    A    Right.  I can try to recall them.  I've
12  acted as an expert in a case in which the estate of a
13  deceased shareholder was claiming that they had a
14  certificate which needed to be honored and the
15  certificate dated back to the early 1950s for Elliot
16  Ness.
17    Q    Wow.
18    A    And the issuer retained me to review the
19  record for the issuer and provide an opinion as to
20  whether I thought it was reasonable that the
21  certificate had been declared lost and stolen and had
22  been subsequently replaced because records going back
23  that far were not complete, and so we were putting
24  together an opinion based upon available records for
25  that purpose.  That was one.
```

61

```
 1         I've been retained to -- as a consulting
 2  expert in a case involving a transfer agent's refusal
 3  to remove a legend based upon an issuer's claim that
 4  consideration was not paid, which is under Rule 144 or
 5  even under 4(a)(1) a necessary element to start the
 6  holding period, the running of a holding period, so --
 7  and this, not that you care, but this is a common
 8  occurrence in my experience, that issuers who have
 9  issued shares that state that they're fully paid and
10  nonassessable in the microcap business have issuers
11  remorse and then claim that the services weren't
12  provided or something, and so object to legend removal.
13  So I was retained as an expert in that -- as a
14  consulting expert in that case.  And --
15    Q    I'm sorry.  Were you qualified as an
16  expert in those cases?
17    A    Neither of those cases has got to that
18  stage.
19    Q    Okay.
20    A    I was a precautionary expert.
21    Q    Okay.
22    A    And there's a third case that I don't
23  recall the details on right now.  And there may be
24  others.  They're not coming to mind.
25    Q    The twenty-six thousand dollars you billed
```

62

```
 1  to Island so far, how much of that is you and how much
 2  of that your colleague?
 3    A    You're going to need to give me a second
 4  to figure that out.
 5    Q    Sure.
 6    A    So I can't tell you how much of the
 7  twenty-six is.  I can tell you the total time, because
 8  there's some unbilled time.  It's the way our records
 9  work.  So twenty-three thousand is my time.  And,
10  approximately, eight thousand, just under eight
11  thousand is my partner's time, Ms. Teske's time.
12    Q    Okay.
13         I want to go back to page five of the
14  company policies.  Section 14 is called, Management
15  Reporting.  And it says, "Address issues with upper
16  management as necessary.  Maintain constant dialogue
17  with upper management regarding daily activities,
18  overall status of operations and business, client
19  relations, et cetera.  And report all significant
20  events to upper management immediately."
21         Good policy?
22    A    You know, just to be clear, these are --
23  that you're reading to me are policies addressed to the
24  duties and responsibilities of the Director of
25  Operations.
```

63

```
 1    Q    No.  It's everyone in the business.  It
 2  refers to the Director of Operations and the customer
 3  service representatives and anybody working there,
 4  basically.
 5    A    I'm only looking at the policies, as I
 6  say, as we know, for the first time, but the subheading
 7  for all of these or whatever is Director of Operations.
 8  So I read this as saying that these are the duties and
 9  responsibilities of the Director of Operations.  I may
10  be wrong, but I don't think that's an unreasonable
11  interpretation here.
12    Q    Same question, is that good advice?  Is
13  that a good policy?
14    A    Everybody should talk to everybody about
15  important things at a firm whether it's a transfer
16  agent or any other company.
17    Q    So good policy generally?
18    A    I always favor open communication.
19    Q    Okay.
20         If you go to page six, Customer Service
21  Representative.
22    Q    Okay.
23    Q    The middle of the page.
24    A    I see it.
25    Q    Do you know who Island's customer service
```

64

1  representative was?
2      A      I do not.  I did not, and I do not.
3      Q      Let me ask you one question about your
4  representation of Island.  You've done twenty-six
5  thousand dollars worth of work so far for Island to
6  serve as an expert in this case, but you said you were
7  hired once before by Island.  When was that?
8      A      So to be clear, Island is not my client
9  here.  New Civil Liberties is my client.
10      Q      Gotch you.
11      A      Just technically just to make sure that
12  we're correct.  When was I -- oh, I'm going to say --
13      Q      You mentioned it.  That's why I'm asking.
14      A      No.  Yes, I know, but not anything that
15  was recent.  And it was a very, very discreet question
16  about how transfer agents in general were handling a
17  question.  So I don't think I spent more than half an
18  hour or an hour getting the question, answering the
19  question.  It was very discreet.
20      Q      Do you remember who from Island contacted
21  you with that question?
22      A      Best guess is that it was David Lopez.
23      Q      Okay.
24          All right.  So we're back to page six
25  under the topic, Customer Service Representative.  Is

65

1  that something you see in your transfer agent clients?
2  Do most have a customer service representative?
3      A      So I don't look at the policies and
4  procedures of my clients.  It's not part of the general
5  work that I do for them to review, draft, or prepare
6  their policies and procedures unless -- unless it comes
7  up in the context of a litigation.
8      Q      Okay.
9      A      You're asking me about whether these are
10  industry standards, and I don't know the answer to
11  those questions.
12      Q      Okay.  That's fair enough, but that's my
13  question.  Are these industry standards?
14      A      I don't know.
15      Q      What about on page seven, Associate of
16  Transfer Operations I, is that something that you see
17  in your other transfer agent clients?
18      A      So this seems to be consistent with my
19  understanding that the policies and procedures that
20  you're showing me now that you're asking me to look at
21  are addressed to in particular individuals or job
22  titles.  I don't know that there's any uniformity
23  between transfer agents as to what they call people.
24  We have -- some companies called them transfer agents.
25  Some call them something else.  Some call their Chief

66

1  Compliance Officer their Chief Compliance Officer.
2  Some call them executive director.  So I don't know
3  what staffing -- I don't know how many employees Island
4  had.  I don't know what their job responsibilities --
5  how their job responsibilities were divided over their
6  staff.  I just -- I don't know.
7      Q      Okay.
8          If we go to page eleven of the policies.
9  There is a section called, Stock Transfer Requirements
10  and Procedures.
11      A      Okay.
12      Q      And I appreciate you don't know who's
13  working there or what the standard is, but it talks
14  about a software called Transtar.  And I'm looking
15  towards the bottom of the page there's one, two, and
16  three, and number one about identifying a log number to
17  be assigned automatically by Transtar.  Are you
18  familiar with that software at all?  I don't mean like
19  type something in, but just generally.
20      A      I struggle to answer your question
21  because, you know, I possibly think probably too fine.
22  Transtar is one of the leading software providers to
23  the transfer agent community, and one of the -- I will
24  say most robust packages for transfer agents --
25      Q      Okay.

67

1      A      -- unless they design their own system.
2      Q      Do you know what the software does
3  exactly?  What function does it have?
4      A      I know some of its functions, not all of
5  its functions.
6      Q      Okay.  Tell me about the ones you know.
7      A      So I believe that Transtar provides the
8  ability to enter into the data entry information
9  regarding the issuance of shares.  That information
10  will then populate various, let's call them, logs or
11  journals with information, so that you don't have to
12  separately enter the information.  And the same with
13  respect to registration of transfer of ownership.
14          So you enter data, and it automatically
15  populates the information that you need, including, I
16  believe, whether an item -- doing the accounting
17  required to comply with the ninety percent of
18  turnaround within seventy-two hours, so I believe it
19  does that, as well.
20          I also believe that Transtar has the
21  ability to function with OTC markets in providing
22  certain generalized information about issuers with a
23  client's consent, so that that becomes an automated
24  process.  OTC likes to keep track of the number of
25  shares authorized and unissued and issued, so I think

68

1  it does that.  I believe that there's a functionality
2  that allows you to interface between the stock track
3  program and certain financial packages, so that
4  information cross-pollinates.
5      Q     Okay.
6           Is the software capable of keeping track
7  of shareholders?
8      A     I don't know what you mean by keeping
9  track of shareholders.
10     Q     Okay.  So if the same twenty-five
11 shareholders appear in three or four companies with the
12 same amount of shares and the same investment and the
13 same names, would Transtar pick up on something like
14 that?
15     A     I don't know if it has that capability.
16     Q     Okay.
17          Do you know if Island used it in that
18 capacity at all?
19     A     I don't know.
20     Q     Okay.
21     A     I will say that given the number of times
22 issues have been raised like that, it's not my
23 understanding that the transfer agents that I run
24 across with these issues have arisen had been aware of
25 those kinds of questions.

69

1      Q     Okay.
2           But you don't know if Island did or didn't
3  do it at any rate?
4      A     I don't know -- so I believe you have the
5  ability to ask the system to show you all of the
6  accounts for a particular shareholder across the
7  database, but it's not -- I do not believe or it's not
8  my understanding, and I'm not certain about this, but I
9  do not believe that that is a report that regularly
10 pops out or -- unless you ask for it.  So somebody has
11 to say, I need this information, and I believe then
12 that it can be generated.
13     Q     Okay.
14          But that's not part of the administerial
15 work that you think the transfer agent is required to
16 do?
17     A     That's right, I do not believe that's part
18 of the administerial duties of a transfer agent.
19     Q     Okay.
20          Even if it can weed out fraud?
21     A     You know, the transfer agents can have
22 thousands and thousands of shareholders registered in
23 their accounts, some active, some not active.  It's
24 just -- transfer agents done generally run
25 investigatory questions through their database every

70

1  time somebody wants to make a transfer or every time
2  somebody issues a share of stock.  It's just not part
3  of their practices.
4      Q     But that wasn't my question.  If they're
5  apprised of fraud, you don't think they have the
6  obligation to look to see if there's actual fraud being
7  carried out?
8      A     You keep on asking me questions about
9  actual knowledge.  And if you have actual knowledge,
10 that's a different question than do I think the
11 transfer agents, as part of their policies and
12 procedures, in their ordinary course should be doing
13 something.  So every time you ask me a question like
14 that, if there's actual knowledge, then my answer
15 changes.
16     Q     Okay.
17     A     But I do not believe the transfer agents
18 are obligated to go out and get that knowledge or to
19 look for it.
20     Q     Can we go to page fourteen.  And we're
21 looking at the paragraph in the middle of the page
22 called, Log Maintenance.
23     A     Mr. Fernandez, I think when you turn your
24 head away from your computer, your words get garbled.
25     Q     I'm sorry.  I'm trying to read and talk at

71

1  the same time.  Not a skill I've mastered yet.
2           The section says under Log Maintenance,
3  "The electronic log of all stock activity that is
4  maintained by Island shareholder database shall be
5  reviewed regularly by the Director of Operations for
6  quality control and compliance purposes and to ensure
7  that turnaround times are being met.  Any discrepancy
8  or issues that arise from such reviews will be handles
9  promptly by all related associates."
10          First of all, you don't know in this
11 particular case whether Island looked at any sort of
12 log or maintained any sort of log, correct?
13     A     So I don't know what the electronic log is
14 that's referred to in this policy, other than to
15 surmise that it has to do with complying with
16 turnaround time, which would be a generalized log of
17 activity over a period of time, not related to the
18 usual stockholders or issuers.
19     Q     Okay.
20          Do your transfer agent clients generally
21 keep these sort of logs?
22     A     They're required to.
23     Q     Okay.
24          By law?
25     A     I believe that's correct.

72

1    Q    Okay.
2         And how were they used?  What do they keep
3  track of exactly?
4    A    Well, there are lots of logs and lots of
5  records that are maintained. The one I'm talking about
6  for turnaround time would be a log of the number of
7  items received over any period of time, how many were
8  routine, how many were not routine, how many of the
9  routine items were turned around in three days, and how
10 many were not turned around in three days because there
11 are -- aside from meeting the general requirement of
12 turnaround time on a regular basis, there are reporting
13 obligations if you fail to meet turnaround time in any
14 period of time -- or over any period of time in more
15 than one occasion.  So I think -- I don't know whether
16 it's once or whether it's twice in a three-month
17 period.  I don't have the regulation memorized, but at
18 some point, you become responsible for self-reporting
19 to the Commission that you haven't met your turnaround
20 time obligations.  And that is a log that is regularly
21 kept by transfer agents and routinely examined by the
22 SEC when the examine transfer agents.
23   Q    Are there instances where there's so much
24 volume that transfer agents can't meet the seventy-two
25 hour rule?

                              73

1    A    I've never heard of that happening, which
2  is not to stay it hasn't.  It just means I've never
3  heard of that happening.  I mean, there's lots of
4  reasons why turnaround is not met, but I've never seen
5  an instance where it's we had too much work to do.
6    Q    Right.
7         Presumably you would hire more people if
8  you had that much work to do, correct?
9    A    Or pay overtime.
10   Q    Or pay overtime.
11        If you would look down with me on the
12 paragraph that begins, Paperless Legals Program.
13   A    Yeah.
14   Q    The second paragraph there says, "If at
15 any time a transfer is submitted and an associate has
16 reason to doubt the appropriateness or legality of the
17 transfer, an associate may request further proof and
18 documentation from the questioner of the transfer."
19        Is that standard language that you've seen
20 with your other transfer agent clients?
21   A    So once again, sir, I have not read the
22 policies and procedures of my clients to this purpose,
23 and I do not know whether that's standard language or
24 not.
25   Q    Okay.

                              74

1         Is there any sort of legal requirement
2  that language like this be communicated to the staff of
3  a transfer agent?
4    A    I'm not aware of any legal requirement
5  that a transfer agent maintain policies and procedures.
6  It's not a regulation of the Commission that transfer
7  agents have policies and procedures, so I do not know
8  of any legal obligation that such policies and
9  procedures contain anything or even exist.
10   Q    Okay.
11        Can you look with me -- we're almost done
12 with the policies and procedures.
13   A    Okay.
14   Q    Page eighteen.
15   A    Yeah.
16   Q    The beginning of the page says, "Stock
17 certificates should contain the following
18 characteristics," and it goes on to list certain
19 requirement that should be on, I guess, a stock
20 certificate.
21        Have you seen this sort of -- these sort
22 of requirements in your other transfer agent clients?
23   A    I have not seen the policies and
24 procedures of my other transfer agents in general, so I
25 can't answer that question.

                              75

1    Q    Have you ever been asked to give advice
2  about this sort of requirement to any of your transfer
3  agents?
4    A    Yes.
5    Q    Okay.
6         Does this list appear consistent with the
7  type of advice you would give if you was asked, what
8  should a stock certificate contain?  Does it look like
9  these are generally some of the requirements?
10   A    So I believe that the obligations for
11 information to be on a stock certificate is a matter of
12 state law.
13   Q    Correct.
14   A    Each state may have its own law, and you
15 would need to look at the statutes of the state of
16 incorporation of the issuer to see what is required.  I
17 know that those statutes exists.  There have been
18 occasions when I have looked at them.  I do not recall
19 everything that needs to be on the certificate, but if
20 you want me to run down this list, you would certainly
21 want the name of the corporation, its states, its par
22 value, the number of shares, it should be identifiable
23 by a unique number, you want the name of the
24 shareholder, you definitely want a statement that the
25 shares are fully paid and nonassessable, transferable,

                              76

1 the seal of the corporation, the signatures, all of
2 those things are important.
3        The one thing that I see that is not
4 listed here, but it may be in somewhere else, is
5 whether or not the shares are restricted, because if
6 they're restricted, then the certificate should have a
7 bold statement on the front of the certificate
8 referencing that there are restrictions and where those
9 restrictions can be found.
10    Q    A legend, if you would?  A stock legend
11 saying there was restrictions?
12    A    You can call it what you -- we can agree
13 on language, on vocabulary, but there could be lots of
14 restrictions that might be applicable to a certificate.
15    Q    Okay.
16    A    I should say to shares.
17    Q    Moving on to page twenty-two.
18    A    Twenty-two?
19    Q    Yes.
20    A    Okay.
21    Q    The section at the bottom of the page
22 deals with Client Confidentiality, and it says, "All
23 transfer records and shareholder lists are the property
24 of the Issuer.  Such information is highly confidential
25 and shall not be given to unauthorized parties under

77

1        And how would a transfer agent know who
2 was an authorized party or an unauthorized party, like
3 how do they know who they can talk to and who they
4 can't?
5    A    Transfer agents should receive
6 instructions from authorized officers of the issuer as
7 to from whom they can take direction, not necessarily
8 to whom they can speak, but from whom they can take
9 direction.
10    Q    Direction.
11        Look with me, if you will, on page
12 twenty-three.  At the bottom of the page it says,
13 Client Set Up.
14    A    Uh-huh.  Sorry.  Yes.
15    Q    And then if you flip to page -- it starts
16 with a list of procedures to follow for new clients.
17        And if we flip to page twenty-four, you'll
18 see that it includes, Articles of Incorporation,
19 specimen stock certificates, a certified shareholder
20 list, list of insiders and control persons.
21        Why would you have to list insiders and
22 control persons, if you know?
23    A    I'm not going to say that it's a
24 requirement to get a list of insiders and control
25 persons typically --

79

1 any circumstances."
2        Is that language that you've shared with
3 your transfer agent clients?  Have you given that
4 advice to a transfer agent client ever?
5    A    Okay.  So that's two different questions.
6    Q    Okay.
7    A    The first question, again, I haven't
8 looked at the policies and procedures of all of my
9 clients.
10        And as to the second question, that would
11 be my advice.
12    Q    Okay.
13        And is that based on -- is that something
14 unique, I guess, to a particular transfer agent, or is
15 that a requirement by law, if you know?
16    A    So interesting question, because with the
17 advent of European union privacy issues and state of
18 California and other state's privacy issues, that may
19 now be a legal requirement for transfer agents.  I do
20 not believe that there's a federal regulation
21 specifically in 17Ad that speaks to this question, but
22 in general, as a matter of good practice, I would say
23 that shareholder confidential personal information
24 should be safeguarded.
25    Q    Okay.

78

1    Q    Well, I'm not saying it is, but my
2 question is, it's listed here.  Why would you need it
3 then?
4    A    So, again, you're asking me to
5 hypothetically answer the question of why it's there,
6 and that's why I'm trying to do.  Maybe I'm giving you
7 too much information in answering your question, but I
8 am going to try and answer your question.
9        So I don't know that getting a list of
10 insiders and control persons is something which
11 transfer agents do in the ordinary course.  It is my
12 understanding that transfer agents get a list of
13 persons who are authorized on behalf of the issuer to
14 act.
15        That said, transfer agents need to know
16 whether a shareholder is an affiliate or not, and a
17 control person and an insider might be considered
18 affiliates along with certain other classes of
19 shareholders, because that may impact whether or not
20 those shareholders are entitled to have legends removed
21 or to receive free trading stock.
22    Q    Okay.
23        Page twenty-six.
24    A    I hope I answered your question.
25    Q    Yes, you did.  Thank you.

80

1     **A**    Okay.
2     **Q**    Page twenty-six under the heading of,
3   Compliance.  It says, "Island Stock Transfer will
4   maintain compliance with all rules and regulations set
5   forth by the Security and Exchange Act of 1934, as well
6   as all other applicable federal and state laws, rules,
7   and regulations at all times.  Specific policies and
8   procedural guidelines to execute this manner of
9   business on a daily business are outlined herein.  It
10   is the responsibility of each staff member of Island
11   Stock Transfer to maintain compliance of these
12   procedures."
13          So help me understand, your basic premise
14   is that transfer agents don't have any sort of legal
15   requirements, other than to perform administerial -- I
16   don't know how to pronounce that -- function --
17     **A**    Administerial.
18     **Q**    Administerial functions.  Yet here we have
19   a requirement that they comply with rules and
20   regulations under the 34 Act and federal law and what
21   have you.  How do you rationalize that?
22     **A**    So I have to object to the premise of your
23   question.
24     **Q**    Okay.
25     **A**    I do not believe that the fact that they

81

1   perform administerial functions means that they do not
2   have compliance obligations.  They comply in the
3   performance of their administerial acts in most
4   instances.  For instance, the swift processing of
5   securities that are presented with the medallion
6   signature guarantee in good order.  So that is
7   compliance, not just with federal law, as we pointed
8   out in the turnaround rules, but also compliance with
9   state laws, namely the Uniform Commercial Code.
10          So somebody who's in the transfer section
11   for routine items needs to know what their requirements
12   are for them to act or should act within the
13   requirements by ensuring that they are transferring
14   certificates, if its certificates, that have proper
15   authentication of the signature, that are not
16   restricted, that are genuine certificates, and that
17   they're doing so promptly in accordance with law.  Just
18   because it's administerial staff doesn't mean its a
19   legal obligation to process.  Somebody who's asked to
20   remove a legend, so if you're in the compliance group,
21   needs to know that in order to establish the right to
22   have legend removal, you need to show an available
23   exemption from registration and meet whatever other
24   obligations there are.  So that is maybe --
25     **Q**    Wait.  Let me interrupt you right here.

82

1   Would you agree with me then that if there's evidence
2   of fraud, the transfer agent has an obligation to
3   respond to that?
4     **A**    No.  I do not agree that the mere evidence
5   of fraud is sufficient to interfere with administerial
6   processing of requests.  I -- I will distinguish
7   between knowledge of fraud and evidence of fraud,
8   because not all evidence of fraud rises to the level of
9   requiring an interference with the transfer of the
10   item.
11     **Q**    Okay.  But I'm not asking about your
12   interpretation of fraud.  If the transfer agent is
13   aware of a fraud going on, you're saying that you it
14   has no obligation to stop its administerial functions?
15     **A**    No.  I'm just haggling with you over when
16   you say, knowledge of fraud, whether you mean that
17   there is knowledge that an actual fraud has taken place
18   or is taking place, or that some indicia which might
19   lead to a question of whether there is fraud is
20   evident, because those things are not the same to me,
21   and the obligation of the transfer agent are going to
22   be different in each instance.
23          So I have not said, and I think I've said
24   to contrary, that if a transfer agent knows that there
25   is fraud, that the exemption -- and I'll try to give

83

1   you an example that is different from the fact pattern
2   here, so -- but still provides you with my -- with a
3   better understanding maybe of what I'm trying to say.
4          Several years ago, and even ongoing today,
5   one of the bases for conducting microcap fraud was the
6   conversion of debt to equity.  And many people -- many
7   people, certain people who attempting to get free
8   trading stock with the complexity of the issuer
9   backdated promissory notes in order to make it look
10   like the note existed as a prior time even though it
11   didn't.  And so to meet the holding period and get
12   stocked right away, they would backdate the promissory
13   note.
14          If the transfer agent is presented with
15   evidence that the note was actually issued then, even
16   though it wasn't, and gets an opinion of counsel to
17   that effect and other indicia, then the transfer agent
18   should process that.  If the transfer agent, on the
19   other hand, is confronted with evidence that there was
20   actual backdating, then the transfer agent shouldn't
21   process that, but it's the actual knowledge that forms
22   the predicate for not acting, because otherwise, you
23   have liability for not acting.
24     **Q**    But you agree with me that actual
25   knowledge --

84

1    **A**    Actual knowledge, yes, I agree with you.
2  Actual knowledge requires the transfer agent to not
3  take action in processing --
4    **Q**    What is a red flag?
5    **A**    I don't know.  I was thinking that that
6  was a question you were going to ask me, and I was
7  going to ask you what you meant by a red flag when you
8  asked the question.  To me, I know it's a term that's
9  bandied about, that there are red flags, but I don't
10  like the term.  So I only know what I think the
11  Commission means by it.
12    **Q**    What do you think the Commission means by
13  a red flag?  Because there's actually a list of red
14  flags.
15    **A**    There may be.  You know, I don't read all
16  the Commission --
17    **Q**    Well, listen, if you're going to be
18  representing transfer agents, that's something you
19  should probably take a look at because they're
20  significant.
21    **A**    I think I've done a fairly good job of
22  understanding my job so far.
23    **Q**    What do you understand a red flag to mean?
24    **A**    I think like a red flag when the
25  Commission uses red flag, I think it means an

<center>85</center>

1  indication that something may be amiss.
2    **Q**    Okay.
3         And how does a transfer agent respond to
4  red flags?
5    **A**    It depends what the red flag is, what the
6  other available evidence is, and how many indications
7  of amiss there are.
8    **Q**    So it has to be more than one?
9    **A**    I didn't say it had to be more than one.
10  It depends on the circumstances of each case.  It also
11  depends on what the other available indications are as
12  to whether or not it's a red flag that rises to the
13  level of saying we're not going to do this, or the
14  other available evidence regarding the requested action
15  meets legal requirements.
16    **Q**    Who reviews opinion letters as to when a
17  restrictive legend can be removed or not removed?
18    **A**    So transfer agent practices vary depending
19  upon the size of the agency.  Typically, one or more
20  persons is designated in each agency to be responsible
21  for reviewing nonroutine items.
22    **Q**    I'm not sure I understand.  What does that
23  mean exactly?
24    **A**    Which part of that?
25    **Q**    Who actually looks at an opinion letter

<center>86</center>

1  and says, this is sufficient to remove --
2    **A**    Okay.  So depending upon the size of the
3  agency, it's my experience that each agency designates
4  one or more persons to be responsible for reviewing
5  nonroutine items.
6    **Q**    Is that person, as we saw here, a director
7  of operations or is it a customer service rep, in your
8  experience?  I only ask you based on your and your
9  clients.
10    **A**    It could be the Chief Compliance Officer.
11  It could be the most knowledgeable person at the company
12  with the greatest amount of experience in processing.
13  If it's a large enough company, it could be a lawyer.
14    **Q**    Okay.
15         I want to speak to you about one of the
16  articles that you wrote and that's listed on your
17  resume.
18    **A**    Sure.
19    **Q**    It's the Ninth Circuit opinion and -- I
20  lost my notes.
21    **A**    CMKM Diamonds?
22    **Q**    Yes, exactly.  Can you tell me a little
23  bit about what --
24    **A**    I'm sorry.  I can't hear you.
25    **Q**    Can you tell me a little about what the

<center>87</center>

1  court -- the holding of the case?
2    **A**    I haven't read that decision in a very
3  long time.  I think it goes back over almost a decade,
4  but --
5    **Q**    From 2013.
6    **A**    Well, a lot has happened in the last seven
7  years, so seven is closer to a decade than not.
8         My general recollection is that the Second
9  Circuit reversed -- I'm sorry, the Ninth Circuit
10  reversed the decision of the Nevada District Court that
11  granted summary judgment to the Commission regarding
12  whether or not the transfer agent had violated Section
13  5 in processing requests for legend removal.
14    **Q**    Right.
15         And you said something at the end that
16  sort of peaked my interest.  You said that it begs the
17  question whether opinion letters from counsel --
18  whether conducting due diligence protects the transfer
19  agent or implicates them.  What'ch you mean by that?
20    **A**    Exactly what I said.  There's a split of
21  opinion in the transfer agent community as to the
22  extent to which transfer agents should be conducting
23  due diligence beyond the face of the presentment.  Some
24  transfer agents believe that you should not do that
25  because you could only get yourself into trouble.  And

<center>88</center>

1  some transfer agents believe that some level of
2  diligence is appropriate.
3      Q     You would counsel a transfer agent not to
4  do due diligence in a matter?
5      A     I will tell you exactly what I say
6  publicly and privately to everybody in my -- in the
7  transfer agent community when I'm addressed this
8  question.  Do the amount of diligence that you will
9  feel comfortable explaining when you're sitting across
10 the table from the SEC at an investigatory deposition.
11     Q     Okay.
12          MR. FERNANDEZ:  I need a couple of
13 minutes to talk to my colleagues, if you don't mind.
14 We're going to take a ten-minute break.
15          MR. KRUCKENBERG:  Sure.
16          THE VIDEOGRAPHER:  We're going off the
17 record at 10:58 a.m.
18          (Whereupon, at 10:58 a.m., a short recess
19          was taken.)
20          THE VIDEOGRAPHER:  We're back on the
21 record at 11:06 a.m.
22 BY MR. FERNANDEZ:
23     Q     I apologize.  My building has decided to
24 do fire alarm testing at this very moment, and I have
25 no way to stop it, so I apologize.

89

1      So your opinion about Island Stock
2  Transfer's role in this whole case is premised on your
3  review of Island Stock Transfer's actions, not on
4  anything regarding the broker/dealer, correct?
5      A     My hesitation is when you start out the
6  question by asking me about Island Stock's role in this
7  case.  So --
8      Q     Your opinion is that they have no role?
9      A     No.  My opinion is that they properly
10 issued and transferred shares based upon the
11 information that was provided for the issuance and
12 transfer of shares.  So that's why I hesitated to
13 answer your question.  And now I lost the thread of
14 your question to give you an answer.
15     Q     Okay.
16          Why don't we look at the complaint in this
17 case.
18     A     I'm sorry?
19     Q     Why don't we look at the complaint for a
20 moment.
21     A     Okay.
22     Q     I'll see if I can ask you a better
23 question.
24     A     There probably was nothing wrong with our
25 question.  I just got lost after my answer or

90

1  nonanswer.
2      Q     We'll get back to it.
3      A     Okay.
4      Q     If you would look page twenty-four of the
5  complaint.
6      A     Yeah.
7      Q     You've got it?
8      A     I'm getting there, yeah.
9      Q     I think I've lost track of the exhibit
10 number.
11     A     282.
12     Q     I think that's right.
13          (Plaintiff's Exhibit 282 was marked for
14          identification.)
15 BY MR. FERNANDEZ:
16     Q     Exhibit 282, page twenty-four, if you'd
17 look at.  It's a chart.
18     A     I'm looking at it now.
19     Q     Okay.
20          Did you review any of the information
21 that's outlined in this chart?  This is a list of
22 companies, the number of shares that are being offered,
23 the approximate offering size, and the rest of the
24 categories.  Did you look at any of the evidence
25 underlying this chart in making your opinion?

91

1      A     I'm really sorry to do this to you.  I
2  don't know what you mean by the evidence underlying the
3  chart.  I looked at some documents regarding the
4  request to issue shares for several of these entities.
5      Q     Okay.
6          Looking at the chart on page twenty-four
7  that's outlined in our complaint, there's,
8  approximately, a dozen companies, all of whom have the
9  same number of shares, the number of shares in the sole
10 officer, the same operating budget.  That's not
11 something that gives you pause at all?  As a transfer
12 agent, that wouldn't give you pause?
13     A     So you're expecting the transfer agent to
14 recognize a pattern and to be on the lookout for it,
15 and I don't know the dates of these.  And, you know --
16     Q     Well, it's the same people.
17     A     There are -- okay.  There are --
18     Q     It's the same people at the broker/dealer
19 as at the transfer agency, so I'm not asking you to do
20 anything.  You don't think that they should notice?
21     A     But you asked me to look at the chart.
22 None of that information is on this chart.  So now
23 you're asking me to look at the chart and saying, does
24 the information on the chart give me pause?  And so I
25 then try to answer that question.  Then you layer on it

92

1  that there's information that Spartan had, and that is
2  not part of what I looked at.  I looked at the
3  submissions to Island for the issuance of the shares and
4  for the registration of transfer of ownership of
5  shares.
6     Q    Okay.
7          So do you think Island should've done more
8  due diligence than it did?
9     A    No.
10    Q    Okay.
11         And, again, you didn't consider the
12 broker/dealer evidence in reaching your conclusion,
13 correct?
14    A    I did not.
15    Q    Okay.  Okay.
16    A    I looked at -- just to be clear, I looked
17 at the documents pursuant to which issuance requests
18 were submitted and pursuant to which transfers of
19 registered ownership were requested.
20    Q    Okay.
21         And that's what your opinion is limited
22 to?
23    A    That's right.
24    Q    Okay.
25         MR. FERNANDEZ:  All right.  I have

93

1  nothing further for you.
2          THE WITNESS:  That's very disappointing,
3  but, okay.  Thank you.
4          MR. FERNANDEZ:  I'm sure.  Thank you
5  very much for doing this.
6          MR. KRUCKENBERG:  And I have nothing.
7          THE COURT REPORTER:  Mr. Kruckenberg,
8  did you need a copy?
9          MR. KRUCKENBERG:  Yes, I do.
10         THE VIDEOGRAPHER:  We're going off the
11 record at 11:11 a.m.
12         (Whereupon, at 11:11 a.m., the proceeding
13         was concluded.)

94

1        DEPONENT'S DECLARATION UNDER PENALTY OF PERJURY
2
3        I, MARK HARMON, do hereby declare under penalty
4  of perjury that I have read the foregoing transcript of
5  my VTC deposition; that I have made such corrections as
6  noted herein, in ink, initialed by me, or attached
7  hereto; that my testimony as contained herein, as
8  corrected, is true and correct.
9        _____ I have made corrections to my VTC deposition.
10       _____ I have NOT made any changes to my VTC
11 deposition.
12
13    Executed this _____ day of _____,
14 _____, at _____, _____.
15         (City)        (State)
16
17
18         _____
19         MARK HARMON
20
21
22
23
24
25

95

1           REPORTER'S CERTIFICATE
2  STATE OF FLORIDA        )
                           ) ss
3  COUNTY OF MIAMI-DADE    )
4
5        I, BRIGITTE ROTHSTEIN, a duly stenograph court
   reporter in and for the State of Florida, do hereby
6  certify:
         That I reported the taking of the VTC deposition
7  of the Witness, MARK HARMON, at the time aforesaid;
         That prior to being examined, the Witness was by
8  me duly sworn in to testify to the truth, the whole
   truth, and nothing but the truth;
9        That I thereafter transcribed my shorthand notes
   into typewriting and that the typewritten transcript of
10 said deposition is a complete, true, and accurate
   record of the proceedings to the best of my ability.
11       I further certify that (1) I am not a relative,
   employee, or independent contractor of counsel of any
12 of the parties; nor a relative, employee, or
   independent contractor of the parties involved in said
13 action; nor a person financially interested in the
   action; nor to I have any other relationship with any
14 of the parties or with counsel of any of the parties
   involved in the action that may reasonably cause my
15 impartiality to be questioned; and (2) that transcript
   review was requested.
16       IN WITNESS WHEREOF, I have hereunto set my hand
   in the County of Miami-Dade, State of Florida, this
17 30th day of July 2020.
18
19
20
21         _____
           BRIGITTE ROTHSTEIN, STENOGRAPHER
22
23
24
25

96

```
1           ERRATA SHEET
2  Deposition of: MARK HARMON
   Date taken:  JULY 29, 2020
3  Case: SEC vs. SPARTAN SECURITIES GROUP, LTD, et al.
   PAGE LINE
4  _____ CHANGE: _____
           REASON: _____
5
           CHANGE: _____
6  _____ REASON: _____
7  _____ CHANGE: _____
           REASON: _____
8
           CHANGE: _____
9  _____ REASON: _____
10 _____ CHANGE: _____
           REASON: _____
11
           CHANGE: _____
12 _____ REASON: _____
13 _____ CHANGE: _____
           REASON: _____
14
           CHANGE: _____
15 _____ REASON: _____
16 _____ CHANGE: _____
           REASON: _____
17
           CHANGE: _____
18 _____ REASON: _____
19 _____ CHANGE: _____
           REASON: _____
20
           CHANGE: _____
21 _____ REASON: _____
22 _____ CHANGE: _____
           REASON: _____
23
24
   Signed _____
25 Dated  _____
```

97