# Exhibit 1

**Condensed Transcript of the July 23, 2020 Deposition of James M. Cangiano**

**In the Matter Of:**

*U.S. Securities vs*

*Spartan Securities Group*

---

*JAMES CANGIANO*

*July 23, 2020*

---



**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE MIDDLE DISTRICT OF FLORIDA
 3              TAMPA DIVISION
 4         Case No: 8:19-cv-448 VMC-CPT
 5
 6  -----------------------------------------
 7  U.S. SECURITIES AND EXCHANGE
 8  COMMISSION,
 9          Plaintiff,
10          -vs-
11  SPARTAN SECURITIES GROUP, LTD.,
12  ISLAND CAPITAL MANAGEMENT,
13  CARL E. DILLEY, MICAH J. ELDRED,
14  AND DAVID D. LOPEZ,
15          Defendants.
16  -----------------------------------------
17
18        REMOTE DEPOSITION OF
19             JAMES CANGIANO
20        July 23, 2020 - 9:00 A.M. EDT
21
22
23
24  JOB NO. 2020-88138
25
```

**2**

```
 1
 2
 3             JULY 23, 2020
 4             9:00 A.M. EDT
 5
 6
 7        REMOTE DEPOSITION of JAMES CANGIANO,
 8  before S. Arielle Santos, Certified Court
 9  Reporter, Certified LiveNote Reporter and Notary
10  Public.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1                      REMOTE APPEARANCES:
 2
 3  FOR THE PLAINTIFF:
 4  BY - ALISE JOHNSON, ESQ.
 5  BY - CHRISTINE NESTOR, ESQ.
 6  BY - WILFREDO FERNANDEZ, ESQ.
 7  US SECURITIES & EXCHANGE COMMISSION
 8  801 Brickell Avenue, Suite 1950
 9  Miami, Florida 33131
10  (305) 982-6385
11  Johnsonali@sec.gov
12  Nestorc@sec.gov
13  Fernandezw@sec.gov
14
15  FOR THE DEFENDANTS:
16  BY - CALEB KRUCKENBERG, ESQ.
17  BY - KARA ROLLINS, ESQ.
18  NEW CIVIL LIBERTIES ALLIANCE
19  1225 19th Street NW, Suite 450
20  Washington, DC 20036
21  (202) 869-5217
22  Kara.rollins@ncla.legal
23  Caleb.kruckenberg@ncla.legal
24
25  Kevin Montgomery, Document Technician
```

**4**

```
 1
 2                      INDEX
 3
 4  JAMES CANGIANO                        7
 5        BY MR. KRUCKENBERG
 6
 7
 8        EXHIBITS MARKED - ATTACHED
 9
10  Exhibit 225, Expert Report            11
11  Exhibit 226, Exhibit A to Expert Report  12
12  Exhibit 227, Curriculum Vitae         14
13  Exhibit 228, Blank FINRA Form 211     66
14  Exhibit 229 - (Not Marked)            ---
15  Exhibit 230, 17 CFR 230.405 (2019),   92
16  Exhibit 231, Shell Company Rules      97
17  Exhibit 232, 17 CFR 230.419 (2019)    104
18  Exhibit 233 - (Not Marked)            ---
19  Exhibit 234, Investor Bulletin: Reverse  115
20        mergers
21  Exhibit 235, 17 CFR 240.15c2-11 (2019)  120
22  Exhibit 236, initiation or resumption  145
23        of quotations without specified
24        information 1984
25
```

5

1  Exhibit 237, initiation or resumption   148
2       of quotations without specified
3       information 1991
4  Exhibit 238, SEC 2019-1630-0001        178
5  Exhibit 239, Agent Attestation Form -  186
6       Obscene Jeans
7  Exhibit 240, 15 USC 77e                204
8  Exhibit 241 - (Not Marked)             ---
9  Exhibit 242, UCC 8-401                 214
10 Exhibit 243 - (Not Marked)             ---
11 Exhibit 244, Proposed Transfer Agents  222
12      Regulations
13 Exhibit 245, Rose Deposition Transcript 232
14 Exhibit 246, Subscription Agreement    258
15 Exhibit 247, Diane Harrison Transcript 269
16 Exhibit 248, OGC-569 (TOPW S1)         278
17 Exhibit 249, subscription agreement    286
18      signature page, First
19      Independence
20 Exhibit 250, Transfer Journal          289
21
22
23
24
25

6

1
2
3      EXHIBITS REFERENCED - PREVIOUSLY MARKED
4
5  Exhibit 177                            159
6  Exhibit 22                             242
7  Exhibit 21                             248
8  Exhibit 30                             253
9  Exhibit 42                             275
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

7

1 JAMES CANGIANO, having been duly affirmed,
2 testifies as follows:
3
4       THE WITNESS:  I do.
5       Good morning, everyone.
6
7       EXAMINATION
8 BY MR. KRUCKENBERG:
9    Q   Good morning.
10      Do you say your last name
11 Cangiano?
12   A   Cangiano.
13   Q   Cangiano.  Okay.  I will do my
14 best today.
15   A   And yours is Kruckenberg.
16   Q   That's right.
17      Good morning.  My name is Caleb
18 Kruckenberg, I represent the defendants
19 in this case, SEC versus Spartan
20 Securities, et al.  And I represent all
21 of the defendants in this case.  Okay?
22   A   Yes.
23   Q   Now, you have -- you have
24 testified in a deposition before; is that
25 right?

8

1    A   Correct.
2    Q   And you have testified in court
3 before as well; is that right?
4    A   I have.
5    Q   So I am going to presume that
6 you are familiar with this process; is
7 that fair?
8    A   I think that is a good
9 assumption, yes.
10   Q   Okay.
11      And you understand you have been
12 placed under oath today and you have
13 sworn to tell the truth, right?
14   A   Yes.
15   Q   And that is no different in a
16 deposition, even though we are all on our
17 computers today, that's no different than
18 if you were testifying in court in front
19 of a jury.
20      Do you understand that?
21   A   I understand.
22   Q   Okay.
23      Now, everything we are saying is
24 being taken down by the court reporter.
25 So it's very important that when I ask

9

1 you a question that you provide answers
2 out loud.
3        Do you understand that?
4    A   Yes.
5    Q   And it's also important that you
6 say yes or no versus hm-hm or uh-Huh,
7 things like that.
8        Do you understand?
9    A   Hm-hm.  I am kidding.  Yes.
10   Q   Now, if for some reason I ask
11 you a question and you don't understand
12 it, please let me know so I can rephrase
13 it.  Okay?
14   A   I will.
15   Q   And if I ask you a question and
16 you do answer it I am going to assume
17 that you understood the question; is that
18 fair?
19   A   Yes.
20   Q   Now, the same way; if you don't
21 remember the answer or don't know the
22 answer, please let me know to a question.
23   A   I will.
24   Q   And similarly, if you do answer,
25 I will assume that you -- you know or you

10

1 remember; is that fair?
2    A   That's fair.
3    Q   Now, if at any point today we
4 need to take a break, please just let me
5 know.  Okay?
6    A   Yes, I will.
7    Q   And the only -- the only thing I
8 will ask you if there is a question
9 pending, please answer the question and
10 then we will take a break, okay?
11   A   Okay.
12   Q   Is there any reason that you can
13 think of that you are not able to proceed
14 with this deposition today?
15   A   No, I am fine.  Thank you.
16   Q   Okay.
17        Now, you have been retained by
18 the Securities and Exchange Commission as
19 a potential expert witness in this case;
20 isn't that right?
21   A   That's right.
22   Q   And you wrote an expert report
23 and you provided it to the SEC in this
24 case; is that right?
25   A   That's correct.

11

1    Q   Okay.
2        I am going to show you a
3 document that's been marked Exhibit 225.
4    (Exhibit 225, Expert Report, is Marked.)
5        MR. KRUCKENBERG:  Kevin, if
6    you can show him that.  If we can
7    zoom out so we can see the first
8    page.
9 BY MR. KRUCKENBERG:
10   Q   Do you see that document in
11 front of you?
12   A   Yes.
13   Q   That is the first page of the
14 expert report that you prepared in this
15 case; isn't that right?
16   A   That's correct.
17   Q   Thinks a 31-page document?
18   A   That's right.
19   Q   Okay.
20   A   In fair disclosure, I do have
21 that -- that is the only document I have
22 on my desk right now.
23   Q   Okay.  Okay.
24        Now, you also prepared two --
25 two exhibits to that report; isn't that

12

1 right?
2    A   That's right.
3    Q   And one of those exhibits listed
4 the documents that you had consulted in
5 preparing your report; is that correct?
6    A   That's correct.
7    Q   All right.  I am going to show
8 you what's been marked as Exhibit 226.
9        (Exhibit 226, Exhibit A to
10   Expert Report, is Marked.)
11        MR. KRUCKENBERG:  And if --
12   Kevin, if you can show him that
13   document.
14 BY MR. KRUCKENBERG:
15   Q   And looking at that document in
16 front of you on your screen, that is the
17 list of documents that you have consulted
18 in preparing your expert report; is that
19 right?
20   A   Yes.
21   Q   And you have not consulted any
22 other documents in preparation of that
23 expert report other than these exhibits;
24 is that fair?
25   A   I have consulted other documents

James Cangiano - July 23, 2020

13

1 in terms of my research, et cetera, all
2 of which are either documented or
3 footnoted in the report.
4     Q    Okay.
5         So it's fair to say that if a
6 source is not either provided in your
7 expert report or in this list of
8 documents that's in Exhibit 226, you have
9 not consulted it; is that fair?
10    A    There could be some others that
11 I have looked at in terms of my research
12 and background, et cetera, to add to my
13 knowledge of the expert report.  They may
14 not be in there.
15    Q    Okay.
16        Have you --
17        (Simultaneous Crosstalk.)
18    A    But -- go ahead.
19    Q    Have you reviewed any other
20 evidentiary documents in this case, any
21 exhibits or testimony not listed on
22 this -- on Exhibit 226?
23    A    I have not.
24    Q    Okay.
25        And finally, you provided a

14

1 curriculum vitae in this case as well,
2 didn't you?
3    A    I did.
4    Q    All right.  I am going to show
5 you Exhibit 227 now.
6        (Exhibit 227, Curriculum
7     Vitae, is Marked.)
8 BY MR. KRUCKENBERG:
9    Q    And looking at the first page of
10 that document, that appears to be your
11 CV; isn't that right?
12    A    Yes.
13    Q    Okay.
14        And that is a comprehensive
15 listing of your relevance employment;
16 isn't that right?
17    A    Yes.
18    Q    And you have not omitted any
19 important employment positions throughout
20 your career on this document?
21    A    I have not.
22    Q    Okay.
23        So if we turn back to
24 Exhibit 225, let's turn to page 2 of that
25 document.

15

1    A    I may use the one on my desk,
2 correct.
3    Q    Yes, you may.
4        So if we look at page 2 of that
5 document, there's a section marked,
6 Introduction.
7        Do you see that?
8    A    Yes.
9    Q    And in the second sentence it
10 says, "I was asked by the SEC to evaluate
11 the materials noted in Exhibit A and
12 provide an expert opinion regarding..."
13        Do you see that?
14    A    Yes.
15    Q    And there's several bullet
16 points.
17    A    Right.
18    Q    The first bullet point says,
19 "The characteristics of 'shell
20 factories'."
21        Do you see that?
22    A    Yes.
23    Q    And you use the term "shell
24 factories" in quotation marks.
25    A    Yes.

16

1    Q    Right.  Is shell factories a
2 legal term?
3    A    I don't believe so.
4    Q    And was that term supplied to
5 you by the SEC?
6    A    No.  Actually, I believe the SEC
7 uses that term in describing activities
8 that relate to the formation of shell
9 companies which are intended to be sold.
10        I may have gotten from an SEC,
11 either an SEC decision relating to shell
12 factories or press release related to
13 shell factories, not quite certain.  But
14 it's a common term in the regulatory
15 world, particularly in the micro cap
16 space.
17    Q    So can you please define that
18 term for me?
19    A    Sure.  It's a situation where
20 individuals or a group of individuals
21 would obtain companies.
22        Generally, they would have these
23 companies registered for resale.
24        Generally, they would control
25 all the securities.  They would never

17

1  intend to have the company carry out a
2  business plan per se, but the intent of
3  the formation of the company, the
4  retention of the stock was to sell it as
5  a public company or a shell.
6      Q    And is that unlawful to sell a
7  public company that is a shell company?
8      A    The Commission has taken a
9  number of actions regarding these, yes.
10     Q    Okay.  So that's not exactly my
11 question.
12         My question is, is it unlawful
13 to sell a public shell company?
14     A    And my answer is that the
15 Commission has found it in violation of
16 Federal Securities laws, yes.
17     Q    And -- so you're --
18         (Simultaneous Crosstalk.)
19     A    In the context of fraud and in
20 the context of -- these shell companies
21 are generally used, according to the SEC
22 and in my experience, to be obtained by
23 fraudsters who are looking to perhaps
24 engage in a pump-and-dump scheme or
25 whatever.

19

1  the company to carry out a business plan,
2  for example.  The sole intent of the
3  company is to be sold.  The value being
4  that it is now a public entity with a
5  stock symbol that could now be used in
6  furtherance of other manipulated schemes
7  down the road.  And that's why the
8  Commission has taken action over the
9  years to shut these so-called shell
10 factories down.
11     Q    I see.
12         So is it fair to say that the
13 enforcement actions that you are
14 referencing are in reference to the other
15 fraudulent activities, like filing false
16 registration statements or doing a
17 subsequent scheme with the company; is
18 that fair?
19     A    That's fair.
20     Q    Okay.
21         And you also referenced pump and
22 dumps, right?
23     A    Correct.
24     Q    There's no allegation in this
25 case anywhere in the Complaint that a

18

1      Q    Okay.  Let me break that down a
2  little bit.
3          You say the SEC has taken action
4  against companies for selling -- or I
5  guess individuals for selling public
6  shell companies; is that right?
7      A    That's right.
8      Q    Is it unlawful to sell a public
9  shell company?
10     A    It is not unlawful to sell a
11 public shell company if it's not in
12 furtherance of a scheme.  The ones I have
13 cited are in furtherance of a scheme.
14     Q    Okay.
15         What do you mean by that,
16 "furtherance of a scheme"?
17         Can you define that for me?
18     A    Well, the Commission cases
19 generally involve fraud.  They involve
20 fraudulent echelons.  They involve
21 fraudulent SEC filings.  They involve
22 shareholders.  They involve fraudulent
23 opinion letters by attorneys which are
24 designed to free up stock.
25         And there's never any intent for

20

1  pump and dump was involved with any of
2  the entities mentioned; is that fair?
3      A    I think there was one company
4  that eventually was the subject of a pump
5  and dump, yes.
6      Q    Which company was that?
7      A    I think it was First
8  Independence.
9      Q    And was that before or after any
10 of the events alleged in the Complaint?
11     A    Well, it would have to be after.
12     Q    Okay.
13         Is there any direct allegation
14 in the Complaint involving a
15 pump-and-dump scheme?
16     A    No, there's not.
17     Q    And is there any indication in
18 any of the information you have seen that
19 my clients had any involvement with the
20 pump-and-dump scheme for that issuer?
21     A    There is not.
22     Q    Is there any indication in any
23 of the records that you have seen, that
24 any of my clients were aware that that
25 company was ever involved in a pump and

21

1  dump?
2     A   I don't believe so, no.
3     Q   Okay.
4        So let's -- let's go back to
5  your CV for a little bit.
6        DOCUMENT TECHNICIAN:  I'm
7  sorry -- Caleb?
8        MR. KRUCKENBERG:  Yes.
9        DOCUMENT TECHNICIAN:  I'm
10  sorry to interrupt.  Alise is
11  having some internet problems and
12  asked if we could pause for
13  two minutes.
14        MS. JOHNSON:  I'm sorry, I am
15  back.  I am having horrible issues
16  today.  If you could ask the
17  question where you were again,
18  please.
19        MR. KRUCKENBERG:  I was just
20  saying I was going to turn to his
21  CV.
22        MS. JOHNSON:  Okay.
23        MR. KRUCKENBERG:  And Willie
24  or anyone else, or Alise, let me
25  know if you are having issues and

23

1     A   That's correct.
2     Q   This is comprehensive -- this is
3  a comprehensive list of all your
4  post-secondary education; is that right?
5     A   Yes.
6     Q   You have a Bachelor of Arts
7  degree from St. Francis College, right?
8     A   Correct.
9     Q   And then 30 graduate credits in
10  English from St. John's University?
11     A   Yes.
12     Q   Is that right?
13     A   Yes.
14     Q   Okay.
15        And then you also attended the
16  New York Institute of Finance.
17        Did you receive a degree from
18  that institution?
19     A   Yes.
20     Q   What kind of degree was that?
21     A   Just a certificate that shows
22  that you completed your coursework.
23     Q   Okay.
24        You have not attended law
25  school; is that right?

22

1  we will stop.
2        MS. JOHNSON:  The problem is
3  I am off so I can't communicate,
4  so I can't let you know but I will
5  try.
6        MR. KRUCKENBERG:  And Willie
7  and Christine, if you notice Alise
8  is off, just let me know.  Okay?
9        THE WITNESS:  Sorry.  I hope
10  you don't mind, I removed my
11  jacket.  It's hot down in Florida.
12        MR. KRUCKENBERG:  And I will
13  just let you know we are not
14  videotaping this.
15        THE WITNESS:  Okay.
16  BY MR. KRUCKENBERG:
17     Q   So if we could turn to
18  Exhibit 227, and if we could turn to the
19  last page of that document, that's page
20  6.
21        And can you see that document in
22  front of you?
23     A   Yes.
24     Q   And you list your education at
25  the bottom of your CV; is that right?

24

1     A   That's right.
2     Q   And you have no formal legal
3  training; is that right?
4     A   I do not.
5     Q   And you have never practiced
6  law; is that right?
7     A   No, I have not.
8     Q   Okay.
9        You are not providing an expert
10  opinion on the meaning of legal
11  provisions; isn't that right?
12     A   Not in the sense of a purely
13  legal standard, for example.  I am not
14  making a legal determination, no.
15     Q   Okay.
16        And it's fair to say you are not
17  an expert in the interpretation of laws;
18  is that right?
19     A   Explain.
20     Q   Well, so if we look at a law,
21  you are not an expert witness in how that
22  law should be interpreted, how that
23  statute should be interpreted.
24     A   From what?
25        MS. JOHNSON:  Object to the

25

1 form.
2        THE WITNESS:  Yeah, exactly.
3    From what point of view are you
4    talking about, Caleb?
5 BY MR. KRUCKENBERG:
6    Q   Well, are you -- I am asking
7 from a purely legal perspective.
8        Are you an expert in the
9 interpretation of laws?
10    A   Well, you know, all regulators
11 at some point or another, whether they be
12 lawyers or non-lawyers, confront the law.
13 Right?  If I am a cop on the beat and I
14 have to make a determination with respect
15 to a crime scene, reading Miranda rights,
16 et cetera; now, I am not a lawyer but I
17 am kind of looking at what constitutes
18 the element of the law, what evidence I
19 need to produce.
20        So in that sense, I would
21 consider myself an expert.  Yes.
22    Q   Okay.
23        And in fact, you have provided
24 your expert opinion about what you
25 believe that certain regulations mean;

27

1    Q   Okay.
2        So I just want to make it clear:
3 You are not rendering legal opinions; is
4 that right?
5    A   I am not.
6    Q   Okay.
7        So let's -- let's go on the same
8 page now.
9        You worked for the NASD from
10 1975 to 2001; is that right?
11    A   Yes.
12    Q   Okay.
13        And we -- when we are looking at
14 page 6, that is the last -- that is the
15 earliest position.
16        There's a date 1975 to 1981,
17 right?
18    A   Yes.  Well, I started at NASD in
19 1972.
20    Q   Okay.
21    A   The managerial positions started
22 in '75.
23    Q   Okay.
24        MR. KRUCKENBERG:  Let's just
25    go up to page 4, briefly.

26

1 isn't that right?
2    A   I have provided it in terms of
3 what the elements of those regulations
4 are, yes.
5    Q   And you have also provided your
6 expert opinion about what you believe --
7 what obligations those laws impose; isn't
8 that right?
9    A   Yeah.  And I have done that,
10 obviously, without making any legal
11 conclusions, for example.
12    Q   What do you mean by that when
13 you say I haven't made any legal
14 conclusions?
15    A   Well, as an expert you never
16 want to step into the purview of the
17 Court, for example.
18    Q   Okay.
19        But you are --
20        (Simultaneous Crosstalk.)
21    A   And in my case where I am
22 opining, as you suggest, on rules
23 regulations, et cetera, I take great
24 pains to ensure that I am not rendering
25 legal opinions.

28

1        Okay.  If we could stop.
2 BY MR. KRUCKENBERG:
3    Q   This is all under the heading
4 NASD Incorporated, right?
5        And ends in February 2001; is
6 that fair?
7    A   (Reviewing.)  Well, a portion of
8 it was NASD Regulation, Inc., which was a
9 different -- which is a subsidiary of
10 NASD.
11    Q   Okay.  Okay.  Let's go back,
12 then, to 1972.
13        What role did you have at NASD
14 starting in 1972?
15    A   I was hired as an examiner
16 trainee.
17    Q   Okay.
18        And was that in the Kansas City
19 office?
20    A   No, it was in the New York
21 office.
22    Q   Okay.
23        Were you an examiner trainee
24 until 1975 or --
25    A   No, I became an examiner in 1973

29

1 I believe.
2    Q    Okay.
3         And what areas did you examine?
4    A    We did on-site inspections of
5 broker-dealer NASD members.  Back in
6 those days there was both a financial and
7 paperwork crisis in the industry.  A lot
8 of what we did was related to net
9 capital, books and records, and ensuring
10 that the broker-dealer was financially
11 capable of meeting the criteria, the net
12 capital rule, the investors were
13 protected and so on.
14        But I examined for everything,
15 you know, that was on the checklist; so
16 that includes suitability, sales
17 practice, you name it.
18    Q    Okay.
19        Did you -- did you examine any
20 entities for compliance with SEC Rule 211
21 during that period?
22    A    Yes, that was part of the
23 examiner checklist.
24    Q    Okay.
25        How many broker-dealers did you

30

1 examine for compliance with that rule
2 from 1972 to 1975?
3    A    I would say, you know -- this is
4 purely a guess because we are going back
5 a ways -- any -- any NASD member that was
6 a market maker was examined for 15c2-11
7 compliance.  And I would say my group was
8 A to C.  So I would imagine there would
9 be five or six firms that I examined just
10 off the top of my head.
11    Q    Okay.  And then after 1975 --
12 actually, let me go back for a second.
13        What is NASD?
14    A    NASD is an acronym for the
15 National Association of Securities
16 Dealers.  They were -- they no longer in
17 existence because they merged into FINRA,
18 with the regulatory arm of the New York
19 Stock Exchange that formed FINRA.  But
20 back in the day they were the
21 self-regulatory organization for the
22 over-the-counter market.
23        And by that I mean they were
24 sanctioned under 15 -- Section 15A of the
25 '34 Act to carry out regulation of the

31

1 over-the-counter market.
2    Q    They also regulated NASDAQ
3 during that period; isn't that right?
4    A    They actually formed NASDAQ back
5 in 1971 and NASDAQ was part of the NASD
6 until I think of 2001, yes.
7    Q    Okay.
8         And so that's in addition to
9 regulating the over-the-counter market?
10    A    Yes.  In those days NASDAQ was
11 considered the over-the-counter market,
12 as well.  It wasn't registered as a
13 National Securities Exchange.
14    Q    Okay.
15        So when you say that -- when you
16 reference investigations of the
17 over-the-counter market during your time
18 with NASD, you're also including
19 investigations of NASDAQ; isn't that
20 right?
21    A    NASDAQ, yes.
22    Q    Okay.
23        Now, you said NASD eventually
24 merged with the New York Stock Exchange,
25 the enforcement arm of the New York Stock

32

1 Exchange; is that right?
2    A    Yes.
3    Q    That was in 2007, right?
4    A    I believe so, yes.
5    Q    And the new entity is FINRA,
6 right?
7    A    That's correct.
8    Q    And that is the Financial
9 Industry Regulatory Authority?
10    A    Yes.
11    Q    And both NASD and FINRA, they
12 are non-profit corporations; is that
13 right?
14    A    That's right.
15    Q    And they are prosecuted under
16 the United States Securities laws, aren't
17 they?
18    A    They are sanctioned by the
19 securities laws, yes.
20    Q    And they regulate member
21 organizations, right?
22    A    Correct.
23    Q    And so they are a quasi
24 governmental entity.
25        Have you heard that term before?

James Cangiano - July 23, 2020

---

33

1    A    Sometimes they are referred to
2 as quasi regulatory, yes.
3    Q    And they --
4         (Simultaneous Crosstalk.)
5    A    What did you say quasi
6 government, I'm sorry?
7    Q    Quasi government or quasi
8 regulatory.
9    A    They are sometimes referred to
10 that, yes.
11    Q    Okay.
12         Now, you have never worked at
13 FINRA; is that right?
14    A    No.
15    Q    Okay.
16         Now, both NASD and FINRA, they
17 pass rules and regulations governing
18 their own members; isn't that right?
19    A    That's right.
20    Q    Those rules governing their
21 members are subject to review by the SEC;
22 isn't that right?
23    A    That's correct.
24    Q    And so when NASD issued a rule
25 governing its members, the SEC would

---

34

1 review it before it could become
2 effective; isn't that right?
3    A    Yes.
4    Q    Okay.
5         And NASD had the capacity or the
6 ability to institute enforcement actions
7 against its members for violating NASD
8 rules, right?
9    A    That's right.
10    Q    And they could fine or otherwise
11 discipline their members; is that right?
12    A    That's correct.
13    Q    Now, NASD and FINRA both, those
14 organizations have no authority to
15 enforce SEC rules, do they?
16    A    No, they do.
17    Q    They do?  Against their members?
18    A    Yes.
19    Q    They are not allowed to say it's
20 due to a lawsuit like the one we are
21 involved in today in federal court?
22         MS. JOHNSON:  Object to the
23    form.
24         THE WITNESS:  No, but they
25    can allege violations of Federal

---

35

1    Securities laws, yes.
2 BY MR. KRUCKENBERG:
3    Q    Okay.
4         Now, NASD -- and FINRA, for that
5 matter -- neither one of those
6 organizations regulate transfer agents;
7 isn't that right?
8    A    That's right.
9    Q    And there's no self-regulatory
10 agency for transfer agents, right?
11    A    I believe there's several
12 associations that -- I don't believe they
13 have any governance, but I know there's a
14 transfer agent association.  I don't know
15 whether they do rules or what they do,
16 but --
17         (Simultaneous Crosstalk.)
18    Q    Okay --
19    A    -- you're right, there's no
20 regulatory function.
21    Q    Okay.
22         And what -- what -- what
23 organizations were you just referring to?
24    A    I think there's a transfer agent
25 association or national transfer

---

36

1 association of some type, I am not
2 totally sure.
3    Q    Okay.
4         You believe there's an
5 organization --
6         (Simultaneous Crosstalk.)
7    A    I think --
8    Q    -- you are not sure?
9    A    -- organization for the transfer
10 agents.
11    Q    Okay.
12         Is it fair to say you are not
13 positive what it it's name is?
14    A    That's right.
15    Q    And I think you mentioned this
16 earlier, you don't know if they issue
17 rules for their members, right?
18    A    I don't believe they do, no.
19    Q    You don't believe they do or you
20 don't know?
21    A    Well, they would have some
22 statutory authority that I am not aware
23 of and I don't believe there is any,
24 so...
25    Q    Okay.

---

37

1      Now, how large was NASD when
2 were you working at it?
3      A   Large in terms of what?
4      Q   How many employees?
5      A   Throughout the whole NASD -- in
6 1972 you're talking about?
7      Q   Well, let's start in 1972.
8      A   I would have no idea.
9      Q   All right.  Well, how about in
10 2001 when you left the organization?
11      A   Oh, gosh.  Well, I know when I
12 left Market Regulation I had over 200
13 people reporting to me alone.  So I would
14 say it's, you know a thousand, 2,000 --
15 you know somewhere between 1- and 2,000
16 people.
17      Q   Okay.  And are there different
18 divisions of NASD?
19      A   I'm sorry?
20      Q   Are there different divisions of
21 NASD?
22      A   Yes.
23      Q   How many?
24      A   Today?
25      Q   When you left in 2001.

38

1      A   I would say off the top of my
2 head, again, without having, you know,
3 refreshed my recollection, maybe five or
4 six.
5      Q   Okay.
6      And what are the different
7 divisions do at NASD?
8      A   Well, for example, there was a
9 technology division which was very large,
10 probably the next largest of all the
11 departments.  There was member regulation
12 which dealt with the on-site examination
13 of broker-dealers.  There was an
14 advertising section which reviewed
15 broker-dealer advertising.  There was a
16 corporate finance section.  There was a
17 government liaison section.  There's an
18 office of the secretary of the
19 corporation.  So there were several.
20      Q   Okay.
21      Do you believe that you are an
22 expert in all of NASD's activities?
23      A   When you say "all," what do you
24 mean?
25      Q   Well, so you just --

39

1      (Simultaneous Crosstalk.)
2      A   -- software engineer, for
3 example, so, you know, I am not -- I am
4 in the application of technology but I
5 don't do code.
6      Q   What about all of -- are you an
7 expert in all of NASD's regulatory role?
8      MS. JOHNSON:  Objection.
9      THE WITNESS:  I have -- I
10      have had, you know, a 32-year
11      career at NASD.  And I would say
12      that my career touched pretty much
13      every aspect of what NASD did
14      while I was there, yes.
15 BY MR. KRUCKENBERG:
16      Q   Okay.
17      So you believe that you have
18 expertise in everything at NASD --
19      (Simultaneous Crosstalk.)
20      A   I mean, obviously we are talking
21 about degrees, you know.  I am much more
22 of an expert in terms of Market
23 Regulation than I am in what a mutual
24 fund has to do for -- applying to
25 advertising rules, for example.

40

1      Q   Okay.
2      A   So it's degrees.  But I have a
3 degree of familiarity with practically
4 everything they have done.  Sure.
5      Q   Okay.
6      Do you believe that if you
7 reviewed outside information or prepared
8 that you could be an expert in any -- in
9 anything that NASD regulated?
10      A   Well, I have never been asked to
11 be an expert outside of the Market
12 Regulation, you know, area.  So it's kind
13 of a tough question for me to answer now.
14      I mean, I have been asked in the
15 context of what I do certain questions
16 about corporate financing or, you know,
17 other areas of NASD.  But, you know, no
18 one has asked me to be an expert in those
19 areas so --
20      (Simultaneous Crosstalk.)
21      Q   Okay.
22      A   -- nothing that I worry about.
23      Q   So you mentioned one division of
24 NASD, member relations; is that right?
25      A   Member relations?

41

1    Q    I think is that what you said.
2         Is that the division that does
3 on-site examinations?
4    A    That's member regulation.
5    Q    Excuse me.  Member regulation?
6    A    Right.
7    Q    Do you believe that you are an
8 expert in any activity that member
9 regulations conducted at NASD?
10   A    Yeah, I think -- I think so,
11 because my first fourteen years were in
12 member regulation and I held various
13 positions from examiner all the way up to
14 district director.  So that was --
15        (Simultaneous Crosstalk.)
16   Q    Okay.
17   A    -- that was the early part of my
18 career and I am very familiar with how
19 broker-dealers are examined and what they
20 are examined for, et cetera.
21   Q    Okay.
22        So let's go back to 1975 to
23 1981, and if we could turn to page 6 of
24 this exhibit.
25        And from that period you held

42

1 managerial positions in NASD's
2 examination offices; isn't that right?
3    A    Yes.
4    Q    And you were also the district
5 director in Kansas City --
6        (Simultaneous Crosstalk.)
7    A    Yes.
8    Q    -- during that period of time?
9        Okay.  As a manager, you managed
10 field examinations, right?
11   A    I have, yes.
12   Q    So I am specifically referencing
13 the period 1975 to 1981, did you
14 supervise field examinations?
15   A    Yes.
16   Q    How many?
17   A    Oh, boy.  I don't know.
18 Probably a hundred.
19   Q    Okay.
20   A    That is a guess.
21   Q    Okay.
22   A    But -- (Audio Distortion) --
23 time.
24   Q    When -- during that period of
25 time when were you supervising a field

43

1 investigation, did you go on-site as
2 well?
3    A    Sometimes, yes.
4    Q    Did you go on-site every time?
5    A    No, only when there was a major
6 issue or a significant action that needed
7 to -- that where the examiner needed
8 help.
9    Q    Okay.
10   A    For example, if we are going to
11 close down a firm for net capital
12 violations, I generally want to make sure
13 that not only were -- you know, were the
14 rules that we were enforcing in play, but
15 that the principals of the firm knew what
16 we were doing, et cetera, et cetera.
17   Q    Do you know -- do you recall how
18 many times you went on-site during that
19 period of time?
20   A    I would say maybe 15 to
21 25 percent.
22   Q    That's out of approximately a
23 hundred examinations?
24   A    Yeah.  As I said, I am guessing.
25   Q    Sure.

44

1        Now, when you're managing an
2 examination, do you review all of the
3 files personally?
4    A    If it's a matter where we are
5 going to file the thing without action,
6 where there's no disciplinary action to
7 come from the exam, I generally would not
8 review, you know, all the details.
9        However, when we were going to
10 issue a complaint or proceed against the
11 firm in a disciplinary -- I would review
12 all the files.
13   Q    How many out of that
14 approximately a hundred examinations that
15 you supervised were they referred to
16 enforcement where there was a complaint?
17   A    I would say maybe 30 to
18 40 percent.
19   Q    Okay.
20        Now, of all of those
21 examinations that you supervised, how
22 many involved checking for compliance
23 with SEC Rule 211?
24   A    Well, as I stated before, if the
25 firm was a market maker, including in

45

1 quotes in either the Pink Sheets or -- a
2 facility of the Pink Sheets, then we
3 would examine for 15c2-11.
4    **Q   How many was that?**
5    A   I don't know.  I think I stated
6 before, maybe -- what did I say, 10, 15
7 in the A to C group.
8    **Q   When you are saying 10 to 15,**
9 **you are referencing 1972 to 1981; is that**
10 **fair?**
11   A   Yeah.
12   **Q   Okay.**
13      **How many of those did you**
14 **personally conduct versus supervise?**
15   A   That would be in the three-year
16 period between '72 to '75.
17   **Q   So during '72 to '75, how many**
18 **involved 15c2-11 examinations?**
19   A   I think I answered the question
20 already but I will answer it again.
21 Probably about 10.
22   **Q   Okay.**
23      **And as a supervisor from 1975 to**
24 **'81, would you say there's additional**
25 **five?  You said there's between 10 to 15.**

46

1    A   No, I would say 10 to 15
2 additional.
3    **Q   Okay.**
4       **How many of those 10 to 15**
5 **additional -- again, I am talking about**
6 **now the managerial portion from '75 to**
7 **'81 -- how many of those did you examine**
8 **the entire file?**
9    A   In the 15(c)211 area or in --
10      (Simultaneous Crosstalk.)
11   **Q   The 15c2-11 area.**
12   A   Well, if we were going to bring
13 a violation of 15c2-11, I would examine
14 the file, yeah.  And probably of those, I
15 would say -- in those days, you know, as
16 I said -- as I testified before, there
17 were faulty recordkeeping and smaller
18 firms that were making markets
19 particularly in low priced stocks, and so
20 a lot of their files were in disarray.
21      So I would say if there was a
22 market maker involved and he was doing
23 low-priced securities and was trying to
24 comply with 15c2-11, my guess is probably
25 75 to 80 percent of those had problems.

47

1      Remember, we are talking about
2 an era where everything was done
3 manually.
4    **Q   Okay.**
5      **And so my question, if you**
6 **recall, is of those approximately 10 to**
7 **15 examinations that you supervised that**
8 **involved compliance with 15c2-11, how**
9 **many of those were referred to**
10 **enforcement, if you recall?**
11   A   I don't recall specifically, but
12 I would say, as I said, before, maybe
13 75 percent of them.
14   **Q   Okay.**
15      **And the ones that were referred**
16 **to enforcement, you would have looked**
17 **over the entire file?**
18   A   Yes.
19   **Q   Okay.**
20      **From 1981 on, you were not**
21 **supervising field examinations; is that**
22 **right?**
23   A   That's right.
24   **Q   Okay.**
25   A   Yeah, go ahead.

48

1    **Q   And it's fair to say that the**
2 **last time you conducted a field**
3 **examination or supervised a field**
4 **examination for compliance with 15c2-11**
5 **was at the latest 1981?**
6    A   No, that is not correct.
7    **Q   Okay.**
8       **Why is that not, correct?**
9    A   Because when I took over Market
10 Reg, the 15c2-11 department reported to
11 me.
12   **Q   Okay.  So let's get to that in a**
13 **little bit.**
14      **From 1981 to 1984 you were**
15 **associate director of NASD's regulatory**
16 **policies and procedures; is that right?**
17   A   Yeah.
18      Can you scroll down to that
19 area, please.
20      MR. KRUCKENBERG:  Yeah.
21   Let's go up.  It's going to be --
22   there we go.
23 BY MR. KRUCKENBERG:
24   **Q   And we are looking at page 5 of**
25 **Exhibit 227.**

49

1       Do you see that?
2    A   Yes.
3    Q   Okay.
4       And it spills over into page 6.
5    Let me know if you want to go to page 6
6    at any point.
7    A   Okay.
8    Q   Can you just describe your
9    duties there as associate director in
10   that department?
11   A   Yeah.  That was the department
12   that carried out the regulatory policy
13   for member regulation.  We did -- as it
14   says there, we developed the examination
15   modules and procedures that -- examiners
16   in the field.  We also did rule
17   proposals.  We, you know, looked at
18   different -- let's say a new rule would
19   come on, either the SEC or NASD would
20   pass a new rule, it would be our role to
21   analyze the rule and come up with
22   specific examination programs, including
23   the checklist and the narrative for the
24   examiner to follow.
25   Q   Okay.

50

1       Now, it's fair to say none of
2    those regulatory proposals regulated
3    transfer agents, right?
4    A   That's right.
5    Q   And it's also fair to say that
6    in your examination work at NASD, none of
7    those were examining transfer agents,
8    right?
9    A   Examining transfer agents per
10   se, no.
11   Q   Okay.
12      So from --
13      MR. KRUCKENBERG:  Let's go up
14   now a little bit on Exhibit 227.
15   BY MR. KRUCKENBERG:
16   Q   From 1984 to 1986 you were
17   corporate secretary for NASD; is that
18   right?
19   A   Yes.
20   Q   And during that period -- during
21   that period and also during the period
22   where you were the associate director in
23   regulatory policies and procedures, it's
24   fair to say you were not supervising
25   examinations -- field examinations,

51

1    right?
2    A   Yes, that's fair.
3       MR. KRUCKENBERG:  So if we
4    could go up now a little bit
5    farther.  Let's go to page 4 of
6    this document.
7    BY MR. KRUCKENBERG:
8    Q   So from 1986 to December 1998,
9    you were senior vice president for Market
10   Regulation; is that right?
11   A   Yes.
12   Q   Okay.
13      And I think you indicated this
14   earlier, in that capacity you supervised
15   field examinations; is that right?
16   A   Some, yes.
17   Q   In what capacity were you
18   supervising the field examinations?
19   A   Well, again, you know, if it was
20   a major case or if it was a case that
21   would be -- I don't want to say
22   controversial -- but let's say
23   groundbreaking in a new era or if we were
24   trying to go in a certain direction with
25   regulatory issues -- if it was an

52

1    important case, I will put it that way --
2    I would get involved with the examiners,
3    the analysts and the attorneys that were
4    handling the case, yes.
5    Q   Okay.
6       How many -- how many
7    investigations did you oversee at one
8    point -- at any given time during that
9    period?
10   A   As a manager?
11   Q   Yes.
12   A   I would say hundreds.
13   Q   So on any given day, you might
14   have 200 cases that you are managing; is
15   that fair?
16   A   Yeah, I think -- well, depends
17   on -- yeah, that's pretty close actually.
18   Q   Okay.
19      And it's fair to say you did not
20   actually conduct field examinations
21   yourself of all those cases?
22   A   I did not in the sense that, you
23   know, I didn't go out in the field and do
24   the grunt work, et cetera, et cetera,
25   right.

James Cangiano - July 23, 2020

53

1    Q    You didn't go out to the field
2  at any point on those investigations; is
3  that right?
4    A    No.  But I might tell the
5  analyst or the lawyer that's in here
6  that, you know, wanted bolster the case,
7  you probably need to go out to the firm
8  and get XYZ document or depose XYZ; just
9  essentially giving direction on how to,
10  you know, finish up the examination so
11  that it's ready to go --
12          (Simultaneous Crosstalk.)
13    Q    And did you review all of the
14  books and records for all of these
15  examinees in those cases?
16    A    Not all, no.
17    Q    From that period, from 1986 to
18  1998, how many investigations did you
19  supervise involving examinations for
20  compliance with Rule 15c2-11?
21    A    Again, you're asking me for
22  numbers, you know, and --
23          (Simultaneous Crosstalk.)
24    Q    Yeah.
25    A    -- it's kind of hard because I

54

1  would say that -- I don't know.  I don't
2  know if I can answer your question.
3  Maybe 10 to 20.
4    Q    Okay.
5          In those cases, did you -- did
6  you review all of the books and records
7  for the examinees?
8    A    I reviewed the records that were
9  gathered by the examiner analyst.
10    Q    Okay.
11    A    I didn't review all the records.
12  I didn't go to the firm and review all
13  the records.
14    Q    Okay.
15          And it's fair to say that when
16  you reviewed those books and records,
17  that was after a field examiner had
18  already found a problem, right?
19    A    Yes.
20    Q    And so you wouldn't have
21  reviewed a broker-dealer's records with
22  respect to compliance for Rule 15c2-11,
23  if there hadn't been an identified
24  problem, right?
25    A    Not as a manager, no.

55

1    Q    And you are aware that during
2  that period of time NASD would review
3  applications submitted by broker-dealers
4  for -- applications to publish a
5  quotation for small issuers; isn't that
6  right?
7    A    Yeah.  As I said before, the --
8  I was in charge of that department.  Yes.
9    Q    So let's just take a step back.
10          When I reference Rule 2-11,
11  there's an SEC Rule 15c2-11, right?
12    A    Yes.
13    Q    And NASD and FINRA both have
14  their own rules requiring broker-dealers
15  to submit applications to them to show
16  compliance with that rule; isn't that
17  right?
18    A    That's correct.
19    Q    Now, as -- in your capacity as
20  senior vice president, did you ever
21  review applications submitted to NASD for
22  compliance with Rule 2-11 for clearance?
23    A    Again, if it involved a major
24  case, I probably would have reviewed it,
25  yes.

56

1    Q    Okay.  All right.
2          And fair to say none of it --
3  none of the activities you supervised as
4  a senior vice president arose out of
5  examinations, field examinations, from
6  transfer agents, right?
7    A    That's right.  Although
8  certainly if it involved a fraud of some
9  type, there could be a transfer agent
10  element to it, particularly when we are
11  looking for, for example, an unregistered
12  distribution.
13    Q    Okay.
14          But you didn't conduct field
15  examinations of transfer agents?
16    A    I did not, no.
17    Q    And your employees didn't
18  either?
19    A    No.
20    Q    Okay.
21          Now, during that period,
22  May 1986 to December 1998, that was
23  before the EDGAR system was fully
24  implemented, isn't it?
25    A    I believe they were in the

57

1  process of completing EDGAR.  May have
2  been completed right around the time, the
3  end of that period.
4      Q    Okay.
5           What is EDGAR, just so I know?
6      A    That is the electronic filing
7  for all public companies.  Not only to
8  file, but to retrieve filings obviously.
9      Q    And when I talk about Rule
10 15c2-11 --
11          MS. NESTOR:  Caleb, Caleb.
12     I'm sorry to interrupt.  Alise
13     sent a message that she is not
14     logged in right now, internet
15     issues.  If we can take a minute
16     break.  Sorry to interrupt.
17          (Technical Interruption.)
18          MS. JOHNSON:  I'm back.  I'm
19     sorry.  I was off for a minute.
20     This is Alise Johnson.
21          MR. KRUCKENBERG:  Are we
22     ready to go back?
23          MS. JOHNSON:  I am back.
24     Sorry.
25          MR. KRUCKENBERG:  No problem.

58

1  BY MR. KRUCKENBERG:
2      Q    Now, when a broker-dealer is
3  complying with Rule 15c2-11, they
4  typically gather public -- filings for
5  public companies underlying the
6  application; isn't that right?
7      A    Yes.  That's one of the
8  documents they need to obtain, that's
9  correct.
10     Q    Okay.
11          And today, anyone can go to
12 EDGAR for any public filer and obtain
13 those documents, right?
14     A    Yes.
15     Q    In 1998 that wasn't the case,
16 was it?
17     A    You know, I don't recall if it
18 was working in 1998 or not, not sure.
19     Q    Okay.
20          And do you know if in 1998 the
21 public would have had access to EDGAR
22 filings versus regulators?
23     A    I don't believe that their
24 website was up and running at that point,
25 no.

59

1      Q    Okay.
2      A    But I think they could go to the
3  public reference room of the SEC and
4  maybe -- and get the documents there.
5      Q    Okay.
6      A    Request it through the mail or
7  whatever.  So it was available.
8      Q    It was available, it just was a
9  different process; is that fair?
10     A    Hm-hm.
11     Q    Is that a yes?
12     A    Yes.
13     Q    Okay.
14          From January 1999 to
15 February 2001, you worked for NASD
16 Incorporated.
17          That is a slightly different
18 entity --
19          (Simultaneous Crosstalk.)
20     A    That's right.
21     Q    -- than NASD Regulation?
22     A    That's right.
23     Q    And you were senior vice
24 president --
25          MR. KRUCKENBERG:  Yeah, let's

60

1  go up on this Exhibit 227.
2  BY MR. KRUCKENBERG:
3      Q    Senior vice president,
4  Regulatory Technology.  So this is going
5  to be the top of page 4.
6          Is that right?
7      A    Yes.
8      Q    From that period, you were no
9  longer supervising Market Regulation; is
10 that right?
11     A    That's right.
12     Q    Okay.
13          February 2001 --
14          MR. KRUCKENBERG:  So let's go
15     to page 3 at the bottom.
16 BY MR. KRUCKENBERG:
17     Q    February 2001 to February 2004,
18 you were senior vice president,
19 Regulation and Controls, for NASDAQ
20 Incorporated; is that right?
21     A    Yes.
22     Q    You mentioned earlier NASDAQ at
23 one point was part of NASD?
24     A    Yes, NASD formed NASDAQ.
25     Q    Okay.

61

1    And when did NASDAQ become its
2 own entity or an independent entity?
3    A    In 2001, I believe.  And --
4 yeah.  They became a separate
5 self-regulatory organization.
6    Q    Okay.
7       When that happened, you went to
8 NASDAQ, right?
9    A    Yeah.  I was asked by both Mary
10 Shapiro who was president of NASD
11 Regulation, and Pat Campbell who was
12 president of NASDAQ at the time, they
13 came to me and asked if I would be
14 interested in kind of being -- let me go
15 back a little bit of history here.
16       When NASD and NASDAQ separated,
17 one of the criteria was that there would
18 be a Chinese wall between the two
19 organizations.  One of the reasons they
20 split was obviously it was, you know,
21 could be viewed as potential conflict for
22 the regulator to be owning the market.
23 And so that's one of the reasons why they
24 spun off.
25       So I was -- I was asked by the

62

1 heads of both organizations to kind of
2 straddle the Chinese wall between the two
3 companies because we had contracted with
4 NASD to carry out regulatory functions on
5 behalf of the NASDAQ.
6    Q    Okay.
7    A    That was my role.
8    Q    And NASDAQ -- that is a national
9 exchange, isn't it?
10    A    It's the registered securities
11 exchange, yes.
12    Q    And that would not be an
13 over-the-counter market?
14    A    No, it would not.  Not anymore,
15 right.
16    Q    Okay.
17       And as of 2001, it was not an
18 over-the-counter market?
19    A    That's right.
20    Q    Okay.
21    A    I think -- I think actually
22 their -- their registration in Exchange
23 came a little bit after the split, maybe
24 a year or so.
25    Q    Okay.

63

1       Now, at NASDAQ, you didn't
2 investigate any over-the-counter markets
3 for market enforcement, did you?
4    A    Well, not specifically examined
5 but I was heavily involved in regulatory
6 issues, obviously, as the regulatory
7 chief -- I guess, you could characterize
8 me as the chief regulatory officer.  So
9 any regulatory issues that arose in the
10 context of the market or -- again, I am
11 straddling the Chinese wall, so NASD
12 would come to me and say, Hey, Jim you
13 guys have a problem because your market
14 makers are doing X.  Okay.  And I would
15 go the other way, as well, where NASDAQ
16 says, NASD, you guys need to check for Y.
17       So it was kind of -- kind of --
18 you know, I am not doing examinations but
19 I am heavily involved in regulatory on a
20 day-to-day basis.
21    Q    Okay.
22       Is that regulatory matters for
23 over-the-counter markets?
24    A    Regulatory matters for NASDAQ,
25 Inc.

64

1    Q    Okay.
2       So from May 2004 to the present,
3 you have been president of Wildcat
4 Consulting, right?
5    A    Right.
6    Q    Is that a full-time position?
7    A    No, it's not.
8    Q    And do you have any employees?
9    A    I do not.
10    Q    Who are your consulting clients?
11    A    Well, I have consulted for the
12 government, obviously, for law firms, for
13 broker-dealers, for exchanges, for
14 foreign countries.  There's a number of
15 different clients.
16    Q    Okay.
17       And one of your -- one of your
18 areas of consulting is consulting as an
19 expert in enforcement cases; isn't that
20 right?
21    A    As an expert witness, yes.
22    Q    Okay.
23       You have --
24       (Simultaneous Crosstalk.)
25    A    Or consulting witness as well.

James Cangiano - July 23, 2020

65

1 Sometimes I have done that where I have
2 not put a report in or appeared in a
3 proceeding.
4    Q    Now, you are -- you have been
5 retained in this case by the SEC as an
6 expert witness; isn't that right?
7    A    Yes.
8    Q    And you are being paid $385 an
9 hour for your services, right?
10   A    That's right.
11   Q    Do you know how much you have
12 been paid by the SEC to date in this
13 case?
14   A    In this case, I just sent an
15 invoice in a couple of weeks ago.  I
16 think it is around, a little -- almost
17 50,000.  About 49 and change.
18   Q    Okay.
19        Now you have never worked at a
20 broker-dealer, have you?
21   A    No.
22   Q    And you have also never worked
23 at a transfer agent --
24        (Simultaneous Crosstalk.)
25   A    No.

66

1    Q    -- am I right?  Okay.
2         And you have never -- you have
3 never submitted a Form 211 application to
4 NASD or FINRA for clearance, have you?
5    A    I have not, no.
6    Q    Okay.
7         You have never -- you have never
8 submitted documents related to a DTC
9 application, have you?
10   A    No.
11        MR. KRUCKENBERG:  So I am
12   going to show you an exhibit.
13   This is going to be Exhibit 228.
14        (Exhibit 228, Blank FINRA
15   Form 211, is Marked.)
16 BY MR. KRUCKENBERG:
17   Q    Do you see that document in
18 front of you?
19   A    Yes.
20   Q    You have seen this document
21 before, haven't you?
22   A    Yes.
23        MR. KRUCKENBERG:  If we could
24   zoom out a little bit.
25 BY MR. KRUCKENBERG:

67

1    Q    This is FINRA Form 211; am I
2 right?
3    A    That's correct.
4    Q    Now, this is -- this is a blank
5 form but this is -- this is a form that
6 was created by FINRA, right?
7    A    Yes.
8    Q    If you look at the general
9 instructions on this first page, it says,
10 Complete this form to initiate or resume
11 quotations in a quotation medium... under
12 the Securities Exchange Act of 1934,
13 including, but not limited to the OTC
14 Bulletin Board.
15        Do you see that?
16   A    Yes.
17   Q    And this is meant to show FINRA
18 that a broker-dealer has satisfied the
19 requirements of SEC Rule 15c2-11 and the
20 filing and information requirements of
21 FINRA Rule 6432.
22        Do you see that?
23   A    Yes.
24   Q    Okay.
25        Now, if we -- now this is a

68

1 document created by FINRA, not by NASD;
2 is that right?
3    A    Yeah.
4    Q    And you have never had a
5 position at FINRA, right?
6    A    That's right.
7    Q    And so it's fair to say that you
8 have never reviewed any FINRA Form 211,
9 right?
10   A    That's right.
11   Q    Now, FINRA's Rule 6432 that's
12 referenced in this, that was a rule
13 issued by FINRA after its creation,
14 right?
15   A    Yes.
16   Q    And it's fair to say you never
17 investigated an entity or supervised an
18 investigation for compliance with FINRA
19 Rule 6432, have you?
20   A    That's right.  Hm-hm.
21   Q    Okay.
22   A    I think it is also fair to say
23 that the form really hadn't changed that
24 much from when I was dealing with it.
25   Q    Okay.

69

1    A    Nor has the rule, for that
2 matter.
3    **Q    You will agree with me that**
4 **FINRA Rule 6432 didn't exist when you**
5 **were working at NASD?**
6    A    That's right.  But there was a
7 rule that required submission of the 211
8 form, obviously.
9    **Q    Right, okay.**
10    A    Maybe not in those words, not in
11 the same context -- not in the same word
12 for word as 6432, but a similar rule
13 obviously on how members file.
14    **Q    Okay.**
15        **Have you ever had your expertise**
16 **or your request to be an expert witness**
17 **rejected by a court in whole or in part?**
18    A    Only once and that was
19 procedural issue, not on my
20 qualifications.
21    **Q    When was that?**
22    A    Last August.
23    **Q    What was the name of that case?**
24    A    That was SEC versus LEK
25 Securities, L-E-K Securities.

70

1    **Q    What was the procedural problem**
2 **there?**
3    A    Well, I had been asked by
4 counsel for LEK to -- if I would be
5 interested in becoming an expert.  The
6 rule -- the issue was -- I don't know if
7 you are familiar with SEC Rule 15c3-5
8 which is electronic access to the market,
9 direct access to the market by
10 individuals other than broker-dealers.
11        What happened was the defendants
12 in this case had put forth an expert in
13 compliance to the court.  They felt that
14 either he wasn't doing a good job or -- I
15 forget what the circumstances were, so
16 they asked me if I would be interested in
17 becoming an expert.  I told them I would
18 in a limited capacity, only to the policy
19 procedures, et cetera, that the firm
20 used.
21        And the judge ruled that they
22 couldn't have a second bite of the apple
23 in terms of experts, so that they would
24 not permit me to -- they would not drop
25 the first guy and put me in there, so...

71

1    **Q    Okay.  Okay.**
2        MR. KRUCKENBERG:  So if we
3    could turn back to Exhibit 225,
4    and if we could turn to page 5.
5    Turn to page 5 and go to the
6    top of the page.
7 BY MR. KRUCKENBERG:
8    **Q    There's a section of your expert**
9 **report that says, Testimony and**
10 **Publications; is that right?**
11    A    Yes.
12    **Q    You've not issued any**
13 **publications in the last 10 years, right?**
14    A    Right.
15    **Q    And then you list the times that**
16 **you have testified as an expert witness;**
17 **is that right?**
18    A    Yes.
19    **Q    You list every time you have**
20 **either testified in court or in a**
21 **deposition or at an arbitration as a**
22 **potential expert witness; isn't that**
23 **right?**
24    A    Yes.
25    **Q    And that is exhaustive of your**

72

1 **testimony as an expert?**
2    A    It is.
3    **Q    And so there's nothing -- you**
4 **have never been -- you have never either**
5 **been deposed or every formally testified**
6 **as an expert that's not listed on this**
7 **sheet?**
8    A    That's right.
9    **Q    Okay.**
10        So the first case that's
11 mentioned here is a case called SEC
12 versus Pasternak from 2008; is that
13 right?
14    A    Hm-hm.
15    **Q    Is that a yes?**
16    A    Yes.
17    **Q    And you testified about market**
18 maker fiduciary duties, market maker
19 compensation, best execution, markups and
20 front running; is that right?
21    A    That's correct.
22    **Q    Okay.**
23        Now, that case did not involve
24 Form 211 filings, did it?
25    A    It did not.

James Cangiano - July 23, 2020

73

1    Q    Okay.
2         It also did not involve a
3  transfer agent?
4    A   It did not.
5    Q    Okay.
6         And you were retained by the
7  SEC, right?
8    A   I was.
9    Q    And you testified consistent
10 with the SEC's allegations; is that
11 right?
12   A   What do you mean by that?
13   Q    Well, was it your expert opinion
14 that the defendant in that matter had
15 violated the securities laws?
16       MS. JOHNSON:  Objection.
17       THE WITNESS:  Yeah.  Again, I
18   did it in the context of certain
19   rules and regulations that were
20   part and parcel of the
21   allegations.  For example,
22   riskless principal transactions,
23   they are listed here.
24 BY MR. KRUCKENBERG:
25   Q    Okay.

74

1    A   Et cetera.
2    Q    It is fair to say that you
3  testified that you believed that the
4  defendant had violated the securities
5  laws?
6        MS. JOHNSON:  Objection.
7    He's already testified he doesn't
8    opine on the ultimate legal
9    conclusions.
10 BY MR. KRUCKENBERG:
11   Q    So if you understand my
12 question, you can answer it.
13   A    Would you please repeat it again
14 or maybe rephrase, it would be helpful.
15   Q    Sure.
16   A    I want to repeat, I don't give
17 legal conclusions.  I think I established
18 that.
19   Q    Did you believe that the
20 defendant in that case had violated the
21 securities laws?
22   A    In my opinion, I did, yeah.
23   Q    Okay.
24        And it's also fair to say that
25 the trial judge ruled for the defense in

75

1  that case, right?
2    A   He did.
3    Q    Okay.
4         So the trial judge, at least,
5  disagreed with your opinion?
6        MS. JOHNSON:  Objection,
7    again.
8        Are you talking about his
9    expert opinion or his personal
10   opinion?
11       MR. KRUCKENBERG:  Both.
12       THE WITNESS:  Well, he
13   obviously disagreed with my
14   personal opinion.  There was some
15   aspects of my report that -- and
16   my testimony that he absolutely
17   agreed with, so...
18 BY MR. KRUCKENBERG:
19   Q    So if we go down, the next case
20 you have listed from 2010 is United
21 States versus Margolies, right?
22   A   Right.
23   Q    You provided a damage estimate
24 based on market manipulation, right?
25   A   That's right.

76

1    Q    So you were not a liability
2  witness; is that right?
3    A   I was not, no.
4    Q    Okay.
5         You testified for the United
6  States Government in a criminal
7  prosecution, right?
8    A   Yes.
9    Q    Okay.
10        And that case also did not
11 involve 211 filings, did it?
12   A   It did not.
13   Q    And it also did not involve a
14 transfer agent?
15   A   It did not.
16   Q    Okay.
17        If we go down to the next one.
18 You testified in 2011 in United States
19 versus East Delta Corporation.
20        Do you see that?
21   A   Yes.
22   Q    And you were retained by the
23 Securities and Exchange Commission,
24 right?
25   A   Yes.

James Cangiano - July 23, 2020

77

1    Q    That case involved promoters and
2 press releases, wash trades, and matched
3 orders, right?
4    A    Correct.
5    Q    Okay.
6        And you -- that case also did
7 not involve any Form 211 applications,
8 did it?
9    A    It did not.
10    Q    It also did not involve a
11 transfer agent?
12    A    It did not.
13    Q    So next case we have, United
14 States versus Roger Lee Shoss, et al.
15        Do you see that?
16    A    Yes.
17    Q    Is and were you retained by
18 United States Government as an expert?
19    A    Yes. Hm-hm.
20    Q    And that was a criminal
21 prosecution, right?
22    A    That is correct, jury trial.
23    Q    All right.
24        And it was a wire fraud
25 prosecution involving a pump-and-dump

78

1 scheme, wasn't it?
2    A    Yes.
3    Q    And once again, this case didn't
4 involve any Form 211 applications, did
5 it?
6    A    Not per se, no.
7    Q    And it also did not involve a
8 transfer agent?
9    A    Well, it did, actually. This
10 one and the case Irwin Boock, which is a
11 related case where I was deposed in
12 211 -- 2011. These fraudsters actually
13 owned their own transfer agent and in
14 order to facilitate the sale of these
15 companies, which they stole, by the way,
16 they used their own dedicated transfer
17 agent to clean up the stock and get it
18 saleable.
19    Q    Okay.
20        Were you -- were you an expert
21 witness on transfer agents in that case?
22    A    No, I was not.
23    Q    So let's go to the next case,
24 the one you just mentioned, SEC versus
25 Irwin Boock.

79

1    A    Right.
2    Q    That was an enforcement case
3 brought by the SEC, right?
4    A    Correct.
5    Q    You said it was related to the
6 Roger Lee Shoss case?
7    A    Yes.
8    Q    Okay.
9        Once again, you were retained by
10 the Securities Exchange Commission,
11 right?
12    A    Yes.
13    Q    That case never went to trial,
14 did it?
15    A    (Audio Distortion.)
16    Q    I'm sorry, I just didn't hear
17 the answer.
18    A    I believe -- I believe that -- I
19 am not sure. I know that they proceeded
20 against some of these people criminally
21 but I just don't recall Boock was one of
22 them.
23    Q    Okay.
24        You didn't testify at a criminal
25 or at a trial in Boock, did you?

80

1    A    I did not, no. Just the
2 deposition.
3    Q    You testified during a
4 deposition, right?
5    A    Yes.
6    Q    The Court did not make a finding
7 one way or the other whether you were an
8 expert witness?
9    A    That's right.
10    Q    Okay.
11        The next case you mentioned --
12 let's turn the page now to page 6.
13        June of 2017, you testified at a
14 FINRA arbitration, right?
15    A    Yes.
16    Q    And you testified at that
17 arbitration proceeding?
18    A    I did.
19    Q    Okay.
20        You will agree with me a FINRA
21 arbitration does not have the same rules
22 of evidence as a federal court trial; is
23 that fair?
24    A    I agree with that, yes.
25    Q    Okay.

81

1      What did you testify about
2 there?
3      A    As I said in the report, Wallace
4 was convicted of improper handling of
5 annuity transaction of a client of Morgan
6 Stanley and for various
7 misrepresentations which led to his
8 termination.
9      Q    Okay.
10         And you testified in favor of
11 Wallace?
12     A    I did.
13     Q    Okay.
14         And you testified that --
15 consistent with Wallace's assertion that
16 he had been wrongly terminated, right?
17     A    That's right.  Hm-hm.
18     Q    And the FINRA arbitrators ruled
19 against Mr. Wallace; is that fair?
20     A    That's fair.  Hm-hm.
21     Q    Okay.
22         Once again, that case didn't
23 involve any Form 211 applications, did
24 it?
25     A    It did not.

82

1      Q    Okay.  Okay.
2           Or a transfer agent?
3      A    It did not.
4      Q    Okay.
5           Next, we have SEC versus Luke
6 Zouvas?
7      A    Yeah.
8      Q    Okay.
9           Once again, were you retained by
10 the SEC, right?
11     A    Right.
12     Q    And you testified in a
13 deposition but not at a trial, right?
14     A    That's correct.
15     Q    And you testified about the
16 characteristics of pump-and-dump schemes,
17 right?
18     A    Yes.
19     Q    Okay.
20         And it's fair to say that you
21 were never formally accepted as an expert
22 by a court in that case?
23     A    That's correct.
24     Q    Okay.
25         And finally, we have United

83

1 States versus Homm, et al., right?
2      A    Yes.
3      Q    That's from June 2019?
4      A    Yes.
5      Q    That was a criminal jury trial,
6 right?
7      A    Correct.
8      Q    You testified for the United
9 States?
10     A    I did.
11     Q    That was a portfolio pumping
12 scheme at a hedge fund, right?
13     A    Right.
14     Q    And you testified generally
15 about market manipulation schemes, right?
16     A    I did.
17     Q    Once again, that case didn't
18 involve Form 211 applications, did it?
19     A    It did not.
20     Q    Okay.
21         MS. JOHNSON:  Would now be a
22     time to take a break?
23         MR. KRUCKENBERG:  Yeah.  Let
24     me ask a couple of questions and
25     then we will take a break.

84

1         MS. JOHNSON:  Okay.
2 BY MR. KRUCKENBERG:
3      Q    Now, Mr. Cangiano, you have
4 never been accepted as an expert witness
5 related to Form 211 application process,
6 have you?
7      A    I have not.  Specifically 211?
8 No.
9      Q    Okay.
10         And you have never been accepted
11 as an expert witness concerning transfer
12 agents, have you?
13     A    That's right.
14         MR. KRUCKENBERG:  Okay.
15     Let's take a break now.
16         THE WITNESS:  For 10?
17         MR. KRUCKENBERG:  Let's take
18     10 minutes.
19         MS. JOHNSON:  Thank you.
20         (Whereupon a Recess Commenced
21     at 10:22 a.m. and Testimony
22     Recommenced at 10:35 a.m.)
23 BY MR. KRUCKENBERG:
24     Q    So, Mr. Cangiano, if we could
25 turn back to Exhibit 226 -- this is --

James Cangiano - July 23, 2020

85

1  these are the evidentiary documents you
2  have considered in this case; is that
3  right?
4     A   Yes.
5     Q   Okay.
6         Now, these were all provided to
7  you by the Securities and Exchange
8  Commission; isn't that right?
9     A   They were.
10    Q   Okay.
11        Now, you have not reviewed the
12 complete Form 211 files from Spartan
13 Securities, have you?
14        MS. JOHNSON:  Objection.
15        THE WITNESS:  As they relate
16    to this case or complete ever?
17 BY MR. KRUCKENBERG:
18    Q   Complete ever.
19        As in you haven't looked at all
20 the materials Spartan Securities
21 collected in their Form 211 applications?
22    A   That's right.
23    Q   You have only reviewed the
24 exhibits containing portions of those
25 files; is that fair?

86

1     A   I reviewed the files that were
2  on Exhibit A here.
3     Q   Okay.
4         Similarly, you haven't reviewed
5  Island Stock Transfer's full transfer
6  agency files for the issuers involved in
7  this case, have you?
8     A   To the extent that they are on
9  that Exhibit A, I have.
10    Q   But only to the extent that they
11 are on Exhibit A, right?
12    A   Correct. Hm-hm.
13    Q   You haven't been given
14 unrestricted access to those files; is
15 that fair?
16    A   No.  No.
17    Q   Okay.
18        And your opinions in this case
19 and the opinions in your expert report
20 are premised only on the evidence you
21 have looked at, right?
22    A   Yes.
23    Q   Okay.
24        So let's go back to your expert
25 report, that's Exhibit 225, and let's

87

1  turn to page 7.
2     A   (Reviewing.)
3     Q   If we look at page 7, the
4  section marked Introduction, Summary of
5  the Complaint.
6         Do you see that?
7     A   Yes.
8     Q   And here you summarize the
9  allegations in the Complaint, right?
10    A   Yes.
11    Q   Based on your review of the
12 documents in your Exhibit A, do you agree
13 with the allegations in the Complaint?
14    A   To the extent that it's in my
15 report, yes.  Yeah, you know, I am an
16 opinion witness.
17    Q   Sure.
18        So let's look at the second
19 sentence of that -- of that first
20 paragraph.  It says, "These were 'blank
21 check' or 'shell' companies formed by the
22 Five, solely with the intent of selling
23 these companies to others for private."
24        Do you see that?
25    A   Yes.

88

1     Q   When you reference the Five, you
2  are talking about five individuals who
3  were involved with 19 public companies;
4  is that right?
5     A   That's right.
6     Q   And you believe that statement
7  to be accurate based on the evidence you
8  have seen, right?
9     A   Yeah.  Not only on the evidence
10 that I have seen, but I don't know if
11 actually it's in the exhibit list but
12 there are adjudicated cases, some cases
13 criminal cases against these five
14 individuals as well.
15    Q   Okay.
16        You believe all of these five
17 individuals made 19 of these public
18 companies solely with the intent of
19 selling them; is that right?
20    A   That's right.
21    Q   Okay.
22        You also say, "The Complaint
23 also alleges that the defendants
24 furthered the scheme by filing or false
25 misleading information with the SEC."

89

1      Do you see that?
2    A   Yes.
3    Q   Do you believe that to be
4  accurate based on the evidence that you
5  have seen?
6    A   Well, I don't know if we are
7  getting into legal determination here, as
8  far as false and misleading is concerned.
9  But certainly, you know, what I state in
10  my report is that there is some issues
11  with these documents, sure.
12    Q   Okay.
13      And you believe that the
14  defendants filed documents with the SEC?
15    A   Yes.
16    Q   What documents did they file
17  with the SEC?
18    A   S-1s, for example.
19    Q   The defendants, my clients,
20  filed S-1s?
21    A   I'm sorry, I thought were you
22  still talking about the Five.
23    Q   That sentence says -- alleges
24  that the defendants furthered the scheme
25  by filing false?

90

1    A   I am with you now, I apologize.
2    Q   Okay.
3      Do you believe that my clients
4  filed -- filed documents with the SEC?
5    A   (Reviewing.)  Actually, here I
6  am just summarizing the Complaint, so I
7  haven't looked at the Complaint in a
8  while, so it's -- I have only read the
9  Complaint like maybe one or two times.
10  So if that's in the Complaint, that's
11  what I am referring to.
12    Q   Okay.
13      Have you seen any documents that
14  my clients, the defendants, have filed
15  with the SEC?
16    A   Filed with the SEC specifically,
17  I don't recall.
18    Q   Okay.
19      MR. KRUCKENBERG:  So let's --
20    let's go down a little bit.
21  BY MR. KRUCKENBERG:
22    Q   If we look at the bottom of the
23  page, section called, Basis for the
24  Opinion.  Then it goes into the next
25  page.

91

1    A   Right.
2    Q   On page 8, under (a), you talk
3  about shell companies, et cetera.
4      Do you see that?
5    A   Yes.
6    Q   Okay.
7      And you provide a definition of
8  shell companies based on Rule 230.405 of
9  the Securities Act of 1933, right?
10    A   Yes.
11    Q   And so I presume you are
12  familiar with that definition, right?
13    A   Yeah.  It's also defined in
14  other areas as well, not just that rule.
15    Q   Okay.  But if --
16      (Simultaneous Crosstalk.)
17    A   -- SEC pronouncements, yes.
18    Q   If we look at Rule 230.405, we
19  can agree that is a valid definition of
20  what a shell company is, right?
21    A   I would presume so, yeah.
22    Q   Okay.
23      And I presume because you cite
24  that rule, that you are familiar with
25  that rule?

92

1    A   Yes.
2    Q   Okay.
3      So you say shell companies are
4  "generally small, thinly capitalized
5  companies with few assets, little or no
6  operating history, inexperienced
7  management, and no real business plan."
8      Is that right?
9    A   Yes.
10    Q   Okay.
11      MR. KRUCKENBERG:  So I am
12    going to show you what's been
13    marked as Exhibit 230.
14      (Exhibit 230, 17 CFR 230.405
15    (2019), is Marked.)
16      MR. KRUCKENBERG:  If we can
17    turn to page 8 of this document.
18    If we could go down.  It's a
19    little hard to read.  If we can go
20    down to the bottom of the page on
21    the right-hand side.  Maybe we can
22    zoom in.
23  BY MR. KRUCKENBERG:
24    Q   You will agree with me looking
25  at this document that this is the

James Cangiano - July 23, 2020

93

1  definition of shell company that you are
2  referencing; isn't that right?
3      A   Yes.
4      Q   Okay.
5          And it says under shell company:
6  "The term shell company means a
7  registrant, other than an asset-backed
8  issuer... that has:  (1), No or nominal
9  operations; and (2) Either:  (i) no or
10  nominal assets, (ii), assets consisting
11  solely of cash and cash equivalents; or
12  (iii) assets consisting of any amount of
13  cash and cash equivalents and nominal
14  other assets."
15          Right?
16      A   Yes.
17      Q   So when you say in your report
18  that shell companies are usually in need
19  of capital, restructuring, or business
20  plan, that's not necessarily true of
21  every shell company, is it?
22      A   In general, it is, I would say.
23  Whether it's every single one, I don't
24  know.
25      Q   Well, if we look at this

94

1  definition about the shell company --
2          (Simultaneous Crosstalk.)
3      A   Let me clarify the record, if I
4  can.
5      Q   Sure.
6      A   This is a generalization or
7  paraphrasing of 405.  It's not verbatim,
8  otherwise I would have footnoted, good
9  English major that I was.  So I am
10  speaking in general here.
11      Q   Okay.
12          When you say that, you know, the
13  usual characteristics about a shell
14  company, you will agree with me that
15  that's not true of every shell company,
16  right?
17      A   Possibly, yes.
18      Q   Okay.
19          So you could -- there could be a
20  shell company that has a business plan,
21  for example?
22      A   Sure.
23      Q   And, in fact, many shell
24  companies have business plans, don't
25  they?

95

1      A   On paper, yes.  Hm-hm.
2      Q   There is a company -- there is
3  an entity called the development stage
4  company, right?
5          You are familiar with that
6  phrase?
7      A   I am.
8      Q   And a development stage company
9  is a shell company, isn't it?
10      A   Yeah.  Are you talking about --
11  they usually referred to as blank check
12  companies.
13      Q   Well, let's --
14          (Simultaneous Crosstalk.)
15      A   -- shell companies, you're
16  right.
17      Q   Let's get to blank check
18  companies in a minute.
19      A   Okay.
20      Q   There could be a shell company
21  as defined by this rule that has no or
22  nominal operations and no or nominal
23  assets, but they have a clear business
24  plan, right?
25      A   Yes.

96

1      Q   And that company has the
2  intention of going and operating a
3  business.
4          It's a startup, right?
5      A   Yeah.  Hm-hm.
6      Q   It's still a shell company?
7      A   Correct.
8      Q   Okay.
9          And you will agree with me that
10  when you say in your report that shell
11  companies are more susceptible to
12  artificial pricing; not all shell
13  companies have artificial pricing, right?
14      A   Not all, no.
15      Q   Okay.
16          (Simultaneous Crosstalk.)
17      A   -- used in manipulative schemes.
18      Q   Not all shell companies used
19  in manipulative schemes, are they?
20      A   That's correct.  Hm-hm.
21      Q   And you will agree with me that
22  shell companies have legitimate business
23  purposes, don't they?
24      A   Yes.
25      Q   And you will also agree with me

97

1  that it's not unlawful to form a shell
2  company, is it?
3     A   It is not.
4     Q   Okay.
5         And, in fact, in 2005 the SEC
6  passed a shell company rule requiring
7  additional disclosures on shell companies
8  in certain instances; is that fair?
9     A   I believe they did, yes.
10    Q   Okay.
11        And they required disclosures
12  that are commonly referenced as Super
13  8-Ks, right?
14    A   Yes.
15    Q   Okay.
16        I presume, based on our
17  conversation, you are familiar with that
18  rule?
19    A   Yes.
20        MR. KRUCKENBERG:  All right.
21    So I am going to show you what's
22    been marked as Exhibit 231.
23        (Exhibit 231, Shell Company
24    Rules, is Marked.)
25  BY MR. KRUCKENBERG:

98

1     Q   And if we look at the top of
2  this document, this is a document titled,
3  Use of Forms S-8, Form 8-K, and Form 20-F
4  by Shell Companies.
5     A   Yes.
6     Q   That's the final rule we just
7  discussed, isn't it?
8     A   Right.
9     Q   If you look at the bottom of the
10  page -- we can scroll down a little
11  bit -- it has an effective date of
12  August 22, 2005, right?
13    A   Yes.
14    Q   Except for a part of it that
15  will take effect in November of 2005?
16    A   That's what it says, right.
17    Q   Okay.
18        So I am going to turn to page 3
19  of this document.
20        THE WITNESS:  Is there any
21    way you can make it a little
22    bigger?
23        MR. KRUCKENBERG:  Yeah, let's
24    make it bigger.
25        THE WITNESS:  Thank you.

99

1  BY MR. KRUCKENBERG:
2     Q   If we look at the first full
3  paragraph that starts with the Rules and
4  Rule Amendments.
5         Do you see this?
6     A   Yes.
7     Q   According to the SEC in this --
8  in this rule or this announcement of the
9  final rule, it says, "The rules and rule
10  amendments we are adopting today do not
11  address the relative merits of shell
12  companies.  We recognize that companies
13  and their professional advisors often use
14  shell companies for many legitimate
15  corporate structuring purposes.
16  Similarly, our definition and use of the
17  term 'shell company' is not intended to
18  imply that shell companies are inherently
19  fraudulent."
20        Do you see that?
21    A   Yes.
22    Q   And you agree with those
23  statements, don't you?
24    A   I do.
25    Q   Okay.

100

1         And you will agree with me that
2  one of the reasons that people
3  legitimately use shell companies is
4  startup companies are seeking access to
5  capital, right?
6     A   That's right.
7     Q   And the company might go public
8  so that it can raise money to then
9  develop a legitimate business, right?
10    A   Well, generally, the shells that
11  they're talking about here are already
12  public companies.
13    Q   Okay.
14    A   Some of them --
15    Q   Okay --
16        (Simultaneous Crosstalk.)
17    A   What they are seeking is usually
18  a merger partner or capital, you're
19  correct.
20    Q   Okay.
21        And actually, if we are talking
22  about this 2005 shell company rules, it
23  actually addresses something called a
24  business combination related shell
25  company; isn't that right?

James Cangiano - July 23, 2020

---

101

1    A   It's been a while since I looked
2 at it, sure.
3        MR. KRUCKENBERG:  Let's turn
4    to page 7 of this document.
5 BY MR. KRUCKENBERG:
6    Q   If we look at page 7 of this
7 document, first full paragraph, the SEC
8 writes, "We have defined the term
9 'business combination related shell
10 company.'  We have adopted this
11 definition to identify the subset of
12 shell companies for which certain of the
13 amendments to Form S-8, Form 8-K and Form
14 20-F will not apply."
15        Do you see that?
16    A   Yes.
17    Q   And a business combination
18 related shell company, as the name would
19 suggest, is a shell company that's used
20 for business combination, right?
21    A   Right.
22    Q   And those are lawful, aren't
23 they?
24    A   Yes.
25    Q   Okay.

---

102

1        So you mentioned earlier
2 public -- or blank check companies,
3 right?
4    A   Yes.
5    Q   Let's turn back to Exhibit 225,
6 that is your expert report.
7        If we look at that same page 8,
8 you write, "A 'blank check' company is
9 distinguished from a shell in that it is
10 in a developmental stage and has no
11 specific business plan or operation other
12 than the intention to merge with another
13 company."
14        Do you see that?
15    A   Yes.
16    Q   You will agree with me that
17 there is a regulatory definition of a
18 blank check company also?
19    A   Yes.
20    Q   And I think you indicated this
21 earlier, because it's not footnoted and
22 you don't have a specific citation, you
23 are not necessarily meaning that the
24 blank check company in the strict
25 regulatory sense; is that fair?

---

103

1    A   Well --
2        MS. JOHNSON:  Can you repeat
3    that, I didn't hear the question.
4        MR. KRUCKENBERG:  Let me
5    rephrase my question.
6 BY MR. KRUCKENBERG:
7    Q   Because you are not citing to
8 the regulation, the regulatory
9 definition, do you mean that in a
10 colloquial sense or do you mean that in a
11 specific regulatory sense?
12    A   Well, it's a general comment
13 regarding, you know, in the regulatory
14 sense, and in the context of the
15 paragraph ends with the fact that both
16 shell and blank check companies in the
17 pronouncements of the SEC, have been used
18 in -- well, involve speculative
19 investments, and so on, often fall within
20 definition of penny stocks.
21        So that was the context of it,
22 not citing a specific regulation.  I just
23 said.  But generally, if you look at the
24 regulation, it will pretty much say that.
25    Q   Okay.

---

104

1        MR. KRUCKENBERG:  All right.
2 So let's turn to Exhibit 232.
3        (Exhibit 232, 17 CFR 230.419
4    (2019), is Marked.)
5        MR. KRUCKENBERG:  And if we
6    can to turn to page 3 of that
7    exhibit.  If we go down to the
8    bottom of the page.
9 BY MR. KRUCKENBERG:
10    Q   I am showing you a regulation 17
11 CFR 230.419.
12        Do you see that?
13    A   Yes.
14    Q   And says "Offerings by blank
15 check companies."
16        Do you see that?
17    A   Yes.
18    Q   You will agree with me that that
19 is where the regulatory definition of a
20 blank check company comes from?
21    A   I think there are other areas
22 where it is cited as well but this is
23 certainly one of them, yeah.
24    Q   This is one of them?
25    A   Hm-hm.

---

105

1    Q    Okay.
2         And I'm sorry that was a yes,
3 right?
4    A    Yes.  Sorry about that.
5    Q    It's okay.
6         And if we look at that Section
7 under (a)(2), it says, "For purposes of
8 this section, the term 'blank check'
9 company shall mean..."
10        Do you see that?
11   A    Yes.
12   Q    Then under (i) "Is a development
13 stage company that has no specific
14 business plan or purpose or has indicated
15 that it's business plan is to engage in a
16 merger or acquisition with an
17 unidentified company or companies or
18 other entity or person."  Right?
19   A    Yes.
20   Q    And in (ii), "Is issuing penny
21 stock as defined in Rule 3a51-1..."  And
22 then if we go to the top of the page, it
23 continues, "...under the Securities
24 Exchange Act of 1934."
25        Right?

106

1    A    Correct.
2    Q    So there's two elements in
3 definition of a blank check company.  It
4 has no specific business plan or intent
5 to merge, and it's a penny stock, right?
6    A    Yes.
7    Q    Okay.
8         Despite its name --
9         (Simultaneous Crosstalk.)
10   A    -- that leads to the purpose of
11 this regulation here.
12   Q    For this regulation?
13   A    Right.
14   Q    And despite its name, you will
15 agree with me that penny stocks sometimes
16 involve public companies with significant
17 business operations?
18   A    I think there probably could be
19 a few, sure.
20   Q    Sure.
21        And you will agree with me that
22 one of the criterion for being a penny
23 stock is that they are stocks with less
24 than $50 million in market value, right?
25   A    Right.

107

1    Q    So --
2         (Simultaneous Crosstalk.)
3    A    Now, let me -- let me clarify
4 something, if you don't mind, Caleb.
5    Q    Sure.
6    A    You know, are we talking penny
7 stocks as defined in '34 Act rule or are
8 we talking, you know, certain stocks that
9 were listed on NASDAQ that became penny
10 stocks in 2007?  You know --
11   Q    And I appreciate the request for
12 clarification.  Let me clarify.
13        I am referencing, exclusively
14 with this definition, when it references
15 penny stocks as defined under the
16 Securities Exchange Act of 1934.
17   A    Okay.
18   Q    You will agree with me that
19 under that definition, one of the
20 criterion is that a penny stock has less
21 than $50 million in market value?
22   A    That's right.
23   Q    Okay.
24        So there are penny stocks, there
25 are companies that sell penny stocks as

108

1 defined by the Securities Exchange Act of
2 1934 that had significant operations,
3 right?
4    A    Yeah.
5    Q    Okay.
6         It is certainly possible under
7 this definition of a blank check company
8 for a company to be a development stage
9 company with significant assets?
10   A    Are you talking the blank check
11 company having --
12   Q    Yeah.
13   A    I would disagree with that.
14   Q    You would disagree with that?
15   A    Yeah.  I mean, they are looking
16 for a merger partner to eventually have
17 maybe significant assets.
18   Q    Correct.
19   A    But generally the blank check
20 companies I am familiar with and that I
21 have seen have little or no assets.
22   Q    Okay.
23        And I'm asking about the
24 regulatory definition here.
25        Is there any indication in this

James Cangiano - July 23, 2020

---

109

1 regulatory definition under Rule 419 that
2 a blank check company have nominal assets
3 or nominal operations?
4     A    Would you go down back down to
5 the definition again.
6     Q    Sure.
7     A    I believe it says -- well, let
8 me look at it.
9         MR. KRUCKENBERG:  Let's go
10    down to the bottom of this page on
11    Exhibit 232.
12        THE WITNESS:  I suppose you
13    could have a business without a
14    specific business plan but not in
15    my experience.
16 BY MR. KRUCKENBERG:
17     Q    Okay.
18         And you will agree with me
19 there's no regulatory requirement here
20 that a blank check company have nominal
21 assets?
22     A    No, it's not in the definition
23 as it isn't in short but generally blank
24 check companies are shell companies so --
25         (Simultaneous Crosstalk.)

---

110

1     Q    Okay.
2     A    -- let's put it that way.
3     Q    I guess my question is you will
4 agree with me that blank check companies
5 and shell companies are not always the
6 same thing.
7     A    I would say most blank check
8 companies are shells, yes.
9     Q    That's not my question.
10         My question is, are they always
11 the same?
12     A    Always?  I mean, there may be an
13 exception or two.  I am dealing with it
14 in the context of my experience in
15 looking at shells and blank check
16 companies.
17     Q    Okay.
18         So my question --
19         (Simultaneous Crosstalk.)
20     A    Maybe I am kind of tainted
21 because I am on the regulatory side,
22 but...
23     Q    Okay.
24     A    But I suppose there are
25 exceptions to everything.

---

111

1     Q    So in your experience you
2 considered those terms synonymous?
3     A    No.  I mean, they are slight
4 definitional changes that, you know --
5 usually the shell has a business.  It's
6 doing something.  Usually not
7 successfully, but it's doing something.
8         Whereas the blank check company,
9 doesn't have a specific business plan but
10 they are looking to -- they might have a
11 vision, okay; they may have a specific
12 goal that they want to get to but
13 generally they are not operational, they
14 are looking to merge with somebody to
15 fulfill that business vision, if you
16 will.
17     Q    Well, so here is my question, is
18 a company that has a specific aspiration
19 for a business, We want to operate in
20 this fashion, and they list their
21 business plan, is that a blank check
22 company in your experience?
23     A    In terms of the company that
24 wants to go public and make -- in terms
25 of disclosures that I have seen, I would

---

112

1 agree with that, yes.
2     Q    Why -- why, then, does the
3 regulatory definition say a blank check
4 company has no specific business plan or
5 purpose?
6     A    That a blank check doesn't?
7     Q    Yeah.
8     A    Like I said, it may have a
9 vision which is different than a business
10 plan.
11     Q    What if it listed business plan
12 instead of a registration statement, is
13 it a blank check company then?
14     A    Generally, you know, blank check
15 companies are defined as not having a
16 business plan.  So I don't understand
17 where we are going here.
18     Q    Okay.
19         You will agree with me, then, if
20 the company has a specific business plan
21 and a registration statement, it is not a
22 blank check company?
23     A    Well, I think we are disagreeing
24 on what you're calling a business plan
25 and what I am calling a business plan.

---

113

1    Q    Okay.
2    A    Blank check companies don't have
3 business plans in the traditional sense.
4 They may say, okay, they have a -- I have
5 this great electronic toothbrush that
6 automatically dispenses mouthwash.  All
7 right.  That's my vision.  I want to sell
8 that.
9        Is that a business plan?  I
10 don't think so.
11    Q    What is a business plan for
12 these purposes?
13    A    A business plan can be 20 pages
14 long and detailed in terms of what the
15 goals and aspirations and details of what
16 the company does and what it hopes to do,
17 and so on.
18        So one is -- one is a plan, and
19 one is a vision.
20    Q    Okay.  And a vision -- a blank
21 check company only has vision.
22        It doesn't have a plan; is that
23 right?
24    A    As is defined in the SEC rules,
25 blank check companies have no business

114

1 plan.
2    Q    Okay.  All right.
3        Are you familiar --
4        (Simultaneous Crosstalk.)
5    A    That's not my words.  That's
6 their words.
7    Q    Okay.  All right.  That's
8 perfectly fair.
9        Are you familiar with the
10 concept of a reverse merger?
11    A    I am.
12    Q    And a reverse merger is where a
13 public company acquires a private company
14 and the private company acquires the
15 majority stake in the private company;
16 isn't that right?
17    A    Yes.
18    Q    And the idea is that the
19 surviving entity goes -- goes public by
20 -- (Audio Distortion) -- the business of
21 the private entity, right?
22    A    I'm sorry.  You kind of broke up
23 with that last part.
24    Q    Sure.
25        The idea is that the private

115

1 entity can go public by merging with the
2 existing public entity, right?
3    A    That's -- yes.
4    Q    And it's an alternative to an
5 Initial Public Offering, right?
6    A    It is.
7    Q    You agree with me also that
8 reverse mergers are lawful?
9    A    I would agree with that.
10    Q    And, you know, for example, New
11 York Stock Exchange went public through
12 reverse merger, didn't it?
13    A    Yes.
14    Q    Okay.
15        And you also agree with me that
16 the SEC has published guidance on reverse
17 mergers, hasn't it?
18    A    Yes.
19    Q    And you are familiar with its
20 guidance on reverse mergers, aren't you?
21    A    For the most part, yeah.
22        MR. KRUCKENBERG:  Okay.  I am
23 going to show you what's been
24 marked as Exhibit 234.
25        (Exhibit 234, Investor

116

1    Bulletin:  Reverse Mergers, is
2    Marked.)
3        MR. KRUCKENBERG:  If we can
4    scroll to the top of that
5    document.
6 BY MR. KRUCKENBERG:
7    Q    It's a document entitled,
8 Investor Bulletin:  Reverse Mergers from
9 SEC Office of Investor Education and
10 Advocacy?
11        Do you see that?
12    A    Yes.
13    Q    And if we scroll down a little
14 bit.
15        The right-hand side of that
16 document, the section called, "Why Pursue
17 a Reverse Merger"?
18        Do you see that?
19    A    Yes.
20    Q    And under that heading, the SEC
21 writes, "A private operating company may
22 pursue a reverse merger in order to
23 facilitate its access to the capital
24 markets, including the liquidity that
25 comes with having its stock quoted on a

James Cangiano - July 23, 2020

117

1 market or listed on an exchange.  Private
2 operating companies generally have access
3 only to private forms of equity, while
4 public companies potentially have access
5 to funding from a broader pool of public
6 investors.  A reverse merger often is
7 perceived to be quicker and cheaper
8 method of 'going public' than an Initial
9 Public Offering, (IPO).  The legal and
10 accounting fees associated with a reverse
11 merger tend to be lower than for an IPO.
12 And while the public shell company is
13 required to report the reverse merger in
14 a Form 8-K filing with the SEC, there are
15 no registration requirements under the
16 Securities Act of 1933, as there would be
17 for an IPO.  In addition, being public
18 may give a company increased value in the
19 eyes of potential acquirers."
20      Do you see all that?
21  A   Yes.
22  Q    Do you agree with those
23 statements?
24  A   I do.
25  Q    Okay.

118

1      So let's now go back to your
2 report, Exhibit 225, and let's turn to
3 page 10.
4  A   (Reviewing.)
5  Q    If we look at the top of the
6 page there marked Section 1, SEC Rule
7 240.15c2-11, right?
8  A   Yes.
9  Q    And you will agree with me that
10 that's much of the discussion in the
11 report is the application of this rule,
12 right?
13  A   That's right.
14  Q    And you say, "The Commission
15 adopted 15c2-11 in 1971 to prevent
16 fraudulent and manipulative trading
17 schemes that had arisen in connection
18 with the distribution and trading of
19 unregistered securities issued by 'shell'
20 companies."  Right?
21  A   Yes.
22  Q    And there's a footnote there,
23 right?
24  A   Yes.
25      MR. KRUCKENBERG:  And if we

119

1      scroll down to the footnote that's
2      at the bottom of this page, scroll
3      down a little bit.
4 BY MR. KRUCKENBERG:
5  Q    footnote 15, you cite the 1991
6 Adopting Release Securities Exchange Act
7 Release Number 9310.
8      Do you see that?
9  A   Yes.
10  Q    So I presume -- well, first of
11 all, I presume you have read Rule
12 15c2-11, right?
13  A   Yes.
14  Q    And I presume also that you have
15 read the 1991 Adopting Release; is that
16 fair?
17  A   Yes.
18  Q    And you are familiar with that
19 release in its entirety aren't you?
20  A   Yes.  Hm-hm.
21  Q    Now, you're also familiar with
22 the history of Rule 15c2-11, aren't you?
23  A   I am.
24  Q    And you will agree with me that
25 in 1991, the rule adopted a significant

120

1 amendment; isn't that right?
2  A   Yes.
3  Q    It changed the applicable
4 standards for broker-dealers that were
5 regulated by the rule, right?
6  A   Yes.
7  Q    Okay.
8      And the current rule was last
9 adopted in 2015, wasn't it -- or last
10 amended?  Excuse me.
11  A   I believe that's right.  Hm-hm.
12  Q    Okay.
13      And you will agree with me that
14 a broker-dealer's obligations under Rule
15 15c2-11 are different today than they
16 were in 1990, right?
17  A   In what sense?
18  Q    Well, okay, so let's -- let's go
19 into specifics in a moment.  I will
20 withdraw that question.
21  A   Okay.
22      MR. KRUCKENBERG:  Let's turn
23 to Exhibit 235.
24      (Exhibit 235, 17 CFR
25 240.15c2-11 (2019), is Marked.)

121

1     MR. KRUCKENBERG:  Let's turn
2  to page 3 of this document.  If we
3  could go down halfway down the
4  page and zoom in.
5  BY MR. KRUCKENBERG:
6     Q    And this is the rule we are
7  talking about, right?  This is Rule 2-11?
8     A    Appears to be, yes.
9     Q    Okay.
10     MR. KRUCKENBERG:  So if we
11  look at paragraph (a) if we can
12  scroll down a little bit.  It
13  says, "As a means reasonably
14  designed to prevent fraudulent,
15  deceptive, or manipulative acts or
16  practices, it shall be unlawful
17  for a broker or dealer to publish
18  any quotation for a security or
19  directly or indirectly to submit
20  any such quotation for publication
21  in any quotation medium (as
22  defined in this section), unless
23  such broker or dealer has in its
24  records the documents and
25  information required by this

122

1  paragraph for purposes of this
2  section, 'paragraph (a),
3  information') and, based upon a
4  review of the paragraph (a)
5  information together with any
6  other documents and information
7  required by paragraph (b) of this
8  section, has a reasonable basis
9  under the circumstances for
10  believing that the paragraph (a)
11  information is accurate in all
12  material respects, and that the
13  sources of the paragraph (a)
14  information are reliable."  Right?
15     A    Yep.  Hm-hm, yes.
16     Q    And -- so when I say the
17  reasonable basis language, I am
18  referencing that paragraph.
19     Does that make sense?
20     A    Would you say that again, I'm
21  sorry.
22     Q    When I say reasonable basis or
23  reasonable basis language, that's what I
24  am talking about for our purposes.
25     A    Okay.

123

1     Q    Okay.
2     That reasonable basis language
3  changed in the 1991 amendments, didn't
4  it?
5     A    I can't say for certain.
6     Q    Okay.  Okay.
7     Now, you have read this entire
8  rule more than once, haven't you?
9     A    Sure.
10     Q    And you will agree with me that
11  the rule never uses the phrase "due
12  diligence" anywhere, does it?
13     A    It does not.
14     Q    And you also agree with me that
15  this rule never uses the term "shell,"
16  right?
17     A    That's right.
18     Q    And this rule only applies to
19  brokers -- to broker-dealers, right?  A
20  broker or dealer?
21     A    That's right.
22     Q    It does not apply to a transfer
23  agent, does it?
24     A    It does not.
25     Q    And you are familiar with what

124

1  paragraph (a) information is for the
2  purposes of this rule, right?
3     A    I am.
4     Q    Okay.
5     Let's go through the paragraph
6  (a) information.  Let's turn to the top
7  of this page.
8     Do you see at the top it says,
9  "The information required pursuant to
10  this paragraph is:"
11     THE WITNESS:  Can you zoom
12  in?  Thank you.
13     These old eyes are getting
14  little worse.
15     That's good.  Thank you.
16  BY MR. KRUCKENBERG:
17     Q    Okay.  And do you see that now?
18     A    I do.
19     Q    Okay.
20     So if we look at number (1),
21  it's a copy of the prospectus specified
22  by section 10(a) of the Securities Act
23  for an issue that has filed a
24  registration statement, right?
25     A    Yes.

James Cangiano - July 23, 2020

125

1    Q    If we scroll down a little bit
2  in number (2), it's a copy of the
3  offering circular provided for under
4  regulation A.
5    A    Correct.
6    Q    Do you see that?
7         In paragraph (3), a copy of the
8  issuer's most recent annual report filed
9  pursuant to section 13 or 15(d) of the
10 Act.
11        Do you see that?
12   A    Yes.
13   Q    And if we go -- let's go down
14 now to the next page, and about halfway
15 down the page on the left-hand side, in
16 number (4) it says, "The information
17 that, since the beginning of its last
18 fiscal year, the issuer has published
19 pursuant to Section 240.12g3-2b, and
20 that -- that's related to a foreign
21 private issuer, right?
22   A    That's correct.
23   Q    Okay.
24        And if we go down to number (5),
25 The following information, which shall be

126

1  reasonably current in relation to the day
2  of the quotation...
3         Do you see that?
4    A    Hm-hm. Yes.
5    Q    And then 5 (i), The exact name
6  of the issuer and its predecessor; (ii),
7  the address of its principal executive
8  offices; (iii), the state of
9  incorporation, if it is a corporation;
10 (iv), the exact title and class of the
11 security; (v), the par or stated value of
12 the security, (vi), the number of shares
13 or total amount of the securities
14 outstanding -- and then if we go to the
15 top of the page, next column -- as of the
16 end of the issuers most recent fiscal
17 year; (vii), the name and address of the
18 transfer agent, (viii), the nature of the
19 issuer's business; (ix), the nature of
20 products or services offered; (x), the
21 nature and extent of the issuers
22 facilities, (xi), the name of the chief
23 executive officer and members of the
24 board of directors; (xii) the issuer's
25 most recent balance sheet and profit and

127

1  loss and retained earnings statements;
2  (xiii), similar financial information for
3  such part of the two preceding fiscal
4  years; (xiv), whether the broker or
5  dealer or any associated persons
6  affiliated directly or indirectly with
7  the issuer; (xv), whether the quotation
8  is being published or submitted on behalf
9  of any broker or dealer; and (xvi),
10 whether the quotation is being submitted
11 or published directly or indirectly on
12 behalf of the issuer.
13        So you see all of that, right?
14   A    Yes.
15   Q    Now the rule doesn't say
16 anything in the paragraph (a)
17 information, about a broker-dealer
18 providing information about a
19 broker-dealer's relationship with the
20 issuer, do they?
21   A    Can you rephrase that.
22   Q    Sure.
23        Is there any requirement under
24 this rule that a broker-dealer provided
25 information to anyone about its

128

1  relationship with the issuer it's seeking
2  to -- (Audio Distortion) --
3         THE REPORTER:  It's seeking
4  to?
5  BY MR. KRUCKENBERG:
6    Q    -- seeking to publish a
7  quotation for?
8    A    I am still not following.
9         Is there any obligation for them
10 to tell anybody that they don't have a
11 relationship with the issuer?
12   Q    Yes.
13   A    I don't think so.
14   Q    Okay.
15        You will agree with me in
16 paragraph (xvi) or 16 that we were just
17 looking at, when it references whether
18 the quotation is being submitted or
19 published directly or indirectly on
20 behalf of the issuer, the broker-dealer
21 can seek to file or to publish a
22 quotation independently of any directions
23 from the issuer, can't it?
24   A    If he avails himself of one of
25 the exemptions under 211, yes.

129

1    Q    As long as the broker-dealer has
2 the required information, the
3 broker-dealer can publish a quotation
4 without being asked by the issuer, can't
5 they?
6    A    Yes.
7    Q    Okay.
8        You also agree with me that the
9 rule actually requires the broker-dealer
10 to identify the issuer's transfer agent
11 before publishing the quotation, right?
12    A    Yes.
13    Q    Now, there's nothing in this
14 rule that suggest broker-dealer has to
15 conduct a background check on an issuer's
16 officers or directors, is there?
17    A    Well, kind of indirectly there
18 is -- well, the answer directly is no.
19 Indirectly, I think one of the keystones
20 of 211 is that the information has to be
21 gleaned from a reliable source.
22    Q    Okay.
23        And when we say "the
24 information," we mean the paragraph (a)
25 information, right?

130

1    A    I think it is everything.
2    Q    Everything I just went through,
3 right?
4        THE REPORTER:  I'm sorry?
5        THE WITNESS:  A and B.
6 BY MR. KRUCKENBERG:
7    Q    A and B.  Okay.
8        You will agree with me that the
9 text of the rule also doesn't mention the
10 term "red flag"; is that right?
11    A    That's right.
12    Q    Okay.
13    A    Although certainly it's a key
14 part of some of the releases that you
15 mentioned over the years.
16    Q    Okay.
17        MR. KRUCKENBERG:  And
18    actually, let's go back to the
19    start of the rule.  Let's turn
20    back to page 3.
21        If we look under that bold
22    heading, if we zoom in -- go down
23    a little bit, about halfway down
24    the page, okay.
25 BY MR. KRUCKENBERG:

131

1    Q    You see the section called
2 "Preliminary Note"?
3    A    Yes.
4    Q    It says, Brokers and dealers may
5 wish to refer to Securities Exchange Act
6 Release Number 29094 from 1991, for a
7 discussion of procedures for gathering
8 and reviewing the information required by
9 this rule and the requirement that a
10 broker-dealer have a reasonable basis for
11 believing that the information is
12 accurate and obtained from reliable
13 sources.
14        Do you see that?
15    A    Yes.
16    Q    Now, you will agree with me that
17 this note says a broker or dealer may
18 wish to refer to that release, right?
19    A    Yes.
20    Q    There's no requirement that a
21 broker-dealer refer to that release,
22 right?
23    A    No.
24    Q    And the guidance provided in
25 that release is not a regulatory

132

1 requirement, is it?
2    A    When you say "regulatory
3 requirement," what exactly does that
4 mean?
5    Q    Well, the guidance issued by the
6 SEC in that exchange -- in that release,
7 does not determine definitively whether
8 or not broker-dealer has complied with
9 the rule, does it?
10        MS. JOHNSON:  Objection to
11    form.
12        THE WITNESS:  Well, let me --
13    let me put it this way:  If the
14    SEC, in a release, and -- I think
15    what you are suggesting this is
16    guidance -- you know.  If I am a
17    good compliance director and the
18    SEC is telling me these are the
19    things I should look for, then I
20    pretty much, you know, know that
21    these are things that I need to be
22    concerned with.
23 BY MR. KRUCKENBERG:
24    Q    Okay.
25    A    And -- and -- and since 15c2-11

James Cangiano - July 23, 2020

133

1  is promulgated, as you know, under the
2  anti-fraud provisions, I think it is
3  probably something that we need to be
4  seriously concerned with, and I would
5  certainly take that guidance to heart,
6  whether it's a regulation probably, you
7  know, I think you can argue it's not, but
8  it's certainly very meaningful.
9      Q   Okay.
10         And you say it's guidance,
11  right?
12         Is that fair?
13     A   I think that's fair.
14     Q   And by guidance, it's meant to
15  help the regulated entities understand
16  their regulatory obligations; is that
17  fair?
18     A   I think when the SEC makes
19  pronouncements like that, it's more than
20  guidance.  It implies that, you know, if
21  these are present, if these red flags are
22  present -- I am presuming we are talking
23  about red flags -- if they are present,
24  you better be diligent in following up.
25  I think -- (Audio Distortion).

134

1          (Reporter clarification.)
2          THE WITNESS:  It's a little
3      more than guidance when the SEC
4      says these are red flags and you
5      better look at them, and I would
6      take that to heart that if I
7      didn't follow up or if I had some
8      concerns about reliability and
9      things of that nature, that I
10      would certainly take them to
11      heart, even though they are not
12      chapter and verse verbatim a rule.
13  BY MR. KRUCKENBERG:
14     Q   You will agree that guidance,
15  agency guidance, can't change the rule to
16  requirements, right?
17         MS. JOHNSON:  I want to put a
18      standing objection here.  I don't
19      know how we started going down the
20      path of guidance.  It's a release
21      and it was adopted as part of the
22      rule, so I think we are talking
23      apples and oranges here.  But if
24      you understand his question.
25         THE WITNESS:  I think that's

135

1      my point, Alise.
2          MS. JOHNSON:  Okay.
3          THE WITNESS:  It's not
4      chapter and verse rule, but it's
5      certainly something that you need
6      to pay attention to in a
7      regulatory context.
8  BY MR. KRUCKENBERG:
9      Q   Okay.
10     A   I think Alise and I are saying
11  the same thing.
12     Q   My question is broker-dealers
13  binding obligations come from the rule,
14  right?
15     A   Technically, yeah.
16     Q   Okay.
17         MR. KRUCKENBERG:  So let's
18      turn back to your report.  Back to
19      Exhibit 225.  Let's skip down a
20      bit.
21          Let's go to page 18.  And
22      let's go to the very bottom of
23      this page.  Last paragraph on that
24      page.
25  BY MR. KRUCKENBERG:

136

1      Q   We are now talking about the
2  defendant's Form 211 applications for
3  Kids Germ and Envoy Corporation.
4          And you write, a degree of due
5  diligence would have revealed the
6  similarities between these companies.
7  Right?
8      A   Yes.
9      Q   Okay.
10         And, in fact, you used the term
11  "due diligence" a number of times in your
12  report, don't you?
13     A   Yeah.  In the context of -- I
14  think we are talking source reliability
15  here.
16     Q   Yeah.  Okay.
17         So it's your belief that a
18  broker-dealer should employ a degree of
19  due diligence in reviewing the
20  information provided under Rule 2-11?
21     A   I mean, it's not a question of
22  should they.  I mean, they must in --
23  given the existence of red flags.
24     Q   Okay.
25         So you believe a broker-dealer

James Cangiano - July 23, 2020

137

1  must apply due diligence when reviewing
2  red flags?
3      A    Yeah.  In the presence of red
4  flags, he has an obligation to go
5  further.
6      Q    Okay.
7          And you equate that with due
8  diligence?
9      A    Yep.
10     Q    Okay.
11         You will agree Rule 2-11 applies
12  to both reporting and non-reporting
13  issuers; isn't that right?
14     A    Yes.
15     Q    And for reporting issuers, as we
16  established when we went through the
17  rule, a broker-dealer has to gather
18  certain public filings from the reporting
19  issuer, right?
20     A    Yes.
21     Q    And that might be a registration
22  statement, for example?
23     A    Yes.
24     Q    Right.
25         Now, the issuer has to file

138

1  those public filings directly with the
2  SEC, right?
3      A    Yes.
4      Q    I'm sorry, you cut off just a
5  second.
6      A    Yes.
7      Q    Okay.
8          And the issuer has to certify
9  the reliability of the representations
10  made in its public filings, right?
11     A    Yes.
12     Q    And if an issuer based, on that
13  certification, makes a material
14  misrepresentation, it could be subject to
15  an enforcement action, couldn't it?
16     A    Yes.
17     Q    And in fact, for registration
18  statements, among the Securities and
19  Exchange Commission reviews (Audio
20  Distortion) -- and before declaring them
21  effective; isn't that right?
22     A    Yes.
23     Q    And so a public company cannot
24  have a registration statement, have an
25  effective registration statement, until

139

1  it has been declared effective by the
2  SEC, right?
3      A    That's right.
4      Q    And for a broker-dealer to
5  publish a quotation under Rule 2-11, the
6  broker-dealer has to have a copy of the
7  effective registration statement of one
8  of the issuers, right?
9      A    That's one of the requirements
10  under (a), yes.
11     Q    Okay.
12         Now, we talked a lot about the
13  difference between over-the-counter
14  markets and national exchanges, right?
15     A    Yeah.
16     Q    Those are different things?
17     A    Yes.
18     Q    Have different regulatory
19  requirements, don't they?
20     A    Yes.
21     Q    So for --
22         (Simultaneous Crosstalk.)
23     A    The -- I'm sorry, go ahead.
24     Q    For a national exchange to
25  publish a quotation, the Exchange has

140

1  different obligations than an over the
2  counter market doesn't it?
3      A    Yes.
4      Q    And to be able to make a market
5  in a penny stock, a broker-dealer has
6  lesser obligations than a market maker in
7  a national exchange, don't they?
8      A    What do you mean by that.
9      Q    Well --
10     A    Lesser obligations --
11         (Simultaneous Crosstalk.)
12     Q    So let's talk about -- what is a
13  national exchanges obligation to publish
14  a quotation for a security?  Their review
15  obligation.
16         It's not Rule 2-11, is it?
17     A    No, 2-11 doesn't apply to them.
18     Q    What is a national exchange's
19  obligation?
20     A    Well, there's a whole myriad of
21  rules that relate to -- you know -- I
22  mean, it's so complex and we only have to
23  4 o'clock.
24     Q    Sure.
25     A    You're talking ATX.  You're

141

1 talking about regulation NMS.  You're
2 talking a whole bunch of stuff not to
3 mention rules relating to specialists.  I
4 mean it's -- you know --
5    Q   Okay.
6        (Simultaneous Crosstalk.)
7    A   -- a --
8    Q   Totally different animal, right?
9    A   Exactly.
10   Q   All right.  Now in practice,
11 rule -- SEC Rule 2-11 doesn't require --
12 doesn't require a broker-dealer to file
13 anything, does it?
14   A   Requires them to file Form 211;
15 the NASD does --
16       (Simultaneous Crosstalk.)
17   Q   Well --
18   A   -- or -- excuse me.
19   Q   So if I am just talking about
20 SEC Rule, it actually doesn't have any
21 requirement that anything gets filed,
22 does it?
23   A   Well, it's kind of a Catch 22
24 because in order to initiate a quote,
25 which is the purpose of the rule in a

142

1 public quotations medium, they have to go
2 through the organization that owns or
3 controls those quotation mediums.  It's
4 almost always a filing involved, so...
5    Q   Okay.  So let's break that down
6 a little bit.
7        So FINRA has -- and we have seen
8 it before -- FINRA has a Form 211
9 application, right?
10   A   Yes.
11   Q   FINRA has its own rule that
12 requires its member firms to apply to be
13 able to publish the quotation, right?
14   A   Right.
15   Q   And that application is to
16 demonstrate compliance with Rule 2-11?
17   A   Pretty much.  I would agree with
18 that, yes.
19   Q   Rule 2-11 doesn't actually
20 necessarily require an application to
21 FINRA, it's just as a matter of practice,
22 that's what FINRA has chosen to do; isn't
23 that right?
24   A   There's no requirement, however,
25 in order to get the quote published, you

143

1 need to make a file.
2    Q   Right.  Because of FINRA's rule;
3 is that right?
4    A   Right.
5    Q   All right.
6        Now, the process for filing a
7 Form 211 application is a broker-dealer
8 files this form with FINRA, right?
9    A   Right.
10   Q   And they do that to demonstrate
11 their compliance with the SEC rule,
12 right?
13   A   Right.
14   Q   Now, FINRA then reviews that
15 application and if they have comments,
16 they go back to the broker-dealer with
17 comments, right?
18   A   Yes.
19   Q   And so FINRA's job there is to
20 review the application to see if there is
21 adequate information to show compliance
22 with their rules, right?
23   A   Yes.
24   Q   If FINRA has no obligation to
25 clear a Form 211 application or permit a

144

1 quotation to be issued, do they?
2    A   Say again, I'm sorry.
3    Q   FINRA doesn't have an obligation
4 to clear the application for quotation,
5 do they?
6    A   You mean can they deny the
7 application?
8    Q   Yes.
9    A   Sure.
10   Q   And as you indicated, a
11 broker-dealer cannot publish a quotation
12 until FINRA has cleared the application,
13 right?
14   A   Yes.
15   Q   And in this case, you will agree
16 with me that FINRA cleared all of the
17 applications with the exception of
18 PurpleReal.com, right?
19   A   Yes.
20   Q   Okay.
21       As we indicated or as we
22 discussed earlier, there was an amendment
23 to Rule 2-11 in 1991, right?
24   A   Right.
25       MR. KRUCKENBERG:  So I am

145

1    going to show you Exhibit 236.
2        (Exhibit 236, Initiation or
3    Resumption of Quotations without
4    Specified Information 1984, is
5    Marked.)
6        MR. KRUCKENBERG:  Looking at
7    that document in front of you --
8    you could zoom in a little bit to
9    the heading.
10 BY MR. KRUCKENBERG:
11    Q    This says, Initiation or
12 Resumption of Quotations without
13 Specified Information, and it's dated
14 November of 1984.
15        Do you see that?
16    A    Yes.
17    Q    And this is a final rule -- this
18 is the promulgation of amendment to Rule
19 15c2-11 from 1984, right?
20    A    Yes.
21    Q    Okay.
22        MR. KRUCKENBERG:  And if we
23    go down to page 8 of this
24    document -- let's go to page 7,
25    first, at the bottom of the page.

146

1 BY MR. KRUCKENBERG:
2    Q    If we look at that -- at the
3 very bottom of the page, this is the new
4 language of the rule.
5        Do you see that?
6    A    (Reviewing.)  What is the new
7 language of the rule?
8    Q    So this is just the start, this
9 is the statutory text of rule amendments,
10 and then this document lists language
11 that starts at Part 240.
12        Do you see that?
13    A    Okay.  (Reviewing.)
14    Q    And then if we go to the very
15 bottom of the page, it says 240.15c2-11.
16        Do you see that?
17    A    Yes.
18    Q    Okay.
19        Let's turn the page now -- let's
20 go to paragraph (a)(1)(ii).
21        Do you see that in the middle of
22 your page?
23    A    (a)(1) -- yeah.
24    Q    Starts, "The broker or dealer
25 wishing..."

147

1    A    Okay.  You have to make it
2 bigger.  Sorry.
3    Q    That's okay.
4        Do you see that now?
5    A    Yes.
6    Q    Okay.
7        So that language says, "The
8 broker or dealer wishing to submit for
9 publication a quotation for such security
10 has in his records, and makes reasonably
11 available upon request to a person..."
12        And then the language continues,
13 and if we look at the second to last
14 line, it says "... which the broker or
15 dealer has no reasonable basis for
16 believing is not true and correct and
17 which was obtained by him from sources
18 that he has a reasonable basis for
19 believing are reliable."
20        Do you see that?
21    A    Yes.
22    Q    That's the old version of the
23 rule, right?
24    A    Right.
25    Q    That's -- that is the standard

148

1 that was -- that applied until 1991,
2 right?
3    A    Yes.
4    Q    Okay.
5        And that -- that language, that
6 specific language was changed in 1991,
7 wasn't it?
8    A    Yes.
9        MR. KRUCKENBERG:  All right.
10    Let's turn to Exhibit 237 now.
11        (Exhibit 237, Initiation or
12    Resumption of Quotations without
13    Specified Information 1991, is
14    Marked.)
15 BY MR. KRUCKENBERG:
16    Q    Looking at this exhibit at the
17 top of your screen, this is the 1991
18 release concerning the rule amendments,
19 wasn't it?
20    A    (Reviewing.)  Appears to be,
21 yeah.
22    Q    And that's -- that's the
23 document you referenced in your report,
24 isn't it?
25    A    Correct.

149

1    Q    Okay.
2         And I presume you have read this
3 entire document, haven't you?
4    A    Yes.
5    Q    Okay.
6         Now, you will agree with me that
7 part of this document explains the nature
8 of the 1991 amendments, right?
9    A    Hm-hm.  Yes.
10   Q    And it explains the change in
11 the standard from the no reasonable basis
12 to the reasonable basis standard; is that
13 fair?
14   A    Yes.
15   Q    I'm sorry, is that a fair
16 characterization?
17   A    Yeah.  I answered yes.
18   Q    Okay.  Sorry, I just didn't hear
19 you.
20        You will agree with me that the
21 Commission specifically rejected a due
22 diligence standard, didn't they?
23   A    Well, you know, again, we are
24 talking apples and oranges here.  I mean,
25 if by due diligence -- I mean -- by due

150

1 diligence, do you mean source,
2 reliability requirements, or what exactly
3 do you mean?
4    Q    What I am exactly meaning is the
5 reasonable basis language that was
6 inserted into the rule, that was instead
7 of an obligation that a broker-dealer
8 have a due diligence requirement; isn't
9 that right?
10        MS. JOHNSON:  Objection.
11   Objection.
12        THE WITNESS:  Well, do me a
13   favor so I understand what you are
14   talking about.  Give me -- give me
15   the differences between '84 and
16   '91.
17 BY MR. KRUCKENBERG:
18   Q    Sure.
19   A    Maybe that will answer the
20 question.
21   Q    So in 1984 --
22        (Simultaneous Crosstalk.)
23   A    '84 said no reasonable and '91
24 said reasonable.  Is that the point you
25 are getting to?

151

1    Q    That's part of it.  So -- yes.
2         So the '84 one said has no
3 reasonable basis for believing it's not
4 true and correct.  Okay.
5         And then the '91 language
6 says -- I want to get it in front of
7 me -- says, has a reasonable basis under
8 the circumstances for believing that the
9 information is accurate and the sources
10 are relied.  Okay?
11   A    Okay.
12   Q    You will agree with me in this
13 adopting release from 1991 that the
14 Commission specifically said that they
15 were not adopting a due diligence
16 standard with the addition of the
17 reasonable basis language?
18   A    You're talking now absent red
19 flags, in general?
20   Q    In general.
21   A    In general, I agree.  Hm-hm.
22   Q    Okay.
23        So for example, we turn now to
24 page 5 of this document, if we go to the
25 bottom of the page --

152

1    A    I was hoping would you stop at
2 6.
3        MR. KRUCKENBERG:  Actually,
4   we can scroll up just a tiny bit.
5   Keep going.
6 BY MR. KRUCKENBERG:
7    Q    There's a paragraph in the
8 middle of the page that starts, "There
9 are important differences..."  Okay.
10        Do you see that?
11   A    Yep.
12   Q    According to the Commission, it
13 says, "There are important differences
14 between the obligations imposed by the
15 Rule upon broker-dealers publishing
16 quotations and the obligations of an
17 underwriter."
18        See that?
19   A    Yes.
20   Q    And it's "because of its special
21 relationship with the issuer, other
22 distribution participants, and the
23 investing public, an underwriter is
24 subject to a largely separate, broad set
25 of investigative responsibilities,

James Cangiano - July 23, 2020

153

1 commonly referred to as due diligence
2 responsibilities, under both the
3 securities laws and the standards of the
4 profession."
5        Do you see that?
6    A   Yes.
7    Q   And then it continues, "In
8 contrast, the revised requirements of the
9 Rule do not contemplate that, before
10 submitting or publishing quotations for a
11 covered security, a market maker must
12 routinely conduct any independent 'due
13 diligence' investigation concerning the
14 issuer or its business operations and
15 financial condition such as the
16 investigation expected to be conducted by
17 an underwriter."
18        Do you see that?
19    A   Yes.
20    Q   Okay.
21        So you will agree with me that
22 the Commission did not apply a due
23 diligence standard with this review --
24 with this rule?
25    A   In general, yes.  Again, with

154

1 the exception of if you look at the
2 bottom paragraph, you know, when red
3 flags are present, then he needs to
4 obtain additional information.
5    Q   Okay.  Let's talk about that.
6        With that last sentence, it
7 says, "When 'red flags' are initially
8 present, the broker-dealer may upon
9 inquiry obtain additional information
10 that provides a reasonable basis for
11 believing that the information is
12 accurate."  Right?
13    A   Correct.
14    Q   That doesn't say that the
15 broker-dealer then has a due diligence
16 obligation, does it?
17    A   No.  But there's an obligation,
18 as I say in my report, and as the
19 Commission said in its pronouncement, to
20 investigate red flags.
21    Q   Okay.
22        That's your understanding of the
23 regulatory requirements?
24    A   Right.
25    Q   Okay.

155

1        Now, if we go back to that
2 paragraph, we left off right at footnote
3 35.  That continues, it says, "A market
4 maker publishing quotations for a
5 non-NASDAQ security may have no
6 relationship with the issuer of the
7 security" --
8    A   I'm sorry, where are you now.
9    Q   Sorry.  It's in the middle of
10 the page, just after footnote --
11    A   Okay.  I see it.  Thank you.
12    Q   You will agree that that says,
13 "A market maker publishing quotations for
14 a non-NASDAQ security may have no
15 relationship with the issuer of the
16 security."  Right?
17    A   (Reviewing.)
18    Q   That's what it says, right?
19    A   Yes.
20    Q   And you will agree with me that
21 this contemplates that a broker-dealer
22 might be publishing a quotation for an
23 issuer that it has no relationship with,
24 right?
25    A   That's right.

156

1    Q   And that's not forbidden under
2 the rule, is it?
3    A   It's not --
4        (Simultaneous Crosstalk.)
5    Q   -- why the rule does not impose
6 a due diligence obligation, right?
7    A   That's what it says, right.
8    Q   Okay.
9        You also agree with me that the
10 rule presumes that documents that are
11 filed with the Commission are reliable
12 unless a broker-dealer has information
13 suggesting otherwise; isn't that right?
14    A   Where does it say that?
15    Q   So let's turn to page 4 of this
16 document --
17    A   I'm not arguing with you --
18    Q   Sure.
19        Let's turn to page 4 of this
20 document.
21    A   I just like to see the context.
22    Q   Sure.
23        So let's go to the top of this
24 page, it's on your screen here, there's a
25 section that says, "Source Reliability."

157

1       Do you see that?
2    A   Yes.  (Reviewing.)
3    Q    And then it looks like the third
4  sentence of that paragraph starts, "In
5  the absence of any 'red flag'..."
6       Do you see that?
7    A   (Reviewing.)  As an initial step
8  or -- yes, I see it.  Okay.
9       THE WITNESS:  Could you make
10    it a little bigger, please.  I'm
11    sorry.  Thank you.
12  BY MR. KRUCKENBERG:
13    Q    So you will agree with me it
14  says, "In the absence of any 'red flag'
15  (i.e., information that under the
16  circumstances reasonably indicates that
17  the source is unreliable), a
18  broker-dealer would be able to satisfy
19  the Rule's requirements regarding the
20  reliability of the information's source,
21  if that information was provided by the
22  issuer of the securities or its agents,
23  including its officers and directors,
24  attorney, or accountant, or was obtained
25  from an independent information service,

158

1  such as the Commission's Public Reference
2  Room, a document retrieval service or
3  standard research sources."
4       Do you see that?
5    A   Yes.
6    Q    And that reference, Public
7  Reference Room, that's because EDGAR
8  didn't exist in 1991, right?
9    A   Yes.
10    Q    That is a reference to being
11  able to obtain public filings through the
12  Commission, right?
13    A   Right.  I mentioned that
14  earlier.
15    Q    Right.
16       So this contemplates that if a
17  broker-dealer gets information from the
18  Commission, it could presume that to be
19  reliable in the absence of any red flag,
20  right?
21    A   In the absence of any red flag,
22  right.
23    Q    Okay.
24       It also contemplates that a
25  broker-dealer might be getting

159

1  information from intermediaries from the
2  issuer, like an attorney or an
3  accountant, right?
4    A   Yes.
5    Q    It does not necessarily require
6  that the information all come directly
7  from the issuer, right?
8    A   That's right.
9       MR. KRUCKENBERG:  So let's
10    now turn to a document that's been
11    previously marked as Exhibit 177.
12       THE WITNESS:  (Reviewing.)
13  BY MR. KRUCKENBERG:
14    Q    Mr. Cangiano, do you see that
15  document in front of you?
16    A   I do.
17    Q    Okay.
18       And this is a document titled,
19  Publication or Submission of Quotation
20  without Specified Information, and it's
21  dated Monday March 8, 1999.
22       Do you see that?
23    A   Yes.
24    Q    And you are familiar there was a
25  proposed amendment to Rule 2-11 in 1999

160

1  that was never enacted; is that right?
2    A   That's right.
3    Q    Now, as part of that proposal,
4  the Commission also published guidance on
5  how to comply with Rule 2-11; isn't that
6  right?
7    A   I believe so, yes.
8    Q    Okay.
9       Let's turn to page 37 of this
10  document.
11       If we look at the top of the
12  page there, it starts, "Note:  This
13  appendix to the preamble will not appear
14  in the code of Federal Regulations."
15  Right?
16    A   Right.
17    Q    This was not proposed as
18  amendment to the Code of Federal
19  Regulations, right?
20    A   That's right.
21    Q    Instead, this was an appendix
22  that is titled, Guidance on the Scope of
23  a Broker-Dealer's Review Under Current
24  Rule 15c2-11 and the Amendments.  Right?
25       That's what it is titled?

161

1    A    Yes.
2    Q    Okay.
3        This is one of those guidance
4  documents we were talking about earlier,
5  isn't it?
6    A    Yes.
7    Q    This is something that is
8  supposed to provide information to
9  broker-dealers but it doesn't necessarily
10 change the regulatory requirements, does
11 it?
12   A    What do you mean change the
13 regulatory --
14   Q    Doesn't change the rule, does
15 it?
16   A    No.  But again, you know, when
17 the SEC gives me guidance, particularly
18 with respect to an anti-fraud rule, I am
19 paying attention.
20   Q    You are paying attention.
21       Can -- can the SEC or any other
22 regulator enforce guidance just like the
23 law?
24   A    No.  But let's put it the other
25 way, I mean, you can definitely fall into

162

1  violative conduct which they would allege
2  under the law if you don't follow the
3  guidance.
4    Q    Okay.
5        And you will agree with me in
6  the introduction under (1), Introduction,
7  it says, "To assist broker-dealers in
8  complying with Rule 2-11..."
9    A    Exactly.
10   Q    This doesn't say a broker-dealer
11 must follow this document, does it?
12   A    It doesn't but I am telling you,
13 they should, otherwise they are going to
14 be in trouble.  That's my point.
15   Q    Okay.
16       Because the Commission will
17 enforce it, even though it's not a law?
18   A    Well, essentially, what the
19 guidance is -- is -- again, assisting
20 compliance.  So the implication there is
21 that if you don't do these things or if
22 you are not diligent in what the SEC is
23 giving you guidance on, there is a
24 potential that they will allege that you
25 are not complying with the rule.

163

1    Q    Okay.
2        So if a regulated entity knows
3  what is good for them, they will follow
4  the guidance; isn't that fair?
5    A    Yeah.
6    Q    Okay.
7    A    The guidance -- and that the
8  guidance could constitute a violation
9  ultimately.
10   Q    Okay.
11       And that's even though --
12       (Simultaneous Crosstalk.)
13   A    Guidance, you know, what I mean.
14   Q    Yeah.
15       That's even if the guidance says
16 it's non-binding or it's merely to
17 provide guidance for assistance?
18   A    Right.
19   Q    Okay.
20       And you have read this opinion,
21 right?
22       You have read this guidance?
23   A    I have.
24   Q    And you will agree with me that
25 this, in part, lists a series of red

164

1  flags that a broker-dealer might
2  consider; is that right?
3    A    Yes.  Hm-hm.
4        MR. KRUCKENBERG:  Okay.
5    Let's turn to page 42.  If we go
6    down to the bottom of that page,
7    Roman Numeral IV.  Sorry, it's
8    higher in the page than I thought,
9    about midway down.
10 BY MR. KRUCKENBERG:
11   Q    There's IV.  Examples of red
12 flags.
13       Do you see that?
14   A    Hm-hm.  Yes.
15   Q    This is not an exhaustive list
16 of every possible red flag, is it?
17   A    No.
18   Q    It's not an exhaustive list of
19 everything a broker-dealer should look
20 at, is it?
21   A    Although I think there are 28 of
22 them, they are pretty exhaustive.
23   Q    There are a lot of them --
24       (Simultaneous Crosstalk.)
25   A    -- the others, yeah.

James Cangiano - July 23, 2020

165

1    Q    What these are meant to be are
2 examples of red flags that the SEC has
3 seen in other cases; isn't that right?
4    A    That's right.
5    Q    And the SEC suggests that
6 broker-dealers might want to be on the
7 look out for these, right?
8    A    Yes.
9    Q    They don't apply in every case,
10 do they?
11    A    No.
12    Q    And there's no rule that says if
13 one of these red flags is present, a
14 broker-dealer is forbidden from
15 publishing a quotation, is there?
16    A    Well, it means that there's a
17 possibility that either the source
18 reliability or the accuracy of
19 information would require further due
20 diligence by the broker -- I know you
21 don't like the word due diligence -- but
22 let's say investigation.
23    Q    Okay.
24        There's no requirement, there's
25 no regulatory requirement, that a

166

1 broker-dealer may not issue a quotation
2 in -- if one of these red flags has come
3 up during its investigation; isn't that
4 fair?
5    A    As long as they, you know, get
6 the appropriate clearances, they can put
7 the quotation in, sure.
8    Q    Right.
9        In fact, sometime red flags come
10 up and a broker-dealer will investigate
11 them and then they have a reasonable
12 basis for believing the accuracy
13 information and they can publish the
14 quotation, right?
15    A    That's exactly what they should
16 be doing, right.
17    Q    Right.
18        Because what they're supposed to
19 do is look at the red flag and then
20 resolve them?
21    A    That's right.
22    Q    And so if a red flag comes up in
23 a specific instance, a broker-dealer can
24 comply with the rule nevertheless, as
25 long as it does additional investigation,

167

1 right?
2    A    As long as they do the
3 investigation.  If, FINRA for example,
4 have indicated in comments back to
5 broker-dealer that this could be a red
6 flag and they have investigated it,
7 gotten back to FINRA, and FINRA accepts
8 the explanation, they can go ahead.
9    Q    Okay.
10        And they would be in compliance
11 with Rule 2-11, wouldn't they?
12    A    Yes.
13    Q    Okay.
14        You will agree with me that not
15 every red flag is really indicia of
16 fraud, right?
17    A    Yeah, but, you know, it doesn't
18 mean there's necessarily an indication of
19 fraud but it definitely means that it's
20 something they need to look at.
21    Q    Okay.  Let's look at an example.
22        MR. KRUCKENBERG:  Let's turn
23 to page 47 in this document.
24        Let's go down to the middle of the
25 page.  It's going to be at the

168

1        very bottom of your screen right
2        now, number 25.  If we could zoom
3        in a little bit.
4        THE WITNESS:  Right.
5 BY MR. KRUCKENBERG:
6    Q    So we are up to 25.  And this
7 one is "Hot Industry" microcap stocks.
8        Do you see that?
9    A    Yes.
10    Q    It says, "Another characteristic
11 of microcap fraud cases is that they
12 often involve stocks that are in vogue.
13 In the past, oil and gas ventures and
14 mining operations, as well as stocks of
15 issuers have been purportedly innovative
16 products have been popular in frauds
17 involving low-priced stocks."
18        See that?
19    A    Yes.
20    Q    So according to SEC is one of
21 their red flags is that the issuer is
22 involved in one of these industries,
23 right?
24    A    Not necessarily those industries
25 but kind industries of the particular

169

1 period we are talking about.
2    Q   Okay.
3        So for example, they think at
4 one point an issuer being involved in oil
5 and gas ventures and mining operations
6 was a red flag.
7        Do you see that?
8    A   Right. I do.
9    Q   Obviously a broker-dealer can
10 publish a quotation for a hot industry,
11 can't it?
12   A   Yes.
13   Q   And there are plenty of
14 legitimate companies involved in hot
15 industries, aren't there?
16   A   Yes.
17   Q   And there was never a point when
18 every oil and gas venture was a
19 fraudulent activity, right?
20   A   Right. I think what they are
21 pointing out here, though, is kind of a
22 cautionary statement that if you see
23 these type of companies, be careful.
24   Q   Okay --
25       (Simultaneous Crosstalk.)

170

1    A   -- all alike.
2    Q   This is one of the red flags
3 they listed?
4    A   Yes.
5    Q   So this is an example of the
6 kinds of red flags we are talking about?
7    A   It's one -- yeah, one of them,
8 yeah.
9    Q   Okay.
10       MR. KRUCKENBERG: So I want
11   to go back up a little bit, let's
12   go to page 40 of this document.
13 BY MR. KRUCKENBERG:
14   Q   Now this document was published
15 in 1999 and, as we have established, at
16 that point EDGAR was starting to be
17 operational, right?
18   A   Correct.
19   Q   If we look at -- let's go to the
20 bottom of the page, under (c), Document
21 Review Obligations.
22       Do you see that?
23   A   Yes.
24   Q   The Commission writes, in the
25 third paragraph, "Because documents filed

171

1 with the Commission are subject to
2 liability provisions, a broker-dealer
3 generally can reach a reasonable believe
4 as to the accuracy of information
5 contained in these documents."
6        Do you see that?
7    A   Yes.
8    Q   And you agree with that
9 statement, don't you?
10   A   Yes.
11   Q   Okay.
12       MR. KRUCKENBERG: Let's turn
13   to page 26 of this document.
14       I will just let everybody
15   know, I understand it's a little
16   bit after noon, I have a little
17   bit in this subject area and then
18   I think we can take a break. So
19   we are almost there. If that's
20   all right with you.
21       THE WITNESS: I am fine,
22   thank you.
23 BY MR. KRUCKENBERG:
24   Q   Okay.
25       If we look at this page, page 26

172

1 of Exhibit 177, the top of your page
2 there you see, Burden-Hours for
3 Broker-dealers.
4        Do you see that?
5    A   Yes.
6    Q   And this is the SEC's estimation
7 of how much time a broker-dealer is going
8 to have to spend complying with Rule
9 2-11; isn't that right?
10   A   Yeah. I think this is something
11 that any proposed rule has to go through
12 in terms of, you know, broker-dealers, et
13 cetera.
14   Q   And -- and this is because when
15 an agency like the SEC is proposing a
16 rule, you have a requirement to tell the
17 industry or to estimate how long they
18 think it's going to take the industry to
19 have to comply with the rule, right?
20   A   Right.
21   Q   Okay. So -- one second. I am
22 trying to find my spot here. Okay.
23       If we look at the second
24 paragraph under that section, it starts,
25 "Because the amendments..."

173

1    A    Yes.
2    Q    If we look at the second
3 sentence of that paragraph, it says, "We
4 believe it will take a broker-dealer
5 about four hours to collect, review,
6 record, retain, and supply to the NASD
7 the information pertaining to a reporting
8 issuer, and about eight hours to collect,
9 review, record, retain, and supply to the
10 NASD the information pertaining to a
11 non-reporting issuer."
12       Do you see that?
13   A    Yes.
14   Q    And as we discussed earlier, the
15 rule contemplates publishing quotations
16 for reporting and non-reporting issuers,
17 right?
18   A    Yes.
19   Q    And it seems like it makes sense
20 that a reporting issuer would take less
21 time because as we just established,
22 public filings for reporting issuer
23 presumed to be reliable, right?
24   A    Yes.
25   Q    And you agree with me that is

174

1 the SEC's assessment or estimate of how
2 long it thinks compliance with Rule 2-11
3 will take?
4    A    Yeah.  You know, I don't think
5 it's based on much science.  But it's in
6 their release, so I am assuming that's,
7 you know, what they are saying.
8    Q    That's what the SEC --
9        (Simultaneous Crosstalk.)
10   A    However -- excuse me -- what
11 they don't say, is that what if I have an
12 issuer where there's 21 of 28 red flags
13 present.  That's going to take me a lot
14 longer, right?
15   Q    Okay.
16   A    So I guess the implication here
17 is that where general regular filings,
18 should take X.
19   Q    Okay.
20   A    So it's not -- you know, they
21 don't talk about the exceptions.
22   Q    Okay.
23       And you will agree with me that
24 for source reliability, communications to
25 a broker-dealer directly from an issuer

175

1 are presumptively reliable; isn't that
2 right?
3    A    Yes.
4    Q    Okay.
5        MR. KRUCKENBERG:  So let's
6 turn back to your report.  Let's
7 go to page -- Exhibit 225.  Let's
8 go to page 11 of that report.
9        THE WITNESS:  (Reviewing.)
10       MR. KRUCKENBERG:  If we
11 scroll down just a little bit,
12 under the section marked, Source
13 Reliability.
14       Do you see that?
15       THE WITNESS:  Yes.
16       MR. KRUCKENBERG:  Let's zoom
17 in.
18 BY MR. KRUCKENBERG:
19   Q    The first sentence, you write,
20 "The SEC has stated that broker-dealers
21 play an important role as gatekeepers."
22       Do you see that?
23   A    Yes.
24   Q    And then you have a quotation,
25 right?

176

1    A    (Reviewing.)  Right.
2    Q    And you footnote that in
3 footnote 19, and then, if we scroll down
4 to the bottom of the page, you have
5 quoted SEC Release Number 34-87115.
6        See that?
7    A    Right.
8    Q    That is a release I presume you
9 have read in its entirety; is that fair?
10   A    Right.  Hm-hm.
11   Q    Is that a yes?
12   A    Yes.
13   Q    Okay.
14       And that is from September of
15 2019, right?
16   A    Yes.
17   Q    And you will agree with me that
18 that release is a proposed amendment to
19 Rule 2-11, right?
20   A    Yes.
21   Q    And you will also agree with me
22 that that amendment has not been
23 finalized yet, right?
24   A    Yes.
25   Q    You will also agree with me that

177

1 the -- that that document was not
2 published before any of the events that
3 are detailed in the Complaint; isn't that
4 right?
5    A   Which document?
6    Q   The 2019 release.
7    A   Right.
8    Q   And you will agree with me
9 because everything we are talking about
10 here happened before 2015, right?
11   A   Yes. But, you know, the
12 substance of the rule hadn't changed.
13   Q   Okay.
14       And to the extent that this is
15 guidance to the industry, it doesn't
16 really guide the industry from before it
17 was published, does it?
18   A   Well, the concept of source
19 reliability has been with the rule since
20 1971. So, you know, I am not -- and the
21 source reliability is to -- again, rule
22 promulgated under the anti-fraud
23 provisions, to ensure that the public is
24 protected on these -- to the extent the
25 broker-dealer can as you imply, when

178

1 these quotations are put in.
2        So --
3        (Simultaneous Crosstalk.)
4    Q   Okay.
5    A   -- you know, the concept of gate
6 keeper is that the broker-dealer market
7 maker has the obligation to ensure that
8 he's done whatever he has to do under
9 2-11 to make sure that he's complied with
10 the rule when quotations are put in the
11 public media, so the public is protected,
12 particularly from fraud.
13   Q   Okay.
14       MR. KRUCKENBERG: Let's turn
15 to Exhibit 238.
16       (Exhibit 238, SEC
17 2019-1630-0001, is Marked.)
18 BY MR. KRUCKENBERG:
19   Q   If we look at the top of this
20 document, you will agree with me that
21 that is the published version in the
22 Federal Register of the release that we
23 were just talking about; isn't that
24 right?
25   A   Yes.

179

1        MR. KRUCKENBERG: And if we
2 can turn to page 35 of this
3 document. And in the middle
4 column about halfway down the
5 page, there's a paragraph that
6 starts, "The proposed rule..." So
7 let's -- "The proposed rule would
8 require..." here we go.
9        Let's zoom in just a little
10 bit on that paragraph. All right.
11 BY MR. KRUCKENBERG:
12   Q   The second sentence of that
13 paragraph says, "However, the
14 requirements of the proposed rule
15 amendments do not contemplate that,
16 before submitting or publishing
17 quotations for a security, a
18 broker-dealer or qualified IDQS must
19 conduct any independent due diligence
20 investigation concerning the issuer or
21 its business operations and financial
22 condition, such as the investigation
23 expected to be conducted by an
24 underwriter."
25       Do you see that?

180

1    A   Yes.
2    Q   So you will agree with me that
3 the Commission has reaffirmed in 2009
4 it's view that Rule 2-11 does not require
5 a due diligence -- an independent due
6 diligence requirement on a broker-dealer?
7    A   Yeah. It's a -- it's certainly
8 consistent. And, you know, once again, I
9 would say that this paragraph is absent
10 red flags.
11   Q   Okay.
12       MR. KRUCKENBERG: So I think
13 that's probably a good place to
14 stop. So why don't we take -- why
15 don't we take about half an hour,
16 if that's okay with everyone.
17       THE WITNESS: Sure.
18       MR. KRUCKENBERG: It's about
19 12:15 right now, why don't we plan
20 to meet back at about 12:45.
21       MS. JOHNSON: Very good.
22       (Whereupon a Recess Commenced
23 at 12:15 p.m. and Testimony
24 Recommenced at 12:48 p.m.)
25 BY MR. KRUCKENBERG:

James Cangiano - July 23, 2020

181

1    Q   Mr. Cangiano, switching gears a
2 little bit from what we were discussing
3 before we took a lunch break.
4        I would like to talk a little
5 bit about DTC eligibility, okay?
6    A   Yes.
7    Q   What does DTC stand for?
8    A   That would be the Depository
9 Trust Company.
10   Q   Okay.
11       And what do you mean when you
12 say DTC eligibility?
13   A   Simply means that the stock is
14 eligible to be cleared through their
15 clearance and settlement system at DTC,
16 which is essentially electronic clearance
17 and settlement.
18   Q   Okay.  And --
19       (Simultaneous Crosstalk.)
20   A   It's also a depository.
21   Q   Okay.
22       And as I understand DTC
23 eligibility and clearance, essentially
24 the Depository Trust Company, they
25 actually take possession of stock

182

1 certificates, right?
2    A   Yes.
3    Q   And when there's a transfer --
4 there's not a physical transfer of
5 certificates because the DTC has taken
6 custody of them, right?
7    A   It's all book entry, yes.
8    Q   Right.
9        And that makes the process go a
10 more smoothly, right?
11   A   Exactly.
12   Q   You will agree with me that
13 securities could certainly be sold and
14 transferred without using the DTC, right?
15   A   It's true but doesn't generally
16 happen because it's expensive and
17 cumbersome.  And you know, the days of --
18 when I first started they had runners run
19 around Wall Street with satchel bags with
20 all the certificates.  That doesn't
21 happen anymore.
22   Q   And that is the whole point of
23 DTC eligibility, it makes it easier,
24 correct?
25   A   Correct.

183

1    Q   Because otherwise, like you
2 said, you have to physically transfer the
3 certificates?
4    A   That's right.
5    Q   So you would agree with me that
6 there would be absolutely nothing unusual
7 for an issuer seeking DTC eligibility?
8    A   Not at all.
9    Q   You would expect that, wouldn't
10 you?
11   A   Absolutely.
12   Q   And you would expect it really
13 from the moment that shares were traded
14 in a public market, right?
15   A   Well, let me put it this way:  I
16 mean, if the anticipation is that the
17 stock would trade in the secondary
18 market, you know, on an active or
19 semi-active basis, then, yeah, they got
20 to be part of the clearance and
21 settlement systems.
22   Q   And you would expect -- if the
23 stock was going to be traded on a
24 secondary market, you would expect the
25 issuer to seek DTC eligibility straight

184

1 away, right?
2    A   Yes.
3    Q   Okay.
4        Now, you will agree with me that
5 only DTC participants can apply for DTC
6 eligibility; isn't that right?
7    A   That's right.
8    Q   And DTC participants, that is a
9 specific term, that is a group of
10 organizations that are listed by the DTC,
11 right?
12   A   Yes.
13   Q   And those are typically banks,
14 right?
15   A   Banks and broker-dealers.
16   Q   Okay.
17       And you will agree with me that
18 only a DTC participant can apply for DTC
19 eligibility, right?
20   A   For the security you're talking
21 about?
22   Q   Yeah.
23   A   Yeah.
24   Q   And you make reference to
25 something in your expert report called

James Cangiano - July 23, 2020

185

1 "an agent attestation form."
2       Do you recall that?
3   A   I know it's in here somewhere.
4   Q   Let me just ask you this:  Do
5 you know what an agent attestation form
6 is?
7   A   Yes.
8   Q   In reference to DTC eligibility?
9   A   Yes.
10   Q   That is a form that is filled
11 out by a transfer agent, right?
12   A   Right.
13   Q   And it's given to a DTC
14 participant, right?
15   A   Yes.
16   Q   And the DTC participant sends
17 that form on to the DTC, right?
18   A   That's right.
19   Q   And that is the process --
20       (Simultaneous Crosstalk.)
21   A   Also has to have a copy of the
22 stock certificate.
23   Q   Okay.
24       And that is the process for
25 seeking a DTC eligibility, right?

186

1   A   Yes.
2   Q   So you will agree with me that
3 if a transfer agent's involvement in
4 seeking DTC eligibility is limited to
5 filling out the agent attestation form
6 and submitting a certificate, right?
7   A   That's right.
8   Q   Okay.
9       And you also agree with me that
10 agent attestation forms are not -- they
11 are not seen by the public, are they?
12   A   No.
13   Q   And, in fact, they contain in
14 some cases proprietary information, don't
15 they?
16   A   Yes.
17   Q   So these are -- okay.
18       MR. KRUCKENBERG:  I am going
19 to show you what's been marked as
20 Exhibit 239.
21       (Exhibit 239, Agent
22 Attestation Form - Obscene Jeans,
23 is Marked.)
24       MR. KRUCKENBERG:  If we could
25 scroll up to the top of this

187

1   document.
2 BY MR. KRUCKENBERG:
3   Q   Mr. Cangiano, this is an agent
4 attestation form; isn't that right?
5   A   Yes.
6   Q   This appears to be one of the
7 forms we were just discussing, right?
8   A   Yes.
9   Q   I'm sorry is that, correct?
10   A   Yes.  I said yes.
11   Q   Okay.
12       And this one is filled out for
13 an issuer named Obscene Jeans Corp.
14       Do you see that?
15   A   Yes.
16   Q   Have you seen this specific
17 document before?
18   A   I don't believe so.
19   Q   Okay.
20       And this appears to be in a
21 standard form that's filled out in
22 handwriting; isn't that right?
23   A   Yes.
24   Q   And this -- this is in a
25 standard agent attestation form, right?

188

1   A   I believe it is.  Hm-hm.
2   Q   Okay.
3       So if we look at this form, it
4 says, "Please provide the following:"
5       Do you see that?
6   A   Can you make it a little bigger,
7 Caleb?
8   Q   Sure.
9   A   I'm sorry.  Okay.  (Reviewing.)
10 That's good.
11   Q   If we look at the top -- well,
12 under the heading, it says, "To induce
13 DTC to accept the Securities as eligible
14 for deposit at DTC... Agent represents to
15 DTC that Agent will comply with the
16 requirements stated in DTC's Operational
17 Arrangements, as they may be amended from
18 time to time."
19       Right?
20   A   Yes.
21   Q   And then it says, "Please
22 provide the following:"  Correct?
23       It asks for issuer name, right?
24   A   Yes.
25   Q   The issue description?

James Cangiano - July 23, 2020

189

1    A    Yes.
2    Q    And that is a reference to
3 whether -- to the type of stock.
4        So here it's common stock,
5 right?
6    A    Correct.
7    Q    Is the CUSIP number?
8    A    Yes.
9    Q    The number of shares authorized?
10   A    Right.
11   Q    The number of shares issued and
12 outstanding, right?
13   A    Right.
14   Q    Interest rate, if applicable,
15 and final maturity/expiration date, if
16 applicable.  Right?
17   A    Right.
18   Q    Is that correct?
19   A    Yes.
20   Q    This form does not ask for any
21 additional information about the issuer,
22 does it?
23   A    Not on its face, no.  If you
24 scroll down, I don't think it says
25 anything further, right?

190

1    Q    Yeah, let's scroll down.
2        There's a paragraph, midway
3 down, that says, "With respect to the
4 above issue, Agent represents to and
5 agrees with DTC as follows:"
6        Do you see that?
7    A    Yes.
8    Q    There's 3 Roman Numerals.
9        (i) says, "The agent shall not
10 deposit with DTC any foreign securities."
11 Right?
12   A    Right.
13   Q    (ii) says, "The agent shall not
14 process any transactions in foreign
15 securities."  Right?
16   A    Right.
17   Q    And (iii) says, "The agent shall
18 provide to DTC such information and
19 documentation as DTC may reasonably
20 request with respect to any foreign
21 securities."  Right?
22   A    Right.
23   Q    Fair to say that all three of
24 those are references to foreign
25 securities, if they apply, right?

191

1    A    Right.
2    Q    I'm sorry, I didn't hear your
3 answer.
4    A    Right.
5    Q    Then it says, "By signing
6 below..."
7        So let's scroll down.
8        It says, "By signing below the:
9 (i) Agent represents and warrants the
10 information provided on this form is
11 true, accurate and complete.  Agent
12 understands that DTC will rely on these
13 representations in determining initial
14 and ongoing depository eligibility
15 status."  Right?
16   A    Right.
17   Q    (ii) says, "DTC requires the
18 transfer agents provide an OFAC
19 certification for securities that DTC
20 considers for eligibility.  This
21 certification indicates that the transfer
22 agent has and will continue to comply
23 with all of its OFAC obligations."
24        Do you see that?
25   A    Yes.

192

1    Q    And OFAC is Office of Foreign
2 Asset Control, right?
3    A    Right.
4    Q    And that is a reference to money
5 laundering controls for foreign issuers,
6 right?
7    A    Exactly.
8    Q    Okay.
9        So you will agree with me,
10 looking at this entire form, that the
11 only representations made on this form
12 about the issuer are about the
13 information provided in those blanks
14 about the applicability or
15 non-applicability of rules concerning
16 foreign securities?
17   A    Right.
18   Q    All right.  There's no
19 representation here about whether a
20 share -- whether shares are free trading,
21 right?
22   A    No.
23   Q    And there are no representations
24 whatsoever about whether shares are
25 properly registered?

James Cangiano - July 23, 2020

193

1    A    No.
2    Q    Or about the business's operate?
3    A    No.
4    Q    Now, in your expert report you
5 write that in Spartan's case, they relied
6 on their clearing firm, Penson Financial,
7 to represent the Five companies for DTC
8 purposes.
9        Do you recall that?
10   A    Yes.
11   Q    And you say, "Additionally
12 Island Transfer provided Penson with the
13 information needed for Penson to apply
14 for DTC eligibility for the Five's
15 companies."
16       Do you recall writing that?
17   A    Yes.
18   Q    Which companies are you talking
19 about?
20       Is that all 19 issuers listed in
21 the Complaint?
22   A    I don't believe it's all 19.  I
23 think they used a couple of other
24 broker-dealers, if I am not mistaken.
25   Q    Have you seen documents

194

1 indicating that Spartan Securities or
2 Island Transfer sought DTC eligibility
3 for all of the issuers listed in the
4 Complaint?
5    A    They did it through their DTC
6 participants, yeah.
7    Q    It's your testimony you
8 believe --
9        (Simultaneous Crosstalk.)
10   A    I think -- I'm sorry, let me
11 finish.
12   Q    Sure.
13   A    I can't recall if it was all 19
14 or not, but --
15   Q    Okay.
16   A    -- the majority of them.
17   Q    You believe it was the majority
18 of the 19 issuers?
19   A    Yeah.
20   Q    Can you provide the breakdown of
21 which ones it was?
22   A    Not off the top of my head, no,
23 I'm sorry.
24   Q    Do you know if you do that in
25 your expert report?

195

1    A    I don't believe I do.
2    Q    Okay.
3        Have you reviewed any documents
4 sent to the DTC by Penson related to any
5 of the issuers in the Complaint?
6    A    Yes.
7    Q    Which ones?
8    A    I believe Kid Germ Defense was
9 one and I think On the Move was another
10 that I recall.  There may have been
11 others.
12   Q    Would it be fair to say that all
13 of the ones you have seen are mentioned
14 in your report?
15   A    Under the DTC section or where
16 or anywhere?
17   Q    Well, anywhere?
18   A    I know Kid Germ Defense is -- I
19 am just looking through the report now --
20 there may have been others.
21   Q    Would it be fair to say that if
22 you reviewed information concerning
23 documents sent from Penson on behalf of
24 an issuer, you mentioned which issuer
25 that was in your report?

196

1    A    I don't know if I do that
2 specifically.  We could look.
3    Q    Sure, let's look at it.  It's
4 Exhibit 225 and you have that in front of
5 you.
6    A    Right.
7    Q    I will direct your attention
8 starting at page 13, that's where you
9 discuss DTC eligibility.
10   A    Right.
11   Q    So if we look at page 14 of your
12 report.
13   A    Right.
14   Q    At the bottom of the section,
15 just before (iv), you write, Again,
16 Penson as the DTC participant was
17 responsible with respect to DTC
18 requirements and relied on Spartan and
19 Island Transfer and the representatives
20 [sic] with respect to the Five's issuers.
21   A    Their representation.
22   Q    Okay.
23       So you mentioned -- and the
24 Five's issuers, we are talking about the
25 19 issuers listed in the Complaint,

197

1 right?
2    A    Right.
3    Q    You do not specify which issuers
4 we are talking about, do you?
5    A    I do not.
6    Q    Do you know offhand which ones
7 we are talking about?
8        Are we talking about all of them
9 or only some of them?
10    A    I don't recall offhand but I
11 think we are talking most of them.
12    Q    So it is your recollection that
13 you reviewed information for most of the
14 19 issuers involving representations made
15 by Penson concerning DTC eligibility?
16    A    Yeah, I don't know exactly how
17 many but some.
18    Q    Is it fair to say that the ones
19 we are talking about, you would have
20 listed that somewhere in your report?
21    A    Maybe. I don't recall if I did
22 or not.
23    Q    Okay.
24    A    I know there are some mentioned
25 in the report -- if I could point those

199

1    A    Right. And you know, you
2 mention there is 19 issuers and I think
3 what I did in order to save time and the
4 government's money, is put in some
5 representative examples and not do every
6 single 19 repeating over and over again
7 what the issue was.
8    Q    Okay.
9    A    So I may have reviewed some more
10 closer than others, but essentially, the
11 same -- the same pattern was emerging as
12 to how to clean these shells.
13    Q    Okay.
14        And so you made an assumption
15 that all -- based off these examples, the
16 pattern was off the 17 issuers?
17        MS. JOHNSON:  Objection.
18        THE WITNESS:  Yeah, the
19    assumption because of the ones I
20    mentioned in my report obviously,
21    and, you know, as the SEC has
22    alleged in their Complaint.  So I
23    am not assuming it, I am also
24    relying on what the SEC said
25    regarding all 19.

198

1 out to you.
2        For example, on page 17, again,
3 we are talking about Kids Germ Defense.
4    Q    Okay.
5    A    You see the four bullets there,
6 last bullet, "Rose also knew the benefit
7 of DTC eligibility in making the sale of
8 the shell more profitable." Then I cite
9 an e-mail to Rose, What do you recommend
10 do with DTC?  And then there's the
11 discussion with Ms. Krokhina and Penson.
12    Q    Okay.
13        And you mentioned it in
14 reference to Kids Germ?
15    A    Right.
16    Q    And then you also mentioned --
17 and I will direct your attention to page
18 18 of your report.
19    A    Right.
20    Q    You mention communications for
21 DTC eligibility for Envoy Group, right?
22    A    Right.
23    Q    Now, you didn't mention DTC
24 eligibility for any other issuer in this
25 report?

200

1 BY MR. KRUCKENBERG:
2    Q    Okay.
3    A    There's no need for me to, I
4 don't think, to take each issuer one by
5 one.  I mean, it would be nice for my
6 consulting fee but I think, you know, my
7 goal is to get the point across.
8    Q    Okay.
9        And is it fair to say that your
10 opinion concerning DTC eligibility is
11 based on your conclusion that the
12 defendants conducted similar actions for
13 the other issuers beyond Kids Germ and
14 Envoy?
15        MS. JOHNSON:  Objection.
16        THE WITNESS:  Yes.
17 BY MR. KRUCKENBERG:
18    Q    Let's go to -- excuse me, one
19 second.
20        Let's go to page 14 of your
21 expert report.
22    A    Okay.
23    Q    And at the very bottom of that
24 page, you have a section called, Transfer
25 Agent's Role.

201

1        Do you see that?
2    A   Yes.
3    Q   Okay.
4        And you -- you write in this
5    section that transfer agents act as
6    gatekeepers for the microcap market; is
7    that right?
8    A   That's right.
9    Q   Okay.
10        And it is your opinion that a
11   transfer agent -- they have an obligation
12   to review the validity of documents that
13   are sent to them; is that fair?
14    A   Yeah, I think they have a
15   requirement, particularly in the microcap
16   area, to ensure they are not aiders and
17   abetters of fraud, et cetera, given the
18   apparent red flags for them actually.
19    Q   Okay.  So let's break that down
20   a little bit.
21        What rule or statute imposes
22   that obligation?
23    A   There's no rule -- there's no
24   defined rule or statute.  But there
25   certainly is SEC pronouncements and

202

1    there's certainly a few SEC enforcement
2    actions which include the same thing.
3    Q   Okay.  So let's -- let's talk
4    about SEC enforcement actions.
5        What are they enforcing, if
6    there is no rule of pronouncement?
7    A   Anti-fraud provisions of the
8    Securities Act, particularly Section 5
9    which deals with unregistered
10   distributions.
11    Q   Okay.
12        Do you believe that Section 5
13   imposes an obligation on a transfer agent
14   to look for red flags?
15    A   What it imposes on is not to be
16   aiders and abetters of a fraud.
17    Q   Okay.
18        And do you believe that that
19   means that a transfer agent also has an
20   obligation to look for red flags?
21    A   Yes.
22    Q   And that comes from Section 5?
23    A   I would say in the microcap
24   space that, again, it's a glaring yellow
25   light warning signal that they need to be

203

1    perceived carefully, and in the face of
2    red flags, do what they need to do in
3    terms of the transfer, and in some cases,
4    refuse the transfer.
5    Q   Okay.
6        That's under Section 5.
7    A   Not specifically.  Section 5 is
8    an anti-fraud provision.  It's -- every
9    fraud is not defined.  Kind of a 10b-5
10   where, you know, generally --
11   generalizations are made.  But usually
12   the transfer agents, the enforcement
13   actions have been taken under Section 5
14   because it dealt with unregistered
15   distributions or some type of microcap
16   fraud.
17    Q   Okay.
18        So I guess what I am trying to
19   establish is you believe that there's an
20   obligation for transfer agent to look for
21   red flags and in some cases refuse a
22   transfer, right?
23    A   Yes, if it's glaring.
24    Q   Okay.
25        And what rule or regulation

204

1    imposes that obligation?
2    A   There's no specific rule or
3    regulation; however, they have been cited
4    under the anti-fraud provision.
5    Q   That's Section 5?
6    A   That's right.
7    Q   Okay.
8        MR. KRUCKENBERG:  I am going
9    to ask you to turn to -- I am
10   going to show you Exhibit 240.
11        (Exhibit 240, 15 USC 77e, is
12   Marked.)
13        MR. KRUCKENBERG:  Let's go to
14   page 3.  Let's go to the bottom of
15   the page and zoom in.
16        It starts with the left-hand
17   side Section 77e.
18    A   Right.
19    Q   Do you see that?
20    A   Yes.
21    Q   So I am showing you a provision
22   of a statute, this is 15 US Code Section
23   77e.
24    A   Right.
25    Q   When you say Section 5, that's

205

1  in some ways a colloquial term.
2        This statute that I am showing
3  you is Section 5; isn't that right?
4    A   I am not sure.
5    Q   Do you know the United States
6  Code provision of Section 5?
7    A   Is this what you're showing me?
8    Q   Yes.
9    A   Okay.  I will take your word for
10  it.
11    Q   And you are familiar with
12  Section 5, aren't you?
13    A   Yes.
14    Q   You will certainly let me know
15  if this is contrary to your understanding
16  of the statute; is that fair?
17    A   Yes.
18    Q   Okay.
19        When we look at Section 77e,
20  subparagraph (a), we have, "Sale or
21  delivery after sale of unregistered
22  securities."
23        Do you see that?
24    A   Yes.
25    Q   And that paragraph says, Unless

206

1  a registration statement is in effect as
2  to a security, it shall be unlawful for
3  any person, directly or indirectly --
4  paragraph (1) to make use of any means or
5  instruments of transportation or
6  communication in interstate commerce, or
7  through the mails, to sell any such
8  security through the use or medium of any
9  prospectus, or otherwise; (2), to carry
10  or cause to be carried through the mails
11  or interstate -- for any such security
12  for the purpose of sale or for delivery
13  after sale.
14        Do you see that?
15    A   Yes.
16    Q   And that's Section 5 that's what
17  we are talking about, right?
18    A   Right.
19    Q   And you will agree with me that
20  the statute prohibits the sale of
21  unregistered -- the sale or distribution
22  or transfer of unregistered securities?
23    A   Right.
24    Q   Okay.
25        And so you will agree with me

207

1  also that one prerequisite of a violation
2  of this section is that the security
3  that's being transferred has to be
4  unregistered, right?
5    A   Security being transferred --
6  the security being sold has to be
7  unregistered.
8    Q   Okay.
9        It applies to a sale or delivery
10  of unregistered securities, right?  Is
11  that right?
12    A   Right.
13    Q   And so if it's properly
14  registered, this doesn't apply, does it?
15    A   Well, it could.
16    Q   How so?
17    A   Well, you can have unregistered
18  distributions by a control person.  You
19  could have a registered distributions by
20  affiliates who don't -- (Audio
21  Distortion) -- Rule 144.  I mean, there's
22  a myriad of other rules that relate to
23  securities distribution.
24    Q   Okay.
25        What I am specifically asking

208

1  you is for purposes of Section 5
2  liability, if a security is properly
3  registered, there can be no Section 5
4  violation, right?
5    A   I don't agree with that.
6    Q   You don't agree with that?
7        MS. JOHNSON:  I want to get
8  an objection in here.  First of
9  all, you guys are talking over
10  each other.
11        Jim, you need to let Caleb
12  finish his question and Caleb, you
13  need to let Jim finish his answer.
14  And I'd appreciate it, Jim, if you
15  pause so I can get objections in.
16  It's very hard doing this over the
17  internet.
18        THE WITNESS:  Yes, sorry
19  about that.
20        MS. JOHNSON:  I am sure the
21  court reporter would appreciate it
22  as well.
23        MR. KRUCKENBERG:  I will try
24  to do better about letting you --
25        MS. JOHNSON:  Okay.

209

1       My objection -- if you can
2   read the question again and maybe
3   if I want to object, I will, but I
4   think we have gotten far down the
5   road here.
6   BY MR. KRUCKENBERG:
7       Q   Okay.
8       So do you not agree that -- let
9   me put it this way:  You believe that
10  a -- that an entity can violate Section
11  5, if it transfers a properly registered
12  security?
13      MS. JOHNSON:  I am going to
14  object.  Calling for a legal
15  conclusion.
16  BY MR. KRUCKENBERG:
17      Q   Is that your understanding of
18  this provision?
19      A   Well, without making a legal
20  conclusion, there can be Section 5
21  violations for sale of registered
22  securities that are not in compliance
23  with -- that can be unregistered
24  distributions due to either a controlled
25  person selling the stock or a violation

210

1   of Rule 144 there are different ways.
2       Q   And what is the basis for that
3   that --
4       (Simultaneous Crosstalk.)
5       A   -- don't necessarily involve
6   legended securities.  They involve
7   unlegended securities as well.
8       Q   Okay.
9       What is the basis for that
10  liability?
11      MS. JOHNSON:  Objection.
12      THE WITNESS:  Again, a legal
13  conclusion but -- you know.
14      MS. JOHNSON:  Actually my
15  objection was relevance.
16      THE WITNESS:  Okay.
17  BY MR. KRUCKENBERG:
18      Q   You can answer.
19      A   I guess a best point of
20  reference is to go to SEC Rule 144.
21      Q   Okay.  So let's talk about SEC
22  Rule 144.
23      MS. JOHNSON:  I am going to
24  object again.  We are way beyond
25  what Jim has been asked to opine

211

1   on in his report.
2   BY MR. KRUCKENBERG:
3       Q   So Mr. Cangiano, your -- (Audio
4   Distortion) --
5       Mr. Cangiano, in your report you
6   are discussing Island Stock Transfer's
7   liability under Section 5; isn't that
8   right?
9       A   I am not going to ask because I
10  don't know where that is or what your --
11  what the question is.
12      Q   Okay.
13      Let's talk about registration of
14  securities.
15      A   Right.
16      Q   So what does it mean to register
17  a security?
18      A   We spoke a little bit about
19  echelons or other forms of registration.
20  A stock cannot be sold unless it's
21  effectively registered through SEC either
22  through a form -- a registration form as
23  an echelon or some qualifying exemptions.
24      Q   Okay.
25      And that's Section 4 of the

212

1   Securities Act, right?
2       A   I believe so.
3       Q   Discusses registration or
4   exemptions?
5       A   Yeah, I believe that's right.
6       Q   Rule 144 provides additional
7   exemptions; isn't that right?
8       A   I don't call it an exemption.
9   It's called a safe harbor.
10      Q   Okay.
11      A   So if exempt, you can sell it
12  but you do it at your own risk.
13      Q   Okay.
14      So we can agree that you are not
15  making any legal conclusions about the
16  scope of liability under Section 5,
17  right?
18      A   No.
19      Q   And you are not making any legal
20  opinions about the required elements or
21  the required showing to prove violation
22  of Section 5, right?
23      A   I am not making any legal
24  conclusions about anything.
25      Q   Okay.

213

1    And I think that's because we
2 agreed you are not claiming to be an
3 expert in legal matters, right?
4    A    No, I didn't exactly say that.
5    Q    Okay.
6    A    It's just like a cop is not
7 framed to adjudicate a legal matter but
8 he is trained to express an opinion about
9 what he found at the crime scene.
10    Q    Okay.
11    Now, can an issuer sell its
12 shares without using a transfer agent?
13    A    Yes.
14    Q    And that, in fact, is something
15 that happens sometimes, right?
16    A    Usually in private transactions,
17 yes.
18    Q    Now, are you familiar with the
19 Uniform Commercial Code?
20    A    I know what it is, yes.
21    Q    Okay.
22    Are you familiar with how the
23 Uniform Commercial Code applies with
24 respect to transfer agents?
25    A    In what -- I am somewhat

214

1 familiar, yes.
2    Q    Now, you don't have a direct
3 reference to your Uniform Commercial Code
4 anywhere in your expert report; isn't
5 that right?
6    A    That's right.
7    Q    Now, are you familiar with
8 Article 8 of the Uniform Commercial Code?
9    A    Generally, yes.
10    Q    Okay.
11    And you will agree with me that
12 that sets out provisions for liability
13 for, among others, transfer agents and
14 issuers?
15    A    That's right.
16    Q    Okay.
17    And you are aware that that
18 Uniform Commercial Code has been adopted
19 by all 50 states; is that right?
20    A    Yes.
21    MR. KRUCKENBERG: I am going
22    to show you what's been marked as
23    Exhibit 242.
24    (Exhibit 242, UCC 8-401, is
25    Marked.)

215

1 BY MR. KRUCKENBERG:
2    Q    Looking at that document, this
3 is Uniform Commercial Code 8-401.
4    Do you see that?
5    A    Yeah. Good. Thank you.
6    Q    Okay.
7    Do you see that?
8    A    I see it. Hm-hm.
9    Q    Okay.
10    This is Duty of Issuer to
11 Register Transfer?
12    A    Yes.
13    Q    Are you familiar with this
14 provision?
15    A    Formally, yes.
16    Q    If we look at paragraph (a), it
17 says, "If a certificated security in
18 registered form is presented to an issuer
19 with a request to register transfer or an
20 instruction is presented to an issuer
21 with a request to register transfer of an
22 uncertified security, the issuer shall
23 register the transfer as requested."
24    Do you see that?
25    A    Yes.

216

1    Q    It lists several enumerated
2 items that need to be present.
3    Do you see that?
4    A    Yes.
5    Q    For example, if we look at
6 paragraph (3), it says, "Reasonable
7 assurances given that the endorsement or
8 instruction is genuine and authorized."
9    Right?
10    A    Yes.
11    Q    And you will -- based on your
12 familiarity with this provision, you will
13 agree with me that if an issuer or its
14 transfer agent violates the provisions
15 set out here, it can be liable to the
16 person giving the transfer agent
17 directions, right?
18    MS. JOHNSON: Objection.
19    THE WITNESS: Again, you
20    know, it's kind of a legal
21    conclusion. But I am assuming,
22    yeah, that would be right.
23 BY MR. KRUCKENBERG:
24    Q    Okay.
25    And your understanding of

James Cangiano - July 23, 2020

217

1 industry practice is that transfer agents
2 have an obligation to promptly transfer
3 shares when given appropriate
4 instructions, right?
5    A   Right.
6    Q   If they don't, they could be
7 subject to liability to the people giving
8 them instructions?
9    A   Right, unless, you know, again,
10 there's some fraud involved.
11   Q   Does --
12       (Simultaneous Crosstalk.)
13   A   Let me state it a different way.
14   Q   Okay.
15   A   Again, I am not trying to make a
16 legal conclusion here, but I would think
17 a violation of Federal Securities laws
18 would supersede any UCC or state
19 requirements in the transfer space.
20   Q   So you believe that if a
21 transfer agent is given instructions
22 consistent with the UCC, it should still
23 refuse the transfer based on the
24 anti-fraud provision in Section 5?
25   A   Well, yeah, if it's involved in

218

1 the fraud or fraudulently transferring
2 the securities, or, you know, it's
3 presented to them, again, I am talking
4 about in the microcap space primarily,
5 that federal law would supersede that.
6    Q   Okay.
7        You're also familiar with SEC
8 regulations for transfer agents; is that
9 fair?
10   A   Yes.
11   Q   And you are aware that the SEC
12 has a regulation directing transfer
13 agents to turn around directions for
14 transfer in most instances within
15 three days; isn't that right?
16   A   Yeah.
17   Q   And so you will agree there's a
18 regulatory requirement for transfer
19 agents that they process transfers
20 quickly, right?
21   A   Agree.
22   Q   And that's when they are
23 presented with adequate documents
24 directing a transfer, right?
25   A   Agree.  Emphasis on adequate

219

1 documents, yes.
2    Q   And if they don't -- if they
3 don't promptly transfer it, they could be
4 subject to liability from the SEC?
5    A   Absolutely.
6    Q   Okay.
7        Let's go back to your report.
8 Let's go back to Exhibit 225.  Let's turn
9 to page 15.
10   A   18 you said?
11   Q   15, excuse me.
12       Actually, let's turn back just
13 one more page to the very bottom of page
14 14.  And you have a quotation here at the
15 very bottom of the page.
16       You see that?
17   A   Hm-hm.  Yep.
18   Q   It starts, "A transfer agent's
19 failure..."  Right?
20   A   Yes.
21   Q   Let's turn the page one more
22 time.
23       You've provided a footnote
24 citation to that quotation; isn't that
25 right?

220

1    A   That's right.
2    Q   If we go down to the bottom of
3 the page you cite to a SEC release from
4 December 2015; is that right?
5    A   Right.
6    Q   Is it fair to say you have read
7 that release?
8    A   Well, I have read parts of it.
9 I mean, I think it is 240 pages.
10   Q   Okay.
11       Are you familiar with what that
12 release is?
13   A   Generally, yes.
14   Q   That is a notice of proposed
15 rulemaking, isn't it?
16   A   Yes.
17   Q   And that is a proposed transfer
18 agency rule from 2015, right?
19   A   Yes.
20   Q   You are aware that rule was not
21 adopted, correct?
22   A   I believe that's true.
23   Q   Okay.
24       You will agree with me that a
25 proposed rule that is not adopted is

James Cangiano - July 23, 2020

221
1 not -- that is not a binding rule on the
2 industry, right?
3    A   That's right.
4    Q   Okay.
5        You will also agree with me that
6 this was proposed in 2015, which was
7 after the events detailed in the
8 Complaint, right?
9    A   Yes.
10   Q   So if we actually go forward in
11 your report, go to page 27. At the
12 bottom of the page, you have a blocked
13 quote.
14       Do you see that?
15   A   Right.
16   Q   This blocked quote says --
17 starts, "Because the relevant
18 determinations can involve the assessment
19 of legal issues that are fact dependent,
20 transfer agents typically may seek to
21 rely on representations or" -- and then
22 we can turn the page -- "or opinions
23 provided by the issuer or security holder
24 and their counsels, usually in the form
25 of an attorney opinion letter."

222
1        Do you see that?
2    A   Right.  Right.
3    Q   And once again, you have a
4 footnote there, right?
5    A   Yes.
6    Q   And if we look at the footnote,
7 you are referencing back to footnote 29.
8        You will agree with me that this
9 is a citation to that transfer agent rule
10 that we were just talking about, right?
11   A   Yes.
12   Q   That is the proposed rule,
13 right?
14   A   That's correct.
15       MR. KRUCKENBERG: So I am
16 going to show you Exhibit 244.
17       (Exhibit 244, Proposed
18 Transfer Agents Regulations, is
19 Marked.)
20 BY MR. KRUCKENBERG:
21   Q   Looking at the first page, it
22 says, "Transfer Agent Regulations."
23       And you will agree with me that
24 that's proposed rule we were just talking
25 about?

223
1    A   Yep.
2    Q   And you weren't kidding, this is
3 208 pages long, right?
4    A   I believe it is, yes.
5    Q   Yeah.  So let's go to page 131
6 of this document.
7        At the top of the page, we have
8 a paragraph that starts, "More
9 specificity..."
10       Do you see that?
11   A   Yes.
12   Q   And this rule -- this document
13 says, "More specificity around transfer
14 agents' responsibilities with respect to
15 illegal distributions may help to better
16 protect investors, facilitate the prompt
17 and accurate clearance and settlement of
18 securities transactions and combat fraud
19 and manipulation in the microcap market."
20       Do you see that?
21   A   Yes.
22   Q   And then it says, "We therefore
23 intend to propose new rules or rule
24 amendments to address transfer agents'
25 role in facilitating transfers of

224
1 securities that result in illegal
2 distributions of securities."
3    A   Yes.
4    Q   And then it continues, "In
5 particular, the Commission intends to
6 propose a new rule prohibiting any
7 registered transfer agent or any of its
8 officers, directors, or employees from
9 directly or indirectly taking any action
10 to facilitate a transfer of securities if
11 such person knows or has reason to know
12 that an illegal distribution of
13 securities would occur in connection with
14 such transfer."
15       That's what it says?
16   A   Yes.
17   Q   And you are aware that the SEC
18 never proposed such a rule; isn't that
19 right?
20   A   That's right.  But I think we
21 need to take a step back because -- let's
22 look at how rules get established.
23   Q   Well --
24       (Simultaneous Crosstalk.)
25   A   I think the first part, okay,

225

1 rules are sometimes designed to address a
2 specific course of conduct that occurred
3 some time in the past, correct?  Maybe
4 through an enforcement action or so on.
5       And so I think what the
6 Commission was doing here is attempting
7 to codify what it had already spoken
8 about in adjudicated actions and
9 enforcement actions that they have
10 undertaken, and I think actually the
11 release says that.  Because it says our
12 enforcement history tells us we need
13 these rules.
14       And yes, they haven't been
15 adopted but the conduct that it was
16 addressing was, you know, in the past --
17    Q   Okay.
18       You will agree --
19       (Simultaneous Crosstalk.)
20    A   -- case law.
21    Q   You will agree with me that in
22 this release, the SEC said we intend to
23 propose these rules, and these rules have
24 not been proposed; is that right?
25    A   That's right.

226

1    Q   And you will also agree with me
2 that by saying -- when the Commission
3 says we intend to propose a rule,
4 presumably the Commission thinks there's
5 a reason for the rule like that?
6    A   Absolutely.  Usually based on
7 past enforcement actions or best
8 practices they want to address.
9    Q   And this is a suggestion that
10 such a rule does not currently exist,
11 correct?
12    A   That's right.
13    Q   Okay.
14    A   However, again --
15       (Simultaneous Crosstalk.)
16    Q   Well --
17    A   I think -- I don't think the
18 rule is but the precedent of the conduct
19 is established through the enforcement
20 actions.
21    Q   And that's rule under
22 enforcement, right?
23    A   Yes.
24    Q   And that's where the Commission,
25 through enforcement actions, changes the

227

1 nature of regulatory requirements?
2    A   That could possibly be an
3 outcome, yes.
4       MR. KRUCKENBERG:  Let's turn
5    back to your report, page 9.
6       DOCUMENT TECHNICIAN:  Are you
7    referring to 225?
8       MR. KRUCKENBERG:  Yes, thank
9    you.
10       DOCUMENT TECHNICIAN:  What is
11    the page number again?
12       MR. KRUCKENBERG:  Page 9.
13       THE WITNESS:  Page 9, I
14    believe he said.
15       MR. KRUCKENBERG:  Let's look
16    at the very top of the page.  If
17    we can zoom in a little bit.
18       There we go.  Thank you.
19 BY MR. KRUCKENBERG:
20    Q   And you write on page 9 of your
21 expert report, "Here, the actions of the
22 Five are consistent with the operation of
23 a shell factory.  These shells were
24 created with the sole purpose of selling
25 them for a considerable profit."

228

1       Do you see that?
2    A   Hm-hm.
3    Q   And based on the evidence you
4 have seen, you believe that the sole
5 purpose -- that these shells were created
6 with the sole purpose of selling them?
7    A   That's my opinion, yes.
8    Q   And it's fair to say your
9 opinions in this report are premised on
10 that conclusion, right?
11    A   I would say that my report makes
12 that conclusion on the basis of the
13 factors that I layout there in the
14 report; that the characteristics of a
15 shell factory are present in this
16 particular case.
17    Q   You will agree with me in this
18 particular case the issuer's intent in
19 creating these companies is important to
20 your conclusions?
21    A   Well, you know, I don't know if
22 the issuers had any intent.  And, you
23 know I think it was the intent of
24 Mirman/Rose, et al., and you know -- in
25 the actual sense, and again, this is me

229

1 in my opinion, there were never any
2 credible issuers.  The issuers were
3 Miriam/Rose, et cetera, et cetera.
4    Q   So you will agree with me when I
5 talk about 19 issuers mentioned in the
6 Complaint, there are 19 public companies
7 that filed registration statements in
8 this case, right?
9    A   Right.
10    Q   And your contention here is that
11 based on the evidence you have seen,
12 these companies, these 19 companies were
13 created with the sole purpose of selling
14 them; is that right?
15    A   Yes.
16    Q   And that conclusion about why
17 the companies were created, that's
18 important to your other conclusion in
19 this report, right?
20    A   I think if you look at the
21 bullet points that follow, I think that
22 would express my opinion as to the nature
23 of the issuer.
24    Q   Okay.
25    A   For example, the first one,

230

1 these plans were created that would not
2 be implemented beyond the few initial
3 steps.  They convinced friends,
4 relatives, acquaintances to become a
5 straw CEO.  They had family and friends
6 and straw shareholders.
7        So that, to me, does not speak
8 of legitimate companies trying to go
9 public and provide goods and services and
10 make money.
11    Q   That's the basis of your
12 conclusion about the purpose of these
13 companies, right?
14    A   Yes.
15    Q   Okay.
16        You will agree with me that your
17 ultimate conclusion about the purpose of
18 these companies, it's important for your
19 conclusions in this case?
20    A   I would say yes.
21    Q   Okay.
22        MR. KRUCKENBERG:  Let's turn
23 to -- let's turn to page 16 of
24 your report.  So under heading
25 marked -- let's zoom in a little

231

1 bit.
2 BY MR. KRUCKENBERG:
3    Q   Under heading, Spartan
4 Facilitated the Sale of the Shell
5 Companies, you talk about the Mirman/Rose
6 companies, right?
7    A   Right.
8    Q   And you quote, Sheldon Rose, his
9 deposition testimony here; don't you?
10    A   I do.
11    Q   And this is to support your
12 conclusion that Spartan should have
13 realized what was going on.
14        Do you see that?
15    A   Yes.
16    Q   Okay.
17        So it is fair to say that by
18 quoting Mr. Rose's testimony, you
19 reviewed his testimony thoroughly, right?
20    A   I did.
21    Q   And you would agree with me that
22 he testified that he never told Spartan
23 or any of the defendants that the
24 information he provided to them
25 reportedly on behalf of the issuers was

232

1 false; isn't that right?
2    A   That he never told them?
3    Q   Yes.
4    A   I don't know if he told them or
5 not.  As he suggests, they should have
6 been smart enough to figure it out.
7        MR. KRUCKENBERG:  Okay.  So
8 let's turn to his deposition
9 testimony.  Let's go to
10 Exhibit 245.
11 (Exhibit 245, Rose Deposition
12 Transcript, is Marked.)
13 BY MR. KRUCKENBERG:
14    Q   If we can scroll down to the
15 bottom of this page, you will agree with
16 me this is the cover sheet for deposition
17 of Sheldon Rose from Friday, December 13,
18 2019, right?
19    A   Yes.
20    Q   Okay.
21    A   Appears to be.
22    Q   And this is the testimony you
23 reviewed?
24    A   Yes.
25    Q   Okay.

233

1        MR. KRUCKENBERG:  Let's turn
2   to page 63 of this document.  So,
3   63.  Let's go to line 11.
4   BY MR. KRUCKENBERG:
5        Q    So starting at line 11, Mr. Rose
6   was asked the question:  "Now did you
7   tell anyone at Spartan Securities that
8   you and Mr. Mirman controlled the shares?
9        "Answer:  No.  You asked me that
10  question before.
11       "Question:  And I am just asking
12  about this company.
13       "Answer:  I know but every
14  company would be the same.
15       "Question.  Okay.
16       "Answer:  I am just telling you
17  right now so you can put it down there.
18  The thing is no."
19       Do you see that?
20  A    Right.
21       Q    And you will agree with me that
22  Mr. Rose was testifying that he -- he nor
23  Mr. Mirman told anyone at Spartan
24  Securities that he was in control of the
25  shares of the issuers involved in this

234

1   case?
2   A    Specifically in control of the
3   shares?
4        Q    Yes.
5   A    Or in control of the company?
6        Q    In control of the shares, that
7   is the question.
8   A    Physical shares?  I don't know
9   what he means by shares.
10       Q    Okay.  So -- okay.
11       So your testimony here looking
12  at that transcript is you don't -- you
13  don't know what he means?
14  A    Yeah, basically.  I mean, is he
15  talking physical certificates?  Is he
16  talking company?  What is he talking
17  about?
18       Q    Okay.
19       MR. KRUCKENBERG:  Let's turn
20  to page 65 of this document.
21       THE WITNESS:  (Reviewing.)
22       MR. KRUCKENBERG:  Excuse me,
23  page 64, and let's start at line
24  15.
25  BY MR. KRUCKENBERG:

235

1        Q    And Mr. Rose is asked the
2   question, at line 15:  "Did you tell
3   anyone at Spartan Securities that you
4   controlled the shareholders for any of
5   those companies --
6        "Answer:  No."
7        The question continued:  " --
8   listed in the plea agreement?
9        "Answer:  No.
10       "Question:  Okay.  Did you tell
11  them that you controlled the president or
12  the controlling shareholder?
13       "Answer:  Say that again.
14       "Question:  Did you tell anyone
15  at Spartan Securities that you were using
16  straw CEOs for any of these companies?"
17       And then it continues to the
18  next page.
19       "Answer:  No.  Why would
20  somebody want to do that?"
21       See that?
22  A    Yes.
23       Q    You will agree with me that Mr.
24  Rose testified that he did not tell the
25  defendants that he was in control of the

236

1   shareholders for these issuers --
2   A    Right.
3        Q    -- is that right?
4   A    Yes.  He did not tell them
5   directly, right.
6        Q    And instead, he speculated that
7   they should have been smart enough to
8   figure it out, right?
9   A    I don't know if he was
10  speculating but he certainly said that
11  they should have been smart enough to
12  figure it out, yes.
13       Q    All right.  Turning back to your
14  report.  Same page, page 16 of
15  Exhibit 225 -- continuing with that quote
16  from Mr. Rose.  Mr. Rose testified --
17       MR. KRUCKENBERG:  Let's zoom
18  in just a little bit.
19       DOCUMENT TECHNICIAN:  Page
20  16?
21       MR. KRUCKENBERG:  Yes, thank
22  you.  It's on the screen.
23  BY MR. KRUCKENBERG:
24       Q    Mr. Rose testified, "The only
25  thing is, they should have been bright

237

1 enough.  They are dealing with
2 industries, they're are dealing with
3 shell type of companies all along because
4 he (Dilley) sold them.  Not necessarily,
5 for us but for other people."
6        Do you see that?
7   A   Yes.
8   Q   Have you seen any evidence that
9 Mr. Dilley sold any shell companies?
10    A   I've seen -- I think I have seen
11 indirect evidence that he was --
12        (Simultaneous Crosstalk.)
13    Q   What is that?
14    A   I think he was involved with
15 some phone calls with an attorney to help
16 Rose sell this company --
17        (Simultaneous Crosstalk.)
18    Q   So it is your --
19    A   -- e-mail chain, I do believe.
20    Q   Okay.
21        So is your -- your belief
22 sitting here today, that there's evidence
23 that Mr. Dilley helped arrange a sale of
24 the shell company?
25    A   As I said, there's that e-mail

238

1 chain which shows him involved, right.
2   Q   Okay.
3       And --
4       (Simultaneous Crosstalk.)
5   A   Rose is saying that he sold them
6 too.  I mean --
7       (Simultaneous Crosstalk.)
8   Q   Okay.
9   A   -- I don't put great stock in
10 what anything Rose says.  But I think he
11 knew that Dilley knew what he was doing.
12   Q   Okay.
13       MR. KRUCKENBERG:  Let's turn
14    to page 19 of our expert report.
15    Let's go towards the bottom of the
16    page.
17       THE WITNESS:  Hm-hm.
18       MR. KRUCKENBERG:  Okay.  It's
19    on the screen here.
20 BY MR. KRUCKENBERG:
21   Q   And you said you don't put great
22 stock in anything Rose said.
23       And in fact, you say something
24 similar here in your report, don't you?
25   A   Where are you pointing to?

239

1   Q   In your report, you say, "It
2 should, in my opinion, have been evident
3 to Spartan and the other defendants that
4 nothing provided by Rose and Mirman
5 should have been relied on."
6        See that?
7   A   Yes.
8   Q   And "nothing" is emphasized,
9 right?
10    A   Right.
11    Q   Okay.
12        Now, based on the documents you
13 have seen and you have reviewed in
14 preparing this report, you would agree
15 with me that both Mr. Mirman and Mr. Rose
16 furnished the defendants with notarized
17 affidavits purporting to be from the
18 issuers in this case?
19    A   Well, let's take a step back, if
20 you don't mind.
21    Q   Well, I am actually just asking
22 the question.  If you could answer that
23 and we can always discuss other things
24 later.
25    A   I don't believe I have seen

240

1 those notarized -- what were they, I'm
2 sorry?
3   Q   The affidavits purportedly from
4 the issuer that were notarized, have you
5 seen those?
6   A   I don't recall seeing those, no.
7   Q   Okay.  All right.  So let's --
8       (Simultaneous Crosstalk.)
9   A   Now, trust me, there was a pile
10 of papers.  I may have looked at it.
11   Q   Fair enough.
12       MR. KRUCKENBERG:  Let's go
13    back to Exhibit 245, that's Mr.
14    Rose's testimony.  Let's turn to
15    page 43 of this transcript.
16    Excuse me, 42.
17 BY MR. KRUCKENBERG:
18   Q   And starting at line 12, the
19 transcript says:  "I am going to show you
20 what's been marked as Exhibit Number 22."
21       And then skipping down it says,
22 "This document says at the top Principal
23 Officer/Director/Shareholder Affidavit."
24       And then skipping down the -- on
25 line 21, the question is:  "And is it an

241

1  affidavit of Mark Nicholas; is that
2  right?
3        "Answer:  Yes.
4        "Question:  And he was the CEO
5  of Kids Germ?
6        "Answer:  CEO, yes."
7        Let's go to the next page.
8        "Question:  Okay.  And is this
9  the affidavit that was supplied to
10 Spartan Securities as part of the 211
11 application?
12        "Answer:  I believe so.
13        "Question:  Turning to the last
14 page of this document, you will agree
15 with me that this is signed by Mr.
16 Nicholas; is that right?
17        "Answer:  Correct.
18        "Question:  And this is a
19 notarized signature?
20        "Answer:  Correct.
21        "Question:  And he signed it,
22 looks like, December either 7th or 9th,
23 2009; is that right?
24        "Answer:  Yes.
25        "Question:  Now, who provided

242

1  this affidavit to Spartan Securities?
2        "Answer:  It was either Al
3  Mirman or myself."
4        Do you see all that?
5   A   Yes.
6   Q   Actually, if we could go down
7  just a little bit more.
8        "Question:  Is it fair to say
9  that you or Mr. Mirman presented this
10 affidavit as being accurate?
11        "Answer:  Yes. "
12        Did you happen to review this
13 affidavit that's listed as Exhibit 22?
14  A   I don't recall it, I'm sorry.
15  Q   Okay.
16        So I am going to show you what's
17 been previously marked as Exhibit 22.
18        And looking at that document,
19 you will agree that says at the top,
20 Principal Officer/Director/Shareholder
21 Affidavit.
22        Do you see that?
23  A   Yes.
24  Q   And it says, Affidavit of Mark
25 Nicholas, right?

243

1   A   Right.
2   Q   And if we scroll down to the
3  bottom of this page, there's an exhibit
4  sticker, Exhibit 22 Rose.
5        Do you see that?
6   A   Yep.  Hm-hm.
7   Q   This is the exhibit he was being
8  asked about that we just read about;
9  isn't it?
10  A   Yes, right.
11  Q   If we turn to page 3 of this
12 exhibit, towards the bottom.
13        That's the notarized signature
14 that we are talking about, isn't it?
15  A   Okay.
16  Q   And it's your opinion that
17 nobody at Spartan Securities should have
18 relied on this document; isn't that
19 right?
20  A   That's my opinion, yes.
21  Q   Okay.
22        What basis would Spartan
23 Securities or any of the defendants have
24 had to reject a notarized document like
25 this?

244

1   A   Well, let's -- let's start at
2  the beginning and, you know, Mr. Rose
3  just stated this affidavit was presented
4  to Spartan by him.
5   Q   Okay.
6   A   I have not seen in the pile of
7  documents that I referred to, anything
8  which authorized -- on behalf of any of
9  these issuers --
10        (Simultaneous Crosstalk.)
11  Q   Okay.  And --
12  A   -- and Nicholas -- let me just
13 finish.
14        Mark Nicholas was I believe the
15 son-in-law or closely related, so he
16 could have said, you know -- of course,
17 this is my regulator coming out with my
18 suspicions of what really happened here,
19 and that's, you know, he put this in
20 front of him and told him to sign it.
21        So the fact that Spartan is
22 getting these documents notarized or not
23 from an unauthorized third-party, who, by
24 the way, one of which was expelled by the
25 NASD in 2007, I would not be relying --

James Cangiano - July 23, 2020

245

1 that goes to my whole source reliability
2 issue.
3    Q    Okay.  So let me follow-up on a
4 couple of those things.
5         You say that Rose was
6 unauthorized to provide this information.
7 How so?
8    A    I didn't say that.
9    Q    Okay.  What --
10         (Simultaneous Crosstalk.)
11   A    I said I haven't seen a document
12 which shows me he was authorized.
13   Q    Okay. Okay.
14        And is this document forged,
15 Exhibit 22?
16   A    Is this document, I'm sorry,
17 what?
18   Q    Is this document forged?
19   A    I am not going to make a
20 determination as to that.
21   Q    You don't know, do you?
22   A    Forged.  He could have just told
23 him to sign it.
24   Q    Do you know if that happened?
25        Do you have any information

246

1 about that?
2    A    Again, that's my suspicions as
3 -- for 48 years of being a regulator.
4    Q    Okay.
5         And you will agree that when a
6 Notary Public affixes a seal, that is an
7 indication that that notary has been
8 given identification by the signer and
9 that helps confirm the signer's
10 identification, right?
11   A    Yeah.  I mean, I have no doubt
12 it was, you know, notarized, apparently,
13 through the stamp and everything.
14   Q    Okay.
15        And it is your belief that
16 Spartan Securities should have
17 disregarded this affidavit?
18   A    You know, you can look at a
19 million documents and say should Spartan
20 have thrown this away.  You got to look
21 at the enormity of the situation, the
22 whole picture.  You just can't say, look,
23 here is a tree, you know, you think this
24 tree is pretty good?  You know, I would
25 say, yeah, the tree is fine, you know,

247

1 but you have to look at the forest,
2 buddy.
3    Q    Okay.
4    A    And that's what I am saying
5 here.  It looks legit.  Given the
6 context, my regulatory suspicions told me
7 it's not legit.
8    Q    Okay.
9         And based on the context, you
10 believe that Spartan Securities should
11 have rejected this document?
12   A    I believe that they should have
13 followed up on the numerous red flags
14 that were evident to anybody who wanted
15 to look.
16   Q    Okay.  That's not my question,
17 though.
18        My question is, based on the
19 context, should Spartan Securities have
20 rejected this document?
21   A    If they had done their
22 appropriate due diligence and felt that,
23 you know, there were no other red flags
24 here on its face, it looks legitimate.
25 And -- but I think given the overall

248

1 context, again, if it was me, I would
2 have rejected the document.
3    Q    Okay.
4         And it is your belief that
5 Spartan Securities should have rejected
6 the document based on the context?
7    A    I think they should have
8 rejected the whole thing.
9    Q    Okay.  Including this document?
10   A    Yeah.
11   Q    Okay.
12        And it's fair to say that if
13 there were identical affidavits for all
14 of the other issuers involved in this
15 case, Spartan Securities should have
16 rejected those as well?
17   A    In the context of what was going
18 on, they should have rejected a lot of
19 things, including the document, yes.
20   Q    Including all of the affidavits?
21   A    Yes.  That's me now.
22   Q    Right.
23        I am going to show you -- I am
24 going to show you Exhibit 21, previously
25 marked Exhibit 21.

249

1        Looking at this document, this
2   is a Form 211 application; isn't that
3   right?
4      A   Yes.
5      Q   And if we turn to page 2 of this
6   document -- you could stop right there --
7   the issuer here is Kids Germ Defense
8   Corporation; is that right?
9      A   Yes.
10     Q   This is a document that you have
11  reviewed; isn't that right?
12     A   Yes.
13     Q   Okay.
14        Let's turn to page 9 of this
15  document, and looking at page 9, this
16  says, Exhibit Index.
17        Do you see that?
18     A   Yes.
19     Q   And having reviewed this
20  document before, you are aware that
21  Spartan Securities submitted a cover
22  letter along with the Form 211
23  application; isn't that right?
24     A   That's correct.
25     Q   And in that cover letter, it

250

1   referenced a number of exhibits, right?
2      A   Right.
3      Q   And Spartan Securities submitted
4   these exhibits along with the
5   application, right?
6      A   Right.
7      Q   And that's in addition to the
8   information required under Rule 2-11;
9   isn't that right?
10     A   That's right.
11     Q   Now, if we look at this page,
12  there are -- if you scroll down
13  slightly -- there are six exhibits
14  listed; isn't that right?
15     A   Yes.
16     Q   Exhibit 1 is Director's
17  Affidavit, right?
18     A   Yes.
19     Q   Exhibit 2, Articles of
20  Incorporation and Bylaws.
21        Exhibit 3, Corporate Overview.
22        Exhibit 4, D&O Questionnaires
23  and Background Checks.
24        Exhibit 5, Sub Agreements and
25  Respective Checks.

251

1        Do you see all that?
2      A   Yes.
3      Q   And then Exhibit 6 says,
4   Certified Shareholder List, to be
5   provided, right?
6      A   Right.
7      Q   And so we can agree that Spartan
8   Securities submitted all these documents
9   along with the application, right?
10     A   Appears that way, yes.
11     Q   And from all of the 211
12  applications that you have reviewed that
13  were submitted by Spartan in this case,
14  you will agree with me that these
15  exhibits are present in every one of the
16  applications; isn't that right?
17     A   Yes.
18     Q   Okay.
19        Did you -- did you review all
20  these exhibits, all these documents?
21     A   Some of them.  Some of them.
22     Q   Do you know if you reviewed all
23  of them?
24     A   All of them for all 19 issuers?
25  Probably not.

252

1      Q   Okay.
2        Do you recall reviewing any of
3   the subscription agreements and
4   respective checks for any of these
5   issuers?
6      A   I don't believe I looked at the
7   subscription agreements or the checks,
8   no.
9      Q   Similar to my question about the
10  affidavits, it's your opinion that if any
11  of these documents that are listed as
12  exhibits, any of those were provided to
13  Spartan by other than Mr. Mirman or Mr.
14  Rose, you believe they should have been
15  rejected by Spartan Securities; isn't
16  that right?
17     A   I think that -- again, given the
18  overall context of what those gentlemen
19  were trying to do and some of the fact
20  that they were not authorized to act on
21  behalf of the issuer, the fact that, you
22  know, Dilley had -- Dilley had, not an
23  obligation, but Dilley should have
24  followed up with the issuer, I think
25  there was a question on one of the

253

1 depositions, Did you ever talk to Mark
2 Nichols?  He said, No.  I think Rose said
3 he didn't have to.  All the CEOs were the
4 same.
5        So all the context, right, I
6 think they should have rejected
7 everything and gone and find another
8 client.
9    Q    Okay.
10        So the short answer to my
11 question is, they should have rejected
12 these documents; is that right?
13    A    In the overall context of what
14 was going on, yes.
15    Q    Okay.
16        MR. KRUCKENBERG:  So let's
17    turn to page 18 of this
18    document -- excuse me, let's --
19    let's actually -- excuse me, to
20    Exhibit 30, what's previously been
21    marked Exhibit 30.
22 BY MR. KRUCKENBERG:
23    Q    This appears to be another Form
24 211 application; isn't that right?
25    A    Right.

254

1    Q    And if we turn to page 2, this
2 is for Envoy Group Corporation, right?
3    A    Yep.
4    Q    This is another 211 application
5 you reviewed, right?
6    A    Yes.
7    Q    Okay.
8        If we turn to page 9 of this
9 document, at the bottom of the page, this
10 is another -- I can show you another part
11 of the document if it will help.
12    A    Okay.
13        MR. KRUCKENBERG:  Let's go
14    back up to the preceding page, the
15    top of the page.
16 BY MR. KRUCKENBERG:
17    Q    And you will agree with me,
18 looking at that, this is a letter to
19 FINRA on Spartan Securities letterhead;
20 this is a cover letter, right?
21    A    Right.
22    Q    Associated with filing the Form
23 211 application?
24    A    Hm-hm.  Yes.
25        MR. KRUCKENBERG:  And then if

255

1    we go down to the next page, at
2    the bottom.
3 BY MR. KRUCKENBERG:
4    Q    Once again, we have a reference
5 to, "Enclosed please find the following
6 documents."
7        Do you see that?
8    A    (Reviewing)  Okay.
9    Q    And again, there's a reference
10 to subscription agreements and respective
11 checks and an officer's affidavit.
12        Do you see that?
13    A    Yes.
14    Q    Okay.
15        And I asked you generally, but
16 have you -- did you review the
17 subscription agreements and respective
18 checks for -- associated with this Form
19 211 application?
20    A    I think the answer I said was
21 no.  I don't recall those.
22    Q    Okay.
23        (Simultaneous Crosstalk.)
24    A    Again, now --
25    Q    There's a lot of exhibits right?

256

1    A    -- pretty substantial here.
2    Q    Okay.
3        MR. KRUCKENBERG:  Let's go to
4    page 18 of this document.
5 BY MR. KRUCKENBERG:
6    Q    And if we look at the top of the
7 page, there looks to be a letter on Envoy
8 Group letterhead, addressed to Mr. Taylor
9 Zajonc at Spartan Securities Group,
10 Limited?
11        Do you see that?
12    A    Yes.
13    Q    And it's subject line, Envoy
14 Group Corp. Common Stock FINRA Matter.
15        Do you see that?
16    A    Yes.
17    Q    And this is a letter from Envoy
18 Group in response to FINRA comments from
19 the Form 211 application; isn't that
20 right?
21    A    Okay.  Yes.
22        MR. KRUCKENBERG:  If we
23    scroll down to the bottom of this
24    document.  Let's turn the page.
25 BY MR. KRUCKENBERG:

257

1    Q    It appears to be signed by
2  Jocelyn Nicholas; is that right?
3    A    It appears to be, yes.
4    Q    I assume your opinion is the
5  same about this document, that's, in
6  context, Spartan Securities should have
7  rejected this communication from the
8  issuer?
9    A    Well, again, you can go -- you
10 can go document by document and I keep
11 going back to the fact that if it was me
12 and my firm and I am seeing all these red
13 flags, I am not -- I am dealing with guys
14 that have been barred by NASD, guys that
15 eventually will go to jail for this
16 stuff, I am not buying any of it.
17   Q    All right.  When you say that
18 "they would eventually go to jail for
19 this stuff," do you know when they went
20 to prison?
21   A    I know it was after the conduct.
22   Q    And so obviously, you wouldn't
23 expect Spartan Securities to know they
24 are going to go to prison?
25   A    No.  But I think that, you know,

258

1  that the record pretty much shows based
2  on e-mail chains that I have seen and
3  correspondence and conversations and
4  depositions, that there was sufficient
5  red flags here to question everything.
6    Q    Okay.
7        MR. KRUCKENBERG:  So I am
8    going to show you just one set of
9    documents briefly and then we will
10   take a break.
11       THE WITNESS:  I'd appreciate
12   that.
13       MR. KRUCKENBERG:  Let me show
14   you Exhibit 246.
15       (Exhibit 246, Subscription
16   Agreement, is Marked.)
17 BY MR. KRUCKENBERG:
18   Q    And looking at that document in
19 front of you, this is the first page of a
20 subscription agreement signature page for
21 Envoy Group Corporation.
22   Do you see that?
23 A  Yes.
24   Q    And that appears to be the
25 subscription agreement that was

259

1  referenced in the cover letter we were
2  just discussing; isn't that right?
3    A    Right.
4    Q    Okay.
5        Now, if we scroll down a little
6  bit.  It says, The subscriber
7  acknowledges, represents and warrants --
8  midway down the page -- as of the date of
9  this subscription agreement that: 1.  No
10 person has made to the subscriber any
11 written or oral representations:  That
12 any person will re-sell or repurchase the
13 common shares; (b), that any person will
14 refund the purchase price of the common
15 shares; or (c), as to the future price or
16 value of the common shares.
17       Do you see that?
18 A   Yes.
19   Q    Okay.
20       If we scroll down, there's a
21 handwritten name Arthur Nersisyan.
22       Do you see that?
23 A   Yes.
24       MR. KRUCKENBERG:  Let's turn
25   the page.  Let's scroll down to

260

1    the bottom.
2  BY MR. KRUCKENBERG:
3    Q    There's a signature block,
4  right?
5    A    Right.
6    Q    It appears to be signed; is that
7  right?
8    A    Yes.
9    Q    And there's a box marked
10 driver's license and it's checked.
11   Do you see that?
12 A   Right.
13   Q    And below that it says,
14 Acceptance of subscription, and it's
15 signed by Jocelyn Nicholas, right?
16 A   Right.
17       MR. KRUCKENBERG:  I am going
18   to turn the page 1 more time.  Go
19   to page 3.
20 BY MR. KRUCKENBERG:
21   Q    That's the photocopy of a
22 driver's license, right?
23 A   Okay.
24   Q    Do you see that?
25 A   Yes.

James Cangiano - July 23, 2020

261

1    Q    It appears to be the photocopy
2 of the license for Arthur Nersisyan, and
3 that is the person who signed the
4 subscription agreement, right?
5    A    Right.
6    Q    Okay.
7        So you will agree that certainly
8 appears that Mr. Nersisyan signed this
9 agreement, right?
10   A    On its face, yes, it appears
11 that way.
12   Q    I will turn the page 1 more
13 time.
14        There's a photocopy of a check
15 isn't there?
16   A    Yes.
17   Q    From Arthur Nersisyan pay to the
18 order of Envoy Group Corp., and it's the
19 price of the shares, right?
20   A    Right.
21   Q    So there is -- you will agree
22 with me that this documentation -- this
23 documents Mr. Nersisyan's purchase of
24 shares in Envoy Group Corporation; isn't
25 that right?

262

1    A    Yes.
2    Q    You will agree with me also that
3 Spartan Securities gathered identical
4 documentation for every shareholder for
5 Envoy Group; isn't that right?
6    A    It appears that way, yes.
7 Hm-hm.
8    Q    All right.  And --
9        (Simultaneous Crosstalk.)
10   A    Assuming it was from these
11 people.
12   Q    Okay.  And --
13        (Simultaneous Crosstalk.)
14   A    I haven't done an investigator
15 or taken anybody under oath, et cetera,
16 et cetera.  So on its face what you're
17 showing me appears okay.
18   Q    Okay.  Right.
19        And are these documents forged,
20 do you know?
21   A    Like I said, on its face it
22 seems okay.  I am not going to make a
23 determination as to whether -- I am not a
24 handwriting expert.
25   Q    Okay.

263

1        And again, your -- your opinion
2 is that Spartan Securities, in context,
3 should have rejected these documents as
4 well?
5    A    In the overall context, yes.
6    Q    Okay.
7        MR. KRUCKENBERG:  I think that
8 is a good time -- good place for us to
9 take a break.  So why don't we take
10 10 minutes, if that's okay with
11 everybody.  Come back about 2:25.
12       THE WITNESS:  Okay.
13       (Whereupon a Recess Commenced
14   at 2:16 p.m. and Testimony
15   Recommenced at 2:29 p.m.)
16       MR. KRUCKENBERG:  Let's
17   switch gears a little bit.  Let's
18   go back to Exhibit 225, which is
19   your expert report.  And let's
20   turn to page 19.  Let's go to the
21   very bottom of page 19, and looks
22   like Roman numeral iii, Micah
23   Eldred Companies.
24 BY MR. KRUCKENBERG:
25   Q    Do you see that?

264

1    A    Yes.
2    Q    When you reference Micah Eldred
3 Companies, these are the companies where
4 Mr. Eldred signed as a principal the Form
5 211 application; isn't that right?
6    A    Yes.
7    Q    Okay.
8    A    I think the distinctions made in
9 the Complaint as well.
10   Q    Okay.
11       These companies, as you indicate
12 on page 19, these companies were, quote,
13 controlled by Harrison and Daniels; is
14 that right?
15   A    That's right.
16   Q    Turning the page.
17       You reference a company called
18 Dinello; is that right?
19   A    Yes.
20   Q    And another, Court Document
21 Services Incorporated.
22   A    Right.
23   Q    And one of the red flags you
24 identify in your report is that these
25 companies had changed ownership shortly

265

1  after being quoted on a bulletin board;
2  isn't that right?
3     A    That they changed ownership
4  shortly after -- would you point that out
5  to me?
6     Q    Sure.  Let me ask it a slightly
7  different way.
8        There's a paragraph about
9  halfway down the page, it starts,
10  Again...
11        And in that paragraph, it says,
12  "Again, the shares were registered with
13  the intention of selling it as a shell
14  even though the S-1 stated that, 'We do
15  not foresee any circumstances that would
16  cause us to alter our current business
17  model within the next 12 months.'"
18        Do you see that?
19   A   Yes.
20    Q    And based on your review of the
21  records, Dinello Corporation -- that's
22  what is referenced here -- Dinello,
23  shortly after the quotation was
24  cleared -- or it was clear for quotation,
25  the company changed ownership and it

266

1  engaged in a merger, right?
2     A   I believe that's right.
3     Q    Okay.
4        And so you -- you point to the
5  issuer's intention of selling the company
6  as a shell, right?
7     A   Right.
8     Q    And you say that contradicts the
9  statement in its S-1 registration
10  statement, right?
11    A   It doesn't necessarily
12  contradict it but it's not what happened.
13    Q    Okay.
14        And you believe that Spartan
15  Securities, once this company changed
16  ownership, it should have been alert to
17  the idea that Harrison and Daniels did
18  not have a genuine intent to operate its
19  companies; is that right?
20    A    Again, Caleb, you're looking at
21  one tree.
22    Q    Okay.
23    A    You got to look at the forest.
24        One of the, you know, one of the
25  elements -- I believe -- I know it's in

267

1  the Complaint, I am pretty sure.  Again,
2  I don't -- I don't -- I only go through
3  the Complaint one or two times because I
4  just want to make an independent
5  judgment.  But the Complaint has a --
6  (Audio Distortion) -- which the SEC
7  claims in their Complaint is indicative
8  of a shell factory.  And one of the
9  things is it becomes public, changes its
10  name, and sold in a short period of time
11  and they have a schedule.
12    Q    Okay.
13    A    That's what this paragraph was
14  pointing to.
15    Q    Okay.  And --
16        (Simultaneous Crosstalk.)
17    A    But again, it's the overall
18  context rather than this one particular
19  company.
20    Q    Understood.
21        So in context, and let's talk
22  about all the issuers, then, one of the
23  red flags or one -- one of the things
24  that you believe that Spartan should have
25  investigated further, is the fact these

268

1  issuers changed ownership; isn't that
2  right?
3     A   Yeah.  Again, as overall part
4  and parcel of every other red flag they
5  have.
6     Q    Okay.
7        You will agree this is one of
8  them that you considered to be important?
9     A   Yes.
10    Q    Okay.
11        You will also agree with me, and
12  I think you just said this, the language
13  you quote from Dinello's S-1, it wasn't
14  necessarily untrue; isn't that right?
15    A    Yeah.  I mean, it's a statement
16  that just didn't happen.
17    Q    Right.
18        They anticipated they would
19  continue to operating, but they didn't?
20    A    Now, again, you know, I haven't
21  taken anybody on the record.  I haven't
22  questioned anybody under oath.  But you
23  know, the circumstances tell me that
24  maybe they weren't being quite open and
25  above board here because the intention

269

1  was to sell and they did sell.  Again --
2       (Simultaneous Crosstalk.)
3     Q    Okay.
4     A    -- didn't put anybody under oath
5  to tell me that.
6     Q    So let's -- one of the documents
7  you reviewed in preparing your report was
8  Diane Harrison's deposition from
9  January 10, 2020; isn't that right?
10    A    Yes.
11        MR. KRUCKENBERG:  Okay.  I am
12    going to show you it's been marked
13    Exhibit 247.
14        (Exhibit 247, Diane Harrison
15    Transcript, is Marked.)
16  BY MR. KRUCKENBERG:
17    Q    And looking at that first page,
18  if we can scroll down just a little bit.
19        You will agree this is Ms.
20  Harrison's deposition transcript?
21    A    Correct.
22    Q    Okay.  Let's turn to page 42, on
23  page 42 let's go to line 3.
24        And I will represent to you this
25  is referencing the Dinello S-1

270

1  registration statement that we just
2  discussed.
3     A    Okay.
4     Q    Okay.
5        And based on that
6  representation, Ms. Harrison was asked
7  the question:  "It says:  The company has
8  not held any discussions with anyone
9  regarding any merger or acquisition.
10       "Do you see that?
11       "Answer:  Yes.
12       "Question:  And was that true
13  when you wrote that?
14       "Answer:  Yes."
15       Do you see that?
16    A    Yes.
17    Q    You will agree with me that Ms.
18  Harrison testified under oath that the
19  statement in the S-1 registration was
20  true, right?
21    A    Okay.
22        MR. KRUCKENBERG:  And let's
23    turn to page 187 of this
24    transcript.  Actually, 177.
25  BY MR. KRUCKENBERG:

271

1     Q    At the bottom of the page, and
2  line 23, Ms. Harrison is asked the
3  question:  "Isn't it true that it was
4  your intention to bring the company
5  public and then look for a reverse merger
6  candidate?"
7        And again, this is in reference
8  to Dinello.
9        And then turn the page.
10       "Answer:  That was not my
11  intention."
12       Do you see that?
13    A    Yes.
14    Q    So you will agree with me that
15  Ms. Harrison also testified under oath
16  that that was not her intention; she did
17  not intend to change control of
18  Dinello --
19       (Simultaneous Crosstalk.)
20    A    Yes.
21    Q    -- when she filed the
22  registration?
23    A    Apparently yes, Hm-hm.
24    Q    Now your conclusion -- your
25  conclusions in your expert report, you

272

1  believe otherwise; isn't that right?
2     A    That's right.
3     Q    So it's fair to say you believe
4  Ms. Harrison was not being truthful in
5  her deposition?
6     A    Again, you know, I haven't
7  interviewed her.  I haven't put her under
8  oath.  I haven't investigated her on the
9  face.  She is saying wasn't the
10  intention, but as the facts played out,
11  that's what happened.
12    Q    Okay.  So --
13       (Simultaneous Crosstalk.)
14    A    Back to the statement that we
15  read before from the prospectus, there
16  may have been -- no problem with the
17  language.  However, I look at the action
18  and the facts.
19    Q    Based on the action and the
20  facts that you reviewed, you believe that
21  Ms. Harrison's intention was to sell the
22  company in a reverse merger; isn't that
23  right?
24    A    I don't know -- well, again, I
25  am not getting into state of mind or a

273

1 scienter or any of that because that's
2 not my purview but I am showing you what
3 the facts show.
4     **Q    And isn't it correct, though,**
5 **that you have written in your expert**
6 **report that the Five, which includes Ms.**
7 **Harrison, they formed these companies**
8 **with the intent to sell them in -- in**
9 **changes of control on the market; isn't**
10 **that right?**
11     A   Yes.
12     **Q    So that is what you believe the**
13 **evidence shows, right?**
14     A    That's what I believe there are,
15 you know, substantial indicia -- if you
16 look at the overall report -- that, in my
17 opinion, is what happened.
18     **Q    Okay.**
19       **And you believe that Ms.**
20 **Harrison was not being truthful in her**
21 **deposition; is that right?**
22     A    Again, I am not going to comment
23 on that --
24       (Simultaneous Crosstalk.)
25     **Q    And --**

274

1     A   -- and I don't do that.
2     **Q    Okay.**
3       **And that's because you never**
4 **examined Ms. Harrison, and you never**
5 **spoke to her; is that right?**
6     A    Well, you know, again, scienter
7 is proven by the attorneys and accepted
8 by the court.  And that is a state of
9 mind thing that I don't delve into.
10     **Q    Okay.**
11       **But my question is, your**
12 **conclusions --**
13     A    My conclusions are based on the
14 facts that I reviewed, based on reviewing
15 the documents in Exhibit A.
16     **Q    Okay.**
17     A    The facts here lead me to
18 believe, as does the schedule and the
19 SEC's report, which is -- in the
20 Complaint, which is factual, that there
21 is a very strong indication that it's not
22 coincidental that all these companies
23 were brought public, had a change of
24 name, and sold.
25     **Q    And if it were not --**

275

1       (Simultaneous Crosstalk.)
2     A   In this period of time.
3     **Q    It was not coincidental, that**
4 **would mean that Ms. Harrison is not being**
5 **truthful?**
6     A    Well, that's for the jury to
7 figure out.
8     **Q    What is your opinion about her**
9 **testimony?**
10     A    She was not being truthful but
11 my opinion doesn't matter much.
12     **Q    Okay.**
13     A    At issue.
14       MR. KRUCKENBERG:  All right.
15     I am going to show you what's been
16     marked as Exhibit 42.
17 BY MR. KRUCKENBERG:
18     **Q    Looking at the first page of**
19 **that document, you will agree with me**
20 **that this is a Form S-1/A Amendment 6 for**
21 **Dinello Restaurant Ventures,**
22 **Incorporated; is that right?**
23     A    Correct.
24     **Q    That's the S-1 we have been**
25 **discussing, correct?**

276

1     A   Yes.
2     **Q    And you quote this document in**
3 **your expert report; isn't that right?**
4     A    I believe I do, yes.
5     **Q    And it's fair to say you have**
6 **reviewed this document isn't it?**
7     A    Most of it.
8     **Q    Okay.**
9       MR. KRUCKENBERG:  Let's turn
10     to page 48 of this document.
11 BY MR. KRUCKENBERG:
12     **Q    Right here at the top of the**
13 **page -- I guess the first full**
14 **paragraph -- this document says, "In the**
15 **event we are unable to generate..."**
16       **Do you see that?**
17     A    Yes.
18     **Q    And the second sentence of that**
19 **paragraph says, "If we are pursued by a**
20 **larger company for a business**
21 **combination, we will analyze all**
22 **strategies to continue the company and**
23 **maintain or increase shareholder value.**
24 **Under these circumstances, we would**
25 **consider a merger, acquisition, joint**

277

1  venture, strategic alliance, a rollup, or
2  other business combination for the
3  purposes of continuing the business and
4  maintaining or increasing shareholder
5  value.  Management believes its
6  responsibility to maintain shareholder
7  value is of paramount importance, which
8  means the company should consider the
9  aforementioned alternatives in the event
10 funding is not available on favorable
11 terms to the company when needed."
12       Do you see all that?
13  A   Yes.
14  Q   You will agree with me that is
15 an indication in the S-1 that the company
16 would consider a merger or other business
17 combination if an appropriate opportunity
18 arose; isn't that right?
19  A   Yes.
20  Q   And you would expect Spartan
21 Securities to have considered this
22 language when reviewing the S-1
23 registration statement and submitting a
24 Form 211 application, wouldn't it?
25  A   I would hope they reviewed the

278

1  S-1.  I am not sure they did but I would
2  hope so.
3   Q   You would hope they would look
4  at this language, right?
5   A   Yes.
6   Q   Okay.
7   A   I am not testifying that they
8  did but --
9   Q   Sure.  Of course.
10  A   -- because they didn't.
11  Q   Now, did you review the other
12 S-1 registration statements for the
13 issuers that were associated with Ms.
14 Harrison and Mr. Daniels?
15  A   Some of them.
16  Q   Okay.
17      MR. KRUCKENBERG:  I am going
18 to show you what's been marked
19 Exhibit 248.
20      (Exhibit 248, OGC-569 (TOPW
21 S1), is Marked.)
22 BY MR. KRUCKENBERG:
23  Q   So if we look at top of that
24 page, this is a Form S-1/A/12 --
25 Amendment 12 -- to a registration

279

1  statement for Top to Bottom Pressure
2  Washing Incorporated.
3       Do you see that?
4   A   Yes.
5   Q   Based on your review of the
6  record, you will agree with me that this
7  is one of the so-called Harrison Daniels
8  companies, right?
9   A   Correct.
10  Q   All right.  Turn -- and this was
11 an effective registration statement,
12 declared effective by the SEC?
13  A   I believe it was, yes.
14  Q   Okay.
15      MR. KRUCKENBERG:  Let's turn
16 to page 4 of this document.
17      THE WITNESS: (Reviewing.)
18 BY MR. KRUCKENBERG:
19  Q   The heading at the top of the
20 page says, Part I - Information Required
21 in Prospectus Summary.
22      Do you see that?
23  A   Yes.
24  Q   Let's go down to the third
25 paragraph, and I understand the text is

280

1  kind of small so let me know if you have
2  trouble reading it.
3   A   No problem.  Okay.
4   Q   The paragraph starts, "The
5  analysis of new business
6  opportunities..."
7       Do you see that?
8   A   Yes.
9   Q   Second sentence of that
10 paragraph says, "As of this date, the
11 company has not entered into any
12 definitive agreement with any party, nor
13 have there been any specific discussions
14 with any potential business combination
15 candidate regarding business
16 opportunities for the company.  The
17 registrant has unrestricted flexibility
18 in seeking, analyzing and participating
19 in potential business opportunities.  In
20 its efforts to analyze potential
21 acquisition targets, the registrant will
22 consider the following kinds of factors."
23      Do you see that?
24  A   Yes.
25  Q   And then it lists factors it

281

1  would consider, right?
2      Do you see that?
3    A   Yes.
4    Q   And actually if we go up a
5  little bit, the second paragraph, it
6  starts, "The company is organized..."
7      Do you see that?
8    A   Yes.
9    Q   It says, "As a 'blank check'
10  company, we have operated as a pressure
11  washing business since our inception in
12  May of 2006 and continue to do so.  We
13  will consider a merger acquisition or
14  business combination if an appropriate
15  target company is found."
16      Do you see that?
17    A   Right.
18    Q   So looking at this registration
19  statement, it would not be surprising if
20  this company entered into a merger
21  acquisition, would it?
22    A   No.
23    Q   Okay.
24    A   And the reason to me why it
25  wouldn't be surprising, because in order

282

1  to supply Andi Fan with shells, the modus
2  operandi was to go out and find local
3  businesses such as the pizzeria and the
4  pressure washing company, and get them to
5  the point they could be sold to Mr. Fan.
6    Q   Okay.
7      And I am talking about --
8      (Simultaneous Crosstalk.)
9    A   And --
10    Q   -- registration statement.
11    A   Trust me, it's not because of
12  the language in the prospectus, it's
13  because of the other factors.
14    Q   Okay.
15      Well, let's confine just for the
16  moment, looking at the language in this
17  prospectus.
18      This company is indicated it is
19  a blank check company, right?
20    A   Yes.
21    Q   It's indicated that we will
22  consider a merger, acquisition, or
23  business combination, right?
24    A   Right.  I am not quarreling with
25  what is in the prospectus.  Just giving

283

1  the context.
2    Q   And looking at the prospectus,
3  one would not be surprised if it then end
4  in to a merger or acquisition, would you?
5    A   That's right.
6    Q   Okay.
7      Now PurpleReal.com was another
8  one of the Harrison and Daniels issuers;
9  isn't that right?
10    A   Yes.
11    Q   Now, we know that
12  PurpleReal.com, it's Form 211 application
13  was never cleared by FINRA; is that
14  right?
15    A   That's right.
16    Q   That corporation was never -- it
17  never changed ownership, did it?
18    A   I don't believe so, right.
19      MR. KRUCKENBERG:  So let's --
20    let's go back to your report, your
21    expert report which is
22    Exhibit 225.  Let's turn to page
23    23.
24  BY MR. KRUCKENBERG:
25    Q   There's a heading there taking

284

1  about Island Transfer; isn't that right?
2    A   Yes.
3    Q   And according to the first line
4  of that section you say, "In the instant
5  case, the stock transfer process also had
6  to be addressed in order for the shells
7  to be successfully sold."
8      Do you see that?
9    A   Yes.
10    Q   Now, I asked you earlier -- I
11  just want to clarify -- you did not
12  review Island Transfer's files concerning
13  the transfers of any of these shares;
14  isn't that right?
15    A   Well, there was some Island
16  Transfer files in the record that was
17  provided to me, mostly ledgers relating
18  to debits and credits; in other words,
19  who were submitting certificates and who
20  were certificates being issued so I saw
21  some of those.
22    Q   Some of those?
23    A   Every record, no.
24    Q   Okay.
25      Now, in your report, you

James Cangiano - July 23, 2020

285

1 reference particularly transfers
2 involving Global Group and First
3 Independence Corporation; isn't that
4 right?
5    A   Yes, I believe that's right.
6    Q   Okay.
7        You are of the opinion that
8 Island Transfer should have rejected the
9 transfer instructions from those two
10 issuers; isn't that right?
11   A   This purpose of this section is
12 to really highlight the red flags that
13 Island Transfer should have, you know,
14 taken on and done something with, so if
15 the ultimate due diligence ended up in
16 rejection, which, you know -- again, if I
17 was running the firm, I would reject it.
18   Q   Okay.
19   A   So, you know, same answer.
20   Q   Okay.
21       Is it fair to say you think
22 Island Transfer should have rejected the
23 transfer instructions --
24       (Simultaneous Crosstalk.)
25   A   Based on their own procedures.

286

1    Q   -- issuers --
2    A   Their procedures had all the red
3 flags that you ever want to look at, they
4 just didn't follow.
5    Q   Okay.
6        And so that is a yes?
7    A   Yes.
8        MR. KRUCKENBERG:  So I am
9 going to show you what's been
10 marked as Exhibit 249?
11       (Exhibit 249, Subscription
12 Agreement Signature Page, First
13 Independence, is Marked.)
14 BY MR. KRUCKENBERG:
15   Q   If we scroll up to the top, this
16 document is a subscription agreement
17 signature page.
18       Do you see that?
19   A   Yes.
20   Q   And it's related to First
21 Independence Corporation, right?
22   A   Yes.
23   Q   And that's one of the one
24 issuers I just asked you about concerning
25 transfer instructions; isn't that right?

287

1    A   Yes.
2    Q   And you will agree with me that
3 a transfer agent would normally gather
4 subscription agreements for the
5 shareholders or certificates -- it's
6 transferring, right?
7    A   Normally, yes.
8    Q   And you will agree with me that
9 Island did, in fact, gather those
10 documents; isn't that right?
11   A   I can't say yes or no to that.
12 I am not -- I don't know.
13   Q   All right.
14       If we scroll down a little
15 bit -- this looks like subscription
16 agreement signature page, this looks very
17 similar to another one we looked at
18 earlier; isn't that right?
19   A   Yes.
20   Q   And if we turn the page, to page
21 2 -- filled out by someone named Andrea
22 Cappelli; is that right?
23   A   Right.
24   Q   It appears to be, right?
25   A   Right.

288

1    Q   And if we turn to page 3, this
2 document is signed, appears to be, by Mr.
3 Cappelli.
4    A   If you say so.
5    Q   There's a signature?
6    A   Right.  I mean, I can't make out
7 what the signature says but I am
8 assuming, right.
9    Q   If we scroll down a little bit
10 to the bottom, this appears to be signed
11 by Bruno O. Pasqualli, President of First
12 Independence Corp., as well; is that
13 right?
14   A   Yes.
15       MR. KRUCKENBERG:  Let's turn
16 the page 1 more time.
17 BY MR. KRUCKENBERG:
18   Q   There's a photocopy of a
19 driver's license for Andrea Cappelli,
20 right?
21   A   Right.
22   Q   And that seems to associate with
23 the person who signed the subscription
24 agreement?
25   A   Yeah.  It kind of looks like the

289

1 other guy, but -- yeah.
2       MR. KRUCKENBERG:  Okay.  And
3   then let's go one more page.
4 BY MR. KRUCKENBERG:
5   Q   It's a photocopy of the check,
6 right?
7   A   Right.
8   Q   And that's from Andrea Cappelli,
9 pay to the order of First Independence
10 Corporation?
11  A   Right.
12  Q   This appears to be Mr.
13 Cappelli's -- payment for Mr. Cappelli's
14 purchase of those shares?
15  A   Appears to be, yes.
16  Q   Okay.
17      And those documents all appear
18 to be genuine, don't they?
19  A   On their face, yes.
20  Q   Okay.
21      MR. KRUCKENBERG:  So I am
22   going to show you now Exhibit 250.
23      (Exhibit 250, Transfer
24   Journal, is Marked.)
25 BY MR. KRUCKENBERG:

290

1   Q   Let's turn to page 2 of this
2 document.
3       Looking at this document, this
4 appears to be a cover sheet related to
5 First Independence Corp.; is that
6 correct?
7   A   Yes.
8   Q   The next page, page 3, at the
9 top we see the words "Transfer Journal."
10      Do you see that?
11  A   Yes.
12  Q   For Island Stock Transfer, First
13 Independence Corp.?
14  A   Right, that's what I was
15 referring to earlier.
16  Q   Okay.
17      And this indicates -- a transfer
18 journal indicates when shares are being
19 transferred, right?
20  A   Right.
21  Q   And this is something a transfer
22 agent would normally make, right?
23  A   Correct.
24  Q   And if we look at the left,
25 there's a debits column, right?

291

1   A   Right.
2   Q   On the right is a credits
3 column?
4   A   Right.
5   Q   So if we look at the top line,
6 for example, someone named Nancy Gordon,
7 and it looks like her shares are being
8 credited to Hudson Park Capital, right?
9   A   Hm-hm.  Yes.
10  Q   So this is an indication that
11 her shares have been transferred.
12      Ms. Gordon's shares have been
13 transferred to Hudson Park Capital,
14 right?
15  A   Well, the amounts are different.
16  Q   Okay.
17  A   She's got 125; Hudson only has
18 104,167.
19  Q   Okay.
20  A   It's not a share for share.
21  Q   Okay.
22      So we will say it appears some
23 of the shares were transferred.  Is that
24 more accurate?
25  A   That's more accurate.

292

1   Q   Okay.
2       So looking down on the debits
3 column, we look down, you might recognize
4 the name Andrea Cappelli.
5       Do you see that?
6   A   Yes.
7   Q   And this is -- this would appear
8 to correspond to the documents we were
9 just looking at with the subscription
10 agreement; isn't that right?
11  A   Right.
12  Q   Now, looking at this first page,
13 if we could scroll up a little bit.
14      Mr. Cappelli has an address in
15 Florida, right?
16  A   Right.
17  Q   Ms. Gordon, the top line, has an
18 address in Michigan, right?
19  A   (Reviewing.)  Yes.  I am sorry.
20  Q   So let's turn to page 21 --
21 actually, hold on.  Before we do that.
22      Looking at Andrea Cappelli on
23 this transfer journal, it appears that he
24 did transfer at least a portion of his
25 shares; isn't that right?

293

1    A    Yes.
2    Q    Okay.
3         MR. KRUCKENBERG:  So let's go
4    to page 21 -- you could zoom out a
5    little bit -- and Kevin, thank you
6    for rotating that.
7  BY MR. KRUCKENBERG:
8    Q    If we look at page 21, this
9  appears to be a canceled stock
10  certificate; isn't that right?
11   A    Appears to be, yes.
12   Q    And it is in the name Andrea
13  Cappelli, right?
14   A    Yes.
15   Q    Okay.
16        Let's go to the next page, page
17  22.  The document says "Stock Power."
18        Do you see that?
19   A    Yes.
20   Q    It says, "The undersigned does
21  hereby irrevocably constitute a point
22  Island Stock Transfer to transfer the
23  said stock on the books of said company
24  with full power of substitution in the
25  premises."

294

1         Do you see that?
2    A    Yes.
3    Q    And it's signed, it appears to
4  be, by Andrea Cappelli.
5    A    Yeah, it appears to be.
6    Q    Okay.
7         Let's scroll down a little bit
8  to the bottom of this page, a there's a
9  medallion signature guaranteed; isn't
10  that right?
11   A    Yes.
12   Q    A medallion guarantee is an
13  indication that an authorized institution
14  has certified that this is an accurate
15  signature; isn't that right?
16   A    Yes.
17   Q    And in this case, this is -- the
18  medallion guarantee is affixed by PNC
19  Bank National Association.
20        Do you see that?
21   A    Yes.
22   Q    And so to get a medallion
23  guarantee by PNC Bank, Mr. Cappelli would
24  have had to go to a bank and sign in
25  front of a witness, who then signed to

295

1  confirm his identification; isn't that
2  right?
3    A    Apparently, yeah.
4    Q    Okay.
5         And PNC Bank, that is a
6  reputable institution, isn't it?
7    A    Yes.
8    Q    In your experience, if you saw a
9  medallion guarantee issued by PNC Bank,
10  you would -- would you rely on that to
11  think this is genuine signature; isn't
12  that right?
13   A    Yeah, under normal circumstances
14  I would.
15   Q    Okay.
16   A    However, on signing a stock
17  certificate that was designed by Mr.
18  Rose, I am not sure it would be on the up
19  and up since he had no association with
20  the company.
21   Q    So my question, then, is that
22  should Island Stock Transfer have
23  disregarded this medallion signature?
24   A    I think I stand by my previous
25  answer, that given the existence of red

296

1  flags and the overall context of this,
2  the fact that Rose had no authorization
3  to do anything, and that he was putting
4  this company on a fast track, and that he
5  was -- mailed all the stock certificates,
6  and that ultimately, the First
7  Independence, as I testified before,
8  became a pump-and-dump operation, I would
9  have some concerns, yes.
10   Q    Okay.
11        So based on the documents that
12  you have seen, you would agree with me
13  that Island Stock Transfer had directions
14  from Andrea Cappelli to transfer his
15  stocks; isn't that right?
16   A    In a vacuum, as a standalone
17  tree, I agree with it.
18   Q    These are unequivocal directions
19  to transfer the shares; isn't that right?
20   A    It appears to be just that, yes.
21   Q    And you will agree with me that
22  this is a medallion guaranteed signature
23  that appears to be genuine, correct?
24   A    Yes.
25   Q    Okay.

297

1      And it is also your belief that
2  in context, Island Stock Transfer should
3  have refused that instruction?
4      A    That's right.
5          Well, let me say that again.  If
6  it was me, I would have refused it.
7      Q    Okay.
8          And you will agree with me that
9  Island Stock Transfer received identical
10  instructions, all with medallion
11  guaranteed signatures, for every transfer
12  that's at issue in this case; isn't that
13  right?
14      A    Right.  But I mean, this implies
15  that -- again, here is my trouble with
16  it, if I may elaborate a little bit.  I
17  think what you are suggesting is a
18  transfer agent has -- (Audio Distortion)
19  -- to accept documents with appropriate
20  presentation.
21          And I am saying generally, that
22  is the case.  In this case, I don't think
23  they should have.
24      Q    Okay.
25      A    Because I don't think it was

298

1  appropriate presentation.
2      Q    And that's because --
3          (Simultaneous Crosstalk.)
4      A    -- or from a reliable source.
5      Q    Okay.
6          So you believe this was not an
7  appropriate presentation because it was
8  not from a reliable source; is that
9  right?
10      A    Yeah, among other factors, yes.
11      Q    Okay.
12          You write in your report that
13  Island should have considered red flags
14  before processing these transfers --
15      A    Right.
16      Q    -- isn't that right?
17      A    That's correct.
18      Q    What imposes an obligation on a
19  transfer agency to investigate red flags?
20      A    I think they have that --
21  certainly the SEC thinks they have an
22  obligation based on their enforcement
23  actions, which we discussed earlier in
24  the microcap space.
25          So that to the extent that they

299

1  could be held liable under an aider and
2  abetter situation, I think that, you
3  know, they need to take care so they
4  don't fall into, particularly in the
5  microcap space now, those issues with
6  respect to unregistered distribution,
7  removing legends when they are not
8  supposed to, unregistered distributions
9  of the said and other fraudulent
10  practices.
11          I think it is their obligation
12  to, quote/unquote, act as the lead -- as
13  the gatekeeper there and not get caught
14  as aider and abetter in a scheme.
15      Q    Okay.
16          When we talked about red flags
17  and we looked at guidance earlier, you
18  will agree with me all those guidance
19  documents that you referenced, those
20  relate to Rule 2-11, right?
21      A    That's right.
22      Q    There's no similar red flag
23  guidance document concerning Section 5,
24  is there?
25      A    Well, to the extent that there

300

1  are adjudicated SEC cases in a transfer
2  agent space, I would hope that, you know,
3  whoever is looking at them in terms of
4  compliance for the transfer agent would
5  be aware of those, yes, particularly if
6  they are doing transfers of microcap
7  companies.
8      Q    Okay.
9          So my question is, there's no
10  published guidance from the SEC
11  concerning transfer agents in the
12  presence of red flags, right?
13      A    Well, I think there's guidance
14  on some of the releases that we have
15  talked about earlier but there's no rule.
16      Q    Right.
17          And the guidance you are
18  referencing, that's the guidance we have
19  already discussed?
20      A    Yes.
21      Q    Okay.
22          What enforcement action
23  specifically are you referencing?
24      A    I think they are footnoted in my
25  report.  Registrar and transfer is one of

301

1 them, you know, there's about four, five
2 of them.
3    Q    Okay.
4         And is it fair to say if there
5 is a relevant enforcement action that you
6 think Island should have considered, that
7 it is in your expert report?
8    A    Say that again, I'm sorry.
9    Q    Is it fair to say that if there
10 is a relevant enforcement action related
11 -- looking for red flags for transfer
12 agents, you have cited it in your report?
13   A    Yes.
14   Q    Okay.
15        You will agree with me that
16 Island Transfer agency did not file any
17 Form 211 applications; isn't that right?
18   A    That's right.
19   Q    And you will agree with me that
20 Spartan Securities did not act as a
21 transfer agent in any instance?
22   A    That's right.
23   Q    You will also agree with me that
24 David Lopez, one of the defendants in
25 this case, did not sign any of the Form

302

1 211 applications mentioned in the
2 Complaint?
3    A    I think that's right, yes.
4    Q    Now, you will agree with me that
5 all of the issuers in this case filed
6 registration statements that were
7 declared effective; isn't that right?
8    A    Yes.
9    Q    And you will agree with me that
10 all of the transfers were for registered
11 shares; isn't that right?
12   A    I believe so, yes.
13   Q    And you will agree with me that
14 Island Stock Transfer received attorney
15 opinion letters saying that these shares
16 were properly registered or exempt?
17   A    Yes.
18   Q    Now, you agree with me when a
19 stock certificate is stamped with a
20 restrictive legend, that doesn't
21 necessarily mean it's either properly
22 registered or unregistered, right?
23        MS. JOHNSON:  Object to form.
24        THE WITNESS:  Alise, did you
25   say something?

303

1         MS. JOHNSON:  I objected to
2 the form.  If you understand the
3 question, of course, answer it.
4         THE WITNESS:  I think I do
5 but please repeat it.
6 BY MR. KRUCKENBERG:
7    Q    Sure.  Let me try to rephrase
8 it.
9         You are familiar with a
10 restrictive legend on a stock
11 certificate, right?
12   A    Correct.
13   Q    And that is a stamp basically
14 that says the stock is either restricted
15 or unrestricted, right?
16   A    Well, it says restricted.
17   Q    Right.
18        If there is no stamp, it's
19 presumably unrestricted?
20   A    Presumably.
21   Q    You will agree with me that the
22 presence or absence of that stamp does
23 not determine whether the stock is
24 properly registered?
25   A    When you say "registered," are

304

1 you talking about like an S-1
2 registration?  I mean, they are both
3 covered by the S-1 registration.  Both --
4 both legended and unlegended generally.
5    Q    And I guess my question is --
6        (Simultaneous Crosstalk.)
7    A    Some of the restriction, you
8 know, I don't think there are any, for
9 example, S-8 stock in this particular
10 case.  So I am assuming they were all
11 covered under the S-1, is what I am
12 saying.
13   Q    Okay.
14        So for example, if a certificate
15 is marked as restricted, that doesn't
16 determine either way whether it was
17 properly registered in an S-1?
18   A    No.
19   Q    Okay.
20        And you will agree with me that
21 shares that are marked restricted can be
22 transferred, can't they?
23   A    Upon proper documentation, yes.
24   Q    Yeah.
25        In fact, there -- restricted

305

1  shares are transferred all the time,
2  aren't they?
3     A    Correct.
4        MR. KRUCKENBERG:  Going back
5     to your expert report.  Let's go
6     to page 13 of Exhibit 225 -- page
7     13.
8  BY MR. KRUCKENBERG:
9     Q    At the very top of the page you
10 write, "In the instant case, it is
11 significant to note that a more complete
12 and highly detailed discussion of 15c2-11
13 and the enumeration of red flags is
14 contained within Spartan's supervisory
15 procedures."
16       Do you see that?
17    A    Yes.
18    Q    One of the bases of your
19 opinions in this report is that Spartan
20 Securities failed to follow its own
21 Written Supervisory Procedures; isn't
22 that right?
23    A    In the context of not following
24 up on red flags, yes.
25    Q    Okay.

306

1        You will agree with me that a
2  broker-dealer can always adopt more
3  stringent Written Supervisory Procedures
4  than those required by a regulation; is
5  that right?
6     A    Absolutely, sure.
7     Q    You will also agree with me when
8  a broker-dealer does that, it does not
9  have a legal obligation to follow its own
10 procedures; isn't that right?
11    A    You mean the ones that go above
12 and beyond or generally?
13    Q    Above and beyond.
14    A    Well, I think if they are in the
15 procedures, they are procedures, so they
16 should be followed.
17    Q    Okay.
18    A    He chose to put them in there,
19 so I am assuming the principals of the
20 broker-dealer would want them to be
21 followed.
22    Q    Okay.  They should be followed.
23       Does that mean if they are not
24 followed, then they have broken the
25 securities laws?

307

1     A    I think if they are not
2  followed, they run the risk of breaking
3  the securities laws; not necessarily a
4  violation on its face.
5     Q    Okay.
6        Is there a rule that says that
7  if a broker-dealer fails to follow its
8  Written Supervisory Procedures, that
9  alone is a violation of the law?
10    A    There is.
11    Q    And what rule is that?
12    A    FINRA rule -- it's a FINRA rule.
13 I can give you the cite.  I don't know it
14 off the top of my head.
15    Q    Is there a SEC rule?
16    A    I don't believe there's an SEC
17 rule.  There's a FINRA rule that relates
18 to supervisory procedures.  It's in
19 there.
20       MR. KRUCKENBERG:  Okay.  So
21    let's turn to page 25.  If we look
22    at the top of page 25 of your
23    expert report -- actually, if we
24    scroll down about midway through
25    the page.

308

1  BY MR. KRUCKENBERG:
2     Q    So you write, "In addition to
3  the due diligence list, Spartan's
4  procedures covered in great detail..."
5        Do you see that?
6     A    Yes.
7     Q    And you're talking again about
8  the Written Supervisory Procedures for
9  Spartan?
10    A    Right.
11    Q    Okay.
12       And you have a quoted section
13 that's in italics.  You quote the manual
14 as saying, "Spartan shall seek a written
15 statement from the issuer attesting to
16 the accuracy of the information."
17       Do you see that?
18    A    (Reviewing.)  The paragraph that
19 begins, "In order to establish a
20 reasonable basis for belief..."?
21    Q    Yes.
22    A    Yep.
23    Q    And you believe that Spartan
24 Securities failed to follow this
25 obligation; isn't that right?

309

1    A    That's right.
2    Q    And as we discussed earlier, in
3  every instance Spartan Securities
4  gathered an affidavit, notarized, signed
5  by the issuer; isn't that right?
6    A    This is in the context, again,
7  of red flags, of which there were
8  substantial amounts. And you know, the
9  fact that their main source of
10  information -- relying companies were
11  Mirman/Rose, et al. And I don't think
12  they got information directly from the
13  issuer.
14        If they did get information from
15  the issuer, it was filtered through Rose
16  and Mirman and the others. So, I --
17        (Simultaneous Crosstalk.)
18    Q    What I'm asking you --
19    A    -- I would say that, you know,
20  in this case they could have asked for
21  written statement from the issuer;
22  however, I wouldn't put much stock in it.
23    Q    Okay.
24        Now I'm asking you specifically
25  with respect to the provision, you will

310

1  agree with me that Spartan did, in fact,
2  receive a written statement from the
3  issuers attesting to the accuracy of the
4  information, didn't they?
5    A    I think so in some cases, yes.
6        MR. KRUCKENBERG: Let's turn
7  to page 26 of this document.
8  BY MR. KRUCKENBERG:
9    Q    The second paragraph is
10  italicized and once again you're quoting
11  from the Written Supervisory Procedures
12  manual, right?
13    A    Yes.
14    Q    And that provision says, "It
15  shall be the responsibility of the CCO,
16  or other designated officer, together
17  with the associated person responsible
18  for originating the file to collectively
19  review the material aspects of the file
20  and to make notation of such review by
21  signing the Form 211."
22        Do you see that?
23    A    Right.
24    Q    Now, in every instance, the Form
25  211 applications were signed by the

311

1  designated officer for Spartan Securities
2  and that was either Carl Dilley or Mike
3  Eldred; is that right?
4    A    Yes.
5    Q    David Lopez was the CCO?
6    A    Yes.
7    Q    David Lopez never signed any of
8  the Form 211s, right?
9    A    I think I testified I don't
10  believe he did.
11    Q    Okay.
12        And so, according to that part
13  of the Written Supervisory Procedures
14  manual, David Lopez would have no
15  obligation to sign or review the Form 211
16  applications; isn't that right?
17    A    Well, it says the CCO or other
18  designated officer.
19    Q    Right.
20        And the other designated officer
21  in the instances we are talking about
22  here, were the principles of the firm,
23  Mike Eldred and Carl Dilley?
24    A    Right. But in the Procedures he
25  was given the responsibility if he, you

312

1  know, chose to do that.
2    Q    Right.
3        But with respect to the 19
4  issuers involved in this case, he didn't?
5    A    Right. Correct.
6        MR. KRUCKENBERG: Mr.
7  Cangiano, let's take about
8  10 minutes, and for the court
9  reporter, I actually mean that, I
10  promise. I just need to confer
11  with counsel and we will be back
12  in just a few minutes.
13        THE WITNESS: Certainly.
14  Thank you.
15        (Whereupon a Recess Commenced
16  at 3:26 and Proceedings
17  Recommenced at 3:40 p.m.)
18        MR. KRUCKENBERG: Mr.
19  Cangiano, I don't have any other
20  questions for you and I thank you
21  very much for your time today.
22        THE WITNESS: Well, thank you
23  for your time and your
24  thoroughness and your letting me,
25  you know, get my points on the

313

1    record.  I appreciate that.
2        MR. KRUCKENBERG:  Sure.
3        MS. JOHNSON:  Thank you and
4    we would like to read.
5        THE WITNESS:  What is that?
6        MS. JOHNSON:  I am telling
7    the court reporter you want to
8    read the depo.  There was a lot of
9    cross talk so --
10       MR. KRUCKENBERG:  And we
11   would like an expedited
12   transcript, if we could.
13       THE REPORTER:  When do you
14   want it?
15       MR. KRUCKENBERG:  What is the
16   standard turnaround time?
17       THE REPORTER:  It's
18   two weeks.  Tell me when you want
19   it and you will have it.  Today is
20   Thursday.
21       MR. KRUCKENBERG:  Can we have
22   it by next Wednesday?
23       THE REPORTER:  Yes.
24       (Witness to Read and Sign.)
25       (Whereupon Testimony

314

1    Concluded at 3:41 p.m.)

315

1            A C K N O W L E D G E M E N T
2    STATE OF _____
3    COUNTY OF _____
4
5            I, the undersigned, hereby
6    certify that I have read the transcript
7    of my testimony taken under oath in my
8    deposition; that the transcript is a true
9    and complete and correct record of my
10   testimony, and that the answers on the
11   record as given by me are true and
12   correct.
13
14       _____
15   JAMES CANGIANO
16
17       Signed and subscribed to before
18   me
19       This _____ day of
20   _____, 20__.
21
22       _____
23   Notary Public
24
25

316

1            I, S. Arielle Santos, Certified
2    Shorthand Reporter, Certified LiveNote
3    Reporter do hereby certify:
4    That prior to being examined, the witness
5    named in the forgoing deposition, was by
6    me duly sworn to testify the truth, the
7    whole truth, and nothing but the truth.
8    That said deposition was taken before me
9    at the time and place set forth and was
10   taken down by me in shorthand and
11   thereafter reduced to computerized
12   transcription under my direction and
13   supervision, and I hereby certify the
14   foregoing deposition is a full, true and
15   correct transcript of my shorthand notes
16   so taken.
17   I further certify that I am neither
18   counsel for nor related to any party to
19   said action nor in anywise interested in
20   the outcome thereof.
21
22       _____
23
     S. Arielle Santos, CCR, CLR
24
25

**$**

**$385** 65:8

**$50** 106:24 107:21

**(**

**(1)** 93:8 124:20 162:6 206:4

**(2)** 93:9 125:2 206:9

**(2019)** 92:15 104:4 120:25

**(3)** 125:7 216:6

**(4)** 125:16

**(5)** 125:24

**(a)** 91:2 121:11 122:2,4,10,13 124:1,6
127:16 129:24 139:10 205:20 215:16

**(a)(1)** 146:23

**(a)(2)** 105:7

**(b)** 122:7 259:13

**(c)** 170:20 259:15

**(i)** 93:9 105:12 126:5 190:9 191:9

**(v)** 126:11

**(x)** 126:20

**1**

**1** 118:6 250:16 259:9 260:18 261:12
288:16

**1-** 37:15

**10** 45:6,8,21,25 46:1,4 47:6 54:3
71:13 84:16,18 118:3 263:10 269:9
312:8

**10(a)** 124:22

**104,167** 291:18

**10:22** 84:21

**10:35** 84:22

**10b-5** 203:9

**11** 175:8 233:3,5

**12** 240:18 265:17 278:25

**125** 291:17

**12:15** 180:19,23

**12:45** 180:20

**12:48** 180:24

**13** 125:9 196:8 232:17 305:6,7

**131** 223:5

**14** 196:11 200:20 219:14

**144** 207:21 210:1,20,22 212:6

**15** 30:24 43:20 45:6,8,25 46:1,4 47:7
119:5 204:11,22 219:9,11 234:24
235:2

**15(c)211** 46:9

**15(d)** 125:9

**15A** 30:24

**15c2-11** 30:6 45:3,18 46:11,13,24
47:8 48:4,10 53:20 54:22 55:11 57:10
58:3 67:19 118:15 119:12,22 120:15
132:25 145:19 160:24 305:12

**15c3-5** 70:7

**16** 128:16 230:23 236:14,20

**17** 92:14 104:3,10 120:24 198:2
199:16

**177** 159:11 172:1 270:24

**18** 135:21 198:18 219:10 253:17
256:4

**187** 270:23

**19** 88:3,17 176:3 193:20,22 194:13,18
196:25 197:14 199:2,6,25 229:5,6,12
238:14 251:24 263:20,21 264:12
312:3

**1933** 91:9 117:16

**1934** 67:12 105:24 107:16 108:2

**1971** 31:5 118:15 177:20

**1972** 27:19 28:12,14 30:2 37:6,7 45:9

**1973** 28:25

**1975** 27:10,16 28:24 30:2,11 41:22
42:13 45:23

**1981** 27:16 41:23 42:13 45:9 47:20
48:5,14

**1984** 48:14 50:16 145:4,14,19 150:21

**1986** 50:16 51:8 53:17 56:22

**1990** 120:16

**1991** 119:5,15,25 123:3 131:6 144:23
148:1,6,13,17 149:8 151:13 158:8

**1998** 51:8 53:18 56:22 58:15,18,20

**1999** 59:14 159:21,25 170:15

**2**

**2** 14:24 15:4 249:5 250:19 254:1
287:21 290:1

**2,000** 37:14,15

**2-11** 55:10,22 121:7 136:20 137:11
139:5 140:16,17 141:11 142:16,19
144:23 159:25 160:5 162:8 167:11
172:9 174:2 176:19 178:9 180:4
250:8 299:20

**20** 54:3 113:13

**20-F** 98:3 101:14

**200** 37:12 52:14

**2001** 27:10 28:5 31:6 37:10,25 59:15
60:13,17 61:3 62:17

**2004** 60:17 64:2

**2005** 97:5 98:12,15 100:22

**2006** 281:12

**2007** 32:3 107:10 244:25

**2008** 72:12

**2009** 180:3 241:23

**2010** 75:20

**2011** 76:18 78:12

**2015** 120:9 177:10 220:4,18 221:6

**2017** 80:13

**2019** 83:3 176:15 177:6 232:18

**2019-1630-0001** 178:17

**2020** 269:9

**208** 223:3

**21** 174:12 240:25 248:24,25 292:20
293:4,8

**211** 29:20 44:23 66:3,15 67:1 68:8
69:7 72:24 76:11 77:7 78:4,12 81:23
83:18 84:5,7 85:12,21 128:25 129:20
136:2 141:14 142:8 143:7,25 241:10
249:2,22 251:11 253:24 254:4,23
255:19 256:19 264:5 277:24 283:12
301:17 302:1 310:21,25 311:15

**211s** 311:8

**22** 98:12 141:23 240:20 242:13,17

243:4 245:15 293:17

**225** 11:3,4 14:24 71:3 86:25 102:5 118:2 135:19 175:7 196:4 219:8 227:7 236:15 263:18 283:22 305:6

**226** 12:8,9 13:8,22 84:25

**227** 14:5,6 22:18 48:25 50:14 60:1

**228** 66:13,14

**23** 271:2 283:23

**230** 92:13,14

**230.405** 91:8,18 92:14

**230.419** 104:3,11

**231** 97:22,23

**232** 104:2,3 109:11

**234** 115:24,25

**235** 120:23,24

**236** 145:1,2

**237** 148:10,11

**238** 178:15,16

**239** 186:20,21

**240** 146:11 204:10,11 220:9

**240.12g3-2b** 125:19

**240.15c2-11** 118:7 120:25 146:15

**242** 214:23,24

**244** 222:16,17

**245** 232:10,11 240:13

**246** 258:14,15

**247** 269:13,14

**248** 278:19,20

**249** 286:10,11

**25** 43:21 168:2,6 307:21,22

**250** 289:22,23

**26** 171:13,25 310:7

**27** 221:11

**28** 164:21 174:12

**29** 222:7

**29094** 131:6

**2:16** 263:14

**2:25** 263:11

**2:29** 263:15

---

**3**

**3** 60:15 98:18 104:6 121:2 130:20 190:8 204:14 243:11 250:21 260:19 269:23 288:1 290:8

**30** 23:9 44:17 253:20,21

**31-page** 11:17

**32-year** 39:10

**34** 30:25 107:7

**34-87115** 176:5

**35** 155:3 179:2

**37** 160:9

**3:26** 312:16

**3:40** 312:17

**3a51-1** 105:21

---

**4**

**4** 27:25 51:5 60:5 140:23 156:15,19 211:25 250:22 279:16

**40** 44:18 170:12

**405** 94:7

**419** 109:1

**42** 164:5 240:16 269:22,23 275:16

**43** 240:15

**47** 167:23

**48** 246:3 276:10

**49** 65:17

---

**5**

**5** 48:24 71:4,5 126:5 151:24 202:8,12, 22 203:6,7,13 204:5,25 205:3,6,12 206:16 208:1,3 209:11,20 211:7 212:16,22 217:24 250:24 299:23

**50** 214:19

**50,000** 65:17

---

**6**

**6** 22:20 27:14 41:23 49:4,5 80:12

152:2 251:3 275:20

**63** 233:2,3

**64** 234:23

**6432** 67:21 68:11,19 69:4,12

**65** 234:20

---

**7**

**7** 87:1,3 101:4,6 145:24

**72** 45:16,17

**75** 27:22 45:16,17 46:6,25 47:13

**77e** 204:11,17,23 205:19

**7th** 241:22

---

**8**

**8** 91:2 92:17 102:7 145:23 159:21 214:8

**8-401** 214:24 215:3

**8-K** 98:3 101:13 117:14

**8-ks** 97:13

**80** 46:25

**81** 45:24 46:7

**84** 150:15,23 151:2

---

**9**

**9** 227:5,12,13,20 249:14,15 254:8

**91** 150:16,23 151:5

**9310** 119:7

**9th** 241:22

---

**A**

**a.m.** 84:21,22

**abetter** 299:2,14

**abetters** 201:17 202:16

**ability** 34:6

**absence** 157:5,14 158:19,21 303:22

**absent** 151:18 180:9

**absolutely** 75:16 183:6,11 219:5 226:6 306:6

**accept** 188:13 297:19

**Acceptance** 260:14

**accepted** 82:21 84:4,10 274:7

**accepts** 167:7

**access** 58:21 70:8,9 86:14 100:4
116:23 117:2,4

**accountant** 157:24 159:3

**accounting** 117:10

**accuracy** 165:18 166:12 171:4
308:16 310:3

**accurate** 88:7 89:4 122:11 131:12
151:9 154:12 191:11 223:17 242:10
291:24,25 294:14

**acknowledges** 259:7

**acquaintances** 230:4

**acquirers** 117:19

**acquires** 114:13,14

**acquisition** 105:16 270:9 276:25
280:21 281:13,21 282:22 283:4

**acronym** 30:14

**act** 30:25 67:12 91:9 105:24 107:7,16
108:1 117:16 119:6 124:22 125:10
131:5 201:5 202:8 212:1 252:20
299:12 301:20

**action** 18:3 19:8 43:6 44:5,6 138:15
224:9 225:4 272:17,19 300:22 301:5,
10

**actions** 17:9 19:13 34:6 200:12
202:2,4 203:13 225:8,9 226:7,20,25
227:21 298:23

**active** 183:18

**activities** 16:7 19:15 38:22 56:3

**activity** 41:8 169:19

**acts** 121:15

**actual** 228:25

**add** 13:12

**addition** 31:8 117:17 151:16 250:7
308:2

**additional** 45:24 46:2,5 97:7 154:4,9
166:25 189:21 212:6

**Additionally** 193:11

**address** 99:11 126:7,17 223:24
225:1 226:8 292:14,18

**addressed** 256:8 284:6

**addresses** 100:23

**addressing** 225:16

**adequate** 143:21 218:23,25

**adjudicate** 213:7

**adjudicated** 88:12 225:8 300:1

**adopt** 306:2

**adopted** 101:10 118:15 119:25
120:9 134:21 214:18 220:21,25
225:15

**adopting** 99:10 119:6,15 151:13,15

**advertising** 38:14,15 39:25

**advisors** 99:13

**Advocacy** 116:10

**affidavit** 240:23 241:1,9 242:1,10,13,
21,24 244:3 246:17 250:17 255:11
309:4

**affidavits** 239:17 240:3 248:13,20
252:10

**affiliated** 127:6

**affiliates** 207:20

**affirmed** 7:1

**affixed** 294:18

**affixes** 246:6

**aforementioned** 277:9

**agency** 35:10 86:6 134:15 172:15
220:18 298:19 301:16

**agent** 35:14,24 56:9 65:23 73:3
76:14 77:11 78:8,13,17 82:2 123:23
126:18 129:10 185:1,5,11 186:5,10,
21 187:3,25 188:14,15 190:4,9,13,17
191:9,11,22 201:11 202:13,19 203:20
213:12 216:14,16 217:21 222:9,22
224:7 287:3 290:22 297:18 300:2,4
301:21

**agent's** 186:3 200:25 219:18

**agents** 35:6,10 36:10 50:3,7,9 56:6,
15 78:21 84:12 157:22 191:18 201:5
203:12 213:24 214:13 217:1 218:8,
13,19 221:20 222:18 300:11 301:12

**agents'** 223:14,24

**agree** 69:3 80:20,24 87:12 91:19
92:24 94:14 96:9,21,25 99:22 100:1
102:16 104:18 106:15,21 107:18

109:18 110:4 112:1,19 115:7,9,15
117:22 118:9 119:24 120:13 123:10,
14 128:15 129:8 130:8 131:16 134:14
137:11 142:17 144:15 149:6,20
151:12,21 153:21 155:12,20 156:9
157:13 162:5 163:24 167:14 171:8
173:25 174:23 176:17,21,25 177:8
178:20 180:2 182:12 183:5 184:4,17
186:2,9 192:9 206:19,25 208:5,6
209:8 212:14 214:11 216:13 218:17,
21,25 220:24 221:5 222:8,23 225:18,
21 226:1 228:17 229:4 230:16 231:21
232:15 233:21 235:23 239:14 241:14
242:19 246:5 251:7,14 254:17 261:7,
21 262:2 268:7,11 269:19 270:17
271:14 275:19 277:14 279:6 287:2,8
296:12,17,21 297:8 299:18 301:15,
19,23 302:4,9,13,18 303:21 304:20
306:1,7 310:1

**agreed** 75:17 213:2

**agreement** 235:8 258:16,20,25
259:9 261:4,9 280:12 286:12,16
287:16 288:24 292:10

**agreements** 250:24 252:3,7 255:10,
17 287:4

**agrees** 190:5

**ahead** 13:18 47:25 139:23 167:8

**aider** 299:1,14

**aiders** 201:16 202:16

**alert** 266:16

**alike** 170:1

**Alise** 21:10,24 22:7 57:12,20 135:1,
10 302:24

**allegation** 19:24 20:13

**allegations** 73:10,21 87:9,13

**allege** 34:25 162:1,24

**alleged** 20:10 199:22

**alleges** 88:23 89:23

**alliance** 277:1

**allowed** 34:19

**alter** 265:16

**alternative** 115:4

**alternatives** 277:9

**amended** 120:10 188:17

**amendment** 120:1 144:22 145:18

159:25 160:18 176:18,22 275:20
278:25

**amendments** 99:4,10 101:13 123:3
146:9 148:18 149:8 160:24 172:25
179:15 223:24

**amount** 93:12 126:13

**amounts** 291:15 309:8

**analysis** 280:5

**analyst** 53:5 54:9

**analysts** 52:3

**analyze** 49:21 276:21 280:20

**analyzing** 280:18

**Andi** 282:1

**Andrea** 287:21 288:19 289:8 292:4,
22 293:12 294:4 296:14

**animal** 141:8

**announcement** 99:8

**annual** 125:8

**annuity** 81:5

**answers** 9:1

**anti-fraud** 133:2 161:18 177:22
202:7 203:8 204:4 217:24

**anticipated** 268:18

**anticipation** 183:16

**anymore** 62:14 182:21

**apologize** 90:1

**apparent** 201:18

**apparently** 246:12 271:23 295:3

**appeared** 65:2

**appears** 14:10 121:8 148:20 187:6,
20 232:21 251:10 253:23 257:1,3
258:24 260:6 261:1,8,10 262:6,17
287:24 288:2,10 289:12,15 290:4
291:22 292:23 293:9,11 294:3,5
296:20,23

**appendix** 160:13,21

**apple** 70:22

**apples** 134:23 149:24

**applicability** 192:14

**applicable** 120:3 189:14,16

**application** 39:4 58:6 66:3,9 84:5

118:11 142:9,15,20 143:7,15,20,25
144:4,7,12 241:11 249:2,23 250:5
251:9 253:24 254:4,23 255:19 256:19
264:5 277:24 283:12

**applications** 55:3,4,15,21 77:7 78:4
81:23 83:18 85:21 136:2 144:17
251:12,16 301:17 302:1 310:25
311:16

**applied** 148:1

**applies** 123:18 137:11 207:9 213:23

**apply** 101:14 123:22 137:1 140:17
142:12 153:22 165:9 184:5,18 190:25
193:13 207:14

**applying** 39:24

**approximately** 43:22 44:14 47:6

**arbitration** 71:21 80:14,17,21

**arbitrators** 81:18

**area** 40:12 46:9,11 48:19 171:17
201:16

**areas** 29:3 40:17,19 64:18 91:14
104:21

**argue** 133:7

**arguing** 156:17

**arisen** 118:17

**arm** 30:18 31:25

**arose** 56:4 63:9 277:18

**arrange** 237:23

**Arrangements** 188:17

**Arthur** 259:21 261:2,17

**Article** 214:8

**Articles** 250:19

**artificial** 96:12,13

**Arts** 23:6

**asks** 188:23

**aspect** 39:13

**aspects** 75:15 310:19

**aspiration** 111:18

**aspirations** 113:15

**assertion** 81:15

**assessment** 174:1 221:18

**Asset** 192:2

**asset-backed** 93:7

**assets** 92:5 93:10,12,14 95:23 108:9,
17,21 109:2,21

**assist** 162:7

**assistance** 163:17

**assisting** 162:19

**associate** 48:15 49:9 50:22 288:22

**association** 30:15 35:14,25 36:1
294:19 295:19

**associations** 35:12

**assume** 9:16,25 257:4

**assuming** 174:6 199:23 216:21
262:10 288:8 304:10 306:19

**assumption** 8:9 199:14,19

**assurances** 216:7

**attempting** 225:6

**attended** 23:15,24

**attention** 135:6 161:19,20 196:7
198:17

**attestation** 185:1,5 186:5,10,22
187:4,25

**attesting** 308:15 310:3

**attorney** 157:24 159:2 221:25
237:15 302:14

**attorneys** 18:23 52:3 274:7

**ATX** 140:25

**audio** 42:22 79:15 114:20 128:2
133:25 138:19 207:20 211:3 267:6
297:18

**August** 69:22 98:12

**authority** 32:9 34:14 36:22

**authorization** 296:2

**authorized** 189:9 216:8 244:8
245:12 252:20 294:13

**automatically** 113:6

**avails** 128:24

**aware** 20:24 36:22 55:1 214:17
218:11 220:20 224:17 249:20 300:5


**B**

**Bachelor** 23:6

**back** 14:23 21:4,15 28:11 29:5 30:4, 12,20 31:4 41:22 55:9 57:18,22,23 61:15 71:3 84:25 86:24 102:5 109:4 118:1 130:18,20 135:18 143:16 155:1 167:4,7 170:11 175:6 180:20 219:7,8, 12 222:7 224:21 227:5 236:13 239:19 240:13 254:14 257:11 263:11,18 272:14 283:20 305:4 312:11

**background** 13:12 129:15 250:23

**bags** 182:19

**balance** 126:25

**bank** 294:19,23,24 295:5,9

**banks** 184:13,15

**barred** 257:14

**based** 75:24 87:11 88:7 89:4 91:8 97:16 122:3 138:12 174:5 199:15 200:11 216:11 217:23 226:6 228:3 229:11 239:12 247:9,18 248:6 258:1 265:20 270:5 272:19 274:13,14 279:5 285:25 296:11 298:22

**bases** 305:18

**basically** 234:14 303:13

**basis** 63:20 90:23 122:8,17,22,23 123:2 131:10 147:15,18 149:11,12 150:5 151:3,7,17 154:10 166:12 183:19 210:2,9 228:12 230:11 243:22 308:20

**beat** 25:13

**beginning** 125:17 244:2

**begins** 308:19

**behalf** 62:5 127:8,12 128:20 195:23 231:25 244:8 252:21

**belief** 136:17 237:21 246:15 248:4 297:1 308:20

**believed** 74:3

**believes** 277:5

**believing** 122:10 131:11 147:16,19 151:3,8 154:11 166:12

**benefit** 198:6

**bigger** 98:22,24 147:2 157:10 188:6

**binding** 135:13 221:1

**bit** 18:2 21:5 48:13 50:14 51:4 61:15 62:23 66:24 90:20 98:11 116:14 119:3 121:12 125:1 130:23 135:20 142:6 145:8 152:4 168:3 170:11

**background** 171:16,17 175:11 179:10 181:2,5 201:20 211:18 227:17 231:1 236:18 242:7 259:6 263:17 269:18 281:5 287:15 288:9 292:13 293:5 294:7 297:16

**bite** 70:22

**blank** 66:14 67:4 87:20 95:11,17 102:2,8,18,24 103:16 104:14,20 105:8 106:3 108:7,10,19 109:2,20,23 110:4,7,15 111:8,21 112:3,6,13,14,22 113:2,20,25 281:9 282:19

**blanks** 192:13

**block** 260:3

**blocked** 221:12,16

**board** 67:14 126:24 265:1 268:25

**bold** 130:21

**bolster** 53:6

**Boock** 78:10,25 79:21,25

**book** 182:7

**books** 29:9 53:14 54:6,16 293:23

**bottom** 22:25 60:15 90:22 92:20 98:9 104:8 109:10 119:2 135:22 145:25 146:3,15 151:25 154:2 164:6 168:1 170:20 176:4 196:14 200:23 204:14 219:13,15 220:2 221:12 232:15 238:15 243:3,12 254:9 255:2 256:23 260:1 263:21 271:1 279:1 288:10 294:8

**box** 260:9

**boy** 42:17

**break** 10:4,10 18:1 57:16 83:22,25 84:15 142:5 171:18 181:3 201:19 258:10 263:9

**breakdown** 194:20

**breaking** 307:2

**briefly** 27:25 258:9

**bright** 236:25

**bring** 46:12 271:4

**broad** 152:24

**broader** 117:5

**broke** 114:22

**broken** 306:24

**broker** 121:17,23 123:20 127:4,9 131:17 146:24 147:8,14 165:20

**broker-dealer** 29:5,10 38:15 58:2 65:20 67:18 127:17,24 128:20 129:1, 3,9,14 131:10,21 132:8 136:18,25 137:17 139:4,6 140:5 141:12 143:7, 16 144:11 150:7 154:8,15 155:21 156:12 157:18 158:17,25 162:10 164:1,19 165:14 166:1,10,23 167:5 169:9 171:2 172:7 173:4 174:25 177:25 178:6 179:18 180:6 306:2,8, 20 307:7

**broker-dealer's** 54:21 120:14 127:19 160:23

**broker-dealers** 29:25 38:13 41:19 55:3,14 64:13 70:10 120:4 123:19 135:12 152:15 161:9 162:7 165:6 172:3,12 175:20 184:15 193:24

**brokers** 123:19 131:4

**brought** 79:3 274:23

**Bruno** 288:11

**buddy** 247:2

**bullet** 15:15,18 198:6 229:21

**bulletin** 67:14 116:1,8 265:1

**bullets** 198:5

**bunch** 141:2

**Burden-hours** 172:2

**business** 17:2 19:1 92:7 93:19 94:20,24 95:23 96:3,22 100:9,24 101:9,17,20 102:11 105:14,15 106:4, 17 109:13,14 111:5,9,15,19,21 112:4, 9,11,16,20,24,25 113:3,9,11,13,25 114:20 126:19 153:14 179:21 265:16 276:20 277:2,3,16 280:5,14,15,19 281:11,14 282:23

**business's** 193:2

**businesses** 282:3

**buying** 257:16

**Bylaws** 250:20

**C**

**Caleb** 7:17 21:7 25:4 57:11 107:4 188:7 208:11,12 266:20

**call** 212:8

**called** 72:11 90:23 95:3 100:23 116:16 131:1 184:25 200:24 212:9 264:17

**calling** 112:24,25 209:14

**calls** 237:15

**Campbell** 61:11

**canceled** 293:9

**candidate** 271:6 280:15

**Cangiano** 7:1,11,12,13 84:3,24
159:14 181:1 187:3 211:3,5 312:7,19

**cap** 16:15

**capable** 29:11

**capacity** 34:5 51:14,17 55:19 70:18

**capital** 29:9,12 43:11 93:19 100:5,18
116:23 291:8,13

**capitalized** 92:4

**Cappelli** 287:22 288:3,19 289:8
292:4,14,22 293:13 294:4,23 296:14

**Cappelli's** 289:13

**care** 299:3

**career** 14:20 39:11,12 41:18

**careful** 169:23

**carefully** 203:1

**Carl** 311:2,23

**carried** 49:12 206:10

**carry** 17:1 19:1 30:25 62:4 206:9

**case** 7:19,21 10:19,24 11:15 13:20
14:1 19:25 26:21 51:20 52:1,4 53:6
55:24 58:15 65:5,13,14 69:23 70:12
72:10,11,23 74:20 75:1,19 76:10
77:1,6,13 78:3,10,11,21,23 79:2,6,13
80:11 81:22 82:22 83:17 85:2,16
86:7,18 144:15 165:9 193:5 225:20
228:16,18 229:8 230:19 234:1 239:18
248:15 251:13 284:5 294:17 297:12,
22 301:25 302:5 304:10 305:10
309:20 312:4

**cases** 18:18 52:14,21 53:15 54:5
64:19 88:12,13 165:3 168:11 186:14
203:3,21 300:1 310:5

**cash** 93:11,13

**Catch** 141:23

**caught** 299:13

**cautionary** 169:22

**CCO** 310:15 311:5,17

**CEO** 230:5 241:4,6

**CEOS** 235:16 253:3

**certificate** 23:21 185:22 186:6
293:10 295:17 302:19 303:11 304:14

**certificated** 215:17

**certificates** 182:1,5,20 183:3 234:15
284:19,20 287:5 296:5

**certification** 138:13 191:19,21

**certified** 251:4 294:14

**certify** 138:8

**cetera** 13:1,12 25:16 26:23 41:20
43:16 52:24 70:19 74:1 91:3 172:13
201:17 229:3 262:15,16

**CFR** 92:14 104:3,11 120:24

**chain** 237:19 238:1

**chains** 258:2

**change** 65:17 134:15 149:10 161:10,
12,14 271:17 274:23

**changed** 68:23 120:3 123:3 148:6
177:12 264:25 265:3,25 266:15 268:1
283:17

**chapter** 134:12 135:4

**characteristic** 168:10

**characteristics** 15:19 82:16 94:13
228:14

**characterization** 149:16

**characterize** 63:7

**charge** 55:8

**cheaper** 117:7

**check** 63:16 95:11,17 102:2,8,18,24
103:16 104:15,20 105:8 106:3 108:7,
10,19 109:2,20,24 110:4,7,15 111:8,
21 112:3,6,13,14,22 113:2,21,25
129:15 261:14 281:9 282:19 289:5

**check'** 87:21

**checked** 260:10

**checking** 44:22

**checklist** 29:15,23 49:23

**checks** 250:23,25 252:4,7 255:11,18

**chief** 63:7,8 126:22

**Chinese** 61:18 62:2 63:11

**chose** 306:18 312:1

**chosen** 142:22

**Christine** 22:7

**circular** 125:3

**circumstances** 70:15 122:9 151:8
157:16 265:15 268:23 276:24 295:13

**citation** 102:22 219:24 222:9

**cite** 91:23 119:5 198:8 220:3 307:13

**cited** 18:13 104:22 204:3 301:12

**citing** 103:7,22

**City** 28:18 42:5

**claiming** 213:2

**claims** 267:7

**clarification** 107:12 134:1

**clarify** 94:3 107:3,12 284:11

**class** 126:10

**clean** 78:17 199:12

**clear** 27:2 95:23 143:25 144:4 265:24

**clearance** 55:22 66:4 181:15,16,23
183:20 223:17

**clearances** 166:6

**cleared** 144:12,16 181:14 265:24
283:13

**clearing** 193:6

**client** 81:5 253:8

**clients** 20:19,24 64:10,15 89:19
90:3,14

**close** 43:11 52:17

**closely** 244:15

**closer** 199:10

**code** 39:5 160:14,18 204:22 205:6
213:19,23 214:3,8,18 215:3

**codify** 225:7

**coincidental** 274:22 275:3

**collect** 173:5,8

**collected** 85:21

**collectively** 310:18

**College** 23:7

**colloquial** 103:10 205:1

**column** 126:15 179:4 290:25 291:3 292:3

**combat** 223:18

**combination** 100:24 101:9,17,20 276:21 277:2,17 280:14 281:14 282:23

**Commenced** 84:20 180:22 263:13 312:15

**comment** 103:12 273:22

**comments** 143:15,17 167:4 256:18

**commerce** 206:6

**Commercial** 213:19,23 214:3,8,18 215:3

**Commission** 10:18 17:8,15 18:18 19:8 76:23 79:10 85:8 118:14 138:19 149:21 151:14 152:12 153:22 154:19 156:11 158:12,18 160:4 162:16 170:24 171:1 180:3 224:5 225:6 226:2,4,24

**Commission's** 158:1

**common** 16:14 189:4 256:14 259:13,14,16

**commonly** 97:12 153:1

**communicate** 22:3

**communication** 206:6 257:7

**communications** 174:24 198:20

**companies** 16:9,21,23 17:20 18:4,6 57:7 58:5 62:3 78:15 87:21,23 88:3, 18 91:3,8 92:3,5 93:18 94:24 95:12, 15,18 96:11,13,18,22 97:7 98:4 99:12,14,18 100:3,4,12 101:12 102:2 103:16 104:15 105:17 106:16 107:25 108:20 109:24 110:4,5,8,16 112:15 113:2,25 117:2,4 118:20 136:6 169:14,23 193:7,15,18 228:19 229:6, 12,17 230:8,13,18 231:5,6 235:5,16 237:3,9 263:23 264:3,11,12,25 266:19 273:7 274:22 279:8 300:7 309:10

**company** 17:1,3,5,7,13 18:9,11 19:1,3,17 20:3,6,25 91:20 93:1,5,6,21 94:1,14,15,20 95:2,4,8,9,20 96:1,6 97:2,6,23 99:17 100:7,22,25 101:18, 19 102:8,13,18,24 104:20 105:9,13, 17 106:3 108:7,8,9,11 109:2,20 111:8,18,22,23 112:4,13,20,22 113:16,21 114:13,14,15 116:21 117:12,18 138:23 181:9,24 233:12,14

234:5,16 237:16,24 264:17 265:25 266:5,15 267:19 270:7 271:4 272:22 276:20,22 277:8,11,15 280:11,16 281:6,10,15,20 282:4,18,19 293:23 295:20 296:4

**company.'** 101:10

**compensation** 72:19

**complaint** 19:25 20:10,14 44:10,16 87:5,9,13 88:22 90:6,7,9,10 177:3 193:21 194:4 195:5 196:25 199:22 221:8 229:6 264:9 267:1,3,5,7 274:20 302:2

**complete** 67:10 85:12,16,18 191:11 305:11

**completed** 23:22 57:2

**completing** 57:1

**complex** 140:22

**compliance** 29:20 30:1,7 44:22 47:8 48:4 53:20 54:22 55:16,22 68:18 70:13 132:17 142:16 143:11,21 162:20 167:10 174:2 209:22 300:4

**complied** 132:8 178:9

**comply** 46:24 160:5 166:24 172:19 188:15 191:22

**complying** 58:3 162:8,25 172:8

**comprehensive** 14:14 23:2,3

**computers** 8:17

**concept** 114:10 177:18 178:5

**concerned** 89:8 132:22 133:4

**concerns** 134:8 296:9

**conclusion** 200:11 209:15,20 210:13 216:21 217:16 228:10,12 229:16,18 230:12,17 231:12 271:24

**conclusions** 26:11,14 74:9,17 212:15,24 228:20 230:19 271:25 274:12,13

**condition** 153:15 179:22

**conduct** 45:14 52:20 56:14 129:15 153:12 162:1 179:19 225:2,15 226:18 257:21

**conducted** 41:9 48:2 153:16 179:23 200:12

**confer** 312:10

**confine** 282:15

**confirm** 246:9 295:1

**conflict** 61:21

**confront** 25:12

**connection** 118:17 224:13

**considerable** 227:25

**considered** 31:11 85:2 111:2 268:8 277:21 298:13 301:6

**considers** 191:20

**consistent** 73:9 81:15 180:8 217:22 227:22

**consisting** 93:10,12

**constitute** 163:8 293:21

**constitutes** 25:17

**consulted** 12:4,17,21,25 13:9 64:11

**consulting** 64:4,10,18,25 200:6

**contained** 171:5 305:14

**contemplate** 153:9 179:15

**contemplates** 155:21 158:16,24 173:15

**contention** 229:10

**context** 17:19,20 40:15 63:10 69:11 73:18 103:14,21 110:14 135:7 136:13 156:21 247:6,9,19 248:1,6,17 252:18 253:5,13 257:6 263:2,5 267:18,21 283:1 296:1 297:2 305:23 309:6

**continue** 191:22 268:19 276:22 281:12

**continued** 235:7

**continues** 105:23 147:12 153:7 155:3 224:4 235:17

**continuing** 236:15 277:3

**contracted** 62:3

**contradict** 266:12

**contradicts** 266:8

**contrary** 205:15

**contrast** 153:8

**control** 16:24 192:2 207:18 233:24 234:2,5,6 235:25 271:17 273:9

**controlled** 209:24 233:8 235:4,11 264:13

**controlling** 235:12

**controls** 60:19 142:3 192:5

**controversial** 51:22

**conversation** 97:17

**conversations** 258:3

**convicted** 81:4

**convinced** 230:3

**cop** 25:13 213:6

**copy** 124:21 125:2,7 139:6 185:21

**Corp** 187:13 256:14 261:18 288:12 290:5,13

**corporate** 38:16 40:16 50:17 99:15 250:21

**corporation** 38:19 76:19 126:9 136:3 249:8 254:2 258:21 261:24 265:21 283:16 285:3 286:21 289:10

**corporations** 32:12

**correct** 8:1 10:25 11:16 12:5,6 15:2 19:23 23:1,8 32:7,22 33:23 34:12 48:6,8 55:18 58:9 67:3 72:21 77:4,22 79:4 82:14,23 83:7 86:12 96:7,20 100:19 106:1 108:18 125:5,22 147:16 148:25 151:4 154:13 170:18 182:24, 25 187:9 188:22 189:6,18 220:21 222:14 225:3 226:11 241:17,20 249:24 269:21 273:4 275:23,25 279:9 290:6,23 296:23 298:17 303:12 305:3 312:5

**correspond** 292:8

**correspondence** 258:3

**counsel** 70:4 312:11

**counsels** 221:24

**counter** 140:2

**countries** 64:14

**couple** 65:15 83:24 193:23 245:4

**coursework** 23:22

**court** 8:2,18,24 26:17 34:21 69:17 70:13 71:20 80:6,22 82:22 208:21 264:20 274:8 312:8 313:7

**cover** 232:16 249:21,25 254:20 259:1 290:4

**covered** 153:11 304:3,11 308:4

**created** 67:6 68:1 227:24 228:5 229:13,17 230:1

**creating** 228:19

**creation** 68:13

**credible** 229:2

**credited** 291:8

**credits** 23:9 284:18 291:2

**crime** 25:15 213:9

**criminal** 76:6 77:20 79:24 83:5 88:13

**criminally** 79:20

**crisis** 29:7

**criteria** 29:11 61:17

**criterion** 106:22 107:20

**cross** 313:9

**Crosstalk** 13:17 17:18 26:20 33:4 35:17 36:6 39:1,19 40:20 41:15 42:6 46:10 53:12,23 59:19 64:24 65:24 91:16 94:2 95:14 96:16 100:16 106:9 107:2 109:25 110:19 114:4 139:22 140:11 141:6,16 150:22 156:4 163:12 164:24 169:25 174:9 178:3 181:19 185:20 194:9 210:4 217:12 224:24 225:19 226:15 237:12,17 238:4,7 240:8 244:10 245:10 255:23 262:9,13 267:16 269:2 271:19 272:13 273:24 275:1 282:8 285:24 298:3 304:6 309:17

**cumbersome** 182:17

**current** 120:8 126:1 160:23 265:16

**curriculum** 14:1,6

**CUSIP** 189:7

**custody** 182:6

**cut** 138:4

**CV** 14:11 21:5,21 22:25

## D

**D&o** 250:22

**damage** 75:23

**Daniels** 264:13 266:17 278:14 279:7 283:8

**date** 27:16 65:12 98:11 189:15 259:8 280:10

**dated** 145:13 159:21

**David** 301:24 311:5,7,14

**day** 30:20 52:13 126:1

**day-to-day** 63:20

**days** 29:6 31:10 46:15 182:17 218:15

**dealer** 121:17,23 123:20 127:5,9 131:17 146:24 147:8,15

**dealers** 30:16 131:4

**dealing** 68:24 110:13 237:1,2 257:13

**deals** 202:9

**dealt** 38:12 203:14

**debits** 284:18 290:25 292:2

**December** 51:8 56:22 220:4 232:17 241:22

**deceptive** 121:15

**decision** 16:11

**declared** 139:1 279:12 302:7

**declaring** 138:20

**dedicated** 78:16

**defendant** 73:14 74:4,20

**defendant's** 136:2

**defendants** 7:18,21 70:11 88:23 89:14,19,24 90:14 200:12 231:23 235:25 239:3,16 243:23 301:24

**defense** 74:25 195:8,18 198:3 249:7

**define** 16:17 18:17

**defined** 91:13 95:21 101:8 105:21 107:7,15 108:1 112:15 113:24 121:22 201:24 203:9

**definition** 91:7,12,19 93:1 94:1 99:16 101:11 102:17 103:9,20 104:19 106:3 107:14,19 108:7,24 109:1,5,22 112:3

**definitional** 111:4

**definitive** 280:12

**definitively** 132:7

**degree** 23:7,17,20 40:3 136:4,18

**degrees** 39:21 40:2

**delivery** 205:21 206:12 207:9

**Delta** 76:19

**delve** 274:9

**demonstrate** 142:16 143:10

**deny** 144:6

**department** 48:10 49:10,11 55:8

**departments** 38:11

**dependent** 221:19

**depends** 52:16

**depo** 313:8

**depose** 53:8

**deposed** 72:5 78:11

**deposit** 188:14 190:10

**deposition** 7:24 8:16 10:14 71:21 80:2,4 82:13 231:9 232:8,11,16 269:8,20 272:5 273:21

**depositions** 253:1 258:4

**depository** 181:8,20,24 191:14

**describe** 49:8

**describing** 16:7

**description** 188:25

**designated** 310:16 311:1,18,20

**designed** 18:24 121:14 225:1 295:17

**desk** 11:22 15:1

**detail** 308:4

**detailed** 113:14 177:3 221:7 305:12

**details** 44:8 113:15

**determination** 24:14 25:14 89:7 245:20 262:23

**determinations** 221:18

**determine** 132:7 303:23 304:16

**determining** 191:13

**develop** 100:9

**developed** 49:14

**development** 95:3,8 105:12 108:8

**developmental** 102:10

**Diane** 269:8,14

**difference** 139:13

**differences** 150:15 152:9,13

**diligence** 123:12 136:5,11,19 137:1, 8 149:22,25 150:1,8 151:15 153:1,23 154:15 156:6 165:20,21 179:19 180:5,6 247:22 285:15 308:3

**diligence'** 153:13

**diligent** 133:24 162:22

**Dilley** 237:4,9,23 238:11 252:22,23 311:2,23

**Dinello** 264:18 265:21,22 269:25 271:8,18 275:21

**Dinello's** 268:13

**direct** 20:13 70:9 196:7 198:17 214:2

**directing** 218:12,24

**direction** 51:24 53:9

**directions** 128:22 216:17 218:13 296:13,18

**directly** 121:19 127:6,11 128:19 129:18 138:1 159:6 174:25 206:3 224:9 236:5 309:12

**director** 41:14 42:5 48:15 49:9 50:22 132:17

**Director's** 250:16

**directors** 126:24 129:16 157:23 224:8

**disagree** 108:13,14

**disagreed** 75:5,13

**disagreeing** 112:23

**disarray** 46:20

**disciplinary** 44:6,11

**discipline** 34:11

**disclosure** 11:20

**disclosures** 97:7,11 111:25

**discuss** 196:9 239:23

**discussed** 98:7 144:22 173:14 270:2 298:23 300:19 309:2

**Discusses** 212:3

**discussing** 181:2 187:7 211:6 259:2 275:25

**discussion** 118:10 131:7 198:11 305:12

**discussions** 270:8 280:13

**dispenses** 113:6

**disregarded** 246:17 295:23

**distinctions** 264:8

**distinguished** 102:9

**Distortion** 42:22 79:15 114:20 128:2 133:25 138:20 207:21 211:4 267:6 297:18

**distribution** 56:12 118:18 152:22 206:21 207:23 224:12 299:6

**distributions** 202:10 203:15 207:18, 19 209:24 223:15 224:2 299:8

**district** 41:14 42:4

**division** 38:9 40:23 41:2

**divisions** 37:18,20 38:7

**document** 11:3,10,17,22,25 12:13,15 14:10,20,25 15:5 21:6,9 22:19,21 51:6 53:8 66:17,20 68:1 92:17,25 98:2,19 101:4,7 116:5,7,16 121:2 145:7,24 146:10 148:23 149:3,7 151:24 156:16,20 158:2 159:10,15,18 160:10 162:11 167:23 170:12,14,20 171:13 177:1,5 178:20 179:3 187:1, 17 215:2 223:6,12 227:6,10 233:2 234:20 236:19 240:22 241:14 242:18 243:18,24 245:11,14,16,18 247:11,20 248:2,6,9,19 249:1,6,10,15,20 253:18 254:9,11 256:4,24 257:5,10 258:18 264:20 275:19 276:2,6,10,14 279:16 286:16 288:2 290:2,3 293:17 299:23 310:7

**documentation** 190:19 261:22 262:4 304:23

**documented** 13:2

**documents** 12:4,17,22,25 13:8,20 58:8,13 59:4 66:8 85:1 87:12 89:11, 14,16 90:4,13 121:24 122:6 156:10 161:4 170:25 171:5 193:25 195:3,23 201:12 218:23 219:1 239:12 244:7,22 246:19 251:8,20 252:11 253:12 255:6 258:9 261:23 262:19 263:3 269:6 274:15 287:10 289:17 292:8 296:11 297:19 299:19

**doubt** 246:11

**driver's** 260:10,22 288:19

**drop** 70:24

**DTC** 66:8 181:5,7,12,15,22 182:5,14, 23 183:7,25 184:5,8,10,18 185:8,13, 16,17,25 186:4 188:13,14,15 190:5, 10,18,19 191:12,17,19 193:7,14 194:2,5 195:4,15 196:9,16,17 197:15 198:7,10,21,23 200:10

**DTC's** 188:16

**due** 34:20 123:11 136:4,11,19 137:1,

7 149:21,25 150:8 151:15 153:1,12,
22 154:15 156:6 165:19,21 179:19
180:5 209:24 247:22 285:15 308:3

**duly** 7:1

**dump** 20:1,5 21:1

**dumps** 19:22

**duties** 49:9 72:18

**Duty** 215:10

**E**

**e-mail** 198:9 237:19,25 258:2

**earlier** 36:16 51:14 60:22 102:1,21
144:22 158:14 161:4 173:14 284:10
287:18 290:15 298:23 299:17 300:15
309:2

**earliest** 27:15

**early** 41:17

**earnings** 127:1

**easier** 182:23

**East** 76:19

**echelon** 211:23

**echelons** 18:20 211:19

**EDGAR** 56:23 57:1,5 58:12,21 158:7
170:16

**education** 22:24 23:4 116:9

**effect** 98:15 206:1

**effective** 34:2 98:11 138:21,25
139:1,7 279:11,12 302:7

**effectively** 211:21

**efforts** 280:20

**elaborate** 297:16

**Eldred** 263:23 264:2,4 311:3,23

**electronic** 57:6 70:8 113:5 181:16

**element** 25:18 56:10

**elements** 26:3 106:2 212:20 266:25

**eligibility** 181:5,12,23 182:23 183:7,
25 184:6,19 185:8,25 186:4 191:14,
20 193:14 194:2 196:9 197:15 198:7,
21,24 200:10

**eligible** 181:14 188:13

**emerging** 199:11

**Emphasis** 218:25

**emphasized** 239:8

**employ** 136:18

**employees** 37:4 56:17 64:8 224:8

**employment** 14:15,19

**enacted** 160:1

**Enclosed** 255:5

**end** 57:3 126:16 283:3

**ended** 285:15

**endorsement** 216:7

**ends** 28:5 103:15

**enforce** 34:15 161:22 162:17

**enforcement** 19:13 31:25 34:6
44:16 47:10,16 63:3 64:19 79:2
138:15 202:1,4 203:12 225:4,9,12
226:7,19,22,25 298:22 300:22 301:5,
10

**enforcing** 43:14 202:5

**engage** 17:24 105:15

**engaged** 266:1

**engineer** 39:2

**English** 23:10 94:9

**enormity** 246:21

**ensure** 26:24 177:23 178:7 201:16

**ensuring** 29:9

**entered** 280:11 281:20

**entire** 46:8 47:17 123:7 149:3 192:10

**entirety** 119:19 176:9

**entities** 20:2 29:20 133:15

**entitled** 116:7

**entity** 19:4 32:5,24 59:18 61:2 68:17
95:3 105:18 114:19,21 115:1,2 163:2
209:10

**entry** 182:7

**enumerated** 216:1

**enumeration** 305:13

**Envoy** 136:3 198:21 200:14 254:2
256:7,13,17 258:21 261:18,24 262:5

**equate** 137:7

**equity** 117:3

**equivalents** 93:11,13

**era** 47:2 51:23

**essentially** 53:9 162:18 181:16,23
199:10

**establish** 203:19 308:19

**established** 74:17 137:16 170:15
173:21 224:22 226:19

**estimate** 75:23 172:17 174:1

**estimation** 172:6

**et al** 7:20 77:14 83:1 228:24 309:11

**evaluate** 15:10

**event** 276:15 277:9

**events** 20:10 177:2 221:7

**eventually** 20:4 31:23 108:16
257:15,18

**evidence** 25:18 80:22 86:20 88:7,9
89:4 228:3 229:11 237:8,11,22
273:13

**evident** 239:2 247:14

**evidentiary** 13:20 85:1

**exact** 126:5,10

**exam** 44:7

**examination** 7:7 38:12 42:2 44:2
48:3,4 49:14,22 50:6 53:10

**examinations** 41:3 42:10,14 43:23
44:14,21 45:18 47:7,21 50:25 51:15,
18 52:20 53:19 56:5,15 63:18

**examine** 29:3,19 30:1 45:3 46:7,13

**examined** 29:14 30:6,9 41:19,20
63:4 274:4

**examinees** 53:15 54:7

**examiner** 28:15,23,25 29:23 41:13
43:7 49:24 54:9,17

**examiners** 49:15 52:2

**examining** 50:7,9

**examples** 164:11 165:2 199:5,15

**exception** 110:13 144:17 154:1

**exceptions** 110:25 174:21

**exchange** 10:18 30:19 31:13,24 32:1
62:9,11,22 67:12 76:23 79:10 85:7
105:24 107:16 108:1 115:11 117:1

119:6 131:5 132:6 138:19 139:24,25 140:7

**exchange's** 140:18

**exchanges** 64:13 139:14 140:13

**exclusively** 107:13

**excuse** 41:5 120:10 141:18 174:10 200:18 219:11 234:22 240:16 253:18, 19

**execution** 72:19

**executive** 126:7,23

**exempt** 212:11 302:16

**exemption** 212:8

**exemptions** 128:25 211:23 212:4,7

**exhaustive** 71:25 164:15,18,22

**exhibit** 11:3,4 12:8,9 13:8,22 14:5,6, 24 15:11 22:18 41:24 48:25 50:14 60:1 66:12,13,14 71:3 84:25 86:2,9, 11,25 87:12 88:11 92:13,14 97:22,23 102:5 104:2,3,7 109:11 115:24,25 118:2 120:23,24 135:19 145:1,2 148:10,11,16 159:11 172:1 175:7 178:15,16 186:20,21 196:4 204:10,11 214:23,24 219:8 222:16,17 232:10,11 236:15 240:13,20 242:13,17 243:3,4, 7,12 245:15 248:24,25 249:16 250:16,19,21,22,24 251:3 253:20,21 258:14,15 263:18 269:13,14 274:15 275:16 278:19,20 283:22 286:10,11 289:22,23 305:6

**exhibits** 11:25 12:3,23 13:21 85:24 250:1,4,13 251:15,20 252:12 255:25

**exist** 69:4 158:8 226:10

**existence** 30:17 136:23 295:25

**existing** 115:2

**expect** 183:9,12,22,24 257:23 277:20

**expected** 153:16 179:23

**expedited** 313:11

**expelled** 244:24

**expensive** 182:16

**experience** 17:22 109:15 110:14 111:1,22 295:8

**expert** 10:19,22 11:4,14 12:10,18,23 13:7,13 15:12 24:9,17,21 25:8,21,24 26:6,15 38:22 39:7,22 40:8,11,18

41:8 64:19,21 65:6 69:16 70:5,12,17 71:8,16,22 72:1,6 73:13 75:9 77:18 78:20 80:8 82:21 84:4,11 86:19,24 102:6 184:25 193:4 194:25 200:21 213:3 214:4 227:21 238:14 262:24 263:19 271:25 273:5 276:3 283:21 301:7 305:5 307:23

**expertise** 39:18 69:15

**experts** 70:23

**Explain** 24:19

**explains** 149:7,10

**explanation** 167:8

**express** 213:8 229:22

**extent** 86:8,10 87:14 126:21 177:14, 24 298:25 299:25

**eyes** 117:19 124:13

# F

**face** 189:23 203:1 247:24 261:10 262:16,21 272:9 289:19 307:4

**facilitate** 78:14 116:23 223:16 224:10

**Facilitated** 231:4

**facilitating** 223:25

**facilities** 126:22

**facility** 45:2

**fact** 25:23 94:23 97:5 103:15 136:10 138:17 166:9 186:13 213:14 221:19 238:23 244:21 252:19,21 257:11 267:25 287:9 296:2 304:25 309:9 310:1

**factories** 15:24 16:1,12,13 19:10

**factories'** 15:20

**factors** 228:13 280:22,25 282:13 298:10

**factory** 227:23 228:15 267:8

**facts** 272:10,18,20 273:3 274:14,17

**factual** 274:20

**failed** 305:20 308:24

**fails** 307:7

**failure** 219:19

**fair** 8:7 9:18 10:1,2 11:20 12:24 13:5, 9 19:12,18,19 20:2 24:16 28:6 36:12

45:10 48:1 50:1,5,24 51:2 52:15,19 54:15 56:2 59:9 68:7,16,22 74:2,24 80:23 81:19,20 82:20 85:25 86:15 97:8 102:25 114:8 119:16 133:12,13, 17 149:13,15 163:4 166:4 176:9 190:23 195:12,21 197:18 200:9 201:13 205:16 218:9 220:6 228:8 231:17 240:11 242:8 248:12 272:3 276:5 285:21 301:4,9

**fall** 103:19 161:25 299:4

**false** 19:15 88:24 89:8,25 232:1

**familiar** 8:6 41:18 70:7 91:12,24 95:5 97:17 108:20 114:3,9 115:19 119:18, 21 123:25 159:24 205:11 213:18,22 214:1,7 215:13 218:7 220:11 303:9

**familiarity** 40:3 216:12

**family** 230:5

**Fan** 282:1,5

**farther** 51:5

**fashion** 111:20

**fast** 296:4

**faulty** 46:17

**favor** 81:10 150:13

**favorable** 277:10

**February** 28:5 59:15 60:13,17

**federal** 17:16 34:21,25 80:22 160:14, 18 178:22 217:17 218:5

**fee** 200:6

**fees** 117:10

**felt** 70:13 247:22

**fiduciary** 72:18

**field** 42:10,14,25 47:21 48:2,3 49:16 50:25 51:15,18 52:20,23 53:1 54:17 56:5,14

**figure** 232:6 236:8,12 275:7

**file** 44:5 46:8,14 47:17 57:8 69:13 89:16 128:21 137:25 141:12,14 143:1 301:16 310:18,19

**filed** 89:14,20 90:4,14,16 124:23 125:8 141:21 156:11 170:25 229:7 271:21 302:5

**filer** 58:12

**files** 44:3,12 46:20 85:12,25 86:1,6, 14 143:8 284:12,16

**filing** 19:15 57:6 67:20 88:24 89:25 117:14 142:4 143:6 254:22

**filings** 18:21 57:8 58:4,22 72:24 76:11 137:18 138:1,10 158:11 173:22 174:17

**filled** 185:10 187:12,21 287:21

**filling** 186:5

**filtered** 309:15

**final** 98:6 99:9 145:17 189:15

**finalized** 176:23

**finally** 13:25 82:25

**finance** 23:16 38:16

**financial** 29:6 32:8 127:2 153:15 179:21 193:6

**financially** 29:10

**financing** 40:16

**find** 172:22 253:7 255:5 282:2

**finding** 80:6

**fine** 10:15 34:10 171:21 246:25

**finish** 53:10 194:11 208:12,13 244:13

**FINRA** 30:17,19 32:5,11 33:13,16 34:13 35:4 55:13 66:4,14 67:1,6,17, 21 68:1,5,8,13,16 69:4 80:14,20 81:18 142:7,8,11,21,22 143:8,14,24 144:3,12,16 167:3,7 254:19 256:14, 18 283:13 307:12,17

**FINRA's** 68:11 143:2,19

**firm** 43:11,15 44:11,25 53:7 54:12 70:19 193:6 257:12 285:17 311:22

**firms** 30:9 46:18 64:12 142:12

**fiscal** 125:18 126:16 127:3

**Five's** 193:14 196:20,24

**flag** 130:10 157:14 158:19,21 164:16 166:19,22 167:6,15 169:6 268:4 299:22

**flag'** 157:5

**flags** 133:21,23 134:4 136:23 137:2,4 151:19 154:3,7,20 164:1,12 165:2,13 166:2,9 168:21 170:2,6 174:12 180:10 201:18 202:14,20 203:2,21 247:13,23 257:13 258:5 264:23 267:23 285:12 286:3 296:1 298:13,19 299:16 300:12 301:11 305:13,24

309:7

**flexibility** 280:17

**Florida** 22:11 292:15

**follow** 49:24 134:7 162:2,11 163:3 229:21 286:4 305:20 306:9 307:7 308:24

**follow-up** 245:3

**footnote** 118:22 119:1,5 155:2,10 176:2,3 219:23 222:4,6,7

**footnoted** 13:3 94:8 102:21 300:24

**forbidden** 156:1 165:14

**foreign** 64:14 125:20 190:10,14,20, 24 192:1,5,16

**foresee** 265:15

**forest** 247:1 266:23

**forged** 245:14,18,22 262:19

**forget** 70:15

**form** 25:1 34:23 66:3,15 67:1,5,10 68:8,23 69:8 72:24 77:7 78:4 81:23 83:18 84:5 85:12,21 97:1 98:3 101:13 117:14 132:11 136:2 141:14 142:8 143:7,8,25 185:1,5,10,17 186:5,22 187:4,21,25 188:3 189:20 191:10 192:10,11 211:22 215:18 221:24 249:2,22 253:23 254:22 255:18 256:19 264:4 275:20 277:24 278:24 283:12 301:17,25 302:23 303:2 310:21,24 311:8,15

**formal** 24:2

**formally** 72:5 82:21 215:15

**formation** 16:8 17:3

**formed** 30:19 31:4 60:24 87:21 273:7

**forms** 98:3 117:3 186:10 187:7 211:19

**forward** 221:10

**found** 17:15 54:18 213:9 281:15

**fourteen** 41:11

**framed** 213:7

**Francis** 23:7

**fraud** 17:19 18:19 56:8 77:24 167:16, 19 168:11 178:12 201:17 202:16 203:9,16 217:10 218:1 223:18

**frauds** 168:16

**fraudsters** 17:23 78:12

**fraudulent** 18:20,21,22 19:15 99:19 118:16 121:14 169:19 299:9

**fraudulently** 218:1

**free** 18:24 192:20

**Friday** 232:17

**friends** 230:3,5

**front** 8:18 11:11 12:16 22:22 66:18 72:20 145:7 151:6 159:15 196:4 244:20 258:19 294:25

**fulfill** 111:15

**full** 86:5 99:2 101:7 276:13 293:24

**full-time** 64:6

**fully** 56:23

**function** 35:20

**functions** 62:4

**fund** 39:24 83:12

**funding** 117:5 277:10

**furnished** 239:16

**furtherance** 18:12,13,16 19:6

**furthered** 88:24 89:24

**future** 259:15

---

**G**

**gas** 168:13 169:5,18

**gate** 178:5

**gatekeeper** 299:13

**gatekeepers** 175:21 201:6

**gather** 58:4 137:17 287:3,9

**gathered** 54:9 262:3 309:4

**gathering** 131:7

**gears** 181:1 263:17

**general** 67:8 93:22 94:10 103:12 151:19,20,21 153:25 174:17

**generalization** 94:6

**generalizations** 203:11

**generally** 16:22,24 17:21 18:19 43:12 44:7 83:14 92:4 100:10 103:23

108:19 109:23 111:13 112:14 117:2 171:3 182:15 203:10 214:9 220:13 255:15 297:21 304:4 306:12

**generate** 276:15

**gentlemen** 252:18

**genuine** 216:8 266:18 289:18 295:11 296:23

**Germ** 136:3 195:8,18 198:3,14 200:13 241:5 249:7

**give** 74:16 117:18 150:14 307:13

**giving** 53:9 162:23 216:16 217:7 282:25

**glaring** 202:24 203:23

**gleaned** 129:21

**Global** 285:2

**goal** 111:12 200:7

**goals** 113:15

**good** 7:5,9,17 8:8 70:14 94:8 124:15 132:17 163:3 180:13,21 188:10 215:5 246:24 263:8

**goods** 230:9

**Gordon** 291:6 292:17

**Gordon's** 291:12

**gosh** 37:11

**governance** 35:13

**governing** 33:17,20,25

**government** 33:6,7 38:17 64:12 76:6 77:18

**government's** 199:4

**governmental** 32:24

**graduate** 23:9

**great** 26:23 113:5 238:9,21 308:4

**groundbreaking** 51:23

**group** 16:20 30:7 45:7 184:9 198:21 254:2 256:8,9,14,18 258:21 261:18, 24 262:5 285:2

**grunt** 52:24

**guarantee** 294:12,18,23 295:9

**guaranteed** 294:9 296:22 297:11

**guess** 18:5 30:4 42:20 46:24 63:7 110:3 174:16 203:18 210:19 276:13 304:5

**guessing** 43:24

**guidance** 115:16,20 131:24 132:5, 16 133:5,10,14,20 134:3,14,15,20 160:4,22 161:3,17,22 162:3,19,23 163:4,7,8,13,15,17,22 177:15 299:17, 18,23 300:10,13,17,18

**guide** 177:16

**guy** 70:25 289:1

**guys** 63:13,16 208:9 257:13,14

---

**H**

**half** 180:15

**halfway** 121:3 125:14 130:23 179:4 265:9

**handling** 52:4 81:4

**handwriting** 187:22 262:24

**handwritten** 259:21

**happen** 182:16,21 242:12 268:16

**happened** 61:7 70:11 177:10 244:18 245:24 266:12 272:11 273:17

**harbor** 212:9

**hard** 53:25 92:19 208:16

**Harrison** 264:13 266:17 269:14 270:6,18 271:2,15 272:4 273:7,20 274:4 275:4 278:14 279:7 283:8

**Harrison's** 269:8,20 272:21

**head** 30:10 38:2 194:22 307:14

**heading** 28:3 116:20 130:22 145:9 188:12 230:24 231:3 279:19 283:25

**heads** 62:1

**hear** 79:16 103:3 149:18 191:2

**heard** 32:25

**heart** 133:5 134:6,11

**heavily** 63:5,19

**hedge** 83:12

**held** 41:12,25 270:8 299:1

**helped** 237:23

**helpful** 74:14

**helps** 246:9

**Hey** 63:12

---

**higher** 164:8

**highlight** 285:12

**highly** 305:12

**hired** 28:15

**history** 61:15 92:6 119:22 225:12

**hm-hm** 9:6,9 59:10 68:20 72:14 77:19 81:17,20 86:12 95:1 96:5,20 104:25 119:20 120:11 122:15 126:4 149:9 151:21 164:3,14 176:10 188:1 215:8 219:17 228:2 238:17 243:6 254:24 262:7 271:23 291:9

**hold** 292:21

**holder** 221:23

**Homm** 83:1

**hope** 22:9 277:25 278:2,3 300:2

**hopes** 113:16

**hoping** 152:1

**horrible** 21:15

**hot** 22:11 168:7 169:10,14

**hour** 65:9 180:15

**hours** 173:5,8

**Hudson** 291:8,13,17

**hundred** 42:18 43:23 44:14

**hundreds** 52:12

---

**I**

**i.e** 157:15

**idea** 37:8 114:18,25 266:17

**identical** 248:13 262:3 297:9

**identification** 246:8,10 295:1

**identified** 54:23

**identify** 101:11 129:10 264:24

**IDQS** 179:18

**ii** 93:10 105:20 126:6 190:13 191:17

**iii** 93:12 126:8 190:17 263:22

**illegal** 223:15 224:1,12

**imagine** 30:8

**implemented** 56:24 230:2

**implication** 162:20 174:16

**implies** 133:20 297:14

**imply** 99:18 177:25

**importance** 277:7

**important** 8:25 9:5 14:19 52:1 152:9, 13 175:21 228:19 229:18 230:18 268:8

**impose** 26:7 156:5

**imposed** 152:14

**imposes** 201:21 202:13,15 204:1 298:18

**improper** 81:4

**inception** 281:11

**include** 202:2

**includes** 29:16 273:6

**including** 31:18 44:25 49:22 67:13 116:24 157:23 248:9,19,20

**Incorporated** 28:4 59:16 60:20 264:21 275:22 279:2

**incorporation** 126:9 250:20

**increase** 276:23

**increased** 117:18

**increasing** 277:4

**Independence** 20:8 285:3 286:13, 21 288:12 289:9 290:5,13 296:7

**independent** 61:2 153:12 157:25 179:19 180:5 267:4

**independently** 128:22

**Index** 249:16

**indicating** 194:1

**indication** 20:17,22 108:25 167:18 246:7 274:21 277:15 291:10 294:13

**indicative** 267:7

**indicia** 167:15 273:15

**indirect** 237:11

**indirectly** 121:19 127:6,11 128:19 129:17,19 206:3 224:9

**individuals** 16:20 18:5 70:10 88:2, 14,17

**induce** 188:12

**industries** 168:22,24,25 169:15 237:2

**industry** 29:7 32:9 168:7 169:10 172:17,18 177:15,16 217:1 221:2

**inexperienced** 92:6

**information** 20:18 40:7 67:20 88:25 121:25 122:5,6,11,14 124:1,6,9 125:16,25 127:2,17,18,25 129:2,20, 24,25 131:8,11 136:20 143:21 145:4, 13 148:13 151:9 154:4,9,11 156:12 157:15,21,25 158:17 159:1,6,20 161:8 165:19 166:13 171:4 173:7,10 186:14 189:21 190:18 191:10 192:13 193:13 195:22 197:13 231:24 245:6, 25 250:8 279:20 308:16 309:10,12,14 310:4

**information'** 122:3

**information's** 157:20

**inherently** 99:18

**initial** 115:5 117:8 157:7 191:13 230:2

**initially** 154:7

**initiate** 67:10 141:24

**Initiation** 145:2,11 148:11

**innovative** 168:15

**inquiry** 154:9

**inserted** 150:6

**inspections** 29:4

**instance** 166:23 301:21 309:3 310:24

**instances** 97:8 218:14 311:21

**instant** 284:4 305:10

**institute** 23:16 34:6

**institution** 23:18 294:13 295:6

**instruction** 215:20 216:8 297:3

**instructions** 67:9 217:4,8,21 285:9, 23 286:25 297:10

**instruments** 206:5

**intend** 17:1 223:23 225:22 226:3 271:17

**intended** 16:9 99:17

**intends** 224:5

**intent** 17:2 18:25 19:2 87:22 88:18 106:4 228:18,22,23 266:18 273:8

**intention** 96:2 102:12 265:13 266:5

268:25 271:4,11,16 272:10,21

**Interest** 189:14

**interested** 61:14 70:5,16

**intermediaries** 159:1

**internet** 21:11 57:14 208:17

**interpretation** 24:17 25:9

**interpreted** 24:22,23

**interrupt** 21:10 57:12,16

**Interruption** 57:17

**interstate** 206:6,11

**interviewed** 272:7

**introduction** 15:6 87:4 162:6

**investigate** 63:2 154:20 166:10 298:19

**investigated** 68:17 167:6 267:25 272:8

**investigation** 43:1 68:18 153:13,16 165:22 166:3,25 167:3 179:20,22

**investigations** 31:16,19 52:7 53:2, 18

**investigative** 152:25

**investigator** 262:14

**investing** 152:23

**investments** 103:19

**Investor** 115:25 116:8,9

**investors** 29:12 117:6 223:16

**invoice** 65:15

**involve** 18:19,20,21,22 72:23 73:2 76:11,13 77:7,10 78:4,7 81:23 83:18 103:18 106:16 168:12 210:5,6 221:18

**involved** 20:1,25 34:21 44:22 45:18 46:22 47:8 52:2 55:23 56:8 63:5,19 77:1 86:6 88:3 142:4 168:22 169:4,14 217:10,25 233:25 237:14 238:1 248:14 312:4

**involvement** 20:19 186:3

**involving** 20:14 53:19 77:25 168:17 197:14 285:2

**IPO** 117:9,11,17

**irrevocably** 293:21

**Irwin** 78:10,25

**Island** 86:5 193:12 194:2 196:19 211:6 284:1,12,15 285:8,13,22 287:9 290:12 293:22 295:22 296:13 297:2,9 298:13 301:6,16 302:14

**issue** 36:16 43:6 44:10 69:19 70:6 124:23 166:1 188:25 190:4 199:7 245:2 275:13 297:12

**issued** 33:24 68:13 71:12 118:19 132:5 144:1 189:11 284:20 295:9

**issuer** 20:20 93:8 125:18,21 126:6 127:7,12,20 128:1,11,20,23 129:4 137:19,25 138:8,12 152:21 153:14 155:6,15,23 157:22 159:2,7 168:21 169:4 173:8,11,20,22 174:12,25 179:20 183:7,25 187:13 188:23 189:21 192:12 195:24 198:24 200:4 213:11 215:10,18,20,22 216:13 221:23 229:23 240:4 249:7 252:21,21 257:8 308:15 309:5,13,15,21

**issuer's** 125:8 126:19,24 129:10,15 228:18 266:5

**issuers** 55:5 86:6 126:16,21 137:13, 15 139:8 168:15 173:16 192:5 193:20 194:3,18 195:5 196:20,24,25 197:3, 14 199:2,16 200:13 214:14 228:22 229:2,5 231:25 233:25 236:1 239:18 244:9 248:14 251:24 252:5 267:22 268:1 278:13 283:8 285:10 286:1,24 302:5 310:3 312:4

**issues** 21:15,25 51:25 57:15 63:6,9 89:10 221:19 299:5

**issuing** 105:20

**italicized** 310:10

**italics** 308:13

**items** 216:2

**iv** 126:10 164:7,11 196:15

**ix** 126:19

---

**J**

**jacket** 22:11

**jail** 257:15,18

**JAMES** 7:1

**January** 59:14 269:9

**Jeans** 186:22 187:13

**Jim** 63:12 208:11,13,14 210:25

**job** 70:14 143:19

**Jocelyn** 257:2 260:15

**John's** 23:10

**Johnson** 21:14,22 22:2 24:25 34:22 39:8 57:18,20,23 73:16 74:6 75:6 83:21 84:1,19 85:14 103:2 132:10 134:17 135:2 150:10 180:21 199:17 200:15 208:7,20,25 209:13 210:11, 14,23 216:18 302:23 303:1 313:3,6

**joint** 276:25

**journal** 289:24 290:9,18 292:23

**judge** 70:21 74:25 75:4

**judgment** 267:5

**June** 80:13 83:3

**jury** 8:19 77:22 83:5 275:6

---

**K**

**Kansas** 28:18 42:5

**keeper** 178:6

**Kevin** 11:5 12:12 293:5

**key** 130:13

**keystones** 129:19

**Kid** 195:8,18

**kidding** 9:9 223:2

**Kids** 136:3 198:3,14 200:13 241:5 249:7

**kind** 23:20 25:17 40:12 53:25 61:14 62:1 63:17 110:20 114:22 129:17 141:23 168:25 169:21 203:9 216:20 280:1 288:25

**kinds** 170:6 280:22

**knew** 43:15 198:6 238:11

**knowledge** 13:13

**Krokhina** 198:11

**Kruckenberg** 7:8,15,18 11:5,9 12:11,14 14:8 21:8,19,23 22:6,12,16 25:5 27:24 28:2 35:2 39:15 48:20,23 50:13,15 51:3,7 57:21,25 58:1 59:25 60:2,14,16 66:11,16,23,25 71:2,7 73:24 74:10 75:11,18 83:23 84:2,14, 17,23 85:17 90:19,21 92:11,16,23 97:20,25 98:23 99:1 101:3,5 103:4,6 104:1,5,9 109:9,16 115:22 116:3,6 118:25 119:4 120:22 121:1,5,10

124:16 128:5 130:6,17,25 132:23 134:13 135:8,17,25 144:25 145:6,10, 22 146:1 148:9,15 150:17 152:3,6 157:12 159:9,13 164:4,10 167:22 168:5 170:10,13 171:12,23 175:5,10, 16,18 178:14,18 179:1,11 180:12,18, 25 186:18,24 187:2 200:1,17 204:8, 13 208:23 209:6,16 210:17 211:2 214:21 215:1 216:23 222:15,20 227:4,8,12,15,19 230:22 231:2 232:7, 13 233:1,4 234:19,22,25 236:17,21, 23 238:13,18,20 240:12,17 253:16,22 254:13,16,25 255:3 256:3,5,22,25 258:7,13,17 259:24 260:2,17,20 263:7,16,24 269:11,16 270:22,25 275:14,17 276:9,11 278:17,22 279:15,18 283:19,24 286:8,14 288:15,17 289:2,4,21,25 293:3,7 303:6 305:4,8 307:20 308:1 310:6,8 312:6,18 313:2,10,15,21

---

**L**

**L-E-K** 69:25

**language** 122:17,23 123:2 146:4,7, 10 147:7,12 148:5,6 150:5 151:5,17 268:12 272:17 277:22 278:4 282:12, 16

**large** 37:1,3 38:9

**largely** 152:24

**larger** 276:20

**largest** 38:10

**latest** 48:5

**laundering** 192:5

**law** 23:24 24:6,20,22 25:12,18 64:12 161:23 162:2,17 218:5 225:20 307:9

**lawful** 101:22 115:8

**laws** 17:16 24:17 25:9 26:7 32:16,19 35:1 73:15 74:5,21 153:3 217:17 306:25 307:3

**lawsuit** 34:20

**lawyer** 25:16 53:5

**lawyers** 25:12

**layout** 228:13

**lead** 274:17 299:12

**leads** 106:10

**led** 81:7

---

ledgers 284:17

Lee 77:14 79:6

left 37:10,12,25 155:2 290:24

left-hand 125:15 204:16

legal 16:2 24:2,10,13,14 25:7 26:10,
13,25 27:3 74:8,17 89:7 117:9
209:14,19 210:12 212:15,19,23
213:3,7 216:20 217:16 221:19 306:9

legend 302:20 303:10

legended 210:6 304:4

legends 299:7

legit 247:5,7

legitimate 96:22 99:14 100:9 169:14
230:8 247:24

legitimately 100:3

LEK 69:24 70:4

lesser 140:6,10

letter 221:25 249:22,25 254:18,20
256:7,17 259:1

letterhead 254:19 256:8

letters 18:23 302:15

letting 208:24 312:24

liability 76:1 171:2 208:2 210:10
211:7 212:16 214:12 217:7 219:4

liable 216:15 299:1

liaison 38:17

license 260:10,22 261:2 288:19

light 202:25

limited 67:13 70:18 186:4 256:10

liquidity 116:24

list 12:17 13:7 22:24 23:3 71:15,19
88:11 111:20 164:15,18 251:4 308:3

listed 12:3 13:21 72:6 73:23 75:20
107:9 112:11 117:1 170:3 184:10
193:20 194:3 196:25 197:20 235:8
242:13 250:14 252:11

listing 14:15

lists 146:10 163:25 216:1 280:25

local 282:2

logged 57:14

long 113:14 129:1 166:5,25 167:2

172:17 174:2 223:3

longer 30:16 60:9 174:14

looked 13:11 47:16 49:17 85:19
86:21 90:7 101:1 240:10 252:6
287:17 299:17

Lopez 301:24 311:5,7,14

loss 127:1

lot 29:7 46:20 139:12 164:23 174:13
248:18 255:25 313:8

loud 9:2

low 46:19

low-priced 46:23 168:17

lower 117:11

Luke 82:5

lunch 181:3

## M

made 26:13 88:17 138:10 192:11
197:14 199:14 203:11 259:10 264:8

mail 59:6

mailed 296:5

mails 206:7,10

main 309:9

maintain 276:23 277:6

maintaining 277:4

major 43:5 51:20 55:23 94:9

majority 114:15 194:16,17

make 25:14 27:2 43:12 80:6 98:21,24
111:24 122:19 140:4 143:1 147:1
157:9 178:9 184:24 188:6 206:4
217:15 230:10 245:19 262:22 267:4
288:6 290:22 310:20

maker 30:6 44:25 46:22 72:18 140:6
153:11 155:4,13 178:7

makers 63:14

makes 133:18 138:13 147:10 173:19
182:9,23 228:11

making 24:14 26:10 46:18 198:7
209:19 212:15,19,23

managed 42:9

management 92:7 277:5

manager 42:9 52:10 54:25

managerial 27:21 42:1 46:6

managing 44:1 52:14

manipulated 19:6

manipulation 75:24 83:15 223:19

manipulative 96:17,19 118:16
121:15

manual 308:13 310:12 311:14

manually 47:3

March 159:21

Margolies 75:21

Mark 241:1 242:24 244:14 253:1

marked 11:3,4 12:8,10 14:7 15:5
66:15 87:4 92:13,15 97:22,24 104:4
115:24 116:2 118:6 120:25 145:5
148:14 159:11 175:12 178:17 186:19,
23 204:12 214:22,25 222:19 230:25
232:12 240:20 242:17 248:25 253:21
258:16 260:9 269:12,15 275:16
278:18,21 286:10,13 289:24 304:15,
21

market 30:6,22 31:1,9,11,17 37:12
39:22 40:11 44:25 46:22 48:9 51:9
60:9 61:22 62:13,18 63:3,10,13 70:8,
9 72:17,18 75:24 83:15 106:24
107:21 117:1 140:2,4,6 153:11 155:3,
13 178:6 183:14,18,24 201:6 223:19
273:9

markets 46:18 63:2,23 116:24
139:14

marks 15:24

markups 72:19

Mary 61:9

matched 77:2

material 122:12 138:13 310:19

materials 15:11 85:20

matter 35:5 44:4 69:2 73:14 142:21
213:7 256:14 275:11

matters 63:22,24 213:3

maturity/expiration 189:15

meaning 24:10 102:23 150:4

meaningful 133:8

means 93:6 121:13 165:16 167:19
181:13 202:19 206:4 234:9,13 277:8

**meant** 67:17 133:14 165:1

**medallion** 294:9,12,18,22 295:9,23 296:22 297:10

**media** 178:11

**medium** 67:11 121:21 142:1 206:8

**mediums** 142:3

**meet** 180:20

**meeting** 29:11

**member** 30:5 32:20 38:11 40:24,25 41:4,5,8,12 49:13 142:12

**members** 29:5 33:18,21,25 34:7,11, 17 36:17 69:13 126:23

**mention** 130:9 141:3 198:20,23 199:2

**mentioned** 20:2 36:15 40:23 60:22 72:11 78:24 80:11 102:1 130:15 158:13 195:13,24 196:23 197:24 198:13,16 199:20 229:5 302:1

**merge** 102:12 106:5 111:14

**merged** 30:17 31:24

**merger** 100:18 105:16 108:16 114:10,12 115:12 116:17,22 117:6, 11,13 266:1 270:9 271:5 272:22 276:25 277:16 281:13,20 282:22 283:4

**mergers** 115:8,17,20 116:1,8

**merging** 115:1

**merits** 99:11

**message** 57:13

**method** 117:8

**Micah** 263:22 264:2

**Michigan** 292:18

**micro** 16:15

**microcap** 168:7,11 201:6,15 202:23 203:15 218:4 223:19 298:24 299:5 300:6

**middle** 146:21 152:8 155:9 167:24 179:3

**midway** 164:9 190:2 259:8 307:24

**Mike** 311:2,23

**million** 106:24 107:21 246:19

**mind** 22:10 107:4 239:20 272:25 274:9

**mining** 168:14 169:5

**minute** 57:15,19 95:18

**minutes** 21:13 84:18 263:10 312:8, 12

**Miranda** 25:15

**Miriam/rose** 229:3

**Mirman** 233:8,23 239:4,15 242:3,9 252:13 309:16

**Mirman/rose** 228:24 231:5 309:11

**misleading** 88:25 89:8

**misrepresentation** 138:14

**misrepresentations** 81:7

**mistaken** 193:24

**model** 265:17

**modules** 49:15

**modus** 282:1

**moment** 120:19 183:13 282:16

**Monday** 159:21

**money** 100:8 192:4 199:4 230:10

**months.'** 265:17

**Morgan** 81:5

**morning** 7:5,9,17

**mouthwash** 113:6

**Move** 195:9

**mutual** 39:23

**myriad** 140:20 207:22

## N

**named** 187:13 287:21 291:6

**Nancy** 291:6

**narrative** 49:23

**NASD** 27:9,18 28:4,8,10,13 29:5 30:5,13,14 31:5,18,23 32:11 33:16,24 34:5,7,13 35:4 37:1,5,18,21 38:7 39:11,13,18 40:9,17,24 41:9 49:19 50:6,17 55:2,13,21 59:15,21 60:23,24 61:10,16 62:4 63:11,16 66:4 68:1 69:5 141:15 173:6,10 244:25 257:14

**NASD's** 38:22 39:7 42:1 48:15

**NASDAQ** 31:2,4,5,10,19,21 60:19,

22,24 61:1,8,12,16 62:5,8 63:1,15,24 107:9

**national** 30:15 31:13 35:25 62:8 139:14,24 140:7,13,18 294:19

**nature** 126:18,19,21 134:9 149:7 227:1 229:22

**necessarily** 93:20 102:23 142:20 159:5 161:9 167:18 168:24 210:5 237:4 266:11 268:14 302:21 307:3

**needed** 43:6,7 193:13 277:11

**Nersisyan** 259:21 261:2,8,17

**Nersisyan's** 261:23

**NESTOR** 57:11

**net** 29:8,11 43:11

**nice** 200:5

**Nicholas** 241:1,16 242:25 244:12,14 257:2 260:15

**Nichols** 253:2

**NMS** 141:1

**nominal** 93:8,10,13 95:22 109:2,3,20

**non-applicability** 192:15

**non-binding** 163:16

**non-lawyers** 25:12

**non-nasdaq** 155:5,14

**non-profit** 32:12

**non-reporting** 137:12 173:11,16

**noon** 171:16

**normal** 295:13

**notarized** 239:16 240:1,4 241:19 243:13,24 244:22 246:12 309:4

**notary** 246:6,7

**notation** 310:20

**note** 131:2,17 160:12 305:11

**noted** 15:11

**notice** 22:7 220:14

**November** 98:15 145:14

**number** 17:9 64:14 119:7 124:20 125:2,16,24 126:12 131:6 136:11 168:2 176:5 189:7,9,11 227:11 240:20 250:1

**numbers** 53:22

**numeral** 164:7 263:22

**Numerals** 190:8

**numerous** 247:13

---

**O**

**oath** 8:12 262:15 268:22 269:4 270:18 271:15 272:8

**object** 24:25 34:22 209:3,14 210:24 302:23

**objected** 303:1

**objection** 39:8 73:16 74:6 75:6 85:14 132:10 134:18 150:10,11 199:17 200:15 208:8 209:1 210:11,15 216:18

**objections** 208:15

**obligation** 128:9 137:4 140:13,15,19 143:24 144:3 150:7 154:16,17 156:6 178:7 201:11,22 202:13,20 203:20 204:1 217:2 252:23 298:18,22 299:11 306:9 308:25 311:15

**obligations** 26:7 120:14 133:16 135:13 140:1,6,10 152:14,16 170:21 191:23

**Obscene** 186:22 187:13

**obtain** 16:21 58:8,12 154:4,9 158:11

**obtained** 17:22 131:12 147:17 157:24

**occur** 224:13

**occurred** 225:2

**OFAC** 191:18,23 192:1

**offered** 126:20

**offering** 115:5 117:9 125:3

**Offerings** 104:14

**offhand** 197:6,10

**office** 28:19,21 38:18 116:9 192:1

**officer** 63:8 126:23 310:16 311:1,18, 20

**officer's** 255:11

**Officer/director/shareholder** 240:23 242:20

**officers** 129:16 157:23 224:8

**offices** 42:2 126:8

**OGC-569** 278:20

**oil** 168:13 169:4,18

**omitted** 14:18

**on-site** 29:4 38:12 41:3 43:1,4,18

**ongoing** 191:14

**open** 268:24

**operandi** 282:2

**operate** 111:19 193:2 266:18

**operated** 281:10

**operating** 92:6 96:2 116:21 117:2 268:19

**operation** 102:11 227:22 296:8

**operational** 111:13 170:17 188:16

**operations** 93:9 95:22 106:17 108:2 109:3 153:14 168:14 169:5 179:21

**opine** 74:8 210:25

**opining** 26:22

**opinion** 15:12 18:23 24:10 25:24 26:6 73:13 74:22 75:5,9,10,14 87:16 90:24 163:20 200:10 201:10 213:8 221:25 228:7 229:1,22 239:2 243:16, 20 252:10 257:4 263:1 273:17 275:8, 11 285:7 302:15

**opinions** 26:25 27:3 86:18,19 212:20 221:22 228:9 305:19

**opportunities** 280:6,16,19

**opportunity** 277:17

**oral** 259:11

**oranges** 134:23 149:24

**order** 78:14 116:22 141:24 142:25 199:3 261:18 281:25 284:6 289:9 308:19

**orders** 77:3

**organization** 30:21 36:5,9 37:10 61:5 142:2

**organizations** 32:21 34:14 35:6,23 61:19 62:1 184:10

**organized** 281:6

**originating** 310:18

**OTC** 67:13

**outcome** 227:3

**outstanding** 126:14 189:12

**over-the-counter** 30:22 31:1,9,11, 17 62:13,18 63:2,23 139:13

**oversee** 52:7

**Overview** 250:21

**owned** 78:13

**ownership** 264:25 265:3,25 266:16 268:1 283:17

**owning** 61:22

**owns** 142:2

---

**P**

**p.m.** 180:23,24 263:14,15 312:17

**pages** 113:13 220:9 223:3

**paid** 65:8,12

**pains** 26:24

**paper** 95:1

**papers** 240:10

**paperwork** 29:7

**par** 126:11

**paragraph** 87:20 99:3 101:7 103:15 121:11 122:1,2,4,7,10,13,18 124:1,5, 10 125:7 127:16 128:16 129:24 135:23 146:20 152:7 154:2 155:2 157:4 170:25 172:24 173:3 179:5,10, 13 180:9 190:2 205:25 206:4 215:16 216:6 223:8 265:8,11 267:13 276:14, 19 279:25 280:4,10 281:5 308:18 310:9

**paramount** 277:7

**paraphrasing** 94:7

**parcel** 73:20 268:4

**Park** 291:8,13

**part** 29:22 31:5 41:17 60:23 69:17 73:20 98:14 114:23 115:21 127:3 130:14 134:21 146:11 149:7 151:1 160:3 163:25 183:20 224:25 241:10 254:10 268:3 279:20 311:12

**participant** 184:18 185:14,16 196:16

**participants** 152:22 184:5,8 194:6

**participating** 280:18

**partner** 100:18 108:16

**parts** 220:8

**party** 280:12

**Pasqualli** 288:11

**pass** 33:17 49:20

**passed** 97:6

**past** 168:13 225:3,16 226:7

**Pasternak** 72:12

**Pat** 61:11

**path** 134:20

**pattern** 199:11,16

**pause** 21:12 208:15

**pay** 135:6 261:17 289:9

**paying** 161:19,20

**payment** 289:13

**pending** 10:9

**penny** 103:20 105:20 106:5,15,22
107:6,9,15,20,24,25 140:5

**Penson** 193:6,12,13 195:4,23 196:16
197:15 198:11

**people** 37:13,16 79:20 100:2 217:7
237:5 262:11

**perceived** 117:7 203:1

**percent** 43:21 44:18 46:25 47:13

**perfectly** 114:8

**period** 29:21 31:3 41:25 42:8,13,24
43:19 45:16 50:20,21 52:9 53:17 55:2
56:21 57:3 60:8 169:1 267:10 275:2

**permit** 70:24 143:25

**person** 105:18 147:11 206:3 207:18
209:25 216:16 224:11 259:10,12,13
261:3 288:23 310:17

**personal** 75:9,14

**personally** 44:3 45:14

**persons** 127:5

**perspective** 25:7

**pertaining** 173:7,10

**phone** 237:15

**photocopy** 260:21 261:1,14 288:18
289:5

**phrase** 95:6 123:11

**physical** 182:4 234:8,15

**physically** 183:2

**picture** 246:22

**pile** 240:9 244:6

**Pink** 45:1,2

**pizzeria** 282:3

**place** 180:13 263:8

**plan** 17:2 19:1 92:7 93:20 94:20
95:24 102:11 105:14,15 106:4 109:14
111:9,21 112:4,10,11,16,20,24,25
113:9,11,13,18,22 114:1 180:19

**plans** 94:24 113:3 230:1

**play** 43:14 175:21

**played** 272:10

**plea** 235:8

**plenty** 169:13

**PNC** 294:18,23 295:5,9

**point** 10:3 15:18 25:3,11 49:6 52:8
53:2 58:24 60:23 135:1 150:24
162:14 169:4,17 170:16 182:22
197:25 200:7 210:19 265:4 266:4
282:5 293:21

**pointing** 169:21 238:25 267:14

**points** 15:16 229:21 312:25

**policies** 48:16 50:23

**policy** 49:12 70:18

**pool** 117:5

**popular** 168:16

**portfolio** 83:11

**portion** 28:7 46:6 292:24

**portions** 85:24

**position** 27:15 64:6 68:5

**positions** 14:19 27:21 41:13 42:1

**positive** 36:13

**possession** 181:25

**possibility** 165:17

**possibly** 94:17 227:2

**post-secondary** 23:4

**potential** 10:19 61:21 71:22 117:19
162:24 280:14,19,20

**potentially** 117:4

**power** 293:17,24

**practically** 40:3

**practice** 29:17 141:10 142:21 217:1

**practiced** 24:5

**practices** 121:16 226:8 299:10

**preamble** 160:13

**precedent** 226:18

**preceding** 127:3 254:14

**predecessor** 126:6

**Preliminary** 131:2

**premised** 86:20 228:9

**premises** 293:25

**preparation** 12:22

**prepared** 11:14,24 40:7

**preparing** 12:5,18 239:14 269:7

**prerequisite** 207:1

**presence** 137:3 300:12 303:22

**present** 64:2 133:21,22,23 154:3,8
165:13 174:13 216:2 228:15 251:15

**presentation** 297:20 298:1,7

**presented** 215:18,20 218:3,23 242:9
244:3

**president** 51:9 55:20 56:4 59:24
60:3,18 61:10,12 64:3 235:11 288:11

**press** 16:12 77:2

**pressure** 279:1 281:10 282:4

**presume** 8:5 91:11,21,23 97:16
119:10,11,14 149:2 158:18 176:8

**presumed** 173:23

**presumes** 156:10

**presuming** 133:22

**presumptively** 175:1

**pretty** 39:12 52:17 103:24 132:20
142:17 164:22 246:24 256:1 258:1
267:1

**prevent** 118:15 121:14

**previous** 295:24

**previously** 159:11 242:17 248:24
253:20

price 259:14,15 261:19

priced 46:19

pricing 96:12,13

primarily 218:4

principal 73:22 126:7 240:22 242:20 264:4

principals 43:15 306:19

principles 311:22

prison 257:20,24

private 87:23 114:13,14,15,21,25 116:21 117:1,3 125:21 213:16

problem 22:2 54:18,24 57:25 63:13 70:1 272:16 280:3

problems 21:11 46:25

procedural 69:19 70:1

procedures 48:16 49:15 50:23 70:19 131:7 285:25 286:2 305:15,21 306:3,10,15 307:8,18 308:4,8 310:11 311:13,24

proceed 10:13 44:10

proceeded 79:19

proceeding 65:3 80:17

Proceedings 312:16

process 8:6 57:1 59:9 84:5 143:6 182:9 185:19,24 190:14 218:19 284:5

processing 298:14

produce 25:19

products 126:20 168:16

profession 153:4

professional 99:13

profit 126:25 227:25

profitable 198:8

programs 49:22

prohibiting 224:6

prohibits 206:20

promise 312:10

promoters 77:1

prompt 223:16

promptly 217:2 219:3

promulgated 133:1 177:22

promulgation 145:18

pronouncement 154:19 202:6

pronouncements 91:17 103:17 133:19 201:25

proper 304:23

properly 192:25 207:13 208:2 209:11 302:16,21 303:24 304:17

proposal 160:3

proposals 49:17 50:2

propose 223:23 224:6 225:23 226:3

proposed 159:25 160:17 172:11 176:18 179:6,7,14 220:14,17,25 221:6 222:12,17,24 224:18 225:24

proposing 172:15

proprietary 186:14

prosecuted 32:15

prosecution 76:7 77:21,25

prospectus 124:21 206:9 272:15 279:21 282:12,17,25 283:2

protect 223:16

protected 29:13 177:24 178:11

prove 212:21

proven 274:7

provide 9:1 15:12 91:7 161:8 163:17 188:4,22 190:18 191:18 194:20 230:9 245:6

provided 10:23 13:6,25 25:23 26:2,5 75:23 85:6 125:3 127:24 131:24 136:20 157:21 191:10 192:13 193:12 219:23 221:23 231:24 239:4 241:25 251:5 252:12 284:17

providing 24:9 127:18

provision 203:8 204:4,21 205:6 209:18 215:14 216:12 217:24 309:25 310:14

provisions 24:11 133:2 171:2 177:23 202:7 214:12 216:14

public 17:5,7,13 18:5,8,11 19:4 57:7 58:4,5,12,21 59:3 88:3,17 100:7,12 102:2 106:16 111:24 114:13,19 115:1,2,5,11 117:4,5,8,9,12,17 137:18 138:1,10,23 142:1 152:23 158:1,6,11 173:22 177:23 178:11 183:14 186:11 229:6 230:9 246:6 267:9 271:5 274:23

publication 121:20 147:9 159:19

publications 71:10,13

publish 55:4 121:17 128:6,21 129:3 139:5,25 140:13 142:13 144:11 166:13 169:10

published 115:16 125:18 127:8,11 128:19 142:25 160:4 170:14 177:2,17 178:21 300:10

publishing 129:11 152:15 153:10 155:4,13,22 165:15 173:15 179:16

pump 19:21 20:1,4,25

pump-and-dump 17:24 20:15,20 77:25 82:16 296:8

pumping 83:11

purchase 259:14 261:23 289:14

purely 24:12 25:7 30:4

Purplereal.com 144:18 283:7,12

purportedly 168:15 240:3

purporting 239:17

purpose 105:14 106:10 112:5 141:25 206:12 227:24 228:5,6 229:13 230:12,17 285:11

purposes 96:23 99:15 105:7 113:12 122:1,24 124:2 193:8 208:1 277:3

pursuant 124:9 125:9,19

pursue 116:16,22

pursued 276:19

purview 26:16 273:2

put 52:1 65:2 70:12,25 110:2 132:13 134:17 161:24 166:6 178:1,10 183:15 199:4 209:9 233:17 238:9,21 244:19 269:4 272:7 306:18 309:22

putting 296:3

<hr>

## Q

qualifications 69:20

qualified 179:18

qualifying 211:23

quarreling 282:24

quasi 32:23 33:2,5,7

question 9:1,11,15,17,22 10:8,9 17:11,12 21:17 40:13 45:19 47:5 54:2

74:12 103:3,5 110:3,9,10,18 111:17
120:20 134:24 135:12 136:21 150:20
208:12 209:2 211:11 233:6,10,11,15
234:7 235:2,7,10,14 239:22 240:25
241:4,8,13,18,21,25 242:8 247:16,18
252:9,25 253:11 258:5 270:7,12
271:3 274:11 295:21 300:9 303:3
304:5

**questioned** 268:22

**Questionnaires** 250:22

**questions** 40:15 83:24 312:20

**quicker** 117:7

**quickly** 218:20

**quotation** 15:24 55:5 67:11 121:18,
20,21 126:2 127:7,10 128:7,18,22
129:3,11 139:5,25 140:14 142:3,13
144:1,4,11 147:9 155:22 159:19
165:15 166:1,7,14 169:10 175:24
219:14,24 265:23,24

**quotations** 67:11 142:1 145:3,12
148:12 152:16 153:10 155:4,13
173:15 178:1,10 179:17

**quote** 141:24 142:25 221:13,16
231:8 236:15 264:12 268:13 276:2
308:13

**quote/unquote** 299:12

**quoted** 116:25 176:5 265:1 308:12

**quotes** 45:1

**quoting** 231:18 310:10

---

**R**

**raise** 100:8

**rate** 189:14

**re-sell** 259:12

**reach** 171:3

**read** 90:8 92:19 119:11,15 123:7
149:2 163:20,22 176:9 209:2 220:6,8
243:8 272:15 313:4,8,24

**reading** 25:15 280:2

**ready** 53:11 57:22

**reaffirmed** 180:3

**real** 92:7

**realized** 231:13

**reason** 9:10 10:12 224:11 226:5
281:24

**reasonable** 122:8,17,22,23 123:2
131:10 147:15,18 149:11,12 150:5,
23,24 151:3,7,17 154:10 166:11
171:3 216:6 308:20

**reasons** 61:19,23 100:2

**recall** 43:17 47:6,10,11 58:17 79:21
90:17 185:2 193:9,16 194:13 195:10
197:10,21 240:6 242:14 252:2 255:21

**receive** 23:17 310:2

**received** 297:9 302:14

**recent** 125:8 126:16,25

**Recess** 84:20 180:22 263:13 312:15

**recognize** 99:12 292:3

**recollection** 38:3 197:12

**Recommenced** 84:22 180:24
263:15 312:17

**recommend** 198:9

**record** 94:3 173:6,9 258:1 268:21
279:6 284:16,23 313:1

**recordkeeping** 46:17

**records** 20:23 29:9 53:14 54:6,8,11,
13,16,21 121:24 147:10 265:21

**red** 130:10 133:21,23 134:4 136:23
137:2,3 151:18 154:2,7,20 157:5,14
158:19,21 163:25 164:11,16 165:2,13
166:2,9,19,22 167:5,15 168:21 169:6
170:2,6 174:12 180:10 201:18
202:14,20 203:2,21 247:13,23 257:12
258:5 264:23 267:23 268:4 285:12
286:2 295:25 298:13,19 299:16,22
300:12 301:11 305:13,24 309:7

**refer** 131:5,18,21

**reference** 19:14 31:16 55:10 59:3
88:1 158:1,6,7,10 184:24 185:8 189:2
192:4 198:14 210:20 214:3 255:4,9
264:2,17 271:7 285:1

**referenced** 19:21 68:12 97:12
148:23 250:1 259:1 265:22 299:19

**references** 107:14 128:17 190:24

**referencing** 19:14 42:12 45:9 93:2
107:13 122:18 222:7 269:25 300:18,
23

**referred** 33:1,9 44:15 47:9,15 95:11
153:1 244:7

**referring** 35:23 90:11 227:7 290:15

**refreshed** 38:3

**refund** 259:14

**refuse** 203:4,21 217:23

**refused** 297:3,6

**Reg** 48:10

**register** 178:22 211:16 215:11,19,
21,23

**registered** 16:23 31:12 62:10 192:25
207:14,19 208:3 209:11,21 211:21
215:18 224:7 265:12 302:10,16,22
303:24,25 304:17

**registrant** 93:7 280:17,21

**Registrar** 300:25

**registration** 19:16 62:22 112:12,21
117:15 124:24 137:21 138:17,24,25
139:7 206:1 211:13,19,22 212:3
229:7 266:9 270:1,19 271:22 277:23
278:12,25 279:11 281:18 282:10
302:6 304:2,3

**regular** 174:17

**regulate** 32:20 35:6

**regulated** 31:2 40:9 50:2 120:5
133:15 163:2

**regulating** 31:9

**regulation** 28:8 30:25 37:12 38:11
39:23 40:12 41:4,5,12 49:13 51:10
59:21 60:9,19 61:11 103:8,22,24
104:10 106:11,12 125:4 133:6 141:1
203:25 204:3 218:12 306:4

**regulations** 25:25 26:3,23 33:17
41:9 73:19 160:14,19 218:8 222:18,
22

**regulator** 61:22 161:22 244:17 246:3

**regulators** 25:10 58:22

**regulatory** 16:14 30:18 32:9 33:2,8
35:20 39:7 48:15 49:12 50:2,23 51:25
60:4 62:4 63:5,6,8,9,19,22,24 102:17,
25 103:8,11,13 104:19 108:24 109:1,
19 110:21 112:3 131:25 132:2 133:16
135:7 139:18 154:23 161:10,13
165:25 218:18 227:1 247:6

**reject** 243:24 285:17

**rejected** 69:17 149:21 247:11,20
248:2,5,8,16,18 252:15 253:6,11
257:7 263:3 285:8,22

**rejection** 285:16

**relate** 16:8 85:15 140:21 207:22 299:20

**related** 16:12 29:8 66:8 78:11 79:5 84:5 100:24 101:9,18 125:20 195:4 244:15 286:20 290:4 301:10

**relates** 307:17

**relating** 16:11 141:3 284:17

**relation** 126:1

**relations** 40:24,25

**relationship** 127:19 128:1,11 152:21 155:6,15,23

**relative** 99:11

**relatives** 230:4

**release** 16:12 119:6,7,15,19 131:6, 18,21,25 132:6,14 134:20 148:18 151:13 174:6 176:5,8,18 177:6 178:22 220:3,7,12 225:11,22

**releases** 77:2 130:14 300:14

**relevance** 14:15 210:15

**relevant** 221:17 301:5,10

**reliability** 134:8 136:14 138:9 150:2 156:25 157:20 165:18 174:24 175:13 177:19,21 245:1

**reliable** 122:14 129:21 131:12 147:19 156:11 158:19 173:23 175:1 298:4,8

**relied** 151:10 193:5 196:18 239:5 243:18

**rely** 191:12 221:21 295:10

**relying** 199:24 244:25 309:10

**remember** 9:21 10:1 47:1

**removed** 22:10

**removing** 299:7

**rendering** 26:24 27:3

**repeat** 74:13,16 103:2 303:5

**repeating** 199:6

**rephrase** 9:12 74:14 103:5 127:21 303:7

**report** 10:22 11:4,14,25 12:5,10,18, 23 13:3,7,13 65:2 71:9 75:15 81:3 86:19,25 87:15 89:10 93:17 96:10 102:6 117:13 118:2,11 125:8 135:18

136:12 148:23 154:18 175:6,8 184:25 193:4 194:25 195:14,19,25 196:12 197:20,25 198:18,25 199:20 200:21 211:1,5 214:4 219:7 221:11 227:5,21 228:9,11,14 229:19 230:24 236:14 238:14,24 239:1,14 263:19 264:24 269:7 271:25 273:6,16 274:19 276:3 283:20,21 284:25 298:12 300:25 301:7,12 305:5,19 307:23

**reported** 48:10

**reportedly** 231:25

**reporter** 8:24 128:3 130:4 134:1 208:21 312:9 313:7,13,17,23

**reporting** 37:13 137:12,15,18 173:7, 16,20,22

**represent** 7:18,20 193:7 269:24

**representation** 192:19 196:21 270:6

**representations** 138:9 191:13 192:11,23 197:14 221:21 259:11

**representative** 199:5

**representatives** 196:19

**represents** 188:14 190:4 191:9 259:7

**repurchase** 259:12

**reputable** 295:6

**request** 59:6 69:16 107:11 147:11 190:20 215:19,21

**requested** 215:23

**require** 141:11,12 142:20 159:5 165:19 179:8 180:4

**required** 69:7 97:11 117:13 121:25 122:7 124:9 129:2 131:8 212:20,21 250:8 279:20 306:4

**requirement** 109:19 127:23 131:9, 20 132:1,3 141:21 142:24 150:8 165:24,25 172:16 180:6 201:15 218:18

**requirements** 67:19,20 117:15 134:16 139:9,19 150:2 153:8 154:23 157:19 161:10 179:14 188:16 196:18 217:19 227:1

**requires** 129:9 141:14 142:12 191:17

**requiring** 55:14 97:6

**resale** 16:23

**research** 13:1,11 158:3

**resolve** 166:20

**respect** 25:14 54:22 161:18 190:3,20 196:17,20 213:24 223:14 299:6 309:25 312:3

**respective** 250:25 252:4 255:10,17

**respects** 122:12

**response** 256:18

**responsibilities** 152:25 153:2 223:14

**responsibility** 277:6 310:15 311:25

**responsible** 196:17 310:17

**Restaurant** 275:21

**restricted** 303:14,16 304:15,21,25

**restriction** 304:7

**restrictive** 302:20 303:10

**restructuring** 93:19

**result** 224:1

**resume** 67:10

**Resumption** 145:3,12 148:12

**retain** 173:6,9

**retained** 10:17 65:5 73:6 76:22 77:17 79:9 82:9 127:1

**retention** 17:4

**retrieval** 158:2

**retrieve** 57:8

**revealed** 136:5

**reverse** 114:10,12 115:8,12,16,20 116:1,8,17,22 117:6,10,13 271:5 272:22

**review** 33:21 34:1 44:2,8,11 53:13 54:6,11,12 55:2,21 87:11 122:4 140:14 143:20 153:23 160:23 170:21 173:5,9 201:12 242:12 251:19 255:16 265:20 278:11 279:5 284:12 310:19, 20 311:15

**reviewed** 13:19 38:14 40:7 54:8,16, 21 55:24 68:8 85:11,23 86:1,4 195:3, 22 197:13 199:9 231:19 232:23 239:13 249:11,19 251:12,22 254:5 269:7 272:20 274:14 276:6 277:25

**reviewing**  28:7 87:2 90:5 118:4
131:8 136:19 137:1 146:6,13 148:20
155:17 157:2,7 159:12 175:9 176:1
188:9 234:21 252:2 255:8 274:14
277:22 279:17 292:19 308:18

**reviews**  138:19 143:14

**revised**  153:8

**right-hand**  92:21 116:15

**rights**  25:15

**risk**  212:12 307:2

**riskless**  73:22

**road**  19:7 209:5

**Roger**  77:14 79:6

**role**  28:13 39:7 49:20 62:7 175:21
200:25 223:25

**rollup**  277:1

**Roman**  164:7 190:8 263:22

**room**  59:3 158:2,7

**Rose**  198:6,9 231:8 232:11,17 233:5,
22 235:1,24 236:16,24 237:16 238:5,
10,22 239:4,15 243:4 244:2 245:5
252:14 253:2 295:18 296:2 309:15

**Rose's**  231:18 240:14

**rotating**  293:6

**routinely**  153:12

**rule**  29:12,20 30:1 33:24 44:23 49:16,
18,20,21 53:20 54:22 55:10,11,16,22
57:9 58:3 67:19,21 68:11,12,19 69:1,
4,7,12 70:6,7 91:8,14,18,24,25 95:21
97:6,18 98:6 99:4,8,9 105:21 107:7
109:1 118:6,11 119:11,22,25 120:5,8,
14 121:6,7 123:8,11,15,18 124:2
127:15,24 129:9,14 130:9,19 131:9
132:9 134:12,15,22 135:4,13 136:20
137:11,17 139:5 140:16 141:11,20,25
142:11,16,19 143:2,11 144:23
145:17,18 146:4,7,9 147:23 148:18
150:6 152:15 153:9,24 156:2,5,10
159:25 160:5,24 161:14,18 162:8,25
165:12 166:24 167:11 172:8,11,16,19
173:15 174:2 176:19 177:12,19,21
178:10 179:6,7,14 180:4 201:21,23,
24 202:6 203:25 204:2 207:21 210:1,
20,22 212:6 220:18,20,25 221:1
222:9,12,24 223:12,23 224:6,18
226:3,5,10,18,21 250:8 299:20
300:15 307:6,11,12,15,17

**Rule's**  157:19

**ruled**  70:21 74:25 81:18

**rulemaking**  220:15

**rules**  26:22 33:17,20 34:8,15 35:15
36:17 39:25 43:14 55:14 73:19 80:21
97:24 99:3,9 100:22 113:24 140:21
141:3 143:22 192:15 207:22 223:23
224:22 225:1,13,23

**run**  182:18 307:2

**runners**  182:18

**running**  58:24 72:20 285:17

### S

**S-1**  265:14 266:9 268:13 269:25
270:19 275:24 277:15,22 278:1,12
304:1,3,11,17

**S-1/A**  275:20

**S-1/A/12**  278:24

**S-1S**  89:18,20

**S-8**  98:3 101:13 304:9

**S1**  278:21

**safe**  212:9

**sale**  78:14 198:7 205:20,21 206:12,
13,20,21 207:9 209:21 231:4 237:23

**saleable**  78:18

**sales**  29:16

**sanctioned**  30:24 32:18

**satchel**  182:19

**satisfied**  67:18

**satisfy**  157:18

**save**  199:3

**scene**  25:15 213:9

**schedule**  267:11 274:18

**scheme**  17:24 18:12,13,16 19:17
20:15,20 78:1 83:12 88:24 89:24
299:14

**schemes**  19:6 82:16 83:15 96:17,19
118:17

**school**  23:25

**science**  174:5

**scienter**  273:1 274:6

**scope**  160:22 212:16

**screen**  12:16 148:17 156:24 168:1
236:22 238:19

**scroll**  48:18 98:10 116:4,13 119:1,2
121:12 125:1 152:4 175:11 176:3
186:25 189:24 190:1 191:7 232:14
243:2 250:12 256:23 259:5,20,25
269:18 286:15 287:14 288:9 292:13
294:7 307:24

**seal**  246:6

**SEC**  7:19 10:23 15:10 16:5,6,10,11
17:21 18:3,21 29:20 33:21,25 34:15
44:23 49:19 55:11 59:3 65:5,12 67:19
69:24 70:7 72:11 73:7 78:24 79:3
82:5,10 88:25 89:14,17 90:4,15,16
91:17 97:5 99:7 101:7 103:17 113:24
115:16 116:9,20 117:14 118:6 132:6,
14,18 133:18 134:3 138:2 139:2
141:11,20 143:11 161:17,21 162:22
165:2,5 168:20 172:15 174:8 175:20
176:5 178:16 199:21,24 201:25
202:1,4 210:20,21 211:21 218:7,11
219:4 220:3 224:17 225:22 267:6
279:12 298:21 300:1,10 307:15,16

**SEC's**  73:10 172:6 174:1 274:19

**secondary**  183:17,24

**secretary**  38:18 50:17

**section**  15:5 30:24 38:14,16,17 71:8
87:4 90:23 105:6,8 116:16 118:6
121:22 122:2,8 124:22 125:9,19
131:1 156:25 172:24 175:12 195:15
196:14 200:24 201:5 202:8,12,22
203:6,7,13 204:5,17,22,25 205:3,6,
12,19 206:16 207:2 208:1,3 209:10,
20 211:7,25 212:16,22 217:24 284:4
285:11 299:23 308:12

**securities**  7:20 10:18 16:25 17:16
30:15 31:13 32:16,19 35:1 46:23
62:10 67:12 69:25 73:15 74:4,21
76:23 79:10 85:7,13,20 91:9 105:23
107:16 108:1 117:16 118:19 119:6
124:22 126:13 131:5 138:18 153:3
157:22 182:13 188:13 190:10,15,21,
25 191:19 192:16 194:1 202:8 205:22
206:22 207:10,23 209:22 210:6,7
211:14 212:1 217:17 218:2 223:18
224:1,2,10,13 233:7,24 235:3,15
241:10 242:1 243:17,23 246:16
247:10,19 248:5,15 249:21 250:3
251:8 252:15 254:19 256:9 257:6,23
262:3 263:2 266:15 277:21 301:20

305:20 306:25 307:3 308:24 309:3 311:1

**security** 121:18 126:11,12 140:14 147:9 153:11 155:5,7,14,16 179:17 184:20 206:2,8,11 207:2,5,6 208:2 209:12 211:17 215:17,22 221:23

**seek** 128:21 183:25 221:20 308:14

**seeking** 100:4,17 128:1,3,6 183:7 185:25 186:4 280:18

**self-regulatory** 30:21 35:9 61:5

**sell** 17:4,6,13 18:8,10 107:25 113:7 206:7 212:11 213:11 237:16 269:1 272:21 273:8

**selling** 18:4,5 87:22 88:19 209:25 227:24 228:6 229:13 265:13 266:5

**semi-active** 183:19

**sends** 185:16

**senior** 51:9 55:20 56:4 59:23 60:3,18

**sense** 24:12 25:20 52:22 102:25 103:10,11,14 113:3 120:17 122:19 173:19 228:25

**sentence** 15:9 87:19 89:23 154:6 157:4 173:3 175:19 179:12 276:18 280:9

**separate** 61:4 152:24

**separated** 61:16

**September** 176:14

**series** 163:25

**service** 157:25 158:2

**services** 65:9 126:20 230:9 264:21

**set** 152:24 216:15 258:8

**sets** 214:12

**settlement** 181:15,17 183:21 223:17

**Shapiro** 61:10

**share** 192:20 291:20

**shareholder** 235:12 251:4 262:4 276:23 277:4,6

**shareholders** 18:22 230:6 235:4 236:1 287:5

**shares** 126:12 183:13 189:9,11 192:20,24 213:12 217:3 233:8,25 234:3,6,8,9 259:13,15,16 261:19,24 265:12 284:13 289:14 290:18 291:7, 11,12,23 292:25 296:19 302:11,15

304:21 305:1

**sheet** 72:7 126:25 232:16 290:4

**Sheets** 45:1,2

**Sheldon** 231:8 232:17

**shell** 15:19,23 16:1,8,11,13 17:5,7, 13,20 18:6,9,11 19:9 87:21 91:3,8,20 92:3 93:1,5,6,18,21 94:1,13,15,20,23 95:9,15,20 96:6,10,12,18,22 97:1,6,7, 23 98:4 99:11,14,17,18 100:1,3,22,24 101:9,12,18,19 102:9 103:16 109:24 110:5 111:5 117:12 118:19 123:15 198:8 227:23 228:15 231:4 237:3,9, 24 265:13 266:6 267:8

**shells** 100:10 110:8,15 199:12 227:23 228:5 282:1 284:6

**short** 109:23 253:10 267:10

**shortly** 264:25 265:4,23

**Shoss** 77:14 79:6

**show** 11:2,6 12:7,12 14:4 55:15 66:12 67:17 92:12 97:21 115:23 143:21 145:1 186:19 204:10 214:22 222:16 240:19 242:16 248:23,24 254:10 258:8,13 269:12 273:3 275:15 278:18 286:9 289:22

**showing** 104:10 204:21 205:2,7 212:21 262:17 273:2

**shows** 23:21 238:1 245:12 258:1 273:13

**shut** 19:9

**sic** 196:20

**side** 92:21 110:21 116:15 125:15 204:17

**sign** 244:20 245:23 294:24 301:25 311:15 313:24

**signal** 202:25

**signature** 241:19 243:13 258:20 260:3 286:12,17 287:16 288:5,7 294:9,15 295:11,23 296:22

**signatures** 297:11

**signed** 241:15,21 257:1 260:6,15 261:3,8 264:4 288:2,10,23 294:3,25 309:4 310:25 311:7

**signer** 246:8

**signer's** 246:9

**significant** 43:6 106:16 108:2,9,17

119:25 305:11

**signing** 191:5,8 295:16 310:21

**similar** 69:12 127:2 200:12 238:24 252:9 287:17 299:22

**similarities** 136:6

**similarly** 9:24 86:4 99:16

**Simply** 181:13

**simultaneous** 13:17 17:18 26:20 33:4 35:17 36:6 39:1,19 40:20 41:15 42:6 46:10 53:12,23 59:19 64:24 65:24 91:16 94:2 95:14 96:16 100:16 106:9 107:2 109:25 110:19 114:4 139:22 140:11 141:6,16 150:22 156:4 163:12 164:24 169:25 174:9 178:3 181:19 185:20 194:9 210:4 217:12 224:24 225:19 226:15 237:12,17 238:4,7 240:8 244:10 245:10 255:23 262:9,13 267:16 269:2 271:19 272:13 273:24 275:1 282:8 285:24 298:3 304:6 309:17

**single** 93:23 199:6

**sitting** 237:22

**situation** 16:19 246:21 299:2

**skip** 135:19

**skipping** 240:21,24

**slight** 111:3

**slightly** 59:17 250:13 265:6

**small** 55:5 92:4 280:1

**smaller** 46:17

**smart** 232:6 236:7,11

**smoothly** 182:10

**so-called** 19:9 279:7

**software** 39:2

**sold** 16:9 19:3 182:13 207:6 211:20 237:4,9 238:5 267:10 274:24 282:5 284:7

**sole** 19:2 227:24 228:4,6 229:13

**solely** 87:22 88:18 93:11

**son-in-law** 244:15

**sought** 194:2

**source** 13:6 129:21 136:14 150:1 156:25 157:17,20 165:17 174:24 175:12 177:18,21 245:1 298:4,8 309:9

**sources** 122:13 131:13 147:17 151:9 158:3

**space** 16:16 202:24 217:19 218:4 298:24 299:5 300:2

**Spartan** 7:19 85:12,20 194:1 196:18 231:3,12,22 233:7,23 235:3,15 239:3 241:10 242:1 243:17,22 244:4,21 246:16,19 247:10,19 248:5,15 249:21 250:3 251:7,13 252:13,15 254:19 256:9 257:6,23 262:3 263:2 266:14 267:24 277:20 301:20 305:19 308:9, 14,23 309:3 310:1 311:1

**Spartan's** 193:5 305:14 308:3

**speak** 230:7

**speaking** 94:10

**special** 152:20

**specialists** 141:3

**specific** 49:22 102:11,22 103:11,22 105:13 106:4 109:14 111:9,11,18 112:4,20 148:6 166:23 184:9 187:16 204:2 225:2 280:13

**specifically** 42:12 47:11 63:4 84:7 90:16 149:21 151:14 196:2 203:7 207:25 234:2 300:23 309:24

**specificity** 223:9,13

**specifics** 120:19

**speculated** 236:6

**speculating** 236:10

**speculative** 103:18

**spend** 172:8

**spills** 49:4

**split** 61:20 62:23

**spoke** 211:18

**spoken** 225:7 274:5

**spot** 172:22

**spun** 61:24

**St** 23:7,10

**stage** 95:3,8 102:10 105:13 108:8

**stake** 114:15

**stamp** 246:13 303:13,18,22

**stamped** 302:19

**stand** 181:7 295:24

**standalone** 296:16

**standard** 24:13 147:25 149:11,12,22 151:16 153:23 158:3 187:21,25 313:16

**standards** 120:4 153:3

**standing** 134:18

**Stanley** 81:6

**start** 37:7 130:19 146:8 234:23 244:1

**started** 27:18,21 134:19 182:18

**starting** 28:14 170:16 196:8 233:5 240:18

**starts** 99:3 146:11,24 152:8 157:4 160:12 172:24 179:6 204:16 219:18 221:17 223:8 265:9 280:4 281:6

**startup** 96:4 100:4

**state** 89:9 126:8 217:13,18 272:25 274:8

**stated** 44:24 45:5 126:11 175:20 188:16 244:3 265:14

**statement** 88:6 112:12,21 124:24 137:22 138:24,25 139:7 169:22 171:9 206:1 266:9,10 268:15 270:1,19 272:14 277:23 279:1,11 281:19 282:10 308:15 309:21 310:2

**statements** 19:16 99:23 117:23 127:1 138:18 229:7 278:12 302:6

**states** 32:16 75:21 76:6,18 77:14,18 83:1,9 205:5 214:19

**status** 191:15

**statute** 24:23 201:21,24 204:22 205:2,16 206:20

**statutory** 36:22 146:9

**step** 26:16 55:9 157:7 224:21 239:19

**steps** 230:3

**sticker** 243:4

**stock** 17:4 18:24 19:5 30:19 31:24,25 78:17 86:5 105:21 106:5,23 107:20 115:11 116:25 140:5 181:13,25 183:17,23 185:22 189:3,4 209:25 211:6,20 238:9,22 256:14 284:5 290:12 293:9,17,22,23 295:16,22 296:5,13 297:2,9 302:14,19 303:10, 14,23 304:9 309:22

**stocks** 46:19 103:20 106:15,23 107:7,8,10,15,24,25 168:7,12,14,17

296:15

**stole** 78:15

**stop** 22:1 28:1 152:1 180:14 249:6

**straddle** 62:2

**straddling** 63:11

**straight** 183:25

**strategic** 277:1

**strategies** 276:22

**straw** 230:5,6 235:16

**Street** 182:19

**strict** 102:24

**stringent** 306:3

**strong** 274:21

**structuring** 99:15

**stuff** 141:2 257:16,19

**subject** 20:4 33:21 138:14 152:24 171:1,17 217:7 219:4 256:13

**submission** 69:7 159:19

**submit** 55:15 121:19 147:8

**submitted** 55:3,21 66:3,8 127:8,10 128:18 249:21 250:3 251:8,13

**submitting** 153:10 179:16 186:6 277:23 284:19

**subparagraph** 205:20

**subscriber** 259:6,10

**subscription** 252:3,7 255:10,17 258:15,20,25 259:9 260:14 261:4 286:11,16 287:4,15 288:23 292:9

**subsequent** 19:17

**subset** 101:11

**subsidiary** 28:9

**substance** 177:12

**substantial** 256:1 273:15 309:8

**substitution** 293:24

**successfully** 111:7 284:7

**sufficient** 258:4

**suggest** 26:22 101:19 129:14

**suggesting** 132:15 156:13 297:17

**suggestion** 226:9

James Cangiano - July 23, 2020

**suggests** 165:5 232:5

**suitability** 29:16

**summarize** 87:8

**summarizing** 90:6

**Summary** 87:4 279:21

**Super** 97:12

**supersede** 217:18 218:5

**supervise** 42:14 45:14 53:19

**supervised** 44:15,21 47:7 48:3 51:14 56:3 68:17

**supervising** 42:25 47:21 50:24 51:18 60:9

**supervisor** 45:23

**supervisory** 305:14,21 306:3 307:8, 18 308:8 310:11 311:13

**supplied** 16:4 241:9

**supply** 173:6,9 282:1

**support** 231:11

**suppose** 109:12 110:24

**supposed** 161:8 166:18 299:8

**surprised** 283:3

**surprising** 281:19,25

**surviving** 114:19

**susceptible** 96:11

**suspicions** 244:18 246:2 247:6

**switch** 263:17

**switching** 181:1

**sworn** 8:13

**symbol** 19:5

**synonymous** 111:2

**system** 56:23 181:15

**systems** 183:21

---

**T**

---

**tainted** 110:20

**taking** 224:9 283:25

**talk** 57:9 91:2 140:12 154:5 174:21 181:4 202:3 210:21 211:13 229:5 231:5 253:1 267:21 313:9

**talked** 139:12 299:16 300:15

**talking** 25:4 37:6 39:20 46:5 47:1 75:8 88:2 89:22 95:10 100:11,21 107:6,8 108:10 121:7 122:24 133:22 134:22 136:1,14 140:25 141:1,2,19 149:24 150:14 151:18 161:4 169:1 170:6 177:9 178:23 184:20 193:18 196:24 197:4,7,8,11,19 198:3 206:17 208:9 218:3 222:10,24 234:15,16 243:14 282:7 304:1 308:7 311:21

**target** 281:15

**targets** 280:21

**Taylor** 256:8

**technical** 57:17

**Technically** 135:15

**TECHNICIAN** 21:6,9 227:6,10 236:19

**technology** 38:9 39:4 60:4

**telling** 132:18 162:12 233:16 313:6

**tells** 225:12

**tend** 117:11

**terminated** 81:16

**termination** 81:8

**terms** 13:1,11 26:2 37:3 39:22 70:23 111:2,23,24 113:14 172:12 203:3 277:11 300:3

**testified** 7:24 8:2 46:16 71:16,20 72:5,17 73:9 74:3,7 76:5,18 80:3,13, 16 81:10,14 82:12,15 83:8,14 231:22 235:24 236:16,24 270:18 271:15 296:7 311:9

**testifies** 7:2

**testify** 79:24 81:1

**testifying** 8:18 233:22 278:7

**testimony** 13:21 71:9 72:1 75:16 84:21 180:23 194:7 231:9,18,19 232:9,22 234:11 240:14 263:14 275:9 313:25

**text** 130:9 146:9 279:25

**thing** 10:7 44:5 110:6 135:11 202:2 233:18 236:25 248:8 274:9

**things** 9:7 132:19,21 134:9 139:16 162:21 239:23 245:4 248:19 267:9,23

**thinks** 11:17 174:2 226:4 298:21

**thinly** 92:4

**third-party** 244:23

**thoroughness** 312:24

**thought** 89:21 164:8

**thousand** 37:14

**three-year** 45:15

**thrown** 246:20

**Thursday** 313:20

**time** 31:17 42:8,23,25 43:4,19 48:2 52:8 55:2 57:2 61:12 71:19 83:22 172:7 173:21 188:18 199:3 219:22 225:3 260:18 261:13 263:8 267:10 275:2 288:16 305:1 312:21,23 313:16

**times** 43:18 71:15 90:9 136:11 267:3

**tiny** 152:4

**title** 126:10

**titled** 98:2 159:18 160:22,25

**today** 7:14 8:12,17 10:3,14 21:16 34:21 37:24 58:11 99:10 120:15 237:22 312:21 313:19

**told** 70:17 231:22 232:2,4 233:23 244:20 245:22 247:6

**toothbrush** 113:5

**top** 30:10 38:1 60:5 71:6 98:1 105:22 116:4 118:5 124:6,8 126:15 148:17 156:23 160:11 172:1 178:19 186:25 188:11 194:22 223:7 227:16 240:22 242:19 254:15 256:6 276:12 278:23 279:1,19 286:15 290:9 291:5 292:17 305:9 307:14,22

**TOPW** 278:20

**total** 126:13

**totally** 36:2 141:8

**touched** 39:12

**tough** 40:13

**track** 296:4

**trade** 183:17

**traded** 183:13,23

**trades** 77:2

---

**trading** 118:16,18 192:20

**traditional** 113:3

**trained** 213:8

**trainee** 28:16,23

**training** 24:3

**transaction** 81:5

**transactions** 73:22 190:14 213:16 223:18

**transcript** 232:12 234:12 240:15,19 269:15,20 270:24 313:12

**transfer** 35:6,10,14,24,25 36:9 50:3, 7,9 56:6,9,15 65:23 73:3 76:14 77:11 78:8,13,16,21 82:2 84:11 86:5 123:22 126:18 129:10 182:3,4 183:2 185:11 186:3 191:18,21 193:12 194:2 196:19 200:24 201:5,11 202:13,19 203:3,4, 12,20,22 206:22 213:12,24 214:13 215:11,19,21,23 216:14,16 217:1,2, 19,21,23 218:8,12,14,18,24 219:3,18 220:17 221:20 222:9,18,22 223:13,24 224:7,10,14 284:1,5,16 285:8,9,13, 22,23 286:25 287:3 289:23 290:9,12, 17,21 292:23,24 293:22 295:22 296:13,14,19 297:2,9,11,18 298:19 300:1,4,11,25 301:11,16,21 302:14

**Transfer's** 86:5 211:6 284:12

**transferred** 182:14 207:3,5 290:19 291:11,13,23 304:22 305:1

**transferring** 218:1 287:6

**transfers** 209:11 218:19 223:25 284:13 285:1 298:14 300:6 302:10

**transportation** 206:5

**tree** 246:23,24,25 266:21 296:17

**trial** 74:25 75:4 77:22 79:13,25 80:22 82:13 83:5

**trouble** 162:14 280:2 297:15

**true** 93:20 94:15 147:16 151:4 182:15 191:11 220:22 270:12,20 271:3

**trust** 181:9,24 240:9 282:11

**truth** 8:13

**truthful** 272:4 273:20 275:5,10

**turn** 14:23,24 21:20 22:17,18 41:23 71:3,4,5 80:12 84:25 87:1 92:17 98:18 101:3 102:5 104:2,6 118:2 120:22 121:1 124:6 130:19 135:18

146:19 148:10 151:23 156:15,19 159:10 160:9 164:5 167:22 171:12 175:6 178:14 179:2 204:9 218:13 219:8,12,21 221:22 227:4 230:22,23 232:8 233:1 234:19 238:13 240:14 243:11 249:5,14 253:17 254:1,8 256:24 259:24 260:18 261:12 263:20 269:22 270:23 271:9 276:9 279:10,15 283:22 287:20 288:1,15 290:1 292:20 307:21 310:6

**turnaround** 313:16

**Turning** 236:13 241:13 264:16

**type** 36:1 56:9 169:23 189:3 203:15 237:3

**typically** 58:4 184:13 221:20

**U**

**UCC** 214:24 217:18,22

**uh-huh** 9:6

**ultimate** 74:8 230:17 285:15

**ultimately** 163:9 296:6

**unable** 276:15

**unauthorized** 244:23 245:6

**uncertified** 215:22

**underlying** 58:5

**undersigned** 293:20

**understand** 8:11,20,21 9:3,8,11 74:11 112:16 133:15 134:24 150:13 171:15 181:22 279:25 303:2

**understanding** 154:22 205:15 209:17 216:25

**understands** 191:12

**understood** 9:17 267:20

**undertaken** 225:10

**underwriter** 152:17,23 153:17 179:24

**unequivocal** 296:18

**unidentified** 105:17

**Uniform** 213:19,23 214:3,8,18 215:3

**United** 32:16 75:20 76:5,18 77:13,18 82:25 83:8 205:5

**University** 23:10

**unlawful** 17:6,12 18:8,10 97:1 121:16 206:2

**unlegended** 210:7 304:4

**unregistered** 56:11 118:19 202:9 203:14 205:21 206:21,22 207:4,7,10, 17 209:23 299:6,8 302:22

**unreliable** 157:17

**unrestricted** 86:14 280:17 303:15, 19

**untrue** 268:14

**unusual** 183:6

**USC** 204:11

**usual** 94:13

**V**

**vacuum** 296:16

**valid** 91:19

**validity** 201:12

**venture** 169:18 277:1

**ventures** 168:13 169:5 275:21

**verbatim** 94:7 134:12

**verse** 134:12 135:4

**version** 147:22 178:21

**versus** 7:19 9:6 45:14 58:22 69:24 72:12 75:21 76:19 77:14 78:24 82:5 83:1

**vi** 126:12

**vice** 51:9 55:20 56:4 59:23 60:3,18

**view** 25:3 180:4

**viewed** 61:21

**vii** 126:17

**viii** 126:18

**violate** 209:10

**violated** 73:15 74:4,20

**violates** 216:14

**violating** 34:7

**violation** 17:15 46:13 163:8 207:1 208:4 209:25 212:21 217:17 307:4,9

**violations** 34:25 43:12 209:21

**violative** 162:1

**vision** 111:11,15 112:9 113:7,19,20,
21

**vitae** 14:1,7

**vogue** 168:12

---

### W

**wall** 61:18 62:2 63:11 182:19

**Wallace** 81:3,11,19

**Wallace's** 81:15

**wanted** 53:6 247:14

**warning** 202:25

**warrants** 191:9 259:7

**wash** 77:2

**washing** 279:2 281:11 282:4

**ways** 30:5 205:1 210:1

**website** 58:24

**Wednesday** 313:22

**weeks** 65:15 313:18

**whatsoever** 192:24

**Wildcat** 64:3

**Willie** 21:23 22:6

**wire** 77:24

**wishing** 146:25 147:8

**withdraw** 120:20

**word** 69:11,12 165:21 205:9

**words** 69:10 114:5,6 284:18 290:9

**work** 50:6 52:24

**worked** 27:9 33:12 59:15 65:19,22

**working** 37:2 58:18 69:5

**world** 16:15

**worry** 40:22

**worse** 124:14

**write** 102:8 136:4 175:19 193:5
196:15 201:4 227:20 298:12 305:10
308:2

**writes** 101:8 116:21 170:24

**writing** 193:16

**written** 259:11 273:5 305:21 306:3
307:8 308:8,14 309:21 310:2,11
311:13

**wrongly** 81:16

**wrote** 10:22 270:13

---

### X

**xi** 126:22

**xii** 126:24

**xiii** 127:2

**xiv** 127:4

**xv** 127:7

**xvi** 127:9 128:16

**XYZ** 53:8

---

### Y

**year** 62:24 125:18 126:17

**years** 19:9 41:11 71:13 127:4 130:15
246:3

**yellow** 202:24

**York** 23:16 28:20 30:18 31:24,25
115:11

---

### Z

**Zajonc** 256:9

**zoom** 11:7 66:24 92:22 121:4 124:11
130:22 145:8 168:2 175:16 179:9
204:15 227:17 230:25 236:17 293:4

**Zouvas** 82:6