# Exhibit 2

**June 19, 2020 Expert Report of James M. Cangiano**

**(Cangiano Dep. Ex. 225)**

**IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA**

**Case No. 8:19-cv-00448-VMC-CPT**

**SECURITIES AND EXCHANGE COMMISSION,**          **PLAINTIFF**

**V.**

**SPARTAN SECURITIES GROUP, LTD.,**
**ISLAND CAPITAL MANAGEMENT LLC.**
**CARL E. DILLEY**
**MICAH J. ELDRED**
**DAVID D. LOPEZ,**                              **DEFENDANTS**

**Report of James M. Cangiano**
**June 19, 2020**

EXHIBIT
225

1

# INTRODUCTION

At the request of the Securities and Exchange Commission ("SEC"), I was asked to review the complaint in the matter of Spartan Securities Group Ltd., ("Spartan"), Carl E Dilley, et. al.

I was asked by the SEC to evaluate the materials noted in Exhibit A attached to this report and provide an expert opinion regarding:

- The characteristics of "shell factories" and how the companies that are sold are sometimes employed in schemes commonly referred to as "pump and dump" and other schemes;
- whether red flags were present and whether those red flags would be easily recognized by industry professionals as they relate to compliance with SEC Rule 15c2-11 and other rules;
- whether the defendants' activities carried out by Island Transfer were customary practice in the transfer agent space and comporting with industry standards;
- whether the defendants' actions were indicative of their essential participation in these activities, and;
- the effect of the defendants' actions in the marketplace and on the investing public.

To prepare this report, I have applied analytical techniques that I have utilized in my nearly 48 years of regulatory and consulting experience to review and interpret various documentation in order to factually ascertain the existence of characteristics that may have indicia of practices typically present in the activities noted above and the effect of those activities.

My opinions are based on an independent review of the documents listed in Exhibit A attached to this report. Those points and direct quotations that are particularly important to this opinion have been italicized for emphasis.

## I.  QUALIFICATIONS

### a. Employment History

I, James M. Cangiano, have nearly 48 years of regulatory and consulting experience. I currently am the President of Wildcat Consulting, Inc. located in Estero, Florida.

I have been employed as an expert by various law firms, broker/dealers, and the government in trading and market related regulatory issues since May of 2004. My areas of expertise include the NASDAQ, listed, and Over the Counter ("OTC") markets and the rules and regulations that govern trading in those markets. I have also testified as an expert on issues such as the role of market makers in over the counter securities markets, best execution, suitability, market maker compensation, supervision, books and records, and the use of shell companies and reverse

mergers in  "pump and dump" schemes.

I have testified as an expert in market manipulation schemes and have expressed opinions on the characteristics that are typically present in "pump and dump" schemes including the use of "shell" and microcap stocks in those schemes.

Those instances are outlined below (see footnotes 2-6).

Prior to 2004, I was Senior Vice President of Regulation and Controls for the NASDAQ Stock Market Inc. I was responsible for developing and recommending policies related to the regulation of NASDAQ, negotiating NASDAQ's regulatory budget and monitoring the financial and operational performance of NASD pursuant to the regulatory services agreement between NASDAQ and NASD. [1]

From 1986 through 1999 I was Senior Vice President of Market Regulation for NASD.

While in that role I was the senior executive in charge of policing the OTC securities markets and the NASDAQ Stock Market Inc. In that regard I established surveillance and examination policies and procedures for NASD in the area of small cap and microcap fraud.  I also was actively involved in establishing regulatory policy for all trading practices in The NASDAQ Stock Market, the OTC Bulletin Board and the OTC markets generally. I worked extensively with the Securities and Exchange Commission, the Securities Industry Association and the Securities Traders Association in developing and enhancing regulatory policies and practices relating to better and more efficient equity markets.

When I assumed the role of Director of Market Regulation in 1986, I oversaw the significant growth and effectiveness of the NASD's surveillance efforts, keeping pace with the overall growth of the NASDAQ and OTC markets. An immediate and continuing priority for the department was the focus on detecting and preventing fraud primarily in the NASDAQ Small Cap, the OTC equity, and penny stock markets.

I established a dedicated "fraud" unit, which is still in existence today, to focus on the issues of market manipulation, including "pump and dump" schemes, "marking the close" activities, and other fraudulent devices such as "wash sales," and "matched orders." With my associates at NASD, many of the policies relating to fraud investigations and evidentiary standards in place today were developed during my tenure.

I was also responsible for the management of that section of Market Regulation that dealt with compliance with SEC Rule 15c2-11 including the review of Form 211 filings and the assignment of stock trading symbols and authorization to initiate or resume quotations for OTC securities. My personal involvement in both investigatory and management of hundreds of fraud and manipulation cases have made me extremely knowledgeable as to the characteristics that are

---

[1] The National Association of Securities Dealers, Inc. (now known as FINRA) was established under the authority of Section 15A of the Securities Exchange Act of 1934 and is the primary self-regulatory authority for the securities industry.

typically present in these types of cases.

I was also responsible for maintaining the integrity of prices that were publicly disseminated by the NASDAQ Stock Market to industry professionals and investors. In that regard I made assessments concerning the validity of prices being disseminated by data vendor services to the public. Where I determined the existence of prices that were not consistent with the then quoted market or "clearly erroneous," I had the authority to remove those prices from the "tape" and from historical records. In this context I reviewed and analyzed thousands of trade reports and consider myself an expert in determining the potential impact of last sale and other trade reports on the market.

In that role I was also responsible for initiating trading halts to permit NASDAQ listed companies to report material news to the marketplace. In that regard I reviewed thousands of press releases in order to determine whether a trading halt should be imposed based on the materiality of the news. I therefore consider myself an expert in determining the impact of a corporate news announcement on the marketplace for its securities.

Prior to assuming the responsibility for Market Surveillance in 1986, I held various managerial and executive positions for the NASD.

I was Corporate Secretary for NASD from 1984 to 1986 and I served as the District Director of the NASD's Kansas City District in 1980.

I began my career with the NASD in 1972 as a District Examiner in New York City, the NASD's largest district office conducting on-site inspections of broker-dealers for violations of NASD and SEC rules and regulations. I assumed various management positions within the district and was promoted to Assistant Director of the NASD's Washington, D.C. district office in 1975.

I have extensive public speaking experience including presentations before the Securities and Exchange Commission. I have spoken on numerous occasions to a wide range of industry groups and have participated in regulatory conferences and training programs for NASD, SEC, and State Securities Commissions. I have also provided training to the staffs of both the NASD and SEC regarding market surveillance procedures and techniques.

I have been featured in a number of magazine articles including Wall Street &Technology, the Wall Street Journal, and Institutional Investor, where I have been quoted as an authority on regulatory and technology issues.

 I am a graduate of St. Francis College in Brooklyn, New York and did extensive graduate studies at St. John's University in Jamaica, New York. I also attended the New York Institute of Finance over several years with a concentration in brokerage accounting and recordkeeping, investment banking and finance.

I retired from NASDAQ in February of 2004 and now reside in Estero, Florida. I have been President of Wildcat Consulting from May of 2004 to the present.

My C/V and Resume are attached as Exhibit B to this report.

### b. Testimony and Publications

I have not issued any publications in the last ten years.

I have testified as an expert in market manipulation schemes and have expressed opinions on the characteristics that are typically present in "pump and dump" schemes including the use of "shell" and microcap stocks in those schemes. Moreover, I have been granted "expert" status by several Federal District courts.

In the District of New Jersey in *SEC v. Pasternak*,[2] a 2008 case, I testified as an expert on behalf of the SEC in the areas of market maker fiduciary duties, market maker compensation, best execution, mark ups and "front-running."

In March of 2010, I testified on behalf of the United States Attorney in the Eastern District of Pennsylvania[3] in the sentencing portion of the trial, *US.v. Margolies,* concerning estimated damages that could have accrued to the defendant based on his intention to engage in the market manipulation of an OTC security.

I testified as an expert for the SEC in March of 2011 in *US v. East Delta Corporation et. al.[4]* This case involved the market manipulation of a small cap OTC company. I was asked to testify concerning the defendants' use of "wash trades," "matched orders," "domination and control" of the market for an OTC security by the defendants and the elements of a typical "pump and dump" operation.

In May of 2012, I testified as an expert for the United States Attorney, Middle District of Florida, in a jury trial: *US v. Roger Lee Shoss et. al.[5]* I testified regarding the use of "shell" companies in schemes involving OTC securities and other manipulative practices in the OTC markets.

I was deposed in February of 2011 in connection with another complaint, *SEC v. Irwin Boock et.al.[6]* in which I was retained as an expert on behalf of the SEC in a case involving the identity

---

[2] In the United States District Court for The District of New Jersey, Civil No. 05-3905.

[3] In the United States District Court for the Eastern District of Pennsylvania, Criminal Case No. 08-736.

[4] In the United States District Court for the Eastern District of New York, Civil Case No.10-0310.

[5] In the United States District Court for the Middle District of Florida, Criminal Case No. 8:11-CR-366-T-30TBM.

[6] In the United States District Court for the Southern District of N.Y, Civil No. 09-8261.

theft of dormant OTC companies. The areas of my expert opinion included NASDAQ operations, including corporate reorganizations, stock splits, trading symbols, transfer agents and Regulation S under the Securities Act of 1933.

I testified in June of 2017 in a FINRA Arbitration, *Charles Peter Wallace v. Morgan Stanley Smith Barney LLC, et.al.*[7] on behalf of the claimant who alleged that he had been the subject of a wrongful termination. The testimony concerned Wallace's handling of an annuity transaction for a client and whether his actions were appropriate under FINRA rules.

I was deposed in May of 2018 in connection with a case, SEC v. *Luke C. Zouvas et. al.*[8] where I was retained by the SEC to provide an expert opinion with regard to the existence of characteristics of a pump and dump scheme. The areas of expertise included the use of "shell" companies in pump and dumps and the various artificial devices that typically occur in a pump and dump.

 In June of 2019, I was granted expert status in a criminal jury trial in the Central District of California in *USA v. Homm et. al.*[9] where I testified regarding the use of manipulative devices in a portfolio pumping scheme and other matters involving a US. broker/dealer and a European hedge fund manager.

Over the many years that I have been actively involved in policing the OTC securities markets, I utilized certain investigative procedures, techniques and evidentiary standards that are commonly employed by securities regulators to identify the presence of certain elements or characteristics that are common to market manipulations schemes, including the use of shell companies, reverse mergers,  and "pump and dump" schemes.

This was necessary given the responsibilities statutorily given to NASD as the self-regulator of the OTC securities markets.[10]  My opinion has as its basis the literally hundreds of investigations, adjudicated cases and NASD/FINRA and SEC pronouncements concerning the OTC markets where the elements and characteristics of manipulative and other devices have been articulated and found. This knowledge and experience developed over many years in market regulation has formed the basis for my expert testimony and the factual conclusions expressed in this expert report.

## c. Compensation

---

[7] FINRA Arbitration *Charles Peter Wallace v. Morgan Stanley et.al.* Master Case No. 14-00259.

[8] IN the United States District Court for the District of Arizona, Civil No.17-00427-phx-spl.

[9] In the United States District Court for the Central District of California, Criminal Case No. 2:13-cr-00183-VAP *USA v. Homm*.

[10] See Securities and Exchange Act of 1934, Section 15(A).

I am being compensated at the rate of $385 per hour for this engagement.  In accordance with recognized professional ethics, my professional fees for this service are not contingent upon the opinions expressed herein, or on the outcome of the matter.

## II.                                    INTRODUCTION

### a.) Summary of the Complaint

 The Complaint alleges that the Defendants from December 2009 through at least August 2014, engaged in the furtherance of a scheme to create and sell at least 19 public companies which had been created by Al Mirman and Sheldon Rose as well as Michael Daniels, Diane Harrison and Andy Fan, (the "Five"). These were "blank check" or "shell" companies formed by the Five solely with the intent of selling these companies to others for profit.[11] The Complaint also alleges that the Defendants furthered the scheme by filing false and or misleading information with the SEC, FINRA, and DTC  in order to secure a trading symbol and DTC eligibility for the companies created by the Five.

The Defendants also employed Island Stock Transfer ("Island Transfer") to provide services related to the securities and their shareholders including stock transfers, certificate production, and shareholder records which services were also critical to the furtherance of the plan to sell the subject companies.

Finally, the complaint alleges that the Defendants, including the Chief Compliance Officer, ignored numerous red flags that were made apparent in their dealings with the Five. The ignoring of these red flags enabled the Five to carry out their plans to profit from the sale of their companies and avoid proper regulatory scrutiny.

## III.  METHODOLOGY

In undertaking this opinion, I have endeavored to base my independent conclusions on my knowledge, skill, training and experience in order to assist the Court and jury in understanding the significance of the scenarios described in the complaint. The opinion is also limited to the data and documents reviewed that are referenced in Exhibit A. In my opinion these records were sufficient for me to reach the conclusions contained herein.

## IV. BASIS FOR THE OPINION

---

[11] These types of companies are often used by participants in "pump and dump" schemes usually after they have been the subject of a "reverse merger" with an operating company.

**a.) "Shell" Companies, "Blank Check" Companies and their use in Manipulative Schemes**

Public shell companies, as defined in Rule 230.405 of the Securities Act of 1933, are generally small, thinly capitalized companies with few assets, little or no operating history, inexperienced management and no real business plan. They are usually in need of capital, restructuring or a business plan. They are not generally known to the investing public and have little investor interest. The thinly traded nature of the security makes it more susceptible to artificial pricing and poses increased risk to investors and professionals alike. These companies are typically not operational and their value lies in the fact that the company has a trading symbol and therefore immediate access to public markets.

A "blank check" company is distinguished from a shell in that it is in a developmental stage and has no specific business plan or operation other than the intention to merge with another company.  Both shell and blank check companies typically involve speculative investments and often fall within the SEC's definition of "penny stocks" or "microcap stocks."[12]

Typically, in pump and dumps, the "shell" company is usually not operational and may have little or no assets. The public shell undergoes a transformation through a merger, acquisition or a reverse merger.  In either case, the net result is the same. The participants end up with a publicly traded entity that appears to have a product in a "hot" industry, be it technology, biogenetics, marijuana, crypto-currency, or health care.

"Fraudsters have been known to use dormant shell companies in pump-and-dump schemes."[13]

Of particular use to the fraudster is the fact these shell companies are public companies.  In that regard, the companies noted in the complaint were all brought public through an S-1 registration with the SEC.  Notwithstanding the fact that the issuers in the complaint were public companies, they all shared one common characteristic, they were formed not to raise capital and carry out a legitimate business plan but were, in my opinion, formed to be sold.

These shells prove to be extremely valuable to potential fraudsters due to the fact that the shells are ready to assume the role of a publicly traded company. The value to the purchaser is simply the ability to enter the public markets with freely tradable shares, DTC eligibility and a trading symbol.  If the shell was purchased with the intent to engage in a typical pump and dump scheme, the danger to the investing public is a publicly traded vehicle is in place, and the fraudsters can now reap significant profits by selling their shares into a market that they have artificially inflated.

---

[12] See www.sec.gov/fast-answers/answers-blankcheckhtm.html

[13] See *Investor.gov* publication dated October 30, 2014, "Investor Alert: Dormant Shell Companies – How to Protect Your Portfolio from Fraud."

Here, the actions of the Five are consistent with the operation of a "shell factory."  These shells were created with the sole purpose of selling them for a considerable profit.  The defendants helped facilitate the sale of shell companies, ignoring obvious red flags left by the Five, who sold the shells using essentially the same pattern for each company.

Specifically, the Five:

- created a business plan for each company that would not be implemented beyond a few initial steps, and then convinced a friend, relative, or acquaintance to become a "straw" CEO who, at times, approved and signed corporate documents at their direction.
- supplied bogus legal documents that were used for regulatory filings or to facilitate the transfer of shares from "straw shareholders" who were recruited and did not generally pay for stock but instead were paid a commission.
- filed registration statements for initial public offerings and falsely claimed that a particular business plan would be developed and/or implemented.  Deliberately omitted from the registration statements were any mention of the participants starting and controlling the company or their intent not to engage in the stated business but to sell the company as a shell.
- filed misleading SEC filings and Form 211 reports with FINRA providing much of the same false information depicted in the registration statements.
- obtained large profits when the empty shell companies were sold.

In relation to this case, the SEC and the U.S. Attorney's office have already brought a number of actions against members the Five for violating or aiding and abetting violations of the antifraud, reporting, and securities registration provisions of the federal securities laws.[14]

**b.) Role of Broker-Dealers and Transfer Agents in Facilitating the Sale of "Shell" Companies.**

Before a company may be publicly traded, it must be assigned a trading symbol to be eligible to be quoted in a public market and must be qualified for entry into the industries' clearance and settlement systems.  This must be accomplished through the efforts of a registered broker-dealer with the assistance of a transfer agent.

Without a sponsoring market maker to initiate public quotations, these schemes could not be carried out. This is due to the fact that published quotations have wide dissemination throughout the marketplace and may be accessed readily by the investing public. Often in "pump and dump" scenarios, the commencement of quotations would coincide with the issuer's publication of press releases which paint an overly optimistic view of the company's future. Manipulative trading follows, generally taking the security price to new highs, with the goal of luring the investing

---

[14] *See* Litigation Release No. 24122 / April 30, 2018.  The release also notes that Mirman and Rose were also convicted of criminal charges and sentenced to prison based on the same alleged conduct.

public into purchasing the stock. The insider participants then sell and "dump" their shares into the market to investors who are left with shares of little or no value once the insider participants move on to their next deal.

### 1.) SEC Rule 240.15c2-11

The Commission adopted Rule 15c2-11 in 1971 to prevent fraudulent and manipulative trading schemes that had arisen in connection with the distribution and trading of unregistered securities issued by "shell" companies. [15]  The Rule prevents broker-dealers from publishing quotations in OTC securities without having reviewed certain information about the issuer.  Specifically, the Rule applies to broker-dealers publishing quotations in a "quotation medium," but it does not apply to broker-dealers publishing quotations for securities listed and traded on an exchange or quoted on Nasdaq.[16]

The information that broker-dealers must gather is found in Rule 15c2-11(a).  Other information that the broker-dealer must have in its records is contained in 15c2-11(b).  The Rule also prescribes record retention requirements and the requirement that the broker-dealer obtain "reasonably" current reports filed by the issuer. The Rule also requires that the broker dealer review the information. Most important, in my opinion, ***are the requirements that broker-dealers have a reasonable basis for believing that the issuer information is accurate and that it was obtained from a reliable source.***

The Financial Industry Regulatory Authority ("FINRA") monitors broker-dealer compliance with the provisions of Rule 15c2-11.  This is accomplished primarily through the obligation of

---

[15] In its adopting release the SEC stated that "Rule 15c2-11 was adopted under Section 15(c)(2) of the Exchange Act, 15 U.S.C. 78o(c)(2), among other sections. Section 15(c)(2) provides the Commission with broad authority to promulgate rules that prescribe means reasonably designed to prevent fraudulent, deceptive, or manipulative acts or practices in the over-the-counter securities markets." See 1991 Adopting Release at 19152 n.43; Securities Exchange Act Release No. 9310 (September 13, 1971), 36 FR 18641.

[16] "Quotation mediums" include the OTC Bulletin Board or "OTCBB", an electronic quotation system in the United States that displays real-time quotes, last-sale prices, and volume information for many over-the-counter (OTC) equity securities that do not meet the listing requirements of the NASDAQ Stock Exchange (such as minimum share price, market capitalization and other requirements).  Another medium, the OTC Markets (formerly the "Pink Sheets") including OTC Link, is a computerized quotation media for equity securities the majority of which do not qualify for listing on Nasdaq or the OTC Bulletin Board. This category includes shell or development stage companies with little or no operations as well as companies without audited financials and are considered extremely speculative by investors.

broker-dealers under FINRA Rule 6432 to file a Form 211 before a stock quotation is entered into any quotation medium.

Form 211 requires that members (such as broker-dealers) provide FINRA with information on the subject security, the issuer, the circumstances surrounding the member's quotation and current information as set forth in Rule 15c2-11(a), such as a prospectus, annual report or similar information, as applicable.  FINRA conducts a review of the Form 211 and accompanying information and notifies the firm whether it is permitted to initiate or resume quotations in the subject security.  The firm is not permitted to initiate or resume quotations without such notification unless the member elects to rely upon an exemption or other relief from SEC Rule 15c2-11 and FINRA Rule 6432 to quote the security.[17]

While FINRA accepts and reviews Form 211, the mere fact that the security is permitted to be quoted does not relieve the broker-dealer from its continuing obligations of complying with all applicable rules and regulations including the obligation under 15c2-11 relating to source reliability and document review.[18]

### i.) Source Reliability

The SEC has stated that broker-dealers play an important role as gatekeepers with respect to Rule 15c2-11 and as such, "it is important that a broker-dealer reviews key, basic information about an issuer before initiating a quoted market to solicit retail investors to purchase and sell a security in the OTC market."[19]  This concept of "gatekeeper" is an important one and in my opinion captures the overriding purpose of insuring that the public has an additional layer of protection against fraud if the broker-dealer submitting quotations for a security has diligently carried out his responsibilities under Rule 15c2-11.

With respect to having a reasonable basis for believing that the 15c2-11 information was from a reliable source, information obtained directly from the issuer and its related persons can be assumed to be acceptable barring any red flags to the contrary.  Given a red flag, the broker-dealer *must* take additional steps to ascertain the original source of the information and contact the issuer itself if necessary.[20]  The nature of red flags would determine what level of follow-up that would be required based on the circumstances involved.

### ii.) Document Review

---

[17] *See* 17 CFR 240.15c2-11(f)(1), (2), (3) and (5) and 15c2-11(h); and FINRA Rule 6432(a).

[18] "The submission of a Form 211 relates solely to the firm's obligation to comply with FINRA Rule 6432 and SEC Rule 15c2-11 when quoting a security.  *See* FINRA Regulatory Notice 18-32.

[19] SEC Release No. 34-87115 dated September 25, 2019.

[20] Ibid.

If it can be reasonably concluded that the information is from a reliable source, the broker/dealer now has a two-fold obligation to obtain and review the required materials.

The review would necessarily require further questioning should it reveal the existence of red flags.

A red flag is a set of circumstances or alerts that may indicate that the information being reviewed  may be materially inaccurate. These red flags should lead a broker-dealer to further inquire as to whether the issuer information is accurate or if the circumstances or scenarios surrounding the information seemed suspect.  When red flags are present *it is the broker-dealer's* obligation to investigate the circumstance which led to the alert so that it can be comfortable with respect to the accuracy of the information.

Specifically, in their March 1999 release, the SEC provided twenty-eight examples of red flags that had been observed in a number of microcap fraud cases and in submissions to FINRA (NASD).[21]  Several red flags listed are:

- Concentration of ownership of the majority of outstanding freely tradeable stock
- Large reverse stock splits
- Shell corporation's acquisition of a private company
- Suspicious documents
- *Broker-dealer receives substantially similar offering documents from different issuers with the following characteristics;*

> *The same attorney is involved;*
> *The same officers and directors are listed; and/or*
> *The same shareholders are listed.*

- *It is not uncommon for the same individuals to be involved in multiple microcap frauds. If a broker-dealer realizes after reviewing the information for several issuers that the same individuals are involved with these entities, the broker-dealer should make further inquiries to determine whether it has a reasonable basis to believe that the issuer information is accurate.*
- Reporting company fails to file an annual report
- Disciplinary actions against an issuer's officers, directors, general partners, promoters, or control persons
- Unusual activity in brokerage accounts of issuer affiliates, especially involving "related" shareholders

---

[21] *See* Securities Exchange Act Release No. 41110, (March 8,1999) at IV "Examples of Red Flags."

In the instant case, it is significant to note that a more complete and highly detailed discussion of 15c2-11 and the enumeration of red flags is contained within Spartan's Supervisory procedures.[22] It is evident to me that the defendants did not follow Spartan's written procedures and neglected or choose to ignore numerous red flags and failed to take action in accordance with their obligations under the rule.

In my opinion, Spartan failed in its role as gatekeeper and instead became a "link in the chain" for the Five to sell their shells without regulatory scrutiny.

### iii). DTC Eligibility

The Depository Trust Company ("DTC") is a clearing agency and self-regulatory body registered with the SEC.  Formed in 1973, the agency's primary role was to provide "book entry" changes to ownership of securities. In that regard DTC acts as a depository, holding securities for its participants (broker/dealers and banks), and maintains ownership records of the securities on its books.  DTC registers the securities deposited with it in the name of the nominee, Cede&Co., which becomes the registered owner of the securities, while participants and their customers retain beneficial ownership. With the centralization of automated securities settlement and the reduction of physical movement of publicly traded securities, DTC eligibility is an essential part of any securities transaction. Securities that are not DTC eligible are cleared outside the system increasing risk and costs of the transaction. Many broker/dealers would, in my experience, not be interested in trading a security which was not DTC eligible. In the world of shell factories, it is therefore paramount that securities coming into the marketplace meet DTC eligibility standards.

While placing of quotes in a recognized market gives some level of legitimacy to a security, the eligibility for clearance and settlement thorough DTC and the ability to deposit shares in "street name" assures that a shell is now ready for secondary market trading thereby making it more attractive to the buyer and adding value to the seller of the shell.

Only a DTC participant can request that DTC make a security eligible. Once an issuer has been approved for trading by FINRA, they must apply to DTC for their eligibility.  If DTC approves the application, they will hold all of the issuer's "free-trading" street name shares on deposit.   As with a Form 211 submission to FINRA, an issuer cannot make a direct application to DTC for eligibility.  The issuer must have a relationship with a broker-dealer or other financial institution that is a participant and will sponsor the eligibility process.

Prior to submittal of the application, the issuer must have a transfer agent and that transfer agent must have an approved relationship with DTC.  For example, it must be participating in the DTC's Fast Automated Securities Transfer ("FAST") program. Accordingly, this is one of the main criteria when an issuer chooses a transfer agent.

Where the issuer's securities are already issued and outstanding, the DTC participant will need to submit a copy of a physical stock certificate and what is referred to as a Transfer Agent Attestation Form. An eligibility application will be reviewed for completeness and will be subject to

---

[22] *See* Spartan Securities Group, Ltd. Supervisory Procedures pages 15-28.

13

comments. It is the responsibility of the *participant* sponsoring the application to address the comments and provide all information requested.  It is therefore essential that the issuer ensure that all information is accurate, complete and up to date.

 In Spartan's case, they relied on their clearing firm, Penson Financial Inc. to represent the Five's companies for DTC purposes.  Additionally, Island Transfer provided Penson with the information needed for Penson to apply for DTC eligibility for the Five's companies.

The DTC Operational Arrangements criteria sets forth in-depth requirements for eligibility. In addition to the Operational Arrangements, in order to be DTC eligible, an Issuer's securities must:

>   (i) be issued in a transaction registered with the SEC under the Securities Act of 1933;

>   (ii) be issued in a transaction exempt from registration under the Securities Act and that, at the time of seeking DTC eligibility, are no longer restricted; or

>   (iii) be eligible for resale pursuant to Rule 144A or Regulation S under the Securities Act.

Additionally, the issuer and its transfer agent must comply with certain standards relating to CUSIP numbers, certificate format, and legends.  With respect to restrictive legends on a certificate, when these certificates are accepted for deposit and sent to the transfer agent for re-registration into the name of Cede & Co., the nominee for DTC, any restrictive legend must be removed and replaced with a DTC disclaimer that removes any liability for DTC with respect to any such legend.

Again, Penson as the DTC participant was responsible with respect to DTC requirements and relied on Spartan and Island Transfer and their representations with respect to the Five's issuers.

### iv.)  Transfer Agent's Role

A transfer agent engages, on behalf of an issuer of securities, in receiving certificates, cancelling them and issuing new certificates, or transferring record ownership of securities by bookkeeping entry.  Transfer is accomplished when the transfer agent does everything necessary to cancel the certificate presented for transfer and to issue a new certificate. Transfer agents play an important role in the securities markets and therefore are required to register with the SEC. They are required by SEC Rules to keep their registration information accurate, maintain certain records, effect transfers promptly, and make records available for examination by the appropriate regulatory authority.

"A transfer agent's failure to perform its duties promptly, accurately, and safely can compromise the accuracy of an issuer's securityholder records, disrupt the channels of communication between

14

issuers and securityholders, disenfranchise investors, and expose issuers, investors, securities intermediaries, and the securities markets as a whole to significant financial loss."[23]

One of the key roles of a transfer agent is to help prevent unregistered securities distributions that violate Section 5 of the Securities Act of 1933.  As the SEC has stated, "The need to prevent unregistered securities distributions is particularly acute in the microcap market, where OTC issuers may not be subject to certain of the Commission's disclosure requirements and there is an increased potential for fraud and abuse…"[24]

In that same release, the Commission also points to the importance of the transfer agent's handling of restricted securities and the affixing or removal of restrictive legends.  "The Commission's experience in investigating abuses in the microcap market and bringing enforcement actions charging violations of the federal securities laws demonstrates how the removal of restrictive legends can often be a central element contributing to illegal, unregistered distributions of securities."[25]

Because of this important role, transfer agents may be liable as aiders and abettors for acts that contribute or help an unregistered distribution.  As with 15c2-11 and DTC eligibility, the transfer agent can be a further "link in the chain" that leads to a manipulative scheme.  There is no doubt that they are "gatekeepers" particularly as to their functions with respect to the microcap market.[26]

 As explained by former SEC Commissioner Aguilar, "In some cases, we have brought an action against the transfer agent for violating Section 5 on the theory that the transfer agent was a "necessary participant" and "substantial factor" in the unregistered distribution or sale."[27]  The Commission has taken several actions in this regard.[28]

The SEC has also stated that due to a myriad of legal issues which may arise in connection with a transfer, including determining a securityholder's affiliate status with the issuer, transfer agents often rely on legal opinions in carrying out a transfer request. The SEC has brought actions however, where illegal distributions were facilitated by improper reliance on opinion letters, particularly when red flags exist such as the use of the same attorney and identical opinions for multiple issuers.[29]

The transfer agent then can be an indispensable "link" in creating a backdrop for the shell company where it appears that the shell is "ready to go" by virtue of steps taken that create the illusion that

---

[23] SEC Release No. 34-76743 dated December 22, 2015. p.127.

[24] Ibid. p.128.

[25] Ibid.

[26] *See* Public Statement of SEC Commissioner Luis A. Aguilar, "The Importance to the Capital Markets of Updating the Rules Regarding Transfer Agents," dated December 17, 2014.

[27] Ibid. p.129.

[28] Ibid., see note 394.

[29] Ibid. see note 405.

the securities in question are "freely tradeable" in that restricted legends had been removed and all accompanying documentation, including bogus legal opinions and forged or blank stock powers are on file.  The "freely tradeable" factor is another element, along with the stock being quoted and DTC eligibility, which contributes to the ability to sell the shell at top dollar.

### c.) SPARTAN  FACILITATED THE SALE OF THE SHELL COMPANIES

As detailed below, Spartan and the defendants facilitated to the sale of the Five's companies.

**Mirman/Rose Companies:**

Al Mirman and Sheldon Rose were found to have manufactured shell companies in an assembly line fashion with the sole intent of selling these shells to buyers looking for a publicly traded vehicle.[30]  They were also creating, in the process, numerous red flags which would have been, in my opinion, evident to anyone who had the responsibility to perform due diligence surrounding these transactions.  Even Rose speculated that Spartan should have realized what was going on. As he stated in his deposition:

*"The only thing is, they should have been bright enough. They are dealing with industries, they're dealing with shell type of companies all along because he (Dilley) sold them. Not necessarily for us, but for other people. So you had to have the brain power to know what's a shell and what's not a shell and why you are popping them out so quickly."*[31]

Spartan did not adhere to, or chose to ignore, the "source reliability" and standards for "document review" provisions of Rule 15c2-11. Several examples of their failures are detailed below.

i.) *15c2-11, Source Reliability – Kids Germ Defense Corp ("Kids Germ")*

Kids Germ established a pattern that would be repeated over and over for the Mirman/Rose shells. The S-1 registration form filed with the SEC on 4/23/09 was typical of the Mirman/Rose companies. For example:

- The S-1 registration form listed Mark Nicholas as CEO, Sole Director, and employee of the company.  Mark Nicholas was Sheldon Rose's son-in law and in Rose's own description a "straw CEO." In fact, Rose states that "every CEO was a straw CEO."[32]
- The S-1 provided for registration of 3,000,000 shares of stock which equated to raising only $30,000 based on its price of $.01.
- The S-1 stated that, "We have not generated any revenues to date and our activities have been limited to developing our business plan."[33]

---

[30] *See* Litigation Release No. 24122 / April 30, 2018.

[31] *See* Deposition of Sheldon Rose before the SEC dated 12/13/2019 at 64 (3-9).

[32] Ibid. 48 (25), 49 (15-19).

[33] *See* Form S-1 for Kids Germ Defense Corp. dated April 23, 2009 at p.7.

- The S-1's for the other Mirman/Rose companies were similar with respect to number of shares issued, dollar amounts raised, and the lack of any real business operations.

While Mark Nicholas was purportedly the CEO, Carl Dilley could not recall speaking with him, and Rose admitted that the contact never took place.

> Q. *Do you know if you put Mr.Nicholas in touch with Carl Dilley or someone at Spartan Securities?*
> A. *There was no need to.[34]*

Rose also admits that he controlled the flow of information to Spartan. Moreover, various documents also point to the fact that Rose was directing the process on Kids Germ Defense with respect to Spartan's 15c2-11 filings. For example,

- Rose was the point of contact for the issuer, not Nicholas. Email chains between Dilley, Anna Krokhina, who was employed by Spartan in the 15c2-11 area, and Rose pointed to the fact that documentation for purposes of the 15c2-11 filings was provided by Rose.[35]

- Rose admitted directly that information provided to Spartan regarding Kids Germ Defense came from himself or Al Mirman.[36]

- Rose also pushed Carl Dilley to obtain a trading symbol for Kids Germ Defense, stating in an email: "Hope you can do whatever possible to get the symbol for Kids Germ Defense Corp. since there were no other comments."[37]

- Rose also knew the benefit of DTC eligibility in making the sale of the shell more profitable.

In an email to Dilley, Rose writes: *"What do you recommend the company do with the DTC knowing the route it is taking?"* Dilley answers: *"We should apply for DTC eligibility – Anna can get that going."[38]*

Anna applied to DTC through Spartan's clearing firm, Penson Financial Services Inc. In response to an inquiry from Penson, Anna Krokhina represented that "the company is not a shell."[39] Even a cursory look at the S-1 would have revealed that the issuer met the definition of a shell company with no assets, and no operations.

---

[34] *See* Rose Deposition at 49 (3-5).

[35] *See* email from Sheldon Rose to Carl Dilley dated 12/08/2009 re: "FW; Form 211 Application."

[36] *See* Rose Deposition at 41 (20-25).

[37] *See* email from Sheldon Rose to Carl Dilley dated 01/04/2010 re: "Happy New Year."

[38] *See* email from Sheldon Rose to Carl Dilley dated 01/04/2010 Re: FINRA Clearance/ Kids Germ Defense Corp.

[39] *See* Dilley Deposition exhibit 872.

The same email points to the fact that Dilley was also involved with a potential buyer of the shell in that he agreed to contact an attorney who was "interested in the company."  Dilley replies that he would call Rose once *HE* spoke to the attorney.[40]

 While 15c2-11 provides for the ability to obtain information from someone other than the issuer, it provides that where it is uncertain that the information was obtained from the issuer, it should contact the issuer directly.  The records that I have reviewed indicate that no one ever contacted Mark Nicholas and all information came from Rose.

*ii.) Envoy Group Corp*

Closely related to Kids Germ Defense was a company named Envoy Group Corp ("Envoy").  The S-1 registration was almost identical to Kids Germ Defense with respect to the number of shares offered and the proceeds of the sale.  This time however, the sole owner, Director and employee was Jocelyn Nicholas, Sheldon Rose's daughter.[41]

Once again the documentation for purposes of a Form 211 submission to FINRA was made by Sheldon Rose. In an email dated 11/06/13, Sheldon Rose sends Carl Dilley various documents relating to Envoy Group including a Notice of Effectiveness for the S-1, the final S-1, a certified shareholder list, and relationships spreadsheet.

In the email, Rose states "Carl, *we know the process*. Included is some due dil. Per our conversation. Please have Taylor (Zajonc, a Spartan employee) send me the templates."[42]  The "process" related to the 211 filings and other steps necessary to get the shell ready for sale.

DTC eligibility was also the subject of an email to Carl Dilley, "Hi Carl: Please provide me with the contract for Envoy, we want you to get the company the DTC, once we receive the symbol. Regards Shelley Rose."[43]

Dilley replies: "Attached is the DTC services agreement for Envoy. You can just fill this out and send back to me and forward payment to Island Stock Transfer."  Again, it is apparent that Dilley merely accepted Rose's representations over that of the issuer's and made no attempt to verify the information or investigate whether Rose was even authorized to provide it.

A degree of due diligence would have revealed the similarities between Kids Germ and Envoy starting with the fact that Jocelyn and Mark Nicholas were husband and wife.  Moreover, the S-1s were almost identical in the amount to be raised, number of registered shares and 24 shareholders of which 11 were in common between the two issuers.  Again, the Form 211 submission for Envoy certified that the information contained therein was obtained from a reliable source and signed by

---

[40] *Ibid*.

[41] *See* Rose Deposition at 91 (4-5).

[42] *See* email chain from Sheldon Rose to Carl Dilley dated 11/06/2013. (Dilley Depo. exhibit 813).

[43] *See* email chain from Sheldon Rose to Carl Dilley dated 11/11/2013 (Dilley Depo. exhibit 814).

Carl Dilley.  Also, Rose stated that he and/or Mirman had provided Dilley with the information and that Dilley never talked to his daughter, the purported CEO.[44]

Thus, in my opinion, the standard for source reliability was utterly disregarded with respect to the Rose/Mirman companies.

The pattern repeats with the other issuers associated with Al Mirman as noted in the SEC's complaint.  Mirman testified that all investors were family and friends who all invested the same amount of money, and that he used the same roster of 25 investors for each company,[45] all companies were failures, yet the investors all received identical returns for their investments.[46] Furthermore, Mirman testified that *he and Rose* had retained Spartan for the purposes of filing Form 211 and not the "straw CEO's" of the companies.[47]  Moreover, Mirman fully acknowledged with respect to Global Group that he was the point of contact for information and not the company.[48]

In fact, it appears that the issuers in question were interchangeable when one considers that they were basically following the same template.  For example, Mirman, responding to a request from Island Transfer for payment of a past due invoice, paid the invoice from the bank account of *a totally different company.*  The payment was never questioned by Island Transfer or Spartan. In fact, Mirman advised Carl Dilley directly that this was what he was going to do, "We spoke with Carl and told him we will pay through the Neutra account." [49]

It should, in my opinion, have been evident to Spartan and the other defendants that *nothing* provided by Rose and Mirman should have been relied on. In terms of the *document reliability* provisions of 15c2-11, and given the substantial *red flags* which were present, (which are discussed below), Spartan and Island Transfer should have carried out their obligation to "investigate red flags that suggest that misconduct may be occurring and to act upon the results of such investigation."[50]

### *iii.  Micah Eldred Companies*

The scenario is similar for the companies controlled by Harrison and Daniels. Eldred proposed a partnership with Diane Harrison to sell shells as early as October of 2010.  Harrison, an attorney

---

[44] *See* Rose Deposition 136 (19-25), 137 (6-25).

[45] *See* Testimony of Alvin Mirman before the SEC on July 14, 2015 at 36 (19-25) and 47 (16-19).

[46] *Id*. at 77-79.

[47] *See* Deposition of Alvin Mirman, December 12, 2019 at 84 (23-25) and 85 (1-2).

[48] Ibid. at 80 (18-24).

[49] *See* Exhibit 881 in the Testimony of David D. Lopez before the SEC on May 9, 2018.

[50] Michael T. Studer, Exchange Act Release No. 50543A, 57 SEC 1011, 2004 WL 2735433, at *6 (Nov. 30, 2004), petition denied, 260 F. App'x 342 (2d Cir. 2008).

and family friend, was told that a clean shell would be worth $300,000 and she would be entitled to one third of the profits. Eldred stated:

> "I would propose your fees are 1/3 of the equity/profits we get after deducting any real $ we have to put into the project…1/3 of the profits so to speak…if cleaned up shell is worth $300k, then that's $100k for you when we sell it."[51]

Their first venture was to turn a local pizzeria into a public company, Dinello Restaurant Ventures Inc. The S-1 was prepared by Diane Harrison who is also listed in the S-1 as an officer and director of the company. Spartan and Island Transfer handled the Form 211 filings and Transfer agent responsibilities. The 211 filing was typical in that it represented that its source reliability obligations related to conversations with the CEO of the company, the owner of the pizzeria who did not know Island Transfer or Spartan.

In his testimony to the SEC, Eldred testified, however, that contrary to the disclosures made on Dinello's 211 which he signed, he did not know the owner.[52] He also arranged for an ex-clearing trade to take place at Spartan in order to assist with DTC eligibility as the issue was "chilled" at DTC because its CUSIP number had expired. The Form 211 also stated that the company would continue as a pizza restaurant when Eldred knew that it was being set up to be sold to Andy Fan.

The second company set up by Harrison & Eldred, Court Document Services Inc., filed its S-1 registration in May of 2012. The company's S-1 looked similar to the one filed for Dinellos's except that Michael J. Daniels was listed as President, Secretary and Board Chairman. Daniels is Harrison's spouse.

Again, the shares were registered with the intention of selling it as a shell even though the S-1 stated that, "We do not foresee any circumstances that would cause us to alter our current business model within the next twelve months."[53] In addition, the shareholder list contained many of the same investors that were noted in the Dinello S-1.

On July 13, 2012, Daniels emailed Eldred to retain the services of Island Transfer.[54]

The Form 211 filing was attested to by Eldred but he testified that he did not review it. Nor did he review either the FINRA deficiency letters or Spartan's responses, instead delegating those duties to Zajonc and Krokhina; notwithstanding that the Form 211 called for a declaration by the officer signing the document that the information contained therein was from a reliable source.[55]

---

[51] *See* Testimony of Micah Eldred before the SEC dated October 17, 2017, (Exhibit 751).

[52] Ibid., see 59 (4-10).

[53] See S-1 Registration Form for Court Document Services Inc. as filed with the SEC on May 9, 2012, p. I-16.

[54] See note 55 supra (Exhibit 756).

[55] Ibid. 101(18-25), 102 (1-3).

When asked about FINRA's questioning the fact that shareholders used unmarked checks to purchase their shares and paid for their shares using sequentially or similarly numbered money orders, Eldred stated that he could not recall the question being raised.

*Q. Do you have any recollection of that issue being addressed by FINRA --*
*A No.* [56]

The same red flags were also present in other Daniels/Eldred deals. Daniels had advised Eldred on July 30, 2012 that Andy Fan "had three companies that he was doing registrations on including the 211 filed on Court."[57] Two Daniels and Eldred companies, Quality Wall Beds Inc. and TTB/Ibex also followed the same script. Michael Daniels was listed as the principal, executive officer, secretary, treasurer, chairman of the board, principal accounting officer, and chief financial officer for Quality Wall Beds.

In their comment letter, FINRA raised many of the same questions that pertained to Court Document Services, including the fact that shareholders had "paid for their shares using sequentially or similarly numbered money orders or checks." Once again Eldred testified that he was not aware of that fact.[58]

Quality Wall Beds would later become an Andy Fan company called Sichuan Leaders Petrochemical Company.

Similarly, Top to Bottom Pressure Washing, later Ibex Advanced Mortgage Technology Inc., also was the subject of an S-1 where Michael Daniels is listed as the Secretary, Treasurer and Chairman of the Board of Directors. Many of the shareholders again were the same as those mentioned in the prior offerings. In fact, the roster of shareholders for Dinello/AF Ocean, Court Document Services, Quality Wall Beds, TTB/Ibex, and the last Fan company, PurpleReal.Com, were almost identical.

During his deposition, Eldred indicated that he did not analyze this red flag even though FINRA had questioned this fact. Spartan in fact even put a regression chart together detailing the shareholders and their holdings.[59] While the shares were concentrated with a number of family and friends all investing identical amounts in each offering, the largest shareholders holding millions of shares were Diane Harrison and Michael Daniels.[60]

Eldred's deposition statement is telling in my opinion in that another red flag had gone unanswered.

*Q. Did you ever assess as to the similarities in these shareholder rosters across these five companies?*

---

[56] Ibid. 103 (5-18).
[57] Ibid. 104 (8-10). See Exhibit 686.
[58] Ibid. 115 (4-8).
[59] Ibid. See Exhibit 769.
[60] Ibid.

*A. I could not say if I had or had not.*
*Q. Are you aware that they are almost identical?*
*A. As I said, I don't remember. I haven't analyzed them. So I could not be aware of that.*
*Q. Are you aware that these were submitted to FINRA by Spartan, these five shareholder lists?*
*A. I don't recall if they were or not.*[61]

In fact, the shareholders of Purple Real.com never actually paid for any shares as they had been "gifted" to them by Daniels. All shares were purportedly paid out through an entity called Five Dogs, Inc. which was controlled by Daniels.[62]

Eldred did not remember whether red flags had been addressed by Spartan. When enumerated in his deposition he just did not recall.  When presented with a document entitled "15c2-11 Red Flag Issues," he acknowledged that he was familiar with the document. The red flag issues that were apparent with respect to the Eldred issuers were clearly listed in the document, yet Eldred did not recall addressing them even though he signed the Form 211's for these issuers:

I've marked as Exhibit 768. It's a document
*... "15c2-11 Red Flag Issues."*
  *Are you familiar with this?*
*A.  Yes.*
*Q.  How long has this policy been in place?*
*A.  I don't know.*
*Q.  And the first line says, "We are providing*
  *examples of red flags that require additional scrutiny by the broker dealer to comply with*
  *Rule 15c-211."*
*A.  Uh-huh. (Indicates affirmatively).*
*Q. And then it lists 28 different issues. Are you familiar with these?*
*A. Some of them, yes.*
*Q. Do you recall analyzing any of these red-flag issues in connection with the 211s for Dinello,*
  *Court Document Services, Quality Wall Beds, Top To Bottom Pressure Washing, or*
  *purplereal.com?*
*A. I don't recall.*
*Q. On Item 16, it says, "Broker dealer received substantially similar offering documents from*
  *different issuers with the following characteristics. The same attorney is involved, the same*
  *officers and directors are listed, and/or the same shareholders are listed."*
*A. Uh-huh. (Indicates affirmatively).*
*Q. Did you ever assess this red flag in connection with the 211s -- the five 211's that we*
  *mentioned?*
*A. I don't recall.*[63]

---

[61] Eldred's Deposition at p. 144 (8-16).
[62] Ibid. at p. 139 (9-23).
[63] Ibid. at 142 (4-25), 143 (1-4).

In summary, the red flags that are evident here are all fundamental to Rule 15c2-11 compliance and in my opinion demand follow up and a thorough investigation.  In essence, it was apparent that Mirman, Rose, Daniels and Harrison controlled the issuers and engaged in a number of actions which when taken together show an attempt to sell the shells that they had created.

**Island Transfer**

In the instant case, the stock transfer process also had to be addressed in order for the shells to be successfully sold.  Chief Compliance Officer David Lopez had responsibility for overseeing the Island Transfer operation and Spartan's compliance with 15c2-11.

Although Island Transfer had written procedures to ensure that the process of registration be accomplished in keeping with what was required in the context of avoiding violations of the federal securities laws, it seemingly did not follow those written procedures.  In addition, my review of the record at hand indicates that the individuals directly involved in the transfer process took all direction from the officers at Spartan and were not adequately trained to either spot or address red flags. For example: representatives of Island Transfer accepted directions from Rose, notwithstanding the fact that he was not designated on Island Transfer's "Corporate Authorization" form as the company representative. This occurred in 10 out of the 12 Mirman/Rose companies.

Also, with respect to Global Group Enterprises Corp., Island Transfer's representative could not recall if Rose was an authorized person for Global Group. Nonetheless Island Transfer sought permission from *Rose* regarding the printing of certificates and Island Transfer forwarded all the certificates to Rose at his request.[64] *The fact that all of the certificates of the company's shares in the names of many different shareholders are being sent to an unauthorized person who was not associated with the company should have been a definite red flag for the transfer agent*.

Another example that Rose was in control of the issuers in question related to First Independence Corp.  On January 28, 2013 Rose emails Zajonc and states: "We want to start a 15c2-11 on the above company fast track." with "fast track" emphasized. "Please call me first thing in the a.m. Thanks, Sheldon Rose." [65]  Zajonc sent Rose a "premier package and an invoice for $8,000 that referenced that it was for a "set up," and Rose went on to approve the shareholder list for the company.[66]

Rose also played an active role in getting the issuer DTC eligible, continually asking Island Transfer employees as to the status. Island Transfer played a role in insuring that the stocks in question were qualified to trade by giving various attestations to DTC when in fact they were taking direction from either Rose or Mirman.

Despite her understanding that affiliates of an issuer do not have free trading shares, Island Transfer's employee did not apparently take into consideration a number of unusual circumstances surrounding bulk transfers.  For example, she relied on blanket opinion letters for

---

[64] *See* Deposition of Anna Kotlova on May 10, 2018 at 225 (6-11).
[65] Ibid. See Exhibit 852.
[66] Ibid. See Exhibit 853.

bulk transfer of the shares covered by the shell's S-1 registration. The opinion letter covering First Independence was written by Diane Harrison and stated that the company had "met all relevant compliance requirements for the shares to be free trading."[67] The letter concluded that these were registered shares and that the sellers were not affiliates under Rule 144(a)(1).

In addition, the Island Transfer employee often used the terms "free trading" or "freely tradable" to describe stock certificates without restrictive legends. The absence of restrictive legends on stock certificates did not mean that the shares could lawfully be sold to the public. The presence of a restrictive legend on a certificate would have precluded its *transfer*. The absence of a restrictive legend merely made transfer of the shares possible, but not necessarily *lawful* to sell due to the affiliate status of the sellers and the control of the issuers by the Five.

In another instance, Island Transfer received five separate letters from the same attorney, Kathleen Delaney, representing that the shareholders noted were selling their stock to clients of her law firm. The shareholders certificate numbers were listed sequentially in each letter and payment for the transfer was enclosed with instruction to deliver all the shares to Delaney's office. The fact that all shareholders elected to sell their stock on the same day to the clients of the same law firm should have been a red flag that should have been investigated.

My conclusions are based on the Island Transfer's lack of concern and minimal action despite the obvious red flags noted above and others mentioned in the complaint.

### Spartan and Island Transfer's Supervisory and Operational Procedures

Spartan and Island Transfer did not lack supervisory procedures with respect to 15c2-11 and for the transfer process. The procedures simply were not followed.  For example, their procedures stated:

> "No associated person of Spartan shall submit a quote in any quotation medium subject to SEC Rule 15c2-11 and NASD Rule 6740 without first *reviewing and adhering* to these written supervisory procedures and guidelines and without first receiving written approval or clearance for submission of such quote from FINRA's Department of OTC Regulation and *Spartan's CCO* or other designated officer. Any questions relating to these written policies or questions relating to 211 content and supporting documents should be addressed with *the CCO or other designated officer* of Spartan Securities first…"[68]

The procedures also track almost verbatim the SEC's April of 1991 release noted above and contain a 28-item due diligence list relating to materials required to be reviewed including, "all aspects of the issuer's business, including but not limited to officers and directors' questionnaires, … relationship chart of shareholders, shareholders list,… all '34 Act filings and all material contracts."[69]

---

[67] Ibid. See Exhibit 953.
[68] *See* Spartan Securities Supervisory Procedures relative to SEC Rule 15c2-11.
[69] Ibid.

Of the due diligence materials noted in the release, the following, in my opinion, were important in the context of this case:

*6. the registration statement or exemption relied upon in obtaining the free trading shares currently outstanding.*

*7. A listing of products currently offered, including pricing and contracts for supply of manufacturing, raw materials as well as distribution, sales or marketing agreements for the companies' products.*

*8. Details of any past investigation or regulatory action taken by the SEC or other governmental or listing agencies against the company or any of its officers.*

*19. A list of who solicited the shareholders to invest and a list of shareholders solicited that did not invest.*

*21. A schedule identifying the current shareholders and what relationships they have to the company and its officers and directors.*

*22. A list of any other companies that the officers or directors have requested a quotation on.*

*24. A list of consultants, PR, or IR persons (or entities) that currently have any agreement for services with the company and a description of those services.*

*26. A copy of the current certified shareholder list indication free trading and restricted shares and officer and director holdings.*

In addition to the due diligence list, Spartan's procedures covered in great detail the provisions that are provided to necessarily comply with Rule 15c2-11.

Section 22.2 deals with "Source Reliability" and again follows closely the SEC's April '91 release. It states in part that:

*In order to establish a reasonable basis for belief that the information is from a reliable source, it shall be Spartan's policy to accept information directly from an issuer or its lawyer or accountant. Spartan shall seek a written statement from the issuer attesting to the accuracy of the information.[70]*

Further on it states:

*When a red flag regarding the source's reliability exists, the broker-dealer must inquire further to reasonably determine whether the information's source is reliable.*

Document Review obligations also cover in detail Spartan's obligation to review the materials relating to the Form 211 filing. The procedures state:

*"When red flags are present the broker-dealers' efforts to satisfy itself with respect to the accuracy of the information will vary with the circumstance and may require the broker-dealer to obtain additional information or seek to verify existing information."[71]*

---

[70] Ibid. p.18
[71] Ibid. p.19.

The procedures specifically assign responsibility to the Chief Compliance Officer for reviewing all material aspects of the filing and acknowledge that review by signing the Form 211.

*"It shall be the responsibility of the CCO, or other designated officer, together with the associated person responsible for originating the file to collectively review the material aspects of the file and to make notation of such review by signing the Form 211." [72]*

The procedures go on to enumerate at least 28 examples of red flags mostly identical to those noted in the SEC Release. The Procedures state that the CCO or other designated officer are responsible to investigate the red flags. As previously noted, both Dilley and Eldred acted as "designated officers" in a number of Form 211 filings.

*"Prior to submission of any quote subject to rule 15c2-11. The CCO of other designated officer of Spartan shall make an effort to ascertain whether any red flags exist in the Issuers due diligence materials. Both the CCO or the officer and associated person responsible for the organization of the file shall collectively investigate the red flags." [73]*

Among the 28 red flags listed in Spartan's Written Supervisory Procedures, the following are significant given the facts that I have reviewed in this case and in my opinion even a cursory review of the facts involved would have strongly pointed to the need for further investigation.

- #3. Concentration of ownership of the majority of outstanding, freely tradeable stock,
- #16. Broker-dealer receives substantially similar offering from different issuers with the following characteristics:
  The same attorney is involved
  The same officers and directors are listed; and/or
  The same shareholders are listed,

- #19. Disciplinary actions against an issuer's officers, directors, general partners, promotors, or control persons.
- #21.  Request to publish both bid and ask quotes on behalf of a customer for the same stock,
- #25.  Transfer of shares by control persons, as gifts, to third parties in order to help create a public market.


I have already discussed the red flags that were in my opinion obvious in red flags #3 and #16 in Spartan's procedures, as well as the disciplinary and criminal records of the Five, including Mirman being barred by FINRA in 2007.

With respect to #21, in October of 2012 an employee of Fan's company AF/Ocean emailed Taylor Zajonc requesting that a two-sided quote be placed in Court Document Services, a totally

---

[72] Ibid.
[73] Ibid. p.29

unrelated company, although related in the sense that it was a Fan shell.  Neither Zajonc, Lopez or Eldred took action relative to this red flag.

The red flag for #25 related to Daniels company, Five Dogs, Inc. "gifting" the shares of purplereal.com to shareholders. After Daniels questions FINRA's comments, Eldred changes his position from one of this "being a problem" to agreeing to file it anyway and dealing with FINRA later.[74]

Lopez also testified that other red flags were basically ignored or he did not recall if they were followed up. For example, he testified that he did not recall comparing shareholder relationship charts across issuers, a definite red flag which was referenced earlier.[75]  Lopez also testified that sequential numbering of money orders to pay for stock was a red flag, yet Court Document Services shares were paid by sequentially numbered checks. This was not caught or reviewed until FINRA pointed it out in their deficiency letter of July 27, 2012.[76]

With respect to Island Transfer, there were many of the red flags we have previously mentioned which were ignored and not addressed by the CCO, (Lopez).

For example, with respect to E Waste, after Rose tells Dilley that he would like Spartan and Island Transfer to take on their dual role, Dilley tells Anna Kotlova of Island Transfer that this deal had the same "TA agreements as the last deal they sent us."  Later, Greg Deck, another Island Transfer employee, corresponds with Rose seeking approval of the shareholder list for E Waste even though she could not recall if Rose was authorized to do this on behalf of the issuer.[77]

Rose also was involved with the approval of certificate printing and instructed Island Transfer employees to send all certificates to him "as directed." This occurred with respect to Global Group Enterprises even though he was not listed as an officer or director of the company. Regardless, the Island Transfer employees involved communicated with Rose without any apparent authorization that they could recall.[78]

It was noted above that attorney opinion letter could be another red flag that could alert the transfer agent of possible problems relating to unregistered distributions or other issues with respect to microcap securities.  In that regard, the SEC in their proposal to amend their transfer agent rules noted;

> *Because the relevant determinations can involve the assessment of legal issues that are fact-dependent, transfer agents typically may seek to rely on representations or*

---

[74] *See* Testimony of David Lopez before the SEC dated October 18, 2017 (Exhibit 831).

[75] *See* Testimony of David Lopez before the SEC dated May 9,  2018, 194 (2-15).

[76] Ibid. Exhibit 873.

[77] *See* Testimony of Anna Kotlova before the SEC dated May 10, 2018 at 208 (6-25), 209 (1-25), 210 (1-25), 211 (1-25), 212 (1-25); also Exhibits 850 and 931.

[78] *See* above at 223 (8-21) in particular, "this is a Sheldon Rose Company."  *See also* Exhibit 938 and ensuing discuss at 224 (8-25) and 225 (1-25) and 226 (1-15) "I do not recall."

*opinions provided by the issuer or securityholder and their counsels, usually in the form of an "attorney opinion letter," to determine whether an exemption from registration under Section 5 of the Securities Act is applicable. As our enforcement experience demonstrates, however, this process is also susceptible to abuse, as many illegal distributions are facilitated by the improper issuance of such opinion letters.[79]*

There is no question in the documents that I have reviewed that the correspondence of both Diane Harrison and Kathleen Delaney should have alerted Island Transfer and Lopez, its CCO, to investigate and question further given the obvious relationships involved.

An extreme example is the five letters written by Kathleen Delaney, all dated October 12, 2011, all interchangeable except for the stock buyers and the shareholder lists. The same could be said with respect to Diane Harrison's correspondence, particularly the legal opinions that relate to the question of removal of legends from stock certificates[80] to other opinions related to the "free trading status" of other companies. Many of these letters were interchangeable and relied on the issuer's shares being S-1 registered and incorrectly, in my opinion, interpreting the shareholders "affiliate status" under Rule 144 given that fact that shareholders were controlled by Daniels and were "friend and family."[81]

As the SEC has stated in a recent Investor Alert:

*While the SEC staff reviews certain forms and filings for compliance with disclosure obligations, the SEC does not evaluate the merits of any offering nor does it determine if any securities offered are "good" investments. Early-stage investing is marked by high risk. You should know the risks of your investment, including that you could lose all of your investment.[82]*

Lopez testified that he did not know of Harrison's relationships with the issuers in question.[83]

---

[79] *See* note 29 *supra*

[80] *See* Deposition of Diane Harrison on March 21, 2017 at Exhibit 539. In addition, while registration generally enables the shares covered to trade in the open market, the affiliate status of the shareholder may preclude their sale. It is also important to note that even though the SEC has declared a registration statement "effective', this does not imply that the offering has been "approved" by the SEC.

[81] *See* Harrison deposition, discussion regarding opinion letters at 238 (10-25), 239 (1-25), 240 (1-6).

[82] *See* SEC. gov "Investor Alert: Beware of Claims that the SEC has Approved Offerings" April 30, 2019."

[83] See Lopez's October deposition at 74 (7-11).

In my opinion, Lopez, as the Compliance Officer, did not carry out his duty to investigate nor did the employees of Island Transfer question any of the directions, orders, or correspondence but instead blindly facilitated the bulk transfer of the companies in question and provided the finished product to members of the Five or their agents notwithstanding the fact that the instructions being followed by Island Transfer were from individuals who had no authority to give them.

The duty of supervision includes the responsibility to investigate 'red flags' that suggest that misconduct may be occurring and to act upon the results of such investigation. "[R]ed flags and suggestions of irregularities demand inquiry as well as adequate follow-up and review."[84]

## CONCLUSION and OPINION

In examining the materials provided me and listed in Exhibit A attached, I have reached the following conclusions and I am prepared to assist the Court and the jury in understanding the regulatory impacts on the investing public resulting from the defendants' actions as follows:

Spartan and Island Transfer were "links in a chain" that permitted the shells to be sold thereby putting the investing public at risk if the outcome of the sale resulted in a pump and dump or other manipulative scheme. Market professionals rely on the integrity of published quotations in the marketplace and the industry's clearance and settlement systems could be compromised by virtue of the misrepresentations of the defendants and others.

a.) The defendants created a "one stop shop"  that provided a way of facilitating the "cleaning" of various shell and blank check companies in order for those shells to be sold, sometimes with the shell purchasers using these companies in manipulative schemes;

b.) The defendants were a critical and necessary part of the alleged fraud as their actions made the shells more valuable by causing the shells to become eligible for quoting in interdealer quotations media with the filing of Form 211 applications with FINRA. Spartan and the defendants were required by SEC rules to have FINRA approval and current information with respect to the issuer on file before being permitted to enter a quotation. The required information must have been obtained from preferably the issuer or other reliable source and the documentation must in fact have been reviewed;

c.) As expressed above, I believe that industry professionals, faced with the information and the multiple red flags presented to the defendants, would have easily concluded that more thorough investigation was warranted regarding source reliability and accuracy of the information being provided particularly because of the involvement of persons known to be

---

[84] Securities Exchange Act of 1934 Release No. 70046 / July 26, 2013, In the matter of ACAP Financial Inc.

involved with selling shells; the similarities among the applications, and by not performing even rudimentary due diligence;

d.) The defendants made the shells appear legitimate and as a result more valuable by causing the shells to become "DTC"eligible.  In this regard, they filed information with DTC which was provided by the persons desiring to sell the shells and not from a reliable or verified source. In addition, they provided information to DTC which was misleading, including multiple false representations to DTC that these were not "shell" companies;

e.) The defendants' activities carried out by Island Transfer were not customary practice in the transfer agent space and did not comport with industry standards. The defendants' actions in the capacity of a transfer agent made the shell company more valuable by making it appear that the shell is "ready to go" and by creating the impression that the securities in question were "freely tradeable."  In that regard, the defendants had restricted legends removed and relied on documentation, including bogus legal opinions and forged or blank stock powers. The "freely tradeable" factor provides additional value to the shell. As stated above, the removal of the restrictive legend does not automatically render a security freely tradeable. Unlegended shares controlled by affiliates of the issuer must be sold in accordance with the provisions of SEC Rule 144 or could be considered unregistered  distributions;

f) Certain activities engaged in by the defendants exhibited characteristics that would be recognized as irregular by industry professionals as they relate to compliance with SEC Rule 15c2-11 and other rules, including ignoring red flags as set forth below;

g.)  These red flags included the following:

- The shell factory scheme followed a predictable pattern. After registering the shares with SEC on Form S-1 the shell sellers would convince a friend, friend of a friend, relative or acquaintance to serve as a "straw" CEO.
- The offerings of each company's shares were almost identical in number of shares to be registered, amount of money raised and number of "straw shareholders" (approximately 25).
- These shareholders either did not exist, or for example, they used cash supplied by Daniels and Harrison  to "buy" the shares. Although this made it appear as if the company was owned by third parties, the Five maintained control of the company. A comparison of shareholder lists in some cases revealed the existence of similar shareholders.
- Spartan and Island Transfer relied solely on the shell sellers or their agents and attorneys for all information relating to the issuers and did not make an attempt to contact the issuer themselves. In one case, an attorney for the shell sellers provided the same legal opinion covering five different companies on the same day.
- Submissions to FINRA and DTC followed typical patterns and contained multiple untrue statements or misrepresentations.
- In the face of multiple red flags, the defendants either did not enforce or chose to ignore Spartan and Island Transfer's written supervisory procedures;

h). The effects of the defendants' actions were, in my opinion, serious and a threat to the integrity of the marketplace.

### LIMITING FACTORS AND OTHER ASSUMPTIONS

This report is delivered subject to the conditions, scope of engagement, limitations and understandings set forth in this report. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to supplement or amend this report should any additional information become available, including, but not limited to, any expert reports submitted on behalf of the defendants, deposition transcripts, and other information unavailable as of the date of this report.

If I am called to testify, I may prepare, employ, or use demonstrative aids such as graphs, charts, or tables to assist in my testimony.

Respectfully submitted,

*James M. Cangiano*

James M. Cangiano
President, Wildcat Consulting Inc.

31