IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

|  |  |  |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE | : | |
| COMMISSION, | : | |
| | : | CASE NO.: 8:19-cv-448-VMC-CPT |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SPARTAN SECURITIES GROUP, LTD., | : | |
| ISLAND CAPITAL MANAGEMENT, | : | |
| CARL E. DILLEY, | : | |
| MICAH J. ELDRED and | : | |
| DAVID D. LOPEZ | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

DEFENDANTS' STATEMENT OF MATERIAL FACTS...................................................2

ARGUMENT...............................................................................................................15

   I. MOST OF THE CLAIMS ARE TIME-BARRED .................................................15

   II. SEC'S THEORY OF LIABILITY UNDER RULE 15C2-11 IS INCONSISTENT WITH THE RULE ..........19

      A. Spartan Is Not Primarily Liable Under Rule 15c2-11 ................................19

      B. The Defendants Are Not Liable as Aiders and Abettors Under Rule 15c2-11......................28

   III. SEC CANNOT RELY ON RULE 10B-5 TO BOOTSTRAP ITS FAILED RULE 15C2-11 CLAIMS ........30

      A. Island Is Not Liable for Any Statements ..................................................32

         i. Form 211 Applications and Cover Letters..............................................32

         ii. DTC Attestation Forms..................................................................32

      B. Spartan, Mr. Dilley, and Mr. Eldred Are Not Liable for any Statements .................34

         i. Form 211 Applications...................................................................34

         ii. Form 211 Cover Letters.................................................................35

      C. None of the Defendants Is Liable as an Aider and Abettor Under Rule 10b-5 ...............37

   IV. SEC CANNOT REPACKAGE THE ALLEGED § 10B-5 VIOLATIONS UNDER § 17 ...........38

      A. None of the Defendants Is Primarily Liable................................................39

      B. Aiding and Abetting Liability Does Not Apply Here.....................................40

   II. THE ONLY APPEALS COURT TO CONSIDER SEC'S § 5 THEORY OF LIABILITY REJECTED IT .....41

CONCLUSION...........................................................................................................45

# TABLE OF AUTHORITIES

## Cases

*Aaron v. SEC*, 446 U.S. 680 (1980) .............................................................................38

*AVCO Corp. v. Precision Air Parts, Inc.*, 676 F.2d 494 (11th Cir. 1982) ........................17

*Badger v. S. Farm Bureau Life Ins. Co.*, 612 F.3d 1334 (11th Cir. 2010) ...............31, 33, 36

*Chiarella v. United States*, 445 U.S. 222 (1980).............................................................31

*Christensen v. Harris Cty.*, 529 U.S. 576 (2000) ......................................................20, 25

*City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245 (10th Cir. 2001) ...........32, 33, 37

*Ctr. for Bio. Div. v. Hamilton*, 453 F.3d 1331 (11th Cir. 2006) ................................18, 19

*Doe v. Drummond Co.*, 782 F.3d 576 (11th Cir. 2015) .....................................................15

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000)...........................................31

*Geiger v. SEC*, 363 F.3d 481 (D.C. Cir. 2004) ................................................................43

*Howard v. SEC*, 376 F.3d 1136 (D.C. Cir. 2004).............................................................28

*Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)..................30, 32, 34, 36

*Kokesh v. SEC*, 137 S. Ct. 1635 (2017)...........................................................................15

*Nat'l Parks & Conservation Ass'n, v. TVA*, 502 F.3d 1316 (11th Cir. 2007) ...................17

*Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d 410 (6th Cir. 2007) ............................16

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ....................................17, 18

*Pub. Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972 (8th Cir. 2012) ......................30

*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015) .........................28, 29, 41

*SEC v. Bio Def. Corp.*, No. CV 12-11669-DPW, 2019 WL 7578525 (D. Mass. Sept. 6, 2019)............43

*SEC v. Blackburn*, No. CV 15-2451, 2020 WL 565551 (E.D. La. Feb. 5, 2020)............................42, 45

*SEC v. Calvo*, 378 F.3d 1211 (11th Cir. 2004) .................................................................42

*SEC v. Carriba Air, Inc.*, 681 F.2d 1318 (11th Cir. 1982) .........................................31, 33, 35

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ...............................................................43

*SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248 (9th Cir. 2013) .............................42, 43, 45

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996) .....................................................................28

*SEC v. Goldstone*, 952 F. Supp. 2d 1060 (D. N.M. 2013) ............................31, 32, 34, 41

*SEC v. Graham*, 823 F.3d 1357 (11th Cir. 2016)..............................................................15

*SEC v. Husain*, No. 16-CV-03250 2017 WL 810269 (C.D. Cal. Mar. 1, 2017) ............43, 45

*SEC v. Jones*, No. 05-cv-7044, 2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006) .........................16

*SEC v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011).................................................31, 32

*SEC v. Kern*, 425 F.3d 143 (2d Cir. 2005) ......................................................................43

*SEC v. Kovzan*, No. 11-cv-2017, 2013 WL 5651401 (D. Kan. Oct. 15, 2013)................17, 18

*SEC v. Lek Sec. Corp.*, No. 17-CV-1789, 2019 WL 5703944 (S.D.N.Y. Nov. 5, 2019)........................40

*SEC v. M & A West Inc.*, 538 F.3d 1043 (9th Cir. 2008)...................................................43

*SEC v. Merch. Capital, LLC*, 483 F.3d 747 (11th Cir. 2007)..................................30, 31, 38

*SEC v. Monarch Funding Corp.*, No. 85-cv-7072, 1996 WL 348209 (S.D.N.Y. June 24, 1996)............43

*SEC v. Morgan Keegan & Co.*, 678 F.3d 1233 (11th Cir. 2012) ......................................38

*SEC v. Morgan Keegan & Co.*, 678 F.3d 1233 (11th Cir. 2012) ......................................41

*SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63 (2d Cir. 1970) ................................28

*SEC v. RPM Int'l, Inc.*, 282 F.Supp.3d 1 (D. D.C. 2017) ................................................41

*SEC v. Steadman*, 967 F.2d 636 (D.C. Cir. 1992) ...........................................................28

*SEC v. Syron*, 934 F. Supp. 2d 609 (S.D.N.Y. 2013) ......................................................41

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968)..........................................32

*SEC v. Weintraub*, No. 11-cv-21549, 2011 WL 6935280 (S.D. Fla. Dec. 30, 2011)...............32

*SEC v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) ............................................................... 39, 41

*Semerenko v. Cendent Corp.*, 223 F.3d 165 (3rd Cir. 2000) ................................................... passim

*Shiver v. Chertoff*, 549 F.3d 1342 (11th Cir. 2008) ................................................................... 15

*United States v. Naftalin*, 441 U.S. 768 (1979) ................................................................... 38, 40

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) ..................................................... 30

## Statutes

15 U.S.C. § 77b ................................................................................................................................. 43

15 U.S.C. § 77d ................................................................................................................................. 43

15 U.S.C. § 77q ............................................................................................................... 37, 38, 40

15 U.S.C. § 78t .................................................................................................................................. 27

15 U.S.C. §§ 77e .............................................................................................................................. 41

28 U.S.C. § 2462 ............................................................................................................................... 15

## Other Authorities

*Initiation or Resumption of Quotations Without Specified Info.*, SEC Release No. 29094, 1991 WL 292186 (Apr. 17, 1991) .......................................................................................................... passim

*Publ'n or Submission of Quotations Without Specified Info.*, S.E.C. Release No. 87115, 2019 WL 4738051 (Sept. 25, 2019) ...................................................................................................... 19, 21, 22

*Publ'n or Submission of Quotations Without Specified Information*, SEC Release No. 34-41110, 64 FR 11124 (March 8, 1999) ............................................................................................................ passim

SEC Investor Bulletin: *Reverse Mergers*, (June 2011) *available at* https://www.sec.gov/investor/alerts/reversemergers.pdf. ........................................................... 27

*Use of Form S-8, Form 8-k, & Form 20-F by Shell Companies*, Release No. 1293, 2005 WL 1667452 (July 15, 2005) ............................................................................................................................. 27

## Rules

Fed. R. Civ. P. 56(a) ......................................................................................................................... 14

## Regulations

17 C.F.R. § 240.15c2-11 ................................................................................................. 18, 19, 20, 25

Defendants Spartan Securities Group, LTD., Island Capital Management LLC, Carl E. Dilley, Micah J. Eldred, and David D. Lopez move for summary judgment on all counts.

The Securities and Exchange Commission's theory of liability rests on a radical expansion of the applicable rules. Market-makers, like the defendants, need only comply with a limited obligation to establish a "reasonable basis" for their decision to publish quotations in an over-the-counter market. The Commission itself has emphasized the limits of this obligation and rejected the view that market-makers have a due diligence requirement to look beyond the statements made to them by issuers of securities. And the defendants amply complied with their obligations, gathering all required information, and supporting it with reams of documents above and beyond the lawful requirements.

Yet SEC seeks to rewrite the rules through this enforcement. Instead of requiring the defendants to follow the applicable rules, SEC would hold them responsible for the accuracy of every representation made to them by issuers and their representatives, and require market-makers to ferret out fraud no matter how impossible it may be to do so, and no matter how many apparently genuine documents an issuer furnishes. SEC would even hold the market-maker responsible when both regulators from the Financial Industry Regulatory Authority and SEC's own examiners have examined the same information and declared it to be valid and genuine.

The Division of Enforcement also seeks to fundamentally alter the scope of a transfer agent's liability under § 5 of the Securities Act. It proposes to hold transfer agents strictly liable for merely recording others' sale or transfers of securities, even when the transfer agent played no role in arranging the sale and would face liability for refusing the transfer. This theory was rightly rejected by the only court to consider it, as it would mean that every transfer agent is *always* liable for any underlying misconduct. This Court should flatly reject the Division's attempt to rule by enforcement. The undisputed evidence shows that the defendants diligently examined every application to publish quotations for issuers, and processed transfers only when given appropriate directions.

1

## DEFENDANTS' STATEMENT OF MATERIAL FACTS

1.       Spartan Securities Group, Ltd. (Spartan) operated as a broker-dealer until 2019. Eldred Dep. 14:10–14, 23–24. Micah Eldred was a director for Spartan Securities. Eldred Dep. 14:7–8, 15:14–17; Lopez Dep. 20:10–14. Carl Dilley was a director for Spartan and President of Island Capital Management LLC (Island). Dilley Dep. 13:13–14:1, 26:4–7; Dilley Aff. ¶ 2.

2.       David Lopez was Chief Compliance Officer for Spartan and Island. Lopez Dep. 13:15–18, 19:20–22, 30:10–20; Lopez Aff. ¶2. From December 9, 2009 through July 2014 (the "relevant time period"), Mr. Lopez did not have the authority to direct Spartan's or Island's business activities, or otherwise bind the company in any way. Lopez Dep. 17:7–8, 18:5–7, 18:24–25; Lopez Aff. ¶ 4.

## SPARTAN'S ACTIONS AS A MARKET-MAKER

3.       From 2005 through 2015 Spartan applied to publish quotations of securities as a market-maker for approximately 1500 issuers. Eldred Dep. 26:2–4, 15–22; Lopez Dep. 197:21–198:3; Lopez Aff. ¶ 5. During that period, large numbers of public issuers of microcap securities sought to be traded on the OTC markets. Eldred Dep. 27:7–17, 117:19–23, 127:23–25; Lopez Aff. ¶ 5. Spartan was solicited almost daily by issuers or their representatives asking for Spartan to make a market in their securities. Eldred Dep. 26:7-27:17; Lopez Dep. 194:4–9; Lopez Aff. ¶ 5. Spartan rejected as many as half of the requests seeking approval for market-making, often because the issuers were not publicly reporting. Eldred Dep. 127: 20–25, 128:1–15; Lopez Dep. 194:4–9; Lopez Aff. ¶ 5.

4.       Spartan filed Form 211 applications to initiate quotations in the common stock of the 19 issuers referenced in the Complaint, ECF No. 1. Lopez Aff. ¶¶ 6-7, Lopez Ex. 1a-1s.

5.       Only the registered principal was responsible for the representations made in the application or subsequent communications to FINRA. Lopez Dep. 88:22–89:17, 93:5–10, 131:13–17; 163:13–20. Mr. Dilley was the registered principal for 15 and Mr. Eldred was the registered principal for 4 of the

issuers. Lopez Aff. ¶¶ 9-10. Mr. Lopez did not sign the Form 211 applications for any of the 19 issuers as either a principal or a registered representative of Spartan. Lopez Dep. 16:17-17:2; Lopez Aff. ¶ 11.

6.      During the relevant period, employees sought to review every S-1 registration statement that was made effective by the Commission to determine if the issuer would be a good candidate for Spartan to make a market in its stock. Eldred Dep. 27:7–17. When Spartan determined that a public issuer met relevant criteria it sometimes contacted the issuer or its representatives to discuss the possibility of acting as a market-maker. Eldred Dep. 27:7–17. Spartan considered its initial market research to be part of its "limited due diligence" process. Eldred Dep. 121:13–122:1.

7.      To apply to publish quotations, Spartan was required to file a Form 211 application with the Financial Industry Regulatory Authority (FINRA) to demonstrate compliance with both FINRA rules and SEC Rule 15c2–11. Martins Dep. 12:4–7, 14:8–10. FINRA rules required the market-maker to first obtain FINRA's "clearance" of its application before it could publish a quotation for an issuer's security as a market-maker. Adams Dep., 12:18–13:9; 68:20–69:1. Form 211 applications and supporting materials are "not public." Stanley Dep. 21:14–22:1; Lopez Dep. 198:16–199:8.

8.      For the 19 issuers, the decision for whether Spartan would seek approval to publish a quotation was made by either Mr. Eldred or Mr. Dilley. Lopez Aff. ¶12. Mr. Lopez could neither have made the unilateral decision for Spartan to file an application nor refuse to do so. Lopez Aff. ¶ 12.

9.      Market-makers must identify an issuer's transfer agent for securities prior to publishing a quotation. Eldred Dep. 135:15–19; Martins Dep. 16:2–17:1. Spartan sought approval to publish quotations irrespective of which transfer agent was retained. Eldred Dep. 116:1–6. Spartan did not charge issuers fees to file Form 211 applications. Eldred Dep. 70:23–71:4.

10.     Spartan would gather a series of standard documents for Form 211 applications. Eldred Dep. 123:3–124:9; Lopez Dep. 67:11–68:12; Lopez Aff. ¶ 13. Rule 15c2–11 has distinct obligations for broker-dealers seeking to publish quotations for public and non-public issuers. Eldred Dep. 32:4–

3

33:4, 123:12–16; Lopez Dep. 49:15–17; Lopez Aff. ¶ 13. Spartan's policy was to gather additional information about the issuers that it anticipated FINRA might request in its review process. Eldred Dep. 41:23–42:22, 123:17–124:21, 128:23; Lopez Aff. ¶ 13.

11.     Spartan required the issuer to provide (1) a signed Form 211 Filing Agreement; (2) a Principal Officer Affidavit; (3) a Director and Officer Questionnaire; and (4) a Shareholder Data Spreadsheet with copies of all stock purchase agreements and proofs of payments. Lopez Aff. ¶ 14; Lopez Ex. 2a-d. Spartan gathered these documents for all 19 issuers. Lopez Aff. ¶ 14.

12.     The Form 211 Filing Agreement provided, in part, that the issuer had provided "complete, true and accurate" information to Spartan in its documents, and that it would notify Spartan promptly of any material changes in the information. Lopez Aff. ¶ 15, Lopez Ex. 2a. Spartan required an authorized officer or director to sign the agreement. Lopez Aff. ¶ 15, Lopez Ex. 2a.

13.     The Affidavit required a relevant officer to attest under penalty of perjury that all of the information she had provided Spartan was materially true and accurate, there were no persons with control over the controlling shares of the issuer other than those listed as owners of the shares, that the issuer would continue with its stated business plan for at least 18 months, that it had no intent to enter into a merger or other transaction that would result in a change of control, and that it would promptly notify Spartan of any material changes in the information set out in the affidavit. Lopez Aff. ¶ 16, Lopez Ex. 2b. Spartan required each officer or director of the company to make a separate attestation and provide a notarized signature to the attestation. Lopez Aff. ¶ 16.

14.     All officers, directors, and shareholders owning 5% or more of voting securities were also required to fill out a Director and Officer Questionnaire. Lopez Aff. ¶ 17, Lopez Ex. 2c. The questionnaire required the relevant persons to certify with a signature the accuracy of the answers provided, including whether any change in control was contemplated. Lopez Aff. ¶ 17, Lopez Ex. 2c.

15.     Spartan required a spreadsheet with information concerning the number of outstanding shares, names of shareholders, and their relationship to the issuer. Lopez Aff. ¶ 18, Lopez Ex. 2d. Spartan also gathered the issuer's public filings and conducted a background check on the officers, directors and shareholders who owned 5% or more of voting securities. Lopez Aff. ¶¶ 19-20.

16.     At the discretion of the registered principal responsible for the Form 211 application, Spartan also collected a "211 Due Diligence Questionnaire." Lopez Aff. ¶ 21, Lopez Ex. 3a-d. The issuer provided, among other things, a certification about any material adverse information the issuer was aware of, and a signed statement "on Company letterhead and signed by an officer" "indicating whether any person or entity has control, written or otherwise, of the sale, transfer, disposition, voting or any other aspect of the shares listed in your S–1 other than the person or entity identified as the shareholder." Lopez Aff. ¶ 21, Lopez Ex. 3a-d. Each page of the form had to be "certified as reliable and accurate" by a signature from an officer or director of the issuer, as did separate statements concerning potential mergers or any anticipated change in control. Lopez Aff. ¶ 21, Lopez Ex. 3a, 3b, 3c, 3d. Spartan acquired this signed form for Dinello, Court Document, Top to Bottom, and Quality Wallbeds. Lopez Aff. ¶ 21, Lopez Ex. 3a-d.

17.     After January 2013, Spartan often provided standard forms to issuers or their representatives. Lopez Aff. ¶ 22. Spartan first sent a 15c2-11 listing application checklist, which requested that "an executive officer of the Company answer all questions," with appropriate signatures, and "attach all requested documents" as a part of the application packet. Lopez Aff. ¶ 23, Lopez Ex. 4. The issuer also had to provide multiple signed certifications that there were no "Red Flag Issues," it had provided accurate information to Spartan, it had not withheld any "material adverse information," and that it would provide additional information in the event of a material change. Lopez Aff. ¶¶ 25, 26, 27, Lopez Ex. 4. The issuer also had to certify, with multiple signatures and a letter on the "Company's letterhead and signed by an executive officer" that "that, to the best of the Company's knowledge,

there is no person or entity that has control, written or otherwise, of the sale, transfer, disposition, voting or any other aspect of the shares listed on the shareholder list other than the person or entity identified as the shareholder" and that the company did not anticipate a change in control "for the foreseeable future." Lopez Aff. ¶¶ 28, 29, 30, Lopez Ex. 4. Spartan acquired signed Form 211 application checklists from First Independence, Envoy, Changing Tech., First Xeris, Top to Bottom and PurpleReal.com. Lopez Aff. ¶ 31, Lopez Ex. 5a, 5b, 5c, 5d, 5e, 5f.

18.     Spartan retained all Form 211 information in its files, segregated from Island's, and accessible only by employees of Spartan. Eldred Dep. 123:12–124:21, 137:20–138:7; Lopez. Aff. ¶ 32.

19.     Spartan followed its common practices for the 19 issuers. Eldred Dep. 123:12–124:21; Lopez Aff. ¶¶ 14, 39.

20.     Once Spartan had gathered appropriate information, it would prepare a Form 211 application related to the issuer. Lopez Aff. ¶ 33. A registered representative would compile the documents, review them, and sign the 211 application. Lopez Aff. ¶ 33. One of the two principals of the firm, either Mr. Eldred or Mr. Dilley, would also certify compliance with Rule 15c2-11. Lopez Aff. ¶ 33.

21.     Spartan also included a cover letter with information it anticipated FINRA might request, but the letter was not an "exhaustive" description of the information in Spartan's possession. Eldred Dep. 128:21–129:6; Lopez Dep. 98:17–21, 99:20–100:8; Lopez Aff. ¶ 34. Each principal used a different cover letter. Lopez Dep. 85:22–86:6, 131:21–132:3. When the cover letter referenced an issuer's use of "promoters or consultants," this was a reference to public relations services, and not meant to suggest that an issuer was or was not working with an intermediary concerning the Form 211 application. Eldred, 133:7–135:2. Spartan routinely provided copies of documents it had obtained from the issuer, many of which were not "required by the rule." Eldred Dep. 145:22–146:12; Adams Dep. 67:14–67:6; Lopez Aff. ¶ 34.

22.     FINRA staff examiners reviewed the Form 211 application for compliance. Martins Dep. 12:8–17; Adams Dep. 12:18–13:1; Lopez Aff. ¶ 35. FINRA examiners were trained to look for SEC "red flags," which were never formally adopted by SEC. Adams Dep. 33:2–9; Martins Dep. 52:1–7. The examiner had no obligation to clear the application for quotation and would not do so until he was satisfied that the application had demonstrated compliance with applicable rules. Martins Dep. 19:9–14, 20:20–25, 51:17–25.

23.     FINRA examiners could seek additional information concerning the application in a deficiency letter. Martins Dep. 19:9–14, 51:21–25; Adams Dep. 57:16–21. FINRA examiners had no limitations on the number of letters they could send, or on the nature of the information they requested. Martins Dep. 51:21–25, 56:15–21. If an examiner saw a "red flag" in an application, it "would absolutely address that in a deficiency letter." Martins Dep. 52:8–14. It was "very common" for FINRA examiners to send deficiency letters, and the examiners did not consider them to be an indication that the application was suspicious. Martins Dep. 20:9–16; Stanley Dep. 67:23–68:1.

24.     An issuer's status as a shell company would not have prevented a Form 211 application from being cleared. Martins Dep. 22:23–23:9. It was also "pretty common" for small issuers to have shareholders with close relationships to the officers or directors, and it was not always a red flag to see such relationships. Martins Dep. 36:25–16, 65:3–13; Adams Dep. 38:11–18.

25.     Broker-dealers were expected to respond to deficiency letters. Martins Dep. 54:9–22; Adams Dep. 49:14–50:3. The FINRA examiner would then review the response and could ask for additional information or clear the application. Stanley Dep. 67:23–68:1; Adams Dep. 27:25–28:5. The FINRA examiner would only clear the application if he was satisfied with the information provided. Martins Dep. 56:4–21; Adams Dep. 49:19–50:3.

26.     FINRA examiners reviewed all the Form 211 applications for the 19 issuers. Lopez Aff. ¶ 35. FINRA issued comment letters for each but cleared for quotation all the issuers except PurpleReal.

Lopez Aff. ¶ 35, Lopez Ex. 6a-s, 7a-r. SEC issued a stop order prior to PurpleReal's clearance. Harrison Dep. 143:23–24, Jan. 10, 2020; Lopez Aff. ¶ 35.

27.     Between February 27, 2013 and February 7, 2014, FINRA sent Spartan seven deficiency letters concerning the applications for First Independence, Top to Bottom, Envoy, Changing Tech., and First Xeris. Lopez Aff. ¶¶ 40-46, Lopez Ex. 6k, 6l, 6m 6r. Mr. Dilley was the registered principal for each application. Lopez Dep. 89:2-4, 89:14-17, 93:5-10, 110:3, Ex. 255 p. 7, 11, Ex. 261 p. 7, 10; Ex. 263 p. 4-5, Ex. 264 p. 7, 13, 16, 22, 26-27, Ex. 270 p. 7, 13-15; Lopez Aff. ¶¶ 40-46, Lopez Ex. 1k, 1l, 1m, 1n, 1r. Spartan's registered representative, Taylor Zajonc, reviewed the deficiency letters and gathered responsive information from the issuer. Lopez Aff. ¶¶ 40-46. Mr. Zajonc gathered responsive information, including signed letters from the issuers' officers and directors, and drafted responses. Lopez Aff. ¶¶ 40-46, Lopez Ex. 6k-n, 8-10, 13-17. Mr. Lopez reviewed Spartan's responses to the deficiency letters, as well as the supporting documents, and approved them. Lopez Dep. 89:2–4, 89:14–17, 93:5–10, 94:2–3, 110:3, Ex. 255 p. 7, Ex. 259, Ex. 263, p. 1, 4-7, Ex. 264 p. 7, 16, 22, 23, 26-27, Ex. 266 p. 1, Ex. 268 p. 1, 3, Ex. 270 p. 7, 13-15, Ex. 271; Lopez Aff ¶¶ 40-46.

28.     Once FINRA cleared Spartan to issue a quotation, many issuers sought eligibility for clearance through the Depository Trust Company (DTC). Cangiano Dep. 181:7–9; Lopez Aff. ¶ 36. DTC held stock certificates in trust for eligible issuers to facilitate easier transfers of securities. Cangiano 181:7–182:7; Lopez Aff. ¶ 36. DTC eligibility was not required for a stock to be traded in an OTC market. Cangiano Dep. 182:1–21; Lopez Aff. ¶ 36. Spartan did not apply for DTC eligibility for any issuer because it was not a DTC participant. Cangiano Dep. 184:4–7; Lopez Aff. ¶ 36.

29.     With respect to the 19 issuers, Kids Germ, On the Move Systems, Rainbow Coral, and Dinello sought DTC eligibility through Penson Financial Services, Inc. Lopez Aff. ¶ 37. Spartan did not provide any information directly to DTC concerning those issuers. Lopez Aff. ¶ 37. Penson did not ultimately file Rainbow Coral's DTC application. Lopez Aff. ¶ 37.

30.     After an issuer was cleared for quotation, Spartan was required to act as the exclusive market-maker for 30 days. Lopez Aff. ¶ 38. Other market-makers could then publish quotations for the issuer without having to file a Form 211 application of their own. Lopez Aff. ¶ 38. Spartan regularly stopped making a market for issuers after this period and did not follow the issuer's operations after it ceased to serve as a market-maker. Eldred Dep. 131:21–18; Lopez Aff. ¶ 38.

31.     Because of then-existing market conditions many issuers received offers to change control when they became listed on an OTC market. Eldred Dep. 131:9-20. Several of the 19 issuers provided in their registration statements that they would consider changes in control to add shareholder value, even though they did not anticipate a change in control at the time. Cangiano Dep. 268:11–16, 276:18–25, 277:1–19, 280:9–15, 281:1–22; Ex. 42 p. 48. It would not have been surprising for one of these issuers to engage in a subsequent merger or acquisition. Cangiano Dep. 281:18–22.

32.     Issuers often interacted with Spartan and Island via intermediaries—attorneys, consultants, etc.—who aided them and their shareholders to navigate the complex process of selling shares on a publicly traded exchange. Eldred Dep. 125:22–126:10, 133:7–135:2; Lopez Dep. 48:19–51:6.

33.     Alvin Mirman and Sheldon Rose held themselves out to be intermediaries for some of the 19 issuers. Rose Dep. 42:17–19; 56:19–57:19; Dilley Aff. ¶ 4. Mr. Mirman and Mr. Rose forwarded all required documents involved with the Form 211 process from the issuers' documented officers who represented the documents and information as being accurate in all respects. Rose Dep. 42:15–19; 56:19–57:19, 66:22–25; Dilley Aff. ¶ 4. They also represented that the documents, including notarized affidavits from the officers, and signed subscription agreements with proof of payment and copies of identification, as being genuine and authentic. Rose Dep. 63:11–13, 64:15–65:1; Dilley Aff. ¶ 4. Mr. Mirman and Mr. Rose never informed Spartan or any employee of Spartan that any of the information provided to Spartan concerning any issuer was materially inaccurate or misleading. Rose Dep. 63:11–

13, 64:15–65:1; Dilley Aff. ¶ 5. Mr. Rose also never told "anyone at Spartan Securities that [he] and Mr. Mirman controlled the shares" of any issuer. Rose Dep. 63: 11–19, 64: 15–21, 65:1.

34.    In 2016, Mr. Mirman pled guilty to making misrepresentations concerning Rainbow Coral, First Titan, Neutra, Aristocrat, First Social, E-Waste, First Independence, Changing Tech., Global, Envoy, and E-Waste. Mirman Ex. 1 p. 12.

35.    In 2016, Mr. Rose pled guilty to making misrepresentations concerning Kids Germ, Obscene Jeans, On the Move, Rainbow Coral, First Titan, Neutra, Aristocrat, First Social, E-Waste, First Independence, Global, Envoy, E-Waste, and First Xeris. Rose Ex. 19 p. 12.

36.    Diane Harrison and her husband, Michael Daniels, requested Spartan file Form 211 applications for five issuers—Dinello, Court, Quality Wallbeds, Top to Bottom, and PurpleReal. Harrison Dep. 25:21–25, 40:13–17, 42:17–20, 131:20–132:2, 139:17–19, Ex 44-46, Ex 64-68; Daniels Aff. ¶ 1. As officers or directors for each issuer, they presented all required documents for the Form 211 process on behalf of the issuer and represented the documents and information as being accurate. Harrison Dep. 25: 21–25, 26:1–12, 44:11–45:10, 47:19–23, 92:5–8; 139:17–19, 143:3–15; Daniels Aff. ¶¶ 3–6. Ms. Harrison and Mr. Daniels never informed Spartan or any of its employees that any of the information they provided concerning the issuers was materially inaccurate or misleading. Harrison Dep. 43:6–12; 143:7–15; Daniels Aff. ¶¶ 3–6.

37.    In 2018, Ms. Harrison and Mr. Daniels were named defendants in an enforcement action by SEC related to alleged misrepresentations concerning Dinello, Court Document, Quality Wallbeds, Top to Bottom and PurpleReal. Harrison Dep. Ex. 38, 39.

38.    Neither Mr. Eldred, Mr. Dilley, nor Mr. Lopez knew or suspected that any of the information provided by the issuers or their intermediaries related to the 19 issuers was materially inaccurate or misleading. Eldred Dep. 135:20–24, 136:24; Dilley Aff. ¶ 3; Lopez Aff. ¶ 47.

39.     In 2012, SEC examiners conducted an on-site examination of Spartan regarding Form 211 applications submitted from January 1, 2011 through September 28, 2012. Franceschini Dep. 29:10–25, Ex. 178. The examiners had access to all emails and 211 files, and specifically requested files related to Aristocrat, First Titan, and Neutra. Franceschini Dep. 15:5–17, 31:6–10, 32:12–33:4, Ex. 180. SEC examiners were expected to review potential "red flags" and measure Spartan's response to them. Franceschini Dep. 51:20-52:1. Not every "red flag" suggested by Commission guidance was necessarily indicative of underlying fraud. Franceschini Dep. 26:9-26-27:1. Many of the shareholders for the three companies overlapped and had apparent relationships with the issuers, but the supervising examiner did not consider this to be a suggestion that Spartan had violated any rule. Franceschini Dep. 40:2–46:10, 46:16–47:12, 54:13-16. Ms. Harrison was listed as counsel for multiple companies on their S-1 registration statements. Dyer Dep. 50:18–22, 52:1–23, 53:21–24, Ex. 92, 99. The examiners did not raise any issues with using the same attorney for multiple issuers or overlapping shareholders between issuers. Dyer Dep. 80:16–18; Franceschini Dep. 49:7–11, 54:13–20, Ex. 179. SEC staff raised no deficiencies concerning Spartan's review of "red flags" for any of the 19 issuers. Franceschini Dep. 54:13–20, Ex 179.

## ISLAND'S ACTIONS AS A TRANSFER AGENT

40.     Island was not involved with filing Form 211 applications. Dilley Aff. ¶ 6; Lopez Aff. ¶ 48. Island was not a broker-dealer and acted solely as a transfer agent. Dilley Aff. ¶ 6; Lopez Aff. ¶ 48. As a transfer agent, Island completed ministerial recording of transfers, canceling stock certificates, and issuing new stock certificates, when given appropriate instructions. Dilley Aff. ¶ 6; Lopez Aff. ¶ 48.

41.     Island segregated its business operations and its files from Spartan and Spartan's employees. Eldred Dep. 137:2–138:7; Dilley Aff. ¶ 7; Lopez Aff. ¶ 49. Spartan never acted as a transfer agent for any shares of stock. Dilley Aff. ¶ 7; Lopez Aff. ¶ 49.

42.     In order to process a sale of stock for any of the 19 issuers, Island gathered documentary evidence: (1) evincing the stockholder's ownership, generally in the form of a signed subscription agreement and proof of payment for the original stock in the stockholder's name; (2) an original Stock Power certificate directing Island to transfer the stock to an identified recipient signed by the original stockholder with a medallion guarantee stamp provided by a reputable financial institution; and (3) a form of instructions to Island signed by the original stockholder directing the transfer to an identified recipient. Lopez Aff. ¶ 50, Lopez Ex. 18. Additionally, Island typically requested letters from attorneys for the stockholder confirming the transfer instructions, and providing any appropriate opinions concerning whether the new certificate should be stamped as restricted. Lopez Aff. ¶ 50.

43.     When presented with appropriate instructions, Island had an obligation to promptly process the transfer to avoid civil liability to the stockholder and regulatory liability to SEC. Lopez Aff. ¶ 50.

44.     Island was not involved with arranging any sale of any stock. Dilley Aff. ¶ 8, 10; Lopez Aff. ¶ 52. Island never processed transfers until after a sale had been completed by the stockholder. Dilley Aff. ¶ 8; Lopez Aff. ¶ 52. Island never received any proceeds or had any stake in the outcome of any sale of stock beyond routine transfer fees. Dilley Aff. ¶ 8; Lopez Aff. ¶ 52.

45.     When requested by the DTC participant firm that was filing an application for eligibility, Island provided an agency attestation form concerning issuers. Lopez Dep. 199:17– 200:5; Cangiano Dep. 186:2–7; Dilley Aff. ¶ 9; Lopez Aff. ¶ 53, Lopez Ex. 19. The attestation only provided ministerial information about an issuer—name, description of stock, CUSIP number, number of authorized shares, and number of shares outstanding. Lopez Dep. 199:17– 200:5; Cangiano Dep. 187:3–8, Ex. 239; Dilley Aff. ¶ 9; Lopez Aff. 53, Lopez Ex. 19. The attestation did not provide any substantive information or representations about the issuer's activities or registration of shares. Cangiano Dep. 188:3–189:25, 192:9–193:3; Dilley Aff. ¶ 9; Lopez Aff. 53, Lopez Ex. 19. The attestation was not seen

by the public. Lopez Dep. 200:7–9; Cangiano: 186:9–12; Lopez Aff. 53, Lopez Ex. 19. Island provided

DTC attestations for Kids Germ, Obscene Jeans, and On the Move Systems. Lopez Aff. ¶ 54.

46.     Island processed transfers of a controlling portion of shares in Kids Germ, Obscene Jeans,

On the Move, Rainbow Coral, First Titan, Neutra, Aristocrat, First Social, Global, E–Waste, First

Independence, and Changing Tech. Lopez Aff. ¶ 55. Each had filed effective registration statements,

which provided that the issuer would engage in a self–underwritten offering. Lopez Aff. ¶ 55.

Thereafter, shareholders had purchased the registered shares from the issuer. Lopez Aff. ¶ 55. In each

instance, the issuer provided Island with copies of the subscription agreements and proof of payments

for each investor indicating that the shares were purchased during the offering described in the

effective S-1. Lopez Aff. ¶ 55. Some of the shareholders then directed Island to transfer their registered

shares to a new purchaser, by providing Island with the appropriate form instructions. Lopez Aff. ¶

55. The transfers sometimes included transfer of shares held by officers or directors of the issuer, and

these newly issued certificates were stamped as restricted for resale. Lopez Aff. ¶ 55.

47.     Island processed transfers of a controlling portion of shares in Dinello, Court Document,

Quality Wallbeds, and Top to Bottom. Lopez Aff. ¶ 56. Each had filed effective registration

statements, which listed shareholders who had purchased shares from private placement sales. Lopez

Aff. ¶ 56. The registered shareholders provided Island with subscription agreements and proof of

payment indicating how they had acquired their shares. Lopez Aff. ¶ 56. Some shareholders directed

Island to transfer their registered shares to a new purchaser by providing Island with the appropriate

form instructions. Harrison Dep. 67:20–69:21, 84:7–11, 102:6–12; Lopez Aff. ¶ 56. The new

certificates were either stamped with a restrictive legend or relied on an opinion letter directing Island

to remove a restricted legend because either the shareholders had been registered in the registration

statement or the affiliate shareholders had been in a non–control position for a sufficient period of

time. Lopez Aff. ¶ 56.

48.    Island played no active role in negotiating or planning any of the sales or transfers of shares for any of the issuers. Dilley Aff. ¶ 10; Lopez Aff. ¶ 57. Ms. Harrison, counsel for Dinello, Court Document, Quality Wallbeds, and Top to Bottom testified that Island had no participation in the planning of the sale of any shares of Dinello. Harrison Dep. 69:4–8; 89:22–90:2, 102:19–22, 119:20–24. All sales would have occurred regardless of Island's involvement as a transfer agent, and the transfer would have proceeded with a different agent if Island had refused the instructions. Harrison Dep. 69:9–14, 91:6–10, 92:9–11, 102:19–22, 119:8–9. Mr. Daniels, an officer of Court, Quality Wallbeds, and Top to Bottom, attested that Island had no role in planning, organizing, negotiating, or executing the sale of shares for those issuers and was not a necessary part of any transfer or sale of shares. Daniels Aff. ¶¶ 7–8.

49.    SEC examined Island during that same period as Spartan. Franceschini Dep. 57:1–4. Onsite examiners had access to all transfer agent files for all of Island's customers from 2011 through 2012 and specifically requested files for Aristocrat, First Titan and Neutra. Franceschini Dep. 57:14–21, 59:8–25, Ex. 187. After the exam, SEC sent Island a letter indicating it had not found any deficiencies. Franceschini Dep. 61:20–62:7, Ex. 186.

50.    Mark Harmon, an expert in transfer agent practice and compliance, opined that Island "acted in accordance with generally accepted practices and procedures of transfer agents and in fulfillment of its legal obligations … in connection with the issuance and transfer of securities in response to requests made in good order." Harmon Report 1, June 16, 2020. After examining the transfer documents at issue in this case, Mr. Harmon concluded that "Island Stock Transfer did not have any basis for refusing to issue these Shares which had been approved for issuance by the Commission and were accompanied by documents authorizing and substantiating the issuance." Harmon Report 4.

**ARGUMENT**

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If "the moving party meets this burden, the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor." *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (citation omitted). "[W]hen the summary judgment movant does not bear the burden of proof at trial, the movant may show that there is an absence of evidence to support the non-moving party's case; a negation of the non-moving party's claim is not required." *Doe v. Drummond Co.*, 782 F.3d 576, 603-04 (11th Cir. 2015) (citation omitted).

## I. MOST OF THE CLAIMS ARE TIME-BARRED

Most of SEC's claims are based on conduct that occurred as many as nine years ago—well outside the five-year limitations period. This Court should enter summary judgment against SEC for any request for penalties outside the relevant limitations period.

Under 28 U.S.C. § 2462, any SEC suit for "any civil fine, penalty, or forfeiture" is subject to a five-year statute of limitations. This applies to any "penalty" or "forfeiture," including disgorgement. *Kokesh v. SEC*, 137 S. Ct. 1635, 1641-1644 (2017); *see also SEC v. Graham*, 823 F.3d 1357, 1363 (11th Cir. 2016) (disgorgement is "forfeiture" for statute of limitations).[1] The cause of action accrues on the date the conduct occurred, regardless of when the government discovered it. *Kokesh*, 137 S. Ct. at 1641-1644.

---

[1] The defendants also note that it remains an open question if the five-year limitations period applies to requests for *injunctions*. *See* ECF No. 56 p. 4-5 (discussing the question with reference to a motion to strike affirmative defenses). As argued previously, that issue depends on the form of any injunction and whether it acts as a penalty. *See id.* at 5 (citing *Graham*, 823 F.3d at 1360, 1361 n. 1). Because no injunctions are presently implicated and no defendants have been found liable for any violation, the defendants reserve this issue should it arise in the future.

The statute of limitations has run for most of the allegations in the Complaint. The conduct at issue must have occurred after October 23, 2013 to fall within the limitations period.[2] But the 13 counts against the defendants all rely on conduct "as early as December 2009 through at least July 2014." *See* ECF No. 1 at 44-60. For Counts I-XIII, which refer to Form 211 applications, Spartan only filed Form 211 applications for Envoy, Changing Tech., First Xeris, Top to Bottom, and PurpleReal.com after October 23, 2013. Lopez Aff ¶ 7, Lopez Ex. 1a-s.[3] With respect to Count XIV, the only acts referenced in the Complaint taken by any defendant related to transfers of shares occurring after October 23, 2013 were the recording of the transfer of shares and issuance of new certificates for Changing Technology and First Xeris. *See* ECF No. 1 at 30, 60. Thus, these are the only acts for which SEC may seek penalties, and only against certain defendants.

SEC has essentially recognized as much, insisting that it can rely on the "continuing violations doctrine," but only for its claims "involving a scheme to defraud, practice, or course of business." ECF No. 33 at 38.[4] This Court previously noted that some of SEC's claims "under Rule 10b-5 and Section 17(a)" might be "based on scheme liability extending into a period within the statute of limitations" and thus "not barred by Section 2462," but also declined to strike the affirmative defense of statute of limitations. ECF No. 44 at 22, ECF No. 57 at 4-5.[5] There is no dispute, therefore, that

---

[2] The Complaint was filed on February 20, 2019, and by agreement, the claims were tolled 118 days from September 4, 2018 until December 31, 2018.

[3] Mr. Lopez's only alleged involvement, in Count II, relates to Changing Tech., Top to Bottom, Envoy, and First Xeris. *See* ECF No. 1 at 44. Mr. Dilley's only alleged involvement in Counts I-XIII relates to Envoy, Changing Tech., and First Xeris. *See* ECF No. 1 at 44-60. Mr. Eldred's only alleged involvement in Counts I-XIII relates to Top to Bottom and PurpleReal.com. *See* ECF No. 1 at 44-60.

[4] SEC also argued that it "may offer evidence of earlier conduct to show the scheme's existence and the Defendants' intent," but that is an evidentiary issue left for another day. *See* ECF No. 33 at 38.

[5] For the sake of preservation, the defendants maintain that the continuing violations doctrine should not apply to SEC enforcement matters. *See SEC v. Jones*, No. 05-cv-7044, 2006 WL 1084276, at *4 (S.D.N.Y. Apr. 25, 2006) (noting that courts "have questioned the availability of" the "continuing violation theory" in SEC enforcement actions). The doctrine is judge-made law, originally found in the Title VII context, and courts have been "extremely reluctant" to extend the continuing-violation doctrine beyond employment discrimination. *Nat'l Parks Conservation Ass'n v. TVA*, 480 F.3d 410, 416 (6th Cir. 2007). Nothing in 28 U.S.C. § 2462 suggests that the mandatory limitations period should somehow become flexible merely by virtue of the type of securities violation alleged. Thus, this Court should reconsider its prior ruling, and hold the doctrine inapplicable in the securities enforcement context.

the counts not alleging scheme liability *are* outside the statute of limitations and not subject to the continuing violations doctrine.[6]

Even for the remaining counts, the continuing violations doctrine does not apply. The application of the doctrine is a fact-sensitive one, and even though SEC survived the motion to dismiss, that does not preclude summary judgment now. *See AVCO Corp. v. Precision Air Parts, Inc.*, 676 F.2d 494, 495 (11th Cir. 1982).

"Under the continuing violations doctrine, the statute of limitations is tolled … where the violation giving rise to the claim continues to occur within the limitations period." *Nat'l Parks & Conservation Ass'n*, 502 F.3d at 1322. A court must "distinguish between the present consequences of a one-time violation, which do not extend the limitations period, and a continuation of a violation into the present, which does." *Id.* (citation omitted). The proponent of the exception must prove that the charged conduct is truly a continuation of prior conduct. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108 (2002). The doctrine does not apply where each alleged violation is a "discrete" act. *See id.* at 112. Discrete acts are those that are "actionable" at the time they occur. *Id.* at 114. Thus, the doctrine does not apply to alleged violations of securities laws that would have been "discretely actionable" misrepresentations, and any claim "based on particular misrepresentations and omissions" is barred by the usual statute of limitations. *SEC v. Kovzan*, No. 11-cv-2017, 2013 WL 5651401, at *3 (D. Kan. Oct. 15, 2013).

The continuing violations doctrine does not apply here. For the scheme liability counts, they are premised on specific statements uttered at discrete points in time—the Form 211 applications. *See* ECF No. 1 at 44-60. Those are all actionable on their own, and SEC has brought specific actions premised on the statements. SEC has just alleged that other defendants uttered different statements about different issuers at various points in time and asserted that they somehow transform to a

---

[6] These are Counts I, VI, IX, XII, and XIV.

continuation of past misconduct because they resemble one another. But the Supreme Court has rejected that analysis, clearly differentiating "discrete," yet repeated actions, like "termination [or] failure to promote," from claims like "[h]ostile environment," which by their nature can only exist with repeated actions. *See Nat'l R.R. Passenger Corp.*, 536 U.S. at 114-15. Each alleged misrepresentation was a separate, actionable, and discrete act. All the claims for damages brought on these "particular misrepresentations and omissions" must be barred. *See Kovzan*, 2013 WL 5651401, at *3.

The "continuing violation doctrine" is also "limited" "to situations in which a reasonably prudent plaintiff would have been unable to determine that a violation had occurred." *Ctr. for Bio. Div. v. Hamilton*, 453 F.3d 1331, 1335 (11th Cir. 2006). "If an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine." *Id.* (citations omitted).

All counts outside the limitations period must be barred because SEC could have acted much sooner. SEC's theory relies on Spartan's failure to discover alleged misrepresentations made by Mr. Mirman, Mr. Rose, Ms. Harrison, and Mr. Daniels. *See* ECF No. 1 at 44-60. Yet, had it been reasonably prudent, SEC could have discovered the alleged misconduct at least by 2012 when it conducted examinations into three of the issuers it now thinks had been involved in fraud—Aristocrat, First Titan and Neutra. *See* Franceschini Dep. 36:1–10, Ex 180. The examiners specifically looked for red flags related to the Form 211 applications for those issuers, reviewed Spartan's entire files, yet SEC raised no issues at the time. Dyer Dep. 80:16-18; Franceschini Dep. 15:5–17, 31:6–10, 32:12–33:4, 40:2-46:10, 49:7-11, 51:20-52:1, 54:13–20, Ex. 179. Further, SEC certainly knew full well of the alleged misconduct by 2016, when both Mr. Mirman and Mr. Rose pled guilty to securities fraud for making misstatements related to the issuers involved in this case. *See* Mirman Ex. 1 p. 12; Rose Ex. 19 p. 12. In 2018, SEC also brought a follow-on action against Ms. Harrison and Mr. Daniels. *See* Harrison Ex. 38, 39. These were a "series of events [that] should have alerted a reasonable person to act to assert

his or her rights at the time of the violation[.]" *See Ctr. for Bio. Div.*, 453 F.3d at 1335. Thus, SEC "cannot [now] rely on the continuing violation doctrine." *See id.*

## II. SEC's Theory of Liability Under Rule 15c2-11 Is Inconsistent with the Rule

### A. Spartan Is Not Primarily Liable Under Rule 15c2-11

Rule 15c2-11, 17 C.F.R. § 240.15c2-11(a), enacted under § 78o(c)(3)(A) of the Securities Exchange Act of 1934 (Exchange Act), provides that "it shall be unlawful for a broker or dealer to publish any quotation for a security … unless such broker or dealer has in its records" specific "documents and information." The documents include 20 specified items, including prospectus information, annual reports, and the issuer's financial information. The broker-dealer is required to retain this information for three years. *Id.* at § (c).

If the broker-dealer has the required information, it is in compliance with the rule so long as it "has a reasonable basis under the circumstances for believing that the paragraph (a) information is accurate in all material respects, and that the sources of the paragraph (a) information are reliable." *Id.* at § (a). For information filed by the issuer with the Commission, such as registration statements or quarterly filings, the broker or dealer need not even make the documents available for inspection because they are deemed "reasonably available." *Id.* For documents gathered by the broker-dealer, if

> such information is made available to others upon request pursuant to this paragraph, such delivery, unless otherwise represented, shall not constitute a representation by such broker or dealer that such information is accurate, but shall constitute a representation … that the broker or dealer has a reasonable basis under the circumstances for believing the information is accurate in all material respects, and that the information was obtained from sources which the broker or dealer has a reasonable basis for believing are reliable.

*Id.*

The Commission has also published guidance on how it thinks the rule might apply. A preliminary note to the rule says, "Brokers and dealers may wish to refer to Securities Exchange Act Release No. 29094 (April 17, 1991), for a discussion of procedures for gathering and reviewing the

information required by this rule[.]" *Id.* In 1999 the Commission published "[g]uidance" as an appendix to a rule proposal that would "not appear in the Code of Federal Regulations." *Publ'n or Submission of Quotations Without Specified Information*, SEC Release No. 34-41110, 64 FR 11124, 11145 (proposed Mar. 8, 1999) (1999 Proposed Rule).[7]

Guidance documents lack force of law and are non-binding. *See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in policy statements, agency manuals, and enforcement guidelines, all … lack the force of law[.]"). Thus, these guidance documents cannot alter the regulatory burdens on broker-dealers set out in the rule.

The documents recognize as much. The preliminary note says that broker-dealers "may wish to refer" to the 1991 release. 17 C.F.R. § 240.15c2-11. The 1999 guidance provided "examples of red flags that [the Commission] noticed" in prior fraud cases "[t]o assist broker-dealers in complying with Rule 15c2-11." *1999 Proposed Rule*, 64 FR at 11145, 111149.

Moreover, the Commission's guidance has also set forth context for the rule that clarifies the limited obligations set out in Rule 15c2-11. In 19991 the Commission expressed its view that the "reasonable basis" standard was deliberately less onerous on brokers and dealers than a "due diligence" standard. *See Initiation or Resumption of Quotations Without Specified Info.*, SEC Release No. 29094, 1991 WL 292186, at *3-4 (proposed Apr. 17, 1991) (1991 Proposed Rule).[8] The Commission noted that this obligation "will not *begin* to approach the depth and breadth of an underwriter's due diligence investigation." *Id.* at *7 (emphasis added). The Commission has recently reaffirmed this

---

[7] The proposed 1999 rule amendment was never adopted by the Commission. *Publ'n or Submission of Quotations Without Specified Info.*, SEC Release No. 87115, 2019 WL 4738051, at *12 (proposed Sept. 25, 2019) (2019 Proposed Rule).

[8] This clarification was important because before the 1991 amendment the rule required a broker-dealer to have "no reasonable basis for believing [information] is not true and correct and which was obtained by him from sources that he has a reasonable basis for believing are reliable." *See* 17 C.F.R. § 240.15c2-11(a)(4)(ii) (1984). The amendment altered that standard but emphasized that the new standard was not the same as due diligence. *See 1991 Proposed Rule*, 1991 WL 292186, at * 3-4 (rejecting the notion that the "amendments would impose on market makers a 'due diligence' standard similar to that imposed on underwriters in a public offering of securities" because it would "misapprehend the nature and potential impact of the amendments").

understanding, saying again that the rule's requirements "do not contemplate that, before submitting or publishing quotations for a security, a broker-dealer … must conduct any independent 'due diligence' investigation concerning the issuer or its business operations and financial condition such as the investigation expected to be conducted by an underwriter." *2019 Proposed Rule*, 2019 WL 4738051, at *68. Thus, the Commission has "estimate[d] that it takes about *three hours* to review, record, and retain the information pertaining to … reporting issuers[.]" *Id.* at *73 (emphasis added).

The Commission also recognized that "A market maker publishing quotations …  may have no relationship with the issuer of the security. The Rule does not demand that the market maker develop such a relationship in order to obtain information about the issuer." *1991 Proposed Rule*, 1991 WL 292186, at *6. Further, the Commission recognized that information may be provided to a broker or dealer "by the issuer of the securities or its agents, including its officers and directors, attorney, or accountant," which would normally "satisfy the Rule's requirements regarding reliability of the information's source." *Id.* at *4. "Because documents filed with the Commission are subject to liability provisions, a broker-dealer generally can reach a reasonable belief as to the accuracy of information contained in these documents." *1999 Proposed Rule*, 64 FR at 11148.

Finally, according to the Commission, even "if 'red flags' appear at any stage of the review process," the broker-dealer need only "satisfy itself with respect to the accuracy of the information" based on the nature of the "red flag." *See 1991 Proposed Rule*, 1991 WL 292186, at *6. "For example, the broker-dealer may reasonably believe that the information is accurate after questioning the issuer directly." *Id.* Even if a broker-dealer learns that some information is "inaccurate[,]" "it may nevertheless submit quotations without violating the Rule, as long as it is able to supplement the [] information with additional information that it believes is accurate." *Id.*

Spartan fully complied with its obligations under Rule 15c2-11 and summary judgment is appropriate on Count I. Spartan always gathered its standard documents prior to filing a Form 211

application. Eldred Dep. 41:23-42:22, 123:3–124:21, 128:23, Ex. 187 p. 3; Lopez Dep. 67:11–68:12; Lopez Aff. ¶¶ 13-14. This included gathering all paragraph (a) information, including relevant public filings for each issuer. Eldred Dep. 32:4–33:4, 123:12–16; Lopez Dep. 49:15–17; Lopez Aff. ¶¶ 13-14, Lopez Ex. 2a-d. And because each was a reporting company, Spartan was entitled to rely on all the representations in the public filings. *See 1991 Proposed Rule*, 1991 WL 292186, at *4. Spartan easily cleared its burden of expending a mere "*three hours* to review, record, and retain the information pertaining to … reporting issuers[.]" *See 2019 Proposed Rule*, 2019 WL 4738051, at *73.

Indeed, Spartan gathered significant additional information not required by the rule. For every issuer Spartan gathered: (1) a signed Form 211 Filing Agreement; (2) a Principal Officer Affidavit; (3) a Director and Officer Questionnaire; and (4) a Shareholder Data Spreadsheet. Lopez Aff. ¶ 14; Lopez Ex. 2a-d. The filing agreement included a signed certification from the issuer that it had provided "complete true and accurate" information in connection with the Form 211 application. Lopez Aff. ¶15, Ex. 2a. The Principal Officer Affidavit—which included attestations stating the issuer's intent to continue the stated business model without changing control and that there were no undisclosed control persons—required a *notarized* signature from the issuer's representative under penalty of perjury. Lopez Aff. ¶16, Lopez Ex. 2b. The Director and Officer Questionnaire also contained signed certifications saying the issuer would promptly notify Spartan of any change in circumstances. Lopez. Aff. ¶ 17. Ex. 2c. Spartan gathered these documents for all 19 issuers, and always from people who had represented that the information had come directly from the issuer. Eldred Dep. 123:12–124:21, 125:6-126:10; Lopez Aff. ¶¶ 14, 39. Spartan also conducted background checks for the officers, directors, and shareholders who owned 5% or more of the voting securities and information about all the shareholders. Lopez Aff. ¶ 20.

Further, Spartan gathered even *more* documents that were not required by the rule for 11 of the issuers. Spartan gathered a "211 Due Diligence Questionnaire" for Dinello, Court Document, Top

to Bottom, and Quality Wallbeds, containing repeated signed certifications from the issuer, including signed statements on "Company letterhead and signed by an officer." Lopez Aff. ¶¶ 21, Lopez Ex. 3a-d. For On the Move, First Independence, Envoy, Changing Tech., First Xeris, Top to Bottom, and PurpleReal, Spartan gathered a "15c2-11 Listing Application Checklist," including numerous signed certifications saying that the issuer had provided accurate information to Spartan, there were no contemplated changes in control, there were no undisclosed control persons, and there were no "red flags" present from the issuer. Lopez Aff. ¶¶ 22-31, Lopez Ex. 4, 5a-f. The application also required additional signed certifications on the issuer's letterhead, signed by a relevant officer of the company. Lopez Aff. ¶¶ 28, 29, 30, Lopez Ex. 4. Even though *none* of this information was required by the rule, Spartan went above and beyond to ensure that it had information *from the issuer*, supporting each application. Spartan's level of diligence was such that it rejected as many as half of the requests to seek approval for market-making. *See* Eldred Dep. 127: 20–25; Lopez Dep. 194:4–9; Lopez Aff. ¶ 5.

Spartan easily met its burden under the rule. Recall that Spartan need not have had a "relationship" with the issuer at all prior to filing a Form 211 application. *1991 Proposed Rule*, 1991 WL 292186, at *6. But Spartan had a signed agreement with each issuer. Lopez Aff. ¶ 14; Lopez Ex. 2a. Further, all information Spartan relied on for its applications came either from the issuer through its intermediaries or from public filings. Eldred Dep. 125:6–126:10; Lopez Aff. ¶ 39. The Commission expects "issuer of the securities or its agents, including its officers and directors, attorney, or accountant" or "the Commission's Public Reference Room" to be reliable sources. *1991 Proposed Rule*, 1991 WL 292186, at *4. SEC's own guidance provides that both sources are presumptively reliable, *even if* "red flags" might exist. This is "[b]ecause documents filed with the Commission are subject to liability provisions, a broker-dealer generally can reach a reasonable belief as to the accuracy of information contained in these documents." *1999 Proposed Rule*, 64 FR at 11148. And even when it needs further information about a "red flag," "the broker-dealer may reasonably believe that the

information is accurate after questioning the issuer directly." *See* *1991 Proposed Rule*, 1991 WL 292186, at *6. Spartan followed this non-binding guidance in every case.

FINRA's examination and clearance of the Form 211 applications further illustrates Spartan's "reasonable basis." FINRA examiners reviewed all the applications, and specifically looked for SEC's "red flags." Martins Dep. 12:8–17, 52:1-7; Adams Dep. 12:18–13:1, 33:2-6. The examiners had no obligation to clear any application until they were satisfied that the application complied with the rule. Martins Dep. 19:9–14, 20:20–25, 51:17–25. They could issue unlimited deficiency letters if they saw any "red flags" and would not clear the application if any "red flags" were outstanding. Martins Dep. 51:21–25, 52:8-14, 56:15-21; Adams Dep. 57:16–21. Often, the deficiency letters prompted signed responses directly from the issuer. *See* Lopez Aff. ¶¶ 40-46. Lopez Ex. 8, 9, 10, 13, 14, 15. Despite this intensive examination of all 19 applications, FINRA cleared 18 for quotation, failing to clear PurpleReal only because of an SEC stop order. Lopez Aff. ¶ 45, Lopez Ex. 6a-s, 7a-r. Plainly *FINRA* thought Spartan had complied with the rule after its own diligent independent examination.

Even SEC's *own* examiners concluded that Spartan's processes were sufficient. In a months-long on-site examination, where examiners had unlimited access to Spartan's Form 211 files and were expected to look for potential "red flags," they found no deficiencies related to any of the issuers involved in this case. Franceschini Dep. 15:5-17, 29:10–25, 31:6-10, 32:12-33:4, 51:20-52:1, 54:13-20; Ex. 178, Ex. 179. This was even though they examined files related to Aristocrat, First Titan, and Neutra. Franceschini Dep. 36:1–10, Ex. 180. Surely these multiple levels of review demonstrate Spartan's compliance with the minimal "reasonable basis" standard applied under Rule 15c2-11.

SEC does not dispute any of this. Instead, its theory of liability relies on Spartan's purported failure to discover underlying fraud in the issuer's public registration statements, despite Spartan's substantial processes. *See* ECF No. 1 at 19, 42-43. This theory fails, as a threshold, because it is inconsistent with Rule 15c2-11. The Rule specifically rejected any kind of "due diligence" obligation

on a market-maker, and the level of diligence required to ferret out possible fraud in underlying documents filed with SEC easily surpasses the rule's obligations. *See 1991 Proposed Rule*, 1991 WL 292186, at \*3-4. The Commission has insisted regularly that public filings are presumptively accurate, because the *issuer* faces liability of its own should it make misrepresentations. *1999 Proposed Rule*, 64 FR at 11148. A market-maker has *no* obligation to investigate a registration statement that has already been deemed effective by SEC. *See id.*

SEC also seems to believe that Spartan should have rejected any information coming from Mr. Mirman, Mr. Rose, Ms. Harrison, or Mr. Daniels, because they were acting as intermediaries for the issuers, and at least Mr. Mirman and Mr. Rose were lying to Spartan about certain aspects of the issuers. But the Commission expects issuers to work with intermediaries, so there was nothing odd about the issuers having done so here. *See 1991 Proposed Rule*, 1991 WL 292186, at \*4. And Mr. Mirman and Mr. Rose presented the documents—including sworn and notarized affidavits—and information as being accurate and genuine and having come from the issuers, and they never informed Spartan otherwise. Rose Dep. 42:15–19; 56:19–57:19, 63:11-13, 64:15-65:1, 66:22–25. Ms. Harrison and Mr. Daniels did the same. Harrison Dep. 25: 21–25, 26:1–12, 26:18-21, 43:2-5, 43:6-12, 44:11–45:10, 47:19–23, 92:5–8; 134:3-5, 139:17–19, 143:3–15; Daniels Aff. ¶¶ 3–6. None of the defendants knew or suspected that any of this information was in fact false. Eldred Dep. 135:20–24, 136:24; Dilley Aff. ¶ 3; Lopez Aff. ¶ 47. To the extent that these people were lying to Spartan, Spartan had no obligation under Rule 15c2-11 to ferret out the misrepresentations.

SEC has also intimated that certain "red flags" were present here, which should have heightened Spartan's obligations. *See* ECF No. 1 at 19. But dispelling "red flags" is not a requirement under the rule, and the Commission has done nothing more than provide examples of factors a market-maker "may wish" to consider. *See* 17 C.F.R. § 240.15c2-11. This hardly imposes an additional regulatory obligation above and beyond the rule. *See Christensen*, 529 U.S. at 587. In any event, many

25

of the "examples" provided by the Commission are found in large numbers of cases and are in no way inherently suggestive of fraud. *See* Franceschini Dep. 26:9-26-27:1.

Regardless, Spartan did everything required under the rule concerning the "red flags" presented. First, SEC seems to believe that because many of the issuers had overlapping shareholders and Ms. Harrison provided legal services for many of the issuers, this somehow should have precluded Spartan's filing a Form 211 application. *See* ECF No. 1 at 23. The FINRA examiners noted that it was "pretty common" for small issuers to have shareholders with close relationships to the officers or directors, and it was not always a red flag to see such relationships. Martins Dep. 36:25–16, 65:3–13; Adams Dep. 38:11–18. They cleared the applications despite shareholder overlap. Lopez Aff. ¶ 45, Lopez Ex. 6a-s, 7a-r. Similarly, SEC examiners reviewed relevant Form 211 files where many of the shareholders for the three companies overlapped and had apparent relationships with the issuers and where Ms. Harrison was counsel for each issuer, yet they did not consider this information to be a suggestion that Spartan had failed to find "red flags." Dyer Dep. 50:18–22, 80:16-18, Ex 99, 52:1– 23, Ex 92, 53:21–24; Franceschini Dep. 40:2–46:10, 46:16-47:12, 49:7–11, 54:13–20, 51:20-52:1, 54:13-16, Ex. 179. These purported "red flags" were simply unimportant to the validity of the applications.

SEC has also put significant stock in the purported shell status of many of the issuers and their ultimate use in reverse mergers as indicative of fraud. *See* ECF No. 1 at 27. But this view ignores Spartan's role. Once Spartan published a quotation, its involvement with an issuer generally ended shortly after its right to make an exclusive market ended, and it did not follow the issuers to see if they changed control. Eldred Dep. 131:21–18; Lopez Aff. ¶ 38. Spartan therefore had no reason to know that the issuers subsequently changed control. And, more importantly, *every* issuer provided multiple certifications, including a notarized affidavit, that at the time of filing the Form 211 application the issuer did not intend to change control, and would instead continue with its stated business for at least

26

18 months. Lopez Aff. ¶ 14; Lopez Ex. 2b. Even if Spartan had known that many unrelated issuers had subsequently changed control, it still had no reason to dismiss sworn attestations by new issuers.

The market conditions also provide context—at the time many issuers received multiple offers to change control the day Spartan published quotations for them. Eldred Dep. 131:9-20. It was not odd or unsound, as a business strategy, to change control in those circumstances. Many of the issuers had even suggested as much in their registration statements—saying they had no present intent to change control but that they would consider opportunities should they arise. *See* Cangiano Dep. 268:11-16, 276:18-25, 277:1-19, 280:9-15, 281:1-22; Ex. 42 p. 48. Even SEC's own putative expert agreed that it would not have been surprising for one of these issuers to enter into a subsequent merger or acquisition. Cangiano Dep. 281:18-22.

Furthermore, SEC's underlying suggestion that Spartan should have refused to do business with shell companies or been concerned over the possibility of reverse mergers contradicts the Commission's longstanding recognition that such companies and transactions are legitimate. The Commission has "recognize[d] that companies and their professional advisors often use shell companies for many legitimate corporate structuring purposes" and its "definition and use of the term 'shell company'; is not intended to imply that shell companies are inherently fraudulent." *Use of Form S-8, Form 8-k, & Form 20-F by Shell Companies*, Release No. 1293, 2005 WL 1667452, at *2 (July 15, 2005). Reverse mergers are a lawful way for issuers to access capital from investors by going public. *See* SEC Investor Bulletin: *Reverse Mergers*, p. 1 (June 2011). Moreover, the FINRA examiners did not consider it out of the ordinary or alarming when reviewing the Form 211 applications involving self-described shell companies. Martins Dep. 22:23–23:9. There was no reason at all for Spartan to have refused to file applications for "shell companies."[9]

---

[9] Spartan was also required to list a transfer agent on the Form 211 application, so it can hardly have been suspicious that the issuers did so here. *See* Eldred Dep. 135:15–19; Martins Dep. 16:2-17:1. Similarly, it was "very common" for FINRA

**B. The Defendants Are Not Liable as Aiders and Abettors Under Rule 15c2-11**

For a defendant to be liable as an aider and abettor under 15 U.S.C. § 78t(e), SEC must prove:
"(1) a primary violation by another party; (2) a general awareness by the accused aider-abettor that his
role was part of an overall activity that is improper; and (3) that the accused aider-abettor must have
knowingly and substantially assisted the violation." *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d
786, 800 (11th Cir. 2015) (citation omitted).[10] "Severe recklessness can satisfy the scienter requirement
in an aiding and abetting case." *Id.* (internal citation and quotation marks omitted).

This standard can be satisfied only by a defendant's "extreme recklessness" when faced with
information alerting him to "a danger so obvious that the actor must have been aware of it." *Howard
v. SEC*, 376 F.3d 1136, 1142 (D.C. Cir. 2004) (citation omitted). "[A]iding and abetting liability cannot
rest on the proposition that the person should have known he was assisting violations of the securities
laws." *Id.* (citation omitted).[11] This standard instead represents an "extreme departure from the
standards of ordinary care." *SEC v. Steadman*, 967 F.2d 636, 641 (D.C. Cir. 1992) (citation omitted).[12]

Summary judgment is appropriate for Count II, first because Spartan is not primarily liable for
violating Rule 15c2-11. Thus, there can be no aiding and abetting liability. *See Big Apple Consulting USA,
Inc.*, 783 F.3d at 800.

---

examiners to issue deficiency letters, and the examiners did not consider it a "red flag" for deficiency letters to have been
issued. Martins Dep. 20:9–16; Stanley Dep. 67:23–68:1. To the extent SEC relies on these factors, they too provide no
reason to fault Spartan's compliance with the rule.

[10] This provision applies only to certain provisions of the Exchange Act, such that it "encompasses [primary violations
of] 15 U.S.C. § 78a through § 78kk[.]" *SEC v. Fehn*, 97 F.3d 1276, 1283 (9th Cir. 1996).

[11] While § 78t(e) was amended in 2010 to encompass "reckless[]" conduct, the Eleventh Circuit has recognized that the
amendment had no effect on the applicable standard in this circuit. *Big Apple Consulting USA, Inc.*, 783 F.3d at 801. The
amendment "was intended to correct the holding of a growing number of courts who concluded that knowingly means
actual knowledge, rather than recklessness." *Id.* (citation omitted). The amendments merely "clarif[ied] relevant law
rather than effect a substantive change in the law." *Id.* (citation omitted).

[12] Even to the extent that primary violations of the securities laws might require only a showing of negligence, because
aiding and abetting liability incorporates a higher standard of scienter, SEC must still prove the heightened scienter of an
alleged aider and abettor. *See Howard*, 376 F.3d at 1142 (SEC was required to prove alleged aider and abettor of "negligen[t]"
primary violations of the Exchange Act acted "willfully"); *Steadman*, 967 F.2d at 641-42 (same).

Second, with respect to Mr. Dilley and Mr. Eldred, SEC has no evidence to suggest they had a "general awareness" they played a "part of an overall activity that is improper" or they "knowingly and substantially assisted the violation." *See id.* They both attested that they neither knew nor suspected that any of the information provided by the issuers or their intermediaries related to the 19 issuers was materially inaccurate or misleading. Eldred Dep. 135:20–24, 136:24; Dilley Aff. ¶ 3. The uncontested evidence supports that lack of knowledge, as Spartan collected numerous attestations from the issuers about the veracity of the information given to Spartan. *See* Eldred Dep. 123:12–124:21; Lopez Aff. ¶ 14, 39; Lopez Ex. 2a-d. Plus, Mr. Mirman, Mr. Rose, Ms. Harrison, and Mr. Daniels never gave the defendants any contrary indication that the information was inaccurate. Rose Dep. 42:15–19; 56:19–57:19, 63:11-13, 64:15-65:1, 66:22–25; Harrison Dep. 25: 21–25, 26:1–12, 26:18-21, 43:2-5, 43:6-12, 44:11–45:10, 47:19–23, 92:5–8; 134:3-5, 139:17–19, 143:3–15; Daniels Aff. ¶¶ 3–6.

Third, for Mr. Lopez, the lack of evidence is even more stark. To the extent that SEC wishes to impute Spartan's state of mind onto Mr. Lopez, again Spartan's diligence in acquiring sworn statements from the issuers easily satisfies any regulatory burden. But SEC's case against Mr. Lopez breaks down even further as he never signed any of the relevant applications. Lopez Dep. 16:17–17:2; Lopez Aff. ¶ 11. Mr. Lopez had no say in which applications would be filed, did not choose to file an application for any issuer in the Complaint, and never made any representations to anyone outside of Spartan in the Form 211 application process. Lopez Aff. ¶ 12.

Moreover, looking at Mr. Lopez's only involvement—approving responses to FINRA's deficiency letters for five issuers—it is apparent that he did nothing wrong. Mr. Dilley was the principal responsible for each application, and thus Mr. Lopez's approvals have no bearing on liability. *See* Lopez Dep. 89:2–4, 89:14–17, 93:5–10, 110:3, Ex. 255 p. 7, 11, Ex. 261 p. 7, 10; Ex. 263 p. 4–5, Ex. 264 p. 7, 13, 16, 22, 26-27, Ex. 270 p. 7, 13-15; Lopez Aff. ¶¶ 40-46, Lopez Ex. 1k-n, 1r. Mr. Lopez simply reviewed draft responses from Spartan's registered representative along with underlying

information provided from the issuers. Lopez Aff. ¶¶ 40-46, Lopez Ex. 8, 9, 10, 16. Each response provided "representations" that the "issuer has made." *See id.* For each, Mr. Lopez reviewed signed letters and certifications from the issuer appended to the draft responses on behalf of the issuers— seven signed documents in total. Lopez Aff. ¶¶ 40-46, Lopez Ex. 8, 9, 10, 16. In short, Mr. Lopez had no reason to doubt the accuracy of the submissions to FINRA—particularly since they each provided only that they were forwarding representations "the issuer has made."

### III. SEC CANNOT RELY ON RULE 10B-5 TO BOOTSTRAP ITS FAILED RULE 15C2-11 CLAIMS

Under Rule 10b-5(b) SEC must prove that a defendant made "(1) a material misrepresentation or materially misleading omission, (2) [] with scienter, (3) in connection with the purchase or sale of securities." *SEC v. Merch. Capital, LLC,* 483 F.3d 747, 766 (11th Cir. 2007). For a primary violation, "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)." *Wright v. Ernst & Young LLP,* 152 F.3d 169, 175 (2d Cir. 1998).

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker.

*Janus Capital Grp., Inc. v. First Derivative Traders,* 564 U.S. 135, 142 (2011).

For "scheme liability" under 10b-5(a) or (c), SEC must prove "conduct beyond misrepresentations or omissions actionable under Rule 10b-5(b)." *Pub. Pension Fund Grp. v. KV Pharm. Co.,* 679 F.3d 972, 987 (8th Cir. 2012). As the Eighth Circuit noted, "[b]oth the Second and the Ninth Circuits," which "traditionally see the most securities cases," "have held a defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b-5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions." *Id.* (citations omitted).

"Liability under § 10(b) of the Exchange Act, therefore, does not attach to secondary actors by repackaging a fraudulent misrepresentation [as] a 'scheme to defraud.'" *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1205 (D. N.M. 2013) (citation omitted). "[W]here the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission, courts have routinely rejected SEC's attempt to bypass the elements necessary to impose 'misstatement' liability under subsection (b) by labeling the alleged misconduct a 'scheme' rather than a 'misstatement.'" *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (collecting cases).

The test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *Merch. Capital, LLC*, 483 F.3d at 766 (citations omitted). It is not enough to suggest that an "investor might have considered the misrepresentation or omission important." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citations omitted).

Additionally, "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 228 (1980). "Thus, there can be no liability for a failure to disclose under Rule 10b-5 … in the absence of a duty to disclose." *Badger v. S. Farm Bureau Life Ins. Co.*, 612 F.3d 1334, 1340–41 (11th Cir. 2010).

"Scienter may be established by a showing of knowing misconduct or severe recklessness." *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982). Recklessness can be established by "a showing that the defendant's conduct was an extreme departure of the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (citation omitted).

> Further, allegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts … in order to deceive, manipulate, or defraud.

*City of Philadelphia v. Fleming Companies, Inc.*, 264 F.3d 1245, 1260 (10th Cir. 2001).

To meet the "in connection with" requirement, there generally must have been misrepresentations "disseminated to the public in a medium upon which a reasonable investor would rely[.]" *Semerenko v. Cendent Corp.*, 223 F.3d 165,175-76 (3rd Cir. 2000); *see also SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860-62 (2d Cir. 1968) (misrepresentations are made "in connection with" securities trading "whenever [such] assertions are made ... in a manner reasonably calculated to influence the investing public"); *SEC v. Weintraub*, No. 11-cv-21549, 2011 WL 6935280, at *6 (S.D. Fla. Dec. 30, 2011) (applying *Semerenko*). There should also be "a causal connection between the claimed fraud" and the offer or purchase. *See Semerenko*, 223 F.3d at 175-76.

**A. Island Is Not Liable for Any Statements**

**i. Form 211 Applications and Cover Letters**

Summary judgment is appropriate for Island, first, in Count VI because it never uttered any statements related to any Form 211 applications. Island was not involved with filing any Form 211 applications. Dilley Aff. ¶ 6; Lopez Aff. ¶ 48. Spartan's files were also segregated from Island's. Eldred Dep. 123: 15–16, 20–25, 124:1–9, 13, 17–21, 137:22–25, 138:1–7; Dilley Aff. ¶ 7; Lopez Aff. ¶ 49. Island therefore did not "'makea statement" related to any Form 211 application and cannot be liable under Rule 10b-5(b). *See Janus*, 564 U.S. at 142. Relatedly, summary judgment is appropriate under Counts V and VII for scheme liability related to the Form 211 applications, because SEC has done nothing more than "repackag[e] a fraudulent misrepresentation [as] a 'scheme to defraud.'" *See Goldstone*, 952 F. Supp. 2d at 1205. SEC does not allege that Island engaged in any kind of scheme beyond uttering alleged misrepresentations or omitting information. But SEC cannot evade the holding in *Janus* just by alleging a baseless "scheme" against Island. *See Kelly*, 817 F.Supp.2d at 343.

**ii. DTC Attestation Forms**

Summary judgment is also appropriate for the only statements made by Island—the DTC attestation forms. These forms only provided ministerial information about an issuer—*i.e.*, its name, description of stock, CUSIP number, number of authorized shares, and number of shares outstanding—and contained no substantive representations about the issuer or its shares. Lopez Dep. 199:17– 200:5; Cangiano Dep. 187:3–8, Ex. 239; Dilley Aff. ¶ 9; Lopez Aff. 53, Lopez Ex. 19. All that information was *true*, and Island had no duty to disclose any additional information to DTC. Thus, there can be no liability premised on any misrepresentations or omissions in the DTC attestation forms under Counts V, VI, or VII. *See Badger*, 612 F.3d at 1340–41.

Furthermore, none of the information in the DTC attestations would have been material in connection with any purchase or sale of security. The attestation did not provide any substantive information or representations about the issuer's activities, business, or registration of shares, and were not seen by members of the public. Lopez Dep. 200:7-9; Cangiano Dep. 188:3–189:25, 192:9– 193:3; Dilley Aff. ¶ 9; Lopez Aff. 53, Lopez Ex. 19. These attestations were not "disseminated to the public in a medium upon which a reasonable investor would rely" and thus do not meet the "in connection with" requirement. *See Semerenko*, 223 F.3d at 175-76.

Finally, SEC cannot demonstrate scienter. Island would have to have had an "extreme departure of the standards of ordinary care" in the attestation forms to be liable. *See Carriba Air, Inc.*, 681 F.2d at 1324. Even if Island had some additional information in its possession (which it did not), liability could only arise if it intentionally withheld the information "in order to deceive, manipulate, or defraud." *See City of Philadelphia*, 264 F.3d at 1260. But there is no allegation that the information in the DTC attestation forms was false, and Island collected the information based on its own files. *See* Lopez Aff. ¶ 54. Moreover, Mr. Harmon, an expert in transfer agent practice, opined that Island "acted in accordance with generally accepted practices and procedures of transfer agents." Harmon Report 1. There is no basis to suggest that Island committed willful misconduct concerning these attestations.

### B. Spartan, Mr. Dilley, and Mr. Eldred Are Not Liable for any Statements

#### i. Form 211 Applications

Summary judgment is also proper for Spartan, Mr. Dilley, and Mr. Eldred with respect to Counts V, VI, and VII. For Count VI, none of the defendants made any direct misrepresentations and thus cannot be liable pursuant to the *Janus* standard. The only statements the defendants made concerning the Form 211 applications were qualified statements about information obtained from issuers. The Form 211 certification required only that Spartan have a "reasonable basis for believing that the information accompanying this form is accurate in all material respects and that the source of the information is reliable." *See* Lopez Aff. ¶¶ 6-7, Lopez Aff. Ex. 1a-s. This is not the same as certifying the accuracy of the information. Indeed, Spartan routinely provided information accompanying the applications that the "issuer ha[d] represented." *See, e.g.*, Lopez Ex. 6a-s (Spartan responses to FINRA comments). The defendants merely attested that they had a reasonable basis for their belief in the accuracy of the information, which, as discussed above, it had because of the documents it had collected from the issuers. Just as "[o]ne who prepares or publishes a statement on behalf of another is not its maker," none of the defendants made any misrepresentations in the Form 211 applications. *See Janus*, 564 U.S. at 142. They cannot be liable under Rule 10b-5(b).

Counts V and VII fail because scheme liability cannot evade the *Janus* rule. The only alleged misrepresentations involved individual statements made by the issuer and forwarded by the defendants. This is yet again "repackaging a fraudulent misrepresentation [as] a 'scheme to defraud.'" *See Goldstone*, 952 F. Supp. 2d at 1205. Without an additional "scheme" there can be no liability. *See id.*

Next, there were no misrepresentations made in "connection with" the sale of securities. Form 211 applications and supporting materials are "not public" and were not available in a public database. Stanley Dep. 21:14–22:1, June 12, 2020; Lopez Dep. 198:16–199:8. Investors would *never* have been privy to Spartan's forwarding of the issuer's statements to FINRA. *See* Stanley Dep. 21:14–22:1; Lopez

Dep. 198:16–199:8. Thus, these statements do not meet the "in connection with" requirement. *See Semerenko*, 223 F.3d at 175-76.

The defendants also did not act with scienter. None of the defendants had any knowledge of misconduct. Mr. Mirman, Mr. Rose, Ms. Harrison, and Mr. Daniels provided the relevant documents and information to Spartan as being accurate and genuine and having come from the issuers, and they never informed Spartan otherwise. Rose Dep. 42:15–19; 56:19–57:19, 63:11-13, 64:15-65:1, 66:22–25; Harrison Dep. 25: 21–25, 26:1–12, 26:18-21, 43:2-5, 43:6-12, 44:11–45:10, 47:19–23, 92:5–8; 134:3-5, 139:17–19, 143:3–15; Daniels Aff. ¶¶ 3–6. None of the defendants knew or suspected that any of this information was in fact false. Eldred Dep. 135:20–24, 136:24; Dilley Aff. ¶ 3; Lopez Aff. ¶ 47.

Moreover, as discussed above, Spartan conducted significant diligence prior to filing any Form 211 application—gathering sworn affidavits and multiple certifications from the issuer concerning the underlying information provided in the Form 211 application. *See* Eldred Dep. 123:12–124:21; Lopez Aff. ¶¶ 14, 39. Many of these documents were not required by the rule and thus exceeded the industry standard. *See* Eldred Dep. 41:23–42:22, 123:17–124:21, 128:23; 145:22-146:12; Adams Dep. 67:14-67:6. Thus, instead of recklessly departing from the "standard of ordinary care" the defendants' actions taken beyond their obligations clearly refute the necessary showing of severe recklessness. *See Carriba Air, Inc.*, 681 F.2d at 1324.

### ii. Form 211 Cover Letters

Defendants also are entitled to summary judgment to the extent SEC relies on any alleged misrepresentations in the Form 211 application cover letters. SEC has focused on two areas of some cover letters Spartan voluntarily submitted to FINRA with the Form 211 applications—a description of the issuer's relationship with Spartan and a statement about promoters. *See* ECF No. 1 at 21.

None of the cover letters contained any material misrepresentations. First, they were never meant to be "exhaustive" descriptions of all information in Spartan's possession; they were simply

35

meant to give FINRA additional insight into the application. Eldred Dep. 128:21–129:6; Lopez Dep. 98:17–21, 99:20–8.[13] Spartan considered its initial market research and review of S–1 filings to be part of its "limited due diligence" process, which it employed when considering whether to make a market in a security. Eldred Dep. 121:13–122:1. Thus, even if the letters were filed shortly after the issuer had signed a formal agreement with Spartan, the representations were not false. And the representations about promoters were for public relations promoters, not attorneys or other consultants who assisted with the Form 211 application. Eldred Dep., 133: 7-135:2. They were therefore true even though some of the issuers worked with intermediaries. Moreover, the defendants had no duty to disclose that the issuers had relationships with attorneys or other consultants, such as Mr. Rose or Ms. Harrison, and absent such a duty, they cannot be liable for omitting this information in the cover letters—or anywhere else. *See Badger*, 612 F.3d at 1340–41.

Even if the cover letters contained misrepresentations, they were not material. Rule 15c2-11 does not require any disclosures concerning the length of a market-maker's relationship with an issuer or about the use of promoters. The information was provided simply to anticipate questions FINRA often posed. Eldred Dep. 128:21–129:6; Lopez Dep. 98:17–21, 99:20–8; Lopez Aff. ¶ 34. FINRA followed up whenever it thought appropriate and cleared all the applications. Lopez Aff. ¶ 35, Lopez Ex. 6a-s, 7a-r. The investing public could hardly have considered the representations in the cover letter to be material for any purchase or sale of securities such that they would have reconsidered a purchase. The public simply would not care what *Spartan's* relationship with the issuer was, much less whether the issuer had retained a public relations consultant. The public likely would never have been aware that Spartan, or any defendant, played any part in the listing process.

---

[13] Moreover, to the extent that liability *could* be premised on these letters, only the signatory of each letter would be liable under the *Janus* standard. 564 U.S. at 142.

Further, the cover letters would never have been seen by the public. Stanley Dep. 21:14–22:1; Lopez Dep. 198:16–199:8. They were therefore not a type of communication made "in connection with" the sale of securities. *See Semerenko*, 223 F.3d at 175-76.[14]

Finally, SEC cannot show scienter. SEC's real issue seems to be its belief that the cover letters should have disclosed additional information about Mr. Mirman, Mr. Rose, Ms. Harrison, or Mr. Daniels. *See* ECF No. 1 at 23. Even if the defendants had withheld material facts, SEC still would need to prove a "defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts … in order to deceive, manipulate, or defraud." *City of Philadelphia*, 264 F.3d at 1260. Not only did the defendants not have any additional information about the issuers, but the cover letters were meant only to anticipate FINRA's comments. *See* Eldred Dep. 128:21–129:6; Lopez Dep. 98:17–21, 99:20–8. They had nothing to do with the ultimate sale of the securities.

### C. None of the Defendants Is Liable as an Aider and Abettor Under Rule 10b-5

SEC also cannot show aiding and abetting liability for Rule 10b-5. First there were no primary violations. The defendants diligently gathered information that they believed was accurate, relying on sworn affidavits in the process, and then relayed that information solely to FINRA in a private transmission. The defendants never *made* any statements at all, beyond the fact that they had gathered the information and documentation required under Rule 15c2-11 and additional information from the issuer—which was true. No investor or potential investor ever saw or heard the misrepresentations made *by the issuers*. In any event, SEC cannot show scienter. The defendants' diligent effort to confirm

---

[14] Spartan, Mr. Dilley, and Mr. Eldred also cannot be liable for any representations made in DTC Attestations, or in any communications to DTC Participant Firms concerning DTC eligibility. DTC Attestations were made by Island, and in some instances Mr. Dilley, and thus Spartan and Mr. Eldred cannot be liable under the *Janus* standard. Further, as discussed, the DTC attestations contained no false representations at all, and certainly no material representations in connection with the sale of securities as they contained only ministerial information that would never have been seen by the public. Finally, any communications made from any of the defendants to DTC Participant Firms, such as Penson, for subsequent applications for DTC eligibility cannot be the basis of liability. Spartan did not provide any information concerning any issuer directly to DTC beyond the agent attestation forms. None of the defendants made any *material* representations inducing DTC to grant eligibility to any issuer.

the validity of the statements is the opposite of the required extreme departure from the standard of care. The aiding and abetting theories fail for the same reasons.[15]

## IV. SEC Cannot Repackage the Alleged § 10b-5 Violations Under § 17

Under § 17(a) of the Securities Act, it is unlawful "to employ any device, scheme or artifice to defraud" "in the offer or sale of any securities." 15 U.S.C. § 77q(a)(1). The "in connection with the purchase or sale of" and "in the offer or sale of" elements of Rule 10b-5 and § 17(a) can be read "interchangeably." See *United States v. Naftalin*, 441 U.S. 768, 773 n. 4 (1979). In both, SEC must set forth facts showing that "the misrepresentations in question were disseminated to the public in a medium upon which a reasonable investor would rely, and that they were material when disseminated." See *Semerenko*, 223 F.3d at 175-76 (discussing 10b-5). At a minimum, there must be "a causal connection between the claimed fraud" and the offer or purchase. See *id.*

To show a violation of § 17(a)(1), SEC must prove a defendant made "(1) material misrepresentations or materially misleading omissions,[16] (2) in the offer or sale of securities, (3) [] with scienter."[17] *Merch. Capital, LLC*, 483 F.3d at 766. Section 17(a)(3) prohibits use of interstate commerce or the mails "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3). To show a violation of either §§ 17(a)(2) or (3) SEC must prove a defendant made "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) [] with negligence." *Merch. Capital, LLC*, 483 F.3d at 766. As with § 10(b), scheme liability under §§ 17(a)(1) and (3) can only exist "when the

---

[15] And yet again, Island is not a proper defendant anyway. Island had no role in the Form 211 application process. Dilley Aff. ¶ 6; Lopez Aff. ¶ 48.

[16] The test for materiality is interchangeable with that under § 10b-5. *SEC v. Morgan Keegan & Co.*, 678 F.3d 1233, 1244-45 (11th Cir. 2012).

[17] Scienter is the required mental state for both § 17(a)(1) and § 10(b)(5). *Aaron v. SEC*, 446 U.S. 680, 682, 695 (1980).. Accordingly, interpretations of that concept are interchangeable.

scheme also encompasses conduct beyond" actionable individual misrepresentations. *SEC v. Wey*, 246 F. Supp. 3d 894, 917-18 (S.D.N.Y. 2017) (citation omitted).

### A. None of the Defendants Is Primarily Liable

The defendants are also entitled to summary judgment concerning the alleged § 17(a) violations for largely the reasons already discussed concerning the overlapping limitations in § 10(b). As an initial matter, summary judgment is appropriate for Island because, again, it made no representations beyond DTC attestation forms. *See* Dilley Aff. ¶ 6; Lopez Aff. ¶ 48. And even though the *Janus* rule does not apply to § 17(a), scheme liability can only exist "when the scheme also encompasses conduct beyond" actionable individual misrepresentations. *See Wey*, 246 F. Supp. 3d at 917-18. There is no evidence that Island engaged in any "scheme," and SEC's only allegations relate to alleged misrepresentations that are themselves actionable. Thus, Island cannot be roped into liability under a scheme theory when SEC could proceed against the source of the allegedly false statements.

SEC also cannot prove any primary violations of § 17(a)(1) in Count III or IV against any defendant. As with the § 10(b) violations, SEC's theory that the defendants violated the law by repeating allegedly false statements made to them by issuers in Form 211 applications fails because none of the statements was materially misleading in the offer or sale of securities. *See* ECF No. 1 at 46-48. The defendants did nothing more than attest to their own reasonable basis for believing the underlying representations. *See* Lopez Aff. ¶¶ 6-7, Lopez Aff. Ex. 1a-s. The statements made in the relevant cover letters were true. Eldred Dep. 128:21–129:6, 133:7-135:2; Lopez Dep. 98:17–21, 99:20–100:8. So too were the statements made in the DTC attestation forms. Lopez Dep. 199:17– 200:5; Cangiano Dep. 187:3–8, Ex. 239; Dilley Aff. ¶ 9; Lopez Aff. 53, Lopez Ex. 19. Thus, SEC has not alleged any actionable misrepresentations. *See Merch. Capital, LLC*, 483 F.3d at 766.

Additionally, the Form 211 applications, the cover letters, and the DTC attestation forms were all were private and were never made public. *See* Stanley Dep. 21:14–22:1; Lopez Dep. 198:16–199:9,

200:7–9; Cangiano: 186:9–12; Lopez Aff. 53, Lopez Ex. 19. Thus, they could not meet the requirement of being "in the offer or sale of any securities." *See Naftalin*, 441 U.S. at 773 n.4; *Semerenko*, 223 F.3d at 175-76. The representations in these documents were also immaterial, because the investing public would never have been *able* to premise a decision on them, and even if investors had seen the representations, the inner workings of the amount of diligence involved in the Form 211 listing process has no bearing on the *issuer's* sale of the shares.

Further, with respect to Count III, none of the defendants acted with scienter. None knew that some of the issuers had lied to them. Eldred Dep. 135:20–24, 136:24; Dilley Aff. ¶ 3; Lopez Aff. ¶ 47. Instead, they relied on the sworn statements of the issuers that they had provided complete and accurate information. Eldred Dep. 123:12–124:21l; Lopez Aff. ¶¶ 14, 39.

Summary judgment for Count IV is also appropriate for largely the same reasons. While the negligence standard is less onerous than scienter, the defendants easily clear even this hurdle. Indeed, the defendants diligently sought to confirm the accuracy of the representations made to them and insisted on an affidavit from the issuer even though no rule required such a step. *See* Eldred Dep. 123:12–124:21l; Lopez Aff. ¶¶ 14, 39. Defendants conducted diligence *above* the industry standard.

## B. Aiding and Abetting Liability Does Not Apply Here

Under 15 U.S.C. § 77o(b), primary liability for violation of the Securities Act is extended to aiders and abettors. This provision incorporates an identical standard as § 78t(e). *See SEC v. Lek Sec. Corp.*, No. 17-CV-1789, 2019 WL 5703944, at *2 (S.D.N.Y. Nov. 5, 2019).

Because § 17(a)(2) makes it unlawful "to obtain money or property by means of … any omission to state a material fact necessary in order to make the statements made … not misleading[,]" 15 U.S.C. § 77q(a)(2), courts have incorporated the requirement that a speaker must first have a duty to provide the relevant information. *SEC v. RPM Int'l, Inc.*, 282 F. Supp. 3d 1, 18 (D. D.C. 2017); *Goldstone*, 952 F. Supp. 2d at 1197-98; *see also Morgan Keegan & Co.*, 678 F.3d at 1245.

Further, while the defendant need not be the one who uttered the misrepresentation, he must still "obtain money ... *by means of* any untrue statement." *Big Apple Consulting USA, Inc.*, 783 F.3d at 797-98. Section 17(a)(2)'s requirement that a defendant "obtain money or property" also requires, at minimum, that the defendant "personally gained money or property from" the alleged fraud. *SEC v. Syron*, 934 F. Supp. 2d 609, 638 (S.D.N.Y. 2013); *accord Wey*, 246 F. Supp. 3d at 915 (collecting cases).

First, none of the defendants can be liable under § 17(a)(2) because none of them "obtain[ed] money ... *by means of* any untrue statement." *See Big Apple Consulting USA, Inc.*, 783 F.3d at 797-98. None of the defendants was ever paid to file Form 211 applications. Eldred Dep. 70:23–71:4, 116:1-6. No issuer was required to engage Island as a transfer agency to have Spartan file an application. Eldred Dep. 116:1–6. Every issuer signed an agreement to that effect. Lopez Aff. ¶ 14; Lopez Aff. Ex. 2a. None of the defendants "personally gained money or property from" the alleged fraud, and none can therefore be liable as an aider and abettor under § 17(a)(2). *See Syron*, 934 F. Supp. 2d at 638.

SEC also cannot prove scienter. As discussed, none of the defendants knew nor suspected that any of the information provided by the issuers or their intermediaries related to the 19 issuers was materially inaccurate or misleading. Eldred Dep. 135:20–24, 136:24; Dilley Aff. ¶ 3; Lopez Aff. ¶ 47. This was because Spartan collected numerous attestations from the issuers about the veracity of the information given to Spartan. *See* Eldred Dep. 123:12–124:21; Lopez Aff. ¶¶ 14, 39.

## II. THE ONLY APPEALS COURT TO CONSIDER SEC'S § 5 THEORY OF LIABILITY REJECTED IT

Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a), makes it unlawful "to sell" any security "[u]nless a registration statement is in effect." Section 77e(c) similarly makes it unlawful "to offer to sell or offer to buy" any security "unless a registration has been filed as to such security." In order to establish a prima facie case for a violation of § 5, "SEC must demonstrate that (1) the defendant directly or indirectly sold or offered to sell securities; (2) through the use of interstate transportation or communication and the mails; (3) when no registration statement was in effect." *SEC v. Calvo*, 378

F.3d 1211, 1214 (11th Cir. 2004). Section 5 does not include aiding and abetting liability, but it does encompass a "participant" theory. *SEC v. CMKM Diamonds, Inc.*, 729 F.3d 1248, 1255 (9th Cir. 2013). Under this theory, "[t]o demonstrate that a defendant sold securities, SEC must prove that the defendant was a necessary participant or substantial factor in the illicit sale." *Calvo*, 378 F.3d at 1215 (citation omitted).

> Because Section 5 imposes strict liability for violations of its registration requirement, [] it is particularly important that the necessary participant and substantial factor test be carefully applied to each case so as not to subject defendants with a de minimis or insubstantial role in a securities scheme to strict liability.

*CMKM Diamonds, Inc.*, 729 F.3d at 1257.

The only court of appeals to have considered the issue has held that merely acting in a ministerial capacity for the transfer of a sale does not make a transfer agent a "substantial participant" under the statute. *Id.* at 1258. This is true even if the illicit sale could not have occurred absent the transfer agent's "participation in removing the restrictive legends" of securities. *Id.* at 1257-1258. Instead a court must ask whether the transfer agent did more to effect the illicit sale, such as whether it "participated heavily in the offerings," "devised the corporate financing scheme for the issuer," "prepared and reviewed offering memoranda," "met personally with broker-dealers, investors and their representatives," or "spoke at broker-dealer sales seminars." *Id.* (citations omitted).

Several cases illustrate the limits of § 5 liability for transfer agents. *Attorneys* who have provided transfer agents with instruction letters concerning the removal of restrictive legends have been found to be liable under § 5. *See SEC v. Blackburn*, No. CV 15-2451, 2020 WL 565551, at *5-6 (E.D. La. Feb. 5, 2020) (collecting cases). But this is because "[w]riting the opinion letter required [the attorney] to exercise his skill and expertise as an attorney and determine whether [the] shares qualified for an exemption from registration." *Id.* at *6. "This is a far cry from performing a merely administrative role" that a "transfer agent[]" plays in simply "issuing shares without the restrictive legends after receiving [] attorney opinion letters." *Id.* at *5-6.

42

Furthermore,

> [a] participant's title, standing alone, cannot determine liability under Section 5, because the mere fact that a defendant is labeled as an issuer, a broker, a transfer agent, a CEO, a purchaser, or an attorney, does not adequately explain what role the defendant actually played in the scheme at issue.

*CMKM Diamonds, Inc.*, 729 F.3d at 1259. "[N]ot everyone in the chain of intermediaries between a seller of securities and the ultimate buyer is sufficiently involved in the process to make him responsible for an unlawful distribution." *Geiger v. SEC*, 363 F.3d 481, 487 (D.C. Cir. 2004) (citation omitted). Without "clear evidence that [a defendant] was involved in negotiations, signing documents, or engaging in anything more substantial than [an] administrative task," § 5 does not provide liability. *SEC v. Bio Def. Corp.*, No. CV 12-11669-DPW, 2019 WL 7578525, at *15 (D. Mass. Sept. 6, 2019).

Even if SEC demonstrates a prima facie § 5 violation, a defendant can still show the transaction involved a registered or exempt security. *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998). A registration statement permits an issuer to make "the offers and sales described in the registration statement." *Id.* Once a registration statement is filed and declared effective, "misstatements in a registration statement" do not "serve to invalidate that statement ab initio." *SEC v. Husain*, No. 16-CV-03250, 2017 WL 810269, at *5 (C.D. Cal. Mar. 1, 2017); *accord SEC v. Monarch Funding Corp.*, No. 85-cv-7072, 1996 WL 348209, at *11 n.8 (S.D.N.Y. June 24, 1996).

Registration aside, § 4(a)(1) exempts "transactions by any person other than an issuer, underwriter, or dealer" from § 5's registration requirement. 15 U.S.C. § 77d(1).[18] Section 4(a)(1) was created "to cover everyday trading between members of the investing public." *SEC v. N. Am. Research & Dev. Corp.*, 424 F.2d 63, 72 (2d Cir. 1970).[19]

---

[18] To clarify the definition of the term "underwriter" SEC drafted Rule 144. The Rule creates a "safe harbor" by limiting the definition of the term to exclude those who meet the requirements of the Rule. *SEC v. M & A West Inc.*, 538 F.3d 1043, 1050 (9th Cir. 2008). A defendant who does not satisfy the requirements of Rule 144 can still avoid liability if he does not meet the statutory definition of an underwriter. *SEC v. Kern*, 425 F.3d 143, 148 (2d Cir. 2005).

[19] An "underwriter" is "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in the direct or indirect underwriting of any such undertaking." 15 U.S.C. § 77b(a)(11).

Summary judgment is proper for Count XIV because SEC cannot show that the defendants were necessary participants and substantial factors in the purchase or sale transactions of securities and, in any event, the shares at issue were all properly registered.

Spartan is not a proper defendant for this allegation. Spartan had no role whatsoever in any transactions of securities or in the transfer of securities. Island segregated its business operations and its files from Spartan's and Spartan's employees, and Spartan never acted as a transfer agent for any shares of stock. Eldred Dep. 137:2-138:7; Dilley Aff. ¶¶ 6, 7; Lopez Aff. ¶¶ 48, 49. SEC has no basis to suggest that Spartan was either a necessary participant or substantial factor in any transfers. *See CMKM Diamonds, Inc.*, 729 F.3d at 1257.

SEC also cannot prevail against Island or Mr. Dilley. They performed nothing more than the ministerial act of facilitating transfers of securities *after* transactions had been completed. Island was not involved with arranging any sale or transfer of any stock, never processed transfers until after a sale or transfer had been completed by the stockholder, and never received any proceeds of any sales of stock or had any stake in the outcome of any sale or transfer of stock beyond routine transfer fees. Dilley Aff. ¶ 8, 10; Lopez Aff. ¶ 52. Indeed, both Ms. Harrison and Mr. Daniels confirmed that Island had no participation in the planning of the sale of any shares of Dinello, Court, Quality Wallbeds, or Top to Bottom. Harrison Dep. 69:4–8; 89:22–90:2, 102:19–22, 119:20–24; Daniels Aff. ¶¶ 7–8.

The defendants acted only after they gathered evidence evincing the stockholder's ownership, a signed Stock power certificate directing the transfer with a medallion guarantee stamp provided by a reputable financial institution, and stockholder's instructions. Lopez Aff. ¶ 50, Lopez Ex. 18. This was entirely consistent with standard industry practice. Harmon Report 1, June 16, 2020. At that point the defendants were required to execute the instructions. Lopez Aff. ¶ 50; Harmon Report 4.

This is a far cry from the kind of active participation in a sale that is typically required to prove a § 5 violation. *See CMKM Diamonds, Inc.*, 729 F.3d at 1258. Indeed, every factor described by the Court

in *CMKM Diamonds* is absent here—whether transfer agent "participated heavily in the offerings," "devised the corporate financing scheme for the issuer," "prepared and reviewed offering memoranda," "met personally with broker-dealers, investors and their representatives," or "spoke at broker-dealer sales seminars." *See id.* (citations omitted). Island performed a "merely administrative role" of a transfer agent and cannot be liable under § 5. *See Blackburn*, 2020 WL 565551, at *5-6. Thus, the record reveals no more than what the *CMKM Diamonds* Court deemed insufficient as a matter of law to establish § 5 liability. *See* 729 F.3d at 1258.

Too, all 19 issuers had properly registered their shares in effective registration statements and each transfer was either pursuant to that registration statement or exempt under § 4(a)(1)'s everyday trading exemption. Island processed transfers for shares in Kids Germ, Obscene Jeans, On the Move, Rainbow Coral, First Titan, Neutra, Aristocrat, First Social, Global, E–Waste, First Independence, and Changing Tech. for sales that had been purchased during the offering described in the S-1. Lopez Aff. ¶¶ 55-56. Even if the registration statements had included fraudulent statements by the issuer, the transfers were nevertheless properly registered under § 5. *See Husain*, 2017 WL 810269, at *5.

Every subsequent transfer met the everyday trading exemption. For each transfer, Island gathered appropriate form instructions, including medallion guaranteed signatures on the original stock power certificate. Lopez Aff. ¶¶ 55-56; Harrison Dep. 67:20–69:21, 84:7–11, 102:6–12. Each came with evidence that it had been a part of a sale not taken by an underwriter, as each seller had proof of independent control in the form of subscription agreements, and each transaction had evidence of payment. Lopez Aff. ¶¶ 55-56.

## CONCLUSION

This Court should enter summary judgment on behalf of all defendants on all counts.

Dated: August 21, 2020                    Respectfully Submitted,

                                          _/s/ Caleb Kruckenberg_
                                          **Caleb Kruckenberg**
                                          Litigation Counsel
                                          **Kara Rollins**
                                          Litigation Counsel
                                          New Civil Liberties Alliance
                                          1225 19th St. N.W., Suite 450
                                          Washington, D.C., 20036
                                          caleb.kruckenberg@ncla.legal
                                          (202) 869-5217
                                          Counsel for Defendants
                                          Appearing _Pro Hac Vice_

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 21, 2020, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which sent notification of such filing to all counsel of record.

Respectfully,

<u>/s/ Caleb Kruckenberg</u>
Caleb Kruckenberg
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. N.W., Suite 450
Washington, D.C., 20036
caleb.kruckenberg@ncla.legal
(202) 869-5217
Counsel for Defendants
Appearing *Pro Hac Vice*

2