# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### CASE NO. 19-CV-00448-VMC-CPT

**SECURITIES AND EXCHANGE COMMISSION,**

     **Plaintiff,**

**v.**

**SPARTAN SECURITIES GROUP, LTD.,**
**ISLAND CAPITAL MANAGEMENT LLC,**
**CARL E. DILLEY,**
**MICAH J. ELDRED, and**
**DAVID D. LOPEZ,**

     **Defendants.**

_____/

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND
## <u>SUPPORTING MEMORANDUM OF LAW</u>

**Table of Contents**

I.   Introduction ................................................................................................ 1

II.  Statement of Undisputed Material Facts ...................................................... 3

   A.   The Mirman and Rose Shell Factory ..................................................... 4

   B.   Dilley and Spartan submit Forms 211 while ignoring red flags ................................... 7

   C.   The Daniels/Fan/Harrison Shell Factory ................................................ 15

   D.   Spartan's Policies and Procedures on Forms 211 ..................................... 22

   E.   Island's Policies and Procedures ......................................................... 25

III. MEMORANDUM OF LAW ......................................................................... 27

   A.   The Standard For Granting Summary Judgment ....................................... 27

   B.   Spartan, Island, and Dilley Violated Section 5 of the Securities Act of 1933 ............. 28

   C.   Violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act ..................... 35

IV.  Conclusion .............................................................................................. 45

**Cases**

*SEC v. Friendly Power*, 49 F. Supp.2d 1363, 1372 (S.D. Fla. 1999)..............................................28, 30

*Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 250 (1986) ....................................................................27

*Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co.,* 802 F.2d 1352, 1356 (11th Cir. 1986)27

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986) .........................................................................27

*Doran v. Petroleum Management Co.*, 545 F.2d 893, 899 (5th Cir. 1977)............................................35

*In re Franklin N. Wolf*, Exchange Act Rel. No. 36523, 1995 WL 704151 (Nov. 29, 1995)................36

*Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)..............................27

*Schreiber v. Burlington Northern Inc.*, 472 U.S. 1, 11 n.11 (1985)......................................................36

*SEC v. Altomare*, 300 Fed.App. 70 (2d Cir. 2008)................................................................................30

*SEC v. Arcturuse Corp.*, 171 F. Supp. 3d 512, 531 (N.D. Tex. 2016) ..................................................30

*SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290, 306 (S.D.N.Y. 2015) ..........................................30

*SEC v. Calvo*, 378 F.3d 1211, 1214-15 (11th Cir. 2004) .......................................................................28

*SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998).......................................................................29, 30

*SEC v. Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941) ....................................29

*SEC v. Continental Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972)....................................................28

*SEC v. Cook,* No. 1:13–cv–01312–SEB–MJD, 2015 WL 5022152, at *23 (S.D. Ind. Aug. 24, 2015)30

*SEC v. Empire Develop. Group, LLC*, 2008 WL 2276629 at *7 (S.D.N.Y May 2008).......................30

*SEC v. Farmer*, 2015 WL 5838867, *18 (S.D. Tex. Oct. 7, 2015) .......................................................29

*SEC v. Goble*, 682 F.3d 934, 947 (11th Cir. 2012) ...............................................................................36

*SEC v. Husain*, 2017 WL 810269, at *5-6 (C.D. Cal. Mar. 1, 2017) ...................................................29

*SEC v. Lybrand*, 200 F. Supp.2d 384, 392 (S.D.N.Y. 2002)................................................................28

*SEC v. Murphy*, 626 F.2d 633, 650-52 (9th Cir. 1980) ........................................................................29

*SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)..........................................................................35

*SEC v. Sierra Brokerage Servs.*, 608 F.Supp.2d 923, 950 (S.D. Ohio 2009).................................29, 30

*SEC v. Softpoint, Inc.*, 958 F. Supp 846, 859-62 (S.D.N.Y. 1997) .......................................................28

*SEC v. Universal Express, Inc.*, 475 F. Supp. 2d. 412, 434 n. 15 (S.D.N.Y. 2007)............................30

*U.S. v. Wolfson*, 405 F.2d 779, 783-84 (2d Cir. 1968) ..........................................................................28

*United States v. O'Hagan*, 521 U.S. 642, 753 (1997)...........................................................................36

*Wassel v. Eglowsky*, 399 F. Supp. 1330 (D. Md. 1975) .......................................................................33

*Zacharias v. SEC*, 569 F.3d 458, 465 (D.C. Cir. 2009).......................................................................29

**Statutes**

15 U.S.C. § 77e(a) and (c)......................................................................................................................30

Exch. Act Rel. No. 41110, 64 FR 11124, 11149 (Mar. 8, 1999)....................................................39, 40

**Treatises**

T. Hazen, 1 *Law of Securities Regulation* § 4.1 ...................................................................................32

# I.  **Introduction**

Here is how the shell game, Three Card Monte, works: the con artist puts up a table with three shells and a dried pea.  Confederates of the con artist pretend to play to convince prospective marks to wager their money, as if it were a game of skill.  However, after placing the bet, victims invariably lose.  First, they are falsely led to believe they can win.  Second, they do not realize the other players are actually in on the fix.  Beginning in 2009, Defendants Spartan Securities Group, LTD ("Spartan"), Island Capital Management LLC ("Island") and its principals ran the regulatory equivalent of a game of Three Card Monte with a series of shell companies, all in violation of federal securities laws.

Spartan, a registered broker-dealer, and Island, a registered transfer agent, are commonly owned and touted their "one-stop shop" services provided in tandem to microcap issuers.  Spartan and Island together played critical roles in two separate microcap fraud schemes: one operated by Alvin Mirman ("Mirman") and Sheldon Rose ("Rose") and the other by Michael Daniels ("Daniels"), Andy Fan ("Fan") and Diane Harrison ("Harrison").  All five individuals are the subjects of Commission enforcement actions, and Mirman and Rose were criminally convicted for their roles in the fraudulent schemes to manufacture collectively at least 19 public companies for sale.

These 19 public companies were not operating businesses and did not have independent management or shareholders; rather they were undisclosed "blank check"[1] companies controlled by Mirman, Rose, Daniels, Fan, and/or Harrison.  In reality, the management and shareholders

---

[1] 17 C.F.R. § 230.419 defines "blank check company" as (i) a development stage company that has no specific business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company or companies, or other entity or person; and (ii) is issuing penny stock.

1

of the blank check companies were nothing more than nominees for Mirman, Rose, Daniels, Fan, and/or Harrison (the undisclosed control persons) who always intended to sell all the securities of the blank check companies in bulk for their own benefit.  Each bulk sale realized proceeds of hundreds of thousands of dollars.  If the truth had been disclosed, the securities would have been restricted from such sales and would have had little value.

The fraudulent schemes depended on the assistance of the Defendants in (a) filing Form 211 applications with the Financial Industry Regulatory Authority ("FINRA") by which the securities became publicly quoted, a key component of both underlying frauds, and (b) serving as the transfer agent to effectuate both the bulk issuance and transfer of the securities without restriction.

Now that discovery in this case has concluded, there are no material disputes as to several issues set forth in the Complaint, warranting summary judgment in favor of the Commission on three counts of the Complaint.  Thus, the Commission respectfully moves for summary judgment as to Counts I and II of the Complaint, alleging violations of 15(c)(2) and Rule 15c2-11 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 77o(c)(2) and 17 C.F.R. § 240.15c2-11 and Count XIV, alleging violations of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e(a) and (c).  In support, the SEC states:

## II.  Statement of Undisputed Material Facts

1.      Spartan has been registered with the Commission as a broker-dealer since 2001.[2]

2.      Spartan is a Florida limited partnership wholly owned by Connect X Capital Markets LLC ("Connect X"), whose managing member is Micah Eldred ("Eldred") and shareholders include Carl E. Dilley ("Dilley") and David D. Lopez ("Lopez").[3]

3.      Between 2009 and 2018, Spartan was the subject of at least 10 disciplinary actions by FINRA or the NASDAQ Stock Market.[4]

4.      Island has been registered with the Commission as a transfer agent since 2003, with its principal place of business in Clearwater, Florida. Island is a Florida limited liability company that shares office space, computer systems, officers and employees with Spartan Securities.[5]

5.      Island is also wholly owned by Connect X, and was the transfer agent for at least a dozen companies that are at issue in this case.[6]

6.      Dilley was a registered principal and registered representative of Spartan from 2004 to 2015 and the President of Island from 2004 until January 2018 and signed at least 14 Forms 211 relevant to this case.[7]

---

[2] Defendants' Answer DE 46, ¶ 13.

[3] Defendants' Answer DE 46, ¶ 13.

[4] Defendants' Answer DE 46, ¶ 13; **Exh. 1**, CRD 104478.

[5] Defendants' Answer DE 46, ¶14, 34.

[6] Defendants' Answer DE 46, ¶14, 35.

[7] Defendants' Answer DE 46, ¶15, 35.

7.     Eldred was a registered principal and representative of Spartan and the Chief Executive Officer of Island from 2001 to the present.[8]

8.     Lopez was a registered principal and Chief Compliance Officer of Spartan and the Chief Compliance Officer of Island at all times during the relevant period.[9]

**A.  The Mirman and Rose Shell Factory**

9.     Alvin Mirman ("Mirman") and Sheldon Rose ("Rose"), alone or together, created and sold at least 14 undisclosed "blank check" companies (the "Mirman/Rose Companies") in assembly-line fashion.  To complete their fraudulent scheme, Mirman and Rose had to be in a position to control all or nearly all of the publicly traded shares of the companies, so that when they later sold the company, part of the sale would include the undisclosed transfer of the unrestricted shares to the purchaser.  As a result of his actions, Mirman pled guilty to a one-count Information charging him with conspiracy to commit securities fraud. *U.S. v. Mirman et al.*, Case No. 16-cr-20572 (S.D. Fla.). On November 9, 2016, Rose also pled guilty to a one-count Information charging him with conspiracy to commit securities fraud. *U.S. v. Rose et al.*, Case No. 16-cr-20706 (S.D. Fla.). The criminal actions include their misconduct in connection with the Mirman/Rose Companies described herein.[10]

---

[8] Defendants' Answer DE 46, ¶16.

[9] Defendants' Answer DE 46, ¶17.

[10] **Exh. 2**, Alvin Mirman Plea Agreement, p. 10-13; **Exh. 3**, Sheldon Rose Plea Agreement, p. 10-13; Defendants' Answer DE 46, ¶18, 19.

10.     Mirman and Rose recruited a sole officer, director, employee, and majority shareholder (the "sole officer") to act as CEO of these companies in name only.[11]

11.     Mirman and Rose also prepared false and misleading registration statements (the "Forms S-1") and subsequent Commission filings which falsely depicted the issuers as actively pursuing a variety of business plans, when the only plan from the onset was for the company to be sold as public vehicles.[12]

12.     The Forms S-1 had similar disclosures as set forth in the chart below, including offering sizes, capitalization structures, assets, and operating budgets.[13]

| Mirman/Rose Company | Form S-1 Shares | Form S-1 Offering Size | # of Shares in Name of Sole Officer | Total Assets (All Cash) | Operating Budget (Duration) | Sole Officer # of Hours Work Week |
|---|---|---|---|---|---|---|
| Kids Germ | 3,000,000 | $30,000 | 9,000,000 | $5,351 | $400,000 (18 months) | 10-25 hours |
| Obscene Jeans | 3,000,000 | $52,500 | 9,000,000 | $9,000 | $500,000 (18 months) | 10-25 hours |
| On The Move | 3,500,000 | $52,500 | 9,000,000 | $9,000 | $477,500 (12 months) | 10-25 hours |
| Rainbow Coral | 2,500,000 | $31,250 | 9,000,000 | $8,912 | $500,000 (18 months) | 10-25 hours |

---

[11] **Exh. 2**, Mirman Plea, p. 10; **Exh. 3**, Rose Plea, p. 10; **Exh. 4**, Alvin Mirman Depo. Tr. at pp. 68:12-25; p.69:2-25; p.70:1-13; **Exh. 5**, Sheldon Rose Depo. Tr. at p.22:19-23.

[12] **Exh. 2**, Mirman Plea p. 11-12; **Exh. 3**, Rose Plea, p. 11-12; **Exh. 4**, Mirman Depo. Tr. at p. 69: 20-25; pp. 70-75; **Exh. 5**, Rose Depo. Tr. at p. 22:1-10.

[13] Defendants' Answer DE 46, ¶66.

| First Titan | 3,000,000 | $37,500 | 9,000,000 | $8,922 | $587,500 (18 months) | 10-25 hours |
| Neutra | 3,000,000 | $42,000 | 9,000,000 | $8,900 | $425,000 (12 months) | 10-25 hours |
| Aristocrat | 3,900,000 | $39,000 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| First Social | 3,000,000 | $45,000 | 9,000,000 | $8,900 | $475,000 (18 months) | 10-25 hours |
| Global Group | 3,000,000 | $34,500 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| E-Waste | 3,000,000 | $36,000 | 9,000,000 | $8,301 | $600,000 (18 months) | 10-25 hours |
| First Independence | 3,000,000 | $34,500 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| Envoy Group | 3,000,000 | $37,500 | 9,000,000 | $8,908 | $612,500 (18 months) | 10-25 hours |
| Changing Technologies | 3,000,000 | $30,000 | 9,000,000 | $8,900 | $339,000 (18 months) | 10-25 hours |
| First Xeris | 3,000,000 | $39,000 | 9,000,000 | $8,976 | $650,000 (18 months) | 10-25 hours |

13.     Once the Forms S-1 went effective, Mirman and Rose solicited the same number of friends and family to invest while maintaining control over those investments.[14]

14.     To make the Mirman/Rose Companies marketable as public vehicles, Mirman and Rose then directed the filing of Forms 211 with FINRA in order to obtain approval for the

---

[14] **Exh. 2**, Mirman Plea, pp 10-13; **Exh. 3**, Rose Plea, pp. 10-14; **Exh. 4**, Mirman Depo. Tr. p 73:3-7; **Exh. 5**, Rose Depo. Tr. pp. 106:19-25.

sale of the shares of these companies to the public.[15]

15.    Mirman and Rose then consummated reverse mergers by which all shares of the issuer were sold together for a single cash price and the companies sold.[16]

**B.  Dilley and Spartan submit Forms 211 while ignoring red flags**

16.    Dilley signed the Forms 211 as the registered principal with responsibility for the Form 211.[17]

17.    Dilley and Spartan took direction from Mirman and/or Rose when completing the Forms 211.[18]

18.    Spartan did not confirm the authority of Mirman and Rose to act for the Mirman/Rose Companies. [19]

19.    On the Form 211 itself, FINRA requested detailed information as to who solicited the broker-dealer to file the Form 211.[20]

---

[15] **Exh. 2**, Mirman Plea, p. 12; **Exh. 3**, Rose Plea p. 12; **Exh. 4**, Mirman Depo. Tr. pp. 69-75, 104:11-24; 105:1-18; **Exh. 5**, Rose Depo. Tr. p 106:7-15.

[16] **Exh. 2**, Mirman Plea, p. 13; **Exh. 3**, Rose Plea, pp 10-14; **Exh. 4**, Mirman Depo. Tr. pp 68-69:23-25; p. 70:1-5; **Exh. 5**, Rose Depo. Tr. p.51:2-14.

[17] Defendants' Answer DE 46, ¶35-36.

[18] **Exh. 6**, Dilley Depo. Tr. at pp 239:19-23; **Exh. 7**, Dilley Testimony Tr. at 144:23-25; **Exh. 43**.

[19] **Exh. 7**, Dilley Testimony Tr. at 78:3-16, 106:18-21, 107:8-10, 123:8-11, 126:7-10, 134:1-13; **Exh. 8**, Zajonc Tr. at 151:16-21, 174:8-15.

[20] **Exh. 9**, p. 9 (First Titan); **Exh. 10**, p. 7 (On the Move); **Exh. 11**, p. 8 (Envoy); **Exh. 12**, p. 10 (Kids Germ); **Exh. 13**, p. 9 (Obscene Jeans); **Exh. 14**, p. 8 (E-Waste); **Exh. 15** (Changing Technologies), p. 8; **Exh. 16**, p. 10 (Neutra); **Exh. 17**, p. 8 (Global Group); **Exh. 18**, p. 8 (First Social); **Exh. 19**, p. 8 (First Independence); **Exh. 20**, p. 7 (Rainbow Coral); **Exh. 21**, p. 8 (Aristocrat); **Exh. 22**, p. 8 (First Xeris).

20. Spartan and Dilley stated on the Form 211 submitted to FINRA that the purported sole officer contacted Spartan to complete the Form 211.[21]

21. However, all but one of the sole officers never communicated with Spartan or Dilley and had not even heard Dilley's name.[22]

22. FINRA also requested information as to the solicitation of the shareholders of the Mirman/Rose Companies.[23]

23. Spartan responded to FINRA by submitting shareholder charts (provided and prepared by Mirman or Rose)[24] stating that the sole officer had solicited each shareholder as a "friend," and stated the same solicitation success rate (24 solicited, 24 invested).[25]

24. However, all but one of the sole officers did not solicit any shareholder, and knew virtually none of them.[26]

---

[21] **Exh. 10,** p. 7 (On the Move); **Exh. 12,** p. 10 (Kids Germ); **Exh. 13,** p. 9 (Obscene Jeans); **Exh. 14,** p. 8 (E-Waste); **Exh. 16,** p. 10 (Neutra); **Exh. 20,** p. 8 (Rainbow Coral); **Exh. 21,** p. 8 (Aristocrat).

[22] **Exh. 23,** Stark Tr. at 77:6-9, 81:2-10; **Exh. 24,** Crawford Tr. at 47-49, 50:18-23; **Exh. 25,** Tatar Tr. at 50-52; **Exh. 26,** Stark-Cappelli Tr. at 51:5-12; **Exh. 27,** J. Maute Tr. at 55-56; **Exh. 28,** M. Maute Tr. at 38-39; **Exh. 29,** J. Nicholas Tr. at 52-53; **Exh. 30,** M. Nicholas Tr. at 48:22-25, 49:1-5; **Exh. 31,** Mullins Tr. at 84.

[23] **Exh. 9,** p. 12; **Exh. 10,** p. 18; **Exh. 11,** p. 13; **Exh. 12,** p. 13; **Exh. 13,** p. 12; **Exh. 14,** p. 11; **Exh. 15,** p. 10; **Exh. 16,** p. 13; **Exh. 17,** p. 17; **Exh. 18,** p. 17; **Exh. 19,** p. 10; **Exh. 20,** p. 11; **Exh. 22,** p. 10.

[24] **Exh.** 32; **Exh.** 33; **Exh.** 34.

[25] **Exh. 9,** p.15; **Exh. 10,** p. 21; **Exh. 11,** p. 18; **Exh. 12,** p.17; **Exh. 13,** p. 15; **Exh. 14,** p. 14; **Exh. 15,** p. 13; **Exh. 16,** p. 16; **Exh. 17,** p.20; **Exh. 18,** p.20 ; **Exh. 19,** p. 13; **Exh. 20,** p. 7; **Exh. 21,** p. 9; **Exh. 22,** p. 13.

[26] **Exh. 23,** Stark Tr. at 77:19-78:6 ("I don't even know who they are"); **Exh. 24,** Crawford Tr. at 48:16-50:1; **Exh. 25,** Tatar Tr. at 43:4-20; **Exh. 35,** Lindsay Tr. at 33-39; **Exh. 26,** Stark-Cappelli Tr. at 44, 49-51; **Exh. 27,** J. Maute Tr. at 49:5-7, 50:25-51:15; **Exh. 28,** M. Maute Tr.

25.     Dilley and Spartan took direction from Mirman and/or Rose when applying for Depository Trust Company ("DTC") eligibility for the issuers.[27]

26.     Obtaining DTC eligibility made the shell companies more valuable when sold to a shell buyer.[28]

27.     Regarding the Mirman/Rose Company, Obscene Jeans, on September 3, 2010 (the day of FINRA's Form 211 clearance),[29] Rose asked Spartan to prepare a DTC eligibility application for Obscene Jeans.[30]

28.     Shortly thereafter, by email dated October 5, 2010, Rose sent Dilley a term sheet for Obscene Jeans making no mention of the sole officer or purported business plan (listing no liabilities and $20,000 assets in cash).[31]

29.     Rose also asked Dilley for Island to act as escrow agent for the sale of Obscene Jeans.[32]

30.     Dilley signed an escrow agreement by which all of the restricted and purportedly unrestricted shares were being sold pursuant to one stock purchase agreement for $440,000.[33]

---

at 37:24-38:12; **Exh. 29**, J. Nicholas Tr. at 39:4-6, 53:23-55:15; **Exh. 30**, M. Nicholas Tr. at 42:19-21, 49:10-19; **Exh. 31**, Mullins Tr. at 90:6-96:10; **Exh. 36**, Egna Tr. at 66:5-19.

[27] **Exh. 37**.

[28] **Exh. 5,** Rose Deposition Tr. p. 117:24-25 – 118:1-6.

[29] **Exh. 13**, p. 19.

[30] **Exh. 38**.

[31] **Exh. 39**.

[32] **Exh. 41,** p.1.

[33] **Exh. 40**.

31.     On December 9, 2010, Dilley's assistant was asked "who is the appropriate party that I should be talking to on [Obscene Jeans]" because "I don't like to deal with middle people."  She responded: "I don't know who is selling it – in whose hands it is now . . . try Sheldon Rose."[34]

32.     Dilley was aware that Island sent the invoices for the Mirman/Rose Companies to Mirman and Rose, and took payment instructions from them. [35]

33.     Specifically, by email dated September 19, 2011, Mirman told an Island employee: "We spoke to Carl [Dilley] and told him we will pay [the Rainbow Coral invoice] through the Neutra account,"[36] despite both issuers purportedly being unrelated with separate management.[37]

34.     The following month, Dilley signed the stock certificates by which all the purportedly unrestricted shares of both Rainbow Coral and Neutra were sold to the same buyers represented by the same counsel.[38]

35.     By email dated December 4, 2012, Mirman had written Dilley: "We are in the process of selling E-Waste and the attorney wants," among other things, "[c]onfirmation from

---

[34] **Exh. 42**.

[35] **Exh. 6**, Dilley Depo. Tr. at p. 143:4-19; p. 147: 1-6.

[36] **Exh. 43**.

[37] **Exh. 16**; **Exh. 20**; **Exh. 44**, Rainbow Coral Form S-1; **Exh. 45,** Neutra Form S-1s.

[38] **Exhs. 46,** p. 1-14 (Total Batch Information, pp. 1, 4, 6, and 12 identify KM Delaney as the "presentor", i.e., party presenting certificates for transfer); **Exh. 47** (shows buyers – names on the certificates - including Svevo Trade Corp., Montego Blue Enterprises, and Jefferson Holdings); **Exh. 48** (pp. 3-5 identify KM Delaney as the "presentor"); **Exh. 49 (**shows buyers – names on the certificates - Svevo Trade Corp., Montego Blue Enterprises, and Jefferson Holdings).

the T[ransfer A[gent] that it has not put restrictions on any free trading shares."[39]

36.     Dilley signed the requested letter to "Alvin Mirman at E-Waste Corp." on December 5, 2012.[40]

37.     By email dated January 1, 2013, Rose again wrote Dilley: "Please send the same letter [as E-Waste] but for Global [Group] and e-mail it to me ASAP."[41]

38.     Dilley signed an identical requested letter for Global as well.[42]

39.     Dilley was aware that Rose participated in the sale of Global as indicated by an email dated February 27, 2013, where Mirman asked Dilley how to handle a lost certificate of one of the "free-trading" shareholders because "Sheldon [Rose] is in New York today closing Global."[43]

40.     In fact, Island effectuated the bulk transfer of all shares of both Global Group and E-Waste to the same exact buyers represented by the same counsel.[44]

41.     Spartan never questioned the fact that each Mirman/Rose Company had a similar profile, much of which derived from the substantially similar Forms S-1  (1) the same number of shareholders (24); (2) the same number of issued shares; (3) the same number of

---

[39] **Exh. 50.**

[40] **Exh. 50.**

[41] **Exh. 51.**

[42] **Exh. 52.**

[43] **Exh. 53**; Dilley Depo. Tr. at 175:3-6.

[44] **Exhs. 54-56** (Global Group); **Exhs. 57-61** (E-Waste).

shares owned per shareholder; (4) the same offering size; and (5) similar annual budgets (for effectuation of vastly different business plans). [45]

42.    By email dated November 6, 2013, Rose solicited Dilley to file a Form 211 for Envoy and told Dilley: "We know the process, included is some due dil per our conversation" including a chart listing the Form S-1 shareholders and their purported relationships with each other.[46]

43.    Spartan filed the Envoy Form 211 five days later, stating that Envoy's sole officer contacted Dilley (with no mention of Rose), Spartan had conducted due diligence over the past month, and Spartan had no other relationship with Envoy's "representatives."[47]

44.    In a series of deficiency letters, FINRA repeatedly questioned whether Envoy was related to another Mirman/Rose Company, Kids Germ.[48]

45.    In its deficiency letter dated November 21, 2013, FINRA asked Spartan for detailed descriptions of any relationship between or among Envoy, Kids Germ, Jocelyn Nicholas (Envoy's sole officer), Mark Nicholas (Kids Germ's sole officer), and Spartan.[49]  By email dated November 22, 2013, Dilley's assistant sent Dilley and Lopez a draft response and told them: "I believe Shelly [Rose] sent us this one.  We did a 211 with Mark Nicholas for

---

[45] **Exh. 62** (First Xeris); **Exh. 63** (First Titan); **Exh. 64** (On the Move); **Exh. 65** (Envoy); **Exh. 66** (Kids Germ); **Exh. 67** (Obscene Jeans); **Exh. 68** (E-Waste); **Exh. 69** (Aristocrat Group); **Exh. 70** (Changing Technologies); **Exh. 45**, (Neutra); **Exh. 71** (Global Group); **Exh. 72** (First Social); **Exh. 6**, Dilley Depo. Tr. at 222:17-25; 224:1-21; 227:12-25; 228:10-25; **Exh. 5**, Rose Deposition Tr. pp. 112-116.

[46] **Exh. 33**.

[47] **Exh. 11**, p.18.

[48] **Exh. 11**, p.13-27.

[49] **Exh. 11**, p. 13-14.

Kids Germ Defense back in 2010."[50]  Within an hour, Lopez responded to the assistant and Dilley: "I am not familiar with any of those people or that company."[51]

46.     Later that day, Dilley responded: "No idea, just go ahead and send it to the company and see what they come back with."[52]  Spartan responded to FINRA that there were no such relationships (other than Jocelyn and Mark Nicholas' marriage) based on a letter provided by Rose and signed by Jocelyn Nicholas.[53]

47.     FINRA inquired a second time for a "detailed description of any **past** relationship between Jocelyn Nicholas and Kids Germ."[54] (emphasis in original).

48.     In response, Spartan submitted a letter signed by Jocelyn Nicholas that she was only a shareholder of Kids Germ.[55]

49.     Spartan failed to investigate these FINRA inquiries, despite the facts readily in its possession that: (1) Spartan filed both the Envoy and Kids Germ Form 211 at Rose's request;[56] (2) Envoy and Kids Germ had 11 shareholders in common (including the sole officers of two other Mirman/Rose Companies) and the same capitalization structure (9,000,000 control block, 3,000,000 Form S-1 shares among 24 shareholders);[57] and (3) Dilley

---

[50] **Exh. 73,** p. 3.

[51] **Exh. 73,** p. 2.

[52] **Exh. 73,** p. 1.

[53] **Exh. 11**, p. 16.

[54] **Exh. 11**, p. 20.

[55] **Exh. 11**, p. 23.

[56] **Exh. 74** (Kids Germ), **Exh. 75** and **Exh. 33** (Envoy).

[57] Compare **Exh. 11** (Envoy 211) with **Exh. 12** (Kids Germ 211); **Exh. 76**; Compare **Exh. 65** (Envoy S-1) and **Exh. 66** (Kids Germ S-1).

had attempted to arrange a sale of Kids Germ for Rose shortly after the Form 211 clearance.[58]

50.     Some of these facts were readily available on Spartan's computer network, on which it maintains a specific Form 211 file folder organized by issuer.[59]  Rather, Dilley and Lopez responded offhand that they were not familiar with Kids Germ and instructed the assistant simply to see what Envoy says.[60]

51.     On November 7, 2013 (the same day Rose solicited Dilley for the Envoy Form 211), Mirman solicited Dilley to file a Form 211 for Changing Technologies.[61]

52.     Dilley approved the portion of the Form 211 representing that Mirman had referred the issuer but that Spartan "does not have any other relationship with Al Mirman."[62]

53.     By letter dated December 3, 2013, FINRA asked Spartan for a "detailed explanation of the Issuer's relationship with Al Mirman."[63]

54.     Spartan sent FINRA's deficiency letter exclusively to Mirman to address this and other questions.[64]

55.     Spartan responded to FINRA that the sole officer approached Mirman, a social acquaintance, for a broker-dealer recommendation and "Mirman has no relationship with

---

[58] **Exh. 37**.

[59] **Exh. 77**, Lopez Tr. at 148:25-152:22; **Exh. 8**, Zajonc Tr. at 73:5-16, 203:21-204:8.

[60] **Exh. 73**.

[61] **Exh. 78**.

[62] **Exh. 79,** p. 1; **Exh. 15**, p. 8.

[63] **Exh. 15**, p. 10.

[64] **Exh. 80**.

Changing Technologies."[65]

56.     In January 2014, Rose solicited Dilley to file a Form 211 for First Xeris.[66] Spartan again failed to disclose Rose's involvement, misrepresenting that Spartan was contacted by the sole officer and had no relationship with any of the issuer's representatives.[67]

## C. The Daniels/Fan/Harrison Shell Factory

57.     The Commission brought suit against Daniels and Harrison, husband and wife, for their conduct related to the manufacture of at least five undisclosed blank check companies (the "Daniels/Harrison Companies"), among other things, which resulting in their having consented to an injunction and other relief in *SEC v.  Diane J. Harrison et al.,*18 CV-01003-SDM-T-23TGW.[68]

58.     The Commission entered, by consent, a cease-and-desist order, officer and director bar and penny stock bar against Fan, and ordered him to pay a civil money penalty of $140,000.  *In re Andy Z. Fan*, Securities Act Rel. No. 10487, 2018 WL 1960465 (Apr. 25, 2018).  The Commission's action related to Fan's conduct with respect to certain of the Daniels/Harrison Companies at issue in this case.[69]

---

[65] **Exh. 15**, p. 8.

[66] **Exh. 81**.

[67] **Exh. 22**, p. 13.

[68] Defendants' Answer DE 46, ¶20-21; Order imposing by consent, permanent injunctions, penny stock bars, officer and director bars, among other things. Case 8:18-cv-01003-SDM-TGW (M.D. Fla.) D.E.144, filed 06/16/20.

[69] Defendants' Answer DE 46, ¶22.

59.     Daniels routinely paid for the shares of approximately 30 friends and family in privately-held companies he acquired.[70]

60.     Daniels and Harrison then filed a registration statement on Form S-1 to register a secondary public offering of the shares.[71]

61.     Thereafter, Daniels and Harrison enlisted the assistance of Spartan to file Forms 211.[72]

62.     Daniels and Harrison sold their first company, Dinello Restaurant Ventures, Inc. aka AF Ocean Investment Management Co. ("Dinello/AF Ocean"), to Andy Fan[73] for approximately $500,000 in his endeavor to amass a roster of public companies for later reverse mergers with Chinese companies.[74]

63.     Daniels and Fan then agreed to create three more public vehicles: Court Document Services, Inc. nka ChinAmerica Andy Movie Entertainment Media Co. ("Court/ChinAmerica"), Quality Wallbeds, Inc. nka Sichuan Leaders Petrochemical Co. ("Wallbeds/Sichuan"), and Top to Bottom Pressure Washing, Inc. nka Ibex Advanced Mortgage Technology Inc. ("TTB/Ibex").[75]

---

[70] **Exh. 82**, Daniels Tr. at 68:6-25; 69:12-25; 70:14-25; 157:19-25; 158:12-15; 174:8-23; **Exh. 95**.

[71] **Exh. 83** (Form 211 Court Document Services); **Composite Exh. 87,** Harrison Testimony Tr. 255:5-10.

[72] Defendants' Answer, DE 46 at ¶ 102; **Exh. 84** (Eldred writes to Daniels "I would be happy to use Court as a vehicle.")

[73] Defendants' Answer DE 46, ¶22.

[74] **Exh. 85**, Declaration of Tina Donnelly dated September 5, 2019 at ¶6, 10.

[75] **Exh. 85**, Declaration of Tina Donnelly dated September 5, 2019 at ¶6.

64.     Daniels and Harrison retained Spartan to file the following Forms 211[76]:

| HARRISON/DANIELS COMPANY | FORM 211 FILING DATE | FORM 211 CLEARANCE DATE | FORM 211 SIGNATORY |
|---|---|---|---|
| Dinello/AF Ocean | 5/20/2011 | 06/14/2011 | Dilley |
| Court/ChinAmerica | 7/24/2012 | 8/30/2012 | Eldred |
| Wallbeds/Sichuan | 10/25/2012 | 11/30/2012 | Eldred |
| TTB/Ibex | 9/6/2013 | 10/29/2013 | Eldred |
| PurpleReal | 7/31/2014 | --- | Eldred |

65.     Daniels and Harrison have been friends with Eldred for at least 10 years.[77] Eldred was aware from the onset that Daniels and Harrison were taking companies public to sell as "OTCBB vehicles."[78]

66.     Harrison and Eldred's wife had each been the sole officer of an issuer which had been acquired by reverse merger.[79]

67.     In November 2010, Eldred asked Harrison whether the head of FINRA's Form 211 group would have any concern if his wife "creates another public company." Harrison responded: "I don't think so.  [Eldred's wife] operated [her prior company] for a couple of

---

[76] Defendants' Answer, DE 46 at ¶ 102.

[77]  Defendants' Answer DE 46, ¶103; **Exh. 86**, Eldred Testimony Tr. at 22:25-23:4; **Composite Exh. 87**, Harrison Testimony Tr. at 45:4-5.

[78] **Exh. 88**, (Eldred introduces Daniels to representative of shell buyers "We always have clients looking for shells").

[79] Defendants' Answer DE 46, ¶103; **Exh. 86**, Eldred Testimony Tr. at 61:12-21; **Composite Exh. 87**, Harrison Testimony Tr. at 48:25-50:14.

years before the acquisition.  [Daniels] might know better.  We are filing [Dinello/AF Ocean] under my name and it has been two years since [Harrison's other issuer]'s acquisition."[80]

68.     In April 2011 (prior to Spartan's filing of the Dinello/AF Ocean Form 211), Daniels requested that Eldred prepare an agreement for Island to act as Dinello/AF Ocean's transfer agent.[81]

69.     Spartan filed Dinello/AF Ocean's Form 211 in May 2011.[82]   Harrison approached Eldred to file the Form 211,[83] but Dilley signed it as the registered principal responsible for the accuracy of all related submissions to FINRA.[84]

70.     Spartan represented that Eldred was contacted by the second officer of Dinello/AF Ocean.[85]  However, that officer never communicated with Spartan and had never even heard of Spartan or Eldred.[86]

71.     Spartan also represented that there was no present or future arrangement with respect to the transfer or disposition of any of the registered shares.[87]

72.     However, Eldred was aware that Dinello/AF Ocean was for sale as a public vehicle soon after FINRA cleared its Form 211 as indicated in the email dated July 20, 2011,

---

[80] Defendants' Answer DE 46, ¶104; **Exh. 89.**

[81] Defendants' Answer DE 46, ¶105; **Exh. 90.**

[82] Defendants' Answer DE 46, ¶102, 106; **Exh. 91** (Dinello Form 211).

[83] **Exh. 92**; **Exh. 93**.

[84] **Exh. 91**, p. 7.

[85] **Exh. 91**, p.8.

[86] **Exh. 94**, Paquette Testimony Tr. at 33:12-34:24.

[87] **Exh. 91**, p. 8.

where Daniels asked Eldred if he knew whether a lawyer "may need a shell for" a reverse merger.[88]

73.     On July 22, 2011, Eldred put Daniels in contact with that lawyer for "an OTCBB vehicle that [Daniels] would like to do something with."[89]

74.     Less than one month later, on August 18, 2011, Daniels again asked Eldred about "available vehicles for a [reverse merger]" with Dinello/AF Ocean.[90]

75.     As early as October 2011, Eldred was aware that Daniels and Harrison had sold Dinello/AF Ocean to Fan.[91]

76.     In July 2012, Eldred negotiated with Fan to use Dinello/AF Ocean as a "public OTCBB shell" for a potential reverse merger with Spartan's parent company.[92]   Specifically, by email dated July 11, 2012, Eldred wrote Fan (copying Daniels and Harrison): "The net result is that you and your investors get an equity interest in our business, and you end up with the same basic public OTCBB shell that you have now."[93]

77.     On July 24, 2012, Spartan filed the Form 211 for Court/ChinAmerica with Eldred signing as the principal responsible for all related submissions to FINRA.[94]

---

[88] **Exh. 88**, p. 1.

[89] **Exh. 88**, p. 2.

[90] **Exh. 96**.

[91] **Exh. 97** (Harrison asks Eldred to help with OTC corporate action announcing Andy Fan's appointment to Dinello/AF Ocean; notes the risk of losing DTC eligibility "if we move forward").

[92] **Exh. 98**; **Exh. 99.**

[93] **Exh. 98.**

[94] Defendants' Answer DE 46, ¶102, 112; **Exh. 83**.

78.     Eldred also became aware that Daniels and Harrison were manufacturing Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex for Fan as public vehicles as indicated by the email dated July 30, 2012 where Daniels told Eldred: "Don't forget that Andy [Fan] has three companies that he is doing registrations on including the 211 we filed on Court.  So there should be plenty of room for you to have a meeting of the minds with Andy [Fan].  Court is a super clean company that is a non-shell and the assets are fully depreciated so there can be a disposal of assets for a real clean deal if needed.  Absolutely no debt or problems."[95]  Eldred responded: "I would be happy to use Court as a vehicle."[96]

79.     Each Daniels/Harrison Company had an overlapping shareholder roster (up to 26 of 29 of the same shareholders).[97]

80.     Eldred did not review the Forms S-1 in connection with the Forms 211 – rather he believed Rule 15c2-11 required only that Spartan possess certain documents that it had received from a reliable source.[98]

81.     Eldred signed the Form 211 for and received draft deficiency letter responses for TTB/Ibex.[99]

82.     FINRA's deficiency letter raised detailed questions, including: (1) all relationships among the shareholders and officers; (2) present or future arrangements by which any person other than the named shareholder has control over the Form S-1 shares; (3)

---

[95] **Exh. 84.**

[96] **Exh. 84.**

[97] **Exh. 100.**

[98] **Exh. 86**, Eldred Testimony Tr. at 112:14-20.

[99] Defendants' Answer DE 46, ¶120; **Exh. 101** (TTB/Ibex Form 211); **Exh. 102**.

confirmation of the Form 211's representation that TTB/Ibex has no intent either to effect a sale of shares or engage in change-of-control transaction; and (4) TTB/Ibex's shell company status.[100]

83.     Spartan cut-and-pasted a response letter drafted by Catherine Bradaick, an employee of Dinello/AF Ocean and shareholder of TTB/Ibex, which listed Fan as an officer of TTB/Ibex as of September 2013 and the shareholders (the vast majority of which were shareholders of Dinello/AF Ocean, Court/ChinAmerica, and Wallbeds/Sichuan) as friends of Daniels.[101]

84.     However, Spartan failed to disclose any aspect of the Daniels/Fan/Spartan relationship[102] (despite Eldred knowing that Daniels had prepared three Forms S-1 for Fan).[103]

85.     In July 2014, Harrison contacted Eldred to file a Form 211 for PurpleReal.[104]

86.     FINRA requested proof of payment by the shareholders (many of whom also appeared as shareholders of the other Daniels/Harrison Companies),[105] and Spartan learned that Daniels and Harrison had paid for all the shares.[106]

---

[100] **Exh. 101**, pp 11-12.

[101] Defendants' Answer DE 46, ¶120; Compare **Exh. 104** with **Exh. 101**, pp.14-15; **Exh. 103** Bradaick Testimony Tr. at 138:4-140:15 (Bradaick say she helped draft the letter and concedes as to some of the false statements in it); **Exh. 105**.

[102] **Exh. 101**.

[103] **Exh. 84**.

[104] Defendants' Answer DE 46, ¶122; **Exh. 106.**

[105] **Exh. 107** (PurpleReal Form 211), p. 24.

[106] **Exh. 108** (Emails of August 22, 2014).

87.     Nonetheless, Eldred approved Spartan's response to FINRA that the shareholders had purchased their shares and submitted checks to the issuer.[107]

88.     The SEC obtained a stop order against PurpleReal, the last of the Daniels/Harrison Companies. *In re Registration Statement of PurpleReal.com Corp.*, Securities Act Rel. No. 9770, 2015 WL 13018293 (May 12, 2015).[108]

**D.  Spartan's Policies and Procedures on Forms 211**

89.     At all relevant times, Lopez was the registered supervisor at Spartan for, among other things, market making, supervision of principals, and training of registered representatives.[109]

90.     Spartan has written policies and procedures specifically outlining its responsibilities regarding Form 211 applications.[110]

91.     Lopez acted as the supervisor or compliance officer with respect to Dilley and Eldred's Form 211 functions.[111]

92.     Per Spartan's procedures, prior to filing the initial Form 211 application, the employee who prepares the application and either the Chief Compliance Officer (Lopez) or "designated officer" (the signing principal) are jointly responsible for preparing and reviewing the due diligence materials and investigating any potential red flags.[112]

---

[107] **Exh. 108**; **Exh. 109**; **Exh. 107**, p. 27-28.

[108] Defendants' Answer DE 46, ¶102.

[109] **Exh. 110** at Appendix A; **Exh. 77**, Lopez Testimony Tr. at 20:12-21:4

[110] **Exh. 110**; **Exh. 111**; **Exh. 833**.

[111] **Exh. 77**, Lopez Testimony Tr. 50:24-51:7; **Exh. 113**, Lopez Deposition Tr. at p. 25-27.

[112] **Exh. 110** (Written Supervisory Manual, Section 22).

93.     The designated officer evidences his review by signing the Form 211.[113]

94.     Spartan's procedures list a number of red flags, including if Spartan "receives substantially similar offering documents from different issuers with" the same attorney, officers, directors, and/or shareholders because "[i]t is not uncommon for the same individuals to be involved in multiple microcap frauds."[114]

95.     Spartan's policies (which incorporates verbatim SEC Release No. 34-41110, 1999 WL 95487) expressly state: "If [Spartan] realizes after reviewing the information for several issuers that the same individuals are involved with these entities, [Spartan] should make further inquiries to determine whether it has a reasonable basis to believe that the issuer information is accurate."[115]  Another red flag is the "transfer of shares by control persons, as gifts, to third persons in order to help create a public market."[116]

96.     The employee and either the Chief Compliance Officer (Lopez) or "designated officer" are also jointly responsible for addressing FINRA's deficiency letters by gathering information from the issuer and otherwise conducting the review required by Rule 15c2-11.[117]  The CCO or "designated officer" is required to initial the deficiency response letters to evidence his review of the response. [118]

---

[113] **Exh. 110** (Written Supervisory Manual, Section 22); **Exh. 77**, Lopez Testimony Tr. at 36:14-37:6.

[114]  **Exh. 114,** (Red Flag Issues at p. 4); **Exh. 110** (Written Supervisory Manual, Section 22 at pp. 24-25); **Exh. 111,** (Written Supervisory Manual at pp. 8-11).

[115] *Id*.

[116] *Id.*

[117] **Exh. 110**; **Exh. 111**; **Exh. 77**, Lopez Testimony Tr. at 37:7-13.

[118] **Exh. 110**; **Exh. 111**.

97.     The Spartan employee involved with the preparation of many of the Forms 211 and Lopez both acknowledged that FINRA deficiency letters raising red flags or other specific questions about the issuer mandated review by the CCO or "designated officer."[119]

98.     Despite Dilley and Eldred's signed certifications on the Form 211s, Spartan's written procedures and the review required under Rule 15c2-11, both Dilley and Eldred ceded all responsibility after the filing of the initial Form 211.[120]

99.     Sometime on or before October 2013, Lopez was tasked with reviewing the FINRA deficiency letters and Spartan's draft responses thereto despite his not being involved in the original Form 211 and a general lack of familiarity with the issuers.[121]

100.    For example, by email dated October 18, 2013, the preparer (a Spartan employee) sent Eldred (the signing principal on the specific Form 211) a FINRA deficiency letter and draft response: "I know that [Lopez] looks at these now, but he's been slammed . . . . Any way you could make an exception and review this one?"[122]

---

[119] **Exh. 8**, Zajonc Tr. at 36:24-37:16, 52:24-56:23; **Exh. 77**, Lopez Tr. at 37:7-45:10.

[120] **Exh. 7**, Dilley Testimony Tr. at 23:16-24:20, 32:21-25, 129:7-13, 135:3-7; **Exh. 6**, Dilley Depo Tr. 254:8-13 (Lopez played a role in the creation of company policies and procedures); **Exh. 86**, Eldred Tr. at 95:4-101:17.

[121] SEC-Spartan-E-0048594; **Exh. 77**, Lopez Testimony Tr. at 200:3-5, 206:10-207:1, 207:18-208:7, 211:24-212:2; **Exh. 8**, Zajonc Testimony Tr. at 243:4-244:22.; **Exh. 77**, Lopez Testimony Tr. at 210:12-212:2 (Lopez would ask issuer for backup documentation on business operations "in cases where a company purports not to be a shell or if they are a shell" to see whether it is a "blank check company, that there's an ongoing effort to further the business plan," but does not recall doing so on First Independence despite FINRA raising a question in the deficiency letter [Exh. 116] approved by Lopez about First Independence's shell status)

[122] **Exh. 117**.

101.    Lopez cursorily reviewed the deficiency letters for at least three Forms 211, approving the response within an hour of receipt and without any apparent inquiry into FINRA's questions (or the issuer more generally) despite FINRA raising specific red flags.[123]

**E.  Island's Policies and Procedures**

102.    Island had new client setup procedures purportedly to ensure that Island acted as agent for the issuer by communicating only with authorized persons as identified in writing by the issuer.[124]

103.    According to Island's policies and procedures, all transfer records and shareholder lists are the "highly confidential" property of the issuer, and "shall not be given to unauthorized parties under any circumstances."[125]

104.    Moreover, Island's policies and procedures stated that "[s]hareholders may inquire about shares they own personally, but may not be provided with information concerning any other shareholder."[126]

105.    Island communicated with Rose regarding the transfer of shareholders' shares and was mailed stock certificates.[127]

---

[123] **Exh. 116** (Lopez approves response within one hour of receipt); **Exh. 118** (35 minutes); **Exh. 119** (within an hour); **Exh. 120**; **Exh. 121**; **Exh. 8**, Zajonc Testimony Tr. at 191:17-20, 213:21-214:7, 216:10-21, 249:4-250:14; **Exh. 77**, Lopez Testimony Tr. at 179:6-11.

[124] **Exh. 122** at 22-24; **Exh. 115**, Kotlova Testimony Tr. at 75:13-77:16, 116:4-117:8.

[125] **Exh. 122** at 22; **Exh. 115**, Kotlova Testimony Tr. at 118:16-20, 147:8-148:5; **Exh. 77**, Lopez Testimony Tr. at 245:12-246:4, 247:15-248:4, 249:12-23, 297:1-9; **Exh. 6**, Dilley Deposition Tr. 262:6-9.

[126] **Exh. 122** at 22; **Exh. 115**, Kotlova Testimony Tr. at 119:20-23, 133:12-15, 193:15-194:1, 226:5-9; **Exh. 77**, Lopez Testimony Tr. at 253:17-25, 295:4-18; **Exh. 6**, Dilley Deposition Tr. 263:7-16.

[127] **Exh. 5,** Rose Depo. Tr. 107:8-13; Example, **Exh. 127** (Certificates mailed to Rose).

106.    Island's policies and procedures also provided that shares without restrictive legend "can NOT be issued in the name of an insider" (emphasis in original),[128] and that Island shall obtain a "list of insiders/control persons" from new clients.[129]

107.    However, Island neither received nor produced any such list of insiders or control persons for any of the Mirman/Rose Companies.[130]

108.    Island's Director of Operations, who trained the processors,[131] understood "insider" included "affiliates" as defined in Rule 144, but believed that someone was an affiliate only if they were a named officer or 15%+ shareholder.[132]

109.    Island's Director of Operations, did not believe that someone with less than 15% could ever be deemed an "affiliate" (despite the "affiliate" definition including those not only controlling an issuer, but also being controlled by or together with an issuer).[133]

110.    Island's Director of Operations reported directly to Dilley.[134]

111.    Island employees do not recall receiving training on recognizing potential red

---

[128] **Exh. 122** at 12; **Exh. 115,** Kotlova Testimony Tr. at 48:4-10 (her understanding of "free trading"); **Exh. 123,** p 19 (IST training material: "Insiders ALWAYS have restricted stock" (emphasis in original)).

[129] **Exh. 122** at 24.

[130] **Exh. 115,** Kotlova Tr. at 92:9-94:16.

[131] **Exh. 115,** Kotlova Testimony Tr. at 264:7-266:2.

[132] **Exh. 115,** Kotlova Testimony Tr. at 56:8-62:5. **Exh. 77,** Lopez Testimony Tr. at 281:5-22; **Exh. 124,** Haskaj Testimony Tr. at 37:15-38:2, 39:25-41:13.

[133] **Exh. 115,** Kotlova Testimony Tr. at 57:25-58:25.

[134] **Exh. 6**, Dilley Deposition Tr. at pp 253:22-25; 254:9-10; **Exh. 115,** Kotlova Testimony Tr. at 40-12:23.

flags involving unregistered distributions.[135]

### III.   <u>MEMORANDUM OF LAW</u>

**A.  The Standard For Granting Summary Judgment**

The SEC should be granted summary judgment as a matter of law where it can show there is no genuine dispute as to any material fact.  *Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co.,* 802 F.2d 1352, 1356 (11th Cir. 1986).  The trial judge must enter summary judgment "if, under the governing law, there can be but one reasonable conclusion." *Anderson v. Liberty Lobby, Inc.,* 477 U.S 242, 250 (1986).  *See also Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) ("'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'") (citation omitted).  For purposes of summary judgment under Rule 56 of the Federal Rules of Civil Procedure, "material"  means a fact that is essential to the proper disposition of the claim.  *Anderson,* 477 U.S. at 248.  A "genuine" factual dispute requires more than a "mere scintilla" of evidence.  *Id.* at 252.  Once the Commission establishes the absence of a genuine issue of material fact, the Defendants must provide "specific facts" - going beyond the pleadings - showing there is a genuine issue for trial.  *Celotex  Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson,* 477 U.S. at 250-51.  Here, the undisputed facts set forth in the Commission's Statement of Material Facts and law in this memorandum yield only one reasonable conclusion: the Defendants violated the federal securities laws.

---

[135] **Exh., 125**, Jarman Testimony Tr. at 70:13-18, 78:19-79:1; **Exh. 126**, Long Testimony Tr. at 27:25-29:20, 38; **Exh. 124**, Haskaj Testimony Tr. at 85:15-87:13.

**B. Spartan, Island, and Dilley Violated Section 5 of the Securities Act of 1933**

The Court should grant summary judgment against Spartan, Island, and Dilley based upon the uncontroverted evidence, testimonial and documentary, with respect to the charges brought against them under Section 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77e(a) and (c).

Sections 5(a) and (c) of the Securities Act prohibit the offering or selling of securities in interstate commerce that are not registered with the Commission unless an exemption is available. *SEC v. Continental Tobacco Co.*, 463 F.2d 137, 155 (5th Cir. 1972). The purpose of the registration requirement is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions. *SEC v. Lybrand*, 200 F. Supp.2d 384, 392 (S.D.N.Y. 2002).

To establish a prima facie case for a Section 5 violation, the Commission must show the defendant, directly or indirectly: (1) sold or offered to sell securities; (2) through the use of interstate transportation or communications[136]; and (3) when no registration statement was in effect as to the transaction. *SEC v. Calvo*, 378 F.3d 1211, 1214-15 (11th Cir. 2004) (citations omitted). A defendant violates Section 5 if he is a "necessary participant" in the transaction or engages in steps necessary to complete the distribution of shares to the public. *Id*. at 1215; *SEC v. Friendly Power*, 49 F. Supp.2d 1363, 1372 (S.D. Fla. 1999). Liability for violations of

---

[136] The Defendants used the facilities of interstate commerce. This requirement of a Section 5 violation is broadly construed to include tangential mailings or intrastate telephone calls. *See SEC v. Softpoint, Inc.*, 958 F. Supp 846, 859-62 (S.D.N.Y. 1997) (citing *U.S. v. Wolfson*, 405 F.2d 779, 783-84 (2d Cir. 1968) ("construing Section 5(a)(1) to prohibit use of the mails to send stock offers, to transmit sales literature, to ship securities certificates after sale, to remit the proceeds to the seller, to send buyers' confirmation slips, and to effect more tangential communications").

Section 5 extends to both direct and indirect participants, such as those who have "engaged in steps necessary to the distribution of [unregistered] security issues." *SEC v. Chinese Consol. Benev. Ass'n, Inc.*, 120 F.2d 738, 741 (2d Cir. 1941); *see also SEC v. Murphy*, 626 F.2d 633, 650-52 (9th Cir. 1980) (an indirect participant, who has not himself passed title to an unregistered security, may nevertheless be liable for its offer or sale. The "necessary participant test…essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place" – in other words, whether the defendant's acts were a "substantial factor in the sales transaction.") A defendant does "not have to be involved in the final step of the distribution to have participated in it." *Zacharias v. SEC*, 569 F.3d 458, 465 (D.C. Cir. 2009); *SEC v. Sierra Brokerage Servs.*, 608 F.Supp.2d 923, 950 (S.D. Ohio 2009) (sale of shell company by reverse merger "could inevitably lead to a public distribution").

Participation in the Form 211 process can constitute the participation necessary for Section 5 liability. *See SEC v. Farmer*, 2015 WL 5838867, *18 (S.D. Tex. Oct. 7, 2015) (defendant who, among other things, provided false information in Form 211 process was a "necessary participant" liable under Section 5); *SEC v. Husain*, 2017 WL 810269, at *5-6 (C.D. Cal. Mar. 1, 2017) (finding where Form S-1 registration statement was in place, subsequent sales to shell company purchasers were not exempt from registration and supported the Commission's complaint against attorney for violation of Section 5 of the Securities Act).

The registration requirements of Section 5 apply to transactions, not to securities as a whole. The "registration of a security is transaction-specific." *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998). "When a registration statement is filed, it is that specific offering of securities that is registered; the securities themselves are not considered registered for all times

  
and all purposes." *SEC v. Caledonian Bank Ltd.*, 145 F. Supp. 3d 290, 306 (S.D.N.Y. 2015)

(citing *Cavanagh*, 155 F.3d at 133 (registration statement covering issuance to management

did not cover reoffering of shares to other persons)). "If a later offering occurs, the securities

sold in that offering must either be 'registered, exempt, or illegal.'" *Id.* (quoting T. Hazen, 1

*Law of Securities Regulation* § 4.1). Thus, even though the initial purported sales to friends

and family were registered pursuant to the Forms S-1, any subsequent transactions would

separately have to satisfy Section 5. "It is of no moment whether the initial offering was

covered by a registration statement," *id.*, because the control people (with the assistance of

Spartan, Island and Dilley) resold the securities in offerings without the separate registration

statements for that separate transactions. (SF ¶9, 15, 34-40)[137]

There is no requirement to show scienter in Section 5 cases.[138] Section 5 is a strict

liability statute and state of mind is irrelevant. *SEC v. Empire Develop. Group, LLC*, 2008

WL 2276629 at *7 (S.D.N.Y May 2008) (ignorance of the registration requirement is not a

proper Section 5 defense); *Friendly Power*, 49 F. Supp. 2d at 1367 (neither negligence nor

---

[137] Citation to the Commission's Statement of Material Facts are designated as "(SF ¶___)".

[138] Case law around the country is replete with decisions holding that Section 5 is a strict liability provision. *See, e.g., SEC v. Universal Express, Inc.*, 475 F. Supp. 2d. 412, 434 n. 15 (S.D.N.Y. 2007) ("No showing of scienter or negligence is necessary to prove a Section 5 violation, as the provision carries strict liability"), *aff'd, SEC v. Altomare*, 300 Fed.App. 70 (2d Cir. 2008); *SEC v. Sierra Brokerage Services, Inc.*, 608 F. Supp. 2d 923, 939 (S.D. Ohio 2009) ("Section 5 imposes strict liability on sellers of securities"), *aff'd*, 712 F.3d 321 (6th Cir. 2013); *SEC v. Arcturuse Corp.*, 171 F. Supp. 3d 512, 531 (N.D. Tex. 2016) ("Section 5 violations are strict liability offenses and the defendant's state of mind is not a consideration"); *SEC v. Cook,* No. 1:13–cv–01312–SEB–MJD, 2015 WL 5022152, at *23 (S.D. Ind. Aug. 24, 2015)) ("Section 5 imposes strict liability on sellers of unregistered securities regardless of intent, fault, or negligence").

scienter is an element of a prima facie case under Section 5).[139]

Here, the undisputed facts show that Spartan, a broker-dealer, and Dilley, its registered principal and registered representative, were necessary participants and substantial factors in the offer or sale of purportedly unrestricted stock of the Mirman/Rose Companies without a valid registration or exemption.  (SF ¶1, 6, 15-56).  With the assistance of the Defendants, Mirman and Rose created and sold at least 14 undisclosed "blank check" companies in assembly-line fashion. (SF ¶9).  To complete their fraudulent scheme, Mirman and Rose had to be in a position to control all or nearly all of the publicly traded shares of the Mirman/Rose Companies, so that when they later sold the companies, part of the sale would include the undisclosed transfer of the unrestricted shares to the purchaser. (SF ¶9).  Mirman and Rose prepared false and misleading Form S-1 registration statements depicting the companies as actively pursuing a various business plans, when the only plan from the start was for the company to be sold.  (SF ¶11).  Mirman and Rose enlisted the assistance of straw sole officers to serve as CEO of the companies in name only because Mirman and Rose retained control of the companies.  (SF ¶ 9-10).

The Mirman/Rose Companies could not have become marketable public vehicles without the services of Spartan and Dilley.  After the Form S-1 was effective, Mirman and Rose then directed the filing of Forms 211 with FINRA in order to obtain approval for the sale of the shares of these companies to the public.  (SF ¶14).  Spartan and Dilley prepared and filed at least 14 Forms 211 which were necessary for the securities of the Mirman/Rose Companies

---

[139] While not necessary to prove a claim for Section 5 violations, the evidence in this case establishes that the Defendants acted knowingly or at least recklessly in the actions taken in this case.

to become quoted on the over the counter market.  (SF ¶6).  Spartan and Dilley also assisted the Mirman/Rose Companies with obtaining DTC eligibility, which made the companies more valuable to shell buyers.  (SF ¶25-27).  Ultimately, Mirman and Rose quickly consummated reverse mergers by which all shares of the issuer were sold together for a single cash price. (SF ¶15).

At the direction of Mirman and Rose, Spartan and Dilley submitted Forms 211 to FINRA for 14 Mirman/Rose Companies, yet all the while hiding Mirman and Rose's involvement with the companies. (SF ¶16-21).  For example, Spartan and Dilley falsely represented to FINRA that the sole officer of the various Mirman/Rose Companies contacted Spartan to complete the Form 211, however, in actuality, the sole officers had never communicated with Spartan or Dilley, and had never heard Dilley's name. (SF ¶20-21).

Similarly, FINRA also requested information regarding the solicitation of shareholders of the Mirman/Rose Companies. (SF ¶22). Spartan responded to FINRA by submitting shareholder charts (provided and prepared by Mirman or Rose) stating that the sole officer had solicited each shareholder as a "friend," and stated the same solicitation success rate (24 solicited, 24 invested).  (SF ¶23). However, this was false because all but one of the sole officers did not solicit any shareholder, and they knew virtually none of them. (SF ¶24).

Dilley and Spartan disclosed Mirman's name in one Form 211 which resulted in additional inquiry by FINRA.  (SF ¶52).  By letter dated December 3, 2013, FINRA asked Spartan for a "detailed explanation of the Issuer's relationship with Al Mirman." (SF ¶53). Instead of answering truthfully, Spartan sent FINRA's deficiency letter exclusively to Mirman to address the issue.  (SF ¶54).  Spartan ultimately responded to FINRA with a lie that Mirman

had referred the issuer but that Spartan "does not have any other relationship with Al Mirman." (SF ¶55).

Dilley and Spartan were aware that while they assisted Mirman and Rose with the Form 211 process and obtaining DTC eligibility, Mirman and Rose were looking to sell the companies. (SF ¶27-31, 49). For example, Dilley attempted to arrange a sale of the company Kids Germ for Rose shortly after the Form 211 clearance. (SF ¶49). In the case of the second Mirman/Rose Company, Obscene Jeans, one month after FINRA cleared the Form 211, Rose sent Dilley a term sheet for Obscene Jeans in contemplation of its sale. (SF ¶27-28). Rose also asked Dilley for Island, its transfer agent company, to act as escrow agent for the sale of Obscene Jeans, showing clearly that Dilley, Spartan, and Island, were all aware of Rose's intention to sell Obscene Jeans shortly after clearance of the Form 211. (SF ¶29-31).

Island and Dilley also played an important role with respect to the issuance and transfer of the restricted securities of the newly quoted companies. (SF ¶29-40). Island and Dilley's actions went beyond arms-length stock processing given they -- at the very least -- ignored red flags that shell purchaser were acquiring securities in bulk from affiliates and publicly reselling those securities without satisfying all the conditions in Rule 144 or any other possible exemption. (SF ¶23-56). *See Wassel v. Eglowsky*, 399 F. Supp. 1330, 1367-68 (D. Md. 1975) (transfer agent has duty to forestall illegal distribution which it knows or has reason to know is occurring), *aff'd on opinion below*, 542 F.2d 1235 (4th Cir. 1976).

Dilley and Island ignored red flags such as:

(1) Mirman and Rose using the funds of one company to pay the expenses of a different company, without question or explanation (SF ¶32-33);

(2) despite internal policies prohibiting sharing information about shareholders and treating that information as "highly confidential" Mirman and Rose presented and received all originally issued certificates in the names of 25 shareholders (SF ¶103, 105);

(3) Mirman and Rose requested multiple attestation letters from Island in the process of selling the issuers (SF ¶ 35-38); and

(4) Island received requests for the transfer of all the issued securities by one law firm representing a handful of buyers (with the same counsel and buyers across multiple issuers) who possessed all originally issued certificates with blank stock powers (SF ¶34, 40).

Dilley and Island also failed to respond to red flags indicating that the sales involved securities owned and/or controlled by affiliates that could not avail themselves of an exemption from registration.   In doing so, Dilley and Island did not follow Island's own policies and procedures prohibiting the preparation of unlegended stock certificates for sales by affiliates. (SF ¶106-109).   Inadequate policies, procedures and training contributed to Island's ignoring red flags that should have alerted it that its own conduct violated Section 5. (SF ¶102-111). For example, Island's policies and procedures provided that shares without restrictive legend "can NOT be issued in the name of an insider" (emphasis in original), and that Island shall obtain a "list of insiders/control persons" from new clients.  (SF ¶106).  However, Island neither received nor produced any such list of insiders or control persons for any of the Mirman/Rose Companies.  (SF ¶107).

Island's Director of Operations (who reported to Dilley) trained the processors, believed that "insider" included "affiliates" as defined in Rule 144, but mistakenly understood that someone was an affiliate only if they were a named officer or 15%+ shareholder. (SF ¶108,

110).  Island's Director of Operations, also mistakenly believed that someone with less than 15% could ever be deemed an "affiliate" (despite the "affiliate" definition including those not only controlling an issuer, but also being controlled by or together with an issuer). (SF ¶109). By rubber-stamping these issuances and transfer requests, despite these red flags, Island and Dilley repeatedly played a significant role in the unlawful distributions of Mirman/Rose Company shares in violation of Section 5.  (SF ¶111).

Having met its burden to establish a prima facie violation, the burden shifts to the Defendants to prove the securities qualified for a registration exemption.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *Doran v. Petroleum Management Co.*, 545 F.2d 893, 899 (5th Cir. 1977).  The Defendants have not pleaded any exemptions as an affirmative defense, nor have they put forth any evidence that the securities were sold pursuant to any exemptions.  Accordingly, the Court should grant summary judgment for the Commission on Count XIV of the Complaint alleging Section 5 violations.

### C.  Violations of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act

The Commission is also entitled to summary judgment on Count I of the Complaint, which alleges Spartan violated Section 15(c)(2) and Rule 15c2-11 of the Exchange Act and Count II which alleges Dilley, Eldred and Lopez aided and abetted Spartan in violating those sections.  Section 15(c)(2)(A) of the Exchange Act generally prohibits broker-dealers from inducing or attempting to induce the purchase or sale of any security by means of any fraudulent, deceptive, or manipulative act or practice, or making any fictitious quotation. Section 15(c)(2)(D) authorizes the Commission to ". . . by rules and regulations define, and

prescribe means reasonably designed to prevent, such acts or practices as are fraudulent, deceive, or manipulative and such quotations as are fictitious."

Violations of such rules and regulations do not require a finding of scienter. *See In re Franklin N. Wolf*, Exchange Act Rel. No. 36523, 1995 WL 704151 (Nov. 29, 1995) (scienter not required under Rule 15c2-6 because it is a rule "reasonably designed to prevent" manipulative acts). *Cf. United States v. O'Hagan*, 521 U.S. 642, 753 (1997) (Commission may prohibit acts "not themselves fraudulent" under Section 14(e) of the Exchange Act (analogous to Section 15(c)(2)(D))); *Schreiber v. Burlington Northern Inc.*, 472 U.S. 1, 11 n.11 (1985) ("reasonably designed" language of Section 14(e) gives the Commission "latitude to regulate nondeceptive activities" as a "means of preventing manipulative acts"). To establish aiding-and-abetting liability, the Commission must show the Defendants knowingly or recklessly provide substantial assistance to another person in violation of any provision. *SEC v. Goble*, 682 F.3d 934, 947 (11th Cir. 2012).

Pursuant to this authorization, the Commission adopted Rule 15c2-11, which requires broker-dealers to gather and review specified information about the issuer prior to initiating or resuming quotations in its securities. A broker-dealer seeking to be the initial market maker (i.e. requesting to make unpriced quotations in a quotation medium) must file a Form 211 with FINRA evidencing compliance with Rule 15c2-11. See Forms 211 referenced in SF ¶20 and 64.

Rule 15c2-11 requires broker-dealers to obtain information required by subsection (a) (e.g. Forms S-1 and periodic reports). Considering that information, plus "any other material information (including adverse information) regarding the issuer" in its possession, Rule 15c2-

11(b)(3), the broker-dealer must have a reasonable basis to believe that the information required by subsection (a) is accurate in all material respects and its source is reliable.  In other words, Rule 15c2-11 prohibits blanket reliance on public filings.  Rather, the broker-dealer must review the required information "in the context of all other information about the issuer in its knowledge or possession."  Publication or Submission of Quotations Without Specified Information, Exch. Act Rel. No. 41110, 64 FR 11124, 11149 (Mar. 8, 1999).  The broker-dealer must be alert to any "red flags," for example, material inconsistencies between that information and other information in the broker-dealer's knowledge or possession.  *Id.* at 11147-49.  If red flags appear at any stage of the review process, the broker-dealer "cannot" publish quotations unless and until those red flags are reasonably addressed.  *Id.* at 11149.

Spartan violated, and Dilley, Eldred and Lopez aided and abetted violations of, Rule 15c2-11 by failing to have a reasonable basis under the circumstances for believing that the Rule 15c2-11(a) information (including the Forms S-1 and periodic reports) was accurate in all material respects and its source was reliable. (SF ¶9-88).  In fact, Spartan and its principals had reason to believe the information was *not* reliable yet failed to report that information on the Form 211 or to otherwise follow up on glaring red flags.  (SF ¶12-88).

Pursuant to Rule 15c2-11 Spartan and its principals were obligated to, but failed to address red flags and other adverse information in its possession about the issuer before initiating price quotations.  For example, striking similarities existed in the public filings across the issuers which, combined with Spartan's awareness of Mirman and Rose's control, substantially cast doubt on the accuracy of the filings and should have raised red flags.  (SF ¶12-24, 41).  Spartan never questioned the fact that each Mirman/Rose Company had a similar

profile, much of which derived from the substantially similar Forms S-1 (1) the same number of shareholders (24); (2) the same number of issued shares; (3) the same number of shares owned per shareholder; (4) the same offering size; and (5) similar annual budgets (for effectuation of vastly different business plans). (SF ¶41).

Additionally, even though Dilley and Spartan took direction from Mirman and/or Rose when completing the Forms 211, Spartan did nothing to confirm the authority of Mirman and Rose to act for the Mirman/Rose Companies (i.e. whether they were a reliable source of information) – nor did it receive any documentation establishing that authority.  (SF ¶17-18).

Spartan then created a gaping hole in its review process by the fact that Dilley and Eldred, who were familiar with the issuers and signed the Forms 211, ceded all responsibility after the initial filing of the Form 211 application.  (SF ¶98).  Dilley and Eldred left it to Lopez and other employees to address FINRA's deficiency letters, which frequently raised specific red flags that Spartan was required to address.  (SF ¶45-50, 96-101).   Lopez, registered principal and Chief Compliance Officer of Spartan and the Chief Compliance Officer of Island did not attempt to familiarize himself with the issuers when approving Spartan's responses, and thus had no reasonable basis as to the accuracy of the information or reliability of its source when approving responses to FINRA across multiple Forms 211.  (SF ¶8, 45, 50, 92, 93, 96-101).

As a result, Spartan ignored the substantial similarities among the Forms S-1 that undermined the fundamental premise that each issuer had a specific business plan run exclusively by a different sole officer (versus having no plan or purpose other than being sold

as a public vehicle by Mirman and Rose, or Daniels and Harrison for the benefit of Fan).  (SF ¶9-88).

Moreover, in assessing this Rule 15c2-11(a) information, Dilley, Eldred and Lopez also knew or ignored a number of "red flags" (i.e. "adverse information" per Rule 15c2-11(b) as to the accuracy of the information and reliability of its source.  For example, Dilley knew that Mirman and Rose solicited him to file the Forms 211, and misrepresented to FINRA that it was the sole officers who had done so.  (SF ¶19-21, 42-43, 51-56).

Even when faced with specific questions by a FINRA examiner, Spartan and Dilley continued to misrepresent the facts to FINRA.  (SF ¶42-50).  On November 6, 2013, Rose solicited Dilley to file a Form 211 for a Mirman/Rose Company, Envoy.  (SF ¶42).  In a series of deficiency letters, FINRA repeatedly questioned whether Envoy was related to another Mirman/Rose Company, Kids Germ. (SF ¶44).  Specifically, FINRA asked Spartan for detailed descriptions of any relationship between or among Envoy, Kids Germ, Jocelyn Nicholas (Envoy's sole officer), Mark Nicholas (Kids Germ's sole officer), and Spartan. (SF ¶45).  Dilley's assistant sent Dilley and Lopez a draft response and told them: "I believe Shelly [Rose] sent us this one.  We did a 211 with Mark Nicholas for Kids Germ Defense back in 2010."  Within an hour, Lopez responded to the assistant and Dilley: "I am not familiar with any of those people or that company." (SF ¶45).  Dilley responded: "No idea, just go ahead and send it to the company and see what they come back with." (SF ¶46).  Spartan responded to FINRA that there were no such relationships (other than Jocelyn and Mark Nicholas' marriage) based on a letter provided by Rose and signed by Jocelyn Nicholas.

FINRA inquired a second time for a "detailed description of any **past** relationship

between Jocelyn Nicholas and Kids Germ." (emphasis in original). (SF ¶47).   In response, Spartan submitted a letter signed by Jocelyn Nicholas that she was only a shareholder of Kids Germ.  (SF ¶48).  Spartan failed to investigate these FINRA inquiries, despite the facts readily in its possession that: (1) Spartan filed both the Envoy and Kids Germ Form 211 at Rose's request; (2) Envoy and Kids Germ had 11 shareholders in common (including the sole officers of two other Mirman/Rose Companies) and the same capitalization structure (9,000,000 control block, 3,000,000 Form S-1 shares among 24 shareholders); and (3) Dilley had attempted to arrange a sale of Kids Germ for Rose shortly after the Form 211 clearance.  (SF ¶49).

At least some of these facts were readily available on Spartan's computer network, on which it maintains a specific Form 211 file folder organized by issuer. Rather, Dilley and Lopez responded offhand that they were not familiar with Kids Germ and instructed the assistant simply to see what Envoy says. (SF ¶50).

Dilley also knew of another red flag in that the Mirman/Rose Companies were intended for reverse mergers, including the fact that the first Mirman/Rose Company (Kids Germ) was available for sale shortly after its Form 211 clearance.  (SF ¶49).  Lopez and Dilley also failed to investigate the red flags directly and repeatedly raised by FINRA in the Envoy Form 211. (SF ¶42-48).

Similarly, Spartan and Eldred failed to recognize significant red flags related to the Daniels/Harrison Companies.  (SF ¶57-88).  Daniels and Harrison have been friends with Eldred for at least 10 years and Eldred was aware from the onset that Daniels and Harrison were taking companies public to sell as "OTCBB vehicles." (SF ¶65).  In fact, Harrison and

Eldred's wife had each been the sole officer of a company which had been acquired by reverse merger. (SF ¶66). Eldred even sought guidance from Harrison regarding whether FINRA would grow suspicious if his wife "created another public company." (SF ¶67). Specifically, in November 2010, Eldred asked Harrison whether the head of FINRA's Form 211 group would have any concern if his wife "creates another public company" and Harrison responded: "I don't think so. [Eldred's wife] operated [her prior company] for a couple of years before the acquisition. [Daniels] might know better. We are filing [Dinello/AF Ocean] under my name and it has been two years since [Harrison's other issuer]'s acquisition." (SF ¶67).

Daniels requested Island act as the transfer agent for Dinello/AF Ocean and Spartan also filed the Form 211 for Dinello/AF Ocean. (SF ¶68-69). Spartan misrepresented in the Form 211 that Eldred was contacted by the second officer of Dinello/AF Ocean. (SF ¶70). However, that officer never communicated with Spartan and had never even heard of Spartan or Eldred. (SF ¶70). Spartan also misrepresented that there was no present or future arrangement with respect to the transfer or disposition of any of the registered shares despite Eldred being aware that Dinello/AF Ocean was for sale as a public vehicle soon after FINRA cleared its Form 211. (SF ¶71-72). In an email dated July 20, 2011, Daniels asked Eldred if he knew whether a lawyer "may need a shell for" a reverse merger and indeed on July 22, 2011, Eldred put Daniels in contact with that lawyer for "an OTCBB vehicle that [Daniels] would like to do something with." (SF ¶72-73).

Less than one month later, Daniels, still looking for a buyer for Dinello/AF Ocean, again asked Eldred about "available vehicles for a [reverse merger]" with Dinello/AF Ocean. (SF ¶74). Daniels eventually sold Dinello/AF Ocean to Fan, a fact Eldred learned as early as

41

October 2011.  (SF ¶75).   Selling issuers was quite lucrative.  Daniels and Harrison sold Dinello/AF Ocean, to Andy Fan for approximately $500,000 in his endeavor to amass a roster of public companies for later reverse mergers with Chinese companies.  (SF ¶62).

Daniels and Fan then agreed to create three more public vehicles: Court/ChinAmerica, Wallbeds/Sichuan, and TTB/Ibex, and retained Spartan to file Forms 211 for the companies. (SF ¶63-64).  Eldred did not review the Forms S-1 in connection with the Forms 211 – rather he believed Rule 15c2-11 required only that Spartan possess certain documents that it had received from a reliable source. (SF ¶80).

Eldred sought to use one of the Daniels/Harrison Companies for his own purposes even while the Form 211 Eldred had signed was pending (in contravention of the purported business plan as set forth in the Form S-1). (SF ¶78).  In an email Daniels told Eldred: "Don't forget that Andy [Fan] has three companies that he is doing registrations on including the 211 we filed on Court.  So there should be plenty of room for you to have a meeting of the minds with Andy [Fan].  Court is a super clean company that is a non-shell and the assets are fully depreciated so there can be a disposal of assets for a real clean deal if needed.  Absolutely no debt or problems."  Eldred responded: "I would be happy to use Court as a vehicle."  (SF ¶78). At the same time, Eldred negotiated with Fan to use Dinello/AF Ocean as a "public OTCBB shell" for a potential reverse merger with Spartan's parent company.  Specifically, by email dated July 11, 2012, Eldred wrote Fan (copying Daniels and Harrison): "The net result is that you and your investors get an equity interest in our business, and you end up with the same basic public OTCBB shell that you have now." (SF ¶76).

42

Eldred and Spartan also ignored red flags when responding to FINRA's deficiency letters. (SF ¶81-87).  Eldred signed the Form 211 for TTB/Ibex and received draft deficiency letter responses regarding the company.  (SF ¶81). FINRA's deficiency letter raised eight detailed questions, including: (1) all relationships among the shareholders and officers; (2) present or future arrangements by which any person other than the named shareholder has control over the Form S-1 shares; (3) confirmation of the Form 211's representation that TTB/Ibex has no intent either to effect a sale of shares or engage in change-of-control transaction; and (4) TTB/Ibex's shell company status. (SF ¶82).  Rather than conduct any of its own due diligence Spartan cut-and-pasted a response letter drafted by Catherine Bradaick, an employee of Dinello/AF Ocean and shareholder of TTB/Ibex, which listed Fan as an officer of TTB/Ibex as of September 2013 and the shareholders (the vast majority of which were shareholders of Dinello/AF Ocean, Court/ChinAmerica, and Wallbeds/Sichuan) as friends of Daniels.  (SF ¶82-83).  In its response to FINRA, Spartan failed to disclose any aspect of the Daniels/Fan/Spartan relationship (despite Eldred knowing that Daniels had prepared three Forms S-1 for Fan). (SF ¶84).

Finally, in July 2014, Harrison contacted Eldred to file a Form 211 for PurpleReal, the last relevant issuer.[140]  (SF ¶85).  After Spartan submitted the Form 211, FINRA requested proof of payment by the shareholders (many of whom also appeared as shareholders of the other Daniels/Harrison Companies), and Spartan learned that Daniels and Harrison had paid for all the shares.  (SF ¶86).  Daniels routinely paid for the shares of approximately 30 friends and family in privately-held companies he acquired.  (SF ¶59).  Nevertheless, Eldred approved

---

[140] The SEC issued a stop order against PurpleReal.  (SF ¶88).

Spartan's response to FINRA which misrepresented that the shareholders had purchased their shares and submitted checks to the issuer.  (SF ¶87).

Lopez was Spartan's Chief Compliance Officer and the principal responsible for effectuating its extensive written policies and procedures applicable to Form 211 applications. (SF ¶89-92).  Lopez knowingly or recklessly ignored those procedures (including his own personal obligations thereunder) and the other requirements inherent in Rule 15c2-11, including failing to conduct any investigation or inquiry into red flags explicitly raised by FINRA in at least 7 deficiency letters and other adverse information in Spartan's possession, or even to familiarize himself with the issuers.  (SF ¶89-101).

Lopez was tasked with reviewing the FINRA deficiency letters and Spartan's draft responses thereto despite his not being involved in the original Form 211 and a general lack of familiarity with the issuers.  (SF ¶99).   For example, by email dated October 18, 2013, a Spartan employee sent Eldred (the signing principal on the specific Form 211) a FINRA deficiency letter and draft response stating: "I know that [Lopez] looks at these now, but he's been slammed . . . .  Any way you could make an exception and review this one?"  (SF ¶100).

Additionally, Lopez only cursorily reviewed the deficiency letters for at least three Forms 211, approving the response within an hour of receipt and without any apparent inquiry into FINRA's questions (or the issuer more generally) despite FINRA raising specific red flags. (SF ¶101).

As a result of the conduct set forth above, Spartan violated Section 15(c)(2) and Rule 15c2-11 of the Exchange and Dilley, Eldred and Lopez aided and abetted Spartan in violating those sections as they were a substantial factor in Spartan's failure to (among other things)

have a reasonable basis for believing that required information about the Mirman/Rose Companies and Daniels/Harrison Companies was accurate and from a reliable source despite a host of red flags to the contrary.

## IV.   <u>Conclusion</u>

Based on the foregoing, the Commission respectfully asks the Court grant this motion and enter partial summary judgment[141] on Counts I and II of the Complaint, alleging violations of 15(c)(2) and Rule 15c2-11 of the Exchange Act, and Count XIV alleging violations of Sections 5(a) and 5(c) of the Securities Act.

<div style="margin-left:50%">

Respectfully submitted,

By: <u>*s/Wilfredo Fernandez*</u>
Wilfredo Fernandez
Senior Trial Counsel
Fla. Bar No. 142859
Telephone: (305) 982-6376
Facsimile: (305) 536-4154
E-mail:  Fernandezw@sec.gov

Christine Nestor
Senior Trial Counsel
Fla. Bar No. 597211
Telephone: (305) 982-6367
Facsimile: (305) 536-4154
E-mail:  nestorc@sec.gov

Alise Johnson
Senior Trial Counsel
Fla. Bar No. 0003270
Telephone: (305) 982-6385
Facsimile: (305) 536-4154
E-mail: johnsonali@sec.gov

</div>

August 21, 2020

---

[141] The Commission seeks permanent injunctive relief, civil penalties, penny stock bars against Spartan, Dilley, Eldred, and Lopez and, disgorgement against Island.  The Commission believes it appropriate to address the issue of remedies after liability has been determined.

**ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served as

indicated below on this 21st day of August 2020 upon the following:

Caleb Kruckenberg, Esq.
Kara Rollins, Esq.
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC. 20036
Email: <u>caleb.kruckenberg@ncla.legal</u>

*Counsel for Spartan  Securities Group, LTD., Island Capital Management LLC., Carl E.
Dilley, Micah J. Eldred and David D. Lopez*
Via email

<u>*s/Wilfredo Fernandez*</u>
Wilfredo Fernandez

46