IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

U.S. SECURITIES AND EXCHANGE
COMMISSION,

      CASE NO.: 8:19-cv-448-VMC-CPT

    Plaintiff,

    v.

SPARTAN SECURITIES GROUP, LTD.,
ISLAND CAPITAL MANAGEMENT LLC,
CARL E. DILLEY, MICAH J. ELDRED and
DAVID D. LOPEZ,

    Defendants.
_____/

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
RESPONSE AND OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE***

**I.    INTRODUCTION**

In their Motion *in Limine* (D.E. 124), Defendants Spartan Securities Group, Ltd. (Spartan), Island Capital Management LLC d/b/a Island Stock Transfer (Island), Carl E. Dilley, Micah J. Eldred and David D. Lopez (collectively "Defendants") seek to exclude probative evidence, including widely used investment terms, relevant to prove Plaintiff Securities and Exchange Commission's claims. Defendants fail, however, to show that such evidence is irrelevant or inadmissible. Further, Defendants offer only broad assertions but little to no analysis as to why this probative evidence is "substantially outweighed" by the possibility of unfair prejudice or juror confusion. Thus, for the reasons set forth in greater detail below, Plaintiff respectfully requests that the Court deny the Defendants' Motion.

1

## II.  LEGAL STANDARD

Rule 403 of the Federal Rules of Evidence allows relevant evidence to be excluded only "if its probative value is **substantially outweighed** by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403 (emphasis added).  Rule 403 requires "unfair prejudice," which means "an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403, Advisory Committee Notes; *see also United States v. Allen*, 341 F.3d 870, 886 (9th Cir. 2003). Indeed, most evidence is prejudicial to the party against whom it is offered and Rule 403 guards only against "unfair prejudice." *United States v. Benedetti*, 433 F.3d 111, 117-118 (1st Cir. 2005). Thus, excluded evidence "must not only be prejudicial, but be unfairly prejudicial, and not only outweigh relevance but substantially outweigh relevance." *United States v. Candelaria-Silva*, 162 F.3d 698, 705 (1st Cir. 1998).

Courts generally view pre-trial motions *in limine* with disfavor, and as this Court has stated should only be granted where the evidence is clearly inadmissible for any purpose. *See, USAA Gen. Indem. Co. v. Snow*, No. 8:19-CV-944-T-33TGW, 2020 WL 4432429, at *6 (M.D. Fla. July 31, 2020) (quoting *In re Seroquel Prod. Liab. Litig.*, No. 606MD-1769-ORL-22DAB, 2009 WL 260989, at *1 (M.D. Fla. Feb. 4, 2009)) (the court has the power to exclude evidence *in limine* "only when the evidence is clearly inadmissible on *all* potential grounds.").  Absent a showing that meets this high standard, "evidentiary rulings should be deferred until trial so that questions of foundation, relevancy

2

and potential prejudice may be resolved in proper context." *Hawthorne Partners v. AT &T Tech., Inc*., 831 F.Supp. 1398, 1400 (N.D. Ill, 1993).

Here, Defendants have not met their burden of showing that the evidence is not admissible on any permissible ground. Indeed, as shown below, the six areas of evidence Defendants seek to exclude are both relevant and probative to issues in the case, and admission of same will not be substantially outweighed by the dangers of prejudice, confusion, or delay that would warrant their exclusion.

### III. LEGAL ANALYSIS

**1. The Court Should Not Impose a Bar on the Use of the Widely Used Term "Shell Factory"**

As alleged in the Complaint, this action involves Defendants' roles in various fraudulent schemes to manufacture 19 public companies for sale premised on a deceptive public float of purportedly "free-trading" securities. Complaint at ¶3. At the heart of Plaintiff's claims are its allegations that Defendants aided and abetted third parties (Rose, Mirman, Fan, Harrison, and Daniels) in defrauding the investing public into believing that companies owned by those third parties were operating businesses with independent management and shareholders, when in actuality they were mere "shells." Complaint at ¶ 6. As detailed in the Complaint, Defendants took critical steps to advance the fraud and acted in tandem with third parties to provide various services which were critical to the third parties' "shell factories." Complaint at ¶8. This included making false statements and omissions to FINRA regarding the management and shareholders of the shell companies and initiating quotations for these companies. *Id.*

In their motion, Defendants seemingly ignore the lengthy sections of the Complaint titled, **"A. The Mirman/Rose Shell Factory"** and "**B. The Daniels/Fan/Harrison Shell Factory"** that are dedicated to explaining the third parties' "shell factory" operation and Defendants' role in aiding and abetting same. Complaint at ¶¶ 8, 26-35, 100-122. Similarly, in the SEC's expert's Report and Deposition, the terms "shell factory" and "shell company" are used to explain how the Defendants aided the third parties to hide the shell status of the companies and develop the companies into public vehicles with securities eligible for public quotation. *See* D.E. 101, Ex 1, Cangiano Depo. at 16:4-25-17:1-5; D.E. 101, Ex. 2, Cangiano Report at pp. 8-10, 13, 16, 30.

Astonishingly, Defendants now contend that the SEC should be prevented from presenting or even using the term "shell factory" because "it is not a recognized legal or colloquial term" that if used will be unfairly prejudicial and mislead the jury. Defendants' contention is factually incorrect and borders on the absurd. Even if the term were ambiguous, which it is not, its meaning would be an issue for the jury to decide just like any other word in the English language. Contrary to Defendants' arguments, however, the use of "shell factory" and the related labels "shell company" and "shell corporation," are not "made-up terms." Rather, the use of the adjective "shell" is part of the widely recognized lexicon in the investment, regulatory and legal industries to describe companies that have no or nominal business operations or non-cash assets for an extended period of time. As the name implies, these companies are simply empty shells.

Far from being obscure, the term "shell" is widely used, publicized and defined. As Investopedia.com (March 21, 2019) explains:

> A shell corporation is a corporation without active business operations or significant assets. These types of corporations are not all necessarily illegal, but they are sometimes used illegitimately, such as to disguise business ownership from law enforcement or the public. Legitimate reasons for a shell corporation include such things as a startup using the business entity as a vehicle to raise, funds, conduct a hostile takeover or to go public.

Similarly, the term is defined on FINCEN's website:

> The term "shell company," as used herein, refers to non-publicly traded corporations, limited liability companies (LLCs), and trusts that typically have no physical presence (other than a mailing address) and generate little to no independent economic value. [1]

Moreover, there is a long history of the SEC and other regulators issuing multiple Releases and Investor Alerts regarding "shell companies" and how they are favorite vehicles of fraudsters. *See e.g.,* Investor Alert: Dormant Shell Companies-How to Protect Your Portfolio from Fraud dated Oct. 30, 2014, available at https://www.sec.gov/oiea/investor-alerts-bulletins/dormantshell.html; SEC Press Release: SEC Continues Microcap Fraud Crackdown, Proactively Suspends Trading in 255 Dormant Shell Companies, Feb. 3, 2014, available at https://www.sec.gov/news/press-release/2014-21.  Indeed, in 2012, the SEC began "Operation Shell-Expel" a publically touted initiative to fight fraud in microcap stock manipulation through the use of sales of dormant "shells."  *See* SEC Press Release: SEC Suspend Trading in 128 Dormant Shell Companies to Put Them Out of Reach of Microcap Fraudsters, March 2, 2015, available at https://www.sec.gov/news/pressrelease/2015-44.html.

---

[1] *See* "Potential Money Laundering Risks Related to Shell Companies," Nov. 9, 2006. available at https://www.fincen.gov/resources/statutes-regulations/guidance/potential-money-laundering-risks-related-shell-companies.

Nor is the use of the "shell" term inherently "besmirching" or unfairly prejudicial. As argued in the Defendants' motion, the Commission has "recognized that companies and their professional advisors often use shell companies for many legitimate corporate structuring purposes." *Use of Form S-8, Form 8-k, & Form 20-F by Shell Companies*, Release No. 1293, 2005 WL 1667452, at *2 (July 15, 2005). Thus, Defendants' own argument belies their contention that simply using the term "shell" to describe a company or scheme is the type of loaded language that is so unfairly prejudicial that it should be excluded.

Lastly, the Defendants' argument that the term should be excluded because the creation of the shell factories is related to alleged conduct of third parties, and not at issue here, is wrongheaded. The SEC Complaint's specifically alleges that Defendants aided and abetted and acted in tandem with these third parties to defraud the public and furthered the shell factory scheme by signing false applications with regulators. (Complaint at ¶6). That repeated turning of a blind eye and outright assistance given by the Defendants in an assembly line fashion is specifically what is on trial here. A motion *in limine* should not be used to resolve factual disputes or weigh evidence. *See C & E Servs., Inc. v. Ashland, Inc.,* 539 F. Supp. 2d 316, 323 (D.D.C. 2008). Thus, the Court should reject Defendants' thinly veiled attempt to preclude the SEC from arguing its theory of the case: "This Court cannot preclude the Government from presenting its theory of the case, supported by its evidence, any more than it can prevent Defendant from presenting evidence. . . ." *United States v. Scott*, No. 06-20185, 2011 WL 4905522, at *2 (E.D. Mich., Oct. 14, 2011).

Therefore, the SEC should not be prevented from using at trial the term shell or shell factory, in the customary way it has been describing the scheme that happened here.

**2. References to "Pump-and-Dump" Scheme Should be Permitted at Trial.**

Similarly, the Court should reject Defendants' motion to completely preclude the SEC from introducing evidence, statements or opinion referring to "pump and dump" schemes. As noted in the SEC's expert report and frequently in SEC Releases, "fraudsters have been known to use dormant shell companies in pump-and-dump schemes." *See* Investor Alert: Dormant Shell Companies-How to Protect Your Portfolio from Fraud dated Oct. 20, 2014, www.sec.gov/oiea/investor-alerts-bulletins. Although Defendants are correct that this action is not centered around a pump-and-dump scheme, and the SEC has no intention of presenting a tutorial on pump-and-dumps, some evidence or mention of pump-and-dumps may be necessary to explain the overall context of micro-cap manipulation schemes, the red-flags presented by the use of shell companies, and the purpose behind FINRA and SEC rules, applications and exams that apply to broker-dealers in this action. In addition, as Defendants acknowledge, the SEC's Complaint alleges Defendants' actions aided and abetted third parties' fraud including in at least one instance in which a company was used for a pump-and-dump. Complaint at ¶ 94. Thus, evidence of a pump-and-dump should not be simply pushed under the rug.

Clearly, the SEC should not be hamstrung from discussing pump-and-dumps in this context. Defendants have not pointed to any reason why such evidence would be unduly prejudicial or create confusion for the jury. If the SEC does present evidence that mentions a pump-and-dump, Defendants will have the opportunity at trial to point out to the jury that

the SEC did not allege that the Defendants were directly involved in a pump-a-dump, or otherwise distinguish such evidence. Without context, however, Defendants' overly broad request fails to pass the requirements for pre-trial exclusion and should be denied. *Assurance Co. of Am. v. Nat'l Fire & Marine Ins. Co.*, No. 09-1182, 2012 WL 1970017, at *7 (D. Nev. June 1, 2012) (denying motion *in limine* because "the court is unable to fully analyze the relevance and admissibility of evidence in a vacuum, divorced from the context and evidentiary flow of trial").

### 3. The Court Should Not Exclude Evidence Related to Other Companies Not Specifically Named In The Complaint.

As alleged in the Complaint, third parties Mirman and Rose were involved in the creation of several shell companies whose shares were ultimately sold on the public market. Complaint at ¶18, 19. Several of these companies were assisted in gaining access to the public market by Defendants, as detailed on the Complaint, while others were not. Defendants seek to exclude as irrelevant evidence relating to those Mirman and Rose companies that Defendants are not alleged to have assisted. Defendants do not point to specific documents or evidence that they wish to see excluded, but rather broadly assert that any reference to such companies may be prejudicial because Rose and Mirman were criminally prosecuted for their fraudulent scheme involving the shells, so that the mere mention of such other companies may lead a jury to a conclusion of guilt by association.

Defendants' request should be denied as overly broad and unnecessary. Although the SEC does not intend to introduce specific evidence regarding companies not listed in the Complaint, reference to such companies may be included in testimony by third parties, or in documents relating to other actions against Rose, Mirman, Daniels or Harrison. Such

references may be important to putting events and evidence in context or to understanding the prior experiences between the witness and Defendants or for impeachment. *See, e.g., U.S. v. Catalan-Roman*, 585 F.3d 453, 469 (1st Cir. 2009) (extrinsic evidence to impeach witness is admissible where subject matter of testimony is logically relevant to merits of case). As the evidence may be admissible for multiple other purposes, the Defendants' motion to exclude such evidence should be denied. *See USAA Gen. Indem. Co.*, 2020 WL 4432429, at *6 (the court has the power to exclude evidence *in limine* "only when the evidence is clearly inadmissible on *all* potential grounds.").

Defendants will suffer no prejudice if the SEC is able to offer such evidence under these circumstances. If the SEC does so, Defendants will have ample opportunity at trial to note that Defendants did not service those companies. Standing alone, Defendants' broad request, that fails to point to any such documents or specific evidence they believe to be prejudicial, fails to pass the requirements for pre-trial exclusion and should be denied. *Goodman v. Las Vegas Metro. Police Dep't.*, 963 F. Supp. 2d at 1047("evidentiary rulings should be deferred until trial so that questions of foundation, relevancy and potential prejudice may be resolved in proper context.").

4. **Enforcement Action and Consent Agreements with Third Parties Should Be Admitted to Avoid Juror Confusion and as Evidence of Bias.**

As alleged in the Complaint, Defendants aided third-party owners of shell companies, including Mirman, Rose, Daniels and Harrison, to defraud the public into believing that companies owned by those third parties were operating businesses with independent management and shareholders, when in actuality they were mere "shells." Complaint at ¶ 6. As detailed in the Complaint, Defendants acted in tandem with these

third parties to provide various services critical to making the companies' stock available for public sale. Complaint at ¶8.

Defendants now seek to exclude from trial evidence related to a separate action the SEC filed in 2018 against Daniels and Harrison that alleges they committed securities fraud relating to their creation of the shell companies and subsequent public sale of the stock of the shells. *See SEC v. Diane J. Harrison, Michael Daniels,* No. 8:18-CIV-1003-T-23TGW (M.D. Fla. 2018). Several of these companies were the same shells that Defendants helped Daniels and Harrison bring public. The SEC's action against Daniel and Harrison was ultimately resolved when Daniels and Harrison consented to the entry of judgments against them.[2]

Defendants assert that the SEC should be excluded from presenting any evidence, statement, consent agreements or findings regarding the SEC action against Daniels and Harrison's in this action. Indeed, Defendants broadly assert that such evidence should be excluded for any third party settlements, as irrelevant, prejudicial and confusing to the jury. Contrary to Defendants' unsupported claim, however, this evidence is highly relevant and is necessary so that the jury will <u>not</u> be confused and as evidence of witness bias.

**A. The Evidence is Necessary Factual Background to Prevent Juror Confusion.**

Contrary to Defendants' arguments, the fact that there was an action and settlement with Daniels and Harrison is necessary for the jury to understand the factual background of this case, and their consents are therefore relevant. *See* Fed. R. Evid. 401. This evidence

---

[2] The Commission's motion for civil penalties against Harrison and Daniels remains pending.

is necessary to tell the complete story of who the Defendants aided and abetted and the seriousness of Daniels and Harrison's actions. It is well established that it is permissible to introduce settlement evidence "to assist the trier of fact in understanding the factual background of the case. Without evidence of why the other [relevant entities] were not litigants, the jury would be confused and left to speculate." *Haynes v. Manning*, 717 F. Supp. 730, 733 (D. Kan. 1989), *aff'd in part and reversed on other grounds*, 917 F.2d 450 (10th Cir. 1990).

At trial, the SEC will be seeking to prove Defendants aided and abetted Daniels and Harrison's scheme. Without evidence of the SEC's action and settlement against the third parties, the jury may be confused as to why the SEC did not also pursue claims against them. *See Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir. 1984) (co-defendants' settlements admitted as "necessary for the purpose of explaining why those parties were not in court"). Absent this evidence, the jury could also incorrectly conclude that the SEC has engaged in improper selective prosecution or that the activities Defendants are alleged to have aided and abetted was not considered to be misconduct by the SEC. To avoid this confusion and prejudice against the SEC, the facts of Harrison and Daniels' settlement and the existence of the underlying action should be admitted into evidence.

### B. The Evidence is Necessary to Assess Bias and Credibility.

Exclusion of Daniels and Harrison's status as former defendants who entered into a settlement with the SEC would also prevent the jury from fully assessing their credibility and understanding any bias against the SEC. Daniels and Harrison are both likely to be called as witnesses in this matter and their prior regulatory history is relevant to show

11

possible bias. "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel,* 469 U.S. 45, 52 (1984). "Cross-examination pertinent to the credibility of a witness and for the development of facts that may tend to show bias or prejudice should be given the largest possible scope. . . ." *Abeyta v. United States*, 368 F.2d 544, 545 (10th Cir. 1996) (internal quotation marks omitted).  Settlements can demonstrate bias. *See US ex rel. Miller v. Bill Harbert Int'l Constr., Inc*., Civil Action No. 95-1231 (RCL), 2007 WL 851868, at *1 (D.D.C. March 14, 2007) ("[B]oth the existence and terms of settlements . . . are probative of the witnesses' credibility and motivation in testifying[.]"). Courts have also recognized that issues of a witness's credibility are generally relevant. *See, e.g., Tippens v. Celotex Corp*., 805 F.2d 949, 954-55 (11th Cir. 1986).

It is self-evident that the fact that the SEC charged Harrison ad Daniels with violations of the law and exacted settlements from them predisposes them to have bias against the SEC. *See SEC v. Conaway*, 698 F. Supp. 2d 771, 867 (E.D. Mich. 2010) ("In discounting certain of the [former defendant's] testimony, the jury could also consider his potential bias because he had for years been a co-defendant and he settled with the SEC a month before trial because he 'just had enough.'"); *SEC v. Retail Pro, Inc.*, 2011 WL 589828 (S.D. Cal. Feb. 10, 2011) (party could request to introduce evidence of settlements if either settlor testified pursuant to Fed. R. Evid. 408(b), which allows the evidence to be offered to prove a witness's bias or prejudice.); *Reichenback v. Smith,* 528 F.2d 1072, 1076

(5th Cir. 1976) ("existence of a settlement agreement goes directly to the issue of credibility").

To permit the SEC to demonstrate Daniels and Harrison's bias, the SEC should be permitted to introduce into evidence the facts of their settlement and the underlying action with the SEC.

**5. Evidence of Prior Disciplinary Actions Should Be Admitted.**

Contrary to Defendants' assertions, the SEC should not be prevented from presenting evidence related to prior disciplinary actions or investigations taken against Defendants. The evidence is highly probative of Defendants' knowledge of their own regulatory shortcomings, and their prior knowledge of regulatory issues and red flags that they should have been alert to and is not unfairly prejudicial. Such prior actions can be relevant and admissible for a host of reasons and therefore, should not be excluded.

"Evidence that forms integral and natural part of the . . . the circumstances surrounding the offenses for which the defendant was [charged] is admissible even if it tends to reflect negatively on the defendant's character." *U.S. v. Foster*, 889 F.2d 1049, 1053 (11th Cir. 1989) (quotation omitted). Such evidence is admissible as inextricably intertwined with the charged conduct where it "pertain[s] to the chain of events explaining the context, motive and set-up of the crime, [and] is properly admitted if linked in time and circumstances with the charged crime, or forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." *US. v. McLean*, 138 F.3d 1398, 1403 (11th Cir.1998) (internal quotations omitted).

Rule 404(b) provides that evidence of a crime, wrong, or other act "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b) (emphasis added). The rule is "one of inclusion which allows [extrinsic] evidence unless it tends to prove *only* criminal propensity." *United States v. Jackson*, 2012 WL 2513499 at *2 (N.D. Ga. Jun. 28, 2012) (emphasis added) (citing *United States v. Ellisor*, 522 F.3d 1255, 1267 (11th Cir. 2008)). The list of permitted uses in Rule 404(b) "is not exhaustive and the range of relevancy outside the ban is almost infinite." *Id*. (citing several cases); *see also United States v. Cohen*, 888 F.2d 770, 776 (11th Cir. 1989).

In the Eleventh Circuit, evidence of "other acts" is allowed whether the acts occurred before or after the act at issue, "so long as [the other acts are]: (1) relevant to an issue other than the defendant's character; (2) established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act; and (3) the probative value is not substantially outweighed by its undue prejudice and the evidence meets the other requirements of Rule 403." *Jackson*, 2012 WL 2513499 at *2 (citing *United States v. Delgado*, 56 F.3d 1357, 1365 (11th Cir. 1995)).

Here, the SEC may present evidence of Defendants' other acts--namely prior regulatory and disciplinary actions--that show Defendants were informed of prior regulatory weaknesses and issues. This evidence is highly relevant, will be established with sufficient proof, and does not unduly or unfairly prejudice Defendants. Thus, it should be admitted.

6. **Evidence, Statement, Argument, or Opinion Related to Commission Releases Should Not Be Excluded**.

Defendants vaguely request that the Commission should be precluded from presenting evidence, statement, argument, or opinion related to "non-binding guidance that attempts to say what the law means". DE 124, p. 11-12. Defendants do not specify which SEC guidance is the subject of their Motion. The Commission presumes Defendants refer to Securities Exchange Act Release No. 34-29094, 1991 WL 292186 (April 17, 1991) (the "1991 Adopting Release") and Release No. 34-41110, 64 FR 11124-01, 1999 WL 114098 (March 8, 1999) (the "1999 Release") as those Releases have been discussed at length in the parties' summary judgment briefing. Both Releases relate to Rule 15c2-11 of the Exchange Act. The Commission has not charged Defendants with violating its Releases or any guidance, rather the Commission charges Spartan with, among other things, violations of Section 15(c)(2) and Rule 15c2-11 and Dilley, Eldred, and Lopez with aiding and abetting those violations.

While not the basis of the Commission's charges against Defendants, it is undisputed that the Commission's Releases are important and relevant as Spartan incorporated parts of the Releases in its own company policies. Additionally, as set forth in more detail at DE 115, p 15-18, the 1991 Adopting Release was issued contemporaneously with the Rule and as part of a notice-and-comment rulemaking process and indicates the Commission's authoritative understanding of the Rule and is entitled to substantial deference. *Halo v. Yale Health Plan*, 819 F.3d 42, 54 (2d Cir. 2016) ("[t]he timing, formality, and history of the department's interpretation further indicate that the Department's interpretation as contained in the regulation's preamble is entitled to substantial deference. The preamble [was] issued contemporaneously with the regulation

15

and thus demonstrates 'the Secretary's intent at the time of the regulation's promulgation.'") (*citing Gardebring v. Jenkins*, 485 U.S. 415, 430 (1998)). The Second Circuit went on to state that "[i]n addition, the preamble issued as part of a formal notice-and-comment rulemaking, formality that generally entitles an agency's interpretation to greater deference." *Id*. Further, "it does not make sense to interpret the text of a regulation independently from its preamble." *Id*. at 52 (citations omitted).

The 1991 Adopting Release explains that "in its review, the broker-dealer must be alert to any "red flags" (i.e., information under the circumstances that reasonably indicates that one or more of the required items of information is materially inaccurate)." Adopting Release, 1991 WL 292186 at *5. "Red flags" would be indicated, for example, by material inconsistencies in the paragraph (a) information, or material inconsistencies between that information and other information in the broker-dealer's knowledge or possession. *Id*. Significantly, if "red flags" appear at any stage of the review process, *the broker-dealer may not publish quotations* unless and until those "red flags" are reasonably addressed. *Id*. at *6 (emphasis added).

Subsequently, in 1999, the Commission issued the 1999 Release, Release No. 34-41110, 64 FR 11124-01, 1999 WL 114098 (March 8, 1999) titled Publication or Submission of Quotations Without Specified Information. The 1999 Release includes an Appendix "about the nature of the review we expect broker-dealers to conduct under both the current Rule and the proposed amendments." 64 FR at 11128. Spartan found the 1999 Release sufficiently important that it incorporated verbatim the language of the 1999 Release into its own policies. Specifically, the "examples of red flags" found at Appendix

A to the Commission's guidance is copied word for word in Spartan's Written Supervisory Procedures Manual.

Defendants do not assert that the Releases are irrelevant or inadmissible but rather (presuming the Releases are "non-binding") assert that such evidence and opinions is likely to "mislead the jury about what the law means and how that law should be applied to Defendants". DE 124 at 12. In support, Defendants cite Fed. R. Evid. 403, but offer no analysis as to why the probative value of the evidence and opinions related to the Releases is "substantially outweighed" by the danger of misleading the jury. At the very least, even assuming *arguendo* that both Releases are non-binding, they are still relevant and probative to establishing Spartan and its principals, Dilley, Eldred, and Lopez, knew what was required of them by Section 15(c)(2) and Rule 15c2-11 and that they failed to conform with the requisite standard of care. Such evidence further serves to rebut Defendants' argument that they were required to merely gather documents and information purportedly provided from the issuer. The Court will determine after consideration of the parties' proposed jury instructions, whether the Releases, or any incorporated language should be provided to the jury. Any alleged risk of misleading the jury can be resolved with the Court's instructions, and the relevance of the Releases is not substantially outweighed by any purported danger of misleading the jury. Accordingly, Defendants' motion should be denied and evidence, statement, argument, or opinion related to the Commission Releases should be permitted.

## IV.     CONCLUSION

In light of the foregoing, the Commission respectfully requests that the Court deny Defendants' Motion *in Limine* in its entirety. Here, Defendants have not met their burden

of showing that that the evidence is not admissible on any permissible ground, or that admission of such evidence will be outweighed by the dangers of prejudice, confusion, or delay that would warrant their exclusion.

Dated: November 20, 2020                    Respectfully submitted,

By: *s/ Alise Johnson*
Alise Johnson
Senior Trial Counsel
Fla. Bar No. 0003270
Telephone: (305) 982-6385
Facsimile: (305) 536-4154
E-mail: johnsonali@sec.gov

Christine Nestor
Senior Trial Counsel
Fla. Bar No. 597211
Telephone: (305) 982-6367
Facsimile: (305) 536-4154
E-mail: nestorc@sec.gov

Alice Sum
Trial Counsel
Fla. Bar No. 354510
Telephone: (305) 416-6293
Facsimile: (305) 536-4154
E-mail: sumal@sec.gov

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE COMMISSION**
801 Brickell Avenue, Suite 1950
Miami, Florida 33131
Telephone: (305) 982-6300