UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES SECURITIES
& EXCHANGE COMMISSION,

    Plaintiff,

v.                   Case No. 8:19-cv-448-T-33CPT

SPARTAN SECURITIES
GROUP, LTD, ISLAND CAPITAL
MANAGEMENT, CARL DILLEY,
MICAH ELDRED, and DAVID LOPEZ,

    Defendants.

_____/

## ORDER

    This matter comes before the Court pursuant to Defendants Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, and Spartan Securities Group, LTD's Motion for Summary Judgment, (Doc. # 102) and Plaintiff Securities and Exchange Commission's Motion for Partial Summary Judgment. (Doc. # 103). For the reasons discussed below, both Motions are denied.

### I.   Background

    The Securities and Exchange Commission (SEC) initiated this action against Spartan, Island, Dilley, Eldred, and Lopez (collectively, "Defendants"). (Doc. # 1). The SEC

accuses Defendants of engaging in two separate microcap fraud schemes from approximately December 2009 through August 2014, in violation of the Securities Act of 1933 (Securities Act) and the Securities Exchange Act of 1934 (Exchange Act). (Id.). As a one-stop shop for microcap securities, the SEC alleges that Defendants helped make public the shares of nineteen undisclosed blank check companies. (Id. at ¶¶ 2-6).

### a. Defendants

Spartan is an inactive broker-dealer located in Clearwater, Florida. (Doc. # 102-2 at 14:12-14, 21:1-20). Island is a transfer agent that operates out of the same building. (Id. at 21:1-20, 38:20-25). Both companies are owned by the same parent holding company, Connect X Capital Markets, LLC. (Id. at 17:13-22).

From December 2009 through August 2014, Dilley, Eldred, and Lopez were principals of Spartan. (Id. at 24:15-25:6). Additionally, Dilley served as Island's president (Doc. # 102-10 at 23:12-24:2), Eldred as its CEO (Doc. # 1 at ¶ 16; Doc. # 46 at ¶ 16), and Lopez as its chief compliance officer. (Doc. # 102-18 at ¶ 2). Lopez also served as Spartan's chief compliance officer. (Doc. # 102-2 at 23:9-11).

### b. **Overview of the alleged microcap schemes**

Alvin Mirman and Sheldon Rose pled guilty in 2016 to conspiracy to commit securities fraud based on their involvement with fourteen blank check companies (the "Mirman/Rose companies"). (Doc. # 104-5; Doc. # 104-6). A blank check company is a company that either has no specific business plan or purpose or has indicated its business plan is to engage in a merger. 17 C.F.R. § 230.419(a)(2). Mirman and Rose both admitted to working with conspirators to recruit a straw CEO for each of these fourteen companies. (Doc. # 104-5 at 10; Doc. # 104-6 at 10). According to Mirman, the conspirators would create the name of the company, obtain state incorporation documents, and file for a tax identification number in the name of each company, all using the name of the straw CEO as the listed owner. (Doc. # 104-5 at 11). The conspirators would also cause the straw CEO to open a bank account in the name of the company using the straw CEO as a listed signatory. (Id.). In reality, the bank account was controlled by the conspirators and was not accessed by the straw CEO. (Id.).

For each of the Mirman/Rose companies, the conspirators would register the company with the SEC using the Form S-1 process. (Id.). During this process, the conspirators

represented to the SEC that each company had a legitimate business plan. But "[t]hese representations were all false and misleading and were intended to deceive the SEC and the public in order to obtain effective registration of the company." (Id. at 12). Each company was in fact a blank check (or shell) company with no legitimate business purpose or operations. (Id.).

At some point after each company was registered, the conspirators would seek buyers for the company and negotiate a bulk sale of the shares. (Id. at 13). Most often, these sales were in the form of reverse mergers, by which all shares of the issuer were sold together for a single cash price. (Id.).

These resales themselves were disclosed to the SEC. (Id. at 13). But as part of the resale, restricted securities were also covertly transferred. (Id.). Prior to each resale, the

> conspirators secretly obtained control of all of the purportedly unrestricted shares of the company. The conspirators would negotiate a sale price that included control of the corporate shell as well as the unrestricted stock. The conspirators then conveyed control of the company to a person or entity designated by the buyer, along with the restricted class of shares (that could not be publicly traded). This aspect of the sale to the buyer was disclosed to the SEC and the public, and usually took the form of a "reverse merger." The conspirators would also convey the unrestricted shares (that could be publicly traded) to the

4

> buyer, typically to a separate person or entity
> designated by the buyer. This aspect of the sale
> would not be disclosed to the SEC or the public. In
> this way, the buyer of the shell company secretly
> acquired the unrestricted shares, and could sell
> the shares without disclosure to the SEC or the
> public that the buyer also controlled the company.

(Id.). After each company's shares were sold in bulk, the

conspirators shared in the profits of the scheme. (Id.).

The SEC brought a separate enforcement action against

Diane Harrison and Michael Daniels, a married couple, for

manufacturing and selling five other blank check companies

(the "Harrison/Daniels companies"). SEC v. Diane J. Harrison

et al., No. 8:18-cv-1003-T-23TGW (Doc. # 1) (M.D. Fla. Apr.

25, 2018). Harrison and Daniels did not admit to the SEC's

allegations, but did consent to an injunction. Harrison, No.

8:18-cv-1003-T-23TGW (Doc. ## 139-3; 139-4) (M.D. Fla. Nov.

21, 2019).

The SEC also filed a related cease-and-desist order, by

consent, against Andrew Fan for his involvement with the

Daniels/Harrison companies. In the Matter of Andy Z. Fan

Respondent, Release No. 10487, 2018 WL 1960465 (Apr. 25,

2018). In the order, the SEC states that Fan provided the

capital upfront for three of the Harrison/Daniels companies

to file a Form S-1 registration statement and a Form 211

application to be publicly quoted. Id. at *3. Afterwards, Fan

obtained essentially all the companies' securities through designees, then effectuated reverse mergers without disclosing his role in capitalizing the companies, or his ownership of essentially all securities through nominees. Id. at *1-*4. The SEC entered a penny stock ban against Fan and ordered him to pay a penalty for his role in creating and selling the Daniels/Harrison companies. Id. at *7.

### c. Defendants' participation in alleged schemes

Before a broker-dealer can publicly quote the price of and make a market for a microcap security, the broker-dealer must satisfy Rule 15c2-11 of the Exchange Act, which requires a Form 211 application be submitted to the Financial Industry Regulatory Authority (FINRA). 17 C.F.R. § 240.15c2-11.

Defendants do not dispute that Spartan filed the Form 211 applications for the fourteen Mirman/Rose companies and the five Harrison/Daniels companies, by which the issuers' shares became publicly quoted. (Doc. # 102-18 at ¶¶ 6-7; Doc. # 104-5 at 12-13; Doc. # 104-6 at 11-12). Defendants explain that, as a broker-dealer, Spartan regularly applied to publish quotations for companies. (Doc. # 102-18 at ¶ 5). From 2005 to 2015, Spartan applied to publish quotations for approximately 1,500 issuers. (Id.). The ultimate decision to publish a quotation was made by either Dilley or Eldred. (Id.

at ¶ 12). Spartan frequently declined to publish quotations for issuers, rejecting up to half of all requests it received. (Id. at ¶¶ 5-7). Yet it is undisputed that Spartan agreed to file the Forms 211 for the nineteen Mirman/Rose and Harrison/Daniels companies, and agreed to publish those nineteen companies' stock quotations. (Id.).

Spartan also does not dispute that Mirman and Rose were involved in the Form 211 process. (Doc. # 113 at ¶¶ 17-18). Mirman and Rose held themselves out to Spartan as intermediaries for some of the shell companies. (Doc. # 102-17 at ¶ 4; Doc. # 102-56 at 43:5-20; 56:14-58:7). In that role, Mirman and Rose emailed Spartan requesting Forms 211 and providing information on the issuers (such as business plans and shareholder information) for Spartan to use while filling out the forms. (Doc. # 104-9 at 239:16-240:22; Doc. # 105-8). Harrison was also involved with the Form 211 process, as she approached Eldred to file these forms. (Doc. ## 107-18; 107-19).

Defendants state that once Spartan agreed to file Forms 211 for each of the nineteen companies, it conducted due diligence by gathering all twenty documents required by Rule 15c2-11. (Doc. # 102-18 at ¶¶ 13-14). Spartan also gathered additional information not required by the rule. (Id.).

Once Spartan had all the requisite information, it filled out an issuer's Form 211 and presented the documents to FINRA. (Id.). Dilley signed at least fourteen Forms 211 (Id. at ¶ 9), and Eldred signed three. (Doc. # 107-9 at 7; Doc. # 108-2 at 7; Doc. # 108-8 at 12). According to Mirman, "[t]hese [Form 211] applications, and follow-up documentation submitted to FINRA in support of the applications, contained material false representations and omissions concerning the companies, including the circumstances surrounding the submission of the application and the role of the straw CEO in relation to the company." (Doc. # 104-5 at 12-13).

For some issuers, after receiving the Form 211, FINRA sent Spartan deficiency letters requesting more information. (Doc. # 102-18 at ¶¶ 40-46). Spartan often forwarded the letters to Mirman or Rose, who responded with shareholder information they stated was from the issuer. (Doc. ## 105-8; 105-9; 105-10; Doc. # 102-56 at 56:14-58:7; Doc. # 113-3 at ¶ 4). Spartan used this information to compose its responses to the deficiency letters. (Doc. # 113-3 at ¶¶ 3-5; ## 104-12; 104-13; 104-14; 104-15; 104-16; 104-17; 104-18; 104-19; 104-20; 104-21; 104-22; 104-23; 104-24; 104-25). Eldred approved the response to at least one FINRA deficiency letter. (Doc. # 108-8; 108-9; 108-10). As the chief compliance

officer, Lopez reviewed the deficiency letters for at least three Forms 211. (Doc. ## 108-17; 108-18; 108-19; 108-20).

After obtaining Form 211 clearance, either Spartan or Island prepared applications with the Depository Trust Company (DTC), by which the securities became DTC eligible for electronic clearance, and thus more valuable. (Doc. # 105-14 at 1; Doc. ## 115-6; 115-7; 115-8; 115-9; 115-10; 115-11; 115-12). This application often included attestation letters providing information about the issuer. (Doc. # 102-18 at ¶¶ 53-54). It is undisputed Rose communicated with Spartan about DTC eligibility and the DTC process. (Doc. # 105-14; Doc. # 105-13 at 2).

After each company was Form 211 approved and DTC eligible, it put in a transfer request to Island to sell the shares. Once Island received a transfer request, it gathered the necessary documents verifying the stockholder's ownership of the stock, a stock certificate directing the transfer, and instructions signed by the stockholder directing the transfer. (Doc. # 102-18 at ¶ 50). Island's policies and procedures also provided that Island "shall" obtain a "list of insiders/control persons" from new clients. (Doc. # 108-23 at 23-24). Island never received nor produced any list of

insiders or control persons for the Mirman and Rose companies. (Doc. # 113 at ¶ 19; Doc. # 108-16 at 92:9-16).

After Island gathered the aforementioned documents, Island recorded the transfers, removed the restrictive legends from the shares, and effectuated the bulk issuance and transfer of securities. (Doc. # 102-18 at ¶¶ 55-56).

At the time of the alleged fraud, Spartan principal and Island CEO Eldred had known Harrison and her husband Daniels for around ten years, and Eldred's wife had earlier been a sole officer of an issuer that Harrison helped register and sell. (Doc. # 107-12 at 22:25-23:7; Doc. # 1 at ¶ 103; Doc. # 46 at ¶ 103). Eldred and Harrison emailed about the Form 211 process, (Doc. ## 107-18; 107-19), potential FINRA issues if Eldred's wife created another public company (Doc. # 107-15), whether Eldred knew a lawyer who needed a shell (Doc. # 107-14), and some of Fan's shell companies. (Doc. # 107-10). Eldred also communicated with Fan about using one of his companies as a "public OTCBB shell" for Eldred's personal holding company. (Doc. ## 107-24; 107-25).

Additionally, as President of Island and registered principal of Spartan, Dilley emailed with Mirman and Rose about the Forms 211 (Doc. # 104-9 at 239:16-240:22; Doc. # 105-8; 107-4), DTC eligibility (Doc. # 105-13 at 2),

collecting payments from buyers (Doc. # 105-19), potential buyers, (Doc. # 105-13 at 2), and lost certificates. (Doc. # 106-4). Dilley also agreed for Island to act as an escrow agent in a company's sale, although the sale never occurred. (Doc. # 105-17; Doc. # 113-9 at 157:4-17).

Furthermore, both Mirman and Rose asked Dilley for attestation letters to reassure potential buyers that shares were unrestricted, which Dilley provided. (Doc. ## 105-27; 106-2). Island (through Dilley) attested to potential buyers that "Island [] has not placed any stops or restrictions on the company shareholders free trading positions." (Doc. ## 105-27; 106-2). At the end of the process, Dilley signed the stock certificates selling the issuer's shares. (Doc. ## 105-23; 105-24; 105-25; 105-26).

Based on the aforementioned conduct, the SEC filed a 62-page, 191-paragraph complaint on February 20, 2019. (Doc. # 1). In its complaint, the SEC alleges: (i) Spartan violated Section 15(c)(2) and Rule 15c2-11 of the Exchange Act (Count 1), and Dilley, Eldred, and Lopez aided and abetted those violations (Count 2); (ii) Spartan, Island, Dilley, and Eldred violated — and aided and abetted violations of — Section 17(a) of the Securities Act (Counts 3-4, 8-10); (iii) Spartan, Island, Dilley, and Eldred violated — and aided and

abetted violations of — Section 10(b) and Rule 10b-5 of the Exchange Act (Counts 5-7, 11-13); and (iv) Spartan, Island, and Dilley violated Sections 5(a) and 5(c) of the Securities Act (Count 14).

Both sides now move for summary judgment. (Doc. ## 102; 103). Both parties have responded (Doc. ## 113; 115) and replied. (Doc. ## 118; 119). The Motions are ripe for review.

## II. **Legal Standard**

Summary Judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir.

1997). The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324).

"Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts." Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983). If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference

13

introduces a genuine issue of material fact, the court should not grant summary judgment. Samples ex rel. Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988) (citing Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)).

Finally, the filing of cross-motions for summary judgment does not give rise to any presumption that no genuine issues of material fact exist. Rather, "[c]ross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004); see also United States v. Oakley, 744 F.2d 1553, 1555 (11th Cir. 1984) ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed . . . ." (quotation omitted)).

### III. **Analysis**

Defendants move for summary judgment on all fourteen counts. (Doc. # 102). The SEC moves for summary judgment as to Counts 1 and 2 of the complaint, alleging violations of 15(c)(2) and Rule 15c2-11 of the Exchange Act, and Count 14,

alleging violations of Sections 5(a) and 5(c) of the Securities Act. (Doc. # 103). The Court will address each Motion separately.

### a. **Defendants' Motion**

#### i. **Statute of limitations**

As a preliminary matter, Defendants argue that most of the SEC's claims are time-barred because they are based on conduct that occurred outside the five-year statute of limitations set forth in 28 U.S.C. § 2462. (Doc. # 102 at 19).

The Court addressed this issue at the motion to dismiss stage. (Doc. # 44). "An injunction . . . is not a penalty within the meaning of [Section] 2462." SEC v. Graham, 823 F.3d 1357, 1361 (11th Cir. 2016); see also United States v. Banks, 115 F.3d 916, 919 (11th Cir. 1997) (holding a government action to enjoin future conduct was a claim for equitable relief not subject to Section 2462). Therefore, the Court previously held that Section 2462 does not apply to the SEC's requests for equitable relief. (Doc. # 44 at 21).

Furthermore, the Court held that the SEC's requests for disgorgement and civil penalties, which are covered by Section 2462, are based on a single course of conduct extending through February 2014 for the Mirman/Rose companies

15

and July 2014 for the Harrison/Daniels companies. (Id. at 21-22). "Under the continuing violations doctrine, the statute of limitations is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the limitations period." Nat'l Parks & Conservation Ass'n, Inc. v. Tenn. Valley Auth., 502 F.3d 1316, 1322 (11th Cir. 2007). As this Court previously found, "because some of the SEC's claims are based on scheme liability extending into a period within the statute of limitations, the SEC's relief is not barred by Section 2462." (Doc. # 44 at 22). This conclusion need not be disturbed.

### ii. **Counts 1 and 2**

Defendants seek summary judgment for Count 1, alleging that Spartan violated Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, and Count 2, alleging that Dilley, Eldred, and Lopez aided and abetted those violations.

### 1. **Primary liability for Spartan**

Section 15(c)(2)(A) prohibits broker-dealers from inducing or attempting to induce the purchase or sale of any security by means of "any fraudulent, deceptive, or manipulative act or practice," or making any "fictitious quotation." 1934 Act § 15(c)(2)(A). Pursuant to this section, the SEC adopted Rule 15c2-11, which requires broker-dealers

16

to gather and review certain documents before it publishes a security quotation. 17 C.F.R. § 240.15c2-11. Rule 15c2-11(a) states in relevant part:

> [I]t shall be unlawful for a broker or dealer to publish any quotation for a security or, directly or indirectly, to submit any such quotation for publication, in any quotation medium (as defined in this section) unless such broker or dealer has in its records the documents and information required by this paragraph (for purposes of this section, "paragraph (a) information"), and, based upon a review of the paragraph (a) information together with any other documents and information required by paragraph (b) of this section, has a reasonable basis under the circumstances for believing that the paragraph (a) information is accurate in all material respects, and that the sources of the paragraph (a) information are reliable.

17 C.F.R. § 240.15c2-11(a).

Paragraph (b) requires broker-dealers to review, among other documents "any other material information (including adverse information) regarding the issuer which comes to the broker's or dealer's knowledge or possession before the publication or submission of the quotation." 17 C.F.R. § 240.15c2-11(b).

Defendants argue that Spartan fulfilled all obligations under the rule by gathering the twenty documents required by Paragraph (a) and adequately considering all red flags. (Doc. # 102 at 25-26, 30). However, compliance with Rule 15c2-11 is not based solely on whether Defendants gathered the necessary

"reams of documents." (Id. at 5). The SEC creates a material
dispute that Spartan possessed adverse information regarding
the Mirman/Rose and Harrison/Daniels companies, or at least
lacked a reasonable basis to believe its information was
accurate.

The SEC points out two inaccuracies in Spartan's FINRA
filings for the Harrison/Daniels companies. For one issuer,
Harrison emailed Eldred about filing the Form 211. (Doc. ##
107-18; 107-19). However, on the Form 211 Spartan represented
that Eldred was contacted by the president of the company.
(Doc. # 107-17 at 8). The president testified that he had
never contacted Eldred or Spartan. (Doc. # 107-20 at 33:12-
34:2).

Furthermore, FINRA requested proof of payment by the
shareholders for one issuer. Eldred approved Spartan's
response that stated:

> The individuals who purchased the shares of our
> stock are either friends or family members of our
> President, Diane J. Harrison, or of our
> Secretary/Treasurer, Anna Williams. Diane J.
> Harrison and Anna Williams were the only two
> solicitors. There were 28 persons solicited in all.
> Of those solicited, none did not choose to
> purchase.

(Doc. # 108-8 at 26-27). But emails show that Spartan was
aware Daniels and Harrison had paid for all shares, and that

"[n]one of the shareholders paid for their own shares." (Doc. # 108-9).

The SEC also points out three inaccuracies in Spartan's FINRA filings for the Mirman/Rose companies. For one company, FINRA sent a deficiency letter to Spartan specifically asking for a "detailed explanation of the Issuer's relationship with Al Mirman." (Doc. # 104-18 at 10). Spartan responded that Mirman was a social friend of the issuer, and Mirman recommended Spartan as a market maker, but otherwise, "Mirman has no relationship with [the issuer]." (Id. at 13). But Spartan was aware that Mirman was holding himself out as the issuer's intermediary and had solicited Dilley to file the issuer's Form 211 in the first place. (Doc. # 107-4).

For another company, Mirman and Rose contacted Dilley to file the Envoy Form 211, but Dilley and Spartan represented to FINRA that it was the sole officer who had contacted Spartan/Dilley. (Doc. # 105-9; Doc. # 104-14 at 8). In fact, in at least seven Form 211 filings, Spartan represented to FINRA that the issuer's sole officer initiated contact with Spartan or Dilley and requested Spartan complete the Form 211. (Doc. # 104-13 at 7; Doc. # 104-15 at 10; Doc. # 104-16 at 9; Doc. # 104-17 at 8; Doc. # 104-19 at 10; Doc. # 104-23 at 7; Doc. # 104-24 at 8). However, all but one of the officers

testified that they never communicated with Spartan or Dilley. (Doc. # 104-26 at 77:7-18; Doc. # 104-27 at 48:13-21; Doc. # 104-28 at 51:18-22; Doc. # 105-3 at 55:13-56:11; Doc. # 105-4 at 39:9-25; Doc. # 105-5 at 52:14-53:20;  Doc. # 105-6 at 48:10-49:5; Doc. # 105-7 at 84:17-90:5). Some even testified that they never contacted a broker-dealer at all. (Doc. # 104-27 at 47:6-9).

Similarly, Spartan responded to several FINRA deficiency letters by submitting charts (based on information provided by Mirman and Rose) that detailed shareholder relationships. (Doc. ## 104-12; 104-13; 104-14; 104-15; 104-16; 104-17; 104-18; 104-19; 104-20; 104-21; 104-22; 104-23; 104-24; 104-25). The shareholder chart indicated the sole officer had solicited shareholders as a friend. (Id.). However, all but one of the sole officers testified they did not solicit any shareholders and knew virtually none of them. (Doc. # 104-26 at 77:19-78:6; Doc. # 104-27 at 48:13-50:1; Doc. # 104-28 at 43:4-20; Doc. # 105-3 at 49:5-15; Doc. # 105-4 at 37:24-38:12; Doc. # 105-5 at 53:23-55:15; Doc. # 105-6 at 49:10-19; Doc. # 105-7 at 90:21-93:21; Doc. # 105-11 at 38:23-25; Doc. # 105-12 at 66:5-19).

It is undisputed that Spartan had some knowledge of Mirman and Rose's involvement with these companies. Mirman

20

and Rose held themselves out to Spartan as intermediaries for some issuers. (Doc. # 102-17 at ¶ 4; Doc. # 102-56 at 43:5-20; 56:14-58:7). As intermediaries, Mirman and Rose emailed Spartan about the Forms 211 (Doc. # 104-9 at 239:16-240:22; Doc. # 105-8), emailed shareholder information to Spartan in order for Spartan to respond to FINRA deficiency letters (Doc. ## 105-9; 105-10), and communicated with Spartan about DTC eligibility (Doc. # 105-14).

From this evidence, a reasonable jury could conclude that Spartan possessed adverse information indicating the Paragraph (a) documents were not authentic, or at least lacked a reasonable basis to believe they were accurate. Accordingly, summary judgment in favor of Spartan is inappropriate.

## 2. **Aiding and abetting liability**

To establish aiding and abetting liability, the SEC must show: (1) a primary violation by another party; (2) a general awareness by the aider and abettor that his role was part of an overall activity that is improper; and (3) the aider and abettor provided "substantial assistance" to the violator. SEC v. Big Apple Consulting USA, Inc., 783 F.3d 786, 800 (11th Cir. 2015). "Severe recklessness can satisfy the scienter requirement in an aiding and abetting case." Id.

21

Dilley declared that he neither knew nor suspected that any of the information provided by the issuers was inaccurate or misleading. (Doc. # 102-17 at ¶ 3). But Dilley frequently communicated with Mirman and Rose about several aspects of the securities. Dilley communicated with Mirman and Rose about the Forms 211 (Doc. # 104-9 at 239:16-240:22; Doc. # 105-8; Doc. # 107-4), DTC eligibility (Doc. # 105-13 at 2), collecting payments from buyers (Doc. # 105-19), potential buyers, (Doc. # 105-13 at 2), how to handle a lost certificate (Doc. # 106-4), and attestation letters to reassure potential buyers that shares were unrestricted. (Doc. ## 105-27; 106-2).

It is also undisputed that for the relevant issuers, Spartan's decision to seek approval to publish a quotation was made by either Dilley or Eldred. (Doc. # 102-18 at ¶ 5). And Dilley signed the Forms 211 for at least seven companies. (Id. at ¶ 9).

A reasonable jury could conclude from this information that Dilley was generally aware of Mirman and Rose's involvement with the companies. Therefore, a reasonable jury could find that Dilley's approval of the Forms 211 was severely reckless and his participation in the Forms 211

process constituted substantial assistance to the overall fraud.

Like Dilley, Eldred also testified that he neither knew nor suspected that any of the information provided by the issuers was inaccurate or misleading. (Doc. # 102-2 at 135:20-136:24). However, Eldred and Harrison specifically discussed shell companies on a few occasions. In one email, Eldred asked Harrison if "[the head of FINRA's Form 211 group] would have an issue with [Eldred's wife] if she creates another public company?" (Doc. # 107-15). In another email, Daniels asked Eldred if he knew whether a lawyer "may need a shell for" a reverse merger. (Doc. # 107-14). Eldred put Daniels in contact with that lawyer, who responded, "We always have clients looking for shells." (Id.). Eldred also communicated with Fan about using one of Fan's companies as a "public OTCBB shell" for his personal holding company. (Doc. ## 107-24; 107-25).

Again, it is undisputed that Spartan's decision to publish a quotation was made by either Dilley or Eldred. (Doc. # 102-18 at ¶ 12). Harrison approached Eldred to file Forms 211 (Doc. ## 107-18; 107-19), Eldred signed three Forms 211 (Doc. ## 107-9; 108-2; 108-8), and Eldred approved the response to at least one FINRA deficiency letter. (Doc. ## 108-8; 108-9; 108-10).

23

From this evidence, a reasonable jury could conclude that Eldred was generally aware of the Harrison/Daniels shell scheme. Therefore, a reasonable jury could conclude that Eldred's approval of Form 211 applications and deficiency letters was severely reckless and substantially assisted the Harrison/Daniels fraud.

As the chief compliance officer, Lopez reviewed at least three FINRA Form 211 deficiency letters for the Mirman/Rose companies. (Doc. ## 108-17; 108-18; 108-19; 108-20). Lopez approved the responses for these three issuers within an hour of receipt. (Doc. ## 108-17; 108-18; 108-19; 108-20). A jury could reasonably find that by approving deficiency letters without taking the time to adequately familiarize himself with the companies, despite numerous red flags raised by FINRA, Lopez acted with severe recklessness and substantially assisted the overall fraud.

Summary judgment is thus denied for all Defendants as to Count 1 and 2.

### iii. <u>Counts 3-13</u>

Defendants also move for summary judgment on all of the SEC's fraud accusations. Counts 3-4 and 8-10 allege that Spartan, Island, Dilley, and Eldred violated, and aided and abetted violations of, Section 17(a) of the Securities Act.

24

Counts 5-7 and 11-13 allege that Spartan, Island, Dilley, and Eldred violated, and aided and abetted violations of, Section 10(b) and Rule 10b-5 of the Exchange Act. Defendants make substantially the same arguments for all of the SEC's fraud claims, therefore the Court addresses them simultaneously.

To state a claim under Rule 10b-5(b), the SEC must allege: "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." SEC v. Merch. Capital, LLC, 483 F.3d 747, 766 (11th Cir. 2007). "A defendant engages in a fraudulent scheme in violation of [Rule 10b-5(a)] when he (1) commits a deceptive or manipulative act; (2) in furtherance of a scheme to defraud; and (3) with scienter." SEC v. Greene, No. 13-CV-61762-ROSENBAUM/HUNT, 2014 WL 11706448, at *1 (S.D. Fla. Jan. 27, 2014). "The scope of liability under Section 10(b) and Rule 10b-5 is the same." Merch. Capital, 483 F.3d at 766 n.17.

Claims under Section 17(a) "require[] substantially similar proof" as claims under Rule 10b-5. SEC v. Monterosso, 756 F.3d 1326, 1334 (11th Cir. 2014). Specifically, to establish a violation of Section 17(a)(1), the SEC must allege: "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities,

(3) made with scienter." <u>Merch. Capital</u>, 483 F.3d at 766. In contrast, claims under Section 17(a)(3) do not require a showing of scienter. Instead, the SEC must allege: "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) made with negligence." <u>Id.</u> Finally, "the 'in connection with the purchase or sale of' and 'in the offer or sale of' elements of Rule 10b-5 and [Section] 17(a) can be interchangeable." <u>SEC v. Radius Capital Corp.</u>, 653 F. App'x 744, 749 (11th Cir. 2016).

Defendants argue that the SEC's 17(a) claims are merely a "repackaging" of the 10b-5 claims. However, the Supreme Court has held that the same conduct may violate both Rule 10b-5 and Section 17(a). <u>See</u> <u>Lorenzo v. Sec. & Exch. Comm'n</u>, 139 S. Ct. 1094, 1096 (2019) (finding that by sending emails known to contain material untruths, the defendant both "'employ[ed]' a 'device,' 'scheme,' and 'artifice to defraud'" within the meaning of subsection (a) of Rule 10(b) and Section 17(a)(1) and, by the same conduct, "engage[d] in a[n] act, practice, or course of business' that 'operate[d] . . . as a fraud or deceit' under subsection (c) of [Rule 10(b)]"). The SEC has created a material dispute of fact that Defendants' actions violated both fraud provisions.

### 1. **Misstatements**

As for the first element, Defendants argue they never made "any direct misrepresentations." (Doc. # 102 at 38). Defendants only made "qualified statements about information obtained from issuers," thus they argue they cannot be liable under Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011). (Id. at 38, 43).

Courts applying Janus have found that signers of statements may be held liable for them. See SEC v. Brown, 878 F. Supp. 2d 109, 116 (D.D.C. 2012) ("Both before and after the decision in Janus, courts have consistently held that the signer of a corporate filing is its 'maker.'"). This remains true even when the statement is purportedly based on third-party information. See In re Nevsun Res. Ltd., No. 12 CIV. 1845 PGG, 2013 WL 6017402, at *11 (S.D.N.Y. Sept. 27, 2013) ("[A]lthough Defendants purported to rely on [an engineering firm's] report for certain of their statements, . . . Defendants adopted those statements, filed them with the SEC, and thereafter repeated them to investors. That is sufficient for the Court to find that Defendants 'made' the statements under Janus."). Therefore, Defendants are the makers of the statements made to FINRA during the Forms 211 process or DTC

eligibility process, despite purportedly relying on Mirman, Rose, and the issuers for the information.

Defendants also argue that they had no affirmative duty to disclose Mirman and Rose's status as intermediaries. (Doc. # 102 at 35). However, the Eleventh Circuit has held that when selling securities, the "duty to disclose is a general one, and arises whenever a disclosed statement would be misleading in the absence of the disclosure of additional material facts needed to make it not misleading." United States v. Bachynsky, 415 F. App'x 167, 172 (11th Cir. 2011) (internal citations and quotations omitted). The SEC presents several statements that a jury could reasonably find misleading.

As examined in Section III(a)(ii)(1), Spartan made several misrepresentations to FINRA. For example, Spartan represented to FINRA that "Mirman has no relationship with [the issuer]," when in fact Mirman was the issuer's intermediary. Spartan also represented to FINRA that the issuer's sole officer initiated contact with Spartan or Dilley. But most officers testified that they never communicated with Spartan or Dilley. Similarly, Spartan responded to several FINRA deficiency letters with shareholder charts indicating the sole officer had solicited

shareholders as a friend. Yet, as discussed in detail in Section III(a)(ii)(1), all but one of the sole officers testified they did not solicit any shareholders and knew virtually none of them.

Spartan also responded to a deficiency letter stating that "[t]he individuals" who purchased all of the issuers' shares were "either friends or family" of Harrison or the issuer's treasurer. (Doc. # 108-8 at 26-27). But Spartan had already learned that Daniels and Harrison had paid for all shares, and that "[n]one of the shareholders paid for their own shares." (Doc. # 108-9).

As for Island, Island and Spartan both stated, in connection with a DTC application, that at least two of the companies were "not a shell." (Doc. ## 115-14; 115-15). Island also submitted twelve DTC transfer agent attestation forms stating it would exercise diligence and provide DTC with complete and accurate information about securities. (Doc. ## 115-6; 115-7; 115-8; 115-9; 115-10; 115-11; 115-12). However, Island never received nor produced any list of insiders or control persons for the Mirman/Rose companies (Doc. # 113 at ¶ 19; Doc. # 108-16 at 92:9-16) despite its official policy providing that Island would obtain a "list of

insiders/control persons" from new clients. (Doc. # 108-23 at 24).

Lastly, Eldred signed two Forms 211 stating each issuer was pursuing local business operations with no plans for mergers or changes in control. (Doc. ## 107-9; 108-2). One of these forms also stated that there were no past or present undisclosed control persons. (Doc. # 107-9). However, according to one of the sole officers, "the plan for [both] companies at the outset was the same - take them public, and then merge them into one of Fan's companies so that Fan would have public companies in the United States. There was never any plan to continue running the businesses of those [two] companies." (Doc. # 107-11 at ¶¶ 6-7).

A reasonable jury could conclude that these statements were either misrepresentations or misleading.

## 2. **In connection with**

Defendants argue that none of the misrepresentations meet the "in connection" requirement because they were not disseminated to the public. (Doc # 102 at 37-44).

"[T]he 'in connection with' requirement is satisfied where the fraud 'touch[es]' the transaction in some way, including situations where 'the purchase or sale of a security and the [preceding] proscribed conduct are part of the same

30

fraudulent scheme.'" Radius Capital, 653 F. App'x at 751
(quoting Rudolph v. Arthur Andersen & Co., 800 F.2d 1040,
1046 (11th Cir. 1986)). Although the Form 211 documents and
DTC attestation forms were not filed with the public, the
information led to the fraudulent companies' abilities to be
eligible for public quotation. Thus, the statements were made
in connection with the offer and sale of securities. SEC v.
Jones & Co., 312 F. Supp. 2d 1375, 1382 (D. Colo. 2004).

### 3. **Materiality**

Defendants next argue that none of the statements were
material, because Island's attestations "did not provide any
substantive information or representations about the issuer's
activities, business, or registration of shares, and were not
seen by members of the public." (Doc. # 102 at 37, 44-43).
Likewise, Defendants argue that the information contained in
the Form 211 cover letters was "provided simply to anticipate
questions FINRA often posed." (Id. at 40, 44). "The investing
public could hardly have considered the representations in
the cover letter to be material for any purchase or sale of
securities." (Id. at 40).

Other courts have held that misrepresentations regarding
an undisclosed control person and shareholder solicitation
are material in the context of the Form 211 process. SEC v.

31

<u>Farmer</u>, No. 4:14-CV-2345, 2015 WL 5838867, at *9 (S.D. Tex. Oct. 7, 2015). Although the statements were made in private, a misstatement can be material "if a reasonable investor would have considered the defendant's alleged misrepresentations important, even if the statement is not made directly to the investor." <u>SEC v. Czarnik</u>, No. 10 CIV. 745 PKC, 2010 WL 4860678, at *5 (S.D.N.Y. Nov. 29, 2010).

Here, a jury could reasonably conclude that an investor would want to know about an undisclosed control person, the possibility of a company being a shell, and the true due diligence of a transfer agent. <u>See</u> <u>Farmer</u>, 2015 WL 5838867, at *13 ("[A] reasonable investor in a microcap security would surely want to know about the existence of an undisclosed control person who not only encouraged close associates and relatives to invest in the company, but also provided those associates and relatives with the cash with which they would then 'buy' the company's stock.").

### 4. **Scienter**

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." <u>Aaron v. SEC</u>, 446 U.S. 680, 686 n.5 (1980). The Eleventh Circuit "do[es] not require actual knowledge to establish scienter under [Section] 17(a)(1) or Rule 10b-5." <u>Radius Capital</u>, 653 F. App'x at 753. Instead,

"[s]cienter may be established by a showing of knowing misconduct or severe recklessness." Monterosso, 756 F.3d at 1335 (quoting SEC v. Carriba Air, Inc., 681 F.2d 1318, 1324 (11th Cir. 1982)).

Relying on expert testimony, Defendants argue that Island lacked scienter because it acted in accordance with generally accepted industry practices and norms. (Doc. # 102 at 37, 39, 44). Specifically, the transfer agent community generally approves transfer requests when they contain certain presentments, such as a medallion signature guarantee. (Doc. # 100-1 at 5). Defendants argue that all of Island's transfer requests had such guarantees, indicating their legitimacy. (Doc. # 102 at 37, 39, 44).

Similarly, Defendants argue that Spartan collected more information than required by Rule 15c2-11 prior to filing its Form 211 applications. (Doc. # 102-18 at ¶¶ 13-14). Thus, according to Defendants, Spartan not only acted within community norms, it exceeded the industry standard. (Doc. # 102 at 39). Defendants also argue that neither Dilley nor Eldred had any knowledge of misconduct. On the contrary, Rose, Harrison, and Daniels all attested to the accuracy of the documents and never informed Defendants of the underlying

33

scheme. (Doc. # 102-56 at 63:11-65:1; Doc. # 102-59 at 12; Doc. # 102-66 at ¶¶ 3-6).

The SEC provides sufficient evidence for a reasonable jury to find scienter on the part of all Defendants. As discussed in Section III(a)(ii)(1), Spartan was indisputably aware of Mirman and Rose's involvement as intermediaries with the companies. Based on this knowledge, a reasonable jury could conclude that Spartan's statements to FINRA omitting Mirman and Rose's intermediary relationship were severely reckless.

Furthermore, as discussed in Section III(a)(ii)(1), Spartan learned that Daniels and Harrison had paid for all shares from one issuer. But in response to a FINRA deficiency letter, Spartan stated that individual friends and family members had purchased those shares. A reasonable jury could find this misrepresentation to be severely reckless.

Regarding Island, Island represented to the DTC that a company was "not a shell," and submitted twelve DTC transfer agent attestation forms stating it would exercise diligence in order to provide DTC with complete and accurate information about the securities. (Doc. ## 115-14; 115-15; 115-6; 115-7; 115-8; 115-9; 115-10; 115-11; 115-12). However, Island did not follow its internal policies on collecting insider lists

34

to ensure the transfers were not restricted. (Doc. # 113 at ¶ 19; Doc. # 108-16 at 92:9-16; Doc. # 108-23 at 24).

The SEC also points out numerous red flags surrounding the Mirman/Rose companies. For example, Island overlooked the fact that issuer Kids Germ had significant ties to another Mirman/Rose company, Envoy (Doc. ## 106-35; 106-36; 105-9; 104-14; 104-15), and that Mirman and Rose used the funds of one company to pay the expenses of a different, purportedly unrelated company. (Doc. # 105-19). On two occasions, Island received requests to transfer all the unrestricted shares of two independent issuers to the same buyers, represented by the same counsel. (Doc. ## 105-23; 105-24; 105-25; 105-26; 106-5; 106-6; 106-7; 106-8; 106-9; 106-10; 106-11; 106-12). Despite expert testimony that it is industry practice to approve transfers containing medallion signature guarantees, a reasonable jury could nonetheless conclude that Island's representations to the DTC were severely reckless in the face of such red flags.

As for the individuals, Dilley's extensive communications with Mirman and Rose (detailed in Section III(a)(ii)(2)) could lead a reasonable jury to believe he was severely reckless in his representations to FINRA that the sole officers of various companies contacted Spartan to file

35

Forms 211. Similarly, Eldred's various communications with Daniels about shell companies (detailed in Section III(a)(ii)(2)) could lead a reasonable jury to believe he was severely reckless in his representations to FINRA that each issuer was pursuing local business operations with no plans for mergers or changes in control. Furthermore, Eldred's knowledge that Daniels paid for the shares of stockholders, (Doc. # 108-8 at 26-27; Doc. # 108-9), could lead a reasonable jury to believe he was severely reckless in his representations to FINRA that the shareholders had purchased their shares.

### iv. Count 14

Defendants seek summary judgment on Count 14, alleging that Spartan, Island, and Dilley violated Sections 5(a) and 5(c) of the Securities Act.

Sections 5(a) and (c) of the Securities Act "forbid[] the use of any means of interstate commerce or of the mails to sell or offer to sell securities without having first filed a registration statement with the Securities and Exchange Commission." SEC v. Cont'l Tobacco Co. of S.C., 463 F.2d 137, 155 (5th Cir. 1972) (citation omitted). "No showing of scienter or negligence is necessary to prove a Section 5 violation, as the provision carries strict liability." SEC v.

36

Universal Express, Inc., 475 F. Supp. 2d. 412, 434 n. 15
(S.D.N.Y. 2007); see also SEC v. Sierra Brokerage Servs.,
Inc., 608 F. Supp. 2d 923, 939 (S.D. Ohio 2009) ("Section 5
imposes strict liability on sellers of securities").

### 1. Prima facie case

To establish a prima facie case for a violation of
Section 5 of the Securities Act, the SEC must demonstrate
that "(1) the defendant directly or indirectly sold or offered
to sell securities; (2) through the use of interstate
transportation or communication and the mails; (3) when no
registration statement was in effect." SEC v. Calvo, 378 F.3d
1211, 1214 (11th Cir. 2004) (citations omitted).

As for the first and third element, Rose and Mirman pled
that they transferred unregistered shares for all fourteen of
their companies. (Doc. # 104-5 at 13; # 104-6 at 12-13).
Island admitted it transferred shares for eleven of these
fourteen companies and acted as a transfer agent for transfers
of a controlling portion of shares for these eleven companies.
(Doc. # 102-18 at ¶¶ 50, 55-56).

As for the second element, "the facilities of interstate
commerce" is broadly construed. United States v. Wolfson, 405
F.2d 779, 784 (2d Cir. 1968). Courts have found that element
violated "when, in connection with the sale of such stock,

the mails are used to transmit an offer or other sales literature, to transport the securities after sale, to remit the proceeds to the seller, to send confirmation slips to the buyer, and perhaps even when used in more tangential ways." Id. Rose admitted in his deposition to receiving stock certificates from Island in the mail (Doc. # 104-8 at 107:8-13) and the SEC attaches sample stock certificates Island mailed to Rose. (Doc. # 108-30). The SEC thus creates a material dispute that unregistered shares were transferred in violation of the statute.

Defendants' only response to the prima facie case is that the SEC does not "articulate *what* transfers are [at] issue," therefore Defendants cannot prove the transfers were registered. (Doc. # 113 at 20). The Court disagrees. The transfers at issue are the resales and reverse mergers of the Mirman/Rose companies. Island admits it processed transfers for at least eleven of these companies, therefore Mirman and Rose's statements create a triable issue for this count.

## 2. **Participation**

"[C]ourts have established the concept of 'participant' liability to bring within the confines of [Section] 5 persons other than sellers who are responsible for the distribution of unregistered securities." SEC v. Murphy, 626 F.2d 633, 649

(9th Cir. 1980). Therefore, an "indirect participant" that did not pass the title himself may still be liable for a violation of Section 5 if he is a necessary participant or substantial factor in the transaction, or he engages in steps necessary to complete the distribution of shares to the public. Id. at 1215; Calvo 378 F.3d at 1215.

However, "not everyone in the chain of intermediaries between a seller of securities and the ultimate buyer is sufficiently involved in the process to make him responsible for an unlawful distribution." Geiger v. SEC, 363 F.3d 481, 487 (D.C. Cir. 2004) (internal quotation marks omitted). The Ninth Circuit in SEC v. CMKM Diamonds, Inc., 729 F.3d 1248, 1255 (9th Cir. 2013), identified conduct that could qualify a defendant as a "participant." In that case, the court reversed summary judgment against a transfer agent, holding that title alone did not create liability under Section 5. Id. at 1258. Devising the underlying scheme, finding potential buyers, and structuring the unregistered securities' sales were all forms of "integral[]" involvement that might satisfy the participant theory. Id. at 1259. But merely issuing shares without a restrictive legend, after receiving two attorney opinion letters to do so, was "insufficient, in and of itself," to establish that the

transfer agent was a substantial factor as a matter of law. Id. at 1259.

### a. **Spartan**

It is undisputed that Spartan filed the Forms 211 for the relevant shell companies. (Doc. # 102-18 at ¶ 6). Courts have found defendants that engaged in the Form 211 process to be necessary under Section 5. See Farmer, 2015 WL 5838867 at *18 (holding defendant who provided false information during Form 211 process "was a necessary participant in the distribution of [the fraudulent company's] stock to the public").

Furthermore, as explained in Section III(a)(ii)(1), during the Forms 211 process Spartan made the following representations to FINRA: (1) that the purported sole officer of each company contacted Spartan or Dilley; (2) that the sole officer had solicited shareholders as a friend; and (3) that Mirman had no relationship to a certain issuer. However, most officers testified they had never contacted Spartan, most officers testified they were unfamiliar with any shareholders, and Spartan was aware Mirman was acting as an intermediary for that issuer.

A reasonable jury could conclude that but for this information, FINRA would not have approved the Forms 211 and

40

the securities would not have gone to market, making Spartan a necessary participant.

### b. **Island**

Summary judgment is likewise inappropriate for Island. Unlike the transfer agent in <u>CMKM Diamonds</u>, the undisputed facts show Island did more than just effectuate the disputed transfers. Dilley agreed for Island to act as an escrow agent in one company's sale (Doc. # 105-17; Doc. # 113-9 at 157:4-17), and Island (through Dilley) affirmatively attested to potential buyers that the companies' shares were unrestricted. (Doc. ## 105-27; 106-2).

Furthermore, the transfer agent in <u>CMKM Diamonds</u> requested a second opinion letter from counsel to confirm the removal of restrictive legends. <u>CMKM Diamonds</u>, 729 F.3d at 1255. But here, as discussed in Section III(a)(iii)(4), the SEC has provided evidence showing that Island (1) failed to obtain insider lists for the Mirman/Rose companies (despite it being company policy for new clients) and (2) overlooked numerous red flags. A reasonable jury could conclude this conduct was a substantial factor in bringing the securities to market. But for Island ignoring several red flags, the restrictive legends would not have been removed and the

41

securities would not have been sold unrestricted. Summary judgment is thus inappropriate for Island.

### c. **Dilley**

As both president of Island and a registered principal of Spartan, Dilley was actively involved in both companies' actions. In that role, as detailed in Section III(a)(ii)(2), Dilley communicated frequently with Mirman and Rose about several aspects of the sales, including providing attestation letters to reassure potential buyers that the shares were unrestricted.

Dilley also personally performed several tasks in the process of selling the securities. Dilley signed the Forms 211 for at least seven companies (Doc. # 102-18 at ¶ 9), and agreed for Island to act as an escrow agent for a sale. (Doc. # 105-17; Doc. # 113-9 at 157:4-17). Dilley also signed the stock certificates selling all shares. (Doc. # 105-17; Doc. # 113-9 at 157:4-17).

A reasonable jury could conclude that Dilley was involved in the scheme from start to finish, making him a necessary participant under Section 5.

### b. __SEC's Motion__

#### i. __Counts 1 and 2__

The SEC also seeks summary judgment for Count 1, alleging that Spartan violated Section 15(c)(2) and Rule 15c2-11 of the Exchange Act, and Count 2, alleging that Dilley, Eldred, and Lopez aided and abetted those violations.

#### 1. __Primary liability for Spartan__

The SEC alleges that Spartan violated Rule 15c2-11 by failing to consider the adverse information in its possession, as required by Paragraph (b). (Doc. # 115 at 16). Specifically, the SEC alleges that Spartan possessed several red flags indicating the true purpose of the shell companies.

According to the SEC, "if 'red flags' appear at any stage of the review process, the broker-dealer may not publish quotations unless and until those 'red flags' are reasonably addressed." (Id. at 17) (citing SEC Release No. 34-29094, 1991 WL 292186, at *2 (Apr. 17, 1991)). Spartan failed to do so; therefore the SEC contends, it lacked a "reasonable basis" for believing the Paragraph (a) documents (including the Forms S-1 and periodic reports) were accurate and reliable. (Doc. # 103 at 40-41; Doc. # 115 at 20-21).

But Defendants have raised a genuine dispute of material fact that Spartan had a reasonable basis to believe its

43

information was accurate. First, Spartan points out it not only reviewed the twenty documents required by Paragraph (a), but it also reviewed significant additional information not required by the rule. (Doc. # 102-18 at ¶¶ 13-14). For every issuer, Spartan gathered: (1) a signed Form 211 Filing Agreement; (2) a principal officer affidavit; (3) a Director and Officer Questionnaire; and (4) a Shareholder Data Spreadsheet. The principal officer affidavit required a notarized signature from the issuer's representative promising, under penalty of perjury, that there were no undisclosed control persons. (Id.). For several companies, Spartan also gathered signed certifications saying the issuer had provided accurate information and there were no undisclosed control persons. (Id.). Defendants argue that Spartan had no reason to believe these documents, given to them directly from issuers, were inaccurate.

Second, regarding the alleged failure to investigate red flags, Defendants respond that none of the promulgations and releases cited by the SEC are binding. Defendants stress that red flags are not an additional regulatory burden Spartan was required to dispel, but merely "examples [provided by the SEC] of factors a market-maker 'may wish' to consider." (Doc. # 113 at 29). Therefore, according to Defendants, Spartan

44

"need only satisfy itself with respect to the accuracy of the information based on the nature of the red flag." (Id. at 25 (internal quotations omitted) (citing SEC Release No. 34-29094, 1991 WL 292186, at *6 (Apr. 17, 1991)). Defendants allege Spartan met this burden and complied with the rule by considering the purported red flags.

Specifically, Defendants highlight several of the SEC's red flags and explain why Spartan was satisfied the information it received from issuers was accurate. (Id. at 30). For example, the SEC argues that Spartan should have been alerted to potential fraud because many issuers had overlapping shareholders and a common attorney. But Defendants cite testimony from a FINRA examiner that it is "pretty common" for small issuers to have shareholders with close relationships to the officers or directors. (Doc. # 102-32 at 37:6-23). Similarly, Defendants argue that the term "shell" did not raise any red flags because professionals often use shell companies for legitimate structuring purposes. SEC Release No. 1293, 2005 WL 1667452, *2 (July 15, 2005).

Defendants also point out that the SEC actually examined Spartan's Form 211 files in late 2012. (Doc. # 102-67 at 18:7-19:4, 48:8-50:7, 54:2-23). At the time, the SEC did not raise

any concern over Spartan's treatment of red flags, and the investigation did not give rise to an enforcement referral. (Id. at 54:2-23). Overall, Defendants argue that Spartan reasonably addressed each red flag and determined that the red flags were "simply unimportant to the validity of the applications." (Id. at 30).

The SEC replies that Spartan, Dilley, Eldred, and Lopez all held "inside information that undisclosed control persons were running each of the issuers with the intention to sell them in the exact same fashion." (Doc. # 115 at 20). Therefore, neither the additional documents Spartan examined nor the measures Spartan undertook to review the red flags created a reasonable belief that the Paragraph (a) information was accurate.

However, the evidence cited by the SEC in support of this argument is far from undisputed. Rather, the SEC draws an inference from its interpretation of several emails, Mirman and Rose's guilty pleas, and depositions of various individuals. Defendants dispute the SEC's interpretation of this evidence and argue that a reasonable jury could conclude otherwise.

The Court agrees. Based on the documents Spartan gathered, and the SEC's evidence of adverse information, a

reasonable juror could conclude that Spartan reasonably
addressed the red flags it uncovered, and thus had a
reasonable basis to believe its information was accurate.

### 2. **Aiding and abetting liability**

Since aiding and abetting liability flows from principal
liability, and Defendants have shown a material dispute as to
Spartan's principal liability, there is also a dispute of
material fact whether Dilley, Eldred, and Lopez are
secondarily liable.

### ii. **Count 14**

The SEC also seeks summary judgment on Count 14, alleging
that Spartan, Island, and Dilley violated Sections 5(a) and
5(c) of the Securities Act. Defendants raise a genuine dispute
of material fact regarding whether they were necessary
participants.

### 1. **Spartan**

A reasonable jury could find that Spartan was not a
necessary participant. In both cases cited by the SEC, the
defendant who filed Forms 211 was also engaged in several
other activities. In Farmer, the defendant not only helped
the issuer file its Form 211, but also paid the issuer's CEO's
salary, helped the issuer secure its initial funding,
solicited several IPO investments and secretly funded at

least 40% of the IPO, directed and financed an advertising campaign publicizing the issuer, and funded the transfer of shares sold in the IPO to consolidate the stock. <u>Farmer</u>, 2015 WL 5838867, at *18.

In <u>SEC v. Husain</u>, No. 216CV03250ODWE, 2017 WL 810269, at *6 (C.D. Cal. Mar. 1, 2017), the defendant was likewise involved in several steps of the sale. Summary judgment was appropriate because the defendant not only assisted in the Form 211 process, but also "devised the 'self[-]filing' method that produced the shells, found six of the seven shell company purchasers, and was at least partially responsible for crafting and processing the deals themselves." <u>Id.</u>

Spartan's only undisputed involvement beyond the Form 211 process was the DTC eligibility form for one company. (Doc. # 105-14). Furthermore, Defendants argue that Spartan's conduct in the Form 211 process was always based on the information it received from the issuers, albeit through intermediaries Mirman and Rose. (Doc. # 113 at 27). Rose testified that neither he nor Mirman informed Spartan or any employee at Spartan that any of the information provided to Spartan was inaccurate or misleading. (Doc. # 102-56 at 63:11-65:1). Based on this information, a reasonable jury could

conclude that Spartan was not a substantial factor in the overall scheme.

## 2. **Island**

A reasonable jury could also conclude that Island was not necessary. Defendants' expert testimony, although partially excluded, was deemed admissible to opine on industry norms. (Doc. # 133 at 20-21). According to the expert's report, the transfer agent community generally approves transfer requests when they contain the guarantees present on Island's transfer requests. (Doc. # 100-1 at 5).

Furthermore, Defendants argue that Island's only undisputed actions were ministerial in nature, thus it was not significantly involved with the broader scheme. (Doc. # 113 at 29). Indeed, Island's only undisputed conduct beyond effectuating the bulk transfers was involvement in DTC applications and sending two attestation letters to potential buyers reassuring the buyers' the companies were unrestricted. (Doc. # 102-18 at ¶¶ 53-54; Doc. ## 105-27; 106-2).

From this evidence, a reasonable jury could find that Island's conduct was not integral to the overall scheme in a way that creates participation liability. See CMKM Diamonds 729 F.3d at 1255 (finding that a transfer agent was not a

substantial factor where it merely removed restrictive legends from stocks). Rather, a reasonable jury could conclude that Island was merely acting within community norms and fulfilling its ministerial role as transfer agent, despite the presence of red flags. Id.

### 3. Dilley

A reasonable jury could also find that Dilley's conduct was not necessary to the overall scheme. As discussed in Section III(a)(ii)(2), the SEC cites evidence showing Dilley was involved in most steps of the sales process and frequently in contact with Mirman and Rose. Nonetheless, a reasonable jury could find that sporadic emails regarding lost certificates and potential buyers are not comparable to devising the entire scheme or personally soliciting most of the buyers. Id. Thus, a reasonable jury could find that Dilley was not a substantial factor to the overall fraud.

### IV.   Conclusion

In sum, the Court finds there are genuine issues of material fact for all claims that require resolution by a jury.

Accordingly, it is hereby

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  Defendants' Motion for Summary Judgment (Doc. # 102) is

**DENIED.**

(2)  Plaintiff's Motion for Partial Summary Judgment (Doc. #

103) is **DENIED.**

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this

<u>28th</u> day of December, 2020.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE