**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**CASE NO. 19-CV-00448-VMC-CPT**


**SECURITIES AND EXCHANGE COMMISSION,**

     **Plaintiff,**

**v.**

**SPARTAN SECURITIES GROUP, LTD.,**
**ISLAND CAPITAL MANAGEMENT LLC,**
**CARL E. DILLEY,**
**MICAH J. ELDRED, and**
**DAVID D. LOPEZ,**

     **Defendants.**
_____/

## JOINT PRETRIAL STATEMENT

Plaintiff Securities and Exchange Commission and Defendants Spartan Securities Group, Ltd., Island Capital Management LLC, Carl E. Dilley, Micah J. Eldred, and David D. Lopez, through their undersigned counsel, submit this Joint Pretrial Statement.

### I.

### SETTLEMENT STATEMENT

Despite a good faith effort by the parties, the parties have agreed that settlement is not possible, and this matter should proceed to trial.


### II.

### NATURE OF ACTION

This civil action involves alleged violations of certain provisions of the federal securities laws, under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act").

## III.

## BASIS OF FEDERAL JURISDICTION

The Commission has alleged federal jurisdiction in this action arises under Sections 20(b), 20(d)(1) and 22(a) of the Securities Act, and Sections 21(d), 21(e), and 27(a) of the Exchange Act. The Defendants did not contest jurisdiction. Thus, there is no issue as to subject matter jurisdiction in this case.

## IV.

## STATEMENT OF THE CASE

### A.  Plaintiff's Statement

The Securities and Exchange Commission (SEC) brought this action against Defendants Spartan Securities Group, Ltd. ("Spartan"), Island Capital Management LLC ("Island"), Carl Dilley, Micah Eldred, and David Lopez (collectively, "Defendants") for violating various federal securities laws.  The SEC alleges Defendants played important roles in two separate fraud schemes from approximately December 2009 through August 2014.  The schemes depended on the participation of Defendants, industry gatekeepers, who assisted by taking critical and active steps necessary to advance the fraudulent schemes.  The SEC alleges that Spartan, a registered broker-dealer, and Island, a registered transfer agent (along with their owners and principals, Dilley, Eldred and Lopez), served as a one-stop shop for microcap securities that furthered fraudulent schemes to make public the shares of nineteen undisclosed blank check companies.

The SEC alleges that Defendants furthered the fraudulent schemes by making misrepresentations and omissions to the SEC, the Financial Industry Regulatory Authority ("FINRA") and the Depository Trust Company ("DTC"), that the 19 blank check companies were legitimate small businesses with independent management and shareholders.  In reality, both the

management and shareholders were nothing more than nominees for control persons who always intended merely to sell all the securities of the companies privately in bulk for their own benefit. The essential value of these securities was their false designation as "free-trading" with the ability to be sold immediately on the public market. Defendants knew or were reckless in not knowing that the companies were pursuing their stated plans under false pretenses and instead being packaged for sale as public vehicles, while the shareholders were mere nominees for the control persons. Nonetheless, Defendants took critical steps to advance the frauds, including signing false Form 211 applications submitted to FINRA, submitting false responses to FINRA's inquiries, contributing to false DTC applications, signing false attestation letters for shell buyers, and effectuating the bulk transfer of the deceptive public float of the companies to shell buyers. As a result of their participation in the fraudulent schemes, Defendants violated various provisions of the Securities Act and Exchange Act.

### B. Defendants' Statement

Plaintiff, the SEC, has brought this action alleging that the Defendants, Spartan, Island, Dilley, Eldred, and Lopez, failed to discover fraud committed by issuers of microcap securities that utilized the Defendants' services as a market-maker and transfer agent. Defendants maintain, however, that they diligently vetted the issuers and had no reason to know of the underlying misconduct. Defendants also did not participate in unregistered sales of securities, as they merely acted as a transfer agent for shares that were properly registered or eligible for an exemption, and, in any event, Defendants were not a substantial participant in the sales of securities.

#### 1. Rule 211 Process

Spartan Securities Group, Ltd. was a broker-dealer, registered with the FINRA, and an active "market maker." One of its lines of business was to file Rule 211 applications with FINRA

to initiate quotations in non-exchange listed securities of issuers of small and microcap securities. Spartan would file these applications in order to publish quotations on over-the-counter marketplaces in the securities of small and mid-sized reporting public companies.

FINRA Form 211 is a document provided to FINRA that evidences the filing market maker has performed its required obligations under SEC Rule 15c2-11, prior to initiating a quotation in a non-exchange listed security. If the required information is provided to FINRA, it then provides clearance to the broker-dealer to initiate a public quotation of the issuer's securities on a registered, public secondary OTC market.

In its existence, Spartan filed nearly 2000 Form 211 applications from issuers seeking access to capital by public sales of securities. It did so in full compliance with robust internal controls designed to go above and beyond the requirements of Rule 15c2-11.

**2. Transfer Agency Process**

Transfer agents, like Island, are agents of the issuer, not the individual shareholders of the issuer. Essentially, they are professional record keepers who perform the ministerial function of recording share ownership, at the direction of the issuer, to assist in the facilitation of issuances and transfers of securities. Only after a purchase decision has been made, and an agreement reached between buyer and seller, does the transfer agent become involved at all.

Wholly separate from Spartan, Island served as transfer agency for an average of about 600 issuers at any given time. In that capacity Island faithfully recorded share ownership, and when directed by the shareholder with sufficient documentation would record transactions. To memorialize such transfers, Island required shareholders to furnish it with transfer instructions and certificates or stock powers that included medallion guaranteed signatures by the stockholder. A medallion signature guarantee is a guarantee provided by a financial institution, such as a bank or

clearing firm, that protects shareholders from unauthorized transfers by evidencing the signature is genuine and the financial institution accepts liability for any forgery.

### 3. Issuers Working with Alvin Mirman or Sheldon Rose

Between January 2010 and March 2014 Spartan filed Form 211 Applications for 14 public companies seeking quotations of their securities. For each company, either Alvin Mirman or Sheldon Rose acted as intermediaries for the company and coordinated with Spartan to seek filing of the Form 211. In each instance, either Mirman or Rose would represent to Spartan that he was acting on behalf of the issuer and would furnish all requested information for the Form 211 process on the issuer's behalf. Mirman and Rose always insisted that the information came from the issuer directly and was accurate in all respects.

Spartan filed these 14 Form 211 applications but did so only after gathering all information and documentation required under Rule 15c2-11 and additional extensive documentation from the issuer. This included, in every case, a notarized affidavit from the President or Executive Officer of the issuer, attesting to the truth and accuracy of all information submitted to Spartan, with a separate attestation that the issuer's shareholders were not under the control of any undisclosed person and the issuer did not have any present intention to change control within the next 12 months. Each of these issuers had also filed registration statements with the SEC, all of which had been declared effective prior to the Form 211 application process.

Spartan filed Form 211s with FINRA to quote the securities of these companies, and either Carl Dilley or Micah Eldred, principals at Spartan, signed the forms, attesting that they had a reasonable basis to believe Spartan had in its possession all required documents and a reasonable basis for believing the sources of the information were reliable. In each case FINRA responded

with comments and Spartan contacted the issuer through Mirman or Rose, and in turn provided additional information derived from the issuer. FINRA then cleared each application for quotation.

David Lopez, who served as Spartan's compliance officer, only participated in the Form 211 process for these 14 issuers by approving some of Spartan's responses to FINRA comment letters for four issuers (First Independence Corp., Envoy Group, Changing Technologies, and First Xeris). In each of those cases Lopez reviewed the information provided by the issuer and concluded it adequately responded to FINRA's request for information.

Once the Form 211s were cleared, Spartan's relationship with the issuers ceased entirely. However, the same issuers retained Island as a transfer agent. Eleven of the issuers sold a controlling share of their stock, and for each transaction Island provided the ministerial role of issuing shares as resolved by the officers of the issuers and also processing shareholder transfers once it received instructions to do so, along with transfer instructions, and original stock certificates and stock powers signed with a medallion guarantee by the stockholders.

Unbeknownst to Spartan, Dilley or Lopez, Mirman and Rose were lying to them and to the SEC in in the issuers' public filings. In reality, Mirman and Rose actually controlled the issuer corporations, and formed them for the purpose of selling them. Further, Mirman and Rose directed the officers and shareholders of the issuers to sell their shares of the issuer companies and directed them to execute transfer agreements.

Mirman and Rose carefully hid these facts from the SEC and all of the defendants. After their fraud was discovered, both men pled guilty to criminal securities violations and served prison sentences.

### 4. Issuers Involving Diane Harrison and Michael Daniels

Between May 2011 and July 2014 Spartan also filed Form 211 applications to quote the securities of five issuers that were introduced to Spartan by either Diane Harrison or Michael Daniels. Each company was an operating business entity with either Harrison or Daniels as an officer or director. And each company had filed a registration statement with the SEC, and each had been declared effective prior to the filing of a Form 211 application.

As with every issuer, Spartan again collected information and documentation required under Rule 15c2-11 and additional information directly from the issuer prior to filing the Form 211 application, including notarized affidavits from the President or Executive Officer of the issuer, attesting to the truth and accuracy of all information submitted to Spartan, with a separate attestation that the issuer's shareholders were not under the control of any undisclosed person and the issuer did not have any present intention to change control within the next 12 months.

After collecting the required information, Eldred, a principal at Spartan, signed the Form 211 applications. After comments from FINRA, four issuers were cleared for quotation. The fifth company was never cleared because the SEC issued stop order. Once the four issuers were cleared for quotation, Spartan's involvement with these issuers ended.

The SEC now believes that Harrison and Daniels were acting as undisclosed control persons for the issuers and had fraudulently declared that they did not intend to change control of the companies when they filed their registration statements and went through the Form 211 process.

## V.

## **PENDING MOTIONS**

1. Defendants' Request for a Jury Determination of Facts (DE 122).

2. SEC's Omnibus Motion in Limine and Memorandum in Support (DE 123).

3. Defendants' Motion in Limine and Memorandum in Support (DE 124).

## VI.

## **STIPULATED FACTS**

1.     Spartan Securities Group, LTD ("Spartan") is a Florida limited partnership registered with the SEC as a broker-dealer from 2001 until 2019.

2.     Island Capital Management LLC ("Island") is a Florida limited liability company registered with the SEC as a transfer agent since 2003.

3.     Spartan and Island are wholly owned by Connect X Capital Markets LLC ("Connect X") whose managing member is Micah Eldred ("Eldred") and shareholders include Carl E. Dilley ("Dilley") and David D. Lopez ("Lopez").

4.     Spartan and Island share certain office space, computer systems, officers, and employees.

5.     Dilley was a registered principal and registered representative of Spartan from 2004 to 2015 and the President of Island from 2004 until January 2018.  Dilley signed 15 Forms 211 relevant to this case as the registered principal for Spartan.

6.     Eldred was a registered principal and representative of Spartan and the Chief Executive Officer of Island from 2001 to the present. Eldred signed four Forms 211 relevant to this case as the registered principal for Spartan.

7.     In 2007, Alvin Mirman consented to being barred by FINRA from association with any FINRA member.  The SEC brought suit against Mirman in 2015, in which the Court entered, by consent, a judgment of permanent injunction, officer and director bar and penny stock bar against Mirman.

8.     In September 2016, the SEC entered, by consent, a cease-and-desist order, officer

and director bar and penny stock bar against Sheldon Rose.  The SEC also ordered Rose to pay disgorgement and prejudgment interest in excess of $2.9 million.

9.     In 2016, both Mirman and Rose pled guilty to criminal charges of conspiracy to commit securities fraud in connection with their respective participation in fraudulent schemes. Mirman pled guilty to conspiracy to commit securities fraud concerning Rainbow Coral Corp. ("Rainbow Coral"), First Titan Corp. ("First Titan"), Neutra Corp. ("Neutra"), Aristocrat Group Corp. ("Aristocrat"), First Social Networx Corp. ("First Social"), E-Waste Corp. ("E-Waste"), First Independence Corp. ("First Independence"), Changing Technologies, Inc. ("Changing Tech"), Global Group Enterprises Corp. ("Global Group"), and Envoy Group Corp. ("Envoy"). Rose pled guilty to conspiracy to commit securities fraud concerning Kids Germ Defense Corp. ("Kids Germ"), Obscene Jeans Corp. ("Obscene Jeans"), On the Move Systems Corp. ("On the Move"), Rainbow Coral, First Titan, Neutra, Aristocrat, First Social, E-Waste, First Independence, Global, Envoy, E-Waste, and First Xeris Corp. ("First Xeris").  Both the SEC and criminal actions against Mirman and Rose included their misconduct in connection with some of the companies at issue in this case.

10.     In 2018, the SEC brought suit against Michael Daniels and Diane Harrison, husband and wife, alleging they manufactured and made misrepresentations related to at least five undisclosed blank check companies (the "Daniels/Harrison Companies"), namely Dinello Restaurant Ventures, Inc., n/k/a AF Ocean Investment Management Co. ("Dinello"), Court Document Services, Inc., n/k/a ChinAmerica Andy Movie Entertainment Media Co. ("Court Document"), Quality Wallbeds, Inc., n/k/a Sichuan Leaders Petrochemical Co. ("Wallbeds"), Top to Bottom Pressure Washing, Inc., n/k/a Ibex Advanced Mortgage Technology Co. ("Top to Bottom") and PurpleReal.com Corp. ("PurpleReal").  As a result of the SEC action, Daniels and

Harrison consented to a Judgment but neither admitted nor denied the SEC's allegations.

11.     In 2018, the SEC entered, by consent, a cease-and-desist order, officer and director bar and penny stock bar against Andy Fan, and ordered him to pay a civil money penalty of $140,000.  Fan consented to the order but neither admitted nor denied the factual assertions made by the SEC.   The SEC's action related to Fan's conduct with respect to certain of the Daniels/Harrison Companies at issue in this case.

12.     To apply to publish quotations, Spartan was required to file a Form 211 application with the Financial Industry Regulatory Authority (FINRA).

13.     Spartan had written policies and procedures for how it processed Form 211 applications.

14.     Pursuant to Spartan's policies the "designated officer" (the signing principal), evidences his review by signing the Form 211.

15.     Spartan's procedures list a number of red flags, including if Spartan "receives substantially similar offering documents from different issuers with" the same attorney, officers, directors, and/or shareholders because "[i]t is not uncommon for the same individuals to be involved in multiple microcap frauds."

16.     Spartan's policies (which incorporates verbatim SEC Release No. 34-41110, 1999 WL 95487) expressly state: "If [Spartan] realizes after reviewing the information for several issuers that the same individuals are involved with these entities, [Spartan] should make further inquiries to determine whether it has a reasonable basis to believe that the issuer information is accurate."  Another red flag is the "transfer of shares by control persons, as gifts, to third persons in order to help create a public market."

17.     Spartan would gather a series of documents for Form 211 applications. Spartan

10

gathered what it deemed to be appropriate information, and prepared a Form 211 application related to the issuer.  A registered representative would compile the documents, review them, and sign the 211 application.

18.     One of the two principals of the firm, either Mr. Eldred or Mr. Dilley, would also sign the 211 application.

19.     Eldred signed the Forms 211 for Court Document, Wallbeds, Top to Bottom, and PurpleReal.

20.     Mirman and/or Rose recruited a sole officer, director, employee, and majority shareholder (the "sole officer") to act as CEO in name only for the Mirman/Rose Companies: Kids Germ, Obscene Jeans, On the Move, Rainbow Coral, First Titan, Neutra, Aristocrat, First Social, E-Waste, First Independence, Changing Tech., Global, Envoy, E-Waste, and First Xeris.  Related to these companies, Mirman and/or Rose also prepared false and misleading registration statements (the "Forms S-1") and subsequent SEC filings which falsely depicted the issuers as actively pursuing a variety of business plans, when the only plan from the onset was for the company to be sold as public vehicles.

21. The Forms S-1 were effective for the companies as of the dates identified in the table below:

| Mirman/Rose Company | Effective Date of Form S-1 |
| --- | --- |
| Kids Germ | 12/2009 |
| Obscene Jeans | 8/2010 |
| On the Move | 12/2010 |
| Rainbow Coral | 1/2011 |
| First Titan | 2/2011 |

| Mirman/Rose Company | Effective Date of Form S-1 |
|---|---|
| Neutra | 4/2011 |
| Aristocrat | 11/2011 |
| First Social | 3/2012 |
| Global Group | 3/2012 |
| E-Waste Corp. | 6/2012 |
| First Independence | 8/2012 |
| Envoy Group | 9/2013 |
| Changing Technologies | 10/2013 |
| First Xeris | 1/2014 |

22. The Forms S-1 for the companies had similar disclosures as set forth in the chart below, including offering sizes, capitalization structures, assets, and operating budgets.

| Mirman/Rose Company | Form S-1 Shares | Form S-1 Offering Size | # of Shares in Name of Sole Officer | Total Assets (All Cash) | Operating Budget (Duration) | Sole Officer # of Hours Work Week |
|---|---|---|---|---|---|---|
| Kids Germ | 3,000,000 | $30,000 | 9,000,000 | $5,351 | $400,000 (18 months) | 10-25 hours |
| Obscene Jeans | 3,000,000 | $52,500 | 9,000,000 | $9,000 | $500,000 (18 months) | 10-25 hours |
| On The Move | 3,500,000 | $52,500 | 9,000,000 | $9,000 | $477,500 (12 months) | 10-25 hours |

| Rainbow Coral | 2,500,000 | $31,250 | 9,000,000 | $8,912 | $500,000 (18 months) | 10-25 hours |
|---|---|---|---|---|---|---|
| First Titan | 3,000,000 | $37,500 | 9,000,000 | $8,922 | $587,500 (18 months) | 10-25 hours |
| Neutra | 3,000,000 | $42,000 | 9,000,000 | $8,900 | $425,000 (12 months) | 10-25 hours |
| Aristocrat | 3,900,000 | $39,000 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| First Social | 3,000,000 | $45,000 | 9,000,000 | $8,900 | $475,000 (18 months) | 10-25 hours |
| Global Group | 3,000,000 | $34,500 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| E-Waste | 3,000,000 | $36,000 | 9,000,000 | $8,301 | $600,000 (18 months) | 10-25 hours |
| First Independence | 3,000,000 | $34,500 | 9,000,000 | $8,900 | $500,000 (18 months) | 10-25 hours |
| Envoy Group | 3,000,000 | $37,500 | 9,000,000 | $8,908 | $612,500 (18 months) | 10-25 hours |
| Changing Technologies | 3,000,000 | $30,000 | 9,000,000 | $8,900 | $339,000 (18 months) | 10-25 hours |
| First Xeris | 3,000,000 | $39,000 | 9,000,000 | $8,976 | $650,000 (18 months) | 10-25 hours |

23.     Spartan Securities filed Forms 211 applications with FINRA to initiate quotations in the common stock of the following 19 companies:  Kids Germ, Obscene Jeans, On the Move, Rainbow Coral, First Titan, Neutra, Aristocrat, First Social, Global, E-Waste, First Independence, Changing Tech, First Xeris, Envoy Group, Dinello, Court Document, Wallbeds, Top to Bottom, and PurpleReal.

24.     Dilley signed the Forms 211 for the 15 companies identified in the table below which includes the dates each of the Forms 211 were cleared by FINRA:

| Mirman/Rose Company | Spartan Securities Form 211 Signatory | FINRA Form 211 Clearance |
|---|---|---|
| Kids Germ | Dilley | 1/2010 |
| Obscene Jeans | Dilley | 9/2010 |
| On The Move | Dilley | 2/2011 |
| Rainbow Coral | Dilley | 3/2011 |
| First Titan | Dilley | 5/2011 |
| Dinello | Dilley | 6/2011 |
| Neutra | Dilley | 7/2011 |
| Aristocrat Group | Dilley | 12/2011 |
| First Social Networx | Dilley | 4/2012 |
| Global Group | Dilley | 5/2012 |
| E-Waste | Dilley | 8/2012 |

| First Independence | Dilley | 3/2013 |
| Envoy Group | Dilley | 12/2013 |
| Changing Technologies | Dilley | 1/2014 |
| First Xeris | Dilley | 3/2014 |

25.    After submission of the Forms 211, FINRA examiners requested information from Spartan in deficiency letters for the companies at issue. FINRA examiners were trained to look for SEC "red flags". FINRA examiners could seek additional information concerning the application in a deficiency letter. Broker-dealers were expected to respond to deficiency letters.

26.    Spartan's computer network maintains a specific Form 211 file folder organized by issuer.  Spartan had registration statements and shareholder lists for issuers in its files.

27.     Daniels and Harrison have been friends with Eldred for at least 10 years.  Harrison and Eldred's wife had each been the sole officer of an issuer that was later acquired.  Eldred was aware that Daniels and Harrison, through Daniels's law practice, were active in the reverse merger business and had consummated a number of reverse mergers prior for clients who wanted to enter the public market.

28.    Mr. Mirman and Mr. Rose forwarded documents involved with the Form 211 process as requested by Spartan. Diane Harrison and her husband, Michael Daniels, requested Spartan file Form 211 applications for five issuers—Dinello, Court, Quality Wallbeds, Top to Bottom, and PurpleReal.

29.    FINRA examiners reviewed all the Form 211 applications for the 19 issuers. FINRA issued comment letters for each but cleared for quotation all the issuers except PurpleReal.

The SEC obtained a stop order against PurpleReal, the last of the Daniels/Harrison Companies.

30.     After an issuer was cleared for quotation, Spartan acted the exclusive market-maker for the issuer for 30 days.

31.     Each Daniels/Harrison Company had an overlapping shareholder roster (up to 26 of 29 of the same shareholders).

32.     Island served as the transfer agent for at least the following 16 companies: Kids Germ, Obscene Jeans, On the Move, Rainbow Coral, First Titan, Neutra, Aristocrat, First Social, Global, E-Waste, First Independence, Changing Tech, Dinello, Court Document, Wallbeds, and Top to Bottom.

33.     According to Island's policies and procedures, all transfer records and shareholder lists are the "highly confidential" property of the issuer, and "shall not be given to unauthorized parties under any circumstances." Moreover, Island's policies and procedures stated that "[s]hareholders may inquire about shares they own personally, but may not be provided with information concerning any other shareholder."

34.     Island's policies and procedures provided that shares without restrictive legend "can NOT be issued in the name of an insider". Island Stock Transfer training materials reiterated that "Insiders ALWAYS have restricted stock" (emphasis in original).

35.     Island's Director of Operations reported directly to Dilley.

36.     DTC held stock certificates in trust for eligible issuers to facilitate easier transfers of securities.

37.     In 2012, SEC examiners conducted an on-site examination of Spartan. SEC examined Island during the same period as Spartan. Examiners requested records for Aristocrat, First Titan and Neutra.

# VII.
## CONTESTED ISSUES OF FACT

### A.  Plaintiff's Contested Issues of Fact

1.      Spartan violated Section 15(c)(2) and Rule 15c2-11 of the Exchange Act because it published a quotation for a security or, directly or indirectly, submitted a quotation for publication, in any quotation medium without having a reasonable basis under the circumstances for believing, based upon a review of the issuer's paragraph (a) information together with other documents and information required by paragraph (b), that the paragraph (a) information was accurate in all material respects and that the sources of that information were reliable.

2.      Dilley, Eldred, and Lopez aided and abetted Spartan's violation of Section 15(c)(2) and Rule 15c2-11 of the Exchange Act:  (1) Spartan violated Section 15(c)(2) and Rule 15c2-11; (2) Dilley, Eldred, and Lopez were aware that they were part of an overall activity that was improper; and (3) they knowingly and substantially assisted Spartan's violations.

3.      Spartan, Island, Dilley, and Eldred violated Section 17(a)(1) when they (1) used an instrumentality of interstate commerce in connection with the offer to sell or sale of a security; (2) Spartan, Island, Dilley, and Eldred used a device, scheme, or artifice to defraud someone in connection with the offer to sell or sale of a security; and (3) Spartan, Island, Dilley, and  Eldred acted knowingly or with severe recklessness.

4.      Spartan, Island, Dilley, and Eldred violated Section 17(a)(3) when they (1) used an instrumentality of interstate commerce in connection with the offer to sell or sale of the security; (2) engaged in a transaction, practice, or course of business, in connection with the offer to sell or sale of a security, that operated or would operate as a fraud or deceit upon a purchaser; and (3) acted negligently.

5.      Spartan, Island, Dilley, and Eldred aided and abetted Mirman, Rose, Daniels, Fan,

or Harrison's violations of Section 17(a)(1), (2), and (3) of the Securities Act of 1933: (1) Mirman, Rose, Daniels, Fan, or Harrison violated Section 17(a)(1), (2), and (3); (2) Spartan, Island, Dilley, and Eldred, were aware that they were part of an overall activity that was improper; and (3) they knowingly and substantially assisted Mirman, Rose, Daniels, Fan, or Harrison's violations of Section 17(a)(1), (2), and (3).

6.      Spartan, Island, Dilley, and Eldred violated Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a), 10b-5(b), and 10b-5(c): (1) they used an instrumentality of interstate commerce in connection with the purchase or sale of a security; (2) they used a device, scheme, or artifice to defraud someone in connection with the purchase or sale of a security; or made a misrepresentation of a material fact, or omitted a material fact, in connection with the purchase or sale of a security; or engaged in an act, practice, or course of business in connection with the purchase or sale of a security that operated or would operate as a fraud or deceit on any person; and (3) they acted knowingly or with severe recklessness.

7.      Spartan, Island, Dilley, and Eldred aided and abetted Mirman, Rose, Daniels, Fan, or Harrison's violations of Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5(a), 10b-5(b), and 10b-5(c): (1) Mirman, Rose, Daniels, Fan, or Harrison violated Section 10(b) and Rules 10b-5(a), 10b-5(b), and 10b-5(c); (2) Spartan, Island, Dilley, and Eldred were aware that they were part of an overall activity that was improper; and (3) they knowingly and substantially assisted Mirman, Rose, Daniels, Fan, or Harrison's violations of Section 10(b) and Rules 10b-5(a), 10b-5(b), and 10b-5(c).

8.      Spartan, Island, and Dilley violated Securities Act Sections 5(a) and 5(c): (1) they directly or indirectly sold, or offered to sell, securities; (2) they used an instrument of transportation or communication in interstate commerce in connection with the offer to sell or sale of securities;

and (3) a registration statement for the securities was not in effect.

## B. Defendants' Contested Issues of Fact

1.      From 2005 through 2015 Spartan applied to publish quotations of securities as a market-maker for approximately 1500 issuers. During that period, large numbers of public issuers of microcap securities sought to be traded on the OTC markets. Eldred Dep. Spartan was solicited almost daily by issuers or their representatives asking for Spartan to make a market in their securities. Spartan rejected as many as half of the requests seeking approval for market-making, often because the issuers were not publicly reporting.

2.      During the relevant period, employees sought to review every S-1 registration statement that was made effective by the Commission to determine if the issuer would be a good candidate for Spartan to make a market in its stock. When Spartan determined that a public issuer met relevant criteria it sometimes contacted the issuer or its representatives to discuss the possibility of acting as a market-maker. Spartan considered its initial market research to be part of its "limited due diligence" process.

3.      Only the registered principal was responsible for the representations made in the application or subsequent communications to FINRA.

4.      For the 19 issuers, the decision for whether Spartan would seek approval to publish a quotation was made by either Mr. Eldred or Mr. Dilley. Mr. Lopez could neither have made the unilateral decision for Spartan to file an application nor refuse to do so.

5.      Spartan also included a cover letter with information it anticipated FINRA might request, but the letter was not an "exhaustive" description of the information in Spartan's possession. Each principal used a different cover letter. When the cover letter referenced an issuer's use of "promoters or consultants," this was a reference to public relations services, and

not meant to suggest that an issuer was or was not working with an intermediary concerning the Form 211 application. Spartan routinely provided copies of documents it had obtained from the issuer, many of which were not "required by the rule."

6.      Neither Mr. Eldred, Mr. Dilley, nor Mr. Lopez knew or suspected that any of the information provided by the issuers or their intermediaries related to the 19 issuers was materially inaccurate or misleading.

7.      Mr. Lopez did not sign the Form 211 applications for any of the 19 issuers as either a principal or a registered representative of Spartan.

8.      Form 211 applications and supporting materials are "not public."

9.      Spartan gathered and had in its records all information required by Rule 15c2-11(a) (paragraph (a) information) for each of the 19 issuers.

10.      Spartan would gather a series of standard documents for Form 211 applications. Rule 15c2–11 has distinct obligations for broker-dealers seeking to publish quotations for public and non-public issuers. Spartan's policy was to gather additional information about the issuers that it anticipated FINRA might request in its review process.

11.      Spartan required the issuer to provide (1) a signed Form 211 Filing Agreement; (2) a Principal Officer Affidavit; (3) a Director and Officer Questionnaire; and (4) a Shareholder Data Spreadsheet with copies of all stock purchase agreements and proofs of payments. Spartan gathered these documents for all 19 issuers.

12.      The Form 211 Filing Agreement provided, in part, that the issuer had provided "complete, true and accurate" information to Spartan in its documents, and that it would notify Spartan promptly of any material changes in the information. Spartan required an authorized officer or director to sign the agreement.

20

13.     The Affidavit required a relevant officer to attest under penalty of perjury that all of the information she had provided Spartan was materially true and accurate, there were no persons with control over the controlling shares of the issuer other than those listed as owners of the shares, that the issuer would continue with its stated business plan for at least 18 months, that it had no intent to enter into a merger or other transaction that would result in a change of control, and that it would promptly notify Spartan of any material changes in the information set out in the affidavit. Spartan required each officer or director of the company to make a separate attestation and provide a notarized signature to the attestation.

14.     All officers, directors, and shareholders owning 5% or more of voting securities were also required to fill out a Director and Officer Questionnaire. The questionnaire required the relevant persons to certify with a signature the accuracy of the answers provided, including whether any change in control was contemplated.

15.     Spartan required a spreadsheet with information concerning the number of outstanding shares, names of shareholders, and their relationship to the issuer. Spartan also gathered the issuer's public filings and conducted a background check on the officers, directors and shareholders who owned 5% or more of voting securities.

16.     At the discretion of the registered principal responsible for the Form 211 application, Spartan also collected a "211 Due Diligence Questionnaire." The issuer provided, among other things, a certification about any material adverse information the issuer was aware of, and a signed statement "on Company letterhead and signed by an officer" "indicating whether any person or entity has control, written or otherwise, of the sale, transfer, disposition, voting or any other aspect of the shares listed in your S–1 other than the person or entity identified as the shareholder." Each page of the form had to be "certified as reliable and accurate" by a signature

from an officer or director of the issuer, as did separate statements concerning potential mergers or any anticipated change in control. Spartan acquired this signed form for Dinello, Court Document, Top to Bottom, and Quality Wallbeds.

17.     After January 2013, Spartan often provided standard forms to issuers or their representatives. Spartan first sent a 15c2-11 listing application checklist, which requested that "an executive officer of the Company answer all questions," with appropriate signatures, and "attach all requested documents" as a part of the application packet. The issuer also had to provide multiple signed certifications that there were no "Red Flag Issues," it had provided accurate information to Spartan, it had not withheld any "material adverse information," and that it would provide additional information in the event of a material change. The issuer also had to certify, with multiple signatures and a letter on the "Company's letterhead and signed by an executive officer" that "that, to the best of the Company's knowledge, there is no person or entity that has control, written or otherwise, of the sale, transfer, disposition, voting or any other aspect of the shares listed on the shareholder list other than the person or entity identified as the shareholder" and that the company did not anticipate a change in control "for the foreseeable future." Spartan acquired signed Form 211 application checklists from First Independence, Envoy, Changing Tech., First Xeris, Top to Bottom and PurpleReal.com.

18.     Spartan retained all Form 211 information in its files, segregated from Island's, and accessible only by employees of Spartan.

19.     Spartan followed its common practices for the 19 issuers.

20.     FINRA examiners had no obligation to clear the application for quotation and would not do so until he was satisfied that the application had demonstrated compliance with applicable rules.

21.     FINRA examiners could seek additional information concerning the application in a deficiency letter. FINRA examiners had no limitations on the number of letters they could send, or on the nature of the information they requested. If an examiner saw a "red flag" in an application, it "would absolutely address that in a deficiency letter." It was "very common" for FINRA examiners to send deficiency letters, and the examiners did not consider them to be an indication that the application was suspicious.

22.     An issuer's status as a shell company would not have prevented a Form 211 application from being cleared. It was also "pretty common" for small issuers to have shareholders with close relationships to the officers or directors, and it was not always a red flag to see such relationships.

23.     The FINRA examiner would review a broker-dealer's response to a deficiency letter and could ask for additional information or clear the application. The FINRA examiner would only clear the application if he was satisfied with the information provided.

24.     Between February 27, 2013 and February 7, 2014, FINRA sent Spartan seven deficiency letters concerning the applications for First Independence, Top to Bottom, Envoy, Changing Tech., and First Xeris. Mr. Dilley was the registered principal for each application. Spartan's registered representative, Taylor Zajonc, reviewed the deficiency letters and gathered responsive information from the issuer. Mr. Zajonc gathered responsive information, including signed letters from the issuers' officers and directors, and drafted responses. Mr. Lopez reviewed Spartan's responses to the deficiency letters, as well as the supporting documents, and approved them.

25.     Once FINRA cleared Spartan to issue a quotation, many issuers sought eligibility for clearance through the Depository Trust Company (DTC).

26.     DTC eligibility was not required for a stock to be traded in an OTC market. Spartan did not apply for DTC eligibility for any issuer because it was not a DTC participant.

27.     With respect to the 19 issuers, Kids Germ, On the Move Systems, Rainbow Coral, and Dinello sought DTC eligibility through Penson Financial Services, Inc. Spartan did not provide any information directly to DTC concerning those issuers. Penson did not ultimately file Rainbow Coral's DTC application.

28.     Shares can be sold without utilizing a market-maker, and FINRA clearance neither ensures that a market-maker will publish a quotation, not that any share will be sold on a market or otherwise.

29.     Other market-makers could publish quotations for the issuer without having to file a Form 211 application of their own after 30 days from when the market-maker was cleared for quotation. Spartan regularly stopped making a market for issuers after this period and did not follow the issuer's operations after it ceased to serve as a market-maker.

30.     Because of then-existing market conditions many issuers received offers to change control when they became listed on an OTC market. Several of the 19 issuers provided in their registration statements that they would consider changes in control to add shareholder value, even though they did not anticipate a change in control at the time. It would not have been surprising for one of these issuers to engage in a subsequent merger or acquisition.

31.     Issuers often interacted with Spartan and Island via intermediaries—attorneys, consultants, etc.—who aided them and their shareholders to navigate the complex process of selling shares on a publicly traded exchange.

32.     Alvin Mirman and Sheldon Rose held themselves out to be intermediaries for some of the 19 issuers. Mr. Mirman and Mr. Rose forwarded all required documents involved with the

Form 211 process from the issuers' documented officers who represented the documents and information as being accurate in all respects. They also represented that the documents, including notarized affidavits from the officers, and signed subscription agreements with proof of payment and copies of identification, as being genuine and authentic. Mr. Mirman and Mr. Rose never informed Spartan or any employee of Spartan that any of the information provided to Spartan concerning any issuer was materially inaccurate or misleading. Mr. Rose also never told "anyone at Spartan Securities that [he] and Mr. Mirman controlled the shares" of any issuer.

33.   Mirman and/or Rose did not disclose their control over the investments in Kids Germ, Obscene Jeans, On the Move, Rainbow Coral, First Titan, Neutra, Aristocrat, First Social, E-Waste, First Independence, Changing Tech., Global, Envoy, E-Waste, and First Xeris to Defendants.

34.   As officers or directors for each issuer, Diane Harrison and Michael Daniels they presented all required documents for the Form 211 process on behalf of the issuer and represented the documents and information as being accurate. Ms. Harrison and Mr. Daniels never informed Spartan or any of its employees that any of the information they provided concerning the issuers was materially inaccurate or misleading.

35.   In 2012, SEC examiners conducted an on-site examination of Spartan regarding Form 211 applications submitted from January 1, 2011 through September 28, 2012. The examiners had access to all emails and 211 files, and specifically requested files related to Aristocrat, First Titan, and Neutra. SEC examiners were expected to review potential "red flags" and measure Spartan's response to them. Not every "red flag" suggested by Commission guidance was necessarily indicative of underlying fraud. Many of the shareholders for the three companies overlapped and had apparent relationships with the issuers, but the supervising examiner did not

consider this to be a suggestion that Spartan had violated any rule. Ms. Harrison was listed as counsel for multiple companies on their S-1 registration statements. The examiners did not raise any issues with using the same attorney for multiple issuers or overlapping shareholders between issuers. SEC staff raised no deficiencies concerning Spartan's review of "red flags" for any of the 19 issuers.

36.     Island segregated its business operations and its files from Spartan and Spartan's employees. Spartan never acted as a transfer agent for any shares of stock.

37.     Island was not involved with filing Form 211 applications. Island was not a broker-dealer and acted solely as a transfer agent. As a transfer agent, Island completed ministerial recording of transfers, canceling stock certificates, and issuing new stock certificates, when given appropriate instructions.

38.     When presented with appropriate instructions, Island had an obligation to promptly process the transfer to avoid civil liability to the stockholder and regulatory liability to SEC.

39.     In order to process a sale of stock for any issuer, Island gathered documentary evidence: (1) evincing the stockholder's ownership, generally in the form of a signed subscription agreement and proof of payment for the original stock in the stockholder's name; (2) an original Stock Power certificate directing Island to transfer the stock to an identified recipient signed by the original stockholder with a medallion guarantee stamp provided by a reputable financial institution; and (3) a form of instructions to Island signed by the original stockholder directing the transfer to an identified recipient. Additionally, Island typically requested letters from attorneys for the stockholder confirming the transfer instructions, and providing any appropriate opinions concerning whether the new certificate should be stamped as restricted.

40.     When requested by the DTC participant firm that was filing an application for

eligibility, Island provided an agency attestation form concerning issuers. The attestation only provided ministerial information about an issuer—name, description of stock, CUSIP number, number of authorized shares, and number of shares outstanding. The attestation did not provide any substantive information or representations about the issuer's activities or registration of shares. The attestation was not seen by the public. Island provided DTC attestations for Kids Germ, Obscene Jeans, and On the Move Systems.

41.     Island was not involved with arranging any sale of any stock. Island never processed transfers until after a sale had been completed by the stockholder. Island never received any proceeds or had any stake in the outcome of any sale of stock beyond routine transfer fees.

42.     Island played no active role in negotiating or planning any of the sales or transfers of shares for any of the issuers. Ms. Harrison, counsel for Dinello, Court Document, Quality Wallbeds, and Top to Bottom testified that Island had no participation in the planning of the sale of any shares of Dinello. All sales would have occurred regardless of Island's involvement as a transfer agent, and the transfer would have proceeded with a different agent if Island had refused the instructions. Mr. Daniels, an officer of Court, Quality Wallbeds, and Top to Bottom, attested that Island had no role in planning, organizing, negotiating, or executing the sale of shares for those issuers and was not a necessary part of any transfer or sale of shares.

43.     For any transfer made by Island concerning Mirman and/or Rose issuers, each had filed effective registration statements, which provided that the issuer would engage in a self–underwritten offering. Thereafter, shareholders had purchased the registered shares from the issuer. In each instance, the issuer provided Island with copies of the subscription agreements and proof of payments for each investor indicating that the shares were purchased during the offering described in the effective S-1. Some of the shareholders then directed Island to transfer their

registered shares to a new purchaser, by providing Island with the appropriate form instructions. The transfers sometimes included transfer of shares held by officers or directors of the issuer, and these newly issued certificates were stamped as restricted for resale.

44.     For any transfers made by Island concerning Daniels and/or Harrison transfers each had filed effective registration statements, which listed shareholders who had purchased shares from private placement sales. The registered shareholders provided Island with subscription agreements and proof of payment indicating how they had acquired their shares. Some shareholders directed Island to transfer their registered shares to a new purchaser by providing Island with the appropriate form instructions. The new certificates were either stamped with a restrictive legend or relied on an opinion letter directing Island to remove a restricted legend because either the shareholders had been registered in the registration statement or the affiliate shareholders had been in a non–control position for a sufficient period of time.

45.     Island acted in accordance with generally accepted practices and procedures of transfer agents and in fulfillment of its legal obligations in connection with the issuance and transfer of securities in response to requests made in good order."

46.     Island Stock Transfer did not have any basis for refusing to issue these Shares which had been approved for issuance by the Commission and were accompanied by documents authorizing and substantiating the issuance.

47.     Island's policies and procedures did not establish any legal obligation for Island or its employees.

48.     Spartan's policies and procedures did not establish any legal obligation for Island or its employees.

49.     During the SEC's onsite examination of Island, examiners had access to all transfer

agent files for all of Island's customers from 2011 through 2012 and specifically requested files for Aristocrat, First Titan and Neutra. After the exam, SEC sent Island a letter indicating it had not found any deficiencies.

## VIII.

## <u>STIPULATED POINTS OF LAW</u>

1.      Rule 15c2-11, 17 C.F.R. § 240.15c2-11(a), enacted under § 78o(c)(3)(A) of the Securities Exchange Act of 1934 (Exchange Act), provides that

> it shall be unlawful for a broker or dealer to publish any quotation for a security or, directly or indirectly, to submit any such quotation for publication, in any quotation medium (as defined in this section) unless such broker or dealer has in its records the documents and information required by this paragraph (for purposes of this section, "paragraph (a) information"), and, based upon a review of the paragraph (a) information together with any other documents and information required by paragraph (b) of this section, has a reasonable basis under the circumstances for believing that the paragraph (a) information is accurate in all material respects, and that the sources of the paragraph (a) information are reliable.

2.      For a defendant to be liable as an aider and abettor under 15 U.S.C. § 78t(e), SEC must prove: "(1) a primary violation by another party; (2) a general awareness by the accused aider-abettor that his role was part of an overall activity that is improper; and (3) that the accused aider-abettor must have knowingly and substantially assisted the violation." *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 800 (11th Cir. 2015) (citation omitted). "Severe recklessness can satisfy the scienter requirement in an aiding and abetting case." *Id.* (internal citation and quotation marks omitted).  Knowledge of the existence of a fact can be inferred if a defendant (1) subjectively believed that there is a high probability that a fact exists and (2) took deliberate actions to avoid learning that fact.  *Id.* at 804.

3.      Under Rule 10b-5, the SEC must prove that a defendant used an instrumentality of

interstate commerce in connection with the purchase or sale of a security and acted knowingly or with severe recklessness. Under Rule 10b-5(a) the SEC must prove that a defendant used a device, scheme, or artifice to defraud in connection with the purchase or sale of a security. Under Rule 10b-5(b) the SEC must prove that a defendant either made an untrue statement of material fact or omitted a material fact, either of which would tend to mislead the prospective buyer or seller of a security. Under Rule 10b-5(c) the SEC must prove that a defendant engaged in an act, practice, or course of business – in connection with the purchase or sale of a security – that operated or would operate as a fraud or deceit on any person. "Scienter may be established by a showing of knowing misconduct or severe recklessness." *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1324 (11th Cir. 1982).

4.      Under § 17(a) of the Securities Act, it is unlawful "to employ any device, scheme or artifice to defraud" "in the offer or sale of any securities." 15 U.S.C. § 77q(a)(1). To show a violation of § 17(a)(1), SEC must prove a defendant made "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) [] with scienter." *SEC v. Merchant Capital, LLC,* 483 F.3d 747, 766-67, 768, & 772 (11th Cir. 2007). Section 17(a)(3) prohibits use of interstate commerce or the mails "to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a)(3). To show a violation of either §§ 17(a)(2) or (3) SEC must prove a defendant made "(1) material misrepresentations or materially misleading omissions, (2) in the offer or sale of securities, (3) [] with negligence." *Id*. The shares of the issuers at issue in this case are securities and interstate commerce or the mails were used here.

5.      Section 5 of the Securities Act, 15 U.S.C. §§ 77e(a), makes it unlawful "to sell" any security "[u]nless a registration statement is in effect." Section 77e(c) similarly makes it

unlawful "to offer to sell or offer to buy" any security "unless a registration has been filed as to such security." In order to establish a prima facie case for a violation of § 5, "SEC must demonstrate that (1) the defendant directly or indirectly sold or offered to sell securities; (2) through the use of interstate transportation or communication and the mails; (3) when no registration statement was in effect." *SEC v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004). Under a "participant" theory of liability, "[t]o demonstrate that a defendant sold securities, SEC must prove that the defendant was a necessary participant or substantial factor in the illicit sale." *Id.* at 1215 (citation omitted). A person who sells unregistered securities violates Sections 5(a) and 5(c) regardless of whether the violation was committed knowingly, intentionally, recklessly, or negligently.  If the SEC demonstrates a prima facie § 5 violation, then the burden shifts to the defendant to show the transaction involved a registered or exempt security. *SEC v. Cavanagh*, 155 F.3d 129, 133 (2d Cir. 1998).

## IX.

## CONTESTED ISSUES OF LAW

Issues of law are as set forth in pending motions and proposed jury instructions.

## X.

## EXPERT LIST AND SUMMARY OF TESTIMONY

**Plaintiff's Expert**

Plaintiff SEC's Expert Witness is James M. Cangiano.  Mr. Cangiano will testify consistent with his expert report and deposition testimony.  In summary, Mr. Cangiano will testify about:

a.   The characteristics of shell factories and how the companies that are sold are sometimes employed in schemes commonly referred to as "pump and dump" and other schemes;

31

b.      Red flags which were present and whether those red flags would be recognized by industry professionals;

c.      Customary practice and industry standards;

d.      Whether Defendants' actions were indicative of their essential participation in the schemes to defraud;

e.      The effect of the Defendants' actions in the marketplace and on the investing public;

f.      Spartan and Island Transfer were "links in a chain" that permitted the shells to be sold thereby putting the investing public at risk.  Defendants created a "one stop shop" that provided a way of facilitating the "cleaning" of various shell and blank check companies in order for those shells to be sold, sometimes with the shell purchasers using these companies in manipulative schemes;

g.      Defendants were a critical part of the alleged fraud as their actions made the shells more valuable by causing the shells to become eligible for quoting in interdealer quotations media with the filing of Form 211 applications with FINRA. Defendants were required by SEC rules to have FINRA approval and current information with respect to the issuer on file before being permitted to enter a quotation. The required information must have been obtained from preferably the issuer or other reliable source and the documentation must in fact have been reviewed;

h.      Defendants engaged in certain activities that exhibited characteristics that would be recognized as irregular by industry professionals as they relate to compliance with SEC Rule 15c2-11 and other rules, including multiple red flags.  Industry professionals, faced with the information and the multiple red flags presented to Defendants, would have easily concluded that more thorough investigation was warranted regarding source reliability and accuracy of the information being provided particularly because of the involvement of persons known to be involved with

selling shells; the similarities among the applications, and by not performing even rudimentary due diligence;

i.      Defendants made the shells appear legitimate and as a result more valuable by causing the shells to become "DTC" eligible. In this regard, they filed information with DTC which was provided by the persons desiring to sell the shells and not from a reliable or verified source. In addition, they provided information to DTC which was misleading, including multiple false representations to DTC that these were not "shell" companies;

j.      Defendants' activities carried out by Island Transfer were not customary practice in the transfer agent space and did not comport with industry standards.  Defendants' actions in the capacity of a transfer agent made the shell company more valuable by making it appear that the shell is "ready to go" and by creating the impression that the securities in question were "freely tradeable." In that regard, the Defendants had restricted legends removed and relied on documentation, including bogus legal opinions and forged or blank stock powers. The "freely tradeable" factor provides additional value to the shell; and

k.      Market professionals rely on the integrity of published quotations in the marketplace and the industry's clearance and settlement systems could be compromised by virtue of the misrepresentations of the Defendants and others.  The effects of the Defendants' actions were serious and a threat to the integrity of the marketplace.

**Defendants' Objection:** Defendants reassert their objections to Mr. Cangiano's testimony for the reasons outlined in the motion in limine.

**Defendants' Expert**

Defendants' Expert Witness is Mark Harmon. Mr. Harmon will testify consistent with his expert report, deposition testimony, and the Court's November 30, 2020 decision (DE 133.). In summary, Mr. Harmon will testify about the generally accepted standards, practices, and procedures of the transfer agent industry including:

a. General background information on the relevant statutory and regulatory schemes;

b. Documents that transfer agents typically consult prior to recording transfers;

c. The decision-making process transfer agents generally follow;

d. The kind of regulatory and legal considerations transfer agents usually take into account when evaluating transfers.

**Plaintiff's Objection**: Plaintiff reserves the right to object to Harmon's testimony to the extent the scope is not relevant to the violations at issue in this case; he attempts to opine on the legality of Defendants' actions; makes other legal conclusions; or otherwise violates the Court's Order limiting his testimony.

## XI.

## WITNESS LIST

The SEC's Witness List is attached as Exhibit 1.

The Defendants' Witness List is attached as Exhibit 2.

## XII.

## EXHIBIT LIST

The Joint Exhibit List is attached as Exhibit 3.

The SEC's Exhibit List is attached as Exhibit 4.

The Defendants' Exhibit List is attached as Exhibit 5.

# XIII.

## DEPOSITION DESIGNATIONS

### A.  Plaintiff's Deposition Designations

Plaintiff's designations are attached as Exhibit 6.

### B.  Defendants' Deposition Designations

Defendants have no deposition designations.

**Defendants' Objections to Plaintiff's Designations:**

Defendants object to Plaintiff's deposition designations on several grounds. First, Plaintiff initially noticed its deposition designations shortly after noon on January12, 2021, the day before the parties' Joint Final Pretrial Statement was due to be filed with the Court. The first deposition designations included almost 58 pages of designations from six depositions of three of the Defendants (Dilley, Lopez, Eldred) consisting of 1,053 pages and nearly 17.36 hours (excluding breaks) of testimony. The chart below breaks down the depositions noticed for deposition designations in Plaintiff's first notice:

| Defendant | Deposition Date | Pages of Testimony | Hours of Testimony* |
|-----------|-----------------|--------------------|---------------------|
| Dilley | July 20, 2020 | 268 | 9.05 hours (9:03 am – 6:00 pm) |
| Dilley | October 17, 2017 | 153 | 3.08 hours (1:42 pm – 4:47 pm) |
| Lopez | July 27, 2020 | 197 | 5.23 hours (9:09 am – 2:23 pm) |
| Lopez | October 18, 2017 | 128 | 2.6 hours (9:39 am – 12:15 pm) |
| Eldred | July 17, 2020 | 161 | 5.08 hours (9:07 am – 2:12 pm) |
| Eldred | October 17, 2017 | 146 | 3.32 hours (9:15 am – 12:34 pm) |
| *Hours calculation excludes breaks* | | | |

When its first notice was sent, Plaintiff's counsel noted that the deposition designations were not yet complete and additional designations would be sent.

Plaintiff sent its second notice of deposition designations about 2.5 hours later. The second deposition designations included almost 65 pages of designations. The second noticed deposition designations included an additional deposition of Mr. Lopez not previously noticed consisting of an additional 211 pages and almost 6.17 hours (excluding breaks) of testimony:

| Defendant | Deposition Date | Pages of Testimony | Hours of Testimony* |
|-----------|-----------------|--------------------|---------------------|
| Lopez | May 5, 2018 | 211 | 6.17 hours (9:39 am – 3:49 pm) |
| *Hours calculation excludes breaks* | | | |

In total, Plaintiff noticed 1,264 pages and almost 24 hours (excluding breaks) of testimony the day before the Joint Final Pretrial Statement was due to be filed, in contravention to this Court's Fourth Amended Case Management and Scheduling Order, ECF No. 132 at III.B.4. Given the volume of the records designated, it was impossible for Defendants to review, object to, and counter-designate Plaintiff's deposition designations prior to the filing of the Joint Final Pretrial Statement and Pretrial Hearing.

In addition to the late disclosure, it is Defendants' view that Plaintiff has improperly and overly designated deposition testimony for witnesses who are scheduled to testify in-person at trial. As a general matter, Plaintiff's excessive designations are a waste of time and cumulative of live trial testimony and should be excluded under Rule 403 the Federal Rules of Evidence. As this Court has noted, "publishing large portions of the depositions of witness[es] who are available and" who are likely to be called as witnesses "not only contravenes the Court's marked preference for live testimony" but it would also likely be unnecessarily cumulative and would waste this Court's time and resources." *White v. United States*, No. 8:11-CV-1355-T-33EAJ, 2013 WL 3422965, at *3 (M.D. Fla. July 8, 2013) (denying Plaintiff's motion to use portions of fourteen depositions of available witnesses).

Further, what review Defendants' counsel was able to accomplish in the limited time provided indicates that Plaintiff has also improperly designated portions of testimony in violation of Rules 401, 403, 602, 801, 802, and 1002.

Defendants' Counsel made a good faith effort to review the designations provided and were only able to complete a first review of the deposition designations of the July 2020 deposition of Mr. Dilley. That first review took 6 hours and 50 minutes to complete. Defendants' Counsel did not track the total number of designations Plaintiff made but did highlight all designations in the transcript. Based on the highlighted transcript, which Defendants are willing to provide to the Court for its review, roughly 75 percent of the transcript was designated by Plaintiff. While the transcript reviewed is the longest transcript, Defendants' Counsel estimates it may take between 10 to 16 hours to complete a *first* review of the remaining transcript designations. Defendants have attached the limited objections and counter-designations they were able to accomplish before this filing.

It is Defendants view that this amount of time to review Plaintiff's late and excessive designations will substantially impair their ability to adequately prepare for trial. Defendants request exclusion pursuant to this Court's Order, *see* ECF No. 132 at VI. Defendants request that Plaintiff be excluded from submitting any deposition testimony into evidence at trial unless it is used for the purposes of impeachment. Alternatively, Defendants request that this Court enter an order precluding additional deposition designations from Plaintiff and providing Defendants sufficient time to raise particular objections and provide counter-designations.

The SEC asserts that the designations are proper and permitted pursuant to Fed.R.Civ.P. 32 as designations of a Party. In addition, the SEC has no objection to Defendants being given additional time to raise objections.

## XIV.

## JOINT PROPOSED JURY INSTRUCTIONS AND PROPOSED JURY VERDICT FORM

The Joint Proposed Jury Instructions are attached as Exhibit 7.

The Proposed Jury Verdict Form are attached as Exhibit 8.

Defendants submit Jury Interrogatories attached as Exhibit 9 which the Commission objections to.

## XV.

## JURY QUESTIONNAIRE AND VOIR DIRE QUESTIONS

Supplemental Juror Questionnaire attached as Exhibit 10.

Proposed Voir Dire Questions attached as Exhibit 11.

## XVI.

## LENGTH OF TRIAL

The parties estimate that the trial shall be 12- 15 trial days.

## XVII.

## STATEMENT REGARDING DISAGREEMENTS ABOUT FEDERAL RULES

The parties have no disagreements regarding the Federal Rule of Evidence or Civil

Procedure at this time. The parties reserve the right to raise any appropriate objection at trial.

## XVIII.

## STATEMENT CONCERNING REMOTE WITNESSES

The parties are mindful that the COVID-19 pandemic has significantly disrupted this

Court's operation and the conduct of trials and that this Court has taken extraordinary measures to

help minimize the threat to jurors, court staff, witnesses, and attorneys. However, the parties intend

to call multiple witnesses from outside the district. Some of these witnesses are at a high-risk for complications from COVID-19 if they become infected. To help reduce the risk to the witnesses, as well as jurors, court staff and the attorneys that might arise from interstate travel for testimony, the parties would like to explore whether it is a viable option to present select witness testimony through remote means at trial. The Plaintiff has additional concerns regarding this approach given the likelihood that most if not all of the witnesses will request leave to appear remotely which could prejudice its case.

Dated: January 13, 2021                              Respectfully Submitted,

*/s/Christine Nestor*
**Christine Nestor**
nestorc@sec.gov
U.S. Securities & Exchange Commission
801 Brickell Ave Ste 1950
Miami, FL 33131-4901
Counsel for Plaintiff

*/s/ Alise Johnson*
**Alise Johnson**
johnsonali@sec.gov
U.S. Securities & Exchange Commission
801 Brickell Ave Ste 1950
Miami, FL 33131-4901
Counsel for Plaintiff

*/s/ Alice Sum*
**Alice Sum**
sumal@sec.gov
U.S. Securities & Exchange Commission
801 Brickell Ave Ste 1950
Miami, FL 33131-4901
Counsel for Plaintiff

*/s/ Caleb Kruckenberg*
**Caleb Kruckenberg**
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. N.W., Suite 450
Washington, D.C., 20036
caleb.kruckenberg@ncla.legal
(202) 869-5217
Counsel for Defendants Appearing *Pro Hac Vice*

*/s/ Kara Rollins*
**Kara Rollins**
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. N.W., Suite 450
Washington, D.C., 20036
kara.rollins@ncla.legal
(202) 869-5210
Counsel for Defendants Appearing *Pro Hac Vice*