IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE | : | |
| COMMISSION, | : | |
| | : | CASE NO.: 8:19-cv-448-VMC-CPT |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SPARTAN SECURITIES GROUP, LTD., | : | |
| ISLAND CAPITAL MANAGEMENT, | : | |
| CARL E. DILLEY, and | : | |
| MICAH J. ELDRED. | : | |
| | : | |
| Defendants. | : | |

**DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................i

TABLE OF AUTHORITIES ........................................................................................................ii

RELEVANT FACTS AND PROCEDURAL HISTORY...............................................................1

DEFENDANTS DID NOT VIOLATE RULE 10b-5(b) AS A MATTER OF LAW .......................2

    I.    SPARTAN DID NOT MAKE ANY ACTIONABLE STATEMENTS OR OMISSIONS............................10

        A.    The Form 211 Applications and Cover Letters................................................10

            1.    Spartan Cannot Be Responsible for the Issuer's Statements............................10

            2.    None of the Statements or Omissions Were Material .....................................12

            3.    None of the Statements or Omissions in the Cover Letters Was Made "In Connection" with the Purchase of Securities.................................................17

        B.    Statements or Omissions Concerning DTC Applications ...................................19

    II.    MR. ELDRED DID NOT MAKE ANY ACTIONABLE STATEMENTS OR OMISSIONS...................21

    III.    ISLAND CAPITAL DID NOT MAKE ANY ACTIONABLE STATEMENTS OR OMISSIONS ............24

    IV.    MR. DILLEY DID NOT MAKE ANY ACTIONABLE STATEMENTS OR OMISSIONS ....................25

CONCLUSION.......................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Badger v. S. Farm Bureau Life Ins. Co.*, 612 F.3d 1334 (11th Cir. 2010) ................................................. 4, 28

*Brink v. Raymond James & Associates, Inc.*, 892 F.3d at 1142 (11th Cir. 2018) ............................. 6, 29

*Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014) ............................................................. 7, 21

*Di Donato v. Insys Therapeutics Inc.*, No. CV-16-00302-PHX-NVW, 2017 WL 3268797
    (D. Ariz. Aug. 1, 2017) ........................................................................................................... 10, 22

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) ...................................................................4

*In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153 (2d Cir. 1998) ........................................................10

*In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257 (11th Cir. 2016) .......................... 4, 14

*Jabend, Inc. by Aebig v. Four-Phase Sys., Inc.*, 631 F. Supp. 1339 (W.D. Wash. 1986) ........................ 10, 22

*Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) ..................................... 4, 14, 24, 25

*Landy v. Fed. Deposit Ins. Corp.*, 486 F.2d 139 (3d Cir. 1973) ............................................... 9, 10, 22

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011) ....................................................................5

*McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241 (11th Cir. 2016) ...............................3

*SEC v. Goble*, 682 F.3d 934 (11th Cir. 2012) ................................................................................passim

*SEC v. Mannion*, 789 F. Supp. 2d 1321 (N.D. Ga. 2011) .................................................................. 10, 22

*SEC v. Merch. Capital, LLC*, 483 F.3d 747 (11th Cir. 2007) ............................................................ 3, 4

*SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233 (11th Cir. 2012) ............................... 5, 15, 24, 28

*SEC v. Pirate Inv. LLC*, 580 F.3d 233 (4th Cir. 2009) ................................................................ 8, 9, 12

*SEC v. Radius Cap. Corp.*, 653 Fed. Appx. 744 (11th Cir. 2016) ..................................................... 11, 12

*SEC v. Rana Research, Inc.*, 8 F.3d 1358 (9th Cir. 1993) ............................................................. 8, 12

*SEC v. Savoy Industries, Inc.*, 587 F.2d 1149 (D.C. Cir. 1978) ...................................................... 9, 12

*SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) ......................................................... 8, 12

*SEC v. Wolfson*, 539 F.3d 1249 (10th Cir. 2008) ........................................................................... 8, 12

*SEC v. Zandford*, 535 U.S. 813 (2002) ......................................................................................... 6, 21

*Semerenko v. Cendent Corp.*, 223 F.3d 165 (3rd Cir. 2000) .......................................................... 8, 9, 12

*Wessel v. Buhler*, 437 F.2d 279 (9th Cir. 1971) ........................................................................ 9, 10, 22

*Wright v. Ernst & Young LLP*, 152 F.3d 169 (2d Cir. 1998) ...............................................................3


**Statutes**

15 U.S.C. § 78(j)(b) ..........................................................................................................................1


**Regulations**

17 C.F.R. § 240.10b-5(b) ...................................................................................................................1


**Rules**

Fed. R. Civ. P. 50 ...............................................................................................................................2

Fed. R. Civ. P. 50(a)(1) .....................................................................................................................3

Fed. R. Civ. P. 50(a)(2) .....................................................................................................................2

Fed. R. Civ. P. 50(b) ..........................................................................................................................3

Defendants Spartan Securities Group, LTD., Island Capital Management LLC, Carl E. Dilley, and Micah J. Eldred move for judgment as a matter of law on the only remaining count against them concerning alleged violations of Section 10(b) of the Securities Exchange Act of 1934. Plaintiff, the Securities and Exchange Commission, failed in its effort to tie Defendants to the misdeeds of others— primarily Alvin Mirman and Sheldon Rose. Nevertheless, the jury accepted SEC's sole argument that Defendants made a variety of false statements or omissions in filings made with the Financial Industry Regulatory Authority (FINRA) and to participant clearing firms in relation to applications for electronic settlement through the Depository Trust Company (DTC). None of the statements or omissions alleged by SEC can support the verdict because none involved misstatements or misleading omissions that a reasonable investor would have considered important to an investment decision. Indeed, the statements or omissions at issue could not have been viewed by *any* potential investors, and certainly could not have been objectively important to the market as a whole. This Court should therefore grant judgment for the Defendants as a matter of law.

## RELEVANT FACTS AND PROCEDURAL HISTORY

SEC brought 14 counts against Defendants and David D. Lopez, alleging a broad scheme to aid and abet the creation of fake publicly-traded companies and subsequent issuance of stock. Defendants acted as the market-maker and, sometimes, transfer agent for these issuers, so SEC alleged that Defendants knowingly participated in the issuers' frauds. SEC also alleged in Count 6 of its Complaint that Defendants directly made materially misleading statements or omissions in connection with the purchase of the issuers' securities in violation of Section 10(b) of the Exchange Act (15 U.S.C. § 78(j)(b), and Rule 10b-5(b) (17 C.F.R. § 240.10b-5(b)). *See* ECF No. 1 (Count VI).

This case proceeded to a 12-day trial before a jury. As this Court presided over the trial, viewed the witnesses and exhibits, and listened to the testimony, Defendants presume familiarity with the relevant facts, and only cite to relevant testimony below concerning discrete legal issues.

In its instructions concerning Count 6, this Court instructed the jury concerning SEC's claimed

misstatements and omissions as follows:

> The SEC claims that Spartan, Dilley, and/or Eldred made misrepresentations and omissions in the filing of 15c2-11 applications and submissions, including, but not limited to:
>
> • Alvin Mirman and Sheldon Rose's involvement and/or role in the issuers;
> • Mirman and Rose's control of the issuers;
> • Whether the issuers were shells or blank check companies;
> • That the issuers had no consultants;
> • The true business purpose of the issuers;
> • Communications with CEOs/Presidents of the issuers;
> • The relationships and affiliations among shareholders and Mirman and Rose;
> • The solicitations of the shareholders;
> • The issuers' plans for potential mergers or acquisitions;
> • That the issuers' shareholders have control of their shares;
> • That Spartan conducted due diligence on the issuers;
> • Spartan and Island's relationship with Sheldon Rose and Alvin Mirman, Diane Harrison, Michael Daniels and Andy Fan;
> • Michael Daniels, Diane Harrison, and Andy Fan's involvement in the issuers;
> • Circumstances surrounding the Form 211 submissions, including the identity of the person for whom the quotation is being submitted;
> • That there are no other issuers that the current officers or directors of the issuers have requested a listing quotation on;
> • That there was no material information, including adverse information regarding the issuer that the firm is aware of or has in its possession.
> • Spartan, Island, and Dilley initiated and provided false information for applications filed with the DTC, including misrepresenting the shell status of issuers.
> • Island and Dilley made misrepresentations and omissions regarding the designation of securities as free trading.
> • Island and Dilley made misrepresentation and omissions when effectuating the bulk issuance and transfer of securities, including stock certificates without restrictive legends.

ECF No. 249 at 38-39.

The jury returned a verdict for Defendants on 13 of the 14 counts, and a verdict for SEC on

Count 6. *See* ECF No. 250 at 3. The Court entered its judgment on August 9, 2021. ECF No. 256.

## DEFENDANTS DID NOT VIOLATE RULE 10b-5(b) AS A MATTER OF LAW

Federal Rule of Civil Procedure 50 provides that the Court may direct the entry of judgment

as a matter of law after trial. Rule 50(a)(2) provides that a party may move for a directed verdict before

2

submission to the jury, while Rule 50(b) provides that the party may "renew[]" that motion after the verdict. *McGinnis v. Am. Home Mortg. Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016). "The standard for granting a renewed motion for judgment as a matter of law under Rule 50(b) is precisely the same as the standard for granting the pre-submission motion under 50(a)." *Id.* (citations omitted). "Thus, as with motions under Rule 50(a), the question before a district court confronting a renewed Rule 50(b) motion is whether the evidence is 'legally sufficient ... to find for the party on that issue.'" *Id.* (quoting Fed. R. Civ. P. 50(a)(1)).

Under Rule 10b-5(b) SEC must prove that a defendant made "(1) material misrepresentations or materially misleading omissions, (2) in connection with the purchase or sale of securities, (3) made with scienter." *SEC v. Merch. Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007).

"[A] defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998).

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not 'make' a statement in its own right. One who prepares or publishes a statement on behalf of another is not its maker.

*Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Additionally, "there can be no liability for a failure to disclose under Rule 10b-5 … in the absence of a duty to disclose." *Badger v. S. Farm Bureau Life Ins. Co.*, 612 F.3d 1334, 1340-41 (11th Cir. 2010).

The test for materiality is "whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action." *Merch. Capital, LLC*, 483 F.3d at 766 (citations omitted). It is not enough to suggest that an "investor might have considered the misrepresentation or omission important." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000) (citations omitted). "The role of the materiality inquiry is to filter out essentially *useless information that a reasonable investor would not consider significant*, even as part of a larger 'mix' of factors to consider in

3

making his investment decision." *SEC v. Goble*, 682 F.3d 934, 944 n. 5 (11th Cir. 2012) (emphasis in original, cleaned up). "Thus, the relevant 'mix' of information is those facts an *investor* would consider when making an investment decision." *Id.* (emphasis added).[1]

While the "total mix" of information is broad, SEC must still demonstrate a connection between the statement or omission and *an investor's* decision to buy or sell *securities.* For instance, in *SEC v. Morgan Keegan & Co., Inc.*, 678 F.3d 1233, 1247 (11th Cir. 2012), the Court concluded that "a misstatement or omission by an individual broker to an individual investor" could be considered in "the 'total mix' of information available to the hypothetical reasonable investor." In rejecting a bright-line rule that SEC could only rely on "disclosures to the public as a whole," the Eleventh Circuit emphasized that it did not matter *where* the disclosure was made, *so long as* it mattered to a "reasonable investor." *Id.* at 1247-48. "In other words, the materiality test requires the court to consider *all* the information available to the hypothetical reasonable investor, which necessarily includes private communications." *Id.* at 1248 (emphasis in original). Of course, the information still had to be "*available to the hypothetical reasonable investor*" to be involved in the total mix of information. *Id.* (emphasis added). Indeed, the Supreme Court has recognized, in general terms, that where Rule 10b-5(b) governs "information that a reasonable investor might consider material," "companies can control what they have to disclose under these provisions by controlling what they say *to the market.*" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011) (emphasis added).

Thus, in *Goble* the Eleventh Circuit held "that a misrepresentation that would only influence an individual's choice of broker-dealers" and not his decision "whether to buy or sell the security," "cannot form the basis for § 10(b) securities fraud liability." 682 F.3d at 944 (citation omitted). This was because the misrepresentation did not bear on any *investment* decision and was not a statement to

---

[1] Omissions also must be material to an *investor*. "The omission of facts is actionable only to the extent that the absence of those facts would, under the circumstances, render another reported statement misleading to the reasonable investor, in the exercise of due care." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1275 (11th Cir. 2016) (citations omitted).

the market more generally but was instead a limited statement that affected whether investors "may have chosen a different broker-dealer to process their transactions." *Id.* at 943-44.

Similarly in *Brink v. Raymond James & Associates, Inc.*, the Eleventh Circuit concluded that an investment advisor's undisclosed profit on processing fees charged to customers was not material because it "objectively could not make a significant difference to a reasonable investor's decision to purchase or sell a covered security." 892 F.3d at 1142, 1149 (11th Cir. 2018). Relying on *Goble*, the Court reaffirmed that "the choice of a type of investment account, much like the choice of a broker-dealer, is not intrinsic to the investment decision itself." *Id.* at 1148-49.

Separately, Section 10(b)'s "in connection" requirement is meant to be construed to "effectuate [the statute's] remedial purpose." *SEC v. Zandford*, 535 U.S. 813, 819 (2002) (citation omitted). While SEC need not prove that a misrepresentation or omission *caused* a purchase, SEC still needs to show a relationship between the two—"It is enough that the scheme to defraud and the sale of securities coincide." *Id.* at 822. Not every misrepresentation would violate the statute. Even a breach of fiduciary duty, without "the requisite connection to a purchase or sale of securities[,]" does not violate the statute. *See id.* at 825 n. 4. This is because SEC still must prove, at least, the coincidental purchase of securities. *Id.*

Since *Zandford* the Court has further explained that "every securities case in which this Court has found a fraud to be 'in connection with' a purchase or sale of a security has involved victims who took, who tried to take, who divested themselves of, who tried to divest themselves of, or who maintained *an ownership interest in* financial instruments that fall within the relevant statutory definition." *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377, 388 (2014) (citations omitted). In that case, the Court read an identical provision of the Securities Litigation Uniform Standards Act "in light of and consistent with the underlying regulatory statutes," including Section 10(b), to mean that a "fraudulent misrepresentation or omission is not made 'in connection with' such a 'purchase or sale of a covered

5

security' unless it is material to a decision by one or more individuals (other than the fraudster) to buy or to sell a 'covered security.'" *Id.* at 387, 389. "The phrase 'material fact in connection with the purchase or sale' suggests a connection that matters. And for present purposes, a connection matters where the misrepresentation *makes a significant difference to someone's decision to purchase or to sell* a covered security." *Id.* at 388 (emphasis added).

Thus, as the Eleventh Circuit has concluded, when conduct is not "the type of behavior meant to be forbidden by § 10(b)," it does not usually meet the "in connection with" requirement. *Goble*, 682 F.3d at 946. When conduct "had no effect on the broader securities market and would not impact an investor's decision to purchase a security," it cannot be said to be made "in connection with" the purchase or sale of securities. *Id.* Thus, the Eleventh Circuit concluded that recording fake transactions to satisfy regulatory reserve requirements were not misrepresentations made "in connection with" the purchase of securities because they defrauded *the regulators* not the public— "Section 10(b) was not intended to protect investors from a broker-dealer's inaccurate records[.]" *Id.*

Other Circuits are in accord and have held explicitly that, if there was not a direct communication with an investor, then to meet the "in connection with" requirement SEC must instead show misrepresentations were "disseminated to the public in a medium upon which a reasonable investor would rely." *Semerenko v. Cendent Corp.*, 223 F.3d 165,175-76 (3rd Cir. 2000). This requirement follows from the Second Circuit's seminal decision in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860-62 (2d Cir. 1968) (en banc), which recognized that while the "in connection with" requirement did not require proof that someone "contemporaneously trade[d]" based on the alleged misrepresentations, "Rule 10b-5 is violated whenever assertions are made, as here, *in a manner reasonably calculated to influence the investing public*, e.g., by means of the financial media, if such assertions are false or misleading or are so incomplete as to mislead irrespective of whether the issuance of the release was motivated by corporate officials for ulterior purposes." (emphasis added, citation omitted). As the

6

Fourth Circuit explained, "Under the *Texas Gulf* standard, the SEC must establish two distinct elements: (1) the misrepresentations in question were disseminated to the public in a medium upon which a reasonable investor would rely and (2) they were material when disseminated." *SEC v. Pirate Inv. LLC*, 580 F.3d 233, 249 (4th Cir. 2009). In addition to the Second, Third, and Fourth Circuits, this same standard has also been adopted by the Ninth, Tenth, and DC Circuits. *See id.* (citing *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1362 (9th Cir. 1993) and S*EC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008)); *SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1171 (D.C. Cir. 1978).

The reason for this rule is simple, "The purpose underlying § 10(b) and Rule 10b-5 is to ensure that investors obtain fair and full disclosure of material facts in connection with their decisions to purchase or sell securities. That purpose is best satisfied by a rule that recognizes the realistic causal effect that material misrepresentations, which raise the public's interest in particular securities, tend to have on the investment decisions of market participants who trade in those securities." *Semerenko*, 223 F.3d at 176 (citation omitted).

As described by the Fourth Circuit,

> At its core, the *Texas Gulf* standard is about notice—attaching liability under the securities laws for statements made in any medium, no matter how tangentially related to the securities markets, would run the risk of roping in speakers who had no idea that their conduct might implicate Section 10(b). Thus, by requiring that misstatements be communicated in a medium upon which a reasonable investor would rely, the *Texas Gulf* standard protects these unknowing speakers from liability and ensures that there is a sufficient nexus between the misrepresentations and the securities sales that they induce to satisfy the Supreme Court's command that the fraud and securities sales "coincide."

*Pirate Inv. LLC*, 580 F.3d at 250-51..

Unsurprisingly then, courts have also long concluded that statements fail the "in connection" requirement when "[t]here is no proof that any [statements] were disseminated to the public or that any investor saw them[.]" *Landy v. Fed. Deposit Ins. Corp.*, 486 F.2d 139, 168 (3d Cir. 1973). Or, as the Ninth Circuit put the point in describing statements that could not give rise to liability, "None of the

three financial statements was made 'in a manner reasonably calculated to influence the investing public.' None was publicly disseminated in any way." *Wessel v. Buhler*, 437 F.2d 279, 282 (9th Cir. 1971). Courts within the Eleventh Circuit have recently agreed that when the relevant statements were *not* "publicly disseminated" the "SEC [] cannot, on their Section 10(b) and Rule 10b-5 claim, rely on the distribution [at issue], because the alleged misrepresentations in those statements did not occur in connection with the purchase or sale of any security." *SEC v. Mannion*, 789 F. Supp. 2d 1321, 1331-32 (N.D. Ga. 2011). So, statements made to industry insiders, like directors, officers, or *relevant agencies*, or even to the public in fora where reasonable investors would not look for investment advice will not meet the "in connection" requirement. *See, e.g.*, *Landy*, 486 F.2d at 168 ("director and counsel for the bank"); *Wessel*, 437 F.2d at 282 ("officers and directors of [the company] a*nd the agencies to which they were directed*") (emphasis added); *Di Donato v. Insys Therapeutics Inc.*, No. CV-16-00302-PHX-NVW, 2017 WL 3268797, at *16 (D. Ariz. Aug. 1, 2017) ("news article" absent evidence that publication was "something upon which investors would presumably rely"); *Mannion*, 789 F. Supp. 2d at 1331-32 (information sent to "existing Fund investors"); *Jabend, Inc. by Aebig v. Four-Phase Sys., Inc.*, 631 F. Supp. 1339, 1344 (W.D. Wash. 1986) (information sent to president of company); *cf. In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156–57 (2d Cir. 1998) ("We hold, therefore, that false advertisements in technical journals may be 'in connection with' a securities transaction *if the proof at trial establishes that the advertisements were used by market professionals in evaluating the stock of the company*.") (emphasis added).

To be sure, in an unpublished decision, a panel of the Eleventh Circuit rejected a *per se* rule "that a material misrepresentation be disseminated into the public arena, and that the exact misrepresentation be an attempted communication directly at the potential investing public to be in connection with the purchase or sale or in the offer or sale of any security." *SEC v. Radius Cap. Corp.*, 653 Fed. Appx. 744, 749 (11th Cir. 2016) (unpublished). That ruling was hardly a repudiation of the broader import of the statutory requirement of "in connection," nor of the prevailing rule in this

Circuit. And other conduct that "had no effect on the broader securities market and would not impact an investor's decision to purchase a security," cannot be said to be made "in connection with" the purchase or sale of securities. *See Goble*, 682 F.3d at 946. The *Radius* decision, like many non-precedential opinions, was fact dependent and arose from an appeal by a pro se defendant. *See* 653 Fed. Appx. at 749. The Court concluded simply that Radius Capital's statements to Ginnie Mae in applications to guarantee mortgage-backed securities met the "in connection" requirement because the "misrepresentations were present both in the GinnieNET forms and in the prospectuses that were made available to the public by download via Ginnie Mae's website, or through an investor's brokerage." *Id.* at 748, 750-51. It appeared as well that because the representations were made to Ginnie Mae, which itself lost $5 million from guarantying the securities and then had to pay out to investors, the Court viewed the statements to Ginnie Mae as having been made "in connection" with investments that passed through Ginnie Mae. *Id.* at 748-49, 753. Thus, *Radius* apparently concluded that when a defendant's misrepresentations "were made available to the public by download via Ginnie Mae's website" and were made directly to a defrauded entity that absorbed investor losses, then they met the statutory requirement—not that the "in connection" requirement was meaningless. *See id.*

Reading *Radius* to mean that SEC need not prove that the misrepresentations were *available* to the public would be inconsistent with binding Eleventh Circuit precedent and, as a non-precedential opinion, must not be followed. *See Goble*, 682 F.3d at 946. Indeed, if *Radius* were read *that* permissively, not only would it render the statutory element meaningless, it would upend 50 years of precedent and create a split with at least six other circuits in the process. *See Wolfson*, 539 F.3d at 1262; *Pirate Inv. LLC*, 580 F.3d at 250-51.; *Semerenko*, 223 F.3d at 175-76; *Rana Research, Inc.*, 8 F.3d at 1362; *Savoy Industries, Inc.*, 587 F.2d at 1171; *Texas Gulf*, 401 F.2d 833, 860-62. It is inconceivable that the Eleventh Circuit meant to do something so significant in an unpublished, per curiam, decision rendered against a pro se defendant.

## I.   SPARTAN DID NOT MAKE ANY ACTIONABLE STATEMENTS OR OMISSIONS

### A.   THE FORM 211 APPLICATIONS AND COVER LETTERS

Most of SEC's proposed misrepresentations or omissions concerned statements or omissions in cover letters appended to the Form 211 applications. *See* ECF No. 249 at 38-39. None of those statements or omissions can support the verdict because—even if they were misrepresentations or misleading omissions—they were immaterial to a reasonable investor and they were not made in connection with the purchase or sale of securities. Indeed, the statements and omissions only related, at most, to information that FINRA, a regulator, requested. No reasonable investor would have considered them, much less considered them to be important. Moreover, this information was confidential, so it would not have been available to any potential investor and hardly could have served as a potential basis for investment information directed to any investor or the public more generally.

### 1.   Spartan Cannot Be Responsible for the Issuer's Statements

As a threshold, many of the misrepresentations alleged by SEC were not "made" by Spartan, and thus could not have lawfully served as the basis for the jury's verdict. SEC faulted Spartan for merely presenting statements made by the issuers to FINRA. For instance, in the jury instructions, SEC faulted Spartan for informing FINRA that "the issuers had no consultants," presenting the "business purpose of the issuers," the "relationships and affiliations among shareholders," the "solicitations of the shareholders," the "issuers' plans for potential mergers or acquisitions," and that "the issuers' shareholders have control of their shares." *See* ECF No. 249 at 38.

Spartan was not the maker of any of these statements, however. The Form 211 Applications, Cover Letters, and accompanying attachments clearly stated that the "issuer has represented" that these facts were true. *See, e.g.*, PX202 (Form 211 Application Materials). Indeed, each cover letter said that the "issuer has represented that they are not working with any consultants," the "issuer described its business" plan as presented, the issuer had "confirmed" and "represented" that the shareholder

information was accurate, that it had presented correct information about shareholder solicitations, the "issuer has represented that they have not entered into any other discussions or negotiations concerning potential merger or acquisition candidates" and that the "issuer is not aware of any person or entity that has control, written or otherwise, of the sale transfer, disposition, voting or any other aspect of the shares listed on the shareholder list other than the person or entity identified as the shareholder." *See id.* at 8. And the undisputed trial testimony was that the issuers *had made* these representations. In every case Spartan gathered written certifications from the officers of the issuers attesting to the accuracy of each of these statements, and further attesting that the issuer had not omitted any relevant or material information. Taylor Zajonc, 7.22.21 a.m., at 77:12-25; 94:3-6. Spartan always gathered such information prior to submitting it to FINRA, and thus, every representation made by *Spartan* concerning this information was undoubtedly accurate. *See id.*

To the extent that the underlying representations made by the *issuer* were false, Spartan cannot be held liable under Rule 10b-5(b) because it had no "control" over the *issuer's* statements, and "[o]ne who prepares or publishes a statement on behalf of another is not its maker." *See Janus*, 564 U.S. at 142. In *Janus* this rule meant that an investment adviser involved in the drafting and preparation of a client's prospectuses was not the "maker" of allegedly fraudulent statements published in the client's prospectuses because only the client—not the advisor—wrote the prospectus. *Id.* at 147. Similarly, in *In re Galectin Therapeutics*, the Eleventh Circuit recognized that a company was not the maker of statements in articles made by stock promoters hired by the company. 843 F.3d at 1272. The same is true here—Spartan had no control over what the issuers said. Merely repeating accurately what the issuer said, and forwarding the issuer's actual statements to FINRA, do not comprise "making" a fraudulent statement under Rule 10b-5(b).[2]

---

[2] SEC also claimed Spartan misrepresented that "there was no material information, including adverse information regarding the issuer that the firm is aware of or has in its possession." This would only be actionable if it related to some other omission or misrepresentation, because otherwise Spartan could not have any "material information" that it failed

### 2.   None of the Statements or Omissions Were Material

Next, none of the statements and omissions at issue were material to a "hypothetical reasonable investor" because they could not have influenced any individual's choice in making a purchase and, indeed, were not even "available" to any potential investor. *See Morgan Keegan*, 678 F.3d at 1248. SEC relied on statements or omissions in the appended cover letters to the Form 211 Applications, and (in addition to the *issuer's* statements discussed above) argued that Spartan misrepresented Mirman, Rose, Daniels, Harrison and Fan's "involvement and/or role" and "control" of the issuers, the "relationships and affiliations among shareholders and Mirman and Rose," that "Spartan conducted due diligence on the issuers," Spartan's "relationship with Sheldon Rose and Alvin Mirman, Diane Harrison, Michael Daniels and Andy Fan," the "[c]ircumstances surrounding the Form 211 submissions, including the identity of the person for whom the quotation is being submitted," and that "there are no other issuers that the current officers or directors of the issuers have requested a listing quotation on." *See* ECF No. 249 at 38-39. Even if this Court determines that some evidence exists in the record from which the jury could have determined these statements or omissions were misleading, they were still *immaterial* to any reasonable investor.

The trial evidence is undisputed that all these statements or omissions were either made in the cover letter or omitted from the cover letter. *See* Zajonc, 7.22.21 a.m., 93:9-13. The Form 211 application had only blanks to fill in, and did not include any place to disclose, for instance, "control of the issuers." *See* DX237 (blank Form 211 application). Instead, Spartan directed FINRA to an appended cover letter, which contained descriptions concerning the relevant topics. *See* Zajonc, 7.22.21 a.m., 77:12-25, 94:3-6; PX113 (partial application materials). These letters were then sent to FINRA, and only FINRA, for review in conjunction with the Form 211 applications. *See* Alvin

---

to disclose. This would not be an independent basis for liability if the remaining alleged misrepresentations or omissions were not sufficient to support the verdict.

Mirman, 7.19.21 a.m., 11:11-13 (testifying that the issuer never received the Form 211 application). As one FINRA examiner agreed in testimony, the "Form 211 application is not publicly available," and "the correspondence that accompanies the Form 211 application—so documents, emails, shared between FINRA and the market maker—that's also not publicly available." Deji Adams, 7.27.21 a.m., 64:17-24. So, SEC's own expert witness agreed that Form 211 applications are not "publicly available." James Cangiano, 7.28.21 p.m., 65:2-7. Taylor Zajonc, who was also SEC's witness, agreed with SEC that the "211 applications had nonpublic information," and "were not public." Zajonc, 7.21.21 p.m., 119:17-19, 23. Mr. Eldred explained why—the applications "were treated as confidential correspondence between Spartan and … FINRA" because "the information in those documents was frequently confidential information." Micah Eldred, 7.26.21 p.m., 37:4-7. Thus, "potential investors" "would not have access to these documents" nor "access to the information that's on the documents." Eldred, 7.26.21 p.m., 37:15-19. Not only were these documents never available to nor seen by the public, but publicly disseminating them would have impermissibly disclosed confidential, non-public information about issuers, which itself likely would have violated the law. *See id.*

While the FINRA examiner testified that *he* considered the statements in the cover letter to be important in whether he cleared the application, that was only regarding whether the application met with FINRA's regulatory approval and was not related to what a reasonable investor would consider important. *See* Adams, 7.27.21 a.m., 9:25-10:3; 28:14-17; 57:19-24. FINRA wanted to know about "any past disciplinary history, any known violation[s] of the issuers, of the directors involved with this or any shareholder." Adams, 7.27.21 a.m., 24:25-25:4. FINRA believed it "important to know the genesis of this 211 being filed, because … we will look to see if there [was] any history, any potential violations or historical violations in the past." Adams, 7.27.21 a.m., 28:14-17. Any misstatements or omissions in the application materials, therefore, could only have been potentially misleading to FINRA, and would not have been relevant to a hypothetical reasonable investor.

The undisputed trial testimony also shows that Spartan's filing of the Form 211 applications themselves was irrelevant to eventual sales of securities. Mirman and Rose often went to different market-makers, whom they too convinced to file Form 211 applications on behalf of issuers that were involved in their schemes. *See* Mirman, 7.19.21 a.m., 22:16-18; 26:19-27:9. Both Mirman and SEC's own expert witness testified that Spartan was not "necessary" for Mirman and Rose's scheme because the two men would simply have gone through a different market-maker, and the sales would have been the same. Mirman, 7.19.21 a.m., 26:19-27:9; Cangiano, 7.28.21 p.m., 73:15-19. It did not matter to any investor if *Spartan* filed the Form 211 application at all, much less what information Spartan included or omitted, because the investors would have made the same purchases regardless.

Thus, the relevant statements or omissions cannot be deemed material as a matter of law. The Eleventh Circuit's decision in *Goble* is particularly instructive because there, just as in this case, the relevant statements were directed at what a *regulator* considered important, not the investing public. *See* 682 F.3d at 944. There the defendants engaged in what SEC alleged was a "scheme to defraud FINRA" and "evade the securities regulations" governing reserve accounts. *Id.* A reasonable investor, however, would not make any "underlying investment decision" based on a broker-dealer's representations to its regulator. *Id.* Even if a reasonable investor might *care*, and go to a *different broker dealer*, that choice would have nothing to do with a choice in *which security* to purchase. *Id.* The same is true here—Spartan's statements and omissions went only to FINRA and could only have influenced FINRA in deciding whether to clear an application that an investor never could have seen. *See* Adams, 7.27.21 a.m., 64:17-24. Whether or not Spartan's applications were cleared, Mirman and Rose would have gone elsewhere, the applications would have been cleared, and the investors would have made the same purchases. *See* Mirman, 7.19.21 a.m., 26:19-27:9; Cangiano, 7.28.21 p.m., 73:15-19.

The undisputed evidence also shows that the specific information, even if available to investors, would not have been relevant or important in making an investment decision. The alleged

misrepresentations and omissions fall into two categories: (1) statements about Mirman, Rose, Daniels, Harrison, and Fan's involvement with the issuers; and (2) statements about how Spartan filed the relevant Form 211 applications. *See* ECF No. 249 at 38-39.

The first category is demonstrably immaterial even to FINRA, and certainly would have been so to a reasonable investor. While some of the Form 211 applications might have omitted that Mirman and Rose served as intermediaries, Harrison had done legal work for Mr. Eldred in his personal capacity, Daniels had worked closely with Harrison in prior offerings, and Fan became an officer in one of the issuers, each of those individuals was disclosed to FINRA in various applications and FINRA cleared the applications anyway. For instance, in the Form 211 Cover Letter for Changing Technology, Mirman was disclosed as having "referred" the issuer to Spartan. Adams, 7.27.21 a.m., 45:14-16; PX202 at 8. FINRA examiners questioned Mirman's role in a comment letter, which prompted a response from the issuer's CEO, Matthew Egna, that "Mirman recommended Spartan Securities" after Egna "asked if he could recommend some broker dealers that could potentially become a market maker for Changing Technologies, Inc." Mirman, 7.19.21 a.m., 70:18-71:3; PX 204; Matthew Egna, 7.19.21 p.m., 46:11-22; DX 84 at 2-4. Mirman, of course, had a long career in the industry, and seemed like a legitimate advisor. Mirman, 7.19.21 a.m., 47:9-12. Moreover, at the time Mirman had already surrendered his license to FINRA and was barred from formally associating with a broker-dealer. Mirman, 7.19.21 a.m., 18:24-19:13. The FINRA examiner agreed he could have reviewed Mirman's disciplinary history, yet he was satisfied with the representations made by the issuer and cleared the application anyway. Adams, 7.27.21 a.m., 52:22-25; 66:2-4. Clearly Mirman's referral was immaterial to FINRA, so why should it have been any different for a potential investor?

Rose was also disclosed as a shareholder in one of the relevant companies and had previously been an officer of an issuer that had successfully filed a Form 211 application. Sheldon Rose, 7.13.21 p.m., 128:1-21; Mirman, 7.19.21 a.m., 47:13-16; Joint Ex. 7. His participation was also immaterial to

FINRA as it again cleared both those applications. *See* Mirman, 7.19.21 a.m., 47:13-16; DX91 (Kids Germ Clearance). FINRA had no reason not to, as Rose had a "spotless reputation" and seemed like a legitimate businessperson. Mirman, 7.19.21 a.m., 47:9-16. The jury clearly rejected any allegations that Spartan aided and abetted Mirman or Rose's crimes. *See* ECF No. 250 Counts 8-13 (aiding and abetting). Thus, simply omitting what Spartan understood to be their roles as intermediaries was not important for any reasonable person who would consider investing in the issuers.

Omissions about Daniels, Harrison, and Fan's involvement were completely trivial. Spartan regularly disclosed Harrison's role as counsel for issuers in the cover letters, many of which involved Mirman and Rose. *See, e.g.*, Zajonc, 7.22.21 p.m., 5:21-24; PX290 at 8. She was also disclosed in relevant filings with the Commission. *See, e.g.*, DX185 (Dinello S-1). Even to the extent that Spartan said that it had no other relationship with Harrison, it wouldn't have mattered to any investor if it had said otherwise. Harrison was a reputable attorney with no disciplinary history who was known to the Commission and FINRA examiners. Daniels, in turn, was not included in the cover letter concerning Dinello, but he was an officer in several other issuers and was disclosed in those applications. *See* PX415 (Court Documents); PX537 (Quality Wallbeds); PX541 (Top to Bottom). FINRA cleared them because again it considered his formal role in the issuer to be no impediment to clearance. *See id.* Fan, meanwhile, was promptly disclosed as soon as he had a formal relationship to one of the issuers in a periodic filing with SEC, and when FINRA inquired about his role, Spartan presented information that it obtained from the issuer, and again FINRA was satisfied and cleared the application. *See* David Lopez, 7.27.21 p.m., 41:23-42:1; Joint 84 at 15, 21. FINRA certainly did not consider it important that Daniels, Harrison, or Fan was involved with different issuers. No investor would have either. It would make no difference at all to a reasonable investor if an issuer had an informal arrangement with an individual who regularly worked in the securities industry, and it is absurd to think that a reasonable investor would have changed their mind about purchasing shares if they had known that Harrison had

previously done legal work for Mr. Eldred, that Daniels had participated informally in drafting the Dinello registration statement, or that Fan ultimately became an officer in Top to Bottom.

The second category, statements about Spartan's decision to file the application, was also irrelevant to any reasonable investor. Assuming that the cover letters were inaccurate in saying that a principal at Spartan was telephonically contacted by the issuer's CEO and that Spartan filed after months of due diligence, these too are trivial details that no reasonable investor would have considered important. This is because Spartan *did* gather extensive due diligence documents from each issuer, had direct communication *by e-mail* from the CEOs, and had extensive written certifications from every issuer prior to filing the applications. Zajonc, 7.22.21 a.m., 77:12-15, 94:3-6; DX 19 (issuer agreement). No reasonable investor would have changed their mind over the difference in being called on the phone versus sent an email, and the presence of a written agreement from *every issuer* confirming that the CEO had asked for the filing would have made it clear that even if technically inaccurate, the substance of the representations was true. *See, e.g.*, DX 19 (issuer agreement). Thus, none of the statements in the cover letters was material to a reasonable investor as a matter of law.

### 3. None of the Statements or Omissions in the Cover Letters Was Made "In Connection" with the Purchase of Securities

The undisputed evidence shows that not only did no investor actually see the statements and omissions at issue, but no investor *could have* possibly done so because they were nonpublic and kept confidential by FINRA. As discussed, the filings were only sent to FINRA for review in conjunction with the Form 211 applications. *See* Mirman, 7.19.21, a.m., 11:11-13 (testifying that the issuer never received the Form 211 applications). The Form 211 application and any correspondence accompanying it is not publicly available because it includes "confidential information" about the issuers. Adams, 7.27.21 a.m., 64:17-24; Zajonc, 7.21.21 p.m., 119:17-19, 23; Eldred, 7.26.21 p.m., 37:4-7. SEC's expert witness agreed. Cangiano, 7.28.21 p.m., 65:2-7. "[P]otential investors" "would not have access to these documents" nor "access to the information that's on the documents." Eldred,

17

7.26.21 p.m., 37:15-19. Therefore, all the trial evidence was clear and consistent that no investor could ever have had access to these statements or omissions.

These private communications between Spartan and a regulator cannot meet Section 10(b)'s "in connection" requirement because they *could not* have been targeted at anyone with "*an ownership interest in*" securities and thus could not have made "a significant difference to someone's decision to purchase or sell." *See Troice*, 571 U.S. at 388. Once again, the Eleventh Circuit's *Goble* decision, 682 F.3d at 945, is instructive as to why the cover letters failed to meet the "in connection" requirement. In that case the misrepresentations were meant to be sent to FINRA concerning a broker-dealer's reserve account, but the "securities regulations directly implicated by this conduct are the Customer Protection Rule and books and records requirements of the Exchange Act, not § 10(b). Section 10(b) was not intended to protect investors from a broker-dealer's inaccurate records or an inadequate reserve fund." *Id.* at 946. Section 10(b) was *not* targeted at misleading statements *to regulators* like FINRA, so it does not encompass alleged misstatements directed at FINRA to show compliance with Rule 211. *See id.* Here, of course, the statements were confined to FINRA. Just as "recording a fake transaction in North American's books had no effect on the broader securities market and would not impact an investor's decision to purchase a security," likewise the Form 211 Application materials could not possibly have affected purchasing decisions and are outside the statute's reach. *See id.* Congress did not intend that result, and indeed the Supreme Court in *Zandford* dismissed such an outcome, noting that the statute cannot be read to encompass routine frauds, even from market participants, if they failed to involve investors. *See* 535 U.S. at 825 n. 4.

This case is indistinguishable from a long line of decisions finding, as a matter of law, that private statements no investor could see cannot meet this essential element of a 10(b) violation. *See, e.g.*, *Landy*, 486 F.2d at 168; *Wessel*, 437 F.2d at 282; *Mannion*, 789 F. Supp. 2d at 1331-32; *Di Donato*, 2017 WL 3268797, at *16; *Jabend*, 631 F. Supp. at 1344. Private statements to "*the agencies to which they*

*were directed*" are not actionable. *Wessel*, 437 F.2d at 282 (emphasis added). Thus, because "[t]here is no proof that any [statements] were disseminated to the public or that any investor saw them[,]" SEC cannot prove this element of the offense. *See Landy*, 486 F.2d at 168.

### B.  STATEMENTS OR OMISSIONS CONCERNING DTC APPLICATIONS

SEC also asserted that "Spartan, Island, and Dilley initiated and provided false information for applications filed with the DTC, including misrepresenting the shell status of issuers." ECF No. 249 at 38-39. The statements that SEC appears to be referencing are three emails sent to introducing clearing firms that applied for eligibility with DTC (not DTC itself), which represented, based on the issuer's filings, that the issuer was "not a shell." *See* Rose, 7.14.21 a.m., 18:7-19; PX617 (On the Move); PX627 (Rainbow Coral); PX691 (Kids Germ). These emails cannot form the basis of liability for any of the defendants, including Spartan, because the statements were *true*, the representations were immaterial and were not made in connection with the purchase of securities.

As SEC's own expert witness admitted, the "formal definition" of a "shell company" is one "that has no or nominal operations and either no or nominal assets or assets consisting solely of cash and cash equivalents." Cangiano, 7.28.21 p.m., 54:8-11. That definition involves, however, value judgments and "there could be some debate on" whether a company meets that definition. Cangiano, 7.28.21 p.m., 55:15-56:3. The three emails all had a legitimate basis for asserting that the issuers were not "shell" companies as each had operations or assets that were more than merely "nominal." For On the Move, the email referenced the fact that the company was operating as a speaker installation company and had over "$100,000 in revenues." Rose, 7.14.21 a.m., 24:3-21, 26:10-15; PX618 (8-k filing). Rainbow Coral likewise had operations as a retail aquarium and had significant revenue over $100,000. *See* Rose, 7.14.21 a.m., 26:25-28:4. Kids Germ meanwhile had regulatory filings showing operations toward a business plan with $25,254 in cash on hand and operating expenses of $62,634.

Rose, 7.14.21 a.m., 20:14-21:2; PX 137 (10-k filing). Thus, none of these was a "shell," and the statements at issue were neither false nor misleading.

Even if these statements were deemed not strictly correct concerning shell status, any error was immaterial. Spartan merely presented information that it had obtained from the issuer. Indeed, Rose agreed that "whatever information that Island Stock Transfer or Spartan Securities gave to anyone concerning DTC eligibility, that would have been from information that you, Mr. Mirman or Ms. Harrison had given them." Rose, 7.14.21 a.m., 23:6-13. More significantly, Spartan included the relevant supporting information with the emails, including regulatory filings showing the issuer's operations and revenues. The email concerning On the Move referenced the 8-k showing over "$100,000 in revenues." Rose, 7.14.21 a.m., 24:3-21, 26:10-15; PX618 (8-k filing). Rainbow Coral also filed an 8-k indicating it was an operating business with revenues, and the email included a hyperlink to the filing with SEC. Rose, 7.14.21 a.m., 26:25-28:4. Kids Germ meanwhile had just filed a 10-k showing $25,254 in cash on hand and operating expenses of $62,634. Rose, 7.14.21 a.m., 20:14-21:2; PX 137 (10-k filing). Penson, the relevant clearing firm, had all the information in its possession; meaning that Anna Krokhina's contemporaneous statements could not be material even if they were false. *See Morgan Keegan*, 678 F.3d at 1251 (recognizing that "sophisticated investors could not have justifiably relied" as a matter of law on misrepresentations that "predated and conflicted with the clear language of two contracts directly given to and signed by the investor") (citation omitted).

Finally, these statements were not made "in connection" with the purchase of securities. Just as with the letters sent to FINRA, these emails were also private communications sent only to the introducing brokerage firm and were not publicly available to anyone. *See* PX617; PX627; PX691. They therefore "had no effect on the broader securities market and would not impact an investor's decision to purchase a security." *See Goble*, 682 F.3d at 946.

20

## II.   MR. ELDRED DID NOT MAKE ANY ACTIONABLE STATEMENTS OR OMISSIONS

Mr. Eldred was never mentioned in any of SEC's specifically asserted misstatements and omissions, and the verdict against him is perhaps the most inexplicable, and legally insupportable of all. *See* ECF No. 249 at 38-39. Even if one thought that Mr. Eldred was tangentially involved in some of the alleged statements, none of the statements or omissions he made is actionable, as none presented material facts nor was any made in connection with the purchase of securities.

Mr. Eldred only signed four Form 211 Applications—Court Documents, Quality Wallbeds, Top to Bottom Pressure Washing, and PurpleReal.com—and could only be the "maker" of the statements contained in those applications. Eldred, 7.26.21 p.m., 62:3-9. These represent the only possible universe of actionable statements or omissions for him. *See Janus*, 564 U.S. at 142.

Those cover letters involved issuers helmed by either Daniels or Harrison, and as discussed above, Mr. Eldred cannot be personally responsible for the statements made by the *issuer* in the application materials. This includes the statements that "the issuers had no consultants," presenting the "business purpose of the issuers," the "relationships and affiliations among shareholders," the "solicitations of the shareholders," the "issuers' plans for potential mergers or acquisitions," and that "the issuers' shareholders have control of their shares." *See* ECF No. 249 at 38. The *issuer* had made such representations for each of these applications. *See* Zajonc, 7.22.21 a.m., 77:12-25, 94:3-6 (Spartan gathered materials for *every* issuer concerning these statements). Mr. Eldred was not responsible for the *underlying* truth of the *issuer's* representations to him—he was only responsible for asserting, truthfully, that the *issuer* had made the representations at all. *See Janus*, 564 U.S. at 142.[3]

This means that the only statements or omissions that could possibly have supported the verdict were SEC's claim that Mr. Eldred misrepresented Daniels, Harrison, and Fan's "involvement

---

[3] Of course, the jury also rejected aiding and abetting charges relevant to these issuers, so clearly the jury did not believe that Mr. Eldred had knowingly assisted the *issuer's* misrepresentations. *See* ECF No. 250 Counts 8-13 (aiding and abetting).

and/or role" and "control" of the issuers, that "Spartan conducted due diligence on the issuers," Spartan's "relationship with" "Diane Harrison, Michael Daniels and Andy Fan," and the "[c]ircumstances surrounding the Form 211 submissions, including the identity of the person for whom the quotation is being submitted." ECF No. 249 at 38-39. None of these statements or omissions was materially misleading though.

The cover letters for these issuers were different from those involving Mirman and Rose, and each of the representations about the initiation of the application said that for Court, Quality and Top to Bottom, Mr. Eldred "was telephonically contacted by" Daniels, "a friend and business contact of Micah Eldred," or Catherine Bradaick, also "a friend and business contact," and for PurpleReal by Harrison, who "has been known to us for many years." PX415 at 8 (Court), PX537 at 8 (Quality), PX605 at 21 (PurpleReal), Joint 84 at 9 (Top to Bottom). Each letter referenced "telephone conversations and electronic communications over" the preceding "month." *Id.* And each letter represented that "Spartan Securities Group, Ltd. does not have any other relationship with" Bradaick, Daniels, Harrison, the respective issuers, Douglas Zola (Bradaick's domestic partner), or the issuer's "representatives." *Id.* Presumably then, SEC has staked its entire case on the notion that these statements were half-truths, because Harrison and Daniels had prior involvement in other issuers, and Daniels was in business with Fan on other matters.[4]

Omissions about Daniels, Harrison, and Fan could not have been material to any reasonable investor as a matter of law because not only were these individuals regularly disclosed to FINRA, including in these applications, but no investor could have possibly *cared* that they were involved. This isn't a situation where the individuals worked behind the scenes and were not known to FINRA. To

---

[4] Notably, there is no evidence to suggest that the statements concerning phone contacts or a month of due diligence were false. No witnesses testified that these were untrue statements, and the uncontested evidence shows that they were non-exhaustive summaries of relevant information that were meant to preempt FINRA's potential questions. *See* Eldred, 7.26.21 p.m., 65:17-25.

the contrary, Daniels, Harrison, and even Fan, were disclosed in the cover letters as being involved. *See* PX415 at 8; PX537 at 8; PX605 at 21; Joint 84 at 9, 15. Indeed, while Fan was not initially disclosed in Top to Bottom, he was disclosed as soon as he became President, which FINRA knew well before it cleared the application. *See* Lopez, 7.27.21 p.m., 41:23-42:1; Joint 84 at 14-15. And FINRA cleared all but PurpleReal after it gathered significant information about these individuals. *See* PX415; PX537; PX605; Joint 84. There was nothing about these three people and their involvement with these issuers that mattered to FINRA or was a concern to the investing public more broadly.

So, what was Spartan supposed to disclose that Mr. Eldred omitted? Perhaps Mr. Eldred failed to disclose that he *personally* had used Harrison as an attorney on legal matters. But he never represented otherwise, he just generally said that she was "known to" Spartan "for many years." *See* Eldred, 7.26.21 p.m., 62:19-22. Or perhaps SEC thinks Mr. Eldred failed to affirmatively disclose every other issuer that these three had also been involved with in the past, and that this somehow made a difference. But again, FINRA knew all that information. FINRA knew all about Ms. Harrison's law practice, and it certainly is not material to think that a securities attorney will practice securities law, and FINRA never raised any concerns when she was disclosed as issuer's counsel in the past. *See, e.g.*, Zajonc, 7.22.21 p.m., 5:21-24; PX290 at 8. FINRA also knew that Harrison, Daniels, and Fan were involved in other business deals together, as it was the subject of comment letters in these very applications. *See* PX415 at 23-26; PX537 at 13-17; PX605 (27-30) Joint 84 at 11-12, 14-16. While FINRA asked questions about these facts, it also cleared the applications because there is nothing illegal about being in business with the same people more than once.

If these statements weren't material to FINRA, it is inconceivable they would be material to a reasonable investor. What does a reasonable investor care if Daniels was an officer for an issuer and had pitched other business arrangements with a market-maker in a wholly separate entity? Just as in *Goble, perhaps* this information, if known to someone, might have changed a *regulator's* mind about the

23

application, or even an *issuer's* mind about using Spartan as a market-maker, but this would have had no impact on an *investor's* decision to purchase shares and was thus immaterial. *See* 682 F.3d at 944.

Finally, as with every cover letter, because these statements were not accessible by the public, they cannot be said to have been made "in connection" with the purchase of securities. The undisputed evidence shows that these letters were all confidential and could not have been accessed by the investing public, even if the public wanted to. *See* Mirman, 7.19.21, a.m., 11:11-13; Adams, 7.27.21 a.m., 64:17-24; Cangiano, 7.28.21, 65:2-7; Zajonc, 7.21.21 p.m., 119:17-19, 23; Eldred, 7.26.21 p.m., 37:4-7, 15-19. These private communications between Mr. Eldred and FINRA could not have "had [any] effect on the broader securities market and would not impact an investor's decision to purchase a security," and thus cannot meet this element of the offense. *See Goble*, 682 F.3d at 946.

## III.   ISLAND CAPITAL DID NOT MAKE ANY ACTIONABLE STATEMENTS OR OMISSIONS

The verdict against Island is also puzzling and insupportable. The undisputed evidence shows that Island, a transfer agent, did not file any Form 211 applications. Cangiano, 7.29.21 a.m., 15:9-11. Thus, not only did it not "make" any statements in the applications that could be actionable, even if it deliberately withheld information, as a transfer agent not involved in the process it had no duty to provide information and cannot be liable for any omissions. *See Badger*, 612 F.3d at 1340-41.

The only statements Island made at issue in this case related to the emails concerning shell status to DTC participant firms and statements or omissions "regarding the designation of the securities as free trading" "when effectuating the bulk issuance and transfer of securities, including stock certificates without restrictive legends." *See* ECF No. 249 at 38-39. None of those statements or omissions could legally support liability.

As discussed above, the statements concerning shell status were true, were made contemporaneously with the underlying information supporting the conclusion and were not made to the investing public. No reasonable investor could have been misled by true information about the

issuer's operations as a matter of law. *See Morgan Keegan*, 678 F.3d at 1251. Regardless, these statements did not and could not have influenced the broader securities market. *See Goble*, 682 F.3d at 946.

The statements concerning transfers were not actionable because there were no misrepresentations or deceptive omissions. The jury *rejected* the idea that the transfers needed to be registered and issued a verdict in Island's favor on SEC's charge asserting otherwise. *See* ECF No. 250 (Count 14). That was because the undisputed evidence shows that the certificates did not need to be stamped with restrictive legends and were free trading. *See* Cangiano, 7.29.21 a.m., 14:5-7, 14-22; Harmon, 7.28.21 p.m., 45:15-20; 49:14-25; 50:7-12. In fact, had Island stamped these as restricted, it would have faced liability to regulators and to the parties to the transactions. Harmon, 7.28.21 p.m., 48:24-49:8.

Moreover, these statements could not have been material even if false, as the statements were made *after* the sales had occurred, and certainly could not have been relevant to a reasonable investor's decision on whether they would purchase stocks. Island merely recorded transfers that had already been completed, *after* the individual parties negotiated the terms of the transfers. Eldred, 7.26.21 p.m., 54:2-3; Harmon, 7.28.21 p.m., 19:15-19. No reasonable investor can be swayed by statements that *haven't been made yet*, and thus the statements could not have been material. *See Brink*, 892 F.3d at 1149.

## IV.   MR. DILLEY DID NOT MAKE ANY ACTIONABLE STATEMENTS OR OMISSIONS

The verdict against Mr. Dilley cannot be supported for reasons discussed above. Mr. Dilley was only responsible for the Form 211 applications that he signed, but none of them was actionable as a matter of law. And with respect to his role at Island, as just discussed, the statements concerning shell status were not false or misleading, much less materially so, and the statements concerning past transfers were also true, and could not have retroactively influenced investment decisions.

## CONCLUSION

This Court should enter judgment for the Defendants.

Dated: September 3, 2021                    Respectfully Submitted,

                                            */s/ Caleb Kruckenberg*
                                            **Caleb Kruckenberg**
                                            Litigation Counsel
                                            **Kara Rollins**
                                            Litigation Counsel
                                            New Civil Liberties Alliance
                                            1225 19th St. N.W., Suite 450
                                            Washington, D.C., 20036
                                            caleb.kruckenberg@ncla.legal
                                            (202) 869-5217
                                            Counsel for Defendants
                                            Appearing *Pro Hac Vice*

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 3.01(G)

On August 11, 2021, Defendants' counsel conferred with counsel for Plaintiff. Plaintiff indicated that it is opposed to this motion.

Respectfully,

*/s/ Caleb Kruckenberg*
Caleb Kruckenberg
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. N.W., Suite 450
Washington, D.C., 20036
caleb.kruckenberg@ncla.legal
(202) 869-5217
Counsel for Defendants
Appearing *Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 3, 2021, I electronically filed the foregoing with the Clerk

of Court using the CM/ECF system which sent notification of such filing to all counsel of record.

Respectfully,

<u>/s/ Caleb Kruckenberg</u>
Caleb Kruckenberg
Litigation Counsel
New Civil Liberties Alliance
1225 19th St. N.W., Suite 450
Washington, D.C., 20036
caleb.kruckenberg@ncla.legal
(202) 869-5217
Counsel for Defendants
Appearing *Pro Hac Vice*