UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

U.S. SECURITIES AND
EXCHANGE COMMISSION,

          Plaintiff,

v.                        Case No. 8:19-cv-448-VMC-CPT

SPARTAN SECURITIES GROUP, LTD.,
ISLAND CAPITAL MANAGEMENT,
CARL E. DILLEY, and
MICAH J. ELDRED,

          Defendants.
_____/

**ORDER**

    This matter comes before the Court upon consideration of Defendants' Renewed Motion for Judgment as a Matter of Law (Doc. # 259), filed on September 3, 2021. Plaintiff U.S. Securities and Exchange Commission ("SEC") responded on October 4, 2021. (Doc. # 262). For the reasons that follow, the Motion is denied.

**I.**   **Background**

    In February 2019, the SEC brought a 14-count Complaint against the Defendants here – Spartan Securities Group, Ltd. ("Spartan"), Island Capital Management ("Island"), Carl E. Dilley, and Micah J. Eldred – along with David D. Lopez, alleging a broad scheme to aid and abet the creation of fake

1

publicly traded companies and the subsequent issuance of stock. (Doc. # 1). As relevant here, Count Six of the Complaint alleged that: Spartan, Island, Dilley, and Eldred made materially misleading statements or omissions in connection with the purchase or sale of securities, in violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act. (Id. at 49).

The evidence at trial centered on the process whereby companies go public, that is, how to enable the purchase and sale of the company's securities on the public market. The first step is registration with the SEC, which is accomplished through an S-1 registration statement. (Doc. # 228 at 23). Once the SEC approves the registration, the offering is declared "effective" and is eligible to be sold. (Id. at 23-24). But the true goal is listing the security on the public, secondary market so that stockholders can easily liquidate their holdings. (Id. at 24).

Therefore, the second step is for a company, or "issuer," to work with a broker-dealer to fill out and file a Rule 15c-211 application (a "Form 211") with the Financial Industry Regulatory Authority ("FINRA"). (Id. at 24-25). As part of the Form 211 process, FINRA may issue comments, also called

deficiency letters, to the broker-dealer when FINRA determines that it needs more information. (Doc. # 226 at 33; Doc. # 249 at 12-13). FINRA works directly with the broker-dealer, who then works with the issuer to fill out the Form 211 and respond to FINRA's comments. (Doc. # 228 at 24-29). Once FINRA approves the application, the final step is to get clearance from the Depository Trust Company ("DTC"). (Id. at 37-38). Approval from the DTC allows the shares to be freely traded electronically, which is necessary to be fully trading on the market. (Id. at 38).

At all relevant times, Spartan was registered as a broker-dealer with the SEC. (Doc. # 249 at 10). Spartan's sister company, Defendant Island Capital Management, also referred to as Island Stock Transfer, was registered with the SEC as a transfer agent. (Id.; Doc. # 216 at 115). Transfer agents handle recordkeeping on behalf of the issuer as to who the shareholders are in the company. (Doc. # 228 at 40). They will issue certificates to new shareholders and cancel certificates to former shareholders. (Id.). Further, because the DTC will take only free-trading shares, one role transfer agents play is to cancel any "restricted legends" on the certificates and issue clean certificates. (Id.).

3

Defendant Micah Eldred formed Spartan and Island, served as the Chief Executive Officer of each company, and indirectly owned a majority ownership in the companies. (Doc. # 216 at 115-16). Defendant Carl Dilley was a registered principal of Spartan and the President of Island. (Doc. # 249 at 10).

Beginning in 2009, Spartan and Island began to assist two men named Sheldon Rose and Alvin Mirman in ushering a batch of companies through the process described above. (Doc. # 190 at 64, 67-69). Specifically, Spartan acted as the broker-dealer for these companies and assisted them in the Form 211 application process, and sometimes helped them achieve DTC clearance as well, while Island acted as the transfer agent. (Doc. # 249 at 10-14).

Rose and Mirman both later pled guilty to criminal charges of conspiracy to commit securities fraud in connection with their respective participation in fraudulent schemes. (Doc. # 249 at 10). Mirman pled guilty to conspiracy to commit securities fraud concerning 10 companies at issue in this case, while Rose pled guilty to charges concerning 14 companies at issue in this case. (Id.).

Specifically, as described in Rose's plea agreement, Mirman and/or Rose would recruit a sole officer, director,

4

employee, and majority shareholder – typically a family member or friend – to act as CEO in name only for the 14 companies at issue in this case. (Doc. # 255-53 at 10-14; Doc. # 249 at 11). These "straw CEOs" would sign the necessary documents, but it was Mirman and/or Rose who directed all corporate activities. (Id.). Mirman and/or Rose would also prepare false and misleading S-1 registration statements and subsequent SEC filings which falsely depicted the issuers as actively pursuing a variety of business plans, when the only plan from the onset was for the company to be sold as a public vehicle. (Doc. # 249 at 11).

Shell companies are companies with nominal assets and little to no business activity. (Doc. # 228 at 46). Blank check companies are similar, in that they are not formed to conduct business but are formed "primarily [to] become a candidate for acquisition." (Id.). The SEC and FINRA both inquire as to whether companies seeking to go public are shell companies or blank check companies because there are recognized risks to these types of companies. As one expert witness testifying for the SEC explained, shell companies are of concern to the SEC "because they're generally the vehicles that are used in pump and dump and other manipulative-type

schemes." (Id. at 48). A testifying FINRA analyst explained
how a "pump and dump" scheme would work: An individual or
individuals that control the majority of a company's shares
might release press releases and other information meant to
generate interest and "pump" up the company's shares. (Doc.
# 226 at 61). Then, that individual or individuals may begin
to sell off their shares, make an "astronomical . . . profit[]
on the shares that  . . . they have control of. And by the
time they're done selling the shares, usually because it's
based on a ruse, the price of the shares actually tanks."
(Id. at 61-62). The SEC's expert witness testified that, in
his opinion, all of the companies involved in this case were
shell companies. (Doc. # 234 at 107).

Indeed, Spartan's own written policies stated that a
shell corporation's acquisition of a private company was a
"red flag." That guidance stated that:

> A shell corporation is characterized by no business
> operations and little or no assets. In a fraud
> scheme, a reporting company with a large number of
> shares controlled by one person or a small number
> of persons often merges with a nonreporting company
> having some business operations. The new public
> company is then used as the vehicle for pump and
> dump and other fraudulent schemes. Broker-dealers
> placing quotes for these issuer's securities should
> be mindful of the potential for abuse.

(Doc. # 210 at 68-69).

In other words, an operating, private company might seek out this public "shell" corporation, and the public shell would acquire the private company. Such a "reverse merger" is a relatively quick and cheap way for a private company to get access to the capital available in the public market. (Doc. # 224 at 24-25).

In addition to Defendants' involvement with the Rose/Mirman companies, the trial evidence also demonstrated that Spartan and Island assisted Michael Daniels, his wife Diane Harrison, and a man named Andy Fan in the FINRA registration process. Daniels and Harrison had been friends with Eldred for at least 10 years. (Doc. # 249 at 13). Eldred was aware that Daniels and Harrison were active in the reverse merger business and had consummated a number of reverse mergers for clients who wanted to enter the public market. (Id.).

In 2018, the SEC brought suit against Daniels and Harrison, alleging that they made misrepresentations related to at least five undisclosed blank check companies at issue in this case. (Doc. # 249 at 10). As a result of the SEC action, Daniels and Harrison consented to a Judgment but

neither admitted nor denied the allegations. (Id. at 10-11).
Also in 2018, the SEC entered a cease-and-desist order and
certain bars against Fan in relation to certain companies at
issue in this case. (Id. at 11). Fan also consented to the
order but neither admitted nor denied the allegations. (Id.).

Spartan filed Form 211 applications with FINRA to
initiate quotations in the common stock for 19 companies
associated with Rose, Mirman, Daniels, Harrison and/or Fan.
(Doc. # 249 at 12). Dilley signed the Form 211 applications
for 15 companies at issue, while Eldred signed the remaining
four. (Id.). Mirman and Rose forwarded documents involved in
the Form 211 application process as requested by Spartan.
(Id. at 13). Daniels and Harrison requested that Spartan file
Form 211 applications for five of their issuers. (Id.).

FINRA examiners reviewed all the Form 211 applications
for the 19 issuers in this case and cleared all but one for
quotation in the public market. (Id.). After an issuer was
cleared for quotation, Spartan acted as the exclusive market-
maker for the issuer for 30 days. (Id.). Island served as the
transfer agent for 16 companies at issue in this case. (Id.).

The case proceeded to a 12-day jury trial in July 2021.
During trial, Defendants made an oral motion for judgment as

a matter of law, which the Court denied. (Doc. ## 244, 251). The jury handed down a verdict in Defendants' favor on 13 of the 14 counts. (Doc. # 250). However, the jury rendered a verdict in favor of the SEC as to Count Six. (Id.). The Clerk entered judgment in accordance with the jury's verdict on August 9, 2021. (Doc. # 256).

On September 3, 2021, Defendants filed the instant Renewed Motion for Judgment as a Matter of Law, requesting that the Court enter judgment in their favor on Count Six. (Doc. # 259). The Motion has been fully briefed and is ripe for review.

## II.  <u>Legal Standard</u>

In reviewing a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), "a court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence." <u>Chaney v. City of Orlando, Fla.</u>, 483 F.3d 1221, 1227 (11th Cir. 2007); <u>see also</u> <u>Cleveland v. Home Shopping Network, Inc.</u>, 369 F.3d 1189, 1192 (11th Cir. 2004) (stating that judgment as a matter of law should only be granted "when there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue"). "In considering whether the

verdict is supported by sufficient evidence, 'the court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party.'" McGinnis v. Am. Home Mortg. Servicing, Inc., 817 F.3d 1241, 1254 (11th Cir. 2016) (quoting Beckwith v. City of Daytona Beach Shores, 58 F.3d 1554, 1560 (11th Cir. 1995)). The district court must not make credibility determinations or weigh evidence, as these are functions reserved for the jury. HGR Constr., Inc. v. Hanover Ins. Co., No. 6:18-cv-1406-PGB-LRH, 2021 WL 868609, at *2 (M.D. Fla. Feb. 1, 2021). Judgment as a matter of law should be granted only where "the evidence is so overwhelmingly in favor of the moving party that a reasonable jury could not arrive at a contrary verdict." Middlebrooks v. Hillcrest Foods, Inc., 256 F.3d 1241, 1246 (11th Cir. 2001).

## III. **Analysis**

In a cause of action under § 10(b) and Rule 10b-5[1], a

---

[1] Rule 10b-5, promulgated by the SEC under Section 10(b) of the Securities Exchange Act of 1934, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

plaintiff must demonstrate: (1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss, commonly called "loss causation." FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1295 (11th Cir. 2011).

Here, Defendants argue that they are entitled to judgment as a matter of law on Count Six for the following reasons. First, as to Spartan's representations on the FINRA Form 211 applications, FINRA cover letters, and the DTC applications: (a) Spartan was not the "maker" of any actionable statements or omissions; (b) none of the

---

    (a)  To employ any device, scheme, or artifice to defraud,

    (b)  To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

    (c)  To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

statements or omissions were "material"; and (c) none of the statements or omissions were made "in connection with" the purchase of securities. (Doc. # 259 at 10-21). Second, Defendants argue that Eldred, Dilley, and Island did not make any actionable statements or omissions. (Id. at 21-25). Defendants' arguments as to Eldred and Dilley recycle many of the same arguments made with respect to Spartan and so the Court will address them together.

## A. <u>Whether Defendants were the "makers" of the misrepresentations or omissions</u>

Defendants argue that they cannot be held liable for misrepresentations made by the issuers. (Doc. # 259 at 10-12, 21, 28). The SEC counters that the jury held Defendants liable for their *own* misrepresentations and omissions contained in the Form 211 applications. (Doc. # 262 at 2-6).

Under Rule 10b-5, it is unlawful for "any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(b). To be liable, therefore, Defendants must have "made" the material misstatements in the Form 211 applications.

The "maker" of a statement, for purposes of Rule 10b-

5(b) liability, is "the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Janus Cap. Grp., Inc. v. First Derivative Traders, 564 U.S. 135, 142 (2011). "One who prepares or publishes a statement on behalf of another is not its maker." Id.

This Court has already considered and rejected Defendants' argument as a general matter during summary judgment briefing. See (Doc. # 135 at 27-30). As the Court previously explained:

> Courts applying Janus have found that signers of statements may be held liable for them. See SEC v. Brown, 878 F. Supp. 2d 109, 116 (D.D.C. 2012) ("Both before and after the decision in Janus, courts have consistently held that the signer of a corporate filing is its 'maker.'"). This remains true even when the statement is purportedly based on third-party information. See In re Nevsun Res. Ltd., No. 12 CIV. 1845 PGG, 2013 WL 6017402, at *11 (S.D.N.Y. Sept. 27, 2013) ("[A]lthough Defendants purported to rely on [an engineering firm's] report for certain of their statements, . . . Defendants adopted those statements, filed them with the SEC, and thereafter repeated them to investors. That is sufficient for the Court to find that Defendants 'made' the statements under Janus."). Therefore, Defendants are the makers of the statements made to FINRA during the Forms 211 process or DTC eligibility process, despite purportedly relying on Mirman, Rose, and the issuers for the information.

(Doc. # 135 at 27-28).

There was ample evidence presented at trial that Dilley or Eldred, on behalf of Spartan, signed the Form 211 applications that were sent to FINRA and contained inaccurate or misleading information. (Doc. # 249 at 12). What's more, the Court agrees with the SEC that the jury held Spartan, Dilley, and Eldred liable for their own misrepresentations and omissions. The trial evidence demonstrated that:

- Spartan represented to FINRA that three different issuers (First Independence, Changing Technologies, and Dinello Restaurant Ventures) contacted Spartan via Dilley or Eldred. (Doc. # 257-45 at 8; Doc. # 257-22; Doc. # 257-60). Dilley signed all three of these Form 211 applications. (Id.). For example, the FINRA Form 211 application for First Independence Corp. stated that: "Carl Dilley of our firm was telephonically contacted by Nigel Lindsay, [CEO] of First Independence Corp. in January of 2013. . . . Following telephone conversations and electronic communication over the past two months with the Issuer . . . we elected to proceed with the filing of the Form 211 on behalf of the Issuer." (Doc. # 257-45 at 8). However, all three of the listed sole officers / CEOs of those issuers testified that they

14

never initiated contact with Defendants, never spoke with Defendants, and two testified that they never even communicated with Defendants. (Doc. # 186 at 71-73; Doc. # 204 at 82-83; Doc. # 224 at 117-19). Rather, the listed sole officers were recruited by Rose, Mirman, or Daniels and Harrison and exclusively followed their instructions with respect to the issuers.

- Trial testimony established that Eldred signed Form 211 applications for companies brought public by Harrison, Daniels, and/or Fan, stating that each issuer was pursuing business operations with no plans for mergers or changes in control. (Doc. # 257-70 at 8; Doc. # 255-62 at 9). However, according to an employee who worked for Fan, the actual business plan from the outset was to take the companies public and then merge them into one of Fan's companies. (Doc. # 216 at 55, 59, 64, 66). For example, the employee testified that, with respect to issuer Court Document Services, Fan "didn't need a document preparation company . . . . That was never part of his plan. He had a movie company in China. . . . [H]e just needed a public company. That's all he needed. So however it came about, it just happened to be a court

15

document company because Michael could get it for a good price." (Id. at 62). Similarly, with respect to Court Document Services, Eldred testified that he had knowledge at least six days after Spartan submitted the Form 211 that Daniels was contemplating using the issuer as the vehicle for a reverse merger, but the Form 211 was never updated to reflect that knowledge. (Doc. # 222 at 62-64). In fact, Eldred wrote in an email that he would be "happy to use Court as a vehicle" for a reverse merger with his own companies – Spartan and Island – although this never came to pass. (Id. at 63-64). Eldred acknowledged that Court Documents' Form 211 application was never amended to reflect those negotiations. (Id. at 67).

- Spartan represented to FINRA in certain Form 211 applications that it had no other relationship with Mirman, but Mirman testified at trial that that was not an accurate statement because he "would ask them to file the 211s for different companies" and he was in constant communication with people at Spartan. (Doc. # 196 at 29-30). Mirman also confirmed that he and Rose were the "point people" for all communications between Spartan

16

and the issuers, and that Spartan never asked for the
issuers' CEOs to provide information to complete the
Form 211 applications or responses to deficiency
letters. (Id. at 15). According to Mirman, he reached
out to Dilley to request that Spartan prepare the Form
211 applications for ten issuers. (Id. at 23) Dilley
acknowledged that he knew Rose and Mirman were acting as
intermediaries for several issuers and that he had gone
to lunch with Rose and/or Mirman on three occasions.
(Doc. # 199 at 141; Doc. # 202 at 11). Eldred also
admitted that at various times he had referred to Mirman
as Spartan's "client."[2] (Doc. # 216 at 126-28). As a
witness employed by FINRA explained, the fact that
Mirman had been previously barred from associating with
any FINRA members would be an important piece of
information that FINRA would expect to be disclosed.
(Doc. # 226 at 65).

• Eldred acknowledged during his trial testimony that —
although Spartan represented to FINRA that, with respect

---

[2] While Defendants presented testimony that broker-dealers
routinely dealt with such intermediaries, this explanation
goes to the credibility of the witnesses and the weight of
the evidence.

to issuer Dinello Restaurant Ventures, it did not have "any other relationship [than what was disclosed] with Diane Harrison of Harrison Law PA, John Paquette, the Issuer and/or its representatives" (Doc. # 257-60) – he did in fact have other business relationships with Harrison that were not disclosed to FINRA. (Doc. # 222 at 35). Eldred further acknowledged that Daniels's role of "owning or controlling" Dinello was not disclosed to FINRA. (Id. at 37). The SEC elicited testimony that Daniels had previously been convicted on securities-fraud related charges. (Doc. # 210 at 105). Once Dinello went public, it was renamed AF Ocean. (Doc. # 222 at 50-51, 54). Eldred also testified that he and Fan discussed merging AF Ocean and Spartan / Island. (Id. at 53). Thereby, Spartan would become a wholly owned subsidiary of AF Ocean and would have received $3 million. (Id. at 53-56).

In light of this evidence, a reasonable juror could find that Defendants Spartan, Dilley, and Eldred were the "makers" of certain misrepresentations or omissions made to FINRA in the Form 211 applications and attached cover letters.

B.   **Whether the misrepresentations and omissions were "material"**

Defendants argue that any misrepresentations that might have been made were not "material" under the law because the misrepresentations would not have been relevant or important to a reasonable investor in making an investment decision. (Doc. # 259 at 12-17). The SEC disagrees and argues that Defendants' misrepresentations were material. (Doc. # 262 at 6-12).

Materiality depends on the significance of a misrepresented or omitted fact to a reasonable investor. SEC v. Morgan Keegan & Co., Inc., 678 F.3d 1233, 1246 (11th Cir. 2012). That is, a misstatement or omission is "material," as an element of securities fraud, if there is a substantial likelihood that the disclosure of that fact would have been viewed by a reasonable investor as having significantly altered the total mix of information that the investor would consider in making an investment decision. Id. at 1245-46. Misstatements need not be publicly disseminated in order to be material. Id. at 1248.

Once again, the Court considered and rejected this argument at summary judgment, writing:

19

Other courts have held that misrepresentations regarding an undisclosed control person and shareholder solicitation are material in the context of the Form 211 process. SEC v. Farmer, No. 4:14-CV-2345, 2015 WL 5838867, at *9 (S.D. Tex. Oct. 7, 2015). Although the statements were made in private, a misstatement can be material "if a reasonable investor would have considered the defendant's alleged misrepresentations important, even if the statement is not made directly to the investor." SEC v. Czarnik, No. 10 CIV. 745 PKC, 2010 WL 4860678, at *5 (S.D.N.Y. Nov. 29, 2010).

Here, a jury could reasonably conclude that an investor would want to know about an undisclosed control person, the possibility of a company being a shell, and the true due diligence of a transfer agent. See Farmer, 2015 WL 5838867, at *13 ("[A] reasonable investor in a microcap security would surely want to know about the existence of an undisclosed control person who not only encouraged close associates and relatives to invest in the company, but also provided those associates and relatives with the cash with which they would then 'buy' the company's stock.").

(Doc. # 135 at 31-32).

What's more, "[m]ateriality is considered at least a mixed question of law and fact involving assessments particularly within the province of the trier of fact." SEC v. Bank Atl. Bancorp, Inc., 2013 WL 5588139, at *12 (S.D. Fla. Oct. 10, 2013) (quoting SEC v. Merchant Cap., LLC, 483 F.3d 747, 766 (11th Cir. 2007)). "So '[t]he trier of fact usually decides the issue of materiality.'" Id. (quoting Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d 1182, 1189 (11th

20

Cir. 2002)).

The Court agrees with the SEC that Defendants are asking this Court to second guess the jury's materiality determination. The jury was instructed that "[a] misstatement or omission of fact is 'material' if there is a substantial likelihood that a reasonable investor would attach importance to the misrepresented or omitted fact in determining his course of action. Put another way, there must be a substantial likelihood that a reasonable investor would view the misstated or omitted fact's disclosure as significantly altering the total mix of available information. A minor or trivial detail is not a 'material fact.'" (Doc. # 249 at 25). The Court's instruction to the jury correctly stated the law on materiality, and Defendants do not argue otherwise.

Here, jurors could have reasonably concluded that the misrepresentations made by Spartan, Dilley, and Eldred would be material to a reasonable investor. Misstatements or omissions that enabled the public sale of stock that posed a risk of "pump and dump" or other market manipulation schemes would be important to a reasonable investor who would, understandably, wish to avoid being duped into such a scheme. As witness Deji Adams, a FINRA analyst, explained,

transparency and truthful information is vital to the securities market because "general public investors need to be informed so they don't make a bad investment." (Doc. # 226 at 51). FINRA attempts to monitor for and prevent market manipulation schemes, such as pump and dumps, "because not a lot of investors are savvy. So [FINRA is] trying to make everything transparent and level the playing field for investors that are trying [to] enter the market or are in the market." (Id. at 62).

Adams additionally testified that there were certain red flags with respect to Defendants' disclosures in this case. For example, he testified that "if you have certain individuals that get market makers to file 211s for multiple companies, it's because of possible manipulation of the market." (Id. at 43). This is troublesome because "[i]t is unusual to have one individual be . . . the reason of a 211 being filed for multiple [issuers]. That is very, very uncommon." (Id. at 43-44).

Adams also testified that if the introduction between an issuer and a broker-dealer was made by a third-party intermediary, that would have impacted FINRA's Form 211 analysis and he would expect it to be disclosed. (Id. at 49,

53). The trial evidence indicated exactly this – that third-party intermediaries Rose and Mirman initiated and managed the Form 211 process with Spartan for more than a dozen issuers, and yet their involvement with the process was not disclosed to FINRA.

Similarly, Adams testified that accurate and complete information regarding an issuer's plan to conduct a reverse merger should be disclosed in a Form 211 application. (Id. at 63). This is because "the 211 is not just about that issuer; it's also about the other entity that they're going to either reverse merge with or take over. . . . That issuer's information would also be reviewed like it was that issuer that filed a Form 211." (Id. at 63-64). Yet there was trial testimony that the Rose/Mirman companies, the Daniels/Harrison companies, and the Fan companies were merely shell companies or blank check companies where the owners planned, and then effected, a sale or change of control shortly after the company went public. Further, the evidence demonstrated that Spartan did not disclose these intentions to FINRA or the DTC.

The jury considered the evidence on this point and determined that the misrepresentations or omissions were

23

material. The Court cannot say that a reasonable jury could
not have arrived at this conclusion. See SEC v. Husain, No.
2:16-cv-03250-ODWE, 2017 WL 810269, at *8 (C.D. Cal. Mar. 1,
2017) ("There is little doubt that a reasonable investor would
have wanted to know the true identity of the shell's leader,
whether the shell was a viable business operating according
to its stated business plan, and whether the shell intended
to merge with another corporation.").

C. **Whether the misrepresentations or omissions were made "in connection with" the purchase or sale of securities**

Defendants argue that because the alleged false
statements were not made to the public, the
misrepresentations were not made "in connection with" the
purchase or sale of securities. (Doc. # 259 at 17-19).
Defendants point out that the Form 211 applications, and any
correspondence related thereto, is between FINRA and the
broker-dealer and is not publicly available. (Id. at 17).

The Court has already rejected this argument. As it
explained in both its Order on a motion to dismiss and in its
summary judgment Order:

> "The 'in connection with' requirement is satisfied
> where the fraud 'touch[es]' the transaction in some
> way, including situations where 'the purchase or

sale of a security and the [preceding] proscribed conduct are part of the same fraudulent scheme.'" [SEC v. Radius Cap. Corp., 653 F. App'x 744, 751 (11th Cir. 2016)] (quoting Rudolph v. Arthur Andersen & Co., 800 F.2d 1040, 1046 (11th Cir. 1986)). Although the information contained in the Form 211 applications and responses to deficiency letters was not filed with the public, that information led to the fraudulent companies' abilities to be eligible for public quotation. Thus, the statements were made in connection with the offer and sale of securities. See SEC v. Jones & Co., 312 F. Supp. 2d 1375, 1382 (D. Colo. 2004) ("[F]alse allegations [in Form 211 applications] enabling a stock to be publicly traded are 'reasonably calculated to influence the investing public' and hence made 'in connection with' the purchase or sale of a security.").

(Doc. # 44 at 13-14); see also (Doc. # 135 at 30-31 (same)). Defendants have not raised any reason that the Court should ignore its earlier rulings.

The Eleventh Circuit has held that "[m]isrepresentations themselves need not be explicitly directed at the investing public or occur during the transaction to be 'in connection with the purchase or sale' . . . of any security." Radius Cap., 653 F. App'x at 751; see also SEC v. Zandford, 535 U.S. 813, 819 (2002) (stating that the "in connection with" phrase should be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes"); SEC v. Zouvas, No. 3:16-cv-0998-CAB (DHBx), 2016 WL 6834028, at *8

25

(S.D. Cal. Nov. 21, 2016) ("[T]he alleged false information that [the defendant] gave to FINRA, the organization relied on by investors to ensure that the information they receive is truthful and complete," enabled "the stock to be publicly traded and [was], therefore, sufficiently connected to subsequent securities transactions.").

Here, a reasonable juror could find that the trial evidence demonstrated that Defendants' misrepresentations or omissions to FINRA enabled the securities to be eligible for public quotation and thereby facilitated the purchase or sale of securities. This is sufficient to meet the "in connection with" requirement.

D.   **Statements or omissions concerning DTC applications**

As to misrepresentations made in the DTC process, the SEC's proffered expert witness testified that Defendants' role in obtaining DTC eligibility for the shell or blank check companies seriously jeopardized the integrity of the clearance and settlement systems through the filing of false information. (Doc. # 234 at 42). This witness testified that Defendants' actions made the companies "more eligible to be sold [and] made them more clean, so to speak." (Id.). Dilley confirmed in his testimony that DTC eligibility is important

26

because it allows for electronic settlement of any purchase or sale of securities, which makes the transaction easier to accomplish. (Doc. # 202 at 32-33).

For example, Anna Krokhina, an employee of both Spartan and Island, represented that issuer Kids Germ Defense "is not a shell" when applying for DTC eligibility.[3] (Doc. # 257-139 at 2-3; Doc. # 240 at 110; see also Doc. # 257-87 (Dilley directing Krokhina to start the process of applying for DTC eligibility)). Later in that email chain, Dilley directed a Spartan employee to invoice Kids Germ Defense, a company associated with Rose, $3,500 for DTC eligibility. (Id. at 1). There was later testimony from the SEC's expert witness that, in his opinion, Kids Germ Defense was a shell company and that this statement was a misrepresentation to the DTC clearing agent. (Doc. # 230 at 69-70). What's more, Dilley acknowledged that Kids Germ Defense was sold in a reverse merger one month later. (Doc. # 240 at 111).

There was sufficient evidence for the jury to find that Defendants made actionable misrepresentations or omissions to

---

[3] The email referenced was between Spartan/Island employee Anna Krokhina and Penson Financial Services, which is a DTC clearing firm. See (Doc. # 202 at 32).

the DTC.  And, in any event, there was no separate count for Section 10b liability for misrepresentations made just to the DTC.  The jury reasonably concluded that Defendants made material misrepresentations or omissions to FINRA, DTC participants, securities purchaser and/or others. <u>See</u> (Doc. # 249 at 35-38).

### E.   <u>Count 6 as to Island Capital</u>

Finally, Defendants argue that the Court should render judgment as a matter of law in favor of Defendant Island because it did not make any actionable statements or omissions. (Doc. # 259 at 24-25).

The jury's verdict against Island was supported by sufficient evidence. First, as explained above, an employee of Spartan and Island represented to a DTC clearing agent that at least one of the Rose/Mirman companies was "not a shell." (Doc. # 257-139 at 2-3).

Second, the SEC's proffered expert witness explained that "insiders," control persons, and affiliates should only have restricted stock, at least for a period of time, because those persons could (1) immediately sell off their stock, thereby diluting the value and forcing the price down, or (2) use their information advantage over the other investors in

the market. (Doc. # 230 at 44-45). As that witness explained, once a company has "met the requirements of resale" – that is, the stock can be freely traded – they would have to go to a transfer agent to get the restrictive legends removed. (Id. at 45-46).

The evidence produced at trial demonstrated that Island and Dilley (Island's president) were aware that the shares being deposited into Island were held by affiliates, or people under the control of the issuer. For example, the trial evidence demonstrated that the same individuals were named multiple times as shareholders of the Rose/Mirman companies, and all of these shareholders were friends and family of Rose and Mirman. (Doc. # 234 at 28-29). Island would then routinely process the bulk transfer of shares by signing and transmitting stock certificates without restrictive legends. There was enough evidence for a reasonable juror to conclude that Island knew, or was reckless in not knowing, that these share certificates should have been restricted, and thereby made a material representation about these securities to facilitate their public trading.

Third, Dilley, on Island's behalf, signed letters to the buyer of an issuer representing that the stocks were free

trading when, for the reasons described above, a reasonable juror could believe that the deposited shares were in truth restricted. <u>See</u> (Doc. # 257-145).

## IV.  <u>Conclusion</u>

In sum, evaluating all of the evidence in the light most favorable to the SEC, the jury's verdict in favor of the SEC on Count Six was supported by sufficient evidence. <u>See</u> <u>Chaney</u>, 483 F.3d at 1227; <u>McGinnis</u>, 817 F.3d at 1254. Put another way, Defendants have not demonstrated that the evidence on this Count was so overwhelmingly in their favor that a reasonable jury could not have arrived at a different verdict. <u>See</u> <u>Middlebrooks</u>, 256 F.3d at 1246. Accordingly, their renewed Motion for Judgment as a Matter of Law must be denied.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

Defendants' Renewed Motion for Judgment as a Matter of Law (Doc. # 259) is **DENIED.** The parties are directed to comply with the briefing schedule previously entered by the Court at Doc. # 261.

30

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this
20th day of January, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

31