## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTICT OF FLORIDA

### Case No. 19-cv-00448-VMC-CPT

**SECURITIES AND EXCHANGE COMMISSION,**

        **Plaintiff,**

**v.**

**SPARTAN SECURITIES GROUP, LTD et al.,**

        **Defendants.**

_____/

### SECURITIES AND EXCHANGE COMMISSION'S
### MOTION FOR REMEDIES AGAINST DEFENDANTS AND SUPPORTING
### MEMORANDUM OF LAW

Following a 12-day jury trial, a verdict was returned in favor of Plaintiff Securities and Exchange Commission ("Commission" or "SEC") finding Defendants Carl E. Dilley, Micah Eldred, Spartan Securities Group, Ltd. ("Spartan") and Island Capital Management LLC d/b/a Island Stock Transfer ("Island")(collectively "Defendants") liable for engaging in fraud in violation of the Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Exchange Act Rule 10b-5(b). The Court most recently denied the Defendants' Renewed Motion for Judgment as a Matter of Law (DE 263) and the SEC now moves the Court to impose meaningful remedies including an injunction, penny stock bars, and monetary relief consisting of disgorgement, prejudgment interest and civil penalties on Defendants.

# I.   **BACKGROUND**

"Once [a] district court has found federal securities law violations, it has broad . . . power to fashion appropriate remedies[.]" *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1474 (2d Cir. 1996); *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1193 (9th Cir.1998) (noting a "district court has broad . . . powers to fashion appropriate relief for violations of the federal securities laws"). As discussed below, the Commission asks this Court to order the following remedies: (a) an injunction against Defendants from violating the anti-fraud provisions of the federal securities laws which the jury found they violated, (b) disgorgement of $147,508, plus prejudgment interest in the amount of $51,286 (for a total of $198,794) against Island, (c) civil money penalties of $480,000 against Dilley, $320,000 against Eldred, and $775,000 each against Spartan and Island, and (d) penny stock bars against Spartan, Dilley and Eldred.

# II.   **SUMMARY OF DEFENDANTS' FRAUDULENT CONDUCT**

Spartan was registered as a broker-dealer, and its sister company, Island, was registered with the SEC as a transfer agent. DE 263 at 3, citing DE 249 at 10 and DE 216 at 115. Eldred was a registered principal of Spartan and Chief Executive Office of Island, while Dilley was a registered principal of Spartan and the President of Island. DE 249 at 10. Spartan filed Forms 211 applications with FINRA to initiate quotations in the common stock of 19 companies. *Id*. at 12. Dilley signed the Forms 211 for 15 companies at issue and Eldred signed the Forms 211 for 4 companies at issue. *Id*.

Defendants Spartan, Eldred, and Dilley made material misstatements and omissions in the Form 211 applications regarding among other things, who hired Defendants and why, whether they were in possession of adverse information about the issuers, and whether the issuers worked with consultants.  Beginning in 2009, Spartan and Island began to assist two men, Sheldon Rose and Alvin Mirman, in the Form 211 process. DE 263 at 4, citing DE 190 at 64, 67-69.   In 2016, Rose and Mirman pled guilty to criminal charges of conspiracy to commit securities fraud.  Mirman pled guilty related to 10 companies at issue in this case and Rose pled guilty related to 14 companies at issue in this case.  DE 249 at 10.  Defendants did not disclose Rose and Mirman's role to FINRA in the Form 211 application process.

In addition to Defendants' involvement with the Rose/Mirman companies, the trial evidence also demonstrated that Defendants assisted three others, Michael Daniels, Diane Harrison and Andy Fan, in the FINRA registration process. DE 263 at 7.   In 2018, the SEC brought suit against Daniels and Harrison, alleging they manufactured and made misrepresentations related to at least five undisclosed blank check companies at issue in the case. DE 249 at 10.  Daniels and Harrison consented to a Judgment in that case.  *Id*. at 11.  In 2018, the SEC entered, by consent, a cease-and-desist order, officer and director bar and penny stock bar against Fan, related to his conduct with respect to certain of the companies at issue here. *Id.*

As the Court pointed out in its Order on the Motion for Summary Judgment (DE 135), "Spartan made several misrepresentations to FINRA" in Spartan's Form 211 applications:

For example, Spartan represented to FINRA that "Mirman has no relationship with [the issuer]," when in fact Mirman was the issuer's intermediary. Spartan also represented to FINRA that the issuer's sole officer initiated contact with Spartan or Dilley. But most officers testified that they never communicated with Spartan or Dilley. Similarly, Spartan responded to several FINRA deficiency letters with shareholder charts indicating the sole officer had solicited 29 shareholders as a friend. Yet . . . all but one of the sole officers testified they did not solicit any shareholders and knew virtually none of them. Spartan also responded to a deficiency letter stating that "[t]he individuals" who purchased all of the issuers' shares were "either friends or family" of Harrison or the issuer's treasurer. (Doc. # 108-8 at 26-27). But Spartan had already learned that Daniels and Harrison had paid for all shares, and that "[n]one of the shareholders paid for their own shares." (Doc. # 108-9) . . .

Lastly, Eldred signed two Forms 211 stating each issuer was pursuing local business operations with no plans for mergers or changes in control. (Doc. ## 107-9; 108-2). One of these forms also stated that there were no past or present undisclosed control persons. (Doc. # 107-9). However, according to one of the sole officers, "the plan for [both] companies at the outset was the same - take them public, and then merge them into one of Fan's companies so that Fan would have public companies in the United States. There was never any plan to continue running the businesses of those [two] companies." (Doc. # 107-11 at ¶¶ 6-7).  (Order on Motion for Summary Judgment DE 135 at 28-29).[1]

---

[1] Exhibits cited in the Court's Order were admitted at trial as P605, P12, P415, and P541. *See also* trial exhibits JT3, JT7, JT8, JT9, JT10, JT11, JT84, P71, P113, P202, P232, P248, P290, P537, and P621.

Spartan's denial of having any relationship with Mirman in the 211 application was a lie and, in fact, Spartan knew Mirman was involved with ten issuers.[2]  Mirman reached out to Dilley to request that Spartan prepare the Form 211 applications for ten issuers.[3]  Dilley admitted he knew Mirman was acting as an intermediary for several issuers and that he had gone to lunch with Mirman on three occasions.[4]  Eldred also admitted that at different times he had referred to Mirman as a Spartan client.[5]  In addition, a Spartan employee who assisted in completing the 211 applications confirmed that Defendants knew there was an "informal" relationship between Mirman and the issuers.[6]  Yet, Defendants failed to disclose this information to FINRA.  Instead, Defendants made misrepresentations and omissions, including that the CEOs of the various companies had initiated contact with Defendants to complete the Form 211 applications.

The testimony of Mirman, Rose, and CEOs for three different issuers confirmed Defendants' lies.  The CEOs testified they never initiated contact with Defendants, never spoke with Defendants, and two testified they had no direct contact with Defendants.[7]  Moreover, although Spartan responded to several FINRA deficiency

---

[2] Mirman Tr. 7-14-21 p.m., 30:4-14, 32:14-25, and 33:1-4. Mirman also confirmed he was the "intermediary" for several issuers, that he and Rose were the "point people" for all communications between Spartan and ten shell companies, and that Spartan never asked the issuers' CEO's to provide information to complete the 211 applications. Mirman Tr. 7-14-21 p.m., 15:1-13.
[3] Mirman Tr. 7-14-21 p.m., 23:7-13.
[4] Dilley Tr. 7-19-21 p.m., 141:13-15 and 7-20-21 a.m., 11:5-8.
[5] Eldred Tr. 7-22-21 p.m., 126:22-25, 127:21-23, and 128:7-25.
[6] Zajonc Tr. 7-22-21 p.m., 47:6:19.
[7] Lindsey Tr. 7-13-21 p.m., 71:6-23, and 73:1-18; Egna Tr. 7-19-21 a.m., 82:21-25, and 83:1-12; Paquette Tr. 7-26-21 p.m., 117:21-25, 118:1-4, and 119:13-21.

letters with shareholder charts indicating the sole officer had solicited 29 shareholders as friends, the issuers' officers testified that they did not solicit any shareholders and knew virtually none of them.[8]

In addition, Eldred signed Form 211 applications for companies brought public by Harrison, Daniels and Fan, which falsely stated each issuer was pursuing business operations with no plans for mergers or changes in control.  In fact, the actual business plan from the outset was not to implement the purported business plan but rather to take them public and then merge them into one of Fan's companies.[9]  Eldred admits he contemplated using at least one issuer, Court Document Services, but that fact was not disclosed in the 211 form.[10]  Eldred also admits that although the 211 forms stated there were no past or present undisclosed control persons, Eldred was informed, but did not disclose, that Fan was involved in "three companies [Fan] is doing registrations on, including the 211 we filed on Court."[11]

Both Dilley and Eldred were aware of the issuers' intentions to complete reverse mergers, yet they lied and hid that information from FINRA.[12] *See also Tr.* Ex. P534 (emails between Eldred and Daniels 6 days after Spartan submits the Form 211 application for Court Document Services discussing Eldred using the company in a

---

[8] *See* Egna Tr. 7-19-21 a.m., 86:20-22 and 87:3-11; Lindsey Tr. 7-13-21 p.m. 69:1-25 and 70:2-15.
[9] Donnelly Tr. 7-22-21 p.m., 55:7-18; 59:1-14; 62:5-14, 64:1-23, 66:5-8, 68:15-25, 69:1-19, 73:13-19.
[10] Eldred Tr. 7-26-21 a.m., 63:6-11.
[11] Eldred Tr. 7-26-21 a.m., 61:10-20.
[12] See Trial Ex. P615 (Dilley email and Escrow Agreement for proposed sale of Obscene Jeans); Trial Ex. P527 (emails between Eldred, Daniels, and a lawyer regarding Daniels' interest in selling a shell company); Eldred Tr. 7-26-21 a.m., 44:13-25 "I knew . . . Daniels had . . . reorganized and sold shells and he and his wife's law practice . . . dealt extensively with these types of companies, yes.".

reverse merger); Eldred Tr. 7-26-21 a.m., 63-6-11 (Eldred admits contemplating using Court Document Services in a reverse merger and not disclosing this to FINRA).

Defendants' role in obtaining DTC eligibility for the shells jeopardized the integrity of the clearance and settlement systems through filing of false information.[13] Defendants also made misrepresentations and omissions to DTC participants, including that the issuers were not shells, even though all of the companies involved were shell companies.[14] Spartan misrepresented the shell status of issuer Kids Germ when communicating with a DTC participant, Penson, and applying for DTC eligibility.[15] Dilley admits it was important for a company to become DTC eligible because, among other things, it makes the securities transaction easier and adds value to the issuer.[16] Notably, Dilley also admits it was important for Penson to know that Kids Germ was not a shell and that being a shell would affect the issuer's DTC eligibility.[17] Kids Germ quickly sold in a reverse merger one month after Defendants requested DTC eligibility for the company.[18] Similarly, Defendants assisted Obscene Jeans to become DTC eligible while also knowing the company was for sale.[19] The evidence showed a similar pattern for other issuers.[20]

---

[13] Cangiano Tr. 7-28-21 p.m., 42:15-20
[14] Cangiano Tr. 7-28-21 p.m., 107:18-20.
[15] Ex P691; Cangiano Tr. 7-28-21 a.m., 69:24-70:6.
[16] Dilley Tr. 7-20-21 a.m., 32:25-33:8; Dilley Depo Designation Tr. 7-29-21 a.m., 109:4-19; 112:3-4.
[17] Dilley Depo. Designation Tr. 7-29-21 a.m., 110:16-111:1.
[18] *Id.* 111:3-111:8.
[19] *Id.* 111:16–113:18; Ex. P611; Dilley Tr. 7-20-21 a.m., 29:2-8.
[20] *Id.* 115:3-116:5.  Mirman Tr. 7-14-21 a.m., 85:4–86:3.

Island served as the transfer agent for 16 of the 19 companies at issue. DE 249 at 13-14. Island collected fees from the issuers, which the Commission seeks to recover as disgorgement of ill-gotten gains.[21] These fees should be disgorged as Island and Dilley also made misrepresentations and omissions regarding the designation of securities as free trading and when effectuating the bulk issuance and transfer of securities, including issuing stock certificates without restrictive legends.

Even though insiders, control persons, and affiliates should only have restricted stock (because these persons would have an information advantage in the market), Island and Dilley issued unrestricted stock to affiliates and undisclosed control people.[22] Island and Dilley were aware that the shares being deposited were held by affiliates (Rose directing all of the DTC submissions, same friends/family of Rose constantly being the named shareholder, all leading up to the bulk sale/transfer).[23] Island routinely processed the bulk transfers by signing and transmitting stock certificates without restrictive legends for securities that Island knew, or was reckless in not knowing, were in fact restricted.[24] Moreover, Dilley, on Island's behalf, signed two letters to buyers of two of the blank check companies which misrepresented the restricted nature of the companies' securities.[25]

---

[21] Mark Dee Dec. attached hereto as Exhibit A, Rose Tr. 7-13-21 a.m., 92:12- 93:1, Rose Tr. 7-13-21 p.m., 8:14 – 9:9; Mirman Tr. 7-14-21 p.m., 22:12 – 18; 26:10- 27:2; Mirman Tr. 7-19-21 p.m., 130:16-24; Dilley Tr. 7-20-21 a.m., 79:3 – 81:8; Dilley Tr. 7-21-21 a.m., 54:22- 55:8; Eldred Tr. 7-26-21 a.m., 38:24-39:8; 39:20 – 40:1; Eldred Tr. 7-26-21 p.m., 54:10 – 23.
[22] Cangiano Tr. 7-28-21, 44:25-45:12.
[23] Cangiano Tr. 7-28-21, 23:22-24:25; 28:22-29:4.
[24] *Id.*
[25] Trial Exs. PX704, JT44.

## III.   MEMORANDUM OF LAW

### A.  The Court Should Enjoin Defendants From Violations of the Securities Laws

Section 21(d) of the Exchange Act contemplates entry of permanent injunctions in enforcement actions brought by the Commission when the evidence establishes: (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated. *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004).  The jury's verdict establishes the first element against the Defendants. Regarding the second element, indicia that a wrong will be repeated include: (1) the egregiousness of the defendant's violations, (2) the isolated or recurrent nature of the infraction, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, and (6) the likelihood that the defendant's occupation will present opportunities for future violations. *Id*.  The Commission need not prove every factor in order to obtain permanent injunctive relief. *Id*.  While scienter is an important factor in this analysis, "it is not a prerequisite to injunctive relief." *Id*.  Moreover, "the likelihood of future illegal conduct is 'strongly suggested' by past illegal activity." *SEC v. American Bd. of Trade*, 750 F. Supp. 100, 104 (S.D.N.Y. 1990); *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975).  The fact that Defendants voluntarily ceased the misconduct does not preclude an injunction. *See SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1101 (2d Cir. 1972) ("cessation of illegal activities in contemplation of an SEC suit does not preclude the issuance of an injunction").

Here, the elements warranting an injunction are easily met.  First, following a lengthy 12 day trial, the jury found that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b), among the stiffest of charges brought by the SEC. These violations were made by securities industry professionals holding important and unique roles in the process of enabling the purchase and sale of a company's securities on the public market. Defendants' gatekeeper role, which they flouted and abused, highlights the egregiousness of their violations. Second, Defendants' conduct was far reaching.  For more than five years, Defendants played critical roles in bringing at least 19 separate blank check companies public under false pretenses.

Third, Defendants' violations involved a substantial degree of scienter.  In fact the jury's verdict finding that Defendants violated the anti-fraud provisions of Securities Exchange Act required a finding that Defendants acted knowingly or with severe recklessness. DE 249 at 35.  Fourth, Defendants have provided no assurances that they will not repeat the violations and have completely failed to acknowledge any aspect of their wrongful conduct.  Indeed, one of Defendants' primary defenses was that FINRA's clearance of the Form 211 applications at issue (replete with misrepresentations) proved Defendants' actions were reasonable.  Thus, Defendants continue to pass the blame and have provided no assurances against future violations, nor have they recognized the wrongful nature of their conduct.

Finally, Defendants' occupations and work history allow them to continue their past pattern of committing violations.  Defendants continue to operate in the microcap space.   Dilley remains as President of Island and is an officer of another publicly

traded micro-cap company.  Eldred continues as President of Spartan.  Both Dilley and Eldred have ownership interest in the company that owns Spartan and Island. That Spartan and Island are not currently operating does not mean they will not in the future-there is currently nothing keeping them from continuing to operate "as usual". Consequently, Defendants have similar opportunities to commit future violations.

For all of these reasons, an injunction is clearly warranted.  Absent an injunction, Defendants could readily repeat the misconduct and claim their actions were condoned by the Court.

**B.     The Court Should Order Island to Disgorge its Ill-Gotten Gains**

Exchange Act Sections 21(d)(5) and 21(d)(7) authorize courts to order disgorgement in Commission enforcement actions.  15 U.S.C. §§ 78u(d)(5) & 78u(d)(7); *see also*, *Liu v. SEC,* 140 S. Ct 1936 (2020) (upholding the authority of lower courts to order disgorgement pursuant to Section 21(d)(5) of the Exchange Act. 15 U.S.C. § 78u(d)(5)).[26]  Indeed, the Commission is entitled to disgorgement upon producing a reasonable approximation of a defendant's ill-gotten gains. *Calvo*, 378 F.3d at 1217.  "Exactitude is not a requirement; so long as the measurement of disgorgement is reasonable, and risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id.; see also*, *SEC v. Hall*, 759 Fed.

---

[26] *After Liu,* on January 1, 2021, Congress enacted the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ("NDAA"), which includes the disgorgement provision since codified at 15 U.S.C. § 78u(d)(7). The NDAA applies to "any action or proceeding that is pending on, or commenced on or after" January 1, 2021. NDAA Section 6501(b).

Appx. 877, 882 (11th Cir. 2019).   Once the Commission provides a reasonable approximation, "the burden then shifts to the defendant to demonstrate that the SEC's estimate is not a reasonable approximation." *Calvo,* 378 F.3d at 1217; *Hall*, 759 Fed. Appx. at 883.  Further, a defendant's current financial situation, or any hardship that disgorgement would impose, are not factors to be considered in determining disgorgement. *SEC v. Warren*, 534 F.3d 1368, 1370 (11th Cir. 2008).

Courts have repeatedly recognized that disgorgement is measured by defendant's profits, not investor losses.[27] *See, e.g., SEC v. Almagarby et al.*, 2021 WL 4461831, at *3 (S.D. Fl. Aug. 16, 2021) (rejecting post-Liu argument that there was no causation between dealer registration violation and investor losses and stating "disgorgement is measured by Defendant's profits and not investor losses") (*citing SEC v. U.S. Pension Trust Corp.*, 2010 WL 3894082, *23 (S.D. Fla Sept. 10, 2010) ("The disgorgement amount should be calculated by measuring illegal profits, not an amount needed to reimburse defrauded investors.")); *SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017) (affirming disgorgement where "the district court properly based the disgorgement upon Levin's gains and not the investors' losses"); *Magruder v. Drury*, 235 U.S. 106, 118-20 (1914) (trustee liable for profits gained in breach of fiduciary duty, and "[i]t makes no difference that the estate was not a loser in the transaction, or that the commission was no more than the services were reasonably worth").

---

[27]  Pursuant to Section 21(d)(8) of the Exchange Act and because of the enactment of the NDAA, the Commission seeks disgorgement covering a 10 year period in light of the jury's finding of scienter based fraudulent conduct.

Consistent with these principles, the SEC has identified the ill-gotten gains that Island generated through its fraudulent conduct during the relevant 10 year statute of limitations period and further tolled by agreement.  Specifically, the SEC compiled the amounts Island received in fees from each of the 14 Mirman/Rose companies through the date of the issuer's bulk sale.[28] DE 1 ¶35.  In total, Island collected $147,508 in fees from these issuers during the relevant time of the fraudulent conduct (see Exhibit A, Declaration of Mark Dee and Exhibits 1 and 2 hereto).  Thus, the SEC requests that Island disgorge these profits.

The Court should also order Island to pay prejudgment interest on this amount. The purpose of prejudgment interest is "to divest those found liable under the securities laws of any benefit accrued from the use of the ill-gotten gain." *SEC v. Yun*, 148 F. Supp.2d 1287, 1293 (M.D. Fla. 2001), *aff'd in part and vac'd on other grounds*, 327 F.3d 1263 (11th Cir. 2001).  Courts routinely use the IRS underpayment rate when calculating prejudgment interest in SEC enforcement actions because "[t]hat rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud." *SEC v. Radius Capital Corp.,* 2015 WL 1781567, *7 (M.D. Fla. Apr. 20, 2015) (citations and quotations omitted).  Using the IRS underpayment rate, and calculating the prejudgment interest from July 1, 2014 (the date of the last bulk sale at issue) to February 28, 2022, prejudgment interest would be $51,268.05 (see Exhibit B hereto).

---

[28] Fees related to Envoy Group consist of DTC services.  Fees related to First Xeris end prior to a bulk sale because of the SEC's issuance of a stop order.

Any disgorged funds will be sent by the Commission to the Treasury as consistent with equitable principles. *See Liu*, 140 S. Ct. at 1949.[29] While the SEC endeavors to distribute disgorged funds to harmed investors when that is feasible and practical, distribution of the disgorged funds to harmed investors is not feasible or practical in this case. Although, Defendant's conduct caused serious harm to the capital markets, identifying specific investors who were harmed or the amount by which any particular investor was harmed is not possible. Thus, the only alternative that is consistent with equitable principles is to send the disgorged funds to the Treasury. Allowing Island to retain the funds would be inequitable where the jury has found Island to have committed fraud and to have acted with a high level of scienter.

Here, Distribution to the Treasury serves the "foundational" principle of equity that no person should profit from his own wrong. *Liu*, 140 S. Ct. at 1943, 1948. Allowing the disgorged funds to remain in Island's hands would frustrate that basic equitable principle. As between the violator and the Treasury, it is more equitable that collected funds be disbursed to the latter so as not to incentivize fraud. *See Kansas v. Nebraska*, 574 U.S. 445, 463 (2015) (equity supports ordering disgorgement to "remind [a violating party] of its legal obligations" and to "deter future breaches");

---

[29] Congress enacted the NDAA to add Exchange Act Section 21(d)(7), which expressly authorizes courts to award disgorgement in Commission actions. Section 21(d)(7) provides courts with greater flexibility to determine where collected disgorged funds may be distributed, because that provision omits the phrase "for the benefit of investors," which is present in Section 21(d)(5), and which the *Liu* Court construed as a "limitation[]" or "restrict[ion]" on a court's equitable authority to disburse collected disgorgement amounts. *Liu,* 140 S. Ct. at 1948-49. *Liu* left as an "open question" whether "depositing disgorgement funds with the Treasury may be justified where it is infeasible to distribute the collected funds to investors." 140 S. Ct. at 1948.

Restatement (First) of Restitution § 187 (1937) (discussing the constructive trust remedy that prevented a murderer from inheriting his victims' estates, and made the murderer the constructive trustee for innocent persons who but for the murder would not have inherited the estate).

Further, equity recognizes that if, as in this case, distribution to a victim is not feasible, disgorged funds may be awarded to the *cy pres* (i.e., nearest possible) alternative. *Pearson v. Target Corp.*, 968 F.3d 827, 837 (7th Cir. 2020) (applying *Liu v. SEC*). And, in the securities laws, "Congress made payment to the Treasury the *cy pres* alternative … to payment to victims of fraud when payment to the victims is infeasible." *SEC v. Custable*, 796 F.3d 653, 656 (7th Cir. 2015); *see also Kansas*, 574 U.S. at 456 ("[W]hen federal law is at issue and the public interest is involved, a federal court's equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.").

### C. The Court Should Order Defendants to Pay Civil Penalties

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] authorizes a court to order penalties for violations of the federal securities laws, and provides three tiers of escalating penalty amounts. The first tier applies to basic violations which do not include fraudulent conduct. The second tier provides a higher amount for violations involving fraud, deceit or a deliberate or reckless disregard of a regulatory requirement. 15 U.S.C. § 78u(d)(3)(B)(ii). The third tier applies to violations that (a) involved fraud, deceit, or a deliberate or reckless disregard of a regulatory requirement and (b) directly

or indirectly resulted in substantial losses or a significant risk of substantial losses to others. 15 U.S.C. § 78u(d)(3)(B)(iii).

For individuals, courts may impose a first-tier penalty of up to $7,500 for any violation; a second-tier penalty of up to $80,000 if the violation "involved fraud or deceit;" and a third-tier penalty of up to $160,000 when, in addition to meeting the requirements of the second tier, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *SEC v. Monterosso*, 756 F.3d 1326, 1338 (11th Cir. 2010) (*quoting* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3)); 17 C.F.R. § 201.1004(a), Table I.[30] For companies and other non-natural persons, courts may impose second-tier penalties of up to $400,000 and third tier penalties up of up to $775,000.[31]

The decision to impose a penalty and the amount of such penalty falls within the Court's discretion. *SEC v. Aura Financial Services, Inc.,* 2010 WL 3419200, *3 (S.D. Fla. July 14, 2010). "Civil penalties are intended to punish the individual wrongdoer and to deter him and others from future securities violations." *Monterosso,* 756 F.3d at 1338; *SEC v. Universal Express, Inc.*, 646 F. Supp. 2d 552, 567 (S.D.N.Y. 2009) (noting that "penalties are designed to deter future violations of the securities laws and thereby

---

[30] The penalty amounts for each tier are periodically adjusted for inflation. See 17 C.F.R. § 201.1004(a). The penalties enumerated above apply to violations occurring between March 6, 2013 and November 2, 2015.

[31] Alternatively, courts may impose a penalty up to the defendant's gross pecuniary gain, regardless of the number of violations or Tier level. See 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B).

further the goals of encouraging investor confidence, increasing the efficiency of financial markets, and promoting the stability of the securities industry.").

Courts have also counted each false statement as a separate violation subject to the tiered penalty limit. *See, e.g., S.E.C. v. Tourre*, 4 F.Supp.3d 579, 592-94 (S.D.N.Y. 2014) (imposing separate penalty for each of defendant's seven false statements); *S.E.C. v. Colonial Inv. Mgmt. LLC*, 659 F. Supp. 2d 467, 503 (S.D.N.Y. 2009) (imposing separate penalty for 18 violations of regulation); *S.E.C. v. Coates*, 137 F. Supp. 2d 413, 430 (S.D.N.Y. 2001) (imposing separate penalty for each of defendant's four false statements); *SEC* v. *Huff*, 758 F. Supp. 2d 1288, 1366 (S.D. Fla. 2010) (third-tier maximum penalty of $100,000 for each of the defendant's six false SEC filings, thus resulting in a $600,000 penalty).

Although each tier establishes a maximum penalty per violation, ultimately "[t]he statutes leave the amount to be imposed to the discretion of the" court. *Monterosso*, 756 F.3d at 1338; 15 U.S.C. §§ 77t(d), 78u(d)(3) (providing that "[t]he amount of the penalty shall be determined by the court in light of the facts and circumstances" of the case). Here, the Court should use its broad discretion to impose significant civil penalties against each of these Defendants.

### 1. Tier Three Penalties Are Appropriate

In determining whether civil penalties should be imposed and the amount of the fine, courts look to a number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other

persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *SEC v. Big Apple Consulting*, 2013 WL 1352166, \*3 (M.D. Fla. Mar. 29, 2013), *aff'd*, 783 F.2d 786 (11th Cir. 2015).   Courts have recognized that these factors are not a rigid checklist that must be satisfied in every case. *Id.* ("While "these factors are helpful in characterizing a particular defendant's actions, . . . each case 'has its own particular facts and circumstances which determine the appropriate penalty to be imposed.'") (Citation and quotation omitted).

Evaluated in their totality, these factors weigh in favor of ordering Defendants to pay Tier Three penalties.  Here, the jury found the Defendants committed securities fraud, not mere technical violations.  Moreover, Defendants' fraudulent conduct was egregious, knowing, and repeated.   The violations were recurrent (rather than isolated), involving multiple transactions spanning several years and the SEC introduced evidence at trial supporting the fact that the violations created a significant risk of losses to other persons.   Specifically, the SEC presented evidence that the issuer's shares could have been used in pump-and-dump schemes and in at least one instance the issuer was in fact used in such a scheme.  Tr. 7-14-21 at 91; Tr. 7-28-21 at 37, 39.   In addition, and as testified to by FINRA Analyst Deji Adams, the conduct directly or indirectly resulted in a significant risk of substantial losses to others. (Doc. 226, Tr. 7-27-21 at 61-62).

Another factor that this Court should consider in deciding whether a penalty is appropriate is "the need to deter repetitive conduct from the defendant and others."

*SEC v. Sky Way Global, LLC*, 2013 WL 12156317, *2 (M.D. Fla. Mar. 1, 2013). Indeed, in promulgating Section 21(d)(3) of the Exchange Act, Congress recognized the need to "provide a financial disincentive to violations that reflect an unwillingness to incur the cost of full compliance with the securities laws, as opposed to engaging in affirmative conduct to defraud investors." Securities Law Enforcement Remedies Act of 1990, H.R. Rep. 101-616, 1990 WL 25646, *1384 (July 23, 1990). The House Report further noted that "[a] broker-dealer . . . may fail to comply with regulatory requirements simply because it is unwilling to devote the resources necessary to comply with these statutory objectives. * * * To the extent that such violations are motivated by a desire to maximize profits by reducing costs, the prospect of civil money penalties will improve compliance with the law and have a significant remedial effect." *Id.*

Given the critical roles that Spartan and Island played in the micro-cap space, Defendants' conduct should be viewed as sufficiently egregious to warrant a penalty both to punish them and to deter others from engaging in similar behavior. *See Monterosso,* 756 F.3d at 1338. Absent a meaningful penalty in this case, there will be little to deter others from engaging in this type of conduct without appropriate regulatory oversight, even though this Court has found it to be illegal. Thus, the Court should impose substantial Tier Three civil penalties based on Defendants' violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. Specifically, the Commission recommends the following civil penalties: (a) $480,000 against Dilley, (b) $320,000 against Eldred, and (c) $775,000 each against Spartan and Island.

As to the Dilley and Eldred, while the Commission could seek higher penalties (based on each of their numerous misrepresentations), the amounts sought represent tier three penalties related to each of the issuers for which they filed false Forms 211. More specifically, during the time period not barred by the applicable five-year statute of limitations (and tolled by agreement), Spartan and Dilley engaged in fraudulent acts and made materially false statements and omissions, including those made in the Form 211 application process for three issuers, Envoy Group, Changing Technologies, and First Xeris while Spartan and Eldred's fraudulent conduct related to two issuers, TTB/Ibex and Purple Real. Thus, the Commission seeks a $480,000 penalty against Dilley ($160,000 x 3 issuers) and a $320,000 penalty against Eldred ($160,000 x 2 issuers). Tier Three penalties against Dilley and Eldred are appropriate here given the important roles they played as gatekeepers in the microcap space.

As to the penalties of $775,000 each for Spartan and Island, one-time Tier Three penalties of $775,000 apiece is appropriately significant, within the guidelines, and will act as a deterrent to future misconduct.

### D. Penny Stock Bars Are Appropriate

Courts may enter a penny stock bar "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock[.]" *See* 15 U.S.C. § 77t(g)(1); 15 U.S.C. § 78u(d)(6)(A). A "penny stock" includes an equity security bearing a price of less than five dollars, except as provided in 17 C.F.R. § 240.3a51-1. The Court may enter a penny stock bar "permanently or for such period of time as the court shall determine." *See* 15 U.S.C. §§ 77t(g)(1), 78u(d)(6).

Here, "at the time of the alleged misconduct," Defendants were "participating in . . . an offering of [a] penny stock[.]" *See* 15 U.S.C. §§ 77t(g)(2), 78u(d)(6)(B) (defining "person participating in an offering of penny stock" to include "any person engaging in activities with a[n] . . . issuer for purposes of issuing, . . . or inducing or attempting to induce the purchase or sale of, any penny stock."). In deciding whether to impose a penny stock bar, "the court examines the nature of the defendant's conduct and the likelihood that his occupation and experience will present further opportunities to violate the securities laws." *SEC v. BIH Corp.*, 2014 WL 7499053, * 6 (M.D. Fla. Dec. 12, 2014) (citation omitted).

In this case, the shares that Defendants helped issuers to bring public to sell were penny stocks. Indeed, Defendants' entire business model was to facilitate the offer and sale of penny stocks to public. Thus, a penny stock bar is appropriate against Spartan, Dilley and Eldred in this case because the primary function of Spartan and its principals, Dilley and Eldred, has been to facilitate the public offering of penny stocks, and Defendants still remain as actors in the micro-cap space.

## IV.   CONCLUSION

For the foregoing reasons, the Court should grant the SEC's motion for remedies and enter the attached Final Judgments against Defendants (attached as Exhibits C1 – C4).

## Local Rule 3.01(g) Certification

Pursuant to Local Rule 3.01(g) undersigned counsel for the Commission have conferred with counsel for the Defendants who oppose the relief requested herein.

Respectfully submitted,

April 13, 2022                    By: *s/ Christine Nestor*
                                 Christine Nestor
                                 Senior Trial Counsel
                                 Fla. Bar No. 597211
                                 Telephone: (305) 982-6367
                                 Facsimile: (305) 536-4154
                                 E-mail:  nestorc@sec.gov

                                 Alise Johnson
                                 Senior Trial Counsel
                                 Fla. Bar No. 003270
                                 Telephone: (305) 982-6385
                                 E-mail: johnsonali@sec.gov

                                 Alice Sum
                                 Trial Counsel
                                 Fla. Bar No. 354510
                                 Telephone: (305) 416-6293
                                 Facsimile: (305) 536-4154
                                 sumal@sec.gov

                                 **ATTORNEYS FOR PLAINTIFF**
                                 **SECURITIES AND EXCHANGE**
                                 **COMMISSION**
                                 801 Brickell Avenue, Suite 1950
                                 Miami, Florida 33131
                                 Telephone: (305) 982-6300

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served

as indicated below on this 13th day of April 2022 upon the following:

Caleb Kruckenberg, Esq.
Kara Rollins, Esq.
John Vecchione, Esq.
New Civil Liberties Alliance
1225 19th St. NW, Suite 450

Washington, DC. 20036
Email: kara.rollins@ncla.legal
John.vecchione@ncla.legal
ckrucken@gmail.com

*Counsel for Defendants*
Via CM/ECF

<u>*s/Christine Nestor*</u>