IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

U.S. SECURITIES AND EXCHANGE     :
COMMISSION,     :
    :     CASE NO.: 8:19-cv-448-VMC-CPT
    :
Plaintiff,     :
    :
         v.     :
    :
    :
SPARTAN SECURITIES GROUP, LTD.,     :
ISLAND CAPITAL MANAGEMENT,     :
CARL E. DILLEY, and     :
MICAH J. ELDRED,     :
    :
Defendants.     :

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR REMEDIES (DKT. 270)**

After a 12-day jury trial, verdicts were returned in favor of Defendants Spartan Securities Group, Ltd. ("Spartan"), Island Capital Management ("Island"), Carl E. Dilley, and Micah J. Eldred (collectively "Defendants") on thirteen of fourteen counts pled by Plaintiff Securities and Exchange Commission ("SEC"). Despite or perhaps because of this, SEC seeks a series of penalties that under the facts and circumstances of this case are not legally available or violate traditional equitable considerations. Defendants dispense with a full recitation of the facts as the Court is well acquainted with this matter.

Defendants oppose the SEC's Motion for Remedies and request that this Court invoke its discretionary and equitable powers to determine appropriate injunctive and monetary remedies, if any.[1]

---

[1] Defendants are contemporaneously filing a request for oral argument and an evidentiary hearing pursuant to Local Rule 3.01(h).

## I.   THE COURT SHOULD NOT ENJOIN DEFENDANTS

The Exchange Act authorizes the SEC to seek an injunction "[w]henever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter." 15 U.S.C. § 78u(d)(1). The Eleventh Circuit has determined that the SEC "is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004) (citation omitted). Whether it is likely that the wrong will be repeated turns on a balancing of numerous factors: (1) the "egregiousness of the defendant's actions," (2) "the isolated or recurrent nature of the infraction," (3) "the degree of scienter involved," (4) "the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of the conduct," and, (5) "the likelihood that the defendant's occupation will present opportunities for future violations." *Id.*

But, "[i]n the Eleventh Circuit, the 'mere fact of past violations' is insufficient to establish the propriety of an injunction." *SEC v. Yun*, 148 F. Supp. 2d 1287, 1293 (M.D. Fla. 2001) (quoting *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir.1978)). "To obtain injunctive relief, the Commission must offer positive proof of the likelihood that the wrongdoing will recur." *Blatt*, 583 F.2d at 1334; *see also Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981).

Here the SEC seeks injunctions against each defendant that enjoin them

from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security: to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; by, directly or indirectly, (i) creating a false appearance or otherwise deceiving any person about the price or trading market for any security, or (ii) making any false or misleading statement, or disseminating any false or misleading documents, materials, or information, concerning matters relating

to a decision by an investor or prospective investor to buy or sell securities of any company.

*See* Dkt. 270-3 at 2 (Ex. C-1); Dkt. 270-4 at 2 (Ex. C-2); Dkt. 270-5 at 2 (Ex. C-3); Dkt. 270-6 at 2 (Ex. C-4) (SEC Br. Exhibits).

These injunctions are not warranted or permissible for several constitutional, jurisdictional, procedural, and statutory reasons. The Court should deny the SEC's request for an injunction.

### A.  Obey-the-Law Injunctions Are Not Permitted in This Circuit

The Eleventh Circuit has long recognized that obey-the-law injunctions are not permissible. *See Florida Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health and Rehabilitative Servs.*, 225 F.3d 1208, 1222-23 (11th Cir.2000). And the Circuit and courts in this District have *explicitly* disclaimed their use in the securities enforcement context. *See Smyth*, 420 F.3d 1225; *SEC v. Sky Way Global*, 710 F. Supp. 2d 1274 (M.D. Fla. 2010); *SEC v. Farha*, Case No. 8:12-cv-47-T-23MAP, 2018 WL 11354497 (M.D. Fla. May 1, 2018) ("As the SEC knows well, the governing law requires an injunction to state the enjoined conduct 'specifically.'").

Obey-the-law injunctions infringe Defendants' procedural rights because such injunctions violate Federal Rule of Civil Procedure 65(d). Rule 65(d) states that "[e]very order granting an injunction … must: state the reasons why it issued; state its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other document—the act or acts sought to be restrained or required…." *Sky Way Global*, 710 F. Supp. 2d at 1277. The Rule's specificity requirement "provid[es] the defendant with 'fair and precisely drawn notice of what the injunction actually prohibits.'" *Id.* at 1278 (citing *Epstein Family P'ship v. Kmart Corp.*, 13 F.3d 762, 771 (3d Cir. 1994)). It also "serves" the "vital function" of "delineat[ing] the bounds of compliance" such that appellate courts know what it is that they are reviewing. *Id.*

As *Smyth* and *Sky Way* establish, obey-the-law injunctions create "a serious constitutional conflict" which is "inherent in a court's enforcing such an injunction." *Sky Way Global*, 710 F. Supp.

3

2d at 1280. This conflict occurs because after the injunction is entered the SEC can return to this Court and seek enforcement of future securities violations regardless of the distinct nature of any future alleged violation. *Id.* "Thus, an obey-the-law injunction permits the Commission to achieve through the mere filing of a motion a result that, absent the injunction, the Commission could achieve only through a full-scale prosecution." *Id.* This process "impermissibly bypasses … the defendant's rights under the Due Process Clause and Seventh Amendment." *Id.*

Obey-the-law injunctions also conflict with separation-of-powers principles. When Congress has adopted a law, on which an injunction is based, "then the legislature is likely also to have created rules regarding the means by which the law should be enforced and the appropriate sanction for a violation of the law." *Chandler v. James*, 180 F.3d 1254, 1271 (11th Cir.1999) (Tjoflat, J., specially concurring), *cert. granted judgment vacated*, 120 S. Ct. 2714. But, obey-the-law injunctions "create[] an 'individualized criminal or civil law' that impermissibly modifies the existing law by substituting (1) a contempt hearing for the statutorily provided procedure and (2) contempt sanctions for the statutorily provided remedy." *Sky Way Global*, 710 F. Supp. at 1282. Stated another way, obey-the-law injunctions unlawfully circumvent the statutory procedural and remedies scheme adopted by Congress.

All of the SEC's proposed injunctions contain an identical provision that seeks to "bind[]" non-parties to the terms of the obey-the-law injunction. *See* SEC Br. Exhibits C-1 at 2, C-2 at 2, C-3 at 2, C-4 at 2.

> As proposed, the obey-the-law injunction permits the Commission to assert against any defendant (or an agent, servant, employee, attorney, or "person in active concert" with any agent, servant, employee, or attorney of the defendant) any future prosecution under the pertinent securities laws by the simple expedient of filing a motion to enforce the injunction, thereby circumventing important procedural, jurisdictional, and constitutional requirements.

*Sky Way Global*, 710 F. Supp. 2d at 1286. So too here, where the proposed injunctions include identical provisions that have already been determined as impermissible in this District. *Compare id. with* SEC Br. Exhibits C-1 at 2, C-2 at 2, C-3 at 2, C-4 at 2.

Such provisions are also impermissible for another reason, courts lack jurisdiction to impose injunctive relief on a non-party. *See FTC v. Vylah Tec LLC*, 378 F. Supp. 1134, 1142 (M.D. Fla. 2019). As the *Vylah Tec* court discussed:

> "Courts of equity have long observed the general rule that a court may not enter an injunction against a person who has not been made a party to the case before it." *E.A. Renfroe & Co. v. Moran*, 338 Fed. Appx. 836, 838-39 (11th Cir. 2009) (*quoting Additive Controls & Measurement Sys. v. Flowdata, Inc.*, 96 F.3d 1390, 1394 (Fed. Cir. 1996)). "[T]he Court lacks the authority to bind a non-party, or to impose injunctive relief on a non-party." *Sewell v. D'Alessandro & Woodyard, Inc.*, No. 2:07cv343, 2008 WL 2445765, at *12 (M.D. Fla. June 16, 2008) (citation omitted).

378 F. Supp. at 1142. "Rule 65(d) 'embod[ies] rather than … limit[s]' the common law powers of the district court." *ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1352 (11th Cir. 2017) (quoting *US v. Hall*, 472 F.2d 261, 267 (5th Cir. 1972) (Wisdom, J.)).

The only named parties are the defendants and injunctive relief, if any, may only be ordered as to them. The Court is without power to do otherwise.

The SEC's proposed injunctions are quintessential obey-the-law injunctions, as they seek to prohibit the defendants from future violations of the securities laws and the regulations promulgated thereunder. They provide no specificity as to the conduct that is prohibited. In effect it would enjoin Defendants from misleading or creating a false impression about the price, trading market, or decisions by a company's investors which is already arguably prohibited conduct under the law. The SEC's proposed obey-the-law injunctions are impermissible because they violate Defendants' constitutional and procedural rights, conflict with separation-of powers-principles, and infringe on the constitutional and procedural rights of non-parties. This Court should not enter the proposed injunctions.

## B. An Injunction Is Not Warranted in this Matter and the SEC Has Offered No Positive Proof Otherwise

While the SEC frames Defendants' actions as abusive of their role in the market and far reaching, *see* Dkt. 270 at 10 (SEC Br.), it has offered no positive proof beyond its mere speculation

and conjecture that Defendants will commit wrongdoing in the future. *See Blatt*, 583 F.2d at 1334. And the *Calvo* factors weigh in favor of Defendants.

First, Defendants' conduct was not sufficiently egregious to warrant a permanent injunction because they reasonably relied on public filings and documents, including notarized documents, that they were permitted to rely under the applicable rules and regulations. Trial Tr. 6-86:18-22; 6-96:2-4; 9-46:1-14; 10-66:9–10-67:3. That those documents were falsified in some way—a fact that Defendants did not know and was purposely hidden from them—does not make that reliance any less reasonable at the time that reliance occurred. Trial Tr. 2-47:10-13; 2-54:6-9; 2-65:20–2-66:2; 3-36:17–3-37:3.

Second, Defendants' conduct was isolated to the Mirman/Rose and Harrison/Daniels/Fan companies. The conduct Defendants were found liable for *only* related to, at most, 19 issuers out of over the 1,200-1,500 Defendants filed Form 211 Applications for, or about 1% of the applications filed during the relevant time. Trial Tr. 6-25:12-17; 9-41:19-25. While the SEC makes much of the 19 issuers in this case, that Defendants failed to catch the underlying fraud in those few applications is hardly widespread and intentional wrongdoing. *See, e.g.*, Trial Tr. 3-36:17–3-37:3. Additionally, at a minimum, the conduct for which the jury found liability ceased over six years ago. Since that time, and before, the SEC has never alleged a single violation of the securities laws by any of the defendants outside of the actions related to the issuers in this case, which further highlights the isolated nature of the violation.

SEC also makes much of what it describes as the defendants' complete failure to acknowledge any aspect of their wrongful conduct. But that ignores the fact that the defendants had and continue to have the lawful right to defend themselves.[2] To penalize them for exercising that right is antithetical to our system of justice. *See Yun*, 148 F. Supp. 2d at 1294 ("[W]here litigants do not publicly

---

[2] Indeed, the defendants successfully defended themselves on thirteen of the fourteen counts SEC alleged.

acknowledge the wrongfulness of their conduct due to a decision to contest SEC enforcement, such actions should not prejudice those litigants since a full and vigorous defense is a "'right under our system of justice.'" (citation omitted)).

Finally, the defendants' current occupations will not present opportunities for future violations. As Defendants can establish at an evidentiary hearing, Island and Spartan are inactive companies that are no longer registered with either FINRA or the SEC. Micah Eldred Decl. ¶ 2 (attached hereto as Exhibit A); Carl Dilley Decl. ¶ 2 (attached hereto as Exhibit B). Neither has any significant assets or operations. Eldred Decl. ¶ 2; Dilley Decl. ¶ 2. Not only do these companies have no present plans or capabilities to operate, but without the express permission by both FINRA and the SEC, neither *can* operate, because each would need to be registered to do business with one or more of these regulators. Eldred Decl. ¶¶ 2-5; Dilley Decl. ¶¶ 2-5.

Mr. Dilley is in the same boat as he has retired from the securities industry entirely, and he is no longer associated with any FINRA or SEC registrant. Instead, Mr. Dilley is a realtor in the state of Florida, who has no intention of returning to the securities industry. Dilley Decl. ¶¶ 8-9. And while he does serve on the board of a corporation, his role is not related to the issuance or sale of securities, and he has no intention of acting as a broker-dealer or transfer agent in the future. *Id.* at ¶¶ 7, 10.

Mr. Eldred likewise presents no risk of future violations. He currently does not work as an associated person with any FINRA or SEC registrant, and, of course, would only be allowed to resume his profession with the permission of the regulators. Eldred Decl. ¶¶ 6-7. In fact, Mr. Eldred stopped working in the industry, and shuttered both Spartan and Island because of this litigation. *Id.* at ¶¶ 2, 9. Mr. Eldred's primary occupation now involves running a salvage company, Endurance Exploration Group, Inc., which had no involvement whatsoever with the allegations at issue in this case. *Id.* at ¶¶ 12, 15. And while Mr. Eldred does wish to return to his primary occupation—his career since

he was 18 years-old—he would only do so with appropriate oversight and only once the regulators approved his registration. *Id.* at ¶¶ 7-11.

### C.  A Penny Stock Bar Is Not Warranted

The SEC also seeks lifetime penny stock bars against Spartan, Mr. Dilley, and Mr. Eldred. "A lifetime bar is an extraordinary remedy, usually reserved for those defendants who intentionally engaged in prior securities violations under circumstances suggesting the likelihood of future violations." *SEC v. Benger*, 64 F. Supp. 3d 1136, 1138 (N.D. Ill. 2014) (citing *Blatt*, 583 F.2d at 1334). Penny stock bars are injunctions and are thus subject to the same standards and considerations. SEC has offered no positive proof beyond its mere speculation and conjecture that Defendants will commit wrongdoing in the future. *See Blatt*, 583 F.2d at 1334. And the *Calvo* factors weigh in favor of Defendants. A lifetime penny stock bar is not warranted.[3]

## II.  DISGORGEMENT IS INAPPROPRIATE AND INEQUITABLE IN THIS MATTER

SEC's request for disgorgement is a thinly veiled attempt to extract penalties for scheme and/or course-of-conduct liability that the jury explicitly rejected. The SEC's disgorgement request is seeking all monies it alleges were paid by issuers to Island during a period set forth in the Complaint. Its rationale and calculation are untethered from the evidence presented and accepted at trial, and SEC ignores the jury's determination finding no liability on thirteen of the fourteen counts alleged. This Court should deny the SEC's request on legal, factual, equitable, and discretionary grounds.

---

[3] A penny stock bar against Mr. Eldred is particularly inappropriate, as it would unfairly deprive Endurance's investors of their legitimate business expectations because it would prevent Endurance from raising capital. Eldred Decl. ¶¶ 12-14. In addition, because the salvage industry is highly-specialized, Endurance would not be able to find a replacement CEO, and a bar against Mr. Eldred would effectively penalize the entire company. Id. at ¶ 13.

**A. Disgorgement That Is Put into the Treasury Is Not 'For the Benefit of Investors' as Required by the Exchange Act**

**1. Principles of Statutory Construction Require Sections 78u(d)(5) and 78u(d)(7) Be Read Together**

There remains an open question post-*Liu v. SEC*, 140 S. Ct. 1936 (2020), about "whether disgorgement is 'awarded for victims' when the money is put into a Treasury fund that helps 'pay whistleblowers reporting securities fraud and to fund the activities of the Inspector General.'" *SEC v. Blackburn*, 15 F.4th 676, 682 (5th Cir. 2021).[4] That question is squarely presented in this case.

In a footnote, SEC argues that the Exchange Act's recent amendment, 15 U.S.C. § 78u(d)(7), "provides the courts with greater flexibility to determine where collected disgorged funds may be distributed, because the provision omits the phrase 'for the benefit of investors[.]'" *See* Br. at 14 n.29. But SEC cites no authority or analysis supporting that view.

SEC's reading of § 78u(d)(7) ignores the clear text of § 78u(d)(5). As the *Liu* Court noted, § 78u(d)(5) "*restricts* equitable relief to that which 'may be appropriate or necessary for the benefit of investors.'" 140 S. Ct. at 1947 (emphasis added). Despite SEC's invitation to do so, a statute's subsections should not be read in isolation. *See In re Wild*, 994 F.3d 1244, 1272 (11th Cir. 2021) (Pryor, J., concurring). Rather, statutes should be read as a whole. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* § 24, at 167 (explaining that a "judicial interpreter" is called on "to consider the entire text, in view of its structure and of the physical and logical relation of its many parts."). "Because statutory construction is a 'holistic endeavor,'" courts "must interpret" statutory provisions, like § 78u(d)(7), "in the context of the entire" statute. *Black Warrior Riverkeeper, Inc. v. Black Warrior Mins., Inc.*, 734 F.3d 1297, 1302 (11th Cir. 2013). "The Supreme Court has

---

[4] The *Blackburn* court noted that it was the first appellate court to be asked to determine what "for the benefit of investors" requires. *Id.* at 678. But that case "[did] not involve the issue *Liu* left open[.]" *Id.* at 682. Unlike in *Blackburn*, the SEC has only specified that any disgorged funds will be "sent" to the Treasury not how they are used. SEC Br. at 14.

instructed that the 'fundamental canon of statutory construction [is] that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme' and that a court should 'fit, if possible, all parts into a harmonious whole.'" *Id.* (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) (internal quotation marks omitted)). Relatedly, "a court should also avoid interpreting a provision in a way that would render other provisions of the statute superfluous." *Id.* at 1303; *see also* Scalia & Garner, *supra*, § 26, 174 (the "surplusage canon" holds that "[i]f possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that is to duplicate another provision *or to have no consequence*.") (emphasis added)).

Congressional intent is also persuasive on this point.[5] As the Congressional Record suggests, the purpose of adding § 78u(d)(7) was not to give courts more flexibility but to make the implicit—that disgorgement is an equitable remedy available under the Exchange Act—explicit. *Cf.* 165 Cong. Rec. H8931 (daily ed. Nov. 18, 2019) (statement of Rep. McAdams).

To reach a harmonious whole reading of § 78u(d)(7), that section must be read in context with the statute, specifically § 78u(d)(5). Disgorgement is an equitable remedy. *See SEC v. Levin*, 849 F.3d 995, 1006 (11th Cir. 2017). And, under §78u(d)(5), equitable remedies must be "appropriate or necessary" and "for the benefit of investors." 15 U.S.C. § 78u(d)(5). Thus, disgorgement sought under § 78u(d)(7) must also be "appropriate or necessary" and "for the benefit of investors" because it is an equitable remedy within the meaning of §78u(d)(5). SEC's reading to the contrary would impermissibly

---

[5] The amendments to the SEC's authority consist of only two pages of a 1,480-page defense authorization bill. Undersigned counsel is unaware of any public debate about including the amendments or their purpose during the NDAA's adoption. However, debate over earlier bills seeking to amend the securities laws establish that inclusion of disgorgement as a remedy under the laws was in response to post-*Kokesh [v. SEC*, 137 S. Ct. 1635 (2017)] concerns about the availability of disgorgement as a remedy at all. *See* 165 Cong. Rec. H8930 (daily ed. Nov. 18, 2019) (statement of Rep. Green).

render the investor-benefit requirement superfluous because it would be payable to the *Treasury* not any harmed investors.

> ### 2.  Return of Funds to the Treasury Is Incompatible with Traditional Notions of Equity

The disgorgement award SEC seeks here is not for the benefit of investors, nor does SEC make any showing that it is. "Equity never, under any circumstances, lends its aid to enforce a forfeiture or penalty, or anything in the nature of either." *Marshall v. City of Vicksburg*, 82 U.S. 146, 149 (1872). SEC asks this Court to order both disgorgement and interest which "will be sent by the Commission to the Treasury as consistent with equitable principles." SEC Br. at 14. But the Commission does not specify how that will be achieved. Indeed, SEC's stated purpose for seeking disgorgement paid to the Treasury sounds in the language of penalty not equity because they are seeking it "so as not to incentivize fraud." SEC Br. at 14. Disincentivizing actions is a prospective consideration; an incentive cannot change past behavior and thus is meant only to *deter* future conduct. The disgorgement SEC seeks is not compensatory because it is being sent to the Treasury.

Here, as in *Kokesh*, 137 S. Ct. at 1644, the disgorgement request "bears all the hallmarks of a penalty: It is imposed as a consequence of violating public law and it is intended to deter, not to compensate."[6] As a penalty, the requested disgorgement is not "for the benefit of investors" and this Court therefore should deny the SEC's disgorgement request.

Lastly, all the monies paid to Island—none were paid to Spartan as the market-maker—were paid by the issuers of the stock. These issuers were proven at trial to be fraudsters. Trail Tr. 3-39:11-15; 3-43:11-15. Equity requires "clean hands" and this is particularly true of a case affected with the public interest. *Precision Instrument Mfg. Co., v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 815-

---

[6] *Kokesh* was limited to whether SEC's use of disgorgement was a "penalty" within the meaning of 28 U.S.C. § 2462, but its analysis about why disgorgement was a penalty under that statute is instructive to the inquiry here about whether SEC's disgorgement request is functioning as a penalty in this context.

816 (1945) (dismissing patent case because of lack of clean hands). The application of unclean hands in equity is within the sound discretion of the trial court. *Shatel Corp., v. Mao Ta Lumber and Yacht Co.,* 697 F.2d 1352, 1355 (11th Cir. 1983). The government put on witness after witness who admitted to lying to Defendants multiple times over a long period. *See, e.g.,* Trial Tr. 2-94:4-20. It cannot now seek reimbursement of these fraudsters' monies, ostensibly to put them in the position they occupied beforehand. On any balance of equities, Defendants are less culpable than everyone who paid any money to Island. At most the jury believed that the Form 211 which went to FINRA, not to any investor, contained a misstatement about whether the principal officer of each company had spoken to Spartan's representative. The jury did not find any defendant was in concert with these fraudulent issuers—and accordingly rejected the scheme liability counts—and such a view would not accord with any facts adduced at trial.  It is unconscionable in equity to take from parties who had no knowledge of the fraud to "disgorge" funds paid by the deceivers, and this Court should not set such precedent even were it allowable in an equitable proceeding.

**B.  In the Alternative, Disgorgement Is Not Warranted Because SEC's Calculation Is Unreasonable, Unproven, and Inequitable**

When seeking disgorgement, the SEC must "produc[e] a reasonable approximation of a defendant's ill-gotten gains." *SEC v. Calvo,* 378 F.3d at 1217. But that does not mean SEC is free to put together any calculation, claim it is reasonable, and then shift the burden to Island. *See Vylah Tec,* 378 F. Supp. 3d at 1141 (finding disgorgement calculation unreasonable when government failed to use the best records available, the calculation was a moving target, and non-party funds were included). The Supreme Court has rejected the practice of granting disgorgement that exceeds the profits gained as a result of the violation, noting that, in such cases, "disgorgement does not simply restore the status quo; it leaves the defendant worse off and is therefore punitive." *Kokesh,* 137 S. Ct. at 1639. When SEC disgorgement is "ordered without consideration of a defendant's expenses" that reduced any amount of illegal profit, disgorgement extends beyond compensation and instead constitutes a penalty.

*Id.* Courts must ascertain "whether expenses are legitimate or whether they are merely wrongful gains 'under another name'" to ensure that "any disgorgement award falls within the limits of equity practice." *Liu*, 140 S. Ct. at 1950 (quoting *Rubber Co. v. Goodyear*, 9 Wall. 788, 803 (1870)).

Thus, the initial inquiry is whether SEC's calculation is reasonable based on the facts and circumstances underlying the disgorgement request and how it is calculated. Any presumption against Island based on uncertainty only applies once the burden has shifted to it, not before. *See FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 69 (2d Cir. 2006) ("This presumption against the wrongdoer should not have been invoked without first establishing a reasonable approximation of unjust gain because this presumption applies only in the second stage of the burden-shifting framework."). And that risk only applies when a defendant's "'illegal conduct [is what] created the uncertainty.'" *Id.*

The SEC's disgorgement calculation is not reasonable and should be rejected. Because of this, the burden as to any uncertainty in SEC's calculation cannot shift to Island. Even if it could, there is nothing in the record saying, nor does SEC allege, it was unable to determine the amount of ill-gotten gains because the underlying illegal conduct created the uncertainty in their ability to tabulate it.

SEC's calculation is not supported by the evidence established at trial. SEC relies on testimony from several witnesses, two exhibits, and a series of financial statements—which were not presented at trial—to support its attempt to disgorge all fees it alleges were collected from issuers during a period set forth in the Complaint. *See* SEC Br. at 8 n.21, n.25; Exhibit A. But a review of the testimony and trial exhibits cited does not establish which issuers actually paid fees, when, and by whom beyond general statements about Island's business practices and that bills were potentially paid from issuer checking accounts set up by Mirman or Rose, the latter being well outside Defendants' scope of knowledge. The testimony SEC relies on also indicates that the fees, if any, were variable. *See* Eldred Tr. 7-26-21 a.m. 38:24-39:8, 39:20-40:1.

SEC also relies on their expert's testimony in an attempt to impermissibly establish that Island and Mr. Dilley "issued unrestricted stock to affiliates and undisclosed control people[,]" that they "were aware that shares being deposited were held by affiliates[,]" and that "Island routinely processed the bulk transfers … without restrictive legends … [that] were in fact restricted." *See* SEC Br. at 8 nn.22-24. The cited testimony does not support these contentions, and even if it did, those theories of liability were explicitly rejected by the jury when they found that the SEC did not meet its burden of proof on the other counts against Island.

The disgorgement calculation is also based on an arbitrary timeframe set forth in ¶ 35 of the Complaint, not based on the testimony and evidence presented at trial. *See* Dkt. 270-1 at ¶ 6 (Mark Dee Decl.). This creates several evidentiary problems for the SEC's calculation. Paragraph 35 only alleges a period based on when the Form 211 was signed until when the bulk transfers allegedly occurred.[7] Those dates are given in a month/year format. As such, it appears that the SEC includes any payments allegedly made in the same month/year the bulk transfer allegedly occurred but does not consider when the bulk transfer actually occurred.[8] Thus, the calculation may be including money paid by the companies or their shareholders after the change in control occurred. As such those fees are outside the scope of this case. This appears to have occurred with at least six issuers: First Titan, Aristocrat Group, Obscene Jeans Corp, On the Move Systems Corp, Kids Germ Defense Corp, and First Social Network Corp. *Compare* Dkt. 1 ¶ 35 *with* SEC Br. Ex. 2. The SEC failed completely to obtain liability on its bulk transfer/restricted stock theory even though it was only finally explained to Defendants and the court at trial.  Even this effort at trial by surprise was ineffective and did not convince the jury.  It should not convince the Court at the penalty phase.  The penalty can only relate to what the Government proved, and it did not prove this.

_____

[7] At trial, SEC did not establish when the companies changed control. That is failure of proof on the Commission's part, which it should be given no benefit of now.

[8] This is a failure of proof on SEC's part and should not shift the burden to Island to disprove.

The SEC's calculation also fails to exclude any legitimate business expenses as required under *Liu*. *See Liu*, 140 S. Ct. at 1950. For example, the financial statements clearly include fees paid to DTC or CUSIP which were not retained by Island. *See* Dkt. 270-1 Ex. 1 at 5, 30, 45, 91, 116, 142; *see also* Dilley Tr. 7-20-21 a.m. 5-34:9-18, 35:3-14. Moreover, as can be established at an evidentiary hearing, Island had routine operational expenses that came into play, such as employee salaries, rent, utilities, and the like, all of which were legitimate and necessary expenses for Island's operation. Dilley Decl. ¶ 11; Eldred Decl. ¶ 17.

Finally, the unique timing of this case warrants other equitable considerations. When this matter was filed, *Kokesh* controlled, and the SEC was not entitled to any disgorgement for any actions taken more than five years before the Complaint was filed. That timeframe would have excluded most of the fees SEC now seeks. *See* Dkt. 23 at 34 (indicating that "drawing all inferences in the SEC's favor" at the motion to dismiss stage, arguably only Envoy Group, Changing Technologies, and First Xeris had activity extending into the statute of limitations period for disgorgement). Indeed, the Complaint is silent as to what authority the SEC was requesting disgorgement relief under. *See* Dkt. 1 at 61. At best this could be interpreted as invoking the Court's general equitable powers and the five-year statute of limitations under 28 U.S.C. § 2462 and *Kokesh* controls. SEC could have amended its Complaint to plead relief under the NDAA's amendments, but it did not, and that failure is fatal to claims for disgorgement outside the five-year period. Additionally, while the NDAA purports to make its amendments retroactive and applicable to then-pending cases, the constitutionality of that is dubious. The retroactive application of the extended penalty period violates the *ex post facto* clause of the United States Constitution. U.S. Const. Art. I, § 9 ("No bill of attainder or ex post facto Law shall be passed."). Such retrospective application of penalties that were previously unavailable also deprives Island of its due process rights because it unlawfully creates unforeseen liability for past conduct. U.S. Const. amend. V.

15

The SEC also seeks $51,286.05 in prejudgment interest. Whether to grant prejudgment interest is a decision that "falls squarely within the discretion of the district court." *SEC v. Hall*, 759 F. App'x 877, 883 (11th Cir. 2019). Equal to roughly one-third of the disgorgement amount requested, the prejudgment interest is likewise inequitable given the unique timing and circumstances of this case. Indeed, over $21,744.32 in interest has accrued since the Complaint was filed. Such an award unfairly penalizes Island for exercising its right to defend itself, and ultimately prevailing on all but one of the counts alleged by the SEC against it. Not only would prejudgment interest reward delay by the SEC in bringing the matter so late, but it would also penalize defendants for asserting valid defenses to a ridiculously overcharged Complaint. Defendants prevailed on all counts but one that were pressed, despite increasing implausibility given the assertions of the SEC's own witnesses.

SEC's *cy pres* argument also fails because it misreads the language in *SEC v. Custable*, 796 F.3d 653, 656 (7th Cir. 2015). In that case, the court opined that *cy pres* "probably is anyway *unavailable* given the district court's authority to bypass victims of a fraud and send the disgorged profits and the penalty to the U.S. Treasury." *Id.* (emphasis added). No court in this Circuit has ever applied *cy pres* in an SEC-enforcement action, and this Court should not do so now.

If this Court determines that disgorgement paid to the Treasury is for the benefit of investors—it should not—Defendant Island respectfully requests the Court to use its discretion to calculate and reduce the disgorgement amount based on the evidence proven at trial, within the confines of *Liu*, and in consideration of equitable principles.[9] Even ignoring ordinary operating

---

[9] Among the settlements reached between the SEC and several of the issuers' officers or directors, on average, the settling party paid only $10,000 in disgorgement, if that. *See* In the Matter of Matthew L. Egna Respondent., Release No. 10377 (June 29, 2017); In the Matter of Andrew S. Keck Respondent., Release No. 10378 (June 29, 2017); In the Matter of Sarah E. Keck Respondent., Release No. 10379 (June 29, 2017); In the Matter of Nigel G. Lindsay Respondent., Release No. 10380 (June 29, 2017); In the Matter of Marilyn Stark Respondent., Release No. 10381 (June 29, 2017).

expenses, Island only received net proceeds for the relevant issuers in the amount of $8,000. *See* Dilley Decl. ¶ 11; Eldred Decl. ¶ 10.

### III. CIVIL PENALTIES ARE NOT WARRANTED OR, IN THE ALTERNATIVE, SHOULD BE REDUCED

It is within this Court's discretion to determine whether to impose a penalty, and how much that penalty will be. *SEC v. Aura Financial Servs.*, 2010 WL 3419200, *3 (S.D. Fla. July 14, 2021). In making that determination, courts consider and weigh several factors that overlap with those considered when determining whether to enter an injunction:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

*SEC v. Huff*, 758 F. Supp. 2d 1288, 1364 (S.D. Fla. 2010) (quoting *SEC v. Abellan*, 674 F. Supp. 2d 1213, 1222 (W.D. Wash. 2009)), *aff'd* 455 Fed. App'x 882 (per curiam). Thus, a court may reduce the amount of civil penalty levied by "evaluating the facts and circumstances of the case." *SEC v. BIH Corp.*, No. 2:10-CV-577-FTM-29, 2014 WL 7499053, at *5 (M.D. Fla. Dec. 12, 2014).

SEC seeks tier three penalties for all Defendants in the amounts of $480,000 against Mr. Dilley, $320,000 against Mr. Eldred, and $775,000 against Spartan and Island each. SEC Br. at 20. These severe tier three penalties are neither permitted nor warranted.[10] Tier three penalties require a showing that a defendant's actions "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 78u(d)(3)(B)(iii). SEC failed to establish this

---

[10] The penalty amounts requested by Defendants are also substantially higher than those ordered against three of the individuals shown at trial to have orchestrated the underlying schemes. Diane Harrison and Michael Daniels both consented to individual third tier penalties of $200,000. *See* Pl's Mot. for Entry of Final Judgments Against Defendants Michael Daniels and Diane Harrison, *SEC v. Harrison*, 8:18-cv-01003-SDM-TGW (filed May 18, 2020), Dkt. 140. A civil penalty of $140,000 was ordered against Andy Fan. *See* In the Matter of Andy Z. Fan Respondent., Release No. 10487 (Apr. 25, 2018).

through competent evidence at trial, and it cannot do so now through conclusory statements and conjecture. *See* SEC Br. at 18 (citing testimony by Mirman, Cangiano, and Adams). First, there was no evidence presented that *any* investor directly or indirectly suffered loss *because of* Defendants' actions. Thus, SEC can only seek tier three penalties if Defendants actions created a "significant risk of substantial losses to other persons." But SEC failed to establish that risk. The possibility that an issuer *may* conceivably be used in a pump-and-dump scheme at some future point in time does not mean that its existence poses a "significant risk of substantial losses to other persons." "Although all Section 10(b) or Rule 10b-5 frauds could be said to create *some* 'risk' of *some* 'harm' to investors, the Remedies Act reserves third-tier civil penalties for those frauds that create a *significant* risk of *substantial* losses." *SEC v. Madsen*, No. 17-CV-8300 (JMF), 2018 WL 5023945, at *4 (S.D.N.Y. Oct. 17, 2018) (emphasis in original). "Substantial losses" is undefined, but this District's "prevailing view" is that some actual pecuniary loss must be identified to determine whether that loss is substantial. *SEC v. Hayter*, No. 210-CV-577-FTM-29DNF, 2015 WL 403323, at *2 (M.D. Fla. Jan. 28, 2015). SEC has identified no losses that are the result of the conduct the jury found Defendants liable for. "Could haves" without more—as SEC has argued here—are not sufficient to warrant tier three penalties. *See Madsen*, 2018 WL 5023945, at *4 (rejecting request for tier three penalties).

As discussed *supra*, *see* Sect. I.B., the violations for which the jury found Defendants' liable were not sufficiently egregious and were isolated. Defendants have pursued a "full and vigorous defense" as is their right. *Yun*, 148 F. Supp. 2d at 1294. And their exercise of that right should not prejudice determination of the amount of civil monetary penalties in this case. Defendants also cooperated with the SEC throughout the years-long pre-Complaint investigation, providing 1000s of pages of documents and sitting for hours of depositions.

Finally, Defendants' current and future financial condition warrant this Court's consideration. Neither Spartan nor Island is currently in operation. Eldred Decl. ¶ 2; Dilley Decl. ¶ 2. Nor do they

have any plan to resume operations. Eldred Decl. ¶ 2; Dilley Decl. ¶ 2. They both have negligible

assets and no physical locations or employees. Eldred Decl. ¶ 2; Dilley Decl. ¶ 2. Neither is currently

registered with the SEC. To resume operations as a broker-dealer, Spartan would have to register with

both the SEC and FINRA, and to resume operations as a transfer agent, Island would have to register

with the SEC. Dilley Decl. ¶ 2; Eldred Decl. ¶ 2. Neither has the assets, resources, nor a future business

plan that would enable them to pay the substantial penalties the SEC seeks. Mr. Dilley is unable to

pay the civil penalty requested by SEC. Dilley Decl. ¶ 12. He is currently 67 years old, and his monthly

income is comprised almost entirely of social security benefits and a retirement payout. *Id.* He receives

$1,497 in social security and $597 in retirement benefits per month, but, after deducting monthly

expenses, his monthly net income is negative. *Id.* He has negative net worth, no significant assets, and

has no realistic opportunity of a significant increase in earnings capacity in the foreseeable future. *Id.*

at ¶ 13.

The Court should exercise its discretion and reject the SEC's proposed penalties.[11]

Given this set of circumstances and what was demonstrated at trial—at most the two

principals, Mr. Dilley and Mr. Eldred, erred on the Form 211 in reporting who they spoke to at the

various issuers and sent the form to FINRA.  That form never went to investors.  The actual issuers

who lied to the SEC and created the SEC forms that all defendants and investors relied on were

penalized $10,000, if that.[12]  No defendant in this case is nearly as culpable on any issue.  The

---

[11] As SEC points out, courts may, in the alternative, "impose a penalty up to defendant's gross pecuniary gain." SEC Br. at 16 n.31. The Defendants' gross pecuniary gain established at trial was $0.
[12] Among the settlements reached between the SEC and several of the issuers' officers or directors, on average, the settling party paid only $10,000 in civil penalties, if that. *See* In the Matter of Matthew L. Egna Respondent., Release No. 10377 (June 29, 2017) ($10,000 civil penalty); In the Matter of Andrew S. Keck Respondent., Release No. 10378 (June 29, 2017) ($2,500 civil penalty based on inability to pay); In the Matter of Sarah E. Keck Respondent., Release No. 10379 (June 29, 2017) ($2,500 civil penalty based on inability to pay); In the Matter of Nigel G. Lindsay Respondent., Release No. 10380 (June 29, 2017) (no civil penalty); In the Matter of Marilyn Stark Respondent., Release No. 10381 (June 29, 2017) ($10,000 civil penalty). Undersigned counsel was unable to find any final enforcement orders or judgments against the officers or directors for nine of the issuers: Kids Germ,

Defendants have been put through years of litigation in a suit where the SEC lost the vast majority of claims it brought. So, no fine or penalty should exceed the $10,000 that most of those who actively lied directly to all investors in SEC filings received.

## **Conclusion**

Defendants respectfully request that this Court invoke its discretionary and equitable powers to deny SEC's requested relief, and to determine what appropriate injunctive and monetary remedies may be, if any.

Respectfully Submitted,

Dated: May 23, 2022

*/s/ Kara Rollins*
KARA ROLLINS
Litigation Counsel
JOHN J. VECCHIONE
Senior Litigation Counsel
New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC 20036
(202) 869-5210
kara.rollins@NCLA.legal
john.vecchione@NCLA.legal

CALEB KRUCKENBERG
3100 Clarendon Blvd, Suite 610
Arlington, VA 22201
ckrucken@gmail.com

*Counsel for Defendants*
Appearing *Pro Hac Vice*

---

Obscene Jeans, On the Move Systems, Rainbow Coral, First Titan, Aristocrat Group, E-Waste Corp., Envoy Group, and First Xeris Group.

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2022, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system which sent notification of such filing to all counsel of record.

Respectfully,

*/s/ Kara Rollins*
KARA ROLLINS
Appearing *Pro Hac Vice*