# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

Sam M. Gibbons U.S. Courthouse
Office of the Clerk
801 North Florida Avenue
Tampa, FL 33602
(813) 301-5400
www.flmd.uscourts.gov

Elizabeth M. Warren                                                      Kristin Esposito
Clerk of Court                                                     Tampa Division Manager

**DATE:** September 16, 2022

**TO:**    Clerk, U.S. Court of Appeals for the Eleventh Circuit

---

U.S. SECURITIES AND EXCHANGE COMMISSION,

      Plaintiff,

v.                                              Case No: 8:19-cv-448-VMC-CPT

SPARTAN SECURITIES GROUP, LTD., ISLAND
CAPITAL MANAGEMENT, CARL E. DILLEY and
MICAH J. ELDRED,

      Defendants.

---

## U.S.C.A. Case No.:          UNKNOWN

Enclosed are documents and information relating to an appeal in the above-referenced action.  Please acknowledge receipt on the enclosed copy of this letter.

- Honorable Virginia M. Hernandez Covington, United States District Judge appealed from.

- Appeal filing fee was not paid. Upon filing a notice of appeal, the appellant must pay the district clerk all required fees. The district clerk receives the appellate docket fee on behalf of the court of appeals.  If you are filing informa pauperis, a request for leave to appeal in forma pauperis needs to be filed with the district court.

- Certified copy of Notice of Appeal, docket entries, judgment and/or Order appealed from.  Opinion was not entered orally.

- Court Reporter:  Melissa Pierson

ELIZABETH M. WARREN, CLERK

By:     s/C. Roberts, Deputy Clerk

# U.S. District Court
## Middle District of Florida (Tampa)
## CIVIL DOCKET FOR CASE #: 8:19−cv−00448−VMC−CPT

| | |
|---|---|
| U.S. Securities and Exchange Commission v. Spartan Securities Group, LTD. et al | Date Filed: 02/20/2019 |
| | Date Terminated: 02/08/2022 |
| Assigned to: Judge Virginia M. Hernandez Covington | Jury Demand: Defendant |
| Referred to: Magistrate Judge Christopher P. Tuite | Nature of Suit: 850 |
| Cause: 15:0077 Securities Fraud | Securities/Commodities |
| | Jurisdiction: U.S. Government Plaintiff |

**Plaintiff**

**U.S. Securities and Exchange Commission**      represented by    **Alice K. Sum**
Securities and Exchange Commission
801 Brickell Avenue, Suite 1950
Miami, FL 33131−3353
305−982−6300
Fax: 305/728−7512
Email: sumal@sec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alise M. Johnson**
Securities and Exchange Commission
801 Brickell Ave., Suite 1800
Miami, FL 33131
Email: johnsonali@sec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine Nestor**
Securities & Exchange Commission
Suite 1800
801 Brickell Ave
Miami, FL 33131
305/982−6367
Fax: 305/536−4154
Email: nestorc@sec.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Wilfredo Fernandez**
US Securities & Exchange Commission
801 Brickell Ave Ste 1800
Miami, FL 33131−4901
305−982−6376
Fax: 305−530−6376
Email: fernandezw@sec.gov
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Spartan Securities Group, LTD.**                 represented by   **Alan Mitchell Wolper**
Ulmer & Berne LLP
500 W. Madison Street
Suite 3600
Chicago, IL 60661
312–658–6500
Email: awolper@ulmer.com
*TERMINATED: 07/17/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caleb Kruckenberg**
Pacific Legal Foundation
3100 Clarendon Blvd Suite 610
22201
Arlington, VA 20036–9005
202–888–6881
Email: ckruckenberg@pacificlegal.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heidi E. VonderHeide**
Ulmer & Berne LLP
500 W Madison St Ste 3600
Chicago, IL 60661
708–658–6512
Fax: 708–658–6513
Email: hvonderheide@ulmer.com
*TERMINATED: 07/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kara McKenna Rollins**
New Civil Liberties Alliance
1225 19th Street N.W., Suite 450
Washington, DC 20002
202–908–6203
Fax: 202–330–5842
Email: kara.rollins@ncla.legal
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Seth Sarelson**
Dhillon Law Group, Inc.
2100 Ponce de Leon Blvd
Suite 1290

Coral Gables, FL 33134
305–773–1952
Email: msarelson@dhillonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anna Patricia Morales–Christiansen**
Palm Beach County School District
Office of The General Counsel
3318 Forest Hill Boulevard
Suite C–331
West Palm Beach, FL 33406
561–434–8746
Fax: 561–434–8105
Email: anna.morales@palmbeachschools.org
*TERMINATED: 07/17/2019*
*ATTORNEY TO BE NOTICED*

**John Julian Vecchione**
New Civil Liberties Alliance
1225 19th St. N.W.
Suite 450
Washington, DC 20036–2411
202–918–6902
Email: john.vecchione@ncla.legal
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

| Island Capital Management | represented by | **Alan Mitchell Wolper** |
| --- | --- | --- |

**Alan Mitchell Wolper**
(See above for address)
*TERMINATED: 07/17/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caleb Kruckenberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heidi E. VonderHeide**
(See above for address)
*TERMINATED: 07/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kara McKenna Rollins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Seth Sarelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anna Patricia Morales–Christiansen**
(See above for address)
*TERMINATED: 07/17/2019*
*ATTORNEY TO BE NOTICED*

**John Julian Vecchione**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Carl E. Dilley** | represented by | **Alan Mitchell Wolper** |

(See above for address)
*TERMINATED: 07/17/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caleb Kruckenberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heidi E. VonderHeide**
(See above for address)
*TERMINATED: 07/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kara McKenna Rollins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Seth Sarelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anna Patricia Morales–Christiansen**
(See above for address)
*TERMINATED: 07/17/2019*
*ATTORNEY TO BE NOTICED*

**John Julian Vecchione**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Micah J. Eldred**                    represented by   **Alan Mitchell Wolper**
(See above for address)
*TERMINATED: 07/17/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caleb Kruckenberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heidi E. VonderHeide**
(See above for address)
*TERMINATED: 07/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kara McKenna Rollins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Seth Sarelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anna Patricia Morales–Christiansen**
(See above for address)
*TERMINATED: 07/17/2019*
*ATTORNEY TO BE NOTICED*

**John Julian Vecchione**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**David D. Lopez**                    represented by   **Alan Mitchell Wolper**
*TERMINATED: 07/30/2021*              (See above for address)
*TERMINATED: 07/17/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caleb Kruckenberg**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Heidi E. VonderHeide**
(See above for address)
*TERMINATED: 07/17/2019*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kara McKenna Rollins**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew Seth Sarelson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anna Patricia Morales–Christiansen**
(See above for address)
*TERMINATED: 07/17/2019*
*ATTORNEY TO BE NOTICED*

**John Julian Vecchione**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mediator**

| | | |
|---|---|---|
| **Brian Mooney**<br>*TERMINATED: 02/07/2020* | represented by | **Brian Gerard Mooney**<br>The Mooney Firm, PLLC<br>4300 W Cypress St, Suite 825<br>Tampa, FL 33607<br>813/877–1800<br>Email: brian.mooney@themooneyfirm.com<br>*TERMINATED: 02/07/2020*<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Mediator**

| | | |
|---|---|---|
| **Peter J. Grilli** | represented by | **Peter John Grilli**<br>Peter J. Grilli, PA<br>3001 W Azeele St<br>Tampa, FL 33609–3138<br>813/874–1002<br>Fax: 813/874–1131 |

Email: peter@grillimediation.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/20/2019 | 1 | | COMPLAINT against Carl E. Dilley, Micah J Eldred, Island Capital Management, David D Lopez, Spartan Securities Group, LTD. filed by U.S. Securities and Exchange Commission. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons)(Fernandez, Wilfredo) (Entered: 02/20/2019) |
| 02/20/2019 | 2 | | NEW CASE ASSIGNED to Judge Virginia M. Hernandez Covington and Magistrate Judge Christopher P. Tuite. New case number: 8:19–cv–448–T–33CPT. (SJB) (Entered: 02/20/2019) |
| 02/21/2019 | 3 | | SUMMONS issued as to Carl E. Dilley, Micah J Eldred, Island Capital Management, David D Lopez, Spartan Securities Group, LTD.. (KMM) (Entered: 02/21/2019) |
| 02/25/2019 | 4 | | WAIVER of service returned executed on 2/21/19 by U.S. Securities and Exchange Commission as to Spartan Securities Group, LTD.. (Fernandez, Wilfredo) (Entered: 02/25/2019) |
| 02/25/2019 | 5 | | WAIVER of service returned executed on 2/21/19 by U.S. Securities and Exchange Commission as to Island Capital Management. (Fernandez, Wilfredo) (Entered: 02/25/2019) |
| 02/25/2019 | 6 | | WAIVER of service returned executed on 2/21/19 by U.S. Securities and Exchange Commission as to Carl E. Dilley. (Fernandez, Wilfredo) (Entered: 02/25/2019) |
| 02/25/2019 | 7 | | WAIVER of service returned executed on 2/21/19 by U.S. Securities and Exchange Commission as to Micah J Eldred. (Fernandez, Wilfredo) (Entered: 02/25/2019) |
| 02/25/2019 | 8 | | WAIVER of service returned executed on 2/21/19 by U.S. Securities and Exchange Commission as to David D Lopez. (Fernandez, Wilfredo) (Entered: 02/25/2019) |
| 02/25/2019 | 9 | | **ENDORSED ORDER: Counsel are directed to meet and confer, in person or by telephone, and by April 29, 2019, file a completed Case Management Report. This document can be found on Judge Covington's page of the Court's website at www.flmd.uscourts.gov. Please be advised that the Court's Case Management Report form is different from those used by other judges. Local Rule 3.05(c)(2)(E), M.D. Fla., explains that most track two cases, like the present case, "will be tried within one year after the filing of the complaint." To accomplish this goal, the Court believes that six to eight months is a sufficient period of time to conduct discovery. If the parties believe that more time than eight months will be needed to complete discovery, the parties should provide the Court with a detailed explanation as to why additional time is needed and a timeline for the discovery that is planned. The Court will then determine whether a Case Management Hearing is necessary before entry of a Case Management and Scheduling Order. Signed by Judge Virginia M.** |

| | | | |
|---|---|---|---|
| | | | Hernandez Covington on 2/25/2019. (DMD) (Entered: 02/25/2019) |
| 02/28/2019 | 10 | | NOTICE of pendency of related cases *SEC v. Daniels, et al., 18−cv−1003−SDM−TGW* per Local Rule 1.04(d) by U.S. Securities and Exchange Commission. Related case(s): yes (Fernandez, Wilfredo) (Entered: 02/28/2019) |
| 03/06/2019 | 11 | | **RELATED CASE ORDER AND NOTICE of designation under Local Rule 3.05 – track 2. Signed by Judge Virginia M. Hernandez Covington on 3/6/2019. (TWL)** (Entered: 03/06/2019) |
| 03/07/2019 | 12 | | NOTICE of pendency of related cases *SEC v. Daniels, et al., 18−cv−1003−SDM−TGW* per Local Rule 1.04(d) by U.S. Securities and Exchange Commission. Related case(s): yes (Nestor, Christine) (Entered: 03/07/2019) |
| 03/11/2019 | 13 | | NOTICE of Appearance by Alan Mitchell Wolper on behalf of Carl E. Dilley, Micah J Eldred, Island Capital Management, David D Lopez, Spartan Securities Group, LTD. (Wolper, Alan) (Entered: 03/11/2019) |
| 03/19/2019 | 14 | | NOTICE of pendency of related cases per Local Rule 1.04(d) by Carl E. Dilley, Micah J Eldred, Island Capital Management, David D Lopez, Spartan Securities Group, LTD.. Related case(s): yes (Wolper, Alan) (Entered: 03/19/2019) |
| 04/04/2019 | 15 | | CERTIFICATE of interested persons and corporate disclosure statement by U.S. Securities and Exchange Commission. (Fernandez, Wilfredo) (Entered: 04/04/2019) |
| 04/11/2019 | | | ***PRO HAC VICE FEES paid by attorney Heidi E. Vonderheide (Filing fee $150 receipt number TPA056067.). (ARC) (Entered: 04/11/2019) |
| 04/11/2019 | 16 | | Unopposed MOTION for leave to file JOINT MOTION FOR LEAVE TO FILE MOTION TO DISMISS IN EXCESS OF THE TWENTY FIVE PAGE LIMIT by Carl E. Dilley, Island Capital Management, Spartan Securities Group, LTD.. (Wolper, Alan) Modified relief on 4/12/2019 (KMM). (Entered: 04/11/2019) |
| 04/11/2019 | 17 | | Unopposed MOTION for leave to file MOTION FOR LEAVE TO FILE MOTION TO DISMISS IN EXCESS OF THE TWENTY FIVE PAGE LIMIT by Micah J Eldred. (Wolper, Alan) Modified relief on 4/12/2019 (KMM). (Entered: 04/11/2019) |
| 04/11/2019 | 18 | | Unopposed MOTION for Heidi E. VonderHeide to appear pro hac vice by All Defendants. (Attachments: # 1 Exhibit Certificate of Good Standing, # 2 Text of Proposed Order Proposed Order)(Morales−Christiansen, Anna) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 04/11/2019) |
| 04/12/2019 | 19 | | **ENDORSED ORDER granting 18 Unopposed Motion for Admission Pro Hac Vice of Heidi E. VonderHeide. Signed by Magistrate Judge Christopher P. Tuite on 4/12/2019. (AHA)** (Entered: 04/12/2019) |
| 04/12/2019 | 20 | | **ENDORSED ORDER granting Defendants Spartan Securities Group, Ltd., Island Capital Management, and Carl E. Dilley's Unopposed Joint Motion for Leave to File Motion to Dismiss in Excess of the Twenty Five Page Limit (Doc. # 16) and Defendant Micah J. Eldred's Unopposed** |

| | | | |
|---|---|---|---|
| | | | **Motion for Leave to File Motion to Dismiss in Excess of the Twenty Five Page Limit (Doc. # 17). Signed by Judge Virginia M. Hernandez Covington on 4/12/2019. (DLB)** (Entered: 04/12/2019) |
| 04/22/2019 | 21 | | CERTIFICATE of interested persons and corporate disclosure statement by Carl E. Dilley, Micah J Eldred, Island Capital Management, David D Lopez, Spartan Securities Group, LTD. identifying Corporate Parent Connect X Capital Markets LLC for Island Capital Management, Spartan Securities Group, LTD. (Wolper, Alan) (Entered: 04/22/2019) |
| 04/22/2019 | 22 | | MOTION to dismiss for failure to state a claim *and incorporated Memorandum of Law* by Micah J Eldred. (Wolper, Alan) (Entered: 04/22/2019) |
| 04/22/2019 | 23 | | Joint MOTION to dismiss for failure to state a claim *and incorporated Memorandum of Law* by Carl E. Dilley, Island Capital Management, David D Lopez, Spartan Securities Group, LTD. (Wolper, Alan) (Entered: 04/22/2019) |
| 04/23/2019 | 24 | | CASE MANAGEMENT REPORT. (Fernandez, Wilfredo) (Entered: 04/23/2019) |
| 04/27/2019 | 25 | | **ENDORSED ORDER: The Clerk is directed to schedule this matter for a case management hearing on May 22, 2019 at 4 pm. Signed by Judge Virginia M. Hernandez Covington on 4/27/2019. (Covington, Virginia)** (Entered: 04/27/2019) |
| 04/29/2019 | 26 | | NOTICE of hearing: Case Management Hearing set for May 22, 2019, at 4:00 PM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. Absent compelling circumstances and leave of Court, Lead Counsel must appear in person at the Case Management Hearing. Lead Counsel must be prepared to discuss the claims and defenses as well as any unique aspects of the case with the Court. This hearing is an investment of the Court's time and presents an opportunity for Counsel to meet the judge presiding over their case as well as present any issues that should be called to the Court's attention.(TWL) (Entered: 04/29/2019) |
| 05/01/2019 | 27 | | Unopposed MOTION for Extension of Time to File Response/Reply as to 22 MOTION to dismiss for failure to state a claim *and incorporated Memorandum of Law*, 23 Joint MOTION to dismiss for failure to state a claim *and incorporated Memorandum of Law and attached Proposed Order* by U.S. Securities and Exchange Commission. (Attachments: # 1 Proposed Order)(Fernandez, Wilfredo) (Entered: 05/01/2019) |
| 05/01/2019 | 28 | | **ENDORSED ORDER granting the Securities and Exchange Commission's Unopposed Motion for an Extension of Time to File Responses to Defendants' Motion to Dismiss and Request for Leave to File Response Briefs in Excess of the Twenty Page Limit. (Doc. # 27). The Commission's response to Micah J. Eldred's Motion to Dismiss (Doc. # 22) may be twenty–five pages, and the Commission's response to Spartan Securities Group, Ltd., Island Capital Management, Carl E. Dilley, and David D. Lopez's Joint Motion to Dismiss (Doc. # 23) may be thirty pages. The Commission's responses to Defendants' Motions are due by May 24, 2019. Signed by Judge Virginia M. Hernandez Covington on 5/1/2019. (DLB)** (Entered: 05/01/2019) |

| 05/06/2019 | 29 | | Unopposed MOTION to Continue *CASE MANAGEMENT HEARING* by Carl E. Dilley, Micah J Eldred, Island Capital Management, David D Lopez, Spartan Securities Group, LTD.. (Wolper, Alan) (Entered: 05/06/2019) |
|---|---|---|---|
| 05/06/2019 | 30 | | **ENDORSED ORDER granting 29 Motion to Continue. Hearing will now be held on May 31, 2019, at 4 p.m. Clerk is directed to enter notice. Signed by Judge Virginia M. Hernandez Covington on 5/6/2019. (Covington, Virginia)** (Entered: 05/06/2019) |
| 05/07/2019 | 31 | | NOTICE OF RESCHEDULING HEARING: The Case Management Hearing hearing previously scheduled for 5/22/2019 is rescheduled. New scheduling date and time: Scheduling Conference set for 5/31/2019 at 4:00 PM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 05/07/2019) |
| 05/13/2019 | 32 | | **ENDORSED ORDER: The Court will hear oral argument on the pending motions to dismiss (Doc. ## 22, 23) at the case management hearing scheduled for May 31, 2019. Signed by Judge Virginia M. Hernandez Covington on 5/13/2019. (DLB)** (Entered: 05/13/2019) |
| 05/24/2019 | 33 | | RESPONSE in Opposition re 23 Joint MOTION to dismiss for failure to state a claim *and incorporated Memorandum of Law* filed by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 05/24/2019) |
| 05/24/2019 | 34 | | RESPONSE in Opposition re 22 MOTION to dismiss for failure to state a claim *and incorporated Memorandum of Law* filed by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 05/24/2019) |
| 05/29/2019 | 35 | | MOTION for miscellaneous relief, specifically Plaintiff's Unopposed Motion To Excuse Plaintiff's Co–Counsel from Court Appearance set for May 31, 2019 by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 05/29/2019) |
| 05/29/2019 | 36 | | **ENDORSED ORDER granting Plaintiff Securities and Exchange Commission's Unopposed Motion to Excuse Plaintiff's Co–Counsel From Court Appearance Set for May 31, 2019. (Doc. # 35). Wilfredo Fernandez is excused from attending the hearing scheduled for May 31, 2019. Signed by Judge Virginia M. Hernandez Covington on 5/29/2019. (DLB)** (Entered: 05/29/2019) |
| 05/30/2019 | 37 | | CERTIFICATE of interested persons and corporate disclosure statement *(First Supplemental)* by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 05/30/2019) |
| 05/30/2019 | 38 | | **ENDORSED ORDER: The hearing scheduled for May 31, 2019, will begin at 3:30 pm rather than 4:00 pm. If counsel can not arrive at 3:30, the Court asks that counsel immediately inform the Court. Signed by Judge Virginia M. Hernandez Covington on 5/30/2019. (Covington, Virginia)** (Entered: 05/30/2019) |
| 05/31/2019 | 39 | | NOTICE OF RESCHEDULING HEARING (AS TO TIME ONLY): The Case Management hearing previously scheduled for 5/31/2019 at 4:00 PM is rescheduled. New hearing time: Scheduling Conference set for 5/31/2019 at 3:30 PM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 05/31/2019) |

| 05/31/2019 | [40](#) | | Minute Entry. Proceedings held before Judge Virginia M. Hernandez Covington: SCHEDULING CONFERENCE held on 5/31/2019. Court Reporter: Scott N. Gamertsfelder (TWL) (Entered: 06/04/2019) |
|---|---|---|---|
| 05/31/2019 | 41 | | **ORAL ORDER denying 22 Motion to Dismiss for Failure to State a Claim. Signed by Judge Virginia M. Hernandez Covington on 5/31/2019. (TWL)** (Entered: 06/04/2019) |
| 05/31/2019 | 42 | | **ORAL ORDER denying 23 Motion to Dismiss for Failure to State a Claim. Signed by Judge Virginia M. Hernandez Covington on 5/31/2019. (TWL)** (Entered: 06/04/2019) |
| 06/04/2019 | [43](#) | | <span style="color:green">**CASE MANAGEMENT AND SCHEDULING ORDER:**</span> **Final Pretrial Conference set for 9/24/2020 at 9:00 AM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington, Jury Trial set for the October 2020 trial term in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington, Conduct mediation hearing by 2/5/2020. Lead counsel to coordinate dates. Signed by Judge Virginia M. Hernandez Covington on 6/4/2019. (TWL)** (Entered: 06/04/2019) |
| 06/05/2019 | [44](#) | | **ORDER: Defendant Micah Eldred's Motion to Dismiss (Doc. # 22) and Defendants Spartan Securities Group, LTD, Island Capital Management, Carl Dilley, and David Lopez's Joint Motion to Dismiss (Doc. # 23) are DENIED. Defendants are directed to file their answers to the Complaint by June 14, 2019. Signed by Judge Virginia M. Hernandez Covington on 6/5/2019. (DLB)** (Entered: 06/05/2019) |
| 06/14/2019 | [45](#) | | NOTICE of mediation conference/hearing to be held on February 5, 2020 at 10:00 a.m. in Tampa, Florida before Brian G. Mooney, Esq.(Nestor, Christine) Modified punctuation on 6/14/2019 (KMM). (Entered: 06/14/2019) |
| 06/14/2019 | [46](#) | | <span style="color:purple">ANSWER and affirmative defenses to 1 Complaint with Jury Demand by Carl E. Dilley, Micah J Eldred, Island Capital Management, David D Lopez, Spartan Securities Group, LTD..(Wolper, Alan)</span> (Entered: 06/14/2019) |
| 06/14/2019 | [47](#) | | DEMAND for trial by jury by Carl E. Dilley, Micah J Eldred, Island Capital Management, David D Lopez, Spartan Securities Group, LTD.. (Wolper, Alan) (Entered: 06/14/2019) |
| 06/17/2019 | [48](#) | | **ORDER appointing Brian G. Mooney as mediator in this action. Mediation Conference set for February 5, 2020. The Court directs that all counsel, parties, corporate representatives, and any other required claims professionals shall be present at the mediation conference with full authority to negotiate a settlement. The Court does not allow mediation by telephone or video conference. Personal attendance is required. See Local Rule 9.05(c). Signed by Judge Virginia M. Hernandez Covington on 6/17/2019. (DLB)** (Entered: 06/17/2019) |
| 07/01/2019 | [49](#) | | Unopposed MOTION for Partial Relief From Local Rule Regarding Attendance At Mediation by U.S. Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order)(Fernandez, Wilfredo) (Entered: 07/01/2019) |
| 07/03/2019 | 50 | | **ENDORSED ORDER: Under the circumstances explained by the SEC, the Unopposed Motion for Partial Relief From Local Rule Regarding** |

| | | | |
|---|---|---|---|
| | | | **Attendance At Mediation (Doc. # 49) is granted. Signed by Judge Virginia M. Hernandez Covington on 7/3/2019. (DLB)** (Entered: 07/03/2019) |
| 07/05/2019 | 51 | | MOTION to Strike 46 Answer to Complaint *Defendant's Affirmative Defenses* by U.S. Securities and Exchange Commission. (Fernandez, Wilfredo) (Entered: 07/05/2019) |
| 07/12/2019 | 52 | | Unopposed MOTION for Caleb Kruckenberg to appear pro hac vice by All Defendants. (Attachments: # 1 Text of Proposed Order)(Sarelson, Matthew) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 07/12/2019) |
| 07/15/2019 | 53 | | **ENDORSED ORDER granting 52 Unopposed Motion for Admission Pro Hac Vice and Written Designation and Consent to Act. If counsel has not already done so, within 14 days hereof, he shall pay the $150 fee to the Clerk of Court and complete the e–filer registration form (available at http://www.flmd.uscourts.gov/special–admission–practice). Signed by Magistrate Judge Christopher P. Tuite on 7/15/2019. (AMM)** (Entered: 07/15/2019) |
| 07/16/2019 | 54 | | MOTION for Alan Wolper, Heidi VonderHeide, Anna Patricia Morales Christiansen to withdraw as attorney by Carl E. Dilley, Micah J Eldred, Island Capital Management, David D Lopez, Spartan Securities Group, LTD.. (Wolper, Alan) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 07/16/2019) |
| 07/17/2019 | 55 | | **ENDORSED ORDER granting 54 Motion to Withdraw. Attorneys Alan Mitchell Wolper, Anna Patricia Morales–Christiansen, and Heidi E. VonderHeide terminated as counsel for the Defendants. Signed by Magistrate Judge Christopher P. Tuite on 7/17/2019. (AHA)** (Entered: 07/17/2019) |
| 07/18/2019 | 56 | | RESPONSE in Opposition re 51 MOTION to Strike 46 Answer to Complaint *Defendant's Affirmative Defenses* filed by Carl E. Dilley, Micah J Eldred, Island Capital Management, David D Lopez, Spartan Securities Group, LTD. (Sarelson, Matthew) (Entered: 07/18/2019) |
| 07/22/2019 | | | ***PRO HAC VICE FEES** paid by attorney Caleb Kruckenberg (Filing fee $150 receipt number TPA057438.) Related document: 52 Unopposed MOTION for Caleb Kruckenberg to appear pro hac vice. (ARC) (Entered: 07/22/2019) |
| 07/24/2019 | 57 | | **ORDER: Plaintiff Securities and Exchange Commission's Motion to Strike Defendants' Affirmative Defenses (Doc. # 51) is DENIED. Signed by Judge Virginia M. Hernandez Covington on 7/24/2019. (DMD)** (Entered: 07/24/2019) |
| 10/22/2019 | 58 | | **ORDER regarding motions for summary judgment. See Order for details. Signed by Judge Virginia M. Hernandez Covington on 10/22/2019. (SGM)** (Entered: 10/22/2019) |
| 12/03/2019 | 59 | | Unopposed MOTION for Kara Rollins to appear pro hac vice by All Defendants. (Attachments: # 1 Text of Proposed Order)(Sarelson, Matthew) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 12/03/2019) |

| | | | |
|---|---|---|---|
| 12/04/2019 | 60 | | **ENDORSED ORDER granting <u>59</u> Unopposed Motion for Admission Pro Hac Vice of Kara Rollins. If counsel has not already done so, within 14 days hereof, she shall pay the $150 fee to the Clerk of Court and complete the e–filer registration form (available at http://www.flmd.uscourts.gov/special–admission–practice). Signed by Magistrate Judge Christopher P. Tuite on 12/4/2019. (AHA)** (Entered: 12/04/2019) |
| 12/05/2019 | | | ***PRO HAC VICE FEES paid by attorney Kara Rollins, appearing on behalf of Micah J. Eldred (Filing fee $150 receipt number TPA059165.) Related document: <u>59</u> Unopposed MOTION for Kara Rollins to appear pro hac vice. (MCB) (Entered: 12/05/2019) |
| 02/07/2020 | 61 | | **ENDORSED ORDER: According to the docket, the parties in this matter conducted a mediation conference on February 5, 2020 (Doc. # <u>48</u>). The Court directs the parties to file a joint notice on or before February 11, 2020, informing the Court of the outcome of the mediation conference. Signed by Judge Virginia M. Hernandez Covington on 2/7/2020. (SGM)** (Entered: 02/07/2020) |
| 02/07/2020 | <u>62</u> | | MEDIATION report Hearing held on February 5, 2020. Hearing outcome: Impasse. (Mooney, Brian) (Entered: 02/07/2020) |
| 02/11/2020 | <u>63</u> | | MEDIATION report Hearing held on 2/5/2020. Hearing outcome: Impasse. (Kruckenberg, Caleb) (Entered: 02/11/2020) |
| 02/14/2020 | <u>64</u> | | Unopposed MOTION to Continue *Discovery and Expert Deadlines* by All Defendants. (Kruckenberg, Caleb) (Entered: 02/14/2020) |
| 02/14/2020 | 65 | | **ENDORSED ORDER granting Defendants' Unopposed Motion to Partially Extend Discovery Deadlines (Doc. # <u>64</u>). The deadline for disclosure of expert reports is now March 20, 2020, and the discovery deadline is April 30, 2020. Signed by Judge Virginia M. Hernandez Covington on 2/14/2020. (SGM)** (Entered: 02/14/2020) |
| 02/18/2020 | <u>66</u> | | MOTION for Sanctions *For Failure To Personally Appear At Mediation* by U.S. Securities and Exchange Commission. (Attachments: # <u>1</u> Exhibit, # <u>2</u> Text of Proposed Order)(Fernandez, Wilfredo) (Entered: 02/18/2020) |
| 02/19/2020 | 67 | | **ENDORSED ORDER: Pursuant to the representations in the Mediation Reports (Doc. # # <u>62</u>, <u>63</u>) that Defendants Carl Dilley and Micah Eldred failed to personally appear at the February 5, 2020 mediation in violation of this Court's Order (Doc. # <u>48</u>), the Defendants are hereby directed to show cause by February 26, 2020, why sanctions, including the sanctions sought by Plaintiff in its Motion (Doc. # <u>66</u>) and the costs of a second round of mediation, should not be imposed for their failure to abide by the Court's Order. Signed by Judge Virginia M. Hernandez Covington on 2/19/2020. (SGM)** (Entered: 02/19/2020) |
| 02/19/2020 | <u>68</u> | | ***STRICKEN, pursuant to court's endorsed order 70.***RESPONSE TO ORDER TO SHOW CAUSE re 67 Order filed by Carl E. Dilley, Micah J. Eldred. (Kruckenberg, Caleb) Modified text on 2/24/2020 (LNR). (Entered: 02/19/2020) |
| 02/21/2020 | <u>69</u> | | |

| | | | MOTION to Strike <u>68</u> Response to order to show cause *or in the Alternative*, MOTION for Miscellaneous Relief, specifically for Leave to File Reply by U.S. Securities and Exchange Commission. (Attachments: # <u>1</u> Text of Proposed Order)(Fernandez, Wilfredo) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 02/21/2020) |
|---|---|---|---|
| 02/21/2020 | 70 | | **ENDORSED ORDER granting Plaintiff's Motion to Strike Defendants' Response to Order to Show Cause (Doc. # <u>69</u>). The Defendants' Response to the Court's show–cause order (Doc. # <u>68</u>) is hereby STRICKEN for violation of Local Rule 9.07(b). Defendants Carl Dilley and Micah Eldred are ordered to file a renewed response to the Court's order to show cause (Doc. # 67) by February 25, 2020. Their response should be limited to an explanation as to why they did not personally appear at the February 5 mediation. Signed by Judge Virginia M. Hernandez Covington on 2/21/2020. (SGM)** (Entered: 02/21/2020) |
| 02/24/2020 | <u>71</u> | | RESPONSE TO ORDER TO SHOW CAUSE re 67 Order filed by Carl E. Dilley, Micah J. Eldred. (Kruckenberg, Caleb) (Entered: 02/24/2020) |
| 02/26/2020 | <u>72</u> | | **ORDER granting <u>66</u> Motion for Sanctions. See Order for details. Signed by Judge Virginia M. Hernandez Covington on 2/26/2020. (SGM)** (Entered: 02/26/2020) |
| 03/02/2020 | <u>73</u> | | NOTICE of mediation conference/hearing to be held on June 16, 2020 at 10:00 a.m. before Peter J. Grilli.(Kruckenberg, Caleb) (Entered: 03/02/2020) |
| 03/03/2020 | <u>74</u> | | **ORDER appointing Peter J. Grilli, Esq. as mediator in this action. The mediation conference is scheduled for June 16, 2020, at 10:00 AM. The Court directs that all counsel, parties, corporate representatives, and any other required claims professionals shall be present at the mediation conference with full authority to negotiate a settlement. The Court does not allow mediation by telephone or video conference. Personal attendance is required. See Local Rule 9.05(c). Signed by Judge Virginia M. Hernandez Covington on 3/3/2020. (SGM)** (Entered: 03/03/2020) |
| 03/03/2020 | <u>75</u> | | NOTICE of Appearance by Peter John Grilli on behalf of Peter J. Grilli.(Grilli, Peter) (Entered: 03/03/2020) |
| 03/17/2020 | <u>76</u> | | Joint MOTION to Continue *Discovery and Related Deadlines* by All Defendants. (Kruckenberg, Caleb) (Entered: 03/17/2020) |
| 03/18/2020 | 77 | | **ENDORSED ORDER granting <u>76</u> Joint Motion to Continue Discovery and Related Deadlines. Due to the extraordinary circumstances facing the Court and the parties in light of the coronavirus pandemic, the parties are granted an extension of all remaining deadlines in this case. Specifically, the parties' disclosures of expert reports are now due on May 19, 2020. The discovery deadline is June 29. 2020. The dispositive motions deadline is July 14, 2020. In conformity with the Court's new policy, responses to dispositive motions shall be due within 14 days and replies are not allowed without permission of the Court. The deadline for all other motions is September 9, 2020. The meeting in person shall take place by September 28, 2020. The joint pretrial statement is due October 8, 2020. The pretrial conference shall take place on October 15, 2020. This matter will be placed on the trial term beginning November 2, 2020. The Clerk is directed to enter an amended Case Management and Scheduling Order in** |

| | | | conformance with this Order. Signed by Judge Virginia M. Hernandez Covington on 3/18/2020. (SGM) (Entered: 03/18/2020) |
|---|---|---|---|
| 03/19/2020 | 78 | | **AMENDED CASE MANAGEMENT AND SCHEDULING ORDER:** **Final Pretrial Conference set for 10/15/2020 at 9:00 AM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington, Jury Trial set for November 2020 trial term in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington, Conduct mediation hearing by 6/16/2020. Lead counsel to coordinate dates. Signed by Judge Virginia M. Hernandez Covington on 3/19/2020. (SKP)** (Entered: 03/19/2020) |
| 04/20/2020 | 79 | | NOTICE of Appearance by Alise M. Johnson on behalf of U.S. Securities and Exchange Commission (Johnson, Alise) (Entered: 04/20/2020) |
| 05/08/2020 | 80 | | **ORDER regarding mediation. Signed by Judge Virginia M. Hernandez Covington on 5/8/2020. (SGM)** (Entered: 05/08/2020) |
| 05/12/2020 | 81 | | Joint MOTION to Continue *Discovery and Related Deadlines* by All Defendants. (Kruckenberg, Caleb) (Entered: 05/12/2020) |
| 05/12/2020 | 82 | | MOTION for Miscellaneous Relief, specifically to Extend Mediation Deadline for 60 Days by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 05/12/2020) |
| 05/14/2020 | 83 | | **ORDER: The parties' Joint Motion to Continue Discovery and Related Deadlines (Doc. # 81) is GRANTED in part and DENIED in part. The Court will extend the remaining deadlines in this matter for 30 days. The Clerk is directed to enter a second amended Case Management and Scheduling Order. Signed by Judge Virginia M. Hernandez Covington on 5/14/2020. (SGM)** (Entered: 05/14/2020) |
| 05/14/2020 | 84 | | **ENDORSED ORDER: The Plaintiff's Motion to Extend the Mediation Deadline for 60 Days (Doc. # 82) is opposed. Accordingly, if the Defendants wish to be heard on this matter, the Court directs them to file a response in opposition by May 18, 2020. Signed by Judge Virginia M. Hernandez Covington on 5/14/2020. (SGM)** (Entered: 05/14/2020) |
| 05/14/2020 | 85 | | RESPONSE in Opposition re 82 MOTION for Miscellaneous Relief, specifically to Extend Mediation Deadline for 60 Days filed by Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, Spartan Securities Group, LTD. (Kruckenberg, Caleb) (Entered: 05/14/2020) |
| 05/15/2020 | 86 | | **ENDORSED ORDER denying 82 Plaintiff's Motion to Extend Mediation Deadline for 60 days. As explained in the Court's May 14, 2020, order (Doc. # 83), the Court believes the parties should move forward with this case, despite the difficulties currently facing the parties, witnesses, and the Court in light of the coronavirus pandemic. As the mediator, Peter Grilli, has the capability in place to conduct the mediation by video conference, the Court directs the parties to conduct the June 16, 2020, conference as scheduled, with all parties mediating in good faith and fully and faithfully exploring every settlement opportunity. Signed by Judge Virginia M. Hernandez Covington on 5/15/2020. (SGM)** (Entered: 05/15/2020) |
| 05/15/2020 | 87 | | **SECOND AMENDED CASE MANAGEMENT AND SCHEDULING ORDER: Final Pretrial Conference set for 11/12/2020 at 9:00 AM in** |

| | | | |
|---|---|---|---|
| | | | **Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington, Jury Trial set for the December 2020 trial term in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. Conduct mediation hearing by 6/16/2020. Lead counsel to coordinate dates. Signed by Judge Virginia M. Hernandez Covington on 5/15/2020. (SKP)** (Entered: 05/15/2020) |
| 05/19/2020 | 88 | | MOTION to Compel Additional Responses to Defendants' Requests for Admissions by All Defendants. (Attachments: # 1 Exhibit Index, # 2 Exhibit Defendants' Requests for Admissions, # 3 Exhibit Plaintiff's Response, # 4 Exhibit Plaintiff's Amended Response)(Kruckenberg, Caleb) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 05/19/2020) |
| 06/02/2020 | 89 | | RESPONSE to Motion re 88 MOTION to Compel Additional Responses to Defendants' Requests for Admissions filed by U.S. Securities and Exchange Commission. (Fernandez, Wilfredo) (Entered: 06/02/2020) |
| 06/05/2020 | 90 | | NOTICE OF ZOOM VIDEO HEARING re 88 Defendants' Motion to Determine the Sufficiency of Plaintiff's Response to Requests for Admissions and to Compel Additional Responses. Motion Hearing set for 6/22/2020 at 02:00 PM in Tampa Courtroom 12B before Magistrate Judge Christopher P. Tuite. The Court intends to conduct the proceeding by video conference. Counsel will receive a Zoom video hearing invitation via email separately. You are hereby reminded that under Local Rule 4.11(b) the taking of photographs, the operation of recording or transmission devices, and the broadcasting or televising of proceedings in any courtroom or hearing room of this Court, or the environs thereof, either while the Court is in session or at recesses between sessions when Court officials, lawyers, jurors, witnesses or other persons connected with judicial proceedings of any kind are present, are prohibited. Additionally, please dress accordingly.(AHA) (Entered: 06/05/2020) |
| 06/16/2020 | 91 | | MEDIATION report Hearing held on June 16, 2020. Hearing outcome: The parties have reached an impasse. (Grilli, Peter) (Entered: 06/16/2020) |
| 06/22/2020 | 92 | | Minute Entry. Proceedings held before Magistrate Judge Christopher P. Tuite: MOTION HEARING held on 6/22/2020 re 88 MOTION to Compel Additional Responses to Defendants' Requests for Admissions filed by Island Capital Management, Spartan Securities Group, LTD., David D. Lopez, Carl E. Dilley, Micah J. Eldred. Court Reporter: Tracey Aurelio (LYB) (LYB). (Entered: 06/22/2020) |
| 06/23/2020 | 94 | | **ENDORSED ORDER: For the reasons stated on the record at the June 22, 2020, hearing on the matter, 88 Defendants' Motion to Determine the Sufficiency of Plaintiff's Response to Requests for Admissions and to Compel Additional Responses is denied. If Defendants elect to revise the requests for admissions (RFAs) referenced in their motion, including RFA Nos. 8, 26, 27, 28, they should phrase such requests in a manner that addresses the concerns articulated by the Court and that otherwise conforms to the governing case law. The Court expects the parties to confer in good faith in a genuine effort to resolve any disputes that might arise with respect to any such future RFAs. Signed by Magistrate Judge Christopher P. Tuite on 6/23/2020. (AHA)** (Entered: 06/23/2020) |

| 08/07/2020 | 95 | | Joint MOTION to File Excess Pages *for Motions for Summary Judgment* by All Defendants. (Kruckenberg, Caleb) (Entered: 08/07/2020) |
|---|---|---|---|
| 08/10/2020 | 96 | | **ENDORSED ORDER granting 95 Joint Motion for Leave to File Excess Pages. The Plaintiff may file a motion for summary judgment that is no more than 45 pages in length. The Defendants may file a combined motion for summary judgment that is no more than 45 pages in length. Responses to summary judgment motions will be due within 30 days, and replies will be due 14 days thereafter. Accordingly, to allow adequate time for the Court to rule on any dispositive motions, the Court will sua sponte extend the trial and certain pretrial deadlines by 30 days. The Clerk is directed to enter an amended Case Management and Scheduling Order in accordance with this Order. Signed by Judge Virginia M. Hernandez Covington on 8/10/2020. (SGM)** (Entered: 08/10/2020) |
| 08/10/2020 | 97 | | **THIRD AMENDED CASE MANAGEMENT AND SCHEDULING ORDER: Final Pretrial Conference set for 12/10/2020 at 9:00 AM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington, Jury Trial set for the January 2021 trial term in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. Signed by Judge Virginia M. Hernandez Covington on 8/10/2020. (TWL)** (Entered: 08/10/2020) |
| 08/12/2020 | 98 | | Joint MOTION for Extension of Time to File Motion For Summary Judgment *By Seven Days* by U.S. Securities and Exchange Commission. (Fernandez, Wilfredo) (Entered: 08/12/2020) |
| 08/13/2020 | 99 | | **ENDORSED ORDER granting 98 Joint Motion for Extension of Time. The parties' motions for summary judgment will be due on August 21, 2020. Responses due September 14, 2020 and replies due on September 28, 2020. Signed by Judge Virginia M. Hernandez Covington on 8/13/2020. (SGM)** (Entered: 08/13/2020) |
| 08/14/2020 | 100 | | MOTION for Miscellaneous Relief, specifically To Exclude the Testimony of Defendant Island Capital Management LLC's Proposed Expert Witness Mark A. Harmon by U.S. Securities and Exchange Commission. (Attachments: # 1 Exhibit Harmon's Expert Report, # 2 Exhibit Harmon's Deposition Transcript)(Fernandez, Wilfredo) (Entered: 08/14/2020) |
| 08/14/2020 | 101 | | MOTION for Miscellaneous Relief, specifically Exclude the Testimony of Plaintiff SEC's Proposed Expert Witness James M. Cangiano by All Defendants. (Attachments: # 1 Exhibit Index, # 2 Exhibit Cangiano Deposition Transcript, # 3 Exhibit Cangiano Expert Report, # 4 Exhibit Cangiano Expert Report (Ex. A), # 5 Exhibit Cangiano Curriculum Vitae)(Rollins, Kara) (Entered: 08/14/2020) |
| 08/21/2020 | 102 | | MOTION for Summary Judgment by All Defendants. (Attachments: # 1 Exhibit Index, # 2 Exhibit 1–A, # 3 Exhibit 1–B, # 4 Exhibit 2–A, # 5 Exhibit 2–B, # 6 Exhibit 2–C, # 7 Exhibit 2–D, # 8 Exhibit 2–E, # 9 Exhibit 2–F, # 10 Exhibit 3–A, # 11 Exhibit 3–B, # 12 Exhibit 3–C, # 13 Exhibit 3–D, # 14 Exhibit 3–E, # 15 Exhibit 3–F, # 16 Exhibit 3–G, # 17 Exhibit 4, # 18 Exhibit 5–A, # 19 Exhibit 5–B, # 20 Exhibit 5–C, # 21 Exhibit 5–D, # 22 Exhibit 5–E, # 23 Exhibit 5–F, # 24 Exhibit 5–G, # 25 Exhibit 5–H, # 26 Exhibit 5–I, # 27 Exhibit 5–J, # 28 Exhibit 5–K, # 29 Exhibit 5–L, # 30 Exhibit 5–M, # 31 |

| | | |
|---|---|---|
| | | Exhibit 5–N, # <u>32</u> Exhibit 6–A, # <u>33</u> Exhibit 6–B, # <u>34</u> Exhibit 6–C, # <u>35</u> Exhibit 6–D, # <u>36</u> Exhibit 6–E, # <u>37</u> Exhibit 6–F, # <u>38</u> Exhibit 6–G, # <u>39</u> Exhibit 7–A, # <u>40</u> Exhibit 7–B, # <u>41</u> Exhibit 7–C, # <u>42</u> Exhibit 7–D, # <u>43</u> Exhibit 7–E, # <u>44</u> Exhibit 8–A, # <u>45</u> Exhibit 8–B, # <u>46</u> Exhibit 8–C, # <u>47</u> Exhibit 8–D, # <u>48</u> Exhibit 8–E, # <u>49</u> Exhibit 9–A, # <u>50</u> Exhibit 9–B, # <u>51</u> Exhibit 9–C, # <u>52</u> Exhibit 9–D, # <u>53</u> Exhibit 9–E, # <u>54</u> Exhibit 9–F, # <u>55</u> Exhibit 9–G, # <u>56</u> Exhibit 10–A, # <u>57</u> Exhibit 10–B, # <u>58</u> Exhibit 11, # <u>59</u> Exhibit 12–A, # <u>60</u> Exhibit 12–B, # <u>61</u> Exhibit 12–C, # <u>62</u> Exhibit 12–D, # <u>63</u> Exhibit 12–E, # <u>64</u> Exhibit 12–F, # <u>65</u> Exhibit 12–G, # <u>66</u> Exhibit 13, # <u>67</u> Exhibit 14–A, # <u>68</u> Exhibit 14–B, # <u>69</u> Exhibit 15–A, # <u>70</u> Exhibit 15–B, # <u>71</u> Appendix 15–C, # <u>72</u> Exhibit 15–D, # <u>73</u> Exhibit 15–E, # <u>74</u> Exhibit 16)(Kruckenberg, Caleb) (Entered: 08/21/2020) |
| 08/21/2020 | <u>103</u> | MOTION for Summary Judgment *(Partial Summary Judgment) and Supporting Memorandum of Law* by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 08/21/2020) |
| 08/22/2020 | <u>104</u> | NOTICE by U.S. Securities and Exchange Commission re <u>103</u> MOTION for Summary Judgment *(Partial Summary Judgment) and Supporting Memorandum of Law /Notice of Filing Exhibits 1 through 25* (Attachments: # <u>1</u> Appendix A – Index of Exhibits, # <u>2</u> Exhibit 1, Part 1, # <u>3</u> Exhibit 1, Part 2, # <u>4</u> Exhibit 1, Part 3, # <u>5</u> Exhibit 2, # <u>6</u> Exhibit 3, # <u>7</u> Exhibit 4, # <u>8</u> Exhibit 5, # <u>9</u> Exhibit 6, # <u>10</u> Exhibit 7, # <u>11</u> Exhibit 8, # <u>12</u> Exhibit 9, # <u>13</u> Exhibit 10, # <u>14</u> Exhibit 11, # <u>15</u> Exhibit 12, # <u>16</u> Exhibit 13, # <u>17</u> Exhibit 14, # <u>18</u> Exhibit 15, # <u>19</u> Exhibit 16, # <u>20</u> Exhibit 17, # <u>21</u> Exhibit 18, # <u>22</u> Exhibit 19, # <u>23</u> Exhibit 20, # <u>24</u> Exhibit 21, # <u>25</u> Exhibit 22, # <u>26</u> Exhibit 23, # <u>27</u> Exhibit 24, # <u>28</u> Exhibit 25)(Nestor, Christine) (Entered: 08/22/2020) |
| 08/22/2020 | <u>105</u> | NOTICE by U.S. Securities and Exchange Commission re <u>103</u> MOTION for Summary Judgment *(Partial Summary Judgment) and Supporting Memorandum of Law / Notice of Filing Exhibits 26 through 50* (Attachments: # <u>1</u> Appendix A – Index of Exhibits, # <u>2</u> Exhibit 26, # <u>3</u> Exhibit 27, # <u>4</u> Exhibit 28, # <u>5</u> Exhibit 29, # <u>6</u> Exhibit 30, # <u>7</u> Exhibit 31, # <u>8</u> Exhibit 32, # <u>9</u> Exhibit 33, # <u>10</u> Exhibit 34, # <u>11</u> Exhibit 35, # <u>12</u> Exhibit 36, # <u>13</u> Exhibit 37, # <u>14</u> Exhibit 38, # <u>15</u> Exhibit 39, # <u>16</u> Exhibit 40, # <u>17</u> Exhibit 41, # <u>18</u> Exhibit 42, # <u>19</u> Exhibit 43, # <u>20</u> Exhibit 44, # <u>21</u> Exhibit 45, Part 1, # <u>22</u> Exhibit 45, Part 2, # <u>23</u> Exhibit 46, # <u>24</u> Exhibit 47, # <u>25</u> Exhibit 48, # <u>26</u> Exhibit 49, # <u>27</u> Exhibit 50)(Nestor, Christine) (Entered: 08/22/2020) |
| 08/22/2020 | <u>106</u> | NOTICE by U.S. Securities and Exchange Commission re <u>103</u> MOTION for Summary Judgment *(Partial Summary Judgment) and Supporting Memorandum of Law / Notice of Filing Exhibits 51 through 75* (Attachments: # <u>1</u> Appendix A – Index of Exhibits, # <u>2</u> Exhibit 51, # <u>3</u> Exhibit 52, # <u>4</u> Exhibit 53, # <u>5</u> Exhibit 54, # <u>6</u> Exhibit 55, # <u>7</u> Exhibit 56, # <u>8</u> Exhibit 57, # <u>9</u> Exhibit 58, # <u>10</u> Exhibit 59, # <u>11</u> Exhibit 60, # <u>12</u> Exhibit 61, # <u>13</u> Exhibit 62, # <u>14</u> Exhibit 63, Part 1, # <u>15</u> Exhibit 63, Part 2, # <u>16</u> Exhibit 64, Part 1, # <u>17</u> Exhibit 64, Part 2, # <u>18</u> Exhibit 64, Part 3, # <u>19</u> Exhibit 65, Part 1, # <u>20</u> Exhibit 65, Part 2, # <u>21</u> Exhibit 65, Part 3, # <u>22</u> Exhibit 66, Part 1, # <u>23</u> Exhibit 66, Part 2, # <u>24</u> Exhibit 67, Part 1, # <u>25</u> Exhibit 67, Part 2, # <u>26</u> Exhibit 68, Part 1, # <u>27</u> Exhibit 68, Part 2, # <u>28</u> Exhibit 69, Part 1, # <u>29</u> Exhibit 69, Part 2, # <u>30</u> Exhibit 70, Part 1, # <u>31</u> Exhibit 70, Part 2, # <u>32</u> Exhibit 71, # <u>33</u> Exhibit 72, # <u>34</u> Exhibit 73, # <u>35</u> Exhibit 74, # <u>36</u> Exhibit 75)(Nestor, Christine) (Entered: 08/22/2020) |

| | | | |
|---|---|---|---|
| 08/22/2020 | 107 | | NOTICE by U.S. Securities and Exchange Commission re 103 MOTION for Summary Judgment *(Partial Summary Judgment) and Supporting Memorandum of Law / Notice of Filing Exhibits 76 through 100* (Attachments: # 1 Appendix A – Index of Exhibits, # 2 Exhibit 76, # 3 Exhibit 77, # 4 Exhibit 78, # 5 Exhibit 79, # 6 Exhibit 80, # 7 Exhibit 81, # 8 Exhibit 82, # 9 Exhibit 83, # 10 Exhibit 84, # 11 Exhibit 85, # 12 Exhibit 86, # 13 Exhibit 87, # 14 Exhibit 88, # 15 Exhibit 89, # 16 Exhibit 90, # 17 Exhibit 91, # 18 Exhibit 92, # 19 Exhibit 93, # 20 Exhibit 94, # 21 Exhibit 95, # 22 Exhibit 96, # 23 Exhibit 97, # 24 Exhibit 98, # 25 Exhibit 99, # 26 Exhibit 100)(Nestor, Christine) (Entered: 08/22/2020) |
| 08/22/2020 | 108 | | NOTICE by U.S. Securities and Exchange Commission re 103 MOTION for Summary Judgment *(Partial Summary Judgment) and Supporting Memorandum of Law / Notice of Filing Exhibits 101 through 127* (Attachments: # 1 Appendix A – Index of Exhibits, # 2 Exhibit 101, # 3 Exhibit 102, # 4 Exhibit 103, # 5 Exhibit 104, # 6 Exhibit 105, # 7 Exhibit 106, # 8 Exhibit 107, # 9 Exhibit 108, # 10 Exhibit 109, # 11 Exhibit 110, # 12 Exhibit 111, # 13 Exhibit 112, # 14 Exhibit 113, # 15 Exhibit 114, # 16 Exhibit 115, # 17 Exhibit 116, # 18 Exhibit 117, # 19 Exhibit 118, # 20 Exhibit 119, # 21 Exhibit 120, # 22 Exhibit 121, # 23 Exhibit 122, # 24 Exhibit 123, Part 1, # 25 Exhibit 123, Part 2, # 26 Exhibit 123, Part 3, # 27 Exhibit 124, # 28 Exhibit 125, # 29 Exhibit 126, # 30 Exhibit 127)(Nestor, Christine) (Entered: 08/22/2020) |
| 09/09/2020 | 109 | | Joint MOTION to File Excess Pages *for Responses to Motions for Summary Judgment and Corresponding Replies* by All Defendants. (Kruckenberg, Caleb) (Entered: 09/09/2020) |
| 09/10/2020 | 110 | | **ENDORSED ORDER granting the joint motion to exceed the page limit. (Doc. # 109). The plaintiff may file a response to defendants' motion for summary judgment that is no more than 35 pages in length. The defendants may file a combined response to plaintiff's motion for summary judgment that is no more than 35 pages in length. Both parties may file a reply in support of their motions for summary judgment that is no more than 10 pages in length. Signed by Judge Virginia M. Hernandez Covington on 9/10/2020. (LEA)** (Entered: 09/10/2020) |
| 09/14/2020 | 111 | | ***TERMINATED; counsel called to refile document.***RESPONSE in Opposition re 100 MOTION for Miscellaneous Relief, specifically To Exclude the Testimony of Defendant Island Capital Management LLC's Proposed Expert Witness Mark A. Harmon filed by Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, Spartan Securities Group, LTD. (Rollins, Kara) Modified text on 9/14/2020 (LNR). (Entered: 09/14/2020) |
| 09/14/2020 | 112 | | RESPONSE in Opposition re 100 MOTION for Miscellaneous Relief, specifically To Exclude the Testimony of Defendant Island Capital Management LLC's Proposed Expert Witness Mark A. Harmon filed by Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, Spartan Securities Group, LTD. (Rollins, Kara) (Entered: 09/14/2020) |
| 09/14/2020 | 113 | | RESPONSE in Opposition re 103 MOTION for Summary Judgment *(Partial Summary Judgment) and Supporting Memorandum of Law* filed by Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, Spartan Securities Group, LTD. (Attachments: # 1 Appendix Exhibit Index, # 2 |

| | | | |
|---|---|---|---|
| | | | Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19)(Kruckenberg, Caleb) (Entered: 09/14/2020) |
| 09/14/2020 | 114 | | RESPONSE to Motion re 101 MOTION for Miscellaneous Relief, specifically Exclude the Testimony of Plaintiff SEC's Proposed Expert Witness James M. Cangiano filed by U.S. Securities and Exchange Commission. (Johnson, Alise) (Entered: 09/14/2020) |
| 09/14/2020 | 115 | | RESPONSE in Opposition re 102 MOTION for Summary Judgment filed by U.S. Securities and Exchange Commission. (Attachments: # 1 Appendix Index to Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17)(Nestor, Christine) (Entered: 09/14/2020) |
| 09/28/2020 | 116 | | REPLY to Response to Motion re 100 MOTION for Miscellaneous Relief, specifically To Exclude the Testimony of Defendant Island Capital Management LLC's Proposed Expert Witness Mark A. Harmon filed by U.S. Securities and Exchange Commission. (Johnson, Alise) (Entered: 09/28/2020) |
| 09/28/2020 | 117 | | REPLY to Response to Motion re 102 MOTION for Summary Judgment filed by Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, Spartan Securities Group, LTD. (Kruckenberg, Caleb) (Entered: 09/28/2020) |
| 09/28/2020 | 118 | | REPLY to Response to Motion re 101 MOTION for Miscellaneous Relief, specifically Exclude the Testimony of Plaintiff SEC's Proposed Expert Witness James M. Cangiano filed by Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, Spartan Securities Group, LTD. (Rollins, Kara) (Entered: 09/28/2020) |
| 09/28/2020 | 119 | | REPLY to Response to Motion re 103 MOTION for Summary Judgment *(Partial Summary Judgment) and Supporting Memorandum of Law* filed by U.S. Securities and Exchange Commission. (Attachments: # 1 Appendix Index to Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12)(Nestor, Christine) (Entered: 09/28/2020) |
| 10/29/2020 | 120 | | Joint MOTION for Miscellaneous Relief, specifically Seeking Status Conference by U.S. Securities and Exchange Commission. (Fernandez, Wilfredo) (Entered: 10/29/2020) |
| 10/30/2020 | 121 | | **ENDORSED ORDER denying without prejudice the joint request for a status conference (Doc. # 120). At this time, the Court intends to try cases in January, 2021, to the extent that it is safe to do so. The Court recognizes the parties' concerns regarding the COVID–19 pandemic and the added challenges of travel over the next few months. There is not much more that the Court can add at this juncture. The Court can better address these concerns at the scheduled pretrial conference on December 10, 2020. If the parties still feel that they need a status conference they can renew their request in approximately 14 days. Signed by Judge Virginia** |

| | | | |
|---|---|---|---|
| | | | M. Hernandez Covington on 10/30/2020. (LEA) (Entered: 10/30/2020) |
| 11/06/2020 | 122 | | MOTION for Miscellaneous Relief, specifically Special Interrogatories to the Jury by All Defendants. (Kruckenberg, Caleb) (Entered: 11/06/2020) |
| 11/06/2020 | 123 | | MOTION In Limine *(Omnibus) and Memorandum In Support* regarding exclusion of certain documents and testimony by U.S. Securities and Exchange Commission. (Attachments: # 1 Exhibit A Deposition Transcript of Michael Daniels)(Fernandez, Wilfredo) (Entered: 11/06/2020) |
| 11/06/2020 | 124 | | MOTION In Limine *Omnibus and Memorandum In Support* regarding exclusion of certain evidence, statements, arguments, or opinions by Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, Spartan Securities Group, LTD. (Rollins, Kara) (Entered: 11/06/2020) |
| 11/16/2020 | 125 | | Joint MOTION for Miscellaneous Relief, specifically Leave to Appear Remotely by All Defendants. (Kruckenberg, Caleb) (Entered: 11/16/2020) |
| 11/19/2020 | 126 | | **ENDORSED ORDER granting the joint motion for leave to appear remotely by videoconference. (Doc. # 125). Although the Court usually requires the parties to meet in person, the Court will permit the parties to conduct the November 23, 2020, meeting to prepare a joint final pretrial statement via Zoom videoconference. The final pretrial conference, scheduled for December 10, 2020, will be conducted via Zoom videoconference before Judge Virginia M. Hernandez Covington. The Clerk will be sending an invitation to the meeting via email. Signed by Judge Virginia M. Hernandez Covington on 11/19/2020. (LEA)** (Entered: 11/19/2020) |
| 11/19/2020 | 127 | | **ENDORSED ORDER: Given the Court's criminal trial docket for January coupled with the limitation of court rooms that can accommodate trials safely in the Tampa Division, the Court continues trial of this matter to the February 2021 trial term. The pretrial conference is rescheduled to January 14, 2021, and the due date of the filing of the pretrial statement is extended to January 7, 2021. The parties should meet sometime before December 28, 2020, either by video or telephone, to prepare their statement. Furthermore, the pretrial conference will be conducted by zoom video conference. The Clerk is directed to enter an amended case management order reflecting these deadlines. Signed by Judge Virginia M. Hernandez Covington on 11/19/2020. (Covington, Virginia)** (Entered: 11/19/2020) |
| 11/20/2020 | 128 | | RESPONSE in Opposition re 123 MOTION In Limine *(Omnibus) and Memorandum In Support* regarding exclusion of certain documents and testimony filed by Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, Spartan Securities Group, LTD. (Rollins, Kara) (Entered: 11/20/2020) |
| 11/20/2020 | 129 | | NOTICE of Appearance by Alice K. Sum on behalf of U.S. Securities and Exchange Commission. (Sum, Alice) (Entered: 11/20/2020) |
| 11/20/2020 | 130 | | RESPONSE to Motion re 122 MOTION for Miscellaneous Relief, specifically Special Interrogatories to the Jury */ Request for a Jury Determination of Facts Necessary to Determine Penalty Tier Level* filed by U.S. Securities and Exchange Commission. (Sum, Alice) (Entered: 11/20/2020) |

| | | | |
|---|---|---|---|
| 11/20/2020 | 131 | | RESPONSE in Opposition re 124 MOTION In Limine *Omnibus and Memorandum In Support* regarding exclusion of certain evidence, statements, arguments, or opinions filed by U.S. Securities and Exchange Commission. (Johnson, Alise) (Entered: 11/20/2020) |
| 11/25/2020 | 132 | | **FOURTH CASE MANAGEMENT AND SCHEDULING ORDER: Final Pretrial Conference set for 1/14/2021 at 9:00 AM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington, Jury Trial set for February 2021 trial term in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. Signed by Judge Virginia M. Hernandez Covington on 11/25/2020. (TWL)** (TWL). (Entered: 11/25/2020) |
| 11/30/2020 | 133 | | **ORDER: Securities and Exchange Commission's Motion to Exclude the Testimony of Defendant Island Capital Management LLC's Proposed Expert Mark A. Harmon (Doc. # 100) is GRANTED IN PART. See Order for details. Signed by Judge Virginia M. Hernandez Covington on 11/30/2020. (LEA)** (Entered: 11/30/2020) |
| 11/30/2020 | 134 | | **ORDER: Defendants' Motion to Exclude the Expert Testimony of Plaintiff Securities and Exchange Commission's Proposed Expert James M. Cangiano (Doc. # 101) is DENIED. See Order for details. Signed by Judge Virginia M. Hernandez Covington on 11/30/2020. (LEA)** (Entered: 11/30/2020) |
| 12/28/2020 | 135 | | **ORDER: Defendants' Motion for Summary Judgment (Doc. # 102) is DENIED. Plaintiff's Motion for Partial Summary Judgment (Doc. #103) is DENIED. See Order for details. Signed by Judge Virginia M. Hernandez Covington on 12/28/2020. (LEA)** (Entered: 12/28/2020) |
| 12/31/2020 | 136 | | Joint MOTION for Extension of Time to File Joint Final Pretrial Statement (6 day extension) by U.S. Securities and Exchange Commission. (Attachments: # 1 Text of Proposed Order)(Nestor, Christine) (Entered: 12/31/2020) |
| 12/31/2020 | 137 | | **ENDORSED ORDER granting the joint motion for extension of time to file the joint pretrial statement. (Doc. # 136). The joint pretrial statement is due January 13, 2021. Signed by Judge Virginia M. Hernandez Covington on 12/31/2020. (LEA)** (Entered: 12/31/2020) |
| 01/07/2021 | 138 | | NOTICE OF RESCHEDULING HEARING (AS TO LOCATION ONLY): The Final Pretrial Conference hearing previously scheduled for 1/14/2021 is rescheduled. New hearing time: Final Pretrial Conference set for 1/14/2021 at 9:00 AM. This hearing will be conducted via Zoom video conference before Judge Virginia M. Hernandez Covington. The Clerk will be sending an invitation to the meeting via email. If you have any questions please contact courtroom deputy, Tamecika Lee, at Tamecika_Lee@flmd.uscourts.gov. Although the hearing is taking place by video, all parties should dress appropriately for this Court proceeding. Furthermore, the parties are hereby reminded that under Local Rule 4.11(b) the taking of photographs, the operation of recording or transmission devices, and the broadcasting or televising of proceedings in any courtroom or hearing room of this Court, or the environs thereof, either while the Court is in session or at recesses between sessions when Court officials, lawyers, jurors, witnesses or other persons connected with judicial proceedings of any kind are present, are prohibited.(TWL) (Entered: 01/07/2021) |

| | | | |
|---|---|---|---|
| 01/13/2021 | 139 | | PRETRIAL statement by U.S. Securities and Exchange Commission. (Attachments: # 1 Exhibit 1– Plaintiff's Witness List, # 2 Exhibit 2– Defendants' Witness List, # 3 Exhibit 3 – Joint Exhibit List, # 4 Exhibit 4– Plaintiff's Exhibit List, # 5 Exhibit 5– Defendants' Trial Exhibit List, # 6 Exhibit 6– Plaintiff's Depo Designations, # 7 Exhibit 7– Joint Proposed Jury Instructions, # 8 Exhibit 8 – Proposed Verdict Form, # 9 Exhibit 9– Defendants' Jury Interrogatories, # 10 Exhibit 10 – Supplemental Juror Questionnaire, # 11 Exhibit 11 – Joint Proposed Voir Dire Questions)(Nestor, Christine) (Entered: 01/13/2021) |
| 01/14/2021 | 140 | | Minute Entry. Virtual Proceedings held before Judge Virginia M. Hernandez Covington: FINAL PRETRIAL CONFERENCE held on 1/14/2021. Court Reporter: Melissa Pierson (TWL) (Entered: 01/19/2021) |
| 01/26/2021 | 141 | | **ENDORSED ORDER: The Clerk is directed to schedule this matter for trial during the trial term beginning March 1, 2021. Signed by Judge Virginia M. Hernandez Covington on 1/26/2021.(TWL)** (Entered: 01/26/2021) |
| 01/26/2021 | 142 | | NOTICE OF RESCHEDULING HEARING: The Jury trial previously scheduled for the February 2021 trial term is rescheduled. New scheduling date and time: Jury Trial set for the March 2021 trial term in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 01/26/2021) |
| 02/10/2021 | 143 | | Joint MOTION for Miscellaneous Relief, specifically To Schedule a PreTrial Conference by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 02/10/2021) |
| 02/10/2021 | 144 | | **ENDORSED ORDER granting in part and denying in part 143 Motion. This Court already held a pretrial conference. But the Court will schedule a status conference in March and the parties will be able to ask questions about procedures at that time. It does not appear that the undersigned will schedule this matter for trial in March, but may be able to do so in April. However, this is fluid and the Court will be in a better position to determine these matters in the next 30 days or so. Signed by Judge Virginia M. Hernandez Covington on 2/10/2021. (Covington, Virginia)** (Entered: 02/10/2021) |
| 02/23/2021 | 145 | | **ENDORSED ORDER: The Clerk is directed to schedule this matter for trial during the trial term beginning April 5, 2021. Signed by Judge Virginia M. Hernandez Covington on 2/23/2021. (TWL)** (Entered: 02/23/2021) |
| 02/23/2021 | 146 | | NOTICE OF RESCHEDULING HEARING: The Jury Trial previously scheduled for the March trial term is rescheduled. New scheduling date and time: Jury Trial set for the April 2021 trial term in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 02/23/2021) |
| 02/23/2021 | 147 | | NOTICE of hearing: Status Conference set for 3/3/2021 at 11:00 AM. This hearing will be conducted via Zoom video conference before Judge Virginia M. Hernandez Covington. The Clerk will be sending an invitation to the meeting via email. If you have any questions please contact courtroom deputy, Tamecika Lee, at Tamecika_Lee@flmd.uscourts.gov. Although the hearing is taking place by video, all parties should dress appropriately for this Court |

| | | | |
|---|---|---|---|
| | | | proceeding. Furthermore, the parties are hereby reminded that under Local Rule 5.01 the taking of photographs, the operation of recording or transmission devices, and the broadcasting or televising of proceedings in any courtroom or hearing room of this Court, or the environs thereof, either while the Court is in session or at recesses between sessions when Court officials, lawyers, jurors, witnesses or other persons connected with judicial proceedings of any kind are present, are prohibited.(TWL) (Entered: 02/23/2021) |
| 03/01/2021 | 148 | | Joint MOTION for Miscellaneous Relief, specifically Date Certain for Trial by All Defendants. (Kruckenberg, Caleb) (Entered: 03/01/2021) |
| 03/03/2021 | 149 | | Minute Entry. Virtual Proceedings held before Judge Virginia M. Hernandez Covington: STATUS CONFERENCE held on 3/3/2021. Court Reporter: Sharon A. Miller (TWL) (Entered: 03/04/2021) |
| 03/15/2021 | 150 | | **ENDORSED ORDER denying without prejudice 148 Joint MOTION for Miscellaneous Relief, specifically Date Certain for Trial. The parties may refile their motion in mid April. Signed by Judge Virginia M. Hernandez Covington on 3/15/2021. (TWL)** (Entered: 03/15/2021) |
| 03/15/2021 | 151 | | **ENDORSED ORDER: The Clerk is directed to continue this case to the May trial term. The Court recognizes that this case may need to be rescheduled to a later date. Signed by Judge Virginia M. Hernandez Covington on 3/15/2021. (TWL)** (Entered: 03/15/2021) |
| 03/15/2021 | 152 | | NOTICE OF RESCHEDULING HEARING: The Jury trial hearing previously scheduled for the April 2021 trial term is rescheduled. New scheduling date and time: Jury Trial set for the May 2021 trial term in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 03/15/2021) |
| 04/13/2021 | 153 | | Joint MOTION for Miscellaneous Relief, specifically Date Certain for Trial by All Defendants. (Kruckenberg, Caleb) (Entered: 04/13/2021) |
| 04/24/2021 | 154 | | **ENDORSED ORDER granting in part and denying in part 153 Motion. The motion is granted to the extent that this matter is removed from the May trial docket and moved to the June trial docket. Numerous trials, both criminal and civil, have been held post pandemic in the Middle District of Florida. The undersigned is currently presiding over a civil trial. Despite these challenges, the Court has been able to move forward in an effort to timely bring matters to resolution. At this juncture, in balancing the Court's criminal and other civil cases, the Court can not provide a date certain. However, the earliest that this case will proceed to trial is in June and the Court is aware of the parties' desire for a July trial with a date certain. The Court will do its best to accommodate this request. Signed by Judge Virginia M. Hernandez Covington on 4/24/2021. (Covington, Virginia)** (Entered: 04/24/2021) |
| 04/25/2021 | 155 | | NOTICE OF RESCHEDULING HEARING: The Jury trial previously scheduled for the May 2021 trial term is rescheduled. New scheduling date and time: Jury Trial set for the June 2021 trial term in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 04/25/2021) |
| 05/20/2021 | 156 | | NOTICE OF RESCHEDULING HEARING: The Jury trial previously scheduled for the June 2021 trial term is rescheduled. New scheduling date and time: Jury Trial set for the July 2021 trial term in Tampa Courtroom 14 B |

| | | | |
|---|---|---|---|
| | | | before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 05/20/2021) |
| 05/20/2021 | 157 | | NOTICE of hearing: Jury Trial set for 7/12/2021 at 09:00 AM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 05/20/2021) |
| 05/26/2021 | 158 | | **ORDER: Plaintiff Securities and Exchange Commission's Omnibus Motion in Limine (Doc. # 123) is GRANTED in part and DENIED in part as set forth herein. Defendants' Omnibus Motion in Limine (Doc. # 124) is DENIED without prejudice. Signed by Judge Virginia M. Hernandez Covington on 5/26/2021. (LEA)** (Entered: 05/26/2021) |
| 05/26/2021 | 159 | | **ORDER: Defendants' Request for a Jury Determination of Facts Necessary to Determine Penalty Tier Level (Doc. # 122) is DENIED. Signed by Judge Virginia M. Hernandez Covington on 5/26/2021. (LEA)** (Entered: 05/26/2021) |
| 06/17/2021 | 160 | | Joint MOTION for Miscellaneous Relief, specifically Pretrial Conference *on July 9, 2021* by All Defendants. (Kruckenberg, Caleb) (Entered: 06/17/2021) |
| 06/21/2021 | 161 | | Unopposed MOTION for John J. Vecchione to appear pro hac vice, Special Admission fee paid, Receipt No. AFLMDC–18385997 for $150 by All Defendants. (Attachments: # 1 Text of Proposed Order)(Sarelson, Matthew) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 06/21/2021) |
| 06/22/2021 | 162 | | **ENDORSED ORDER denying without prejudice Defendants' 161 Unopposed Motion for Admission Pro Hac Vice and Written Designation and Consent to Act as to John J. Vecchione. It appears from the motion that counsel has not satisfied the requirements of Local Rule 2.01(c)(4). Signed by Magistrate Judge Christopher P. Tuite on 6/22/2021. (ACL)** (Entered: 06/22/2021) |
| 06/25/2021 | 163 | | Unopposed MOTION for John J. Vecchione to appear pro hac vice *(Corrected)* by All Defendants. (Attachments: # 1 Text of Proposed Order)(Sarelson, Matthew) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 06/25/2021) |
| 06/25/2021 | 164 | | **TRIAL CALENDAR for the July 2021 trial term. Signed by Judge Virginia M. Hernandez Covington on 6/25/2021. (TWL)** (Entered: 06/25/2021) |
| 06/26/2021 | 165 | | Joint MOTION for Miscellaneous Relief, specifically Permission to Present Remote Testimony by All Defendants. (Kruckenberg, Caleb) (Entered: 06/26/2021) |
| 06/28/2021 | 166 | | Joint MOTION to Allow Electronic Equipment, specifically up to 9 HP laptop computers, power supplies and mouse; Apple iPad; Dell Laptop computer, power supply and mouse; MSI laptop computer, power supply and mouse; Asus LCD monitor and USB cable; HDMI to VGA converter; 4 HDMI cables; 3.5 mm audio cable; Samsung Galaxy A51 smart phone; Power strip(s); Extension cord(s); Printer/copier/scanner(s); Verizon hotspot; PowerPoint remote control/laser pointer; up to 18 smart phones (Apple, Samsung); up to 7 smart watches (Apple, Samsung); up to 10 remote storage devices (flash drives, external hard drives) *by the following individuals: Christine Nestor,* |

| | | | |
|---|---|---|---|
| | | | *SEC Counsel; Alise Johnson, SEC Counsel; Alice Sum, SEC Counsel; Andrew Schiff, SEC Regional Trial Counsel; Lalaine Landau, SEC Paralegal; James M. Cangiano, SEC Expert Witness; David Hess, SEC courtroom presentation personnel and multi–media designer; Caleb Kruckenberg, Defendants' Counsel; Kara Rollins, Defendants' Counsel; and John Vecchione, Defendants' Counsel* by U.S. Securities and Exchange Commission. (Nestor, Christine) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 06/28/2021) |
| 06/28/2021 | 167 | | **ENDORSED ORDER granting <u>160</u> Motion. While the Court has held a pretrial conference already, the Court will schedule a hearing July 9, 2021, at 3:00 pm to finalize any pending issues. The Clerk is directed to schedule such a hearing. Signed by Judge Virginia M. Hernandez Covington on 6/28/2021. (Covington, Virginia)** (Entered: 06/28/2021) |
| 06/28/2021 | 168 | | **ENDORSED ORDER granting <u>165</u> Motion. With the wide availability of vaccinations, the health situation of today is very different than that of just several months ago. Nevertheless, if both sides agree that a witness may testify remotely, the Court will permit such testimony to be provided in that fashion. The parties should provide a joint list by July 7, 2021, of witnesses that both sides agree should be permitted to testify remotely. Signed by Judge Virginia M. Hernandez Covington on 6/28/2021. (Covington, Virginia)** (Entered: 06/28/2021) |
| 06/28/2021 | 169 | | NOTICE of hearing: Jury Selection set for 7/12/2021 01:00 PM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 06/28/2021) |
| 06/28/2021 | 170 | | NOTICE of hearing: Final Pretrial Conference set for 7/9/2021 at 03:00 PM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 06/28/2021) |
| 06/28/2021 | 171 | | **ENDORSED ORDER granting Defendants' <u>163</u> Unopposed Renewed Motion for Admission Pro Hac Vice and Written Designation and Consent to Act as to John J. Vecchione. If counsel has not already done so, within fourteen (14) days hereof, he shall complete the e–filer registration form (available at http://www.flmd.uscourts.gov/special–admission–practice). Signed by Magistrate Judge Christopher P. Tuite on 6/28/2021. (ACL)** (Entered: 06/28/2021) |
| 07/07/2021 | <u>172</u> | | Witness List by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 07/07/2021) |
| 07/07/2021 | <u>173</u> | | NOTICE by U.S. Securities and Exchange Commission *of Filing Deposition Testimony Transcripts For Trial.* (Attachments: # <u>1</u> Exhibit Carly Dilley Transcript dated 10/17/17, # <u>2</u> Exhibit Carly Dilley Transcript dated 7/20/20, # <u>3</u> Exhibit David Lopez Transcript dated 10/18/17, # <u>4</u> Exhibit David Lopez Transcript dated 5/9/18, # <u>5</u> Exhibit David Lopez Transcript dated 7/27/20, # <u>6</u> Exhibit Micah Eldred Transcript dated 10/17/17, # <u>7</u> Exhibit Micah Eldred Transcript dated 7/17/20)(Nestor, Christine) (Entered: 07/07/2021) |
| 07/07/2021 | <u>174</u> | | Proposed Jury Instructions by U.S. Securities and Exchange Commission. (Sum, Alice) (Entered: 07/07/2021) |

| 07/08/2021 | 175 | | NOTICE OF RESCHEDULING HEARING (AS TO TIME ONLY): The Jury selection hearing previously scheduled for 7/12/2021 at 1:00 PM is rescheduled. New hearing time: Jury Selection set for 7/12/2021 09:00 AM in the Jury assembly room on the 3rd floor before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 07/08/2021) |
|---|---|---|---|
| 07/09/2021 | 176 | | **ORDER directing lunch be provided for jurors during trial commencing July 12, 2021. Signed by Judge Virginia M. Hernandez Covington on 7/9/2021. (TWL)** (Entered: 07/09/2021) |
| 07/09/2021 | 177 | | **ORDER granting 166 Motion to Allow Electronic Equipment. Signed by Judge Virginia M. Hernandez Covington on 7/9/2021. (LEA)** (Entered: 07/09/2021) |
| 07/09/2021 | 178 | | TRANSCRIPT of Final Pretrial Conference held on 07/09/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301−5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 7/30/2021 Redacted Transcript Deadline set for 8/9/2021 Release of Transcript Restriction set for 10/7/2021. (SRM) (Entered: 07/09/2021) |
| 07/09/2021 | 179 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/09/2021) |
| 07/09/2021 | 182 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: FINAL PRETRIAL CONFERENCE held on 7/9/2021. Court Reporter: Shayna Montgomery (TWL) (Entered: 07/12/2021) |
| 07/10/2021 | 180 | | Witness List by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 07/10/2021) |
| 07/12/2021 | 184 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 1) held on 7/12/2021. Court Reporter: Shayna Montgomery/Tana Hess (TWL) (Entered: 07/13/2021) |
| 07/13/2021 | | | Sealed Document: S−181. (LNR) (Entered: 07/13/2021) |
| 07/13/2021 | 183 | | NOTICE by U.S. Securities and Exchange Commission of *Filing Plaintiff's Exhibit List.* (Attachments: # 1 Plaintiff's Exhibit List)(Nestor, Christine) (Entered: 07/13/2021) |
| 07/13/2021 | 185 | | Defendants' Exhibit List by Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, Spartan Securities Group, LTD. (Rollins, Kara) (Entered: 07/13/2021) |
| 07/13/2021 | 186 | | TRANSCRIPT of Jury Trial Day 2, PM Session held on 07/13/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna |

| | | | |
|---|---|---|---|
| | | | Montgomery. Contact: (813) 301−5124 − shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/3/2021 Redacted Transcript Deadline set for 8/13/2021 Release of Transcript Restriction set for 10/12/2021. (SRM) (Entered: 07/13/2021) |
| 07/13/2021 | 187 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/13/2021) |
| 07/13/2021 | 191 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 2) held on 7/13/2021. Court Reporter: Shayna Montgomery/Tana Hess. (TWL) (Entered: 07/14/2021) |
| 07/14/2021 | 188 | | NOTICE by U.S. Securities and Exchange Commission *of Filing Joint Exhibit List For Trial.* (Attachments: # 1 Joint Exhibit 1 to Joint Exhibit 86)(Nestor, Christine) (Entered: 07/14/2021) |
| 07/14/2021 | 189 | | TRANSCRIPT of Jury Trial Day 1 PM Session held on July 12, 2021 before Judge Virginia M. Hernandez Covington. Court Reporter/Transcriber Tana J. Hess, Telephone number 813.301.5207 tana_hess@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 8/4/2021 Redacted Transcript Deadline set for 8/16/2021 Release of Transcript Restriction set for 10/12/2021. (TJH) (Entered: 07/14/2021) |
| 07/14/2021 | 190 | | TRANSCRIPT of Jury Trial Day 2 AM Session held on July 13, 2021 before Judge Virginia M. Hernandez Covington. Court Reporter/Transcriber Tana J. Hess, Telephone number 813.301.5207 tana_hess@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 8/4/2021 Redacted Transcript Deadline set for 8/16/2021 Release of Transcript Restriction set for 10/12/2021. (TJH) (Entered: 07/14/2021) |
| 07/14/2021 | 192 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Tana Hess. (TJH) (Entered: 07/14/2021) |

| | | | |
|---|---|---|---|
| 07/14/2021 | 193 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. (TJH) (Entered: 07/14/2021) |
| 07/14/2021 | <u>194</u> | | TRANSCRIPT of Jury Trial Day 3, AM Session held on 07/14/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301–5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/4/2021 Redacted Transcript Deadline set for 8/16/2021 Release of Transcript Restriction set for 10/12/2021. (SRM) (Entered: 07/14/2021) |
| 07/14/2021 | 195 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/14/2021) |
| 07/14/2021 | <u>196</u> | | TRANSCRIPT of Jury Trial Day 3 PM Session held on July 14, 2021 before Judge Virginia M. Hernandez Covington. Court Reporter/Transcriber Tana J. Hess, Telephone number 813.301.5207 tana_hess@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 8/4/2021 Redacted Transcript Deadline set for 8/16/2021 Release of Transcript Restriction set for 10/12/2021. (TJH) (Entered: 07/14/2021) |
| 07/14/2021 | 197 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Tana Hess. (TJH) (Entered: 07/14/2021) |
| 07/14/2021 | <u>198</u> | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 3) held on 7/14/2021. Court Reporter: Shayna Montgomery (TWL) (Entered: 07/16/2021) |
| 07/19/2021 | <u>199</u> | | TRANSCRIPT of Jury Trial Day 4, PM Session held on 07/19/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301–5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the |

| | | | court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/9/2021 Redacted Transcript Deadline set for 8/19/2021 Release of Transcript Restriction set for 10/18/2021. (SRM) (Entered: 07/19/2021) |
|---|---|---|---|
| 07/19/2021 | 200 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/19/2021) |
| 07/19/2021 | 201 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 4) held on 7/19/2021. Court Reporter: Shayna Montgomery/Tana Hess (TWL) (Entered: 07/20/2021) |
| 07/20/2021 | 202 | | TRANSCRIPT of Jury Trial Day 5, AM Session held on 07/20/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301−5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/10/2021 Redacted Transcript Deadline set for 8/20/2021 Release of Transcript Restriction set for 10/18/2021. (SRM) (Entered: 07/20/2021) |
| 07/20/2021 | 203 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/20/2021) |
| 07/20/2021 | 212 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 5) held on 7/20/2021. Court Reporter: Shayna Montgomery/Tana Hess (TWL) (Entered: 07/22/2021) |
| 07/21/2021 | 204 | | TRANSCRIPT of Jury Trial Day 4 AM Session held on July 19, 2021 before Judge Virginia M. Hernandez Covington. Court Reporter/Transcriber Tana J. Hess, Telephone number 813.301.5207 tana_hess@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 8/11/2021 Redacted Transcript Deadline set for 8/23/2021 Release of Transcript Restriction set for 10/19/2021. (TJH) (Entered: 07/21/2021) |
| 07/21/2021 | 205 | | |

| | | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Tana Hess. (TJH) (Entered: 07/21/2021) |
|---|---|---|---|
| 07/21/2021 | 206 | | TRANSCRIPT of Jury Trial Day 5 PM Session held on July 20, 2021 before Judge Virginia M. Hernandez Covington. Court Reporter/Transcriber Tana J. Hess, Telephone number 813.301.5207 tana_hess@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 8/11/2021 Redacted Transcript Deadline set for 8/23/2021 Release of Transcript Restriction set for 10/19/2021. (TJH) (Entered: 07/21/2021) |
| 07/21/2021 | 207 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Tana Hess. (TJH) (Entered: 07/21/2021) |
| 07/21/2021 | 208 | | TRANSCRIPT of Jury Trial Day 6 AM Session held on July 21, 2021 before Judge Virginia M. Hernandez Covington. Court Reporter/Transcriber Tana J. Hess, Telephone number 813.301.5207 tana_hess@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 8/11/2021 Redacted Transcript Deadline set for 8/23/2021 Release of Transcript Restriction set for 10/19/2021. (TJH) (Entered: 07/21/2021) |
| 07/21/2021 | 209 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Tana Hess. (TJH) (Entered: 07/21/2021) |
| 07/21/2021 | 210 | | TRANSCRIPT of Jury Trial Day 6, PM Session held on 07/21/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301–5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be |

| | | | |
|---|---|---|---|
| | | | obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/11/2021 Redacted Transcript Deadline set for 8/23/2021 Release of Transcript Restriction set for 10/19/2021. (SRM) (LNR). (LNR). (Entered: 07/21/2021) |
| 07/21/2021 | 211 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/21/2021) |
| 07/21/2021 | 213 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 6) held on 7/21/2021. Court Reporter: Shayna Montgomery/Tana Hess (TWL) (Entered: 07/22/2021) |
| 07/22/2021 | 214 | | TRANSCRIPT of Jury Trial Day 7, AM Session held on 07/22/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301−5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/12/2021 Redacted Transcript Deadline set for 8/23/2021 Release of Transcript Restriction set for 10/20/2021. (SRM) (Entered: 07/22/2021) |
| 07/22/2021 | 215 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/22/2021) |
| 07/22/2021 | 218 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 7) held on 7/22/2021. Court Reporter: Shayna Montgomery/Tana Hess (TWL) (Entered: 07/23/2021) |
| 07/23/2021 | 216 | | TRANSCRIPT of Jury Trial Day 7 PM Session held on July 22, 2021 before Judge Virginia M. Hernandez Covington. Court Reporter/Transcriber Tana J. Hess, Telephone number 813.301.5207 tana_hess@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 8/13/2021 Redacted Transcript Deadline set for 8/23/2021 Release of Transcript Restriction set for 10/21/2021. (TJH) (Entered: 07/23/2021) |
| 07/23/2021 | 217 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request |

| | | | |
|---|---|---|---|
| | | | Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Tana Hess. (TJH) (Entered: 07/23/2021) |
| 07/23/2021 | 219 | | TRANSCRIPT of Jury Trial Day 8 held on 07/23/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301–5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/13/2021 Redacted Transcript Deadline set for 8/23/2021 Release of Transcript Restriction set for 10/21/2021. (SRM) (Entered: 07/23/2021) |
| 07/23/2021 | 220 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/23/2021) |
| 07/23/2021 | 221 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 8) held on 7/23/2021. Court Reporter: Shayna Montgomery (TWL) (Entered: 07/26/2021) |
| 07/26/2021 | 222 | | TRANSCRIPT of Jury Trial Day 9, AM Session held on 07/26/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301–5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/16/2021 Redacted Transcript Deadline set for 8/26/2021 Release of Transcript Restriction set for 10/25/2021. (SRM) (Entered: 07/26/2021) |
| 07/26/2021 | 223 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/26/2021) |
| 07/26/2021 | 232 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 9) held on 7/26/2021. Court Reporter: Shayna Montgomery/Tana Hess (TWL) (TWL). (Entered: 07/28/2021) |

| | | | |
|---|---|---|---|
| 07/27/2021 | <u>224</u> | | TRANSCRIPT of Jury Trial day 9 PM Session held on July 26, 2021 before Judge Virginia M. Hernandez Covington. Court Reporter/Transcriber Tana J. Hess, Telephone number 813.301.5207 tana_hess@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 8/17/2021 Redacted Transcript Deadline set for 8/27/2021 Release of Transcript Restriction set for 10/25/2021. (TJH) (Entered: 07/27/2021) |
| 07/27/2021 | 225 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Tana Hess. (TJH) (Entered: 07/27/2021) |
| 07/27/2021 | <u>226</u> | | TRANSCRIPT of Jury Trial Day 10 A.M. Session held on July 27, 2021 before Judge Virginia M. Hernandez Covington. Court Reporter/Transcriber Tana J. Hess, Telephone number 813.301.5207 tana_hess@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 8/17/2021 Redacted Transcript Deadline set for 8/27/2021 Release of Transcript Restriction set for 10/25/2021. (TJH) (Entered: 07/27/2021) |
| 07/27/2021 | 227 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Tana Hess. (TJH) (Entered: 07/27/2021) |
| 07/27/2021 | <u>228</u> | | TRANSCRIPT of Jury Trial Day 10, PM Session held on 07/27/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301–5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/17/2021 Redacted Transcript Deadline set for 8/27/2021 Release of Transcript Restriction set for 10/25/2021. (SRM) (Entered: 07/27/2021) |
| 07/27/2021 | 229 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 |

| | | | |
|---|---|---|---|
| | | | calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/27/2021) |
| 07/27/2021 | 236 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 10) held on 7/27/2021. Court Reporter: Shayna Montgomery/Tana Hess (TWL) (Entered: 07/29/2021) |
| 07/28/2021 | 230 | | TRANSCRIPT of Jury Trial Day 11, AM Session held on 07/28/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301–5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/18/2021 Redacted Transcript Deadline set for 8/30/2021 Release of Transcript Restriction set for 10/26/2021. (SRM) (Entered: 07/28/2021) |
| 07/28/2021 | 231 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/28/2021) |
| 07/28/2021 | 237 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 11) held on 7/28/2021. Court Reporter: Shayna Montgomery/Tana Hess (TWL) (Entered: 07/29/2021) |
| 07/29/2021 | 233 | | Unopposed MOTION to Seal *Certain Portions of Transcripts of Proceedings of Jury Trial held on July 26, 2021 (D.E. 222) and July 28, 2021 (D.E. 230) Pursuant to Local Rule 1.11 and Court Order* by U.S. Securities and Exchange Commission. (Sum, Alice) (Entered: 07/29/2021) |
| 07/29/2021 | 234 | | TRANSCRIPT of Jury Trial day 11 PM Session held on July 28, 2021 before Judge Virginia M. Hernandez Covington. Court Reporter/Transcriber Tana J. Hess, Telephone number 813.301.5207 tana_hess@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 8/19/2021 Redacted Transcript Deadline set for 8/30/2021 Release of Transcript Restriction set for 10/27/2021. (TJH) (Entered: 07/29/2021) |
| 07/29/2021 | 235 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the |

| | | | document at the clerk's office public terminal. Court Reporter: Tana Hess. (TJH) (Entered: 07/29/2021) |
|---|---|---|---|
| 07/29/2021 | 238 | | TRANSCRIPT of Jury Trial Day 12, PM Session held on 07/29/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301–5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/19/2021 Redacted Transcript Deadline set for 8/30/2021 Release of Transcript Restriction set for 10/27/2021. (SRM) (Entered: 07/29/2021) |
| 07/29/2021 | 239 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery.. (SRM) (Entered: 07/29/2021) |
| 07/29/2021 | 242 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 12) held on 7/29/2021. Court Reporter: Shayna Montgomery/Tana Hess (TWL) (Entered: 07/30/2021) |
| 07/29/2021 | 244 | | ORAL MOTION for Judgment as a Matter of Law by Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, Spartan Securities Group, LTD.. (TWL) (Entered: 07/30/2021) |
| 07/29/2021 | 245 | | ORAL MOTION for Judgment as a Matter of Law by U.S. Securities and Exchange Commission. (TWL) (Entered: 07/30/2021) |
| 07/30/2021 | 240 | | TRANSCRIPT of Jury Trial Day 12 AM Session held on July 29, 2021 before Judge Virginia M. Hernandez Covington. Court Reporter/Transcriber Tana J. Hess, Telephone number 813.301.5207 tana_hess@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 8/20/2021 Redacted Transcript Deadline set for 8/30/2021 Release of Transcript Restriction set for 10/28/2021. (TJH) (Entered: 07/30/2021) |
| 07/30/2021 | 241 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Tana Hess. (TJH) (Entered: 07/30/2021) |
| 07/30/2021 | 243 | | **ENDORSED ORDER granting the Securities and Exchange Commission's unopposed motion to seal. (Doc. # 233). The requested** |

| | | | |
|---|---|---|---|
| | | | **portions of the proceedings – Page 9–4, line 3 through page 9–23, line 22 of Transcript of Jury Trial Day 9 A.M. session on July 26, 2021 as reported by Shayna Montgomery (Doc. # 222); and Page 11–4, line 3 through page 11–17, line 25 of Transcript of Jury Trial Day 11 A.M. session on July 28, 2021 as reported by Shayna Montgomery (D.E. 230) – shall remain sealed until further ordered by the Court. Signed by Judge Virginia M. Hernandez Covington on 7/30/2021. (LEA)** (Entered: 07/30/2021) |
| 07/30/2021 | 246 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: JURY TRIAL (DAY 13) completed on 7/30/2021. Court Reporter: Shayna Montgomery (TWL) (Entered: 07/30/2021) |
| 07/30/2021 | 247 | | TRANSCRIPT of Jury Trial Day 13 held on 07/30/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301–5124 – shayna_montgomery@flmd.uscourts.gov. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter. Redaction Request due 8/20/2021 Redacted Transcript Deadline set for 8/30/2021 Release of Transcript Restriction set for 10/28/2021. (SRM) (Entered: 07/30/2021) |
| 07/30/2021 | 248 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Shayna Montgomery. (SRM) (Entered: 07/30/2021) |
| 07/30/2021 | 249 | | Jury Instructions. (TWL) (Entered: 07/30/2021) |
| 07/30/2021 | 250 | | JURY VERDICT. (TWL) (Entered: 07/30/2021) |
| 07/30/2021 | 251 | | **ORAL ORDER denying Defendants' Oral Motion for Judgment as a Matter of Law 244 as to Count 6 and denying as moot Counts 1–5, 7–14, for the reason stated on the record. Signed by Judge Virginia M. Hernandez Covington on 7/30/2021. (TWL)** (Entered: 08/02/2021) |
| 07/30/2021 | 252 | | **ORAL ORDER denying Plaintiff's Oral Motion for Judgment as a Matter of Law 245 for the reason stated on the record. Signed by Judge Virginia M. Hernandez Covington on 7/30/2021. (TWL)** (Entered: 08/02/2021) |
| 08/02/2021 | 253 | | REDACTION re 222 Transcript. REDACTED TRANSCRIPT of Jury Trial Day 9, AM Session held on 07/26/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301–5124 – shayna_montgomery@flmd.uscourts.gov. (SRM) (Entered: 08/02/2021) |
| 08/02/2021 | 254 | | REDACTION re 230 Transcript. REDACTED TRANSCRIPT of Jury Trial Day 11, AM Session held on 07/28/2021 before Judge Virginia M. Hernandez Covington. Court Reporter: Shayna Montgomery. Contact: (813) 301–5124 – shayna_montgomery@flmd.uscourts.gov. (SRM) (Entered: 08/02/2021) |

| | | | |
|---|---|---|---|
| 08/03/2021 | 255 | | Joint Exhibit List and exhibits admitted during the Jury trial. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 7 part 1, # 6 Exhibit 7 part 2, # 7 Exhibit 8 part 1, # 8 Exhibit 8 part 2, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 14 part 1, # 14 Exhibit 14 part 2, # 15 Exhibit 18, # 16 Exhibit 19, # 17 Exhibit 20, # 18 Exhibit 21, # 19 Exhibit 22, # 20 Exhibit 23, # 21 Exhibit 24, # 22 Exhibit 25, # 23 Exhibit 26, # 24 Exhibit 27, # 25 Exhibit 28, # 26 Exhibit 30, # 27 Exhibit 32, # 28 Exhibit 38, # 29 Exhibit 39, # 30 Exhibit 40, # 31 Exhibit 41, # 32 Exhibit 42, # 33 Exhibit 43, # 34 Exhibit 44, # 35 Exhibit 45, # 36 Exhibit 48, # 37 Exhibit 49, # 38 Exhibit 51, # 39 Exhibit 52 part 1, # 40 Exhibit 52 part 2, # 41 Exhibit 52 part 3, # 42 Exhibit 52 part 4, # 43 Exhibit 53 part 1, # 44 Exhibit 53 part 2, # 45 Exhibit 53 part 3, # 46 Exhibit 53 part 4, # 47 Exhibit 53 part 5, # 48 Exhibit 54, # 49 Exhibit 57, # 50 Exhibit 59, # 51 Exhibit 60, # 52 Exhibit 61, # 53 Exhibit 63, # 54 Exhibit 65, # 55 Exhibit 66, # 56 Exhibit 77, # 57 Exhibit 83 part 1, # 58 Exhibit 83 part 2, # 59 Exhibit 83 part 3, # 60 Exhibit 83 part 4, # 61 Exhibit 83 part 5, # 62 Exhibit 84 part 1, # 63 Exhibit 84 part 2, # 64 Exhibit 85, # 65 Exhibit 86)(TWL) (Entered: 08/03/2021) |
| 08/09/2021 | 256 | | **CLERK'S JUDGMENT Count(s) 1–5, 7–14 in favor of the Defendants and Count 6 in favor of the Plaintiff. Signed by Deputy Clerk on 8/9/2021. (TWL)** (Entered: 08/09/2021) |
| 08/11/2021 | 257 | | Plaintiff Exhibit List and Exhibits admitted during the jury trial. (Attachments: # 1 Exhibit 12, # 2 Exhibit 16 part 1, # 3 Exhibit 16 part 2, # 4 Exhibit 16 part 3, # 5 Exhibit 19, # 6 Exhibit 36, # 7 Exhibit 44, # 8 Exhibit 71, # 9 Exhibit 113 part 1, # 10 Exhibit 113 part 2, # 11 Exhibit 113 part 3, # 12 Exhibit 137, # 13 Exhibit 193, # 14 Exhibit 194, # 15 Exhibit 195, # 16 Exhibit 196, # 17 Exhibit 197, # 18 Exhibit 198, # 19 Exhibit 199, # 20 Exhibit 200, # 21 Exhibit 201, # 22 Exhibit 202, # 23 Exhibit 203, # 24 Exhibit 204, # 25 Exhibit 205, # 26 Exhibit 206, # 27 Exhibit 207, # 28 Exhibit 208, # 29 Exhibit 211, # 30 Exhibit 212, # 31 Exhibit 232, # 32 Exhibit 237, # 33 Exhibit 248 part 1, # 34 Exhibit 248 part 2, # 35 Exhibit 248 part 3, # 36 Exhibit 249, # 37 Exhibit 252, # 38 Exhibit 254, # 39 Exhibit 256, # 40 Exhibit 285, # 41 Exhibit 286, # 42 Exhibit 287, # 43 Exhibit 288, # 44 Exhibit 289, # 45 Exhibit 290, # 46 Exhibit 293, # 47 Exhibit 294, # 48 Exhibit 299 part 1, # 49 Exhibit 299 part 2, # 50 Exhibit 232, # 51 Exhibit 324, # 52 Exhibit 325, # 53 Exhibit 326, # 54 Exhibit 327, # 55 Exhibit 328, # 56 Exhibit 329 part 1, # 57 Exhibit 329 part 2, # 58 Exhibit 329 part 3, # 59 Exhibit 330, # 60 Exhibit 331, # 61 Exhibit 332, # 62 Exhibit 333, # 63 Exhibit 334, # 64 Exhibit 335, # 65 Exhibit 336, # 66 Exhibit 338, # 67 Exhibit 340, # 68 Exhibit 373, # 69 Exhibit 378, # 70 Exhibit 415, # 71 Exhibit 462, # 72 Exhibit 463, # 73 Exhibit 527, # 74 Exhibit 531, # 75 Exhibit 534, # 76 Exhibit 537, # 77 Exhibit 588, # 78 Exhibit 589, # 79 Exhibit 591, # 80 Exhibit 592, # 81 Exhibit 598, # 82 Exhibit 605, # 83 Exhibit 606, # 84 Exhibit 608, # 85 Exhibit 609, # 86 Exhibit 610, # 87 Exhibit 611, # 88 Exhibit 613, # 89 Exhibit 614, # 90 Exhibit 615, # 91 Exhibit 616, # 92 Exhibit 617, # 93 Exhibit 618, # 94 Exhibit 620, # 95 Exhibit 621, # 96 Exhibit 622, # 97 Exhibit 623, # 98 Exhibit 625, # 99 Exhibit 626, # 100 Exhibit 627, # 101 Exhibit 634, # 102 Exhibit 635, # 103 Exhibit 637, # 104 Exhibit 639, # 105 Exhibit 640, # 106 Exhibit 641, # 107 Exhibit 642, # 108 Exhibit 644, # 109 Exhibit 647, # 110 Exhibit 648, # 111 |

| | | | |
|---|---|---|---|
| | | | Exhibit 649, # 112 Exhibit 650, # 113 Exhibit 651, # 114 Exhibit 652, # 115 Exhibit 653, # 116 Exhibit 654, # 117 Exhibit 656, # 118 Exhibit 657 part 1, # 119 Exhibit 657 part 2, # 120 Exhibit 657 part 3, # 121 Exhibit 657 part 4, # 122 Exhibit 658, # 123 Exhibit 666, # 124 Exhibit 667, # 125 Exhibit 668, # 126 Exhibit 669, # 127 Exhibit 670, # 128 Exhibit 674, # 129 Exhibit 675, # 130 Exhibit 676, # 131 Exhibit 677, # 132 Exhibit 678, # 133 Exhibit 679, # 134 Exhibit 680, # 135 Exhibit 681, # 136 Exhibit 683, # 137 Exhibit 684, # 138 Exhibit 685, # 139 Exhibit 691, # 140 Exhibit 693, # 141 Exhibit 697 part 1, # 142 Exhibit 697 part 2, # 143 Exhibit 699, # 144 Exhibit 701, # 145 Exhibit 704, # 146 Exhibit 706, # 147 Exhibit 709, # 148 Exhibit 712, # 149 Exhibit 717 part 1, # 150 Exhibit 717 part 2, # 151 Exhibit 731, # 152 Exhibit 733 part 1, # 153 Exhibit 733 part 2, # 154 Exhibit 733 part 3, # 155 Exhibit 740, # 156 Exhibit 746, # 157 Exhibit 747, # 158 Exhibit 755 part 1, # 159 Exhibit 755 part 2, # 160 Exhibit 766, # 161 Exhibit 770, # 162 Exhibit 773, # 163 Exhibit 774, # 164 Exhibit 775, # 165 Exhibit 776, # 166 Exhibit 785, # 167 Exhibit 786, # 168 Exhibit 787, # 169 Exhibit 791, # 170 Exhibit 797, # 171 Exhibit 798, # 172 Exhibit 802, # 173 Exhibit 808, # 174 Exhibit 817, # 175 Exhibit 818 part 1, # 176 Exhibit 818 part 2, # 177 Exhibit 820, # 178 Exhibit 821 part 1, # 179 Exhibit 821 part 2, # 180 Exhibit 822, # 181 Exhibit 823, # 182 Exhibit 826, # 183 Exhibit 830, # 184 Exhibit 831, # 185 Exhibit 832, # 186 Exhibit 833, # 187 Exhibit 834, # 188 Exhibit 836, # 189 Exhibit 837, # 190 Exhibit 843 part 1, # 191 Exhibit 843 part 2, # 192 Exhibit 843 part 3, # 193 Exhibit 845 part 1, # 194 Exhibit 845 part 2, # 195 Exhibit 845 part 3, # 196 Exhibit 845 part 4, # 197 Exhibit 846 part 1, # 198 Exhibit 846 part 2, # 199 Exhibit 846 part 3, # 200 Exhibit 848 part 1, # 201 Exhibit 848 part 2, # 202 Exhibit 848 part 3, # 203 Exhibit 849 part 1, # 204 Exhibit 849 part 2, # 205 Exhibit 849 part 3, # 206 Exhibit 853 part 1, # 207 Exhibit 853 part 2, # 208 Exhibit 853 part 3, # 209 Exhibit 853 part 4, # 210 Exhibit 855 part 1, # 211 Exhibit 855 part 2, # 212 Exhibit 855 part 3, # 213 Exhibit 856 part 1, # 214 Exhibit 856 part 2, # 215 Exhibit 858 part 1, # 216 Exhibit 858 part 2, # 217 Exhibit 858 part 3, # 218 Exhibit 860 part 1, # 219 Exhibit 860 part 2, # 220 Exhibit 862 part 1, # 221 Exhibit 862 part 2, # 222 Exhibit 862 part 3, # 223 Exhibit 865 part 1, # 224 Exhibit 865 part 2, # 225 Exhibit 865 part 3, # 226 Exhibit 866 part 1, # 227 Exhibit 866 part 2, # 228 Exhibit 866 part 3, # 229 Exhibit 867 part 1, # 230 Exhibit 867 part 2, # 231 Exhibit 867 part 3, # 232 Exhibit 869, # 233 Exhibit 875, # 234 Exhibit 876)(TWL) (Entered: 08/11/2021) |
| 09/02/2021 | 258 | | **ENDORSED ORDER: The Judgment having been entered in this case on August 9, 2021 (Doc. # 256), the Court directs the parties to provide a joint status report regarding post–trial matters for the Court's attention by September 9, 2021. Signed by Judge Virginia M. Hernandez Covington on 9/2/2021. (SGM)** (Entered: 09/02/2021) |
| 09/03/2021 | 259 | | MOTION for Judgment as a Matter of Law by Carl E. Dilley, Micah J. Eldred, Island Capital Management, Spartan Securities Group, LTD. (Attachments: # 1 Exhibit Trial Transcript, # 2 Exhibit Trial Transcript, # 3 Exhibit Trial Transcript, # 4 Exhibit Trial Transcript, # 5 Exhibit Trial Transcript, # 6 Exhibit Trial Transcript, # 7 Exhibit Trial Transcript, # 8 Exhibit Trial Transcript, # 9 Exhibit Trial Transcript, # 10 Exhibit Trial Transcript, # 11 Exhibit Trial Transcript, # 12 Exhibit Trial Transcript)(Kruckenberg, Caleb) (Entered: 09/03/2021) |

| | | | |
|---|---|---|---|
| 09/09/2021 | 260 | | STATUS report *(Joint) regarding Post−Trial Matters and Request for Briefing Schedule* by U.S. Securities and Exchange Commission. (Johnson, Alise) (Entered: 09/09/2021) |
| 09/10/2021 | 261 | | **ORDER: The parties are directed to comply with the deadlines set forth in this Order. See Order for details. Signed by Judge Virginia M. Hernandez Covington on 9/10/2021. (SGM)** (Entered: 09/10/2021) |
| 10/04/2021 | 262 | | RESPONSE in Opposition re 259 MOTION for Judgment as a Matter of Law filed by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 10/04/2021) |
| 01/20/2022 | 263 | | **ORDER: Defendants' Renewed Motion for Judgment as a Matter of Law (Doc. # 259) is DENIED. The parties are directed to comply with the briefing schedule previously entered by the Court at Doc. # 261. Signed by Judge Virginia M. Hernandez Covington on 1/20/2022. (SGM)** (Entered: 01/20/2022) |
| 01/25/2022 | 264 | | Defendants Carl E. Dilley, Micah J. Eldred, Island Capital Management, David D. Lopez, Spartan Securities Group, LTD. Exhibit List and Exhibits admitted during the jury trial. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 11, # 11 Exhibit 12, # 12 Exhibit 14, # 13 Exhibit 15, # 14 Exhibit 16, # 15 Exhibit 17, # 16 Exhibit 18, # 17 Exhibit 19, # 18 Exhibit 20, # 19 Exhibit 21, # 20 Exhibit 22, # 21 Exhibit 23, # 22 Exhibit 24, # 23 Exhibit 25, # 24 Exhibit 26, # 25 Exhibit 27, # 26 Exhibit 28, # 27 Exhibit 29, # 28 Exhibit 30, # 29 Exhibit 31, # 30 Exhibit 32, # 31 Exhibit 33, # 32 Exhibit 34, # 33 Exhibit 36, # 34 Exhibit 37, # 35 Exhibit 38, # 36 Exhibit 39, # 37 Exhibit 40, # 38 Exhibit 41, # 39 Exhibit 42, # 40 Exhibit 43, # 41 Exhibit 44, # 42 Exhibit 45, # 43 Exhibit 46, # 44 Exhibit 47, # 45 Exhibit 48, # 46 Exhibit 49, # 47 Exhibit 50, # 48 Exhibit 51, # 49 Exhibit 54, # 50 Exhibit 55, # 51 Exhibit 56, # 52 Exhibit 57, # 53 Exhibit 58, # 54 Exhibit 61, # 55 Exhibit 62, # 56 Exhibit 63, # 57 Exhibit 64, # 58 Exhibit 65, # 59 Exhibit 66, # 60 Exhibit 67, # 61 Exhibit 68, # 62 Exhibit 69, # 63 Exhibit 70, # 64 Exhibit 71, # 65 Exhibit 72, # 66 Exhibit 73, # 67 Exhibit 74, # 68 Exhibit 75, # 69 Exhibit 76, # 70 Exhibit 77, # 71 Exhibit 78, # 72 Exhibit 79, # 73 Exhibit 80, # 74 Exhibit 81, # 75 Exhibit 82, # 76 Exhibit 83, # 77 Exhibit 84, # 78 Exhibit 85, # 79 Exhibit 88, # 80 Exhibit 89, # 81 Exhibit 90, # 82 Exhibit 91, # 83 Exhibit 92, # 84 Exhibit 93, # 85 Exhibit 94, # 86 Exhibit 95, # 87 Exhibit 96, # 88 Exhibit 97, # 89 Exhibit 98, # 90 Exhibit 99, # 91 Exhibit 100, # 92 Exhibit 101, # 93 Exhibit 102, # 94 Exhibit 103, # 95 Exhibit 104, # 96 Exhibit 107, # 97 Exhibit 109, # 98 Exhibit 110, # 99 Exhibit 111, # 100 Exhibit 112, # 101 Exhibit 113, # 102 Exhibit 122, # 103 Exhibit 139, # 104 Exhibit 140, # 105 Exhibit 141, # 106 Exhibit 143, # 107 Exhibit 149, # 108 Exhibit 164, # 109 Exhibit 185, # 110 Exhibit 188, # 111 Exhibit 189, # 112 Exhibit 197, # 113 Exhibit 199, # 114 Exhibit 200, # 115 Exhibit 201, # 116 Exhibit 202, # 117 Exhibit 206, # 118 Exhibit 207, # 119 Exhibit 208, # 120 Exhibit 209, # 121 Exhibit 210, # 122 Exhibit 211, # 123 Exhibit 212, # 124 Exhibit 213, # 125 Exhibit 214, # 126 Exhibit 215, # 127 Exhibit 216, # 128 Exhibit 217, # 129 Exhibit 218, # 130 Exhibit 219, # 131 Exhibit 220, # 132 Exhibit 221, # 133 Exhibit 222, # 134 Exhibit 223, # 135 Exhibit 224, # 136 Exhibit 225, # 137 Exhibit 226, # 138 Exhibit 227, # 139 Exhibit 228, # 140 Exhibit 229, # 141 Exhibit 230, # 142 |

| | | | |
|---|---|---|---|
| | | | Exhibit 231, # <u>143</u> Exhibit 232, # <u>144</u> Exhibit 234, # <u>145</u> Exhibit 235, # <u>146</u> Exhibit 237, # <u>147</u> Exhibit 239, # <u>148</u> Exhibit 241, # <u>149</u> Exhibit 251, # <u>150</u> Exhibit 252, # <u>151</u> Exhibit 258, # <u>152</u> Exhibit 259, # <u>153</u> Exhibit 260, # <u>154</u> Exhibit 261, # <u>155</u> Exhibit 262, # <u>156</u> Exhibit 263, # <u>157</u> Exhibit 264)(TWL) (Entered: 01/25/2022) |
| 02/08/2022 | 265 | | **ENDORSED ORDER: The trial in this case concluded on July 30, 2021. (Doc. # <u>250</u>). The Court has also considered and ruled upon Defendants' Renewed Motion for Judgment as a Matter of Law, upholding the jury's verdict. (Doc. # <u>263</u>). At this juncture, the Court exercises its discretion to administratively close this case. The post–trial briefing will continue as set forth in Doc. # <u>261</u>. Once the issue is fully briefed, and the Court is prepared to rule upon that matter, the Court will reopen the case at an appropriate time. Accordingly, the Clerk is directed to administratively close this case until further order of the Court. Signed by Judge Virginia M. Hernandez Covington on 2/8/2022. (SGM)** (Entered: 02/08/2022) |
| 03/04/2022 | <u>266</u> | | Unopposed MOTION for Extension of Time to File Motion to Establish Remedies by U.S. Securities and Exchange Commission. (Attachments: # <u>1</u> Text of Proposed Order)(Nestor, Christine) (Entered: 03/04/2022) |
| 03/05/2022 | 267 | | **ENDORSED ORDER granting <u>266</u> Motion for Extension of Time to File. The pleading is due by April 6, 2022. Signed by Judge Virginia M. Hernandez Covington on 3/5/2022. (Covington, Virginia)** (Entered: 03/05/2022) |
| 03/31/2022 | <u>268</u> | | Unopposed MOTION for Extension of Time to File Motion to Establish Remedies by U.S. Securities and Exchange Commission. (Johnson, Alise) (Entered: 03/31/2022) |
| 04/01/2022 | 269 | | **ENDORSED ORDER granting <u>268</u> Plaintiff's Motion for Extension of Time. The SEC may file its motion to establish remedies by April 13, 2022. Signed by Judge Virginia M. Hernandez Covington on 4/1/2022. (SGM)** (Entered: 04/01/2022) |
| 04/13/2022 | <u>270</u> | | MOTION for Miscellaneous Relief, specifically for Remedies against Defendants and Supporting Memorandum of Law by U.S. Securities and Exchange Commission. (Attachments: # <u>1</u> Exhibit A, Declaration of Mark Dee with Exhibits 1 and 2, # <u>2</u> Exhibit B, Island Prejudgment Interest Report, # <u>3</u> Text of Proposed Order –Exhibit C–1, Final Judgment against Spartan Securities Group Ltd., # <u>4</u> Text of Proposed Order –Exhibit C–2, Final Judgment against Island Capital Management LLC, # <u>5</u> Text of Proposed Order –Exhibit C–3, Final Judgment against Carl E. Dilley, # <u>6</u> Text of Proposed Order –Exhibit C–4, Final Judgment against Micah J. Eldred)(Nestor, Christine) (Entered: 04/13/2022) |
| 05/05/2022 | <u>271</u> | | Unopposed MOTION for Extension of Time to File Response/Reply as to <u>270</u> MOTION for Miscellaneous Relief, specifically for Remedies against Defendants and Supporting Memorandum of Law by Carl E. Dilley, Micah J. Eldred, Island Capital Management, Spartan Securities Group, LTD. (Attachments: # <u>1</u> Proposed Order)(Rollins, Kara) (Entered: 05/05/2022) |
| 05/06/2022 | 272 | | **ENDORSED ORDER granting in part and denying in part <u>271</u> Motion for Extension of Time. The Defendants' response to the SEC's Motion for Remedies is now due by May 23, 2022. Signed by Judge Virginia M.** |

| | | | |
|---|---|---|---|
| | | | Hernandez Covington on 5/6/2022. (SGM) (Entered: 05/06/2022) |
| 05/23/2022 | 273 | | RESPONSE in Opposition re 270 MOTION for Miscellaneous Relief, specifically for Remedies against Defendants and Supporting Memorandum of Law filed by Carl E. Dilley, Micah J. Eldred, Island Capital Management, Spartan Securities Group, LTD. (Attachments: # 1 Exhibit A, Declaration of Micah Eldred, # 2 Exhibit B Declaration of Carl Dilley)(Rollins, Kara) (Entered: 05/23/2022) |
| 05/23/2022 | 274 | | MOTION for Miscellaneous Relief, specifically Request for oral argument and evidentiary hearing re 270 by Carl E. Dilley, Micah J. Eldred, Island Capital Management, Spartan Securities Group, LTD. (Rollins, Kara) (Entered: 05/23/2022) |
| 06/06/2022 | 275 | | RESPONSE re 274 MOTION for Miscellaneous Relief, specifically Request for oral argument and evidentiary hearing re 270 filed by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 06/06/2022) |
| 06/06/2022 | 276 | | MOTION for Miscellaneous Relief, specifically for Leave to File a Reply in Support of Plaintiff's Motion for Remedies (DE 270) by U.S. Securities and Exchange Commission. (Nestor, Christine) (Entered: 06/06/2022) |
| 07/05/2022 | 277 | | **ORDER: The SEC's motion for leave to file a reply brief (Doc. # 276) is GRANTED. The reply brief may only address the four topics outlined by the SEC in its Motion requesting same, may not exceed four (4) pages in length, and is due seven days from the date of this Order. Defendants' request for oral argument and an evidentiary hearing (Doc. # 274) is GRANTED to the extent set forth herein. The evidentiary hearing will take place on July 19, 2022, at 9:00 a.m. in Courtroom 14B of the Sam Gibbons United States Courthouse, 801 N. Florida Ave., Tampa, FL 33602. Oral argument in this matter will take place on July 20, 2022, at 3:00 p.m. via Zoom video conference. Signed by Judge Virginia M. Hernandez Covington on 7/5/2022. (SGM)** (Entered: 07/05/2022) |
| 07/06/2022 | 278 | | NOTICE of hearing: Evidentiary Hearing set for 7/19/2022 at 9:00 AM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 07/06/2022) |
| 07/06/2022 | 279 | | NOTICE of hearing: Oral argument set for 7/20/2022 at 3:00 PM via Zoom Video Conference before Judge Virginia M. Hernandez Covington. The Clerk will be sending an invitation to the meeting via email. If you have any questions please contact courtroom deputy, Tamecika Lee, at Tamecika_Lee@flmd.uscourts.gov. Although the hearing is taking place by video, all parties should dress appropriately for this Court proceeding. Furthermore, the parties are hereby reminded that under Local Rule 5.01 the taking of photographs, the operation of recording or transmission devices, and the broadcasting or televising of proceedings in any courtroom or hearing room of this Court, or the environs thereof, either while the Court is in session or at recesses between sessions when Court officials, lawyers, jurors, witnesses or other persons connected with judicial proceedings of any kind are present, are prohibited. (TWL) (Entered: 07/06/2022) |
| 07/08/2022 | 280 | | Joint MOTION for Miscellaneous Relief, specifically Joint Motion to continue hearing by Carl E. Dilley, Micah J. Eldred, Island Capital Management, Spartan Securities Group, LTD. (Vecchione, John) (Entered: 07/08/2022) |

| 07/12/2022 | 281 | | **ENDORSED ORDER: Upon review of the parties' joint motion to continue the evidentiary hearing (Doc. # 280), and discussion with both parties, the Court orders as follows. The evidentiary hearing on the SEC's Motion for Remedies will begin at 1:00 p.m. on Wednesday, July 20, 2022. If necessary, the Court will re–convene the evidentiary hearing at 10:00 a.m. the following morning, July 21, 2022. The Court's expectation is for the parties to conclude their presentation of evidence by lunchtime on Thursday. The Court will break for lunch, and the parties will present their oral arguments on the Motion beginning at 1:00 p.m. Thursday, with each party being allotted no more than 25 minutes to speak. Signed by Judge Virginia M. Hernandez Covington on 7/12/2022. (SGM)** (Entered: 07/12/2022) |
|---|---|---|---|
| 07/12/2022 | 282 | | NOTICE OF RESCHEDULING HEARING: The Evidentiary Hearing hearing previously scheduled for 7/19/2022 is rescheduled. New scheduling date and time: Evidentiary Hearing set for 7/20/2022 at 1:00 PM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington. (TWL) (Entered: 07/12/2022) |
| 07/12/2022 | 283 | | NOTICE OF RESCHEDULING HEARING: The Oral argument hearing previously scheduled for 7/20/2022 is rescheduled. New scheduling date and time: Oral argument set for 7/21/2022 at 1:00 PM in Tampa Courtroom 14 B before Judge Virginia M. Hernandez Covington (TWL) (Entered: 07/12/2022) |
| 07/12/2022 | 284 | | REPLY to Response to Motion re 270 MOTION for Miscellaneous Relief, specifically for Remedies against Defendants and Supporting Memorandum of Law filed by U.S. Securities and Exchange Commission. (Attachments: # 1 Exhibit A – Post–Liu Orders (SEC v Nortel Networks Corp. et al, SEC v Macquarie Capital LLC et al, SEC v Buck))(Nestor, Christine) (Entered: 07/12/2022) |
| 07/15/2022 | 285 | | Joint MOTION to Allow Electronic Equipment, specifically Personal Electronic Devices *such as smart phones, smart watches, laptop computers, power supplies, mouse, remote storage devices (flash drives and hard drives) for July 20–21, 2022 Evidentiary Hearings* by U.S. Securities and Exchange Commission. (Nestor, Christine) Motions referred to Magistrate Judge Christopher P. Tuite. (Entered: 07/15/2022) |
| 07/18/2022 | 286 | | **ORDER granting 285 Motion to Allow Electronic Equipment. Signed by Judge Virginia M. Hernandez Covington on 7/18/2022. (SGM)** (Entered: 07/18/2022) |
| 07/18/2022 | 287 | | STIPULATED *Issues for Evidentiary Hearing on July 20, 2022* by U.S. Securities and Exchange Commission. (Johnson, Alise) (Entered: 07/18/2022) |
| 07/20/2022 | 289 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: Evidentiary Hearing held on 7/20/2022. Court Reporter: Melissa Pierson (TWL) (Entered: 07/21/2022) |
| 07/21/2022 | 288 | | STIPULATION *regarding July 20–21, 2022 Evidentiary Hearing* by U.S. Securities and Exchange Commission. (Attachments: # 1 Exhibit A – Chart re bulk sale transfer dates)(Nestor, Christine) (Entered: 07/21/2022) |
| 07/21/2022 | 290 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: Evidentiary Hearing held on 7/21/2022. Court |

| | | | |
|---|---|---|---|
| | | | Reporter: Melissa Pierson (TWL) (Entered: 07/21/2022) |
| 07/22/2022 | 291 | | Minute Entry. In Person Proceedings held before Judge Virginia M. Hernandez Covington: Oral Argument held on 7/22/2022 re 270 MOTION for Miscellaneous Relief, specifically for Remedies against Defendants and Supporting Memorandum of Law filed by U.S. Securities and Exchange Commission. Court Reporter: Melissa Pierson (TWL) (Entered: 07/22/2022) |
| 07/28/2022 | 292 | | STIPULATION : *Corrected Stipulation Regarding July 20–21, 2022 Evidentiary Hearing* by U.S. Securities and Exchange Commission. (Attachments: # 1 Exhibit A– Chart re Bulk Sale Transfer Dates (corrected))(Nestor, Christine) (Entered: 07/28/2022) |
| 07/28/2022 | 293 | | Plaintiff's exhibit list and exhibits admitted during the 7/20/22 Evidentiary hearing. (Attachments: # 1 Exhibit P–877 part 1, # 2 Exhibit P–877 part 2, # 3 Exhibit P–877 part 3, # 4 Exhibit P–877 part 4, # 5 Exhibit P–878, # 6 Exhibit P–879, # 7 Exhibit P–880)(TWL) (Entered: 07/28/2022) |
| 07/28/2022 | 294 | | Defendants Carl E. Dilley, Micah J. Eldred, Island Capital Management, Spartan Securities Group, LTD. exhibit list and exhibits admitted during the 7/20/22 Evidentiary hearing. (Attachments: # 1 Exhibit DX 265, # 2 Exhibit DX 266)(TWL) (Entered: 07/28/2022) |
| 07/28/2022 | 295 | | RESPONSE by Carl E. Dilley, Micah J. Eldred, Island Capital Management, Spartan Securities Group, LTD. re 270 MOTION for Miscellaneous Relief, specifically for Remedies against Defendants and Supporting Memorandum of Law. *Defendants' Response to Court's inquiry regarding business expenses and post–argument supplemental authorities.* (Attachments: # 1 Attachment A)(Rollins, Kara) (Entered: 07/28/2022) |
| 07/28/2022 | 296 | | SUPPLEMENT : *Securities and Exchange Commission's Supplemental Brief and Argument in Support re 270 Motion For Remedies Against Defendants* by U.S. Securities and Exchange Commission. (Attachments: # 1 Exhibit 1 –Final Judgment as to Island Capital Management LLC, # 2 Exhibit 2 – Final Judgment as to Spartan Securities Group Ltd., # 3 Exhibit 3 – Final Judgment as to Micah J. Eldred, # 4 Exhibit 4 – Final Judgment as to Carl E. Dilley, # 5 Exhibit 5 – Revised Prejudgment Interest minus $400 as to Island Capital Management LLC, # 6 Exhibit 6 – Island Capital Management LLC –Possible Expenses Summary, # 7 Exhibit 7 – Island Capital Management LLC – Prejudgment Interest minus $21,388, # 8 Exhibit 8 – Inflation Adjustments to the Civil Monetary Penalties Administered by the SEC as of January 15, 2022)(Nestor, Christine) (Entered: 07/28/2022) |
| 08/10/2022 | 297 | | **ORDER: The Motion for Remedies filed by Plaintiff Securities and Exchange Commission (Doc. # 270) is GRANTED in part and DENIED in part as set forth herein. The Clerk is directed to enter judgments against the Defendants in accordance with this Order and thereafter CLOSE this case. Signed by Judge Virginia M. Hernandez Covington on 8/10/2022. (SGM)** (Entered: 08/10/2022) |
| 08/10/2022 | 298 | | **JUDGMENT in favor of U.S. Securities and Exchange Commission against Carl E. Dilley. Signed by Judge Virginia M. Hernandez Covington on 8/10/2022. (LNR)** (Entered: 08/10/2022) |
| 08/10/2022 | 299 | | |

| | | | |
|---|---|---|---|
| | | | **JUDGMENT in favor of U.S. Securities and Exchange Commission against Spartan Securities Group, LTD. Signed by Judge Virginia M. Hernandez Covington on 8/10/2022. (LNR)** (Entered: 08/10/2022) |
| 08/10/2022 | 300 | | **JUDGMENT in favor of U.S. Securities and Exchange Commission against Micah J. Eldred. Signed by Judge Virginia M. Hernandez Covington on 8/10/2022. (LNR)** (Entered: 08/10/2022) |
| 08/10/2022 | 301 | | **JUDGMENT in favor of U.S. Securities and Exchange Commission against Island Capital Management. Signed by Judge Virginia M. Hernandez Covington on 8/10/2022. (LNR)** (Entered: 08/10/2022) |
| 08/25/2022 | 302 | | TRANSCRIPT of Evidentiary hearing Day 1 held on 7/20/2022 before Judge Virginia Hernandez Covington. Court Reporter/Transcriber Melissa Pierson, Telephone number 813–301–5336. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 9/15/2022 Redacted Transcript Deadline set for 9/26/2022 Release of Transcript Restriction set for 11/23/2022. (Pierson, Melissa) (Entered: 08/25/2022) |
| 08/25/2022 | 303 | | TRANSCRIPT of Evidentiary hearing Day 2 held on 7/21/2022 before Judge Virginia Hernandez Covington. Court Reporter/Transcriber Melissa Pierson, Telephone number 813–301–5336. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or purchased through the Court Reporter.. Redaction Request due 9/15/2022 Redacted Transcript Deadline set for 9/26/2022 Release of Transcript Restriction set for 11/23/2022. (Pierson, Melissa) (Entered: 08/25/2022) |
| 08/25/2022 | 304 | | NOTICE to counsel of filing of OFFICIAL TRANSCRIPT. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or view the document at the clerk's office public terminal. Court Reporter: Melissa Pierson. (Pierson, Melissa) (Entered: 08/25/2022) |
| 09/16/2022 | 305 | | NOTICE OF APPEAL as to 300 Judgment, 299 Judgment, 301 Judgment, 298 Judgment by Carl E. Dilley, Micah J. Eldred, Island Capital Management, Spartan Securities Group, LTD. Filing fee not paid. (Rollins, Kara) Modified on 9/16/2022 (CTR). (Entered: 09/16/2022) |

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SECURITIES AND EXCHANGE COMMISSION,

    Plaintiff,

v.                            Case No. 8:19-cv-448-VMC-CPT

SPARTAN SECURITIES GROUP, LTD,
ISLAND CAPITAL MANAGEMENT,
CARL DILLEY, and MICAH ELDRED,

    Defendants.

_____/

### ORDER

Before the Court is the Motion for Remedies filed by Plaintiff Securities and Exchange Commission ("SEC") on April 13, 2022. (Doc. # 270). Defendants Spartan Securities Group, Ltd., Island Capital Management, Carl E. Dilley, and Micah J. Eldred (collectively, "Defendants") filed a response in opposition on May 23, 2022. (Doc. # 273). The SEC filed a reply on July 12, 2022. (Doc. # 284). The Court thereafter held an evidentiary hearing and oral argument on this matter, and it solicited supplemental materials from the parties. Following careful consideration, and for the reasons that follow, the Motion is granted in part and denied in part.

### I.  Background

Following a 12-day trial in July 2021, a jury handed down a verdict in Defendants' favor on 13 of the 14 counts brought by the SEC. (Doc. # 250). However, the jury rendered a verdict in favor

1

of the SEC as to Count Six of the complaint, finding that Spartan, Island, Dilley, and Eldred made materially misleading statements or omissions in connection with the purchase or sale of securities, in violation of Section 10(b) and Rule 10b-5(b) of the Exchange Act. (Id.). Defendants filed a renewed motion for judgment as a matter of law, which this Court denied. (Doc. # 263).

The SEC now seeks certain remedies against Defendants, including an injunction, penny stock bars, and monetary relief consisting of disgorgement and civil penalties. (Doc. # 270). Defendants have responded, and the Motion is ripe for review.

## II.   **Legal Standard**

Congress has authorized the SEC to enforce the Securities Act of 1933 and the Securities Exchange Act of 1934 and to punish securities fraud through administrative and civil proceedings. Liu v. SEC, 140 S. Ct. 1936, 1940 (2020). Once a court determines that a federal securities law violation has occurred, it has broad equitable powers to fashion appropriate remedies. SEC v. Lorin, 76 F.3d 458, 461-62 (2d Cir. 1996).

## III.  **Discussion**

### A.   **Injunctive Relief**

The Exchange Act authorizes the SEC to seek an injunction "[w]henever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter." 15 U.S.C. § 78u(d)(1).

2

"The SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." SEC v. Calvo, 378 F.3d 1211, 1216 (11th Cir. 2004).

The jury's verdict against Defendants sufficiently meets the requirement of a previous violation, leaving the issue of whether there is a "reasonable likelihood that the wrong will be repeated." The SEC bears the burden of proving that a recurrent violation is reasonably likely to occur and, in the Eleventh Circuit, the "mere fact of past violations" is insufficient to establish the propriety of an injunction. SEC v. Yun, 148 F. Supp. 2d 1287, 1293 (M.D. Fla. 2001) (citing SEC v. Blatt, 583 F.2d 1325, 1334 (5th Cir. 1978)). In determining whether to grant injunctive relief, factors to consider are: "[1] [the] egregiousness of the defendant's actions, [2] the isolated or recurrent nature of the infraction, [3] the degree of scienter involved, [4] the sincerity of the defendant's assurances against future violations, [5] the defendant's recognition of the wrongful nature of the conduct, and [6] the likelihood that the defendant's occupation will present opportunities for future violations." Calvo, 378 F.3d at 1216.

The SEC seeks permanent injunctive relief against all four Defendants. Defendants claim that, under the Calvo factors, an injunction is not warranted in this case. (Doc. # 273 at 3–8). The

Court must first, then, determine whether an injunction is appropriate.

First, as to the egregiousness of Defendant's actions, the SEC presented evidence at trial that Defendants submitted Form 211s to FINRA for multiple issuers containing information that Defendants knew or reasonably should have known was false, made materially false statements or omissions in connection with clearance from the Depository Trust Company, and/or processed bulk transfers in instances where shares were restricted or their actions were otherwise improper. In short, the Court agrees with the SEC that, taking the evidence in the light most favorable to the jury's verdict, the evidence demonstrated that Defendants abused their "gatekeeper" role by enabling the purchase and sale of securities on the public market that should have been barred or more carefully vetted by FINRA. This factor leans in favor of an injunction.

Second, as to the isolated or recurrent nature of the infraction, the SEC calls the Defendants' conduct "far-reaching," arguing that for more than five years, they played "critical roles in bringing at least 19 separate blank check companies public under false pretenses." Defendants argue that the SEC only presented evidence of 19 problematic securities offerings, out of the over 1,200-1,500 Form 211 applications Defendants filed , or about 1% of the applications filed during the relevant time. The Court

believes both parties make valid points, and this factor is neutral.

Third, as to the degree of scienter involved, based on the jury's verdict, Defendants had to make the material misrepresentations or omissions at issue with at least severe recklessness. Scienter weighs in favor of an injunction.

Fourth, as to the sincerity of Defendant's assurances against future violations and Defendants' recognition of the wrongful nature of their conduct, Defendants have not expressed any remorse for their actions. But they rightly point out that their right to defend themselves should not be held against them. While the Court respects Defendants' right to raise a vigorous defense, the fact remains that neither individual Defendant has provided the Court with specific assurances against future violations, has not admitted any wrongful conduct, and has not shown any remorse. This factor weighs in favor of an injunction.

Finally, the Court turns to the likelihood that Defendants' occupation(s) will present opportunities for future violations. The parties presented evidence on this point at the hearing. Mr. Eldred, who is 54 years old, testified that he is no longer registered as a securities broker with the SEC or FINRA. He voluntarily withdrew his licenses with the regulators in 2019. Mr. Eldred explained that FINRA requires brokers to have a "sponsoring organization," so that to reactivate his FINRA license, he would

need to first find an organization willing to sponsor him and then FINRA would need to re-grant his licensure. He believes that, based on his convictions in this case, the likelihood of this happening is very slim.

Currently, Mr. Eldred is the CEO and on the Board of Directors of Endurance Exploration Group, a shipwreck recovery and salvage company. He does not draw a salary from Endurance, although he could receive dividends or shares of the company's profits, should the company do well. Mr. Eldred also works as a non-lawyer partner in a small law firm, in which he provides business development services and "expertise," including securities expertise, to the firm's clients.

Mr. Eldred also elaborated on the current status of Spartan and Island. Island went out of business in 2020 and is not currently operating. He explained that it shut down due to this litigation – clients left, and the firm became unprofitable. Island is no longer registered with the relevant regulators and, to resume operations, it would have to re-register with the SEC and the DTC. Mr. Eldred testified that, upon closing, Island sold its book of business and Eldred has drawn continuing payments from that sale – he received approximately $100,000 in the past year, and there are three years left on the sales agreement.

Spartan is also no longer in operation. Mr. Eldred explained that, in June 2019, Spartan lost more than $15 million in one day

due to the actions of a rogue employee. Spartan initiated a FINRA arbitration action against the employee and received a $5.4 million judgment in its favor. However, under an agreement they made with another firm who paid their legal expenses, if the employee were to ever pay the judgment, the firm would be reimbursed first. The employee has thus far not paid any amount of the judgment, and Mr. Eldred does not believe he has the means to do so.

Pursuant to SEC regulations, Spartan was required to wind down and cannot operate because of its negative resources. Thus, to restart operations, Spartan would need to recover all of its lost capital and also receive regulatory approval from the SEC and FINRA. Mr. Eldred stated that he does not believe FINRA would allow Spartan to re-register. Mr. Eldred explained that, although he personally had no prior disciplinary history with securities regulators, FINRA had filed 10 actions against Spartan over the years, fining them close to $400,000. The Court finds Mr. Eldred's testimony credible with respect to Spartan and Island.

Mr. Dilley, who is 67 years old, concurred with Mr. Eldred's statements about what would be required for Island, Spartan, or himself as an individual broker to re-enter the securities business. Given these hurdles, he similarly believes it highly unlikely that Island or Spartan could resume operations. Mr. Dilley voluntarily gave up his securities licenses in 2014. Mr. Dilley retired from Island in January 2018 but remained a consultant for

7

the company. Mr. Dilley is also involved with Endurance, the shipwreck salvage company, as the COO and a member of the Board of Directors. He receives *de minimus* amounts for overseeing that company's accounting, but, like Mr. Eldred, could plausibly receive profit sharing or dividends from the company. Mr. Dilley receives income from Social Security, a Canadian pension, work from his repair shop, and "limited securities consulting." He also has a real estate license but testified that he has not yet earned any money in the real estate business. He is also the owner or part-owner of certain companies that do not generate much, if any, income.

1. Injunction against Spartan

The Court is persuaded that the economic, logistical, and regulatory impediments to Spartan resuming operations make it unlikely that it will ever re-enter the securities business. The Court is mindful that "[t]he purpose of injunctive relief is, after all, not to punish but to deter future violations." SEC v. Advance Growth Capital, Corp., 470 F.2d 40, 54 (7th Cir. 1972). The SEC argues that Spartan could plausibly resurrect operations in the securities realm, but the standard the SEC must show is a "*reasonable* likelihood that the wrong will be repeated." Calvo, 378 F.3d at 1216 (emphasis added). They have not met that standard here, and the Court will not issue an injunction against Spartan because that entity is basically defunct with little to no chance

of ever resuming operations. See SEC v. Scott, 565 F. Supp. 1513, 1537 (S.D.N.Y. 1983) (refusing to grant injunctive relief where, based on the record, the court was "unable to find a reasonable likelihood that, absent an injunction, [the defendant] would be likely to commit future violations of the securities laws"); see also SEC v. Blockvest, LLC, No. 18CV2287-GPB(BLM), 2018 WL 6181408, at *8 (S.D. Cal. Nov. 27, 2018), on reconsideration, No. 18CV2287-GPB(BLM), 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) (refusing to grant preliminary injunction where defendant agreed to stop his challenged actions and thus, SEC had not demonstrated a reasonable likelihood that the wrong will be repeated). Finally, the Court also notes that Spartan will be subject to a penny stock bar, as explained further below, which is appropriate because its business (and the misconduct at issue here) centered on penny stocks.

2. Injunction against Island

Testimony from the evidentiary hearing showed that Island, like Spartan, is no longer operational. However, there are two important differences between the companies. First, while Island may be de-registered with regulators, it does not face the same capitalization concerns that Spartan does if it wished to resume operations. Second, as a transfer agent, the SEC is not seeking a penny stock bar against Island, a measure that the Court believes to be adequate with respect to Spartan. For these reasons, the Court will issue an injunction against Island. Furthermore, as a

corporate defendant, the Court need not consider impacts upon livelihood or credibility like it does with individual defendants. The Court sees no reason why the injunctive relief granted here cannot be permanent. Furthermore, the Court finds the SEC's proposed injunctive language, as revised, is sufficiently specific, and the Court adopts it here:

> IT IS ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) promulgated thereunder [17 C.F.R. § 240.10b-5(b)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:
>
> to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, regarding:
>
> i.   whether an issuer is a shell or blank check company; or
> ii.  information submitted to the Depository Trust Company ("DTC") or its participants when seeking DTC eligibility for an issuer; or
> iii. the designation of securities as free trading; or
> iv.  the issuance and transfer of securities, including by means of stock certificates without restrictive legends.

(Doc. # 296-1).

3. Injunctions against Mr. Dilley and Mr. Eldred

The Court will issue injunctions against Mr. Dilley and Mr. Eldred. Looking at the totality of the facts and circumstances, including the fact that both individuals still have at least

tangential contacts with the securities industry (Mr. Dilley with his "limited securities consulting" and Mr. Eldred in his advisory role at the law firm), there is a reasonable likelihood that the wrong could be repeated. Both men have been involved with the securities industry for most of their lives. Both are involved or have been involved in multiple businesses and are likely still well connected in the industry. Furthermore, while the Court does not penalize them for defending this case, neither man has given adequate assurances against future misconduct, beyond (credible) doubts regarding their ability to re-enter the industry. See, e.g., SEC v. Selden, 632 F. Supp. 2d 91, 99 (D. Mass. 2009) (imposing injunction where defendant worked at a non-public company, but "should it become [a public company], Selden would once again assume the ultimate responsibility of ensuring the accuracy of the company's public statements. His abuse of such authority in the past and his refusal to accept full responsibility in this case . . . demonstrates, at the very least, a lack of adequate assurance against future misconduct.").

Here, both Mr. Dilley and Mr. Eldred are serial entrepreneurs with years of experience offering services whereby private companies can access the public markets. The Court believes there to be a reasonable likelihood that both men could attempt to leverage their knowledge of the securities business and the penny stock market and possibly repeat the wrongs for which they were

convicted. See SEC v. Miller, 744 F. Supp. 2d 1325, 1341-42 (N.D. Ga. 2010) (holding that defendant's "background as an entrepreneur and his proven ability to start a private company and take it public weighs in favor of an injunction").

However, while the SEC seeks permanent lifetime injunctions against Mr. Dilley and Mr. Eldred, the Court is not persuaded that such a drastic remedy is necessary. These violations occurred many years ago and both men have voluntarily withdrawn their securities licenses. They are also advancing in age, being 54 and 67 years old. Thus, after careful consideration, the Court believes a five-year injunction to be appropriate against Mr. Dilley and Mr. Eldred. See Miller, 744 F. Supp. 2d at 1348 (imposing a five-year bar); Selden, 632 F. Supp. 2d at 99 (imposing a two-year bar)

Having determined that a five-year injunction is appropriate, the Court must fashion relief that is fair and legal. The SEC seeks an injunction against Mr. Dilley and Mr. Eldred that states as follows:

> IT IS ORDERED, ADJUDGED, AND DECREED that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) promulgated thereunder [17 C.F.R. § 240.10b-5(b)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:
>
> to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make

12

the statements made, in the light of the circumstances under which they were made, not misleading, regarding:

    i.   initiating a quoted market in an issuer's security; or

    ii.  the listing and trading of an issuer's stock; or

    iii. applications or submissions pursuant to Exchange Act Rule 15c2-11; or

    iv.  whether an issuer is a shell or blank check company; or

    v.   the identity of any consultants or persons in control of an issuer; or

    vi.  the relationships or affiliations among an issuer's shareholders and those in control of the issuer; or

    vii. an issuer's plans for potential mergers or acquisitions; or

    viii. an issuer's business purpose; or

    ix.  the nature and conduct of due diligence of an issuer; or

    x.   the identity of the person or entity for whom a security's quotation is being submitted, when seeking to initiate or resume quotations of an issuer's security; or

    xi.  whether material information, including adverse material information, exists regarding an issuer; or

    xii. information submitted to the Depository Trust Company ("DTC") or its participants when seeking DTC eligibility for an issuer; or

    xiii. information submitted to Financial Industry Regulatory Authority ("FINRA" when seeking to initiate or resume quotations of an issuer's security; or

    xiv. the designation of securities as free trading; or

    xv.  the issuance and transfer of securities, including by means of stock certificates without restrictive legends.

(Doc. ## 296-3, 296-4).

    Defendants argue that injunctive relief is inappropriate because the SEC seeks "obey the law" injunctions, which are not

permitted in this Circuit.[1] Another court within the Middle District of Florida has explained why "obey the law" injunctions are problematic:

> Articulating the standard of specificity that every injunction must satisfy, Rule 65(d), Federal Rules of Civil Procedure, states that "[e]very order granting an injunction . . . must: state the reasons why it issued; state its terms specifically; and describe in reasonable detail — and not by referring to the complaint or other document — the act or acts sought to be restrained or required[.]" The specificity requirement "prevent[s] uncertainty and confusion on the part of those faced with injunctive orders and . . . avoid[s] the possible founding of a contempt citation on a decree too vague to be understood." Schmidt v. Lessard, 414 U.S. 473, 476 (1974) (finding that because "an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."). Thus, every injunction must contain "an operative command capable of 'enforcement.'" "A person enjoined by court order should only be required to look within the four corners of the injunction to determine what he must do or refrain from doing." Accordingly, "appellate courts will not countenance injunctions that merely require someone to 'obey the law.'"

SEC v. Sky Way Glob., LLC, 710 F. Supp. 2d 1274, 1277-78 (M.D. Fla. 2010) (citations omitted or altered); see also SEC v. Smyth, 420 F.3d 1225, 1233 (11th Cir. 2005) (finding that proposed injunctions that tracked the provisions of the statute or regulation was a "quintessential 'obey-the-law' injunction").

---

[1] At oral argument, the Court indicated that it agreed with Defendants that the SEC's first set of proposed injunctions was inadequate. While the Defendants have not proffered this argument against the SEC's revised injunctive language, the Court will still discuss it.

The Court believes that the additional, revised language proposed by the SEC takes the proposed injunctive language outside the realm of an "obey the law" injunction because it describes specific conduct that is prohibited. Certain of the language, however, remains too broad or vague. For example, the prohibition on making any misrepresentation pertaining to "the listing and trading of an issuer's stock" is very broad and not directly linked to the misconduct at issue in this case. For this reason, the Court has adopted only those prohibitions on conduct that are sufficiently specific and tied to the misconduct at issue in this case.

Accordingly, the Court will enter injunctions against Mr. Dilley and Mr. Eldred as follows:

> IT IS ORDERED, ADJUDGED, AND DECREED that Defendant is restrained and enjoined, for a period of five years from the date of this judgment, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) promulgated thereunder [17 C.F.R. § 240.10b-5(b)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:
>
> to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, regarding:
>
> > i.     initiating a quoted market in an issuer's security; or
> > ii.    applications or submissions pursuant to Exchange Act Rule 15c2-11; or
> > iii.   whether an issuer is a shell or blank check company; or

    iv.    the identity of any consultants or persons in control of an issuer; or

    v.    an issuer's plans for potential mergers or acquisitions; or

    vi.    the identity of the person or entity for whom a security's quotation is being submitted, when seeking to initiate or resume quotations of an issuer's security; or

    vii.    information submitted to the Depository Trust Company ("DTC") or its participants when seeking DTC eligibility for an issuer; or

    viii.    information submitted to Financial Industry Regulatory Authority ("FINRA") when seeking to initiate or resume quotations of an issuer's security.

## B.   **Penny Stock Bar**

Courts may enter a penny stock bar "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock[.]" 15 U.S.C. § 77t(g)(1); 15 U.S.C. § 78u(d)(6)(A). A "penny stock" generally includes an equity security bearing a price of less than five dollars. See SEC v. E-Smart Techs., Inc., 139 F. Supp. 3d 170, 182 (D.D.C. 2015). The Court may enter a penny stock bar "permanently or for such period of time as the court shall determine." 15 U.S.C. §§ 77t(g)(1), 78u(d)(6). Defendants do not dispute that the underlying scheme involved penny stocks. Nor do they dispute that they participated in an "offering of penny stock," which broadly encompasses "engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting

16

to induce the purchase or sale of, any penny stock." 15 U.S.C §§ 77t(g), 78u(d)(6).

The only question, then, is whether such a bar is warranted. In deciding whether to impose a penny stock bar, "the court examines the nature of the defendant's conduct and the likelihood that his occupation and experience will present further opportunities to violate the securities laws." SEC v. BIH Corp., No. 2:10-cv-577-JES-DNF, 2014 WL 7499053, * 6 (M.D. Fla. Dec. 12, 2014) (citation omitted).

Here, a penny stock bar against Mr. Dilley and Mr. Eldred is warranted. The jury convicted them of securities fraud in connection with the offering of penny stocks. There was testimony at the evidentiary hearing that the vast majority of businesses with which Mr. Eldred and Mr. Dilley involved themselves were penny stocks. In other words, a penny stock bar would prohibit Mr. Dilley and Mr. Eldred from engaging in precisely the sort of misconduct that led to their instant convictions. Both men protest that such a bar would have ramifications on innocent investors in Endurance, the shipwreck salvage company with which they are both involved. But the Court finds that the need to protect the investing public as a whole outweighs the speculative possibility that 400 investors within one company could suffer future harm.

The SEC requests a lifetime ban, but the statute permits the Court to fashion a penny stock bar "for such period of time as the

17

court shall determine." 15 U.S.C. §§ 77t(g)(1), 78u(d)(6). Given the age of Mr. Dilley and Mr. Eldred, the Court determines that a 10-year penny stock bar is appropriate in this case. In declining to impose a lifetime bar, the Court is mindful of the guidance offered by the Fifth Circuit: "[W]hen the [SEC] chooses to order the most drastic remedies at its disposal, it has a greater burden to show with particularity the facts and policies that support those sanctions and why less severe action would not serve to protect investors." Steadman v. SEC, 603 F.2d 1126, 1137 (5th Cir. 1979).[2] The SEC has not explained why a lifetime bar is more appropriate than a lesser sanction. Given the Commission's failure to do so here, the Court will not impose the most drastic remedy, deciding that a temporally limited bar is sufficient on these facts.

The SEC also seeks a permanent penny stock bar against Spartan. Considering that Spartan dealt in penny stocks, the Court is persuaded that a permanent ban with respect to penny stocks is in order for Spartan.

C.    **Disgorgement**

The SEC originally sought disgorgement from Island in the amount of $147,508. (Doc. # 270 at 2). As the SEC explains it,

---

[2] Decisions of the Fifth Circuit rendered prior to October 1, 1981, are binding upon courts in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Island collected fees from 14 identified issuers as part of the scheme, and the Commission seeks to recover these "ill-gotten gains."

Currently, federal law provides for disgorgement in this way:

> (5) Equitable relief
> In any action or proceeding brought or instituted by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of investors.
>
> . . .
>
> (7) Disgorgement
> In any action or proceeding brought by the Commission under any provision of the securities laws, the Commission may seek, and any Federal court may order, disgorgement.

15 U.S.C. §§ 78u(d)(5), 78u(d)(7).

The first question this Court must address is whether it may order disgorgement at all. The key case in this area is the recent Supreme Court case of Liu v. SEC, 140 S. Ct. 1936 (2020). In that case, the Supreme Court held that the SEC could seek disgorgement through its power to award "equitable relief" under 15 U.S.C. § 78u(d)(5) so long as the award did not exceed the wrongdoer's net profits and was "awarded for victims." Id. at 1940. The Court wrote that while disgorgement was at heart an equitable remedy so long as it sought to restore ill-gotten gains from the wrongdoer to his victims, the SEC had been pushing the bounds of the equitable nature of the remedy in three ways: (1) "by ordering the proceeds

of fraud to be deposited in Treasury funds instead of dispersing them to victims"; (2) "imposing joint and several disgorgement liability"; and (3) "declining to deduct even legitimate expenses from the receipts of fraud." Id. at 1946.

As to the first problem, which centers on the importance of returning ill-gotten gains to defrauded victims, the Supreme Court stressed that "the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains. To hold otherwise would render meaningless" the statute's language about the relief being "appropriate or necessary for the benefit of investors." Id. at 1948. This language "must mean something more than depriving a wrongdoer of his net profits alone, else the Court would violate the cardinal principle of interpretation that courts must give effect, if possible, to every clause and word of a statute." Id. (quotation marks and citation omitted).

Importantly for this case, the Supreme Court specifically declined to address the question of whether, when it is impossible to identify defrauded victims, disgorged funds deposited into the Treasury could comply with the requirements of the statute, writing that:

> The Government additionally suggests that the SEC's
> practice of depositing disgorgement funds with the
> Treasury may be justified where it is infeasible to
> distribute the collected funds to investors. It is an
> open question whether, and to what extent, that practice

nevertheless satisfies the SEC's obligation to award relief "for the benefit of investors" and is consistent with the limitations of § 78u(d)(5). The parties have not identified authorities revealing what traditional equitable principles govern when, for instance, the wrongdoer's profits cannot practically be disbursed to the victims. But we need not address the issue here. The parties do not identify a specific order in this case directing any proceeds to the Treasury. If one is entered on remand, the lower courts may evaluate in the first instance whether that order would indeed be for the benefit of investors as required by § 78u(d)(5) and consistent with equitable principles.

Id. at 1948-49.

After Liu, Congress amended the securities remedies statute as part of the National Defense Authorization Act of 2021 ("NDAA"). Specifically, the NDAA added subsection (7) above to expressly permit courts to "[i]n any action or proceeding brought by the Commission under any provision of the securities laws, [] order [] disgorgement." 15 U.S.C. § 78u(d)(7). The NDAA also amended subsection (d)(3) to make it explicit that district courts have the power to impose both civil penalties and to "require disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of such violation." Id. § 78u(d)(3). Thus, Sections 78u(d)(3) and (7), as added by the NDAA, do not contain the "for the benefit of investors" language that is still included in Section 78u(d)(5). The NDAA applies to "any action or proceeding that is pending on" January 1, 2021. NDAA, Section 6501(b). This action was pending on that date.

With this background in mind, the Court turns to the parties' arguments. The SEC concedes that "distribution of the disgorged funds to harmed investors is not feasible or practical in this case" and that while Defendants' conduct harmed the capital markets at large, "identifying specific investors who were harmed or the amount by which any particular investor was harmed is not possible." (Doc. # 270 at 14). The SEC's position is that "the only alternative that is consistent with equitable principles is to send the disgorged funds to the Treasury." (Id.). The parties have stipulated that a distribution to investors of the disgorgement amount requested would be infeasible. (Doc. # 287).

The SEC argues that the recent amendments under the NDAA "provide[] the courts with greater flexibility to determine where collected disgorged funds may be distributed, because the provision omits the phrase 'for the benefit of investors.'" (Doc. # 270 at 14 n.29). The Court takes the SEC's position to be that because the newly added provisions of the NDAA are silent on the question of whether funds must be returned to investors – i.e., because subsections (d)(3) and (7) do not contain the "for the benefit of investors" language that is included in subsection (d)(5) – the SEC need not show that disgorgement is for "the benefit of investors" and, thus, disgorgement to the Treasury is appropriate.

Again, the NDAA applies to the instant action because it was pending on January 1, 2021. NDAA, Section 6501(b). Thus, 15 U.S.C. § 78u(d)(7) explicitly provides this Court the ability to order disgorgement and does not require that such disgorgement be "for the benefit of investors." The Court holds that it may order disgorgement and direct that disgorged funds be sent to the Treasury under Section 78u(d)(7).

Alternatively, the Court holds that, even if it is (post-NDAA) still required to balance the equities under Liu, the equities here weigh in favor of disgorgement to the Treasury, rather than allowing Island to retain the money. Both parties, acknowledging that this case squarely presents the "open question" in Liu, have attempted to identify which traditional equitable principles should govern here. The SEC identifies two such principles. First, it argues that distribution to the Treasury serves the foundational principle that no person should benefit from his own wrongs and that, between Island and the Treasury, it is more equitable for the money to go to Treasury. (Doc. # 270 at 14). Second, it points to the legal doctrine of *cy pres*, arguing that where identifying victims is not feasible, the money should go to the nearest possible alternative. (Id. at 15). And Defendants also identify certain equitable principles: (1) that disgorgement here is inherently a penalty on Island and that equity never "lends its aid" to enforce a penalty; and (2) that the issuers who paid

the claimed money into Island were themselves fraudsters and the
doctrine of unclean hands bars repayment of these funds.   (Doc. #
273 at 11-12).

The Eleventh Circuit has yet to issue any guidance on this
topic. The Court's independent research demonstrates that multiple
district courts have, post-Liu, allowed disgorgement awards to be
directed toward the Treasury. See SEC v. Bronson, No. 12-CV-6421
(KMK), 2022 WL 1287937, at *14 (S.D.N.Y. Apr. 29, 2022) (denying
petitioner's challenge to disgorgement award in Rule 60 motion
where the final judgment did not identify any identifiable harmed
investors to whom the disgorged profits should be returned,
concluding that the disgorgement award was consistent with Liu);
SEC v. Almagarby, No. 17-62255-CIV-COOKE/HUNT, 2021 WL 4461831, at
*3 (S.D.N.Y. Aug. 16, 2021) (rejecting defendants' argument that
disgorgement should be denied because the SEC had not identified
any victims and there was no proximate causation between the
defendants' securities law violation (failing to register as a
dealer) and any losses from investors, writing that Supreme Court
precedent does not require the SEC to "identify specific victims
to whom a disgorgement award shall be distributed, or that all
disgorged funds must be returned to investors, or that a
disgorgement award should be limited to those funds that could be
returned to investors"); SEC v. Laura, No. 18-CV-5075 (NGG)(VMS),
2020 WL 8772252, at *5 (E.D.N.Y. Dec. 30, 2020) (reasoning that

24

Liu "does not require that a disgorgement award reflect every individually wronged investor's private agreements. If it did, a court would need to conduct a mini-trial as to each investor before it could order disgorgement. There is no reason to believe that Liu, which confirmed the breadth of the SEC's power to seek equitable awards, also stealthily erected such a substantial barrier to SEC recovery").

In sum, a balancing of the equities favors ordering disgorgement and allowing it to be sent to the Treasury. Between the money staying with Island, a key player in a scheme to put dubious equities on the market, or a fund at the Treasury, it is more equitable to order disgorgement.

Having determined that disgorgement is appropriate in this case, the Court must next calculate the amount of the disgorgement. The parties dispute the applicable statute of limitations. Once again, the NDAA comes into play here. The previous statute of limitations for disgorgement was five years. But in the NDAA, Congress mandated that the SEC may bring a disgorgement action under the newly added subparagraph (7) within 10 years of the latest violation of the securities laws for which scienter must be established, including section 10(b). 15 U.S.C. § 78u(d)(8)(A).

Defendants argue that the SEC did not amend its complaint to plead relief under the NDAA and, thus, it is more equitable for the five-year statute of limitations (in effect when the SEC first

filed this action) to apply. Moreover, Defendants call the NDAA's retroactivity provision constitutionally "dubious" because it violates the ex post facto clause and violates Island's due process rights. These arguments are unconvincing. This case was currently pending as of January 1, 2021, and thus the NDAA applies to it. One court has applied the NDAA even to cases where a judgment was entered under the old five-year statute of limitations but was still "pending" because the Second Circuit had not yet ruled on the parties' appeal. See SEC v. Ahmed, No. 3:15CV675 (JBA), 2021 WL 2471526, at *4 (D. Conn. June 16, 2021) (citing Landgraf v. USI Film Prod., 511 U.S. 244, 273-74 (1994) ("[A] court should apply the law in effect at the time it renders its decision, even though that law was enacted after the events that gave rise to the suit.")). What's more, Defendants fail to cite any authority in support of its due process and ex post facto arguments. Cf. SEC v. Gallison, No. 15 CIV. 5456 (GBD), 2022 WL 604258 (S.D.N.Y. Mar. 1, 2022) (holding that ex post facto clause did not preclude application of the NDAA's extended statute of limitations to disgorgement claims). Accordingly, the Court will apply a 10-year statute of limitations to the disgorgement award. As explained at the evidentiary hearing, taking into account certain tolling agreements, this allows the SEC to recover fees going back to 2008.

The SEC is entitled to disgorgement upon producing "a reasonable approximation" of a defendant's ill-gotten gains.

Calvo, 378 F.3 at 1217. "Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." Id. (citation and quotation marks omitted). Once the SEC has met its burden, the burden then shifts to the defendants to demonstrate that the SEC's estimate is not a reasonable approximation. Id. A defendant's current financial situation, or any hardship that disgorgement would impose, are not factors to be considered in determining disgorgement. SEC v. Warren, 534 F.3d 1368, 1370 (11th Cir. 2008). Both parties seem to agree that the "reasonable approximation" standard has survived Liu. See SEC v. Tayeh, 848 F. App'x 827, 828 (11th Cir. 2021) (unpublished) ("Disgorgement is an equitable remedy intended to prevent unjust enrichment from ill-gotten gains and must not be used punitively. The CFTC has the burden to produce a reasonable approximation of a defendant's ill-gotten gains to sustain a disgorgement amount." (citation omitted)); SEC v. Camarco, No. 19-1486, 2021 WL 5985058, at *15-16 (10th Cir. Dec. 16, 2021) (noting multiple courts across the country that continue to abide by the reasonable approximation standard).

The SEC here has compiled the amounts that Island received in fees from each of the 14 Mirman/Rose companies from the applicable statute of limitations date through the date of the issuer's bulk sale. In support, the SEC attached a declaration from Mark Dee, an

accountant with the SEC. He reviewed certain Island statements showing fees invoiced and paid by these 14 issuers. Dee then calculated a summary of the total fees paid by the issuers to Island during the relevant time frames. Dee's calculation shows the total fees collected as follows:

(1) Topaz Resources, Inc. f/k/a Kids Germ Defense Corp: $11,800
(2) MyGo Games Holding Co. f/k/a Obscene Jeans Corp.: $18,923
(3) On the Move Systems Corp.: $11,875
(4) Rainbow Coral Corp.: $13,975
(5) Angiosoma f/k/a First Titan: $8,375
(6) Neutra Corp.: $8,175
(7) Aristocrat Group Corp.: $11,208
(8) Rebel Group Inc. f/k/a Inception Technology Group Inc. f/k/a Moxian Group Holdings Inc. f/k/a First Social Networx: $10,674
(9) Global Group Enterprises Corp.: $9,779
(10) E-Waste Corp.: $9,474
(11) Codesmart Holdings Inc. f/k/a First Independence Corp.: $8,178
(12) Envoy Group: $7,500
(13) Changing Technologies Inc.: $9,400
(14) First Xeris Corp.: $8,172

**TOTAL:   $147,508**

See (Doc. # 270-1, Ex. 2).

The analysis is not yet complete because, under Liu, courts must deduct legitimate business expenses when fashioning disgorgement awards. See Liu, 140 S. Ct. at 1950 (explaining that "courts must deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)" because "[a] rule to the contrary that makes no allowance for the cost and expense of conducting a business would be inconsistent with the ordinary principles and

practice of courts of chancery" (internal alterations and quotation marks omitted)).

Following the evidentiary hearing, both parties submitted documents identifying legitimate expenses incurred by Island prior to the bulk sale date for each company. The SEC tacitly agreed to most of these expenses, and to the extent it continues to argue that such expenses should not be deducted, that position is both unfair and inconsistent with Liu. The expenses identified by the parties include fees that Island paid to third parties for courier services, printing, and regulatory fees. The Court agrees that these expenses are appropriate to deduct, and they are supported by the statements provided by the SEC.

Defendants argue for further reductions, pointing out that the fees paid into Island do not account for the business's fixed costs and overhead. That may well be, but the only evidence that Island set forth in support of this argument were Island's audited annual financial statements for 2013 and 2014, along with the testimony of Mr. Eldred that Island's profit margins were typically between 10 and 25%. But this is insufficient to show that the SEC's estimate is not a reasonable approximation and, moreover, any risk of uncertainty necessarily falls on Island. See Calvo, 378 F.3 at 1217 (explaining that "[e]xactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of

29

uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty").

Accordingly, listed below are the total fees paid by each of the 14 issuers to Island up to the stipulated bulk sale dates; the legitimate business expenses incurred by Island prior to the bulk sale date; and the net fees for that account (that is, fees paid to Island less business expenses).

| Issuer | Fees Paid In | Expenses | Fees - Expenses |
|---|---|---|---|
| Angiosoma f/k/a First Titan | 8375 | 75 | 8,300 |
| Aristocrat Group Corp. | 11008[3] | 1136 | 9,872 |
| Changing Technologies | 9400 | 925 | 8,475 |
| E-Waste Corp. | 9474 | 274 | 9,200 |
| Global Group Enterprises | 9579[4] | 229 | 9,350 |
| MYGO Games f/k/a Obscene Jeans | 18923 | 8500 | 10,423 |
| On the Move Systems | 11675[5] | 3575 | 8,100 |
| Neutra Corp. | 8175 | 75 | 8,100 |
| Rainbow Coral Corp. | 13975 | 5075 | 8,900 |
| Topaz Resources f/k/a Kids Germ Defense Corp. | 11800 | 3500[6] | 8,300 |

[3] The Court excluded one $200 payment made after the bulk sale date.

[4] The Court excluded one $200 payment made after the bulk sale date.

[5] The Court excluded one $200 payment made after the bulk sale date.

[6] The SEC disputes whether this expense, marked on the statement as a $3,500 payment to the DTC (Depository Trust Company), should be included. While it is true that this was invoiced on April 6, 2010 (before the bulk sale date), and the next payment made was not until June 2010 (after the bulk sale date), as SEC witness

| | | | |
|---|---|---|---|
| Codesmart f/k/a First Independence Corp. | 8178 | 278 | 7,900 |
| Rebel Group f/k/a First Social Networx Corp. | 10674 | 974 | 9,700 |
| Envoy Group[7] | | | N/A |
| First Xeris Group[8] | 8172 | 272 | 7,900 |
| **TOTALS** | **$139,408** | **$24,888** | **$114,520** |

Accordingly, Island will be ordered to disgorge $114,520.00.

D.   **Prejudgment Interest**

The SEC also seeks prejudgment interest on any disgorged amount, specifically, it seeks the IRS underpayment rate (what it would have cost to borrow money from the government). Courts in this Circuit regularly apply this rate in calculating prejudgment interest on disgorgement awards. See SEC v. Lauer, 478 F. App'x 550, 557-58 (11th Cir. 2012) (noting the widespread use of the IRS underpayment rate and holding that the district court did not abuse

---

Mark Dee testified, Topaz Resources had an odd payment history. It began with a $1,500 payment, prior to any invoice, and the issuer then made a $10,000 payment on February 23, 2010, even though there was only a $6,500 balance. The Court believes, on the whole, this DTC cost was in furtherance of setting up the issuer's account and is appropriately deducted as a legitimate business expense.

[7] The Court agrees with Defendants that because the SEC submitted only an invoice, not a statement, in support of the Envoy Group issuer, there is insufficient evidence to support a fee payment for Envoy Group.

[8] No bulk sale date.

its discretion in applying this "commonly used" rate). Because awards of prejudgment interest are compensatory, not punitive, the district court should make the interest decision through an "assessment of the equities." Id.

Defendants note that over $21,000 of the $51,000 requested in interest has accrued since the complaint was filed and they argue that the award would therefore unfairly penalize Island for exercising its right to defend itself. Defendants do not point to any case law in support of this proposition, and the Court does not find Defendants' argument persuasive.

Rather, the Court utilized the same framework employed by the SEC in calculating prejudgment interest – using the IRS underpayment rate, with interest compounded quarterly, and running from July 1, 2014 until February 28, 2022. But the Court utilized the disgorgement value calculated above: $114,520. The Court calculates that $39,874.05 is due in prejudgment interest. Thus, in total, Island owes $154,394.05. Regardless of the precise mathematical calculation, the Court believes this to be a fair and appropriate amount of disgorgement principal and interest.

### E.   Civil Penalties

Federal securities law authorizes a court to impose civil penalties for violation of the federal securities laws and provides three "tiers" of penalties in escalating amounts.

(1)  First tier

32

For each violation, the amount of the penalty shall not exceed the greater of (i) $5,000 for a natural person or $50,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.

(2)   Second tier
The amount of penalty for each such violation shall not exceed the greater of (i) $50,000 for a natural person or $250,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.

(3)   Third tier
The amount of penalty for each such violation shall not exceed the greater of (i) $100,000 for a natural person or $500,000 for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.

15 U.S.C. §§ 77t(d), 78u(d)(3).

These amounts are occasionally adjusted for inflation. Thus, for the relevant period, Tier One penalties are $7,500/$80,000, Tier Two penalties are $80,000/$400,000, and Tier Three penalties are $160,000/$775,000. See (Doc. # 296-8).

The Court can determine the applicability of each tier only "upon a proper showing" by the SEC. For a Tier Two penalty, the Court must find that the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 78u(d)(3). For a Tier Three penalty, the Court must find that the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" **and** that the violation "directly or indirectly

33

resulted in substantial losses or created a significant risk of substantial losses to other persons." (Id.).

The amount of the civil penalty is determined by the district court judge "in light of the facts and circumstances" and is subject to the statutory maximums prescribed above.  In evaluating the facts and circumstances of the case, the Court looks to factors such as: (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing, (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons, (6) defendants' lack of cooperation and honesty with authorities, if any, and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition. SEC v. Aerokinetic Energy Corp., No. 08-CV-1409, 2010 WL 5174509, at *5 (M.D. Fla. Dec. 15, 2010).

The SEC here argues for Third Tier penalties, arguing that at trial they presented evidence that (1) Defendants' violations involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and (2) the violations created a significant risk of substantial losses. The Court agrees only in part.

First, the Court agrees with the SEC that Defendants' violations here involved fraud, deceit, manipulation, or

deliberate or reckless disregard of a regulatory requirement, which is sufficient to support Tier Two penalties. The jury here convicted Defendants of violating Section 10(b) and Rule 10b-5 of the Exchange Act, which requires that a material misrepresentation or omission be made with scienter. See FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1295 (11th Cir. 2011) (explaining that the elements of a claim under Section 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission; (2) made with scienter; (3) a connection with the purchase or sale of a security; (4) reliance on the misstatement or omission; (5) economic loss [i.e., damages]; and (6) a causal connection between the material misrepresentation or omission and the loss").

The Supreme Court has defined the level of scienter necessary to support a securities fraud claim as a "mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). In order to adequately plead scienter in the Eleventh Circuit, a plaintiff must allege facts creating a "strong inference" that the defendant acted purposefully or with "severe recklessness." Thompson v. RelationServe Media, Inc., 610 F.3d 628, 634 (11th Cir. 2010). Because the jury necessarily found that Defendants were at least severely reckless, this aligns with the penalty statute's requirement of "deliberate or reckless disregard of a regulatory requirement."

35

The trial evidence supports that Defendants acted with, at least, a reckless disregard for regulatory requirements and/or that their violations involved fraud, deceit, or manipulation. There were multiple instances where the FINRA Form 211s that Mr. Eldred or Mr. Dilley signed contained misrepresentations that Mr. Dilley or Mr. Eldred (and therefore Spartan and Island) should have known to be false. For example, some of the Forms 211s stated that Mr. Dilley had a phone call with the issuers when there was evidence that that was false.

The Court does not believe, however, that the SEC has demonstrated that the violations "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons" sufficient to support Tier Three penalties. The SEC has not pointed to any evidence showing that the violations "resulted in substantial losses." And while the Court has reviewed the trial evidence that the SEC relies on to argue that the violations "created a significant risk of substantial losses to other persons," the most that can be said is that: (1) one of the fraudsters testified that the people who bought the shell companies wanted unrestricted stock so they would "be in a position" to engage in pump and dump schemes; and (2) the fraudster was "aware" that "one or two" of those companies later became pump and dumps, though he could not say which ones. (Doc. # 194 at 90-91).

36

This is insufficient. "Although all Section 10(b) or Rule 10b-5 frauds could be said to create some 'risk' of some 'harm' to investors, the Remedies Act reserves third-tier civil penalties for those frauds that create a significant risk of substantial losses." SEC v. Madsen, No. 17-CV-8300 (JMF), 2018 WL 5023945, at *4 (S.D.N.Y. Oct. 17, 2018). The SEC has not made that showing here.

Moving on, the SEC requests that the Court assess penalties for three "violations" against Mr. Dilley, two violations against Mr. Eldred, and a single violation against the corporate Defendants. (Doc. # 270 at 20). Defendants do not dispute this particular point of the civil-penalties analysis.

Turning now to the factors that the Court may look to in determining civil penalties, the Court has considered Defendants' roles in the overall scheme, the evidence admitted at trial tending to show that Defendants acted with a certain level of scienter in submitting Form 211s to FINRA containing false information, the fact that this information was originally provided by third parties (at the behest of Mirman and Rose), the fact that Defendants' actions facilitated the possibility of pump and dump schemes, the inability of the SEC to identify any harmed investors, the testimony given at the trial and the hearing on remedies, and all of the other pertinent facts and circumstances. Being so advised, the Court orders civil penalties in the amount of $150,000 each

against both Mr. Dilley and Mr. Eldred. The Court believes that these Defendants have equal culpability and should face equal civil penalties. The Court further orders that Spartan and Island each pay civil penalties in the amount of $250,000. The Court has determined that these amounts are fair and appropriate under all the facts and circumstances.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1)  The Motion for Remedies filed by Plaintiff Securities and Exchange Commission (Doc. # 270) is **GRANTED in part and DENIED in part** as set forth herein.

(2)  The Clerk is directed to enter judgments against the Defendants in accordance with this Order and thereafter **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 10th day of August, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### CASE NO. 19-CV-00448-VMC-CPT

**SECURITIES AND EXCHANGE COMMISSION,**

               **Plaintiff,**

**v.**

**SPARTAN SECURITIES GROUP, LTD.,**
**ISLAND CAPITAL MANAGEMENT LLC,**
**CARL E. DILLEY,**
**MICAH J. ELDRED, and**
**DAVID D. LOPEZ,**

               **Defendants.**

_____/

## FINAL JUDGMENT AS TO DEFENDANT CARL E. DILLEY

This cause comes before the Court upon Plaintiff Securities and Exchange Commission's (the "Commission") Motion for Remedies.  The Court finds that good cause exists for the Court to grant in part the Commission's motion against Defendant Carl E. Dilley ("Defendant").  Based on the evidence presented and for the reasons set forth in the Court's order, and the jury having found Defendant liable for violating Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b) thereunder:

# I.

## PERMANENT INJUNCTIVE RELIEF

### Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder

**IT IS ORDERED, ADJUDGED, AND DECREED** that Defendant is restrained and enjoined, for a period of five years from the date of this judgment, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) promulgated thereunder [17 C.F.R. § 240.10b-5(b)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

> to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, regarding:

> i.      initiating a quoted market in an issuer's security; or

> ii.     applications or submissions pursuant to Exchange Act Rule 15c2-11; or

> iii.    whether an issuer is a shell or blank check company; or

> iv.     the identity of any consultants or persons in control of an issuer; or

> v.      an issuer's plans for potential mergers or acquisitions; or

> vi.     the identity of the person or entity for whom a security's quotation is being submitted, when seeking to initiate or resume quotations of an issuer's security; or

vii.    information submitted to the Depository Trust Company ("DTC") or its participants when seeking DTC eligibility for an issuer; or

viii.   information submitted to Financial Industry Regulatory Authority ("FINRA") when seeking to initiate or resume quotations of an issuer's security.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:   (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

## CIVIL PENALTY

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant shall pay a civil penalty in the amount of $150,000 to the Securities and Exchange Commission pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].   Defendant shall make this payment within 30 days after entry of this Final Judgment.   Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request. Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.   Defendant may also pay by

certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Micah J. Eldred as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant. The Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action. Defendant shall pay post-judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 USC § 1961.

## III.

### PENNY STOCK BAR

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant is barred, for a period of ten years from the date of this judgment, from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. 240.3a51-1].

## IV.

### RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## V.

### RULE 54(b) CERTIFICATION

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this ___10th_____

day of August, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE NO. 19-CV-00448-VMC-CPT

SECURITIES AND EXCHANGE COMMISSION,

        Plaintiff,

v.

SPARTAN SECURITIES GROUP, LTD.,
ISLAND CAPITAL MANAGEMENT LLC,
CARL E. DILLEY,
MICAH J. ELDRED, and
DAVID D. LOPEZ,

        Defendants.

_____/

## FINAL JUDGMENT AS TO SPARTAN SECURITIES GROUP, LTD

    This cause comes before the Court upon Plaintiff Securities and Exchange Commission's (the "Commission") Motion for Remedies.  The Court finds that good cause exists for the Court to grant in part the Commission's motion against Spartan Securities Group, Ltd. ("Defendant").  Based on the evidence presented and for the reasons set forth in the Court's order, and the jury having found Defendant liable for violating Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b) thereunder:

# I.

## CIVIL PENALTY

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that Defendant shall pay a civil penalty in the amount of $250,000 to the Securities and Exchange Commission pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  Defendant shall make this payment within 30 days after entry of this Final Judgment.  Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.  Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

 and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Spartan Securities Group, Ltd.as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action.  By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.  The

Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action.  Defendant shall pay post-judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 USC § 1961.

## II.

## PENNY STOCK BAR

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock. A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. 240.3a51-1].

## III.

## RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

# IV.

## RULE 54(b) CERTIFICATION

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this ___10th___ day of August, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
CASE NO. 19-CV-00448-VMC-CPT

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

v.

SPARTAN SECURITIES GROUP, LTD.,
ISLAND CAPITAL MANAGEMENT LLC,
CARL E. DILLEY,
MICAH J. ELDRED, and
DAVID D. LOPEZ,

                Defendants.

_____/

## FINAL JUDGMENT AS TO DEFENDANT MICAH J. ELDRED

This cause comes before the Court upon Plaintiff Securities and Exchange Commission's (the "Commission") Motion for Remedies.  The Court finds that good cause exists for the Court to grant in part the Commission's motion against Defendant Micah J. Eldred ("Defendant").  Based on the evidence presented and for the reasons set forth in the Court's order, and the jury having found Defendant liable for violating Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b) thereunder:

# I.

## PERMANENT INJUNCTIVE RELIEF

### Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder

**IT IS ORDERED, ADJUDGED, AND DECREED** that Defendant is restrained and enjoined, for a period of five years from the date of this judgment, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) promulgated thereunder [17 C.F.R. § 240.10b-5(b)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, regarding:

i.      initiating a quoted market in an issuer's security; or

ii.     applications or submissions pursuant to Exchange Act Rule 15c2-11; or

iii.    whether an issuer is a shell or blank check company; or

iv.     the identity of any consultants or persons in control of an issuer; or

v.      an issuer's plans for potential mergers or acquisitions; or

vi.     the identity of the person or entity for whom a security's quotation is being submitted, when seeking to initiate or resume quotations of an issuer's security; or

vii.     information submitted to the Depository Trust Company ("DTC") or its

participants when seeking DTC eligibility for an issuer; or

viii.     information submitted to Financial Industry Regulatory Authority

("FINRA") when seeking to initiate or resume quotations of an issuer's

security.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that, as

provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also

binds the following who receive actual notice of this Final Judgment by personal

service or otherwise:   (a) Defendant's officers, agents, servants, employees, and

attorneys; and (b) other persons in active concert or participation with Defendant or

with anyone described in (a).

## II.

## CIVIL PENALTY

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that

Defendant shall pay a civil penalty in the amount of $150,000 to the Securities and

Exchange Commission pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C.

§ 78u(d)(3)].   Defendant shall make this payment within 30 days after entry of this

Final Judgment.   Defendant may transmit payment electronically to the Commission,

which will provide detailed ACH transfer/Fedwire instructions upon request.

Payment may also be made directly from a bank account via Pay.gov through the SEC

website at http://www.sec.gov/about/offices/ofm.htm.   Defendant may also pay by

certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Micah J. Eldred as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action.  By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.  The Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action.  Defendant shall pay post-judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 USC § 1961.

## III.

### PENNY STOCK BAR

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant is barred, for a period of ten years from the date of this judgment, from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. 240.3a51-1].

## IV.

### RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## V.

### RULE 54(b) CERTIFICATION

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this \_\_\_10th_____

day of August, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### CASE NO. 19-CV-00448-VMC-CPT

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**v.**

**SPARTAN SECURITIES GROUP, LTD.,**
**ISLAND CAPITAL MANAGEMENT LLC,**
**CARL E. DILLEY,**
**MICAH J. ELDRED, and**
**DAVID D. LOPEZ,**

**Defendants.**

_____/

## FINAL JUDGMENT AS TO ISLAND CAPITAL MANAGEMENT LLC

This cause comes before the Court upon Plaintiff Securities and Exchange Commission's (the "Commission") Motion for Remedies. The Court finds that good cause exists for the Court to grant in part the Commission's motion against Island Capital Management LLC ("Defendant"). Based on the evidence presented and for the reasons set forth in the Court's order, and the jury having found Defendant liable for violating Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5(b) thereunder:

## I.

## PERMANENT INJUNCTIVE RELIEF

**Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder**

**IT IS ORDERED, ADJUDGED, AND DECREED** that Defendant is permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) promulgated thereunder [17 C.F.R. § 240.10b-5(b)], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security:

> to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, regarding:

i.   whether an issuer is a shell or blank check company; or

ii.  information submitted to the Depository Trust Company ("DTC") or its participants when seeking DTC eligibility for an issuer; or

iii. the designation of securities as free trading; or

iv.  the issuance and transfer of securities, including by means of stock certificates without restrictive legends.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that, as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise:  (a) Defendant's officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendant or with anyone described in (a).

## II.

## <u>DISGORGEMENT AND CIVIL PENALTY</u>

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Defendant is liable for disgorgement of $154,394.05, representing net profits gained as a result of the conduct alleged in the Complaint ($114,520.00), together with prejudgment interest thereon in the amount of $39,874.05. The Court finds that sending the disgorged funds to the United States Treasury, as ordered below, is consistent with equitable principles.  The Court further imposes a civil penalty in the amount of $250,000 to the Securities and Exchange Commission pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].  Defendant shall satisfy these obligations by paying $404,394.05 to the Securities and Exchange Commission within 30 days after entry of this Final Judgment.   Defendant may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request.   Payment may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm. Defendant may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

> Enterprise Services Center
> Accounts Receivable Branch
> 6500 South MacArthur Boulevard
> Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number,

and name of this Court; Island Capital Management LLC as a defendant in this action; and specifying that payment is made pursuant to this Final Judgment.

Defendant shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action.  By making this payment, Defendant relinquishes all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendant.  The Commission shall send the funds paid pursuant to this Final Judgment to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by using all collection procedures authorized by law, including, but not limited to, moving for civil contempt at any time after 30 days following entry of this Final Judgment.  The Commission may enforce the Court's judgment for penalties by the use of all collection procedures authorized by law, including the Federal Debt Collection Procedures Act, 28 U.S.C. § 3001 *et seq.,* and moving for civil contempt for the violation of any Court orders issued in this action.  Defendant shall pay post-judgment interest on any amounts due after 30 days of the entry of this Final Judgment pursuant to 28 USC § 1961.

### III.

### RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that this Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Final Judgment.

## IV.

## RULE 54(b) CERTIFICATION

There being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this ___10th___ day of August, 2022.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE

```
 1                    UNITED STATES OF AMERICA
                     UNITED STATES DISTRICT COURT
 2                    MIDDLE DISTRICT OF FLORIDA

 3
                              -  -  -
 4           HONORABLE VIRGINIA HERNANDEZ COVINGTON
             UNITED STATES DISTRICT JUDGE PRESIDING
 5                            -  -  -

 6   SECURITIES & EXCHANGE COMMISSION,)
                                      )
 7         PLAINTIFF,                  )
                                      )
 8   VS.                              ) NO. 8:19-cv-448-VMC-CPT
                                      )
 9   SPARTAN SECURITIES GROUP, LTD.,  )
     ET. AL,                          )
10                                    )
           DEFENDANT.                 )
11   _____)

12

13                   EVIDENTIARY HEARING
                            DAY 1
14           REPORTER'S TRANSCRIPT OF PROCEEDINGS
                        JULY 20, 2022
15                     TAMPA, FLORIDA

16

17
                 MELISSA A. PIERSON, CA CSR 12499,
18                   IL CSR 084.003138, RPR
                  FEDERAL OFFICIAL COURT REPORTER
19               801 N. FLORIDA AVENUE, 2ND FLOOR
                     TAMPA, FLORIDA 33602
20                   PH:  (813)301-5336
                   USDCtranscripts@gmail.com
21

22

23

24

25
```

1    **APPEARANCES OF COUNSEL:**

2    **ON BEHALF OF PLAINTIFF:**

3            SECURITIES AND EXCHANGE COMMISSION
             BY:  MS. CHRISTINE NESTOR, ESQ.
4            BY:  MS. ALISE M. JOHNSON, ESQ.
             BY:  MS. ALICE K. SUM, ESQ.
5            801 BRICKELL AVENUE
             ST. 1800
6            MIAMI, FL 33131
             (305) 982-6300
7            nestorc@sec.gov
             johnsonali@sec.gov
8            sumal@sec.gov

9

10   **ON BEHALF OF DEFENDANTS:**

11           PACIFIC LEGAL FOUNDATION
             BY:  MR. CALEB KRUCKENBERG, ESQ.
12           3100 CLARENDON BLVD.
             ST. 610
13           ARLINGTON, VA 20036
             (202) 888-6881
14           ckruckenberg@pacificlegal.org

15           NEW CIVIL LIBERTIES ALLIANCE
             BY:  MS. KARA MCKENNA ROLLINS, ESQ.
16           BY:  MR. JOHN JULIAN VECCHIONE, ESQ.
             1225 19th STREET N.W.
17           ST. 450
             WASHINGTON, DC 20002
18           (202) 908-6203
             kara.rollins@ncla.legal
19           john.vecchione@ncla.legal

20

21

22

23

24

25

1                        I-N-D-E-X

2     WITNESS:

3     MARK DEE

4             Direct Examination by Ms. Johnson:          11
              Cross-Examination by Ms. McKenna Rollins:    38
5             Redirect Examination by Ms. Johnson:         56
              Recross-Examination by Ms. McKenna Rollins:  58
6

7

8     MICAH J. ELDRED

9             Direct Examination by Mr. Kluckenberg:       60
              Cross-Examination by Ms. Nestor:             85
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| 1 | **E-X-H-I-B-I-T-S** | **ADM** |
| 2 | **GOVERNMENT:** | |
| 3 | No. 877 | 29 |
| | No. 878 | 29 |
| 4 | No. 880 | 29 |
| | No. 879 | 32 |
| 5 | | |

GOVERNMENT:

No. 877                                         29
No. 878                                         29
No. 880                                         29
No. 879                                         32

DEFENSE:

No. 265                                         85
No. 266                                         85

```
 1                   TAMPA, FLORIDA; JULY 20, 2022

 2                              - - -

 3                   (COURT IN SESSION AT 1:03 P.M.)

 4                            *   *   *

 5             THE COURT:  Good afternoon.  We're here today for

 6     an evidentiary hearing in SEC v. Spartan Securities Group,

 7     LTD.  It's case 19-cv-448, and I'll begin by having counsel

 8     state their appearances.  Who do we have for the SEC?

 9             MS. NESTOR:  Good afternoon, your Honor.  Christine

10     Nestor for the SEC and with me are Alise Johnson and Alice

11     Sum.

12             THE COURT:  Okay.  Good afternoon.  For the

13     Defense?

14             MR. KRUCKENBERG:  Good afternoon, your Honor.

15     Caleb Kruckenberg, and here with me are Kara Rollins and John

16     Vecchione.

17             THE COURT:  As I said, I've basically cleared my

18     schedule for the rest of the day today as well a good portion

19     of the day tomorrow.  I have criminal statuses at 9:00 a.m.

20     that should be finished by 10:00 a.m., generally speaking

21     about an hour, maybe an hour and fifteen minutes, and then we

22     can resume tomorrow.  I just probably need to be finished by

23     2:00 o'clock-ish, maybe a little bit longer than that but not

24     much more tomorrow afternoon.  Okay.  So that's what we've

25     got.  I'm here all day, obviously as long as you need me.
```

1    And I really appreciate everybody juggling their schedules

2    around to be here.  I know especially Mr. Kruckenberg, you

3    had something else going.  I really appreciate it.  I know

4    that's not easy to do.

5            So I'm going to do -- how would you like to proceed

6    in the evidentiary matter?  I know tomorrow we obviously need

7    to have some time for the oral argument, but certainly I'm

8    willing to hear how you would like to proceed with respect to

9    the evidentiary proceeding.  I think I saw that something was

10   filed earlier today, I guess -- I suppose it was a witness

11   sheet -- witness list.  Did I misunderstand that or maybe I

12   looked at it so quickly I didn't see what it was, exhibits?

13   You don't have to -- if you have them today that's fine.  I

14   mean normally we do do those for evidentiary matters if there

15   are witnesses that you wish to present or exhibits that you

16   wish to introduce, normally I do like to have that, but it

17   sure is okay if you don't.  But you tell me, how would you

18   like to proceed?  I'll start with the SEC, which way do you

19   propose?

20           MS. NESTOR:  Thank you, your Honor.  So we have one

21   witness here with us, an SEC accountant, Mark Dee.  We would

22   like to start with him and finish with him so he can head

23   home.

24           We also then anticipate the examination of the

25   Defendants, Mr. Dilley, Mr. Eldred.  The Defendants have

1    indicated they are also going to be calling their clients to

2    testify.  We thought it made sense to call them once rather

3    than in our case and in their case.

4         There's been some dispute among counsel as to the

5    scope of today's evidentiary hearing.  The SEC's position is

6    that this hearing is an evidentiary hearing to get to all the

7    remedies that the SEC seeks, as well as whereby the defenses

8    that the Defense has raised to the remedies, and I'll let the

9    Defendant's speak for their position.  I think it's more

10   limited than that.

11        THE COURT:  So you are in favor of a broader

12   hearing so to speak than what they are?

13        MS. NESTOR:  Your Honor, we were not in favor of a

14   hearing at all.

15        THE COURT:  All right.

16        MS. NESTOR:  If we're going to have one and they

17   are going to be relying on declarations, for example, then I

18   believe we have -- we should have the opportunity to

19   cross-examine them on the topics raised in that Declaration,

20   and the contents of their defenses, particularly that the

21   remedies in this case are not appropriate, and so that would

22   be the scope of our questioning of the Defendants.  If we

23   need to call them in our case then we will.  We thought it

24   made more sense to just call them once.  If the Defendants

25   wanted to bring them first, that's fine, whatever the case

```
 1    is, we just wanted to have an understanding upfront about the
 2    scope of the hearing.
 3            THE COURT:  All right.  Let me hear from the
 4    Defense on that.
 5            MR. KRUCKENBERG:  Your Honor, I think we completely
 6    agree with the format.  I think it makes sense to call
 7    Mr. Dee.  We'll take care of him and move on to my two
 8    clients.  I don't think we have any dispute about the
 9    Declarations being fair game.  I think that is probably the
10    subject of the hearing.  That certainly is appropriate.  I
11    think our one concern there were a number of exhibits that
12    the SEC put on their exhibit list that are liability
13    questions.  I think we're just concerned that we don't want
14    to relitigate the trial.  I think liability has been dealt
15    with.  So we're here just on a remedies motion.  That I think
16    is just our concern.
17            THE COURT:  All right.  Well --
18            MS. NESTOR:  Your Honor, can I speak to that?  We
19    certainly don't want to revoke the trial on liability.  We
20    are certainly comfortable with where we stand there.  With
21    the documents and exhibits that Mr. Kruckenberg was
22    referencing are transfer general records, three companies,
23    just to establish the date of the bulk sale.  Because we are
24    not under the impression that that was a contested fact.  We
25    now since have learned during this process that it is a
```

1    contested fact that I guess they are not agreeing to the

2    month and the year of the bulk sale.  So those records, which

3    are item records, which are actually on the Defendant's

4    exhibit list for trial, are solely used to establish the bulk

5    sale date.  That's it.  And that's to establish the

6    disgorgement in this case, not for liability just for

7    disgorgement.

8          THE COURT:  I'm going to take this as it comes up,

9    quite frankly.  So I just want to put a couple of things on

10   the record.  You can call your first witness and I'll deal

11   with these things as they come up.

12         So just procedurally, this lawsuit was filed in

13   2019.  The SEC has accused the Defendants of engaging in two

14   separate micro cap fraud schemes from December 2009 through

15   August 2014 in violation of the Securities Act of 1933.  The

16   case went to trial last year, almost exactly a year ago.  The

17   Jury found that the Defendants were not liable for Counts 1

18   through 5 and 7 through 14.  The Jury only found that

19   Spartan, Island, Dilley and Eldred were only responsible for

20   violation to Section 10(b) of Rule 5(b) of the Exchange Act.

21   The Defendants filed a post-verdict motion for Judgment as a

22   Matter of Law, which I denied.

23         Under the Exchange Act once the Jury has made a

24   finding the Court is tasked with imposing penalties.  So the

25   SEC has filed its motion seeking certain penalties.  The

 1    Defendants have responded.  The Defendants requested an

 2    evidentiary hearing, which I think is appropriate, so that's

 3    what we're doing today, and as I said I'm doing this one step

 4    at a time with respect to these witnesses and I'll take these

 5    objections as they come up.

 6            I'm still not exactly sure where we are on the

 7    scope of it, the scope of the testimony, so I'm just going to

 8    see what happens and if there's an objection somebody can

 9    raise it and I'll rule accordingly rather than having a

10    blanket ruling at the beginning.

11            So Mr. Kruckenberg, are you okay with Ms. Nestor

12    calling her first witness?

13            MR. KRUCKENBERG:  No problem.

14            THE COURT:  Very good.  Ms. Nestor, if you can

15    please call your first witness.

16            MR. KRUCKENBERG:  Thank you, your Honor.  First we

17    do have a thumb drive of exhibits and an exhibit list.

18            THE COURT:  Okay.  Wonderful.

19            MS. NESTOR:  Shall I provide it?

20            THE COURT:  Yes, that would be wonderful.

21            MS. NESTOR:  And we call Mark Dee.

22            MADAM CLERK:  Please raise your right hand.

23            THE WITNESS:  I do.

24    (Witness sworn.)

25            MADAM CLERK:  Please state your name for the

UNITED STATES DISTRICT COURT

1    record.

2         THE WITNESS:  My name is Mark Dee.  Mark with a K,

3    spelling of the last name is D-E-E.

4         MADAM CLERK:  Thank you.  You may take the witness

5    stand.

6         THE COURT:  You may proceed with your direct

7    examination of the witness.

8         MS. JOHNSON:  Thank you, your Honor.

9                        **MARK DEE**

10   Called as a witness herein, having been first duly sworn was

11   examined and testified as follows:

12                   **DIRECT EXAMINATION**

13   **BY MS. JOHNSON:**

14   **Q.**   Mr. Dee, I would like to start with you giving a little

15   bit of information about your background.  Could you start

16   and tell us about your educational background after high

17   school?

18   **A.**   I have a Bachelor of Science in Criminality from Eastern

19   Michigan University in 1978.  I have a Bachelor of Accounting

20   from Florida International University 2004, and I have a

21   Masters in Accounting from Florida Atlantic University.

22   **Q.**   And could you tell us your employment background?

23   **A.**   My employment background is a little bit long so I'm

24   going to condense it.  I spent ten years with General Motors

25   both in a managerial and nonmanagerial role.  I was a State

1    of Florida police officer for 24 years, eight of those years

2    I spent with the Department of Financial Services Division of

3    Insurance Fraud working in policyholder fraud from insurance

4    agents all the way to insurance companies.  I was a CFO of a

5    surety company for four-and-a-half years after that.  I then

6    worked for Lockheed Martin as a contractor in the role of a

7    financial investigator/senior auditor for about a

8    year-and-a-half.  I then was employed by the Securities and

9    Exchange Commission as an accountant where I have been

10   employed for over seven-and-a-half years.

11   **Q.**   Are you still employed by the Securities and Exchange

12   Commission?

13   **A.**   Yes, I still am.

14   **Q.**   What do you do for the SEC?  What is your job title at

15   the SEC?

16   **A.**   Oh, I'm sorry.  I'm a Senior Accountant in the

17   Enforcement Division.

18   **Q.**   What do you do in that role?

19   **A.**   In that role we generally -- we generally look for

20   misuse and misappropriation of investors' funds.  Somewhere

21   down the line, depending upon the investigation, as directed

22   by the formal order we subpoena records and those records

23   could include but are not limited to financial statements of

24   both public entities and nonpublic entities, books and

25   records of both of those type of entities, tax records,

```
 1    audits, work papers, bank records where we do bank

 2    reconstructions of cash flow.  We look at stock transfer

 3    records.  We look for or have examined whether stock has been

 4    sold that's restricted and shouldn't be for sale, and we

 5    prepare disgorgement analysis.

 6  Q.   As part of your employment duties with the SEC did you

 7    have cause to review any records of Island Transfer, one of

 8    the Defendants in this case?

 9  A.   I did.

10  Q.   Did you have cause to review any other financial records

11    of any other Defendants in this case?

12  A.   No, just the invoices produced by Island Capital.

13  Q.   As part of your employment were you asked to perform any

14    analysis of those records?

15  A.   I was.

16          MS. JOHNSON:  May I approach the witness, your

17    Honor?

18          THE COURT:  You may do so.

19  BY MS. JOHNSON:

20  Q.   I'm going to show you what is in the record at docket

21    entry 270, Exhibit 2, and that's been premarked as an exhibit

22    here.  I'm going to show you and ask you what is it?  Do you

23    recognize this?

24  A.   I do.

25  Q.   What is this?
```

1   **A.**   This is the disgorgement analysis that I was asked

2   what --

3   **Q.**   Asked what?  Did you create this record?

4   **A.**   Yes.

5   **Q.**   And can you explain what it is?  What is the title of

6   this document?

7   **A.**   This is -- this analysis is through the bulk sale.

8   **Q.**   What is the title on the document?

9   **A.**   Oh, The Island Summary of Fees.

10  **Q.**   What does the document reflect?

11  **A.**   It reflects the payments to Island Capital from 14

12  individual entities.

13  **Q.**   What type of payments -- when you say payments, payments

14  of fees?  What kind of --

15  **A.**   They were.  I'm sorry.  They were invoiced and then fees

16  were paid for maintenance fees, um, just if I look at the

17  invoices they kind of speak for themselves.  But generally

18  anything with a payment on it I recorded per the date that

19  was on there to the bulk sale.

20  **Q.**   Okay.  What documents did you review to put this summary

21  together?

22  **A.**   The invoices that are produce by Island Capital.

23  **Q.**   If I show you these --

24        MS. JOHNSON:  May I approach again, your Honor?

25        THE COURT:  You may.

```
 1    BY MS. JOHNSON:
 2    Q.   I'm showing you what was in the docket as Document 270,
 3    Exhibit 1.  Are these the transfer of billing records that
 4    you were -- Island accounting transfer records that you
 5    reviewed to come up with this analysis?
 6    A.   Yes.  I looked at them in a different format, in PDF,
 7    but they appear to be the same.
 8    Q.   And looking back to your summary you have an issue and
 9    then you have dates.  How did you come up with the dates?
10    What do those dates reflect?
11    A.   The dates reflect the time that Island Capital was paid.
12    Q.   Did you get those dates from these records?
13    A.   I got the dates from the invoices.
14    Q.   Okay.  And how did you choose what dates to include and
15    exclude in your summary?
16    A.   Well, for this analysis I was just asked to go up to the
17    bulk sale.  So I went up to the core through the bulk sale in
18    some instances, but anything after that was stopped --
19    stopped -- let me back up.  I didn't include any payments
20    once I was through the bulk sale.
21    Q.   In this analysis?
22    A.   In this analysis.
23    Q.   Where did you get the dates of the bulk sale?
24    A.   I got those from the Complaint.
25    Q.   So you also reviewed the Complaint in forming this
```

1    chart?

2    **A.**    Yes.

3    **Q.**    I would like to show you one more exhibit and then I

4    will ask you some questions about them.

5            MS. JOHNSON:  May I hand up a copy, your Honor?

6            THE COURT:  Thank you.

7            MS. MCKENNA ROLLINS:  Your Honor, we do have

8    objections to this document.

9            THE COURT:  Let me hear it now please.

10           MS. MCKENNA ROLLINS:  This document was provided to

11   counsel on Monday night in an exchange of documents they had

12   under "testimony."  In the far right column it includes new

13   information not included in Mr. Dee's Declaration.  We have

14   no information about who developed this, when it was

15   developed, and so it's sort of a little bit of surprise to us

16   when we received it.

17           THE COURT:  Okay.  What's your -- what's the

18   Government's response to that?

19           MS. JOHNSON:  This was a document that we made for

20   demonstrative purposes.  I'm going to ask him everything

21   about the right-hand column, simply, if you went past the

22   bulk date what the fees would be.

23           THE COURT:  I understand what you're saying,

24   Ms. Rollins.  I would be concerned too if I was getting it at

25   the last minute.  On the other hand I think it's fine.  I

| 1 | note the objection but it's overruled.  Go ahead. |
| 2 | MS. MCKENNA ROLLINS:  Thank you, your Honor. |
| 3 | MS. JOHNSON:  It's just a summary. |
| 4 | THE COURT:  That's fine. |

BY MS. JOHNSON:

**Q.**   This was premarked as P880 so I will refer to it as that.  Can you explain what this document --

**A.**   This document shows the summary through the bulk sale and beyond the bulk sale, the total payment ever made in those time frames in those date ranges for the full SOL. Through the bulk sale is what's represented through my Declaration and it also has the bulk sale dates through the bulk sale in that column.

**Q.**   Okay.  As to that column, we'll call it the "through bulk sale" column, what additional information does that have other than the first summary that you -- that I showed you of these, Exhibit 1?

**A.**   This summary has the bulk sale dates where the other summary does not.

**Q.**   What about the date range, what does that -- is that similar to the date range you had on your first --

**A.**   Yes.

**Q.**   So the only difference of this on the bulk sale column you included the change of date?

**A.**   Yes.

1    Q.   And then where it says, "full SOL," what is that column?

2    A.   That column represents the transactions for each entity

3    from beginning to end in the -- from the invoices, and the

4    totals that were -- would reflect that if they were ever

5    used.

6    Q.   So while "through bulk sale" cuts off the fees, at the

7    fees where the bulk sale, under the first column, the second

8    column doesn't cut off, it's just any fee that they paid?

9    A.   Yes.

10   Q.   I would like to go through -- I would like you to show

11   the Court how you used transfer records from the date range,

12   how you transfer records from the billing records and put

13   them in the chart.  If we start with the first one on this

14   chart, AngioSoma/First Titan, if you look at the top, page 64

15   of 147.

16        MS. JOHNSON:  Would the Court like a hard copy or

17   are you okay with the Elmo?

18        THE COURT:  That's fine.

19        MS. JOHNSON:  Okay.

20   BY MS. JOHNSON:

21   Q.   So if you look at these in the date range, what date

22   range did you include on First Titan in your first chart

23   through bulk sale?

24   A.   For AngioSoma/First Titan the date range was May 4, 2011

25   through September 13, 2011.

1   **Q.**   Okay.  If you look on the invoice and go down -- if we

2   look at the date 7/31, what does that reflect, 2011?

3   **A.**   7/31 reflects invoice 172431.  It reflects, "amount due

4   200," and it shows a balance of 200.

5   **Q.**   And then if we look at 8/31, what does that show?

6   **A.**   It shows an invoice charge, Invoice No. 1729076, monthly

7   maintenance fee 200 and the balance at the end of that time

8   $400.

9   **Q.**   And if you look at 9/13/2011 what does that reflect?

10  **A.**   You see a payment of $400.

11  **Q.**   So in looking at these three entries, which entries

12  would you include on your B Schedule?

13  **A.**   Well, I included the May 4, 2011, June 13th and July 15,

14  2011, and September 13, 2011.

15  **Q.**   Why did you not include the 7/31 -- I mean the 9/13 -- I

16  mean the 7/31 and the 8/31?

17  **A.**   The 8/31 and 7/31 were invoice charges and they just

18  created a balance.  That balance, if you follow the invoice,

19  was paid on 9/13/2011.

20  **Q.**   So did you include payment dates and invoice dates, just

21  payment dates, how did you decide which entries to include on

22  your chart?

23  **A.**   On my chart I just used payment dates but I referred and

24  looked at the invoice dates.

25  **Q.**   So you matched them up?

1    **A.**    Yes.

2    **Q.**    Now, were the payment dates -- were they made in

3    areas -- were they made for services already provided or were

4    they made in advance of services provided?

5    **A.**    Could you repeat that?

6    **Q.**    Yeah.  When did they pay?  Did they pay after they were

7    invoiced for services already provided?

8    **A.**    Yes, according to the invoice.

9    **Q.**    So in this example the 9/13 payment that you included in

10   the chart was for services provided some date prior to 8/31

11   and 7/31?

12   **A.**    Yes.

13   **Q.**    Prior to the bulk sale date of September 2011?

14   **A.**    Yes.

15   **Q.**    Is that how you did all of the analysis on the "through

16   bulk sale" using the payment date versus the invoice date?

17   **A.**    Yes.

18   **Q.**    Let's look at another one to see how this works.  Let's

19   look at Obscene Jeans, which I believe is page 16 of your

20   table, 16 of 147.

21            THE COURT:  Did you establish the bulk sale date?

22   Did the witness establish that?

23            MS. JOHNSON:  I'll get to that.

24            THE COURT:  Are you going to?  Okay.

25                                        *

1   BY MS. JOHNSON:

2   **Q.**   Where did you get the bulk sale date from?

3   **A.**   From the Complaint on paragraph 35 -- or under paragraph

4   35.

5   **Q.**   Okay.

6           THE COURT:   Okay.

7   BY MS. JOHNSON:

8   **Q.**   Now, for Obscene Jeans if we look at the date when was

9   the bulk sale date that you used for Obscene Jeans?

10  **A.**   December 2010.

11  **Q.**   What dates did you include from this -- from these bill

12  records?

13  **A.**   September 9, 2010 through December 15, 2010.

14  **Q.**   All right.  If we look down to the end of that time

15  period you'll see payment on an invoice on 11/30/2010 for

16  $200?

17  **A.**   Yes.

18  **Q.**   And when was that paid?

19  **A.**   That was paid on 12/15.

20  **Q.**   So is that -- which date did you include -- which of

21  those two records did you include on the sheet?  Which of

22  those dates did you include, both the 11/30/2010 and the

23  12/15?

24  **A.**   No.  11/30 is the invoice date.  12/15 is the payment

25  date.

1   **Q.**   Okay.  So which of those did you include?

2   **A.**   Just the 12/15.

3   **Q.**   And that's represented as being a payment for a prior

4   service?

5   **A.**   That's how I read the invoice.

6   **Q.**   Okay.  When was that service invoiced?

7   **A.**   That service would have been 11/30/2010.

8   **Q.**   That's prior to the bulk sale date --

9   **A.**   Yes.

10   **Q.**   -- that you used?

11   **A.**   Yes.  Sorry.

12   **Q.**   And is that consistent with what you did with all of the

13   issuers listed on your summary?

14   **A.**   Yes.

15   **Q.**   Did you -- did you find any fees that were -- that were

16   invoiced prior to the invoice date -- the same month, I'll

17   just put it that way?  The same month.

18   **A.**   Yes.

19   **Q.**   What was that?

20   **A.**   That was a setup fee for -- for Topaz Incorporated.

21   **Q.**   (Inaudible) System?

22   **A.**   Yes.

23   **Q.**   Was that the only payment you found in the same month,

24   invoiced in the same month and paid in the same month?

25   **A.**   Just off the top of my head and recollection, yes.  That

1    stuck out because there was a setup fee of 8,000.  There was

2    a payment of 10,000, and the invoice started off with no

3    forwarding balance but they made a $15,000 payment to Island

4    Capital.  So that was a my own characterization.  It was odd

5    to me.  It just stuck out to me.

6    **Q.**   What was the closing date that you used for your bulk

7    date for Kids Germ?

8    **A.**   Well, for Kids Germ the bulk closing date that I had

9    taken from the Complaint was March -- I'm sorry,

10   February 2010 because it was an oddity and I brought it up.

11   We looked at the transfer journal and saw that the bulk sale

12   date was actually March of 2010 and not February as it was in

13   the Complaint.

14   **Q.**   This is Topaz.  The Topaz records, page 5 out of 147.

15   Can you refer to what setup fee you were referring to, what

16   date that was?

17   **A.**   Sure.

18          MS. MCKENNA ROLLINS:  Objection.

19          THE COURT:  What is that?

20          MS. MCKENNA ROLLINS:  I believe some of these facts

21   aren't in evidence.

22          MS. JOHNSON:  I'm putting them in evidence right

23   now.

24          THE COURT:  Pardon me.  You know it's a "judge"

25   hearing.  It's fine to object but I can certainly get to the

1   heart of the matter.  The objection is noted but overruled.

2   Go ahead.

3          THE WITNESS:  As I previously just testified, you

4   could see December 31, 2009 balance forward is zero and

5   there's a media payment for January 2010 for $1,500 that I

6   can't match up with anything that may have occurred before

7   that payment was made.  There is nothing subsequent that

8   matches what that $1,500 -- because you're looking at

9   January 31, 2010 the invoice there is 16396 and it's 300, but

10  you see the payment for that on February 12, 2010 for 300.

11  And then, the setup fee pops up, and then on the same date on

12  February 23, 2010, the invoice 16482 you see the payment the

13  same day for $10,000.

14  BY MS. JOHNSON:

15  **Q.**   So is this 2023 invoice of 2010 where it says, "16482

16  setup fee of 8,000," is this the one instance where you said

17  there was an invoice the same month as the bulk date that you

18  used from the Complaint?

19  **A.**   That I recall because the way the situation of the

20  balance, and the payments, and how it started off with a

21  negative balance it just -- the way this was booked it stood

22  out.  There was something going on here.  We don't know or --

23  I don't know the way I was reading it but it looks like

24  there's a payment taken there even though prior to

25  February 23, 2010 there was a negative balance of 1,500, and

1    then 11 days later there is on the same day as I testified an

2    $8,000 invoice, and then a $10,000 payment, and then a

3    negative $3,500 balance.

4    **Q.**   I get how it was odd to you, but my question was, is

5    this the only payment that you found that was paid in the

6    same month as the bulk --

7    **A.**   Yes, I believe so.

8    **Q.**   And you said this seemed odd to you.  So what did you do

9    to investigate that?

10   **A.**   I went back to the transfer journal and saw that the

11   actual bulk sale date was the subsequent month in March,

12   March 18, 2010.  So there was an error in the Complaint.

13   There was an error in the -- the use of the bulk date from

14   that Complaint so it needs to be corrected, if it can.

15   **Q.**   Okay.  So the February 23, 2010 date would be within the

16   corrected bulk date that you --

17   **A.**   Yes.  The book changed the amount or the total for the

18   total alleged disgorgement for Island Capital doing the bulk

19   sale as the summary states.

20   **Q.**   Did you look -- so for every entity that's listed from

21   bulk sale what is your process, the same as we have gone over

22   here, you used the payment date to include in it versus the

23   invoice date?

24   **A.**   Yes.

25   **Q.**   Why did you do that?

1    **A.**   It was the simplest methodology to employ, and probably

2    the fairest I could think of.  There may have been payments

3    after that I didn't pick up that we could have included, but

4    we tried to err on the side of caution.  So that's what the

5    number is in the end.  It doesn't, you know, get any greater,

6    it doesn't get any smaller unless other forces intervene.

7    **Q.**   What was the total amount of fees that these 14 issuers

8    paid to Island through the bulk sale?

9    **A.**   $147,508.

10   **Q.**   Did you see that after the bulk sale that these issuers

11   continued to use Island services?

12   **A.**   I don't know.  I was only tasked with this assignment.

13   **Q.**   After -- were there other records after the bulk sale

14   showing that Island charged these issuer fees?

15   **A.**   Yes.  The right-hand would be a summary suggesting that.

16   **Q.**   Okay.  And so what is this right-hand that the summary

17   reflects?

18   **A.**   These are all the payments from the invoices that I

19   collected and totaled.

20   **Q.**   Under where it says "full SOL and date range" what does

21   that reflect?

22   **A.**   Almost $569,000.

23   **Q.**   Under the date range, not the total.  Where it says the

24   date, what are those dates?  Look at First Titan 5/4/2001 to

25   2017, what does that look like?

**A.**   Those date ranges are the payment days for -- invoiced for each of the entities.

**Q.**   Okay.  So if you look at the total where it says 54,800, what does that reflect for First Titan?

**A.**   All the payments made to AngioSoma, also known as First Titan, during that date range May 4, 2011 to June 20, 2017.

**Q.**   Okay.  And then if you count all the four issuers, you jumped ahead, what is the grand total that Island issued to these for these records?

**A.**   $568,599.

        MS. JOHNSON:  Your Honor, I would like to admit the three -- the two summaries and the Island records.

        THE COURT:  Can you read me please the exhibit numbers.

        MS. JOHNSON:  Sure.

        MS. MCKENNA ROLLINS:  Your Honor, objection on relevance, again to, the fourth column.  It's not clear to me, are they looking to increase the damages request or in that case relevance would matter on what they intend to actually use this for.

        THE COURT:  All right.  What's your response to that?

        MS. JOHNSON:  When we get into the legal argument, one of our duties is to show it was a reasonable amount and we could have requested the full amount, the 568, if we

1    wanted to.  That's going to be part of our argument as to why

2    the 147 is reasonable and not an overreach.

3          THE COURT:  I'm going to overrule the objection.

4    Go ahead.

5          MS. JOHNSON:  I would like to admit what we've

6    marked as P877, it's a compilation of invoices from Island

7    that was previously attached -- previously entered in the

8    record as Exhibit 1 to docket entry 270.

9          And then the summary of disgorgement calculation

10   which we marked as Plaintiffs 878, which is the single

11   summary previously docketed as 270, Exhibit 1.

12         And then the new summary, the two columns is

13   P879 -- whoops.  It's P880, and that reflects the sales of

14   disgorgement through bulk sale and through the full statute

15   of limitations.

16         THE COURT:  Okay.  Are you moving that into

17   evidence now?

18         MS. JOHNSON:  Yes, I am.

19         THE COURT:  Okay.

20         MS. JOHNSON:  I just have one more exhibit to ask

21   him about.

22         THE COURT:  Okay.  That's fine.  I want to make

23   certain I'm calling it the right thing.  It was previously

24   what Plaintiffs, did you say 70 -- I've got it right here.

25   Thank you.

```
 1                    MS. JOHNSON:  So 877, 878 and 880 and I'm about to
 2       ask him about --
 3                    THE COURT:  That's fine.  Go ahead.  Do you want me
 4       to admit it now or are you going to lay a foundation?
 5                    MS. JOHNSON:  I'll lay the foundation.
 6                    THE COURT:  Why don't you have him identify it so
 7       we are certain.
 8                    MS. JOHNSON:  The new document or the three?
 9                    THE COURT:  No, I think I've admitted the first
10       one.  It's just this one.
11                    MS. JOHNSON:  Okay.  879.
12                    THE COURT:  I intended to.  Let me just say it 877,
13       I think, and I'm sorry I didn't have this in front of me
14       before --
15                    MS. JOHNSON:  I'm sorry.  That's my fault.
16                    THE COURT:  That's quite all right.  Is this 879
17       you're going to be talking about now?
18                    MS. JOHNSON:  Yes.  I'll show him what's been
19       previously docketed 272, Exhibit 2, and it's going to be
20       Plaintiff's 879.
21                    THE COURT:  That's fine.
22                    MS. JOHNSON:  Thank you.
23       (Plaintiff's Exhibit Nos. 877, 878, 880
24       admitted into evidence.)
25                                          *
```

```
 1   BY MS. JOHNSON:
 2   Q.   Mr. Dee, do you recognize this document?
 3   A.   Yes.
 4   Q.   What is it?
 5   A.   This is the pre-interest judgment report.
 6   Q.   And what does it -- how -- how was it prepared?
 7   A.   It was prepared by using one of the tools that the SEC
 8   provides enforcement.  It's called the PJA Calculator.  There
 9   are certain inputs that you have to do to come up with a
10   prejudgment total.
11   Q.   And did you put certain inputs in there to come up with
12   a prejudgment total?
13   A.   I did.
14   Q.   And is that reflected in this report?
15   A.   Yes.
16   Q.   What were the dates you inputted to come up with the
17   prejudgment interest report?
18   A.   For the violation date I used June 1st, 2014, and for
19   the payoff date I used March 7, 2022.
20   Q.   And where did you get the 6/1/2014 violation date from?
21   A.   That was the most recent bulk sale date for On Move
22   Systems -- On The Systems Move.  Hang on one second.  On The
23   Move Systems.
24   Q.   And what was that, the most recent bulk sale date?  I
25   didn't hear.
```

 1   **A.**   I'm sorry, I'm changing technologies.  I tried to go --

 2   never mind.

 3   **Q.**   What was that?  What was that date?

 4   **A.**   It was June 2014.

 5   **Q.**   What did it symbolize?  Why did you use that one?

 6   **A.**   That was the most recent.  It wasn't the oldest.

 7   **Q.**   The most recent what?

 8   **A.**   Bulk sale date.

 9   **Q.**   Okay.

10   **A.**   And I used that for violation date.

11   **Q.**   Could you have used older dates -- older bulk sale

12   dates?

13   **A.**   Yes.  The effect would have been different.  The outcome

14   would have been different.

15   **Q.**   How would it have been different?

16   **A.**   Because it would have been a longer period of time and

17   the interest is compounded quarterly.  So the interest would

18   have most likely exceeded $51,286.05.

19   **Q.**   Why did you stop it at 3/7/2022?

20   **A.**   That was the time to do the analysis.  It was to

21   calculate the disgorgement.  So that was the cutoff date.

22   **Q.**   That was the date when you ran the report?

23   **A.**   One of them or many of them.

24   **Q.**   Okay.  You're not saying that was the date that we

25   were -- that the prejudgment interest should be stopped at?

1    **A.**   Yes.

2    **Q.**   Okay.  What interest rate does the SEC tool use when it

3    computes interest?

4    **A.**   It uses the same rate as the Internal Revenue Service

5    for underpayments.

6    **Q.**   What was the violation amount that you put in the

7    calculator?

8    **A.**   $147,508.

9    **Q.**   And what does that reflect again?

10   **A.**   That was the disgorgement amount that was calculated

11   from the 14 entities.

12   **Q.**   And what amount of prejudgment interest was determined

13   appropriate on the amount of 147,508?

14   **A.**   You just add the $51,286.05 and the prejudgment total

15   would be $198,784.05.

16          MS. JOHNSON:  Your Honor, could I enter Exhibit 879

17   into evidence?

18          THE COURT:  Yes.  879.  Okay.  879 is received into

19   evidence.

20   (Plaintiff's Exhibit No. 879

21   admitted into evidence.)

22          MS. JOHNSON:  That's all I have, Mr. Dee, thank

23   you.

24          THE COURT:  All right.  Any cross-examination?

25          MS. MCKENNA ROLLINS:  Yes, your Honor.

1          Your Honor, I'm prepared to proceed?

2          THE COURT:   My goodness, yes.

3                    **CROSS-EXAMINATION**

4    **BY MS. MCKENNA ROLLINS:**

5    **Q.**   Thank you.  Mr. Dee, you testified earlier that you

6    worked for the SEC for seven-and-a-half years.  How many

7    times have you testified before Court as an employee of the

8    SEC?

9    **A.**   Less than half-a-dozen times.

10   **Q.**   Have you ever testified on behalf of the SEC in your

11   official position for an adjudication before the Court on the

12   commission of ALJ's?

13   **A.**   I don't think so.

14   **Q.**   Specifically, thinking the previous times you testified

15   for Court's, were you providing disgorgement calculations?

16   **A.**   No.

17   **Q.**   You prepared a Declaration in support of your

18   calculations.  In it you had indicated that you examined

19   documents received from Island related to the fees collected

20   by Island.  It's my understanding that the documents -- you

21   then attached the statements that we've been discussing, was

22   that the only documents you reviewed in preparing your

23   Declaration and calculations?

24   **A.**   Yes.

25   **Q.**   And I want to clear up one thing realistically.  Looking

1    at P877, I'm using page 5 of 147.  I believe in your

2    testimony you've interchangeably been referring to these as

3    "invoices" but I will be referring to them as "statements,"

4    and based on what they are to just make that clear.

5           When you're preparing your calculation, did you

6    review any other documents or just these statements, and I

7    believe you testified the Complaint?

8    **A.**   Just these statements and the Complaint.

9    **Q.**   All right.  And then you later -- you testified earlier

10   that you looked at the transfer journal in identifying,

11   trying to assess out what was going on.  When did you look at

12   the transfer journal?

13   **A.**   Last night -- or I'm sorry, this morning.

14   **Q.**   Okay.  And are you aware that there was a pre-Complaint

15   investigation in this case?

16   **A.**   No.

17   **Q.**   Are you aware there was discovery in this case before

18   the trial?

19   **A.**   No.

20   **Q.**   Are you aware that there was a trial in this case last

21   summer?

22   **A.**   Yes.

23   **Q.**   And you didn't request any of the documents that were

24   produced in all those stages of litigation?

25   **A.**   Well, I didn't -- well, let me back up.

UNITED STATES DISTRICT COURT

1          When you say "discovery," you're talking in the

2     litigation side.  The enforcement side we would just call it

3     production.  So let me say there are -- there was production

4     reviewed.  There was production I looked through that I tried

5     to find relevant to Island Capital but for the calculation of

6     disgorgement, these were the only records that were produced

7     by Island Capital that I looked at.

8     **Q.**   Who made the determination what documents to look at in

9     developing the disgorgement calculation?

10    **A.**   I think that would involve work product discussion.  I'm

11    not sure I can disclose that.

12    **Q.**   Also stated in your Declaration consistent with your

13    testimony today is that the time periods that were set forth

14    in paragraph 35 of the Complaint were used to calculate the

15    disgorgement amount, correct?

16    **A.**   Are you talking about the bulk sale dates?

17    **Q.**   Yes.

18    **A.**   Yes.

19    **Q.**   And those dates in the Complaint were given in a

20    month/year format, correct?

21    **A.**   That's correct.

22    **Q.**   Do you know what a bulk transfer is?

23    **A.**   Do I know what what is?

24    **Q.**   What a bulk transfer is?

25    **A.**   I've never participated in a bulk transfer.  I only

1    operate on that conceptually.  So I do not know what a bulk

2    transfer is literally.

3    **Q.**   Okay.  Turning now to the issuer statements you

4    reviewed.  I would like to turn to again Topaz Resources

5    formally known as Kids Germ.  Looking at just this statement,

6    is there any way to determine that this statement is related

7    to any bulk transfer?

8    **A.**   Oh, no.

9    **Q.**   And in looking at this statement you can't tell me when

10   the bulk transfer actually occurred, the specific date?

11   **A.**   Not from the invoices, no.

12   **Q.**   Looking specifically at the dates in the statements,

13   those are given in a month/day/year format, correct?

14   **A.**   That's correct.

15   **Q.**   And that's different than the format that was used in

16   paragraph 35 of the Complaint.  It was a month/year format?

17   **A.**   Yes, between -- if you're comparing those two, yes.

18   **Q.**   If you're looking at just the statement you can't tell

19   me specifically how many of the line items here relate to any

20   allegations of any underlying fraud, correct?

21   **A.**   No.

22   **Q.**   And thinking about the statements you relied on, you

23   can't tell me who specifically paid these fees that went into

24   your calculation?

25   **A.**   That's correct.

| 1 | **Q.** | Okay.  And you can't tell me how they were paid either? |
| 2 | **A.** | No. |
| 3 | **Q.** | And those answers would be the same for any of the |
| 4 | | issuers identified in your Declaration? |
| 5 | **A.** | Yes. |
| 6 | **Q.** | In preparing your disgorgement calculation, did you ever |
| 7 | | consider the deductions of legitimate business expenses? |
| 8 | **A.** | We are --  I didn't have any -- no. |
| 9 | **Q.** | So you didn't deduct from the calculation payroll? |
| 10 | **A.** | No. |
| 11 | **Q.** | Benefits? |
| 12 | **A.** | No. |
| 13 | **Q.** | Utilities? |
| 14 | **A.** | No. |
| 15 | **Q.** | Leases? |
| 16 | **A.** | No. |
| 17 | **Q.** | Technology fees? |
| 18 | **A.** | No. |
| 19 | **Q.** | Data fees? |
| 20 | **A.** | No. |
| 21 | **Q.** | Printing costs? |
| 22 | **A.** | No. |
| 23 | **Q.** | Shipping costs? |
| 24 | **A.** | No. |
| 25 | **Q.** | DTC fees? |

1    **A.**   No.

2    **Q.**   CUSIP fees?

3    **A.**   No.

4    **Q.**   Regulatory compliance costs?

5    **A.**   No.

6    **Q.**   Legal compliance costs?

7    **A.**   No.

8    **Q.**   Business insurance?

9    **A.**   No.

10   **Q.**   Or taxes paid?

11   **A.**   No.

12   **Q.**   You didn't deduct anything from the calculation?

13   **A.**   No.

14   **Q.**   Using the tabulated -- apologies.

15            You didn't deduct anything from the calculation,

16   you simply tabulated the payments resolved?

17   **A.**   Yes.

18   **Q.**   So your calculation effectively is for gross receipts

19   not net receipts?

20   **A.**   Yes.

21   **Q.**   And those questions that I just asked, those -- those

22   would be true for all the issuers identified in your

23   Declaration?

24   **A.**   That's correct.

25   **Q.**   I want to turn to the statement for Aristocrat Group and

1     I'll get the page in one second.  I want to direct your

2     attention to some of the transaction line items on I believe

3     it looks like December 31, 2011, identified as IMB

4     No. 174599.  Did you ever look at Invoice 174599 in preparing

5     your calculation?

6     **A.**   No.

7     **Q.**   Did you request invoice 174559?

8     **A.**   I wouldn't request it from you.  The attorneys would.

9     So my answer would be no.

10    **Q.**   Do you know what the monthly maintenance fee Island

11    invoiced for what?

12    **A.**   No.

13    **Q.**   Do you know what the statement "restrict the new

14    issuance" means?

15    **A.**   No.

16    **Q.**   Courier?

17    **A.**   No.

18    **Q.**   CUSIP?

19    **A.**   No.

20    **Q.**   Or printing costs?

21    **A.**   No.

22    **Q.**   Assuming these were business expenses, those wouldn't

23    have been deducted from the calculation because no reductions

24    were made?

25    **A.**   Well, you're dealing with a hypothetical.  Let me

 1   respond hypothetically.

 2           MS. JOHNSON:  I'm going to object.  This is outside

 3   what he is tasked to do.  He's not being presented as an

 4   expert.

 5           THE COURT:  What's your response to that?

 6           MS. MCKENNA ROLLINS:  My idea, he prepared the

 7   calculation and we're entitled to question that calculation.

 8           THE COURT:  You know I'm going to let her do it.

 9   Go ahead.  It's overruled.

10   BY MS. MCKENNA ROLLINS:

11   **Q.**   Would you like me to repeat the question?

12           THE COURT:  I think you should do that.

13   BY MS. MCKENNA ROLLINS:

14   **Q.**   Speaking hypothetically and looking specifically at

15   these transactions that occurred on December 31, 2011, if

16   these were business expenses that we're seeing, they wouldn't

17   have been deducted from the disgorgement calculation?

18   **A.**   No, they would have if I would have known it.

19   **Q.**   Okay.

20   **A.**   I wasn't asked to prepare that though.

21   **Q.**   You weren't asked to consider business expenses?

22   **A.**   No.  We didn't have any documents to support those.  I

23   did ask that.  We don't have any documents that would support

24   any of the expenses.

25   **Q.**   So did you ask for the invoices themselves?

1    **A.**    I did not.

2    **Q.**    Okay.  Did you ask for any other information regarding

3    business expenses about how Island operated for example,

4    leases they had on their properties?

5    **A.**    I did not.

6    **Q.**    We talked a little bit earlier about the difference

7    between the time period and the Complaint in terms of

8    formatting that's given in month/year, and in the statements

9    it's given in month/day/year.  Is it fair to say that you

10   included any payment made during a month/year in the

11   disgorgement calculation?

12   **A.**    That would be accurate.

13   **Q.**    So if for example, a bulk transfer occurred on the first

14   of the month and a payment was made on the third, that

15   payment would be included in the disgorgement calculation?

16   **A.**    If -- no, it wouldn't.  If I understood your question.

17   **Q.**    Let me try rephrasing it.  Let me put it in context.  It

18   might be a little easier to receive that way.  I'm going to

19   turn to the statement for First Titan.  I want to draw your

20   attention to the line item.  My apologies, I have the wrong

21   page.  It's Page 64 of 147.  Looking at the line item for

22   9/30/2011 -- it seems to come out fuzzy.

23           I would like to direct your attention to the

24   9/30/2011 line item.  Apologies.  9/13/2011, that is listed

25   as a PMT for $400, correct?

1   **A.**   Correct.

2   **Q.**   I believe you -- in your summary you had listed that you

3   considered for First Titan through the period of 9/2011, and

4   so thinking about that question I asked, if the bulk transfer

5   had occurred --

6          MS. JOHNSON:  I'm going to object because that's

7   not what the testimony is.  What the charge says.

8          THE COURT:  The witness can answer the question.

9   It's overruled.  Go ahead.

10  BY MS. MCKENNA ROLLINS:

11  **Q.**   So if the bulk transfer had occurred on September 1st

12  but you used the time frame through the end of September

13  based on the month/year format, that payment for 9/13 even if

14  it hypothetically occurred after the bulk transfer would have

15  been included in your calculation?

16  **A.**   Well, this isn't -- in this example here that you're

17  using and the payment that was made in the bulk transfer

18  period, the payment that was made actually those -- both

19  those invoices occurred prior to this.  So that's why I

20  included this payment because the invoices were $200 for

21  6/30/2011, and $200 for 7/31/2011, and there was a $400

22  balance at 8/31/2011, and then on the 13th of September there

23  was a $400 payment, which I credited for June and July.  So

24  it wouldn't be -- the invoice didn't occur on September 1st.

25  It occurred prior to that.

1  **Q.**   But you didn't include that methodology in your

2  Declaration, correct?

3  **A.**   I don't understand the question.

4  **Q.**   The matching of the invoices to the payments that were

5  -- came in, you did not provide that description of your

6  methodology for what went in or out of the calculation in

7  your Declaration?

8  **A.**   Are you talking about that type of language you just

9  said, I did not include -- I -- let me back up.

10         I did not articulate the methodology as you had

11  previously stated.  The methodology I used -- or the language

12  I used in my Declaration stands on itself.  You can review

13  the Declaration and read it for what it is.  You can read it

14  right now.

15         MS. MCKENNA ROLLINS:  One second, your Honor.

16         I'm going to move on to the next question.

17         THE COURT:  That's fine.

18  BY MS. MCKENNA ROLLINS:

19  **Q.**   You don't -- again, you do not specifically know when

20  any of the bulk transfers occurred, you don't know the

21  specific dates?

22  **A.**   I don't, no.

23  **Q.**   I would like to turn back to the statement for

24  Aristocrat Group?  Apologies, page 91 of 147.  I would like

25  to direct your attention to the line item for 1/30/2012 where

1  it says CREDMEM, and that's No. 175584, and based on the

2  summary chart you provided as Exhibit B to your -- I believe

3  Exhibit 2 to your Declaration, this charge was included in

4  your calculation.  Do you know what CREDMEM No. 175584 is?

5  **A.**   The document itself?

6  **Q.**   What's it for.

7  **A.**   The acronym I read as "credit now."  That's how I

8  understood it.

9  **Q.**   Do you know who would have paid that credit?

10  **A.**   No.  I don't -- I don't know.

11  **Q.**   In looking at the 12/31/2011 transaction line items,

12  you'll see it says "restricted issuance 25 at $28 equals

13  700," correct?

14  **A.**   Yes.

15  **Q.**   And that description there matches the same transaction

16  description for the 1/30/2012 credit amount, correct?

17  **A.**   Well, the amounts match, yes.

18  **Q.**   It says, "restrict the new issuance," correct?

19  **A.**   Yes.

20  **Q.**   And they both say 25 of 28, correct?

21  **A.**   Yes.

22  **Q.**   You didn't ask what this transaction was, correct?

23  **A.**   No.

24  **Q.**   But you included it in your calculation?

25  **A.**   Yes.

1   **Q.**   And so if we were looking at other statements from other

2   issuers is it fair to say if there was a CREDMEM line that

3   would have been included in your calculation?

4   **A.**   Yes.

5   **Q.**   And I'm going to turn to the statement now for Obscene

6   Jeans Corp.  I would like to specifically direct your

7   attention to the transaction on 9/30/2010 -- apologies,

8   9/3/2010, and that's invoice No. 19519, and it says DTC

9   $8,500.  Do you see that?

10  **A.**   I do.

11  **Q.**   Do you know what DTC is?

12  **A.**   The acronym offhand, no.

13  **Q.**   Do you know what the Depository Trust Company is?

14  **A.**   Yes.

15  **Q.**   Did you recognize DTC as meaning Depository Trust

16  Company in reviewing your records?

17  **A.**   I didn't.

18  **Q.**   Did you ask what DTC meant?

19  **A.**   No.

20  **Q.**   And you didn't ask to see this invoice, correct?

21  **A.**   That's correct.

22  **Q.**   You didn't ask to exclude DTC amounts from the invoice,

23  correct?

24  **A.**   No, that's actually the charge on the invoice, the

25  8,500.

1    **Q.**   Yeah.  And if you saw other transactions that said DTC

2    on them throughout the other issuer statements, is it fair to

3    say that you wouldn't have excluded them from the

4    calculation?

5    **A.**   That's correct.

6    **Q.**   Then I'm going to move on to Global Group.  Are you

7    aware Global Group is still actively trading as late as

8    June 2022?

9    **A.**   I did not.

10    **Q.**   I would like to direct your attention to the transaction

11    dated April 30, 2012, listed as Invoice No. 177166, and under

12    there there's a line item that says C-U-S-I-P, CUSIP and it's

13    for $154.  Do you see that?

14    **A.**   I do.

15    **Q.**   Do you know what CUSIP means?

16    **A.**   Yes.

17    **Q.**   What does it mean?

18    **A.**   The acronym actually stands for the security that's

19    issued but I don't know what it is exactly but I know what it

20    is.

21    **Q.**   And you didn't ask to see this invoice, correct?

22    **A.**   Yes.

23    **Q.**   And you didn't exclude CUSIP amounts from the

24    disgorgement calculation, correct?

25    **A.**   No.

1    **Q.**   Is it fair to say if we saw other transactions that

2    listed CUSIP those weren't listed in the calculation either?

3    **A.**   That's correct.

4    **Q.**   And you testified earlier about the summary fees that

5    was marked as Exhibit P878, and again, there's no deductions

6    for business expenses included in that summary?

7    **A.**   That's correct.

8    **Q.**   I'm now showing what's previously marked as P879 and

9    this is the interest calculation.  I believe you testified

10   earlier that you used, is it fair to say, software for the

11   PGI calculator program?

12   **A.**   It's a -- I wasn't the creator so.  It's an -- I'll call

13   it a "tool."  It's on one of our enforcement web pages that's

14   put out.  If I call it a "tool" would you understand what it

15   is?

16   **Q.**   I want to make sure we're phrasing it the same way.

17   **A.**   Okay.

18   **Q.**   And you did not prepare this document?

19   **A.**   I ran the calculations.

20   **Q.**   You ran the calculation through the program?

21   **A.**   Yes.

22   **Q.**   And you testified earlier that interest compounds

23   quarterly?

24   **A.**   Yes.

25   **Q.**   And thinking about the compounding interest, is that

 1   based on the idea that the funds that the SEC units disgorged

 2   would have been saved in an interest bearing account as

 3   opposed to being spent on business operations?

 4   **A.**   I don't believe that's the explanation for prejudgment

 5   interest or the interest factor that they used.

 6   **Q.**   Okay.  Do you have any understanding of why compounding

 7   interest is used as opposed to simply calculating for the

 8   order?

 9   **A.**   You're wondering why they compound the interest on

10   prejudgment?

11   **Q.**   Yeah.  I'm wondering if you know why compounding

12   interest is used in the calculation as opposed to simply

13   calculating third quarter and tallying it?

14   **A.**   Well --

15   **Q.**   It's fair if you don't know the answer.

16   **A.**   Yeah.  I'm not sure I understand your question.  The

17   quarterly interest is posted and then it's added to the

18   previous balance and then the next quarter depends on the

19   previous balance to get that interest.

20   **Q.**   Right.  So it's compounded.  So essentially interest

21   that's been calculated for a previous quarter gets interest

22   added to it in the next quarter?

23   **A.**   Yes.

24   **Q.**   And you're unsure of why that's the method the SEC uses

25   in calculating that?

1    **A.**    Yes.

2    **Q.**    You testified earlier that this interest calculation is

3    based on the entire disgorgement calculated $147,508,

4    correct?

5    **A.**    Yes.

6    **Q.**    And that the amount calculated by the SEC is -- the

7    interest amount calculated by the SEC is $51,286.05, correct?

8    **A.**    Yes.

9    **Q.**    So looking at those numbers roughly half of the

10   prejudgment total comes strictly from interest that has

11   accrued, is that fair to say?

12   **A.**    No.  If the prejudgment totals --

13   **Q.**    I'm sorry, one-third.

14   **A.**    Let's -- I would say no to that too.  Because if you

15   just use round numbers it would be 50,000 over 200,000.  That

16   would be only one quarter.  If you're adding it to 148,000,

17   it's almost 50, you're adding probably one-third, I would

18   agree.

19   **Q.**    Okay.  All right.  Are you aware that the Complaint in

20   this case was filed I believe in January 2019?

21   **A.**    I wouldn't remember the exact date.  The file is pretty

22   lengthy.

23   **Q.**    And so looking at this statement there's been at least

24   several quarters that have passed since the Complaint was

25   filed, and interest continues to accrue during the duration

1    of this litigation, correct, at least in this calculation?

2    **A.**    Could you reword that?

3    **Q.**    Yes.  Assuming that the Complaint was filed in January

4    of 2019, this calculation includes interest calculation

5    during the pendency of this litigation?

6    **A.**    Yes.

7    **Q.**    And again, because your disgorgement calculation didn't

8    account for business expenses incurred by Island, neither

9    does the prejudgment interest now?

10   **A.**    That's correct.

11   **Q.**    And I want to turn to what's been previously marked as

12   P880.  I want to just talk a little bit about the date ranges

13   here.  When it says "through bulk sale" and then there's a

14   date range, you don't mean that, for example, for First

15   Titan, which is the first line, that the bulk sale occurred

16   on September 13, 2011, correct?

17   **A.**    That's correct.

18   **Q.**    And that would be the same for all the other issuers?

19   **A.**    That's correct.

20   **Q.**    And looking at the date range for the full SOL, as I

21   understand your prior testimony that was -- those dates are

22   based on the last payment that came in, is that a fair

23   understanding?

24   **A.**    The first and last.

25   **Q.**    Okay.  And did you create this exhibit?

1    **A.**   Yes.

2    **Q.**   Okay.  When did you create it?

3    **A.**   This past weekend.

4    **Q.**   What were the parameters given for developing this full

5    SOL calculation?  What were you tasked with in identifying

6    this far right column that says "full SOL?"

7    **A.**   It was to condense the number of pages if it would have

8    been done individually.  It was easier to show a summary of

9    what would happen if we used or -- we used in the calculation

10   every payment that was made to Highland Capital, what the

11   amount would be.  Visually or optically it's easier to look

12   at this one page than it is 14 or 15 or however.

13   **Q.**   As I gather from what you're saying you used the

14   statements that we've been discussing to create this

15   document?

16   **A.**   Yes.  The statements were used for my analysis and then

17   for my analysis I developed this.

18   **Q.**   Okay.  And did you consult any other documents when

19   developing this exhibit?

20   **A.**   Just the exhibits I previously testified to.

21   **Q.**   And I asked you specifically about another -- are you

22   aware as of June 20, '22, five of the companies on this

23   exhibit are still actively trading?

24   **A.**   I didn't.  I was not aware.

25   **Q.**   Earlier we talked about the CREDMEM line items that were

 1    included in your disgorgement calculation.  Is it fair to say

 2    those would have been included on the calculations on the

 3    right-hand side of this table as well?

 4    **A.**   Yes.

 5    **Q.**   I would like to show the statement for Obscene Jeans.

 6    Briefly on this P880, on the right-hand column for SOL, last

 7    date you have is 6/30/2016, correct?

 8    **A.**   Yes.

 9    **Q.**   And this is page 29 of 147, and this is dated 6/30/2016.

10    It says CREDMEM No. 19 through 22 and that is for $9,077.44,

11    correct?

12    **A.**   Yes.

13    **Q.**   Is it fair to say this would be the last payment

14    calculated as part of developing that right-hand full SOL

15    calculation?

16    **A.**   Yes.

17    **Q.**   And this is page 28 of 147.  This is just the previous

18    one.  You will see there is -- for example, May 31, 2016,

19    there is another invoice which has several other invoices

20    listed.  Did you consider these when you looked at that

21    CREDMEM on 6/30/2016?

22    **A.**   In what -- I need clarification on what you're asking.

23    Would I consider for what?

24    **Q.**   Previously you said that you tried to match the invoice

25    amounts to the payments that were made.  Did you do that with

1    this CREDMEM?  Did you match these invoices to that CREDMEM

2    amount of 6/30/2016?

3    **A.**   No, if I understand.

4    **Q.**   I want to briefly turn to the statement for Rainbow

5    Coral.  This is Page 63 of 147.  Looking at this there's a

6    date 10/31/2017.  It lists credit -- let me go back and forth

7    on what we call this.  It's No. 403266 and it's for

8    $11,632.28, correct?

9    **A.**   Correct.

10   **Q.**   And this would have been included in that calculation

11   for the full SOL period?

12   **A.**   Correct.

13   **Q.**   All right.  And did you consider the invoices before --

14   did you match the invoices that come before this transaction

15   to tabulate that $11,632.28?

16   **A.**   No.

17   **Q.**   Do you know, and because I don't want to mischaracterize

18   your earlier testimony, do you know who or from what monitory

19   source that CREDMEM amount came from?

20   **A.**   I do not.

21   **Q.**   Okay.  Did you ask for information regarding where that

22   may have come from, what the source of money was?

23   **A.**   No.

24   **Q.**   And thinking again if we saw these sort of CREDMEM

25   descriptions in other issuer statements during the full SOL

1   period, it's fair to say that you would have included them in

2   that larger calculation as well?

3   **A.**   Yes.

4   **Q.**   Earlier we also talked about transactions that were

5   titled DTC and CUSIP, and I believe your testimony was that

6   you did not exclude those from your disgorgement calculation,

7   correct?

8   **A.**   That's correct.

9   **Q.**   And it's fair to say that thinking about that larger SOL

10  time period you wouldn't have excluded DTC from that larger

11  time period?

12  **A.**   That's correct.

13  **Q.**   And you wouldn't have excluded the CUSIP amounts from

14  that larger time period either?

15  **A.**   That's correct.

16  **Q.**   And putting back up P880, again looking at this full

17  SOL, that does not exclude any business expenses incurred by

18  Island Stock Transfer?

19  **A.**   That is correct.

20  **Q.**   So it doesn't include payroll?

21  **A.**   No.

22  **Q.**   Benefits?

23  A.   No.

24  **Q.**   Utilities?

25  **A.**   No.

```
 1    Q.    Visas?

 2    A.    No.

 3    Q.    Technology fees?

 4    A.    No.

 5    Q.    Printing fees?

 6    A.    No.

 7    Q.    Shipping costs?

 8    A.    No.

 9    Q.    Regulatory compliant costs?

10    A.    No.

11    Q.    Legal compliance costs?

12    A.    No.

13    Q.    Business insurance?

14    A.    No.

15    Q.    Or taxes paid?

16    A.    No.

17           MS. JOHNSON:  No further questions, your Honor.

18           THE COURT:  Thank you.  I do have a question I want

19    to make certain of something here and then I'll give you the

20    opportunity for redirect there.

21           With respect to your second summary -- this is to

22    the witness, the second summary that you testified to, I'm

23    not certain if the change of control date is still in the

24    month/year format?  I'm just trying to determine if you know

25    the precise date of the bulk sale?  I don't know if you have
```

1    that information.

2              THE WITNESS:  No.

3              THE COURT:  Okay.  So were you able to see any

4    documents with respect to that?  The bulk sale date.

5              THE WITNESS:  No.

6              THE COURT:  Okay.  Thank you.  Go ahead, please,

7    with your redirect.

8                    **<u>REDIRECT EXAMINATION</u>**

9    **BY MS. JOHNSON:**

10   **Q.**   I just want to clarify your last response.  For Kids

11   Germ you testified that you did see the bulk sale, right?

12   **A.**   Yes.  I did see the bulk sale date, a specific date, but

13   I had not seen it or the summary when it was created.

14   **Q.**   Okay.  That gets me to another question.  You testified

15   about your methodology in doing your Declaration.  That

16   methodology hadn't changed.  It was the same methodology to

17   prepare the new two-screen summary as it was for the debt,

18   right?  You didn't change it and make a new chart?

19   **A.**   Yes.

20   **Q.**   Ms. Rollins asked you about several deductions, payroll,

21   printing.  Why didn't you deduct these when you saw them on

22   the list for those type items?

23   **A.**   I don't know how they were paid.  There were not any

24   supporting docs for me to take a look at.

25   **Q.**   Did you see -- did the Defendants produce any documents

1   that you saw to support those fees?

2   **A.**   Not from what I looked at, no.

3   **Q.**   Did you see any documents showing that any of those fees

4   were paid to outside vendors?

5   **A.**   No.

6   **Q.**   Just that they were billed to the issuers?

7   **A.**   Just that they were billed.

8   **Q.**   Similarly she asked you about DTC.  Did you see any

9   evidence that money was paid to an outside or to DTC?

10  **A.**   No.

11  **Q.**   How about CUSIP, did you see any invoices, did the

12  Defendants produce anything to establish --

13  **A.**   Not to my knowledge.

14  **Q.**   Let me finish -- that someone other than Island was

15  billed for those services?

16  **A.**   No.

17  **Q.**   Ms. Rollins also asked about the prejudgment interest

18  and made a comment that the time reflected was overlapped

19  with the time period that the Complaint was pending until

20  trial.  Do you remember that, those questions?

21  **A.**   Yes.

22  **Q.**   Isn't that just simply a matter of the Defendants having

23  a use of the money that whole time period so that's why it's

24  included in the prejudgment interest?

25  **A.**   That's -- yes.

1    **Q.**   And just to clarify, is it correct that in your

2    summaries both for the bulk sale and the long period one,

3    that you included payment dates not interest dates?

4    **A.**   Yes.

5              MS. JOHNSON:  That's all I have, your Honor.

6              THE COURT:  Okay.  Anything else from the Defense?

7              MS. MCKENNA ROLLINS:  Just a couple of questions.

8              THE COURT:  Please.  That's fine.

9                      **RECROSS-EXAMINATION**

10   **BY MS. MCKENNA ROLLINS:**

11   **Q.**   You don't know what discovery was produced by Island,

12   correct?

13   **A.**   I don't know how to answer that because I know -- I know

14   Island produced the invoices.  So that's all I know that they

15   produced.

16   **Q.**   Again, I want to just clarify the language.  Island

17   produced the statements that you relied on, correct?

18   **A.**   Yes.

19   **Q.**   And your testimony is that you did not review any of the

20   underlying invoices related to those -- that are mentioned in

21   those statements, correct?

22   **A.**   Yes.

23   **Q.**   And you -- and you didn't ask for additional information

24   regarding the transactions that you saw in your review of the

25   statements, correct?

1    **A.**   No.

2           MS. MCKENNA ROLLINS:  Thank you.  No further

3    questions, your Honor.

4           THE COURT:  Okay.  Thank you.  Can I excuse the

5    witness then?

6           ALL COUNSEL:  Yes.

7           THE COURT:  Okay.

8    (witness excused.)

9           THE COURT:  You can return to either counsel table

10   or to your seat, or you can be excused.  I think he needed to

11   go back to Miami.

12          THE WITNESS:  Yes.  Thank you, your Honor.

13          MR. KRUCKENBERG:  Your Honor, I'm just confirming

14   with SEC that's their witness.

15          THE COURT:  I think that's --

16          MR. KRUCKENBERG:  We can move on to our witnesses.

17          THE COURT:  Anybody else?

18          MS. NESTOR:  That's it, your Honor.  Obviously we

19   are reserving our right to question the Defendants outside of

20   the scope of whatever defense counsel is asking them.

21          THE COURT:  That's fine.  I will give you that.

22   Okay.  Go ahead.  Mr. Kruckenberg.

23          MR. KRUCKENBERG:  Your Honor, we call Micah J.

24   Eldred.

25          MADAM CLERK:  Please raise your right hand.

1          THE WITNESS:  I do.

2     (Witness sworn.)

3          MADAM CLERK:  Please state your name for the

4     record.

5          THE WITNESS:  Micah James Eldred.

6          MADAM CLERK:  Thank you.  You may take the witness

7     stand.

8                    **MICAH JAMES ELDRED**

9     Called as a witness herein, having been first duly sworn was

10    examined and testified as follows:

11                    **DIRECT EXAMINATION**

12    **BY MR. KRUCKENBERG:**

13    **Q.**   Good afternoon, Mr. Eldred.

14    **A.**   Good afternoon.

15    **Q.**   Taking you back to Island Capital Management, Island

16    stock transfers, is it all right if I just refer to it as

17    "Island?"

18    **A.**   That's fine.

19    **Q.**   What was your role at Island when it was in operation?

20    **A.**   I was cofounder and CEO of the company.

21    **Q.**   Is it fair to say that you were generally aware of its

22    operations and expenses?

23    **A.**   Yes.

24    **Q.**   And what is Island's current status?

25    **A.**   Out of business.

1    **Q.**   When did that happen?

2    **A.**   2020.

3    **Q.**   And why did you -- why did it shut down?

4    **A.**   Um, well, after the SEC filed the litigation against SI

5    most or many of the clients left for other service providers,

6    and so the company became unprofitable and so it was -- we

7    continued to run as long as practical but we all basically

8    ran out of resources and just closed down.

9    **Q.**   Was that before or after the verdict in this case?

10   **A.**   That was prior to the verdict.

11   **Q.**   And do you currently have any ownership interest in

12   Island?

13   **A.**   Yes, I still do.

14   **Q.**   But it does not have any operations today?

15   **A.**   It has no operations and it deregistered itself from the

16   transfer SEC business.

17   **Q.**   Does it have any assets?

18   **A.**   No, only a few $1,000 in the bank.

19   **Q.**   And if it were to try to resume operations, would it

20   need to register with a regulator?

21   **A.**   Yes.  It would need to reregister with both the SEC and

22   need to become a participant with DTC.

23   **Q.**   And could it resume operations if either the DTC or the

24   SEC denied its registration?

25   **A.**   No.

1   **Q.**   Going back to your career, how long did you work in the

2   securities industry?

3   **A.**   Since 1989 I believe.

4   **Q.**   And when I say "working in the securities industry," can

5   you specify what you did?

6   **A.**   Well, that was, you know, a long period of time.  I had

7   quite a number of different functions and jobs during that

8   30-plus-year period.  So I started in the business as a clerk

9   and over 30 years had various jobs and responsibilities at

10   different firms.

11   **Q.**   And prior to this case, were you ever held directly

12   liable for misconduct or fined personally by any regulator?

13   **A.**   No.

14   **Q.**   And are you currently registered with either FINRA or

15   the SEC?

16   **A.**   No.

17   **Q.**   Did you previously hold licenses with FINRA?

18   **A.**   Yes.

19   **Q.**   What licenses were those?

20   **A.**   Um, I held the General Security License Series 7,

21   Principal License which is a Series 24, an Equity Traders

22   License which is a 55, I believe, and there's another one

23   that's a State Blue Sky License.  I don't remember the number

24   of that one.

25   **Q.**   Who issued those licenses?

1   **A.**   Those are run by FINRA.

2   **Q.**   Are those -- well, what did those licenses allow you to

3   do?

4   **A.**   They each allowed different -- they each allowed the

5   participant of those licenses, owner of those licenses to

6   carry on certain functions within the Securities business.

7   So each one allows different job duties and functions.

8   **Q.**   And are they current today?

9   **A.**   Currently I have no Securities license.

10   **Q.**   What happened to those licenses that you mentioned?

11   **A.**   In 2019 I withdrew my membership from FINRA.

12   **Q.**   Now, to maintain your licenses with FINRA, do you need a

13   sponsor and firm?

14   **A.**   Yeah.  To have a license with FINRA you have to go

15   through a licensed broker.  You can't as an individual go

16   directly to FINRA and say, "I want to be a broker."  It has

17   to be through a member organization.  So they would sponsor

18   you.

19   **Q.**   And from 1989 until 2019 did you have a sponsoring

20   organization?

21   **A.**   Yes.

22   **Q.**   And what was the sponsoring organization when you --

23   when your licenses expired in 2019?

24   **A.**   That would have been Spartan Securities.

25   **Q.**   And why did you surrender those licenses in 2018?

1    **A.**   The company went out of business and so we had to

2    withdraw our membership with FINRA and subsequently then all

3    of the licenses that Spartan sponsored would have expired

4    with that withdrawn membership.

5    **Q.**   Now to reactivate these licenses what would you need?

6    **A.**   Probably an act of God.  I mean, um, I would have to get

7    a FINRA member to sponsor my license, and then I would have

8    to get FINRA itself to approve regranting any license.

9    **Q.**   Now, when we talk about Spartan Securities shutting down

10   in 2019, what happened there?

11   **A.**   I think it may have been June 2019 we had a trader that

12   had been a long-term employee with us.  He -- he exceeded his

13   credit limits and caused the firm to lose about 15 or

14   $16 million in a period of about six hours, and that

15   subsequently put us into that capital violation, out of net

16   capital, and we were required to wind down the firm.

17   **Q.**   And has it been in operation since then?

18   **A.**   No.  We cannot operate it.  It's got a negative net

19   worth of 15 or $16 million.

20   **Q.**   Has Spartan obtained a judgment against that trader?

21   **A.**   We have, yes.

22   **Q.**   Has that been paid?

23   **A.**   No.

24   **Q.**   Is that likely to be paid?

25   **A.**   I don't believe it's likely to be paid.  I don't believe

1   the trader has anywhere near the resources to pay that type

2   of judgment.

3   **Q.**   And unless Spartan can come up with that amount of money

4   to pay that loss, can they operate?

5   **A.**   Well, we would need to come up with that amount of

6   money, plus additional capital that would allow us to

7   operate.  So we would need to come up with, I don't know,

8   somewhere in the neighborhood of $20 million.

9   **Q.**   Is that likely to happen?

10   **A.**   Absolutely not.

11   **Q.**   And in addition to the capital, what else would Spartan

12   need to do to resume operation?

13   **A.**   Um, well, it would have to again go through the entire

14   approval process with the SEC and FINRA to obtain its

15   license.  It's voluntarily deregistered.

16   **Q.**   And if either FINRA or the SEC refused to register

17   Spartan could it operate?

18   **A.**   No, not as a representative.  No.

19   **Q.**   Have you -- have you had a sponsoring firm with FINRA

20   since 2019?

21   **A.**   No.

22   **Q.**   And how long did you operate Spartan Securities?

23   **A.**   Again, setting out the firm and going through the

24   regulatory approval process in 2000 and it took about almost

25   a year to get the approval process.  So we began operations

1   sometime in 2001.

2   **Q.**   And Spartan was primarily a broker-dealer, is that

3   right?

4   **A.**   Correct.

5   **Q.**   And is that primarily the type of work you did for the

6   last 20 years in the industry?

7   **A.**   Yeah.  I mean, there's a lot of different lines of

8   business and types of business that fall under a

9   "broker-dealer," but yes, we had a number of different lines

10  of business that we conducted through the firm.

11  **Q.**   And all of those different lines of business that go

12  under the umbrella of "broker-dealer" would require you to

13  register with FINRA, is that right?

14  **A.**   That's correct.

15  **Q.**   You also -- you were also principal of Island, is that

16  right?

17  **A.**   I was CEO of Island, yes.

18  **Q.**   Island was primarily a transfer agent?

19  **A.**   That's correct, yes.

20  **Q.**   Did Island have to register with any regulator?

21  **A.**   It would -- as a transfer agency it would be required to

22  register with the SEC as well as any kind of participating

23  member in DTC.

24  **Q.**   How long was Island in operation?

25  **A.**   I started Island in 2003.

**Q.**   Is it fair to say when I refer to your work in the
Securities industry, at least the last 20 years, I'm
referring to your dealer work with Spartan or work with a
transfer agent with Island?

**A.**   Yes.

**Q.**   And you mentioned earlier what would have to happen if
you wanted to reregister with FINRA and you said, you
probably needed an act of God?

**A.**   Yes.

**Q.**   Why do you say that?

**A.**   Well, based on the outcome of this case I believe that
I'm statutorily disqualified for being a member.  So I don't
believe that there would be any likelihood that FINRA would
allow me to become an associate person or have a license
today.

**Q.**   Is it fair to say that in addition to finding a firm
that is -- would be willing to sponsor you, you would have to
convince FINRA to allow you to register?

**A.**   That's correct, yes.

**Q.**   Is it your understanding that they would not allow you
to do so?

**A.**   It's my understanding that fraud based liability would
preclude me from becoming an associated person of a
broker-dealer.

**Q.**   What is your current work status?

1   **A.**   Um, I suppose I'm struggling a little bit with that.  I

2   have a couple things that are keeping me busy.  I run a -- a

3   shipwreck exploration and salvage business.  I do that

4   part-time.  That's my primary duty.

5   **Q.**   Have you earned a regular salary since Spartan and

6   Island went out of business?

7   **A.**   I don't receive a salary from any company, anything that

8   would make it performance-based or sum-shared profits

9   something like that.

10   **Q.**   Have you worked as a broker-dealer since 2019?

11   **A.**   No.

12   **Q.**   And have you worked as a transfer agent since Island

13   closed?

14   **A.**   No.

15   **Q.**   You mentioned your exploration company.  What is that?

16   **A.**   What is the name of it?

17   **Q.**   What's the name of it?

18   **A.**   It's called Endurance Exploration Group.

19   **Q.**   What's your role at that company?

20   **A.**   I'm CEO and on the Board of records.

21   **Q.**   Do you work full time?

22   **A.**   It's not a full-time job, no.

23   **Q.**   And you mentioned it generally.  What is the main

24   business objective of Endurance?

25   **A.**   The main business objective is to research and search

```
 1    for and recover principally historic shipwrecks and cargo,

 2    sir.

 3  Q.   How is that company organized?

 4  A.   It's a C Corporation.  I believe it's domiciled in the

 5    Bahamas.

 6  Q.   Was that company ever publicly traded?

 7  A.   It was, yes.

 8  Q.   Is it currently publicly traded?

 9  A.   No.  We deregistered the company from SEC reporting

10    towards the end of 2018.

11  Q.   And when it was publicly trading did you get any

12    investors on the public market?

13  A.   I believe so.  The company I believe today has around

14    400 shareholders.

15  Q.   Was that important to Endurance's operation to be able

16    to sell shares?

17  A.   At the time to get the company capitalized and buy the

18    equipment and things we needed to have capital to run

19    operations, yes, absolutely.

20  Q.   Now, does Endurance have any connection with the charges

21    in this case?

22  A.   No.

23  Q.   Do you have any other business ventures at this moment?

24  A.   I do, yes.

25  Q.   What are those?
```

1   **A.**   I'm a nonlawyer partner in a small law firm based in DC.

2   **Q.**   And as far as you know is that law firm in compliance

3   with local rules about non-attorney ownership?

4   **A.**   Yes, I believe so.

5   **Q.**   What does that law firm do?

6   **A.**   It helps people that have legal problems, principally

7   compliance oriented, securities and compliance, things like

8   that.

9   **Q.**   Do you provide any securities advice or any investment

10   advice?

11   **A.**   No.  I'm -- basically my job is business development.

12   So trying to find clients for the firm.  I'm not -- as I say,

13   I'm not a lawyer so I'm not able to provide any type of legal

14   advice.

15   **Q.**   And how -- how many hours a week do you think you spend

16   on that?

17   **A.**   Very few.

18   **Q.**   Would you say less than five?

19   **A.**   Yeah at this time, yes.

20   **Q.**   And do you draw a salary from that company?

21   **A.**   No.

22   **Q.**   Do you have any specific work opportunities either as a

23   broker-dealer or transfer agent that are currently available

24   to you?

25   **A.**   Not that I am aware of.

1    **Q.**   Do you have any specific plans to join a broker-dealer

2    or transfer agent?

3    **A.**   No.

4    **Q.**   Other than the two businesses you mentioned, do you have

5    any specific opportunities available to you in the Securities

6    industry?

7    **A.**   No, not that I am aware of.

8    **Q.**   Do you think it's likely that another firm would hire

9    you, a Securities firm would hire you?

10   **A.**   I think there's slim to no chance of that.

11   **Q.**   Why is that?

12   **A.**   I suppose the regulatory requirements to hire me,

13   supervise me, to be quite high and I don't see why anyone

14   would want to do that.

15   **Q.**   As we sit here today do you think it is likely that you

16   would be able to work in the Securities industry at any point

17   in the future?

18   **A.**   As we sit here today, no.

19   **Q.**   Are you familiar with the penny stock market?

20   **A.**   Yes.

21   **Q.**   Are you familiar with the specific penny stock market

22   that has been examined in this case?

23   **A.**   Somewhat, yes.

24   **Q.**   What would -- what would the ramifications of that penny

25   stock market be for you?

1    **A.**   Well, it would not allow me to participate in any manner

2    in any security sale or purchase that involved penny stock.

3    **Q.**   Would that impact Endurance's operation or its work in

4    any way?

5    **A.**   It could, yes.

6    **Q.**   How so?

7    **A.**   Well, it would prevent the CEO of the company -- prevent

8    me and subsequently Endurance from any type of penny stock

9    offer.

10   **Q.**   Of those 400 or so shareholders you mentioned earlier

11   were some of those -- did some of those invest in Endurance

12   through a penny stock offering?

13   **A.**   Yes.  Private placements, yes.

14   **Q.**   Now, is Endurance currently traded anywhere publicly?

15   **A.**   It has a symbol but it's not -- it's not traded.

16   **Q.**   Was it ever traded at some point?

17   **A.**   Yes.

18   **Q.**   And where was it traded?

19   **A.**   It was traded on the OTCQB tier.

20   **Q.**   And why is it no longer traded on that market?

21   **A.**   So one of the requirements to continue trading on that

22   marketplace is the requirement to provide disclosure and

23   financial information and certain information to the

24   marketplace.  That's done by posting that information on OTC

25   markets through their database, so the marketplace has access

1 | to that, and once the SEC sued Spartan and myself, OTC
2 | markets would no longer allow Endurance to post their
3 | financial statements or disclosure on their platform.
4 | **Q.**   And was that before or after the verdict in this case?
5 | **A.**   That was prior to the verdict in this case.
6 | **Q.**   And is it -- is it fair to say that based on what
7 | happened before the verdict, do you have any expectation that
8 | OTC markets would resume trading activity on Endurance?
9 | **A.**   I'm sorry, say that question again.
10 | **Q.**   Do you think the OTC market would allow trading in the
11 | future?
12 | **A.**   Today?
13 | **Q.**   Yes, today.
14 | **A.**   I don't think so.
15 | **Q.**   How would a penny stock bar affect Endurance's
16 | shareholders?
17 | **A.**   Um, I'm not sure exactly.  I mean from a business
18 | standpoint it prevents the company -- could prevent the
19 | company from obtaining capital which would have a potential
20 | long term detriment to the shareholders, I suppose.
21 | **Q.**   Would a penny stock bar, if you continued to serve as
22 | Endurance's CEO, affect the likelihood of Endurance
23 | continuing its operations?
24 | **A.**   I think it could have a meaningful impact in future
25 | operations.

1   **Q.**   What would that impact be?

2   **A.**   If we have no capital there would be no practical way to

3   pay it.

4   **Q.**   What would happen with Endurance if you resigned as CEO?

5   **A.**   I suspect that the company would probably go out of

6   business.

7   **Q.**   Why is that?

8   **A.**   Um, because I'm the key principal that basically drives

9   all the business, and all the strategy, all the projects,

10   everything.

11   **Q.**   What would that do to your investors?

12   **A.**   I suppose it would cause them to all lose all their

13   money, all their investment in the project.

14   **Q.**   Would a penny stock bar also affect your ability to

15   create additional companies in the future?

16   **A.**   Could -- it could negatively impact my ability to raise

17   any capital for any other type of business.

18   **Q.**   I'm going to switch to talking about Island now.

19   Talking about its expenses and its operations.

20        I think you said this earlier but I just want to

21   make sure.  Are you familiar with the Island expenses for say

22   2008 through 2014?

23   **A.**   Of course that was a long time ago but yeah, I'm vaguely

24   familiar with them.

25   **Q.**   At the time would you say you were more familiar with

1  them in 2008?

2  **A.**   Yes, yes.

3  **Q.**   Now, do you continue to have access to all of Island

4  financial records?

5  **A.**   Um, well, but I have access to many of the records that

6  are left.  But they were -- went through the record retention

7  process and policies.  So any of the records that were

8  relevant to the period that we are discussing today -- were

9  shown today are no longer in our possession.  They have been

10  destroyed.

11  **Q.**   During the litigation of this case, is it fair to say

12  that Island produced whatever records in its possession that

13  the SEC requested?

14  **A.**   Yes.

15  **Q.**   Other than those records that were already produced, do

16  you still have access to financial records from say 2008?

17  **A.**   Possibly some, yes.

18  **Q.**   Where are they?

19  **A.**   In a storage facility in boxes.

20  **Q.**   And do you have any specific indexing or anything like

21  that?

22  **A.**   I do not.

23  **Q.**   Now, in anticipation of today's hearing did you attempt

24  to locate financial records for Island?

25  **A.**   I did, yes.

1    **Q.**   And were you able to find any?

2    **A.**   I think we found some, yes.

3    **Q.**   What did you find?

4    **A.**   I think we found some of the audit financial statements

5    for Island from those periods.

6    **Q.**   And do you know what years those were for?

7    **A.**   I don't recall off of the top of my head.

8    **Q.**   Okay.

9           MR. KRUCKENBERG:  Your Honor, may I approach the

10   witness?

11          THE COURT:  Yes, you may.

12   BY MR. KRUCKENBERG:

13   **Q.**   This is going to be marked as Defense Exhibit 266.

14   While I'm at it I'm going to hand him Defense Exhibit 265 as

15   well.

16          So Mr. Eldred, directing your attention to what has

17   previously been marked as Defense Exhibit 265, do you

18   recognize that document?

19   **A.**   I do.

20   **Q.**   And what is that?

21   **A.**   It's our, um, annual audit and financial statements for

22   the year 20 -- year-end 2013.

23   **Q.**   And have you had a chance to look through this entire

24   document?

25   **A.**   I have, yes.

1    **Q.**   And what was this document created for?

2    **A.**   Um, well, we had our financial statements audited every

3    year basically for self and our partners and things like

4    that.

5    **Q.**   And was this record made near the time that the

6    accounting was done for Island?

7    **A.**   Yeah.  The audit would have been done a couple of months

8    post of year-end closing.

9    **Q.**   By who?

10   **A.**   This was audited by DKM Certified Public Accountants.

11   **Q.**   And is it fair to say that the accountants would have

12   had access to your financial records at the time?

13   **A.**   Of course, yes.

14   **Q.**   Now, did Island regularly keep consolidated financial

15   statements in the course of its business?

16   **A.**   Yes.

17   **Q.**   And as far as you know was this record kept in its

18   ordinary course of business?

19   **A.**   Yes, I believe so.

20   **Q.**   Now, I'm going to ask you to turn to page five of this

21   document, and looking at that page at the top it says,

22   "Consolidated statement of comprehensive income."  Do you see

23   that?

24   **A.**   I do, yes.

25   **Q.**   Now, does this list Island's gross revenue at some point

1    for the year?

2    **A.**   Yes, yes.

3    **Q.**   And what was the total revenue for the year ending in

4    December 31, 2013?

5    **A.**   It's $3,357,153.

6    **Q.**   And is that all of the money that came in the door for

7    that year?

8    **A.**   Yes.

9    **Q.**   Do you list operating expenses as well?

10   **A.**   Yes.

11   **Q.**   And what were the operating expenses for that year?

12   **A.**   Total operating expenses were $2,923,173.

13   **Q.**   And those are broken out in different ways, is that

14   fair?

15   **A.**   Yes.  It's line items, different pockets of expenses.

16   **Q.**   What was Island's biggest expense?

17   **A.**   Mainly employee compensation and benefits.

18   **Q.**   So what did that include?

19   **A.**   Well, that was -- that was for all the staff.

20   **Q.**   How many staff did you have?

21   **A.**   Um, I don't know the exact number in 2013 but maybe

22   somewhere around 20 people.

23   **Q.**   And did that number include benefits for those staff

24   members?

25   **A.**   Yes.

1   **Q.**   Could Island have operated without staff members?

2   **A.**   No, of course not.

3   **Q.**   And when we look at communication information technology

4   that's listed there, can you just briefly describe what that

5   is?

6   **A.**   So we had to have specific and compliant database and

7   systems, IT systems for one of the business, manage the

8   records, keep track of the records, process all that's needed

9   to coordinate the business.  We had to outsource basically,

10  hire systems that would run on to manage that business.

11  **Q.**   What were some other major expenses that Island had to

12  be able to operate?

13  **A.**   There was a lot.  Legal expenses, administrative

14  expenses, business development expenses, rent expenses, all

15  the things that any business would have.

16  **Q.**   What -- what was the net income for that year?

17  **A.**   The net income for 2013 was $433,980.

18  **Q.**   And it looks like there's another comprehensive income

19  line item.  What is that?

20  **A.**   I'm sorry that would have been if we held any securities

21  that would have been in this case it was unrelaxed gain on

22  securities sales.  So we hadn't sold them yet.  That money

23  could have realized gain or loss.

24  **Q.**   So if we look at Island gross revenue minus operating

25  expenses, roughly speaking what was its margin -- what was

1    its profit margin for that year?

2    **A.**   I guess it's probably about 15 percent, something like

3    that.

4    **Q.**   Was that typical for Island?

5    **A.**   Yeah.  I mean the business we had about -- better years

6    and we had worse years.  I would say the net margins in this

7    business if you were able to generate from Island you know it

8    was between 10, 20 percent per year.

9    **Q.**   I'm going to show you -- actually hold on.

10            So you saw earlier during Mr. Dee's testimony some

11   of the statements about -- that were compilations of invoices

12   for different issuers for Island.  Do you remember that?

13   **A.**   I do, yes.

14   **Q.**   One of the things we saw in those statements was set-up

15   fees.  Do you recall that?

16   **A.**   Yes.

17   **Q.**   What was Island's typical set-up fee?

18   **A.**   It varied greatly from year-to-year in overtime because

19   of the expenses that were required to actually do the set up

20   varied greatly and change quite frequently.

21   **Q.**   What was the typical fee?  Again, I'm talking about 2008

22   through '14.

23   **A.**   Anywhere from 5 to 10 or $15,000, I think.  Many of the

24   companies we saw here were $7,500 set-up fees.

25   **Q.**   Let's use a $7,500 set-up fee as an example.  What did

1    that pay for?

2    **A.**   Well, we billed -- we billed the company or the issuer,

3    the client that amount of money, and essentially that is what

4    we estimated that would cover the actual costs, you know,

5    labor, direct costs, printing costs, Visa costs, many of

6    those cases we paid DTC -- their fee for becoming DTC

7    eligible.  So it paid for a lot of direct costs that were

8    required to set up the company, as well as general business

9    costs that -- you know, like labor.  Somebody had to input

10   data into the database.  The database that would probably

11   take something like 20 or 30 hours.  We had direct labor and

12   all the other costs that had to be absorbed in the business,

13   in running the business.

14   **Q.**   Was the set-up fee -- or what was the profit margin on

15   the set-up fee?

16   **A.**   Depended on what we charged and depended on what the

17   direct costs were and how complex it would be.  But generally

18   we -- generally you know we -- the transfer agency business

19   is very competitive.  We couldn't make up whatever fees we

20   wanted and charge whatever we wanted.  It had to be

21   competitive.  So typically we would try to set our fees so we

22   made $500, maybe $1,000 above the direct costs and what we

23   estimate our labor costs and things like that were to get the

24   company set up.

25   **Q.**   Was that -- was the set-up fees was that a primary way

1    that Island made money or made profit?

2    **A.**    Um, I don't know what percent, um, of the revenues were

3    set-up fees.  Some years it was more than others, but it

4    wasn't -- certainly was nowhere near the majority.  The

5    majority of the revenues came from processing, making those

6    type of fees.

7    **Q.**    I'm going to show you -- I believe you have it in front

8    of you what's been marked as Defense Exhibit 266.  Do you see

9    that document?

10   **A.**    I do, yes.

11   **Q.**    And I'm showing the first page on the overhead here.

12   What is that?

13   **A.**    That's just a cover page for the audit, financial

14   statements for the period ending 2014.

15   **Q.**    And have you looked through this entire document?

16   **A.**    I have looked through it, yes.

17   **Q.**    Is it fair to say that this is -- this is essentially

18   the same as Defense Exhibit 265 just for the following year?

19   **A.**    That's correct.

20   **Q.**    And was this prepared in the same fashion as the

21   previous year?

22   **A.**    Yes.

23   **Q.**    And if I turn to page five of this document, does this

24   once again list Island total revenue, as well as its

25   expenses?

1    **A.**   Yes, it does.

2    **Q.**   And what was its total revenue for the year?

3    **A.**   It was $3,430,227.

4    **Q.**   And what were the operating expenses?

5    **A.**   $2,596,730.

6    **Q.**   Were those fairly the same as the costs we listed

7    earlier?

8    **A.**   Yes, the general expenses it took to run the business.

9    **Q.**   Now, you saw Mr. Dee's testimony earlier and you saw the

10   statements and invoices and you looked through those

11   documents, is that fair?

12   **A.**   Yes.

13   **Q.**   As far as you know are they generally authentic?

14   **A.**   I believe so, yes.

15   **Q.**   Do those statements list Island fixed costs?

16   **A.**   No.  Those statements only list the amount we billed --

17   we billed and received from the client.  They don't indicate

18   anything to do with the costs of running the business or the

19   costs involved with providing any of the specific services.

20   **Q.**   I believe Mr. Dee testified that the total -- total

21   gross income for his disgorgement calculation is roughly

22   147,000.  Do you recall that?

23   **A.**   I do, yes.

24   **Q.**   Now, is that number an accurate representation of

25   Island's net receipts from those statements?

1   **A.**   No, not at all.  Because you've got -- those numbers

2   didn't reflect any of the factual direct and indirect costs

3   that it took to provide those services.

4   **Q.**   And if you were to apply the direct and indirect costs,

5   do you have an estimate of what Island -- Island's net

6   revenue from those payments was?

7   **A.**   I hadn't done any specific year-by-year analysis on the

8   exact companies, but generally I would estimate that it would

9   probably be between 10 and 20 percent of that was typical of

10  our net margins.

11          THE COURT:  Why don't we take a break.  We've been

12  here -- it's been a couple hours.

13          MR. KRUCKENBERG:  Your Honor, I'm finished.

14          THE COURT:  You are finished.  I didn't want to

15  rush you.  All right.  We will take a break and continue with

16  cross-examination in about ten minutes or so.

17          CSO OFFICER:  All rise.

18  (Afternoon recess taken at 3:21 p.m.)

19  (Court back in session at 3:42 p.m.)

20          THE COURT:  All right.  So you were finished with

21  your direct examination.  Now the SEC is ready to do its

22  cross-examination.

23          MR. KRUCKENBERG:  Your Honor, I just have one

24  thing.  I just move Defense Exhibits 265 and 266 into

25  evidence.

1           THE COURT:  All right.  265 and 266 they are

2     received into evidence.

3           MR. KRUCKENBERG:  With that I'm finished.

4           THE COURT:  All right.  Thank you.

5     (Defendant's Exhibit Nos. 265 and 266

6     admitted into evidence.)

7                        **CROSS-EXAMINATION**

8     **BY MS. NESTOR:**

9     **Q.**   Good afternoon.

10    **A.**   Good afternoon.

11    **Q.**   Mr. Eldred, you testified before that Spartan and

12    Endurance are out of business?

13    **A.**   Yes.

14    **Q.**   With the State of Florida they are still, in fact,

15    active corporations?

16    **A.**   I believe I kept the State of Florida registration

17    statements alive, yes.

18    **Q.**   And why is that?

19    **A.**   Um, well, I wanted -- I thought I needed to do that

20    until all this litigation was completed and litigation with

21    our ex-employees that we had and all that sort of thing.

22    **Q.**   So you haven't taken any efforts to deactivate or

23    inactivate Spartan and Island as corporations, correct?

24    **A.**   The efforts we have taken to deactivate has been with

25    the regulators and not as -- not with the state as a

 1   corporate entity.

 2   **Q.**   And you also mentioned that Spartan and Island do not

 3   plan to resume operations, correct?

 4   **A.**   That's correct.

 5   **Q.**   But there's nothing prohibiting Island and Spartan right

 6   now from resuming operation, right?  There is no bar in

 7   place?

 8   **A.**   That's correct.  There is no bar in place.

 9   **Q.**   So there are no restrictions in place right now for

10   Island and Spartan to resume operation?

11   **A.**   Practical or regulatory I guess is the difference.

12   Which are you referring to?

13   **Q.**   Is there any restriction from FINRA or the SEC

14   prohibiting Island and Spartan from operating a business?

15   **A.**   Island is not registered with the SEC so it's prohibited

16   until and unless the SEC were to grant it permission again.

17   It is deregistered.  So it cannot operate as a transfer

18   agency, and the same would apply for Spartan.  It's not

19   allowed to operate as a broker-dealer unless it goes through

20   the registration process with the SEC.

21   **Q.**   Now you caused those things to happen because you

22   voluntarily withdrew the registrations for both Spartan and

23   Island, right?

24   **A.**   That's correct.

25   **Q.**   And I think you testified earlier that you thought it

1   was unlikely that you would find a new sponsoring

2   broker-dealer to place your license, is that correct?

3   **A.**   Yes.

4   **Q.**   What efforts have you taken to find a new sponsoring

5   broker firm?

6   **A.**   Very little.

7   **Q.**   What efforts?

8   **A.**   None.

9   **Q.**   None.  And what efforts have you taken to try to

10  re-register Spartan and Island with FINRA or the SEC?

11  **A.**   None.

12  **Q.**   And you state in your Declaration that you submitted to

13  the Court that you hoped to be able to return to the

14  securities industry full-time and once again work as a

15  broker-dealer or associated person?

16  **A.**   Yes.

17  **Q.**   Do you recall that in your Declaration?

18  **A.**   Yes.

19  **Q.**   But earlier you said that it would take an act of God,

20  something along those lines?

21  **A.**   Yes.

22  **Q.**   In order for you to re-enter?

23  **A.**   Yes.

24  **Q.**   So which is true, are you planning on re-entering or is

25  it impossible for you to re-enter?

 1    **A.**   I think my declaration just reads, "I hope," which is

 2    different than practically being able to do that.

 3    **Q.**   What would need to happen for you to re-enter the

 4    industry?

 5    **A.**   I would need to find a sponsoring broker that would

 6    sponsor me and allow me to work for them, and then I would

 7    need to get FINRA to approve, you know, my association for

 8    brokering.

 9    **Q.**   And as of right now there is nothing that the SEC has

10    done to prohibit you from taking those actions, right?

11    **A.**   I believe that's true, yes.

12    **Q.**   Who made the choice for Island to stop operating

13    business?

14    **A.**   I did.

15    **Q.**   And did Island have assets at the time that it ceased

16    operations?

17    **A.**   A little bit, yes.

18    **Q.**   What was the value of those assets?

19    **A.**   Um, it was in the tens of thousands of dollars.

20    **Q.**   What happened to those assets?

21    **A.**   Most of them were spent winding down the company.  We

22    had creditors and bills to pay and employees that got laid

23    off and things like that.

24    **Q.**   And at the end of the day did you receive any beneficial

25    interest through a holding company or whatever way you had

| 1 | the company framed from the closure of Island? |
|---|---|
| 2 | **A.**   I received some money during the floating period, my |
| 3 | salary, yes. |
| 4 | **Q.**   Other than your salary? |
| 5 | **A.**   No. |
| 6 | **Q.**   And did Island have a book of business that it |
| 7 | transferred to another transfer agent? |
| 8 | **A.**   Yes. |
| 9 | **Q.**   And was compensation received by Island for that book of |
| 10 | business? |
| 11 | **A.**   Yes. |
| 12 | **Q.**   And what was that amount? |
| 13 | **A.**   I don't remember the exact amount. |
| 14 | **Q.**   Was it more than $100,000? |
| 15 | **A.**   It was less than I think -- I think the payment was |
| 16 | about $10,000 when we transferred -- when we closed the |
| 17 | transaction, and then there was contingency payments over |
| 18 | several years. |
| 19 | **Q.**   Okay.  And those contingency payments, are those still |
| 20 | ongoing? |
| 21 | **A.**   Yes. |
| 22 | **Q.**   So Island still has a continued stream of income then? |
| 23 | **A.**   No, those payments are paid to me. |
| 24 | **Q.**   They are paid to you individually? |
| 25 | **A.**   Yes. |

```
1    Q.   And how much have you received thus far?

2    A.   I'm not sure maybe about $100,000 I think.

3    Q.   And what's the prospect for additional payments?

4    A.   It just depends on the book of business and how it

5    performs over the next couple of years.

6    Q.   How many more years are left on this agreement that you

7    are going to receive residual income?

8    A.   I believe about three.

9    Q.   This $100,000 that you received was that all in one year

10   or over what period of time?

11   A.   I believe that was over a period of about -- in 2021

12   approximately.  A little more than a year.

13   Q.   A little over a year you received income from the sale

14   of Island business, is that correct?

15   A.   Yes.

16   Q.   Are you expected to receive about the same, less or more

17   over the next three years?

18   A.   I don't know.  It all depends on what the book of

19   business does over time.  Generally they trail off over time

20   as more issuers drop business and things like that.  So I

21   expect that the payment stream would decline.

22   Q.   But you don't know right, you're speculating?

23   A.   I'm speculating.  I have no way of knowing.

24   Q.   It could go up, right?

25   A.   Absolutely.
```

1   **Q.**   Who made the choice to cease Spartan's operations?

2   **A.**   I think that was sort of a regulatory requirement.  We

3   were below net capital and so we put fixed capital issues so

4   the alternative is we had to withdraw our membership.

5   **Q.**   Okay.  But you were involved in that decision, right?

6   **A.**   Yes.

7   **Q.**   And that decision for Spartan to cease operating was not

8   impacted by the SEC case, right?  This was rogue

9   employee/brokers, bad trade, right?

10  **A.**   That's correct, yes.

11  **Q.**   So if you testified inconsistently at trial your

12  testimony today is that truthful that you are -- the reason

13  why Spartan closed up shop is because of the rogue trade of

14  one of your employees, is that correct?

15  **A.**   That is correct, yes.

16  **Q.**   And in the FINRA arbitration -- well, let me back up.

17          You brought a FINRA arbitration against that

18  employee, Mr. Reynolds, is that correct?

19  **A.**   That's true, yes.

20  **Q.**   And Spartan hired an attorney to represent it during

21  that proceeding, right?

22  **A.**   Yes.

23  **Q.**   And went through a whole trial let's say --

24  **A.**   Yes.

25  **Q.**   -- before an arbitration panel, right?

1    **A.**   Yes.

2    **Q.**   And did Spartan pay fees for that proceeding?

3    **A.**   No.

4    **Q.**   Who paid fees?

5    **A.**   The clearing firm paid the legal fees and all the fees

6    associated with that.

7    **Q.**   And the arbitration panel ultimately found Mr. Reynolds

8    liable to Spartan, correct?

9    **A.**   Yes.

10   **Q.**   And Mr. Reynolds was ordered to pay over $1.4 million in

11   compensatory damages directly to Spartan, right?

12   **A.**   I believe so.  I actually think it was a higher number.

13   **Q.**   Okay.  Was Mr. Reynolds also ordered to pay more than

14   $4 million in punitive damages?

15   **A.**   I believe so, yes.

16   **Q.**   Combined Mr. Reynolds owes Spartan $5.4 million,

17   correct?

18   **A.**   He owes it to the clearing firm, yes.

19   **Q.**   He owes it to the clearing firm or to Spartan?

20   **A.**   Well, the agreement that we had with the clearing firm

21   is that any funds that came in, they would receive first

22   until they were paid back what they lost, which I think was

23   like 15 million or something, plus the costs, and then after

24   that there was a waterfall provision where some would go to

25   Spartan if they collected more than that, some would go to

1    Spartan, some would go to the clearing firm.

2    **Q.**   Okay.  But the amount that was ordered to Axos, your

3    clearing firm, is separate and apart from the amount that's

4    owed to Spartan, correct?

5    **A.**   I'm not exactly sure how it works but I know there were

6    two separate orders, yes.

7    **Q.**   Have you seen the FINRA award?

8    **A.**   I've read it, yes.

9    **Q.**   There it is.  Okay.

10           MR. KRUCKENBERG:  Your Honor, at this point I'm

11   going to object.  I haven't seen this document.  I think for

12   context I can gather what this is, but I haven't received a

13   copy of it.  I'm not sure what it is.

14           THE COURT:  Did you not show it to them first?

15           MS. NESTOR:  And I'm not admitting it, its just to

16   refresh the witness's recollection on the award.

17           THE COURT:  Well, let him look at it so he can see

18   what it is.

19   BY MS. NESTOR:

20   **Q.**   Mr. Eldred, I put up on the screen the FINRA arbitration

21   award.  Do you see that?

22   **A.**   I do, yes.

23   **Q.**   And then I'm going to turn to the last page where you

24   see the electronic signatures of the arbitration panel.  Do

25   you see that?

1    **A.**    Yes, I do.

2    **Q.**    Do you recognize this as being the FINRA arbitration

3    award in the matter of Spartan vs. Scott Fischer Reynolds?

4    **A.**    It appears to be that, yes.

5    **Q.**    And turning to the bottom of page 8 of 12, it says,

6    "Accordingly, Scott Reynolds is liable and shall pay to

7    Claimant Spartan the sum of $1,421,296.34 in compensatory

8    damages plus interest accruing at the Florida statutory rate

9    from March 8, 2019 until the award is paid in full."  Do you

10   see that?

11   **A.**    I do, yes.

12   **Q.**    Is that accurate?  Was he ordered to pay Spartan more

13   than $1.4 million in compensatory damages?

14   **A.**    I believe so, yes.

15   **Q.**    And the award goes on to say that, "Reynolds is further

16   liable for and shall pay to Claimant Spartan punitive damages

17   in the amount of $4 million."  Do you see that?

18   **A.**    Yes.

19   **Q.**    And if you go down a little bit further, paragraph four

20   mentions that Reynolds is liable for and shall pay to Third

21   Party Respondent Axos the some of $15,393,598.93 as

22   compensatory damages plus interest.  Do you see that?

23   **A.**    Yes.

24   **Q.**    And there's an additional sum.  So at the end of the day

25   Mr. Reynolds owes Axos more than $17 million, right?

1    **A.**   Yes.

2    **Q.**   What efforts have you made to collect on this judgment?

3    **A.**   I'm actually not certain on what yours and Axos lawyers

4    have been utilizing in that process.  I don't know where that

5    is.

6    **Q.**   But Spartan stands to gain a recovery from that award,

7    right?

8    **A.**   Yes.

9    **Q.**   Was there any other, like, insurance benefits or

10   anything else that Spartan may receive as a result of that

11   transaction with Mr. Reynolds?

12   **A.**   Not that I am aware of.

13   **Q.**   What other assets did Spartan have at the time that it

14   ceased operations?

15   **A.**   I don't remember the exact amount.  It would have had

16   some quantum tens of thousands of dollars in its bank

17   account.  Most of our -- most of our assets were held at the

18   clearing firm.

19   **Q.**   What about the client base of Spartan?

20   **A.**   There were -- really wasn't much of a client base.  The

21   firm was -- principle activity of the firm was wholesale

22   market making and so there were -- really weren't -- really

23   clients with assets and thing like that.  Very little of

24   that.

25   **Q.**   Okay.  So when it closed up shop Spartan had whatever

1    tens of thousands left in their bank accounts and then we

2    also know it has this judgment as an asset, right?

3    **A.**   Yes.

4    **Q.**   And if Spartan collects on the judgment who will get

5    paid?

6    **A.**   Well, like I said before, there's a cooperation and

7    settlement agreement or agreement with our clearing firm.  So

8    any money that comes into Spartan goes to the clearing firm

9    until they are whole, plus I think there's about three or

10   maybe $4 million now in legal fees that they have spent.  And

11   then after that I don't remember the exact waterfall, but a

12   portion of it goes to Spartan and a portion would go to the

13   clearing firm.

14   **Q.**   Okay.  My question was if Spartan receives funds, whose

15   going to receive those funds?

16   **A.**   The clearing firm.

17   **Q.**   No, no, no.  So after say that waterfall effect and all

18   that happens and Spartan gets a dollar?

19   **A.**   Yes.

20   **Q.**   Where does that dollar go?

21   **A.**   Well, it would be Spartan's money.

22   **Q.**   Would it go to you?

23   **A.**   It would not necessarily, no.  It would go to --

24   probably stay in Spartan or go up to the holding company

25   something like that.

1    **Q.**   And who owns the majority interest in the holding

2    company?

3    **A.**   I do.

4    **Q.**   Earlier you mentioned that in your years as a securities

5    professional, you didn't have a disciplinary history, right?

6    **A.**   Yes.

7    **Q.**   But Spartan, your company that you formed and you ran,

8    had an extensive disciplinary history, didn't it?

9    **A.**   Yes.

10   **Q.**   In fact, in a nine-year period between 2009 and 2018

11   FINRA brought at least ten actions against Spartan, correct?

12   **A.**   I'm not sure of the number but there were quite a few

13   actions brought against Spartan, yes.

14   **Q.**   And over the course of that time Spartan was fined by

15   FINRA in the collective amount of approximately $398,000, is

16   that correct?

17   **A.**   I don't know the exact amount.

18   **Q.**   Okay.  Are you familiar with a form TA-1?

19   **A.**   Yes, somewhat familiar with it.

20          MS. NESTOR:  Your Honor, I'm just going to show

21   counsel the document.

22          THE COURT:  That would be fine.

23          MS. NESTOR:  Your Honor, may I approach the

24   witness?

25          THE COURT:  You may.

1    BY MS. NESTOR:

2    **Q.**   Mr. Eldred, I'm showing you a form TA-1/A document.  Do

3    you see that?

4    **A.**   Yes.

5    **Q.**   And it's for Island Capital Management, correct?  At the

6    bottom of the first page.

7    **A.**   Um, yes.

8    **Q.**   Is that a yes?

9          MS. MCKENNA ROLLINS:  Your Honor, I am objecting to

10   this.  I believe Ms. Nestor is trying to refresh Mr. Eldred's

11   recollection.  If she's trying to refresh his recollection, I

12   ask she just do that.  I would object to this becoming an

13   exhibit or being entered because this, again, was not on an

14   exhibit list.  I just received a copy of it Saturday.

15        THE COURT:  I think what he's arguing is that it's

16   not really fair he didn't -- he had no idea you were going to

17   go down this road.  I mean at a minimum it should have been

18   given over to him.  I think that's kind of a fair complaint.

19        MS. NESTOR:  Your Honor, they have got an issue

20   with the disciplinary history and I'm showing him a document

21   with specific information about that history.  This is a

22   public document.  It is not something that was hidden.  It

23   was signed by the Defendant himself electronically.

24        THE COURT:  It may be public.  He didn't know about

25   it.  He didn't know you were going to ask the witness

```
 1    questions about it.  So I think I'm going to sustain the
 2    objection.  You need to move on to something else.  It's not
 3    fair.
 4              MS. NESTOR:  Okay.
 5    BY MS. NESTOR:
 6    Q.   You can put that down then.  All right.  Let's
 7    summarize, during a nine-year period Spartan was disciplined
 8    several times?
 9    A.   Yes.
10    Q.   By FINRA, right?
11    A.   Yes.
12    Q.   And there were hundreds of thousands of dollars in fines
13    issued by FINRA to Spartan, right?
14    A.   I think so, yes.
15    Q.   Did Spartan pay those fees?
16    A.   Yes.
17    Q.   You have extensive experience in bringing private
18    companies public, right?
19    A.   I have experience in that, yes.
20    Q.   Do you have a little bit of experience or a lot of
21    experience?
22    A.   I would say quite a lot, yes.
23    Q.   And you've been involved in the process of getting
24    companies listed on trading markets, right?
25    A.   Yes.
```

1  Q.   And how many of these companies were -- what percentage

2  of companies you worked for were penny stock companies?

3  A.   The majority of them, maybe 80 or 90 percent.

4  Q.   Do you consider yourself sort of a penny stock expert?

5  A.   I'm not sure if that would be a good characterization.

6  I'm not sure I'm an expert in penny stocks any more than any

7  other stock I guess.

8  Q.   You've written articles about the penny stock process,

9  right?

10 A.   Yes.

11 Q.   And you wrote an article titled, "The SEC overregulation

12 digs shallow graves for investors and entrepreneurs."  You

13 wrote that?

14 A.   Yes.

15 Q.   You published that article in 2018, right?

16 A.   Yes.

17 Q.   And that article talked about how you felt that the SEC

18 overregulates the penny stock market, right?

19 A.   Yes.

20 Q.   And that's still your view, right?

21 A.   By in large, yes.

22 Q.   I'm going to move on to some of your businesses.  What

23 is Issuer Services Corp?

24 A.   It was a company that we set up, I don't know exactly

25 when, um, I think we registered as a second -- secondary

1    transfer agency at some point.

2    **Q.**   Okay.  So it was involved in transfer agent services?

3    **A.**   I don't remember exactly what the business purpose of

4    that was that we were -- we were -- it was involved in the

5    transfer agency business but I don't think it ever actually

6    collected.

7    **Q.**   Is that company still ongoing and operational?

8    **A.**   I believe it's deregistered now.  I don't know if it's

9    still a viable corporation or not.

10   **Q.**   And it provided services to public companies, is that

11   correct?

12   **A.**   I believe so, yes.

13   **Q.**   And you were CEO, right?

14   **A.**   Yes.

15   **Q.**   And you had an ownership interest?

16   **A.**   I believe indirect ownership, yes.

17   **Q.**   Indirect meaning through a holding company?

18   **A.**   Correct.

19   **Q.**   That you own an interest in?

20   **A.**   Correct.

21   **Q.**   And what is Trans Share?

22   **A.**   Trans Share was a transfer agency that we bought, I

23   don't remember what year, but, um, we bought that in one of

24   our -- one of our subsidiaries.

25   **Q.**   That was another transfer agent company that you

1    operated?

2    **A.**    Yes.

3    **Q.**    And you've had an ownership interest in that company?

4    **A.**    Indirectly.

5    **Q.**    What happened to it?

6    **A.**    It was sold.

7    **Q.**    And how much was it sold for?

8    **A.**    Um, around $200,000 if I remember correctly.

9    **Q.**    When was it sold?

10   **A.**    2019.

11   **Q.**    Who received the $200,000 as a result of the sale?

12   **A.**    The holding company.

13   **Q.**    And that holding company paid who?

14   **A.**    It paid its bills and had other things -- other things

15   that it had to do.  So it -- it -- it utilized the funds in

16   its day-to-day operations.

17   **Q.**    And then you received payment, correct?

18   **A.**    I received, um, a payment from the holding company and

19   over the last few years yes, from it.

20   **Q.**    I'm sorry, did I interrupt your answer?  And what

21   amounts?

22   **A.**    What amounts I received from the holding company?

23   **Q.**    Yes.

24   **A.**    I don't know exactly.  I don't recall.

25   **Q.**    Is it more than $100,000?

103

1    **A.**    Um, from what period?

2    **Q.**    The last two years.

3    **A.**    Um, I think I'd say for the last two years is probably

4    no.  But from '19 to, um -- from 2019 to 2000, say '21,

5    probably was more than 100,000, yes.

6    **Q.**    I'm going to ask you to help me pronounce his name,

7    Caird or "Caird Exploration?"

8    **A.**    Caird.

9    **Q.**    Caird?

10   **A.**    Caird.

11   **Q.**    That's C-A-I-R-D?

12   **A.**    Yes.

13   **Q.**    What is that business?

14   **A.**    It's a subsidiary of Endurance Exploration.

15   **Q.**    And you are the president of that company, right?

16   **A.**    Yes.

17   **Q.**    And what is its business?

18   **A.**    Shipwreck -- historical shipwreck search and recovery.

19   **Q.**    Who's Daniel Taylor?

20   **A.**    He is the prior principal, predecessor of Caird.

21   **Q.**    Is he still involved with the business?

22   **A.**    Yes.  He is the Wreck Director of the company.

23   **Q.**    Is he also involved in Endurance?

24   **A.**    He is not a director/officer of Endurance.  He is a

25   director of Caird, which is a 50 percent owned subsidiary of

1    Endurance.

2    **Q.**   And could he run Endurance if he needed to?

3    **A.**   Probably not.

4    **Q.**   Why not?

5    **A.**   I don't think he has the experience to do it.

6    **Q.**   He has the experience to run Caird Exploration?

7    **A.**   He's the director of Caird.  He doesn't run it really.

8    **Q.**   Could he be a director of Endurance?

9    **A.**   Yeah, he could.

10   **Q.**   Who else is involved with Endurance, Mr. Dilley,

11   correct?

12   **A.**   Yes.

13   **Q.**   What's his involvement?

14   **A.**   He's the Director in the site lease, and also the COO or

15   Vice President, I think.

16   **Q.**   And what does that mean?  What is he doing here today

17   for Endurance?

18   **A.**   Really the last couple of years he's not been all that

19   active.  He maintains the books and financial's and things

20   like that for the company.

21   **Q.**   Is he being compensated for his work?

22   **A.**   I think he's been compensated around two or $3,000 this

23   last year.

24   **Q.**   What about prior to last year?

25   **A.**   Prior to last year I don't think he received any

1    compensation.

2    **Q.**    And what have you been compensated by Endurance?

3    **A.**    The only compensation I receive have been reimbursement

4    of expenses that I've incurred on behalf of the business.

5    **Q.**    What about Caird, have you received any revenue or

6    earnings from that company?

7    **A.**    No.

8    **Q.**    Does Endurance have any other employees?

9    **A.**    Currently, no.

10   **Q.**    Does it have any assets, like equipment for example?

11   **A.**    It does, yes.

12   **Q.**    And tell us about those assets and their value?

13   **A.**    Well, there are principally subsidy assets, technology

14   assets, underwater vehicles, remote operated vehicles, remote

15   -- a small boat.  I don't know the value of those assets,

16   probably in the hundreds of thousands of dollars today.

17   **Q.**    And Endurance is not in the securities industry, right?

18   **A.**    Correct.

19   **Q.**    And Endurance's business operation is to locate sunken

20   ships and gold and silver coins or other valuables in those

21   ships, is that right?

22   **A.**    Yes.

23   **Q.**    And has it been successful?

24   **A.**    Um, well, I guess it would depend on what your

25   definition of success is.  We found, um, shipwrecks and we

 1   recovered gold and silver and those sort of things and so we

 2   have been successful from that standpoint.  But from an

 3   overall profitability standpoint it's not been very

 4   successful.

 5   **Q.**   And what was the value of the coins or whatever else

 6   Endurance found in that shipwreck?

 7   **A.**   Around, like, a million dollars.

 8   **Q.**   That million dollars was -- has it been monetized?

 9   **A.**   Yes.

10   **Q.**   Or is that just the value of that?

11   **A.**   Yes.

12   **Q.**   It was monetized?

13   **A.**   Hmm-hmm.

14   **Q.**   When?

15   **A.**   I don't know, over the period of its operation.  So the

16   last five years, something like that.

17   **Q.**   When was the shipwreck -- and so we know what we're

18   talking about, this was a steamship, Pulaski, is that

19   correct?

20   **A.**   That's one of them, yes.

21   **Q.**   Okay.  What time period did Endurance discover the gold

22   coins and whatever other artifacts that resulted in a million

23   dollars?

24   **A.**   Like 2018, '19 and '20.

25   **Q.**   Did you receive any payout as a result?

**A.**   No.  Only, um, no salary or bonus or anything.  Only,

um, either repayment of debt that I made for the company, or

reimbursement of expenses that I personally paid on behalf of

the company.

**Q.**   And what does that -- what is that figure?

**A.**   How much is that?

**Q.**   How much is that.

**A.**   Over what period of time?

**Q.**   Over the same period of time, 2008 [sic], 2019 -- I'm

sorry, 2018 through 2020?

**A.**   Maybe $100,000 in that period of time.

**Q.**   So what happened to the rest of the million dollars?

**A.**   Well, it's very expensive to do that.  It doesn't, you

know -- you've got ship expenses, and fuel, and contractors,

and crew and everything else.  So it's eaten up very quickly.

**Q.**   Okay.  Did it also purchase some of the equipment assets

that the company currently owns?

**A.**   Probably, yes.

**Q.**   And if Endurance finds another sunken ship or treasure

with other valuable items, gold, silver, whatever it might

be, will you receive a distribution as a result?

**A.**   I don't know.  You'd have to quantify it and determine

what -- you know, if you found $10 of coins, probably not.

If it found millions of dollars, perhaps, yeah.

**Q.**   But as a majority owner of the company, you could

```
 1    receive a payout, right?

 2    A.    I could, yeah.  Possible.

 3    Q.    And the shareholders could also, right?

 4    A.    Yes.

 5    Q.    Now, Endurance is not currently traded on a public

 6    market, right?

 7    A.    Well, it has a symbol that it's -- it's in -- my

 8    understanding it is not eligible to trade.

 9    Q.    And that's because you withdrew its registration with

10    the SEC, right?

11    A.    No.

12    Q.    No?

13    A.    We did, in fact, withdraw our registration from the SEC,

14    but that didn't eliminate its ability to trade -- to continue

15    to trade.  What eliminated its ability to continue to trade

16    was the fact that OTC markets would no longer accept our

17    required disclosure documents, meaning like our financial

18    statements and things like that.  So that information could

19    be posted and published to the, you know, public.  So -- and

20    my understanding is OTC markets will not allow the security

21    to trade on the platform.

22    Q.    Okay.  And OTC markets won't accept the financial

23    information or data from Endurance because Endurance is no

24    longer providing information to the SEC, right?

25    A.    No.
```

1    **Q.**   Explain why not?

2    **A.**   So OTC market has a listing tier that allows companies

3    to trade that are nonreporting -- nonreporting to the SEC.

4    So there's exemptions that allow securities to trade without

5    being reported to the SEC.

6    **Q.**   And you mentioned that OTC is not allowing Endurance

7    financial information to be posted on its marketplace because

8    of the SEC's complaint, right?

9    **A.**   That's what they told us, yeah.

10    **Q.**   Who told you that?

11    **A.**   I guess it was their -- somebody that worked in their

12    compliance department.

13    **Q.**   Do you have any documentation indicating that?

14    **A.**   I have emails, yes.

15    **Q.**   Have you produced any of those emails?

16    **A.**   No one has asked me for those, no.

17    **Q.**   Now, Endurance's stock is only available for unsolicited

18    quotes, right?

19    **A.**   I'm not sure.  I believe that's true, yes.

20    **Q.**   Your Declaration mentioned that penny stock bar against

21    you would -- effectively destroyed Endurance's ability to

22    raise capital, right?

23    **A.**   It would significantly diminish it, yes.

24    **Q.**   What efforts have you made to raise capital?

25    **A.**   I haven't made any efforts.

1  **Q.**   Have you tried to get a loan from a financial

2  institution?

3  **A.**   No.

4  **Q.**   There are lots of different ways that a company can

5  raise capital that doesn't consist with making a penny stock

6  offering, right?

7  **A.**   Potentially, but loans and those type of, um -- sorts of

8  financing just are not available for high risk type of

9  companies like shipwreck salvage.

10  **Q.**   But you haven't made any efforts right, to obtain a

11  loan?

12  **A.**   That's true.

13  **Q.**   Have you leveraged any of your assets, the equipment and

14  everything else that the company owns to try to get capital

15  fundraising from some other source?

16  **A.**   No.

17  **Q.**   In your Declaration you stated that any court imposed

18  industry bar will significantly impact your ability to earn a

19  living and greatly reduce your future earnings capacity.  Do

20  you remember that?

21  **A.**   Yes.

22  **Q.**   Okay.  We've talked today about several other sources of

23  earnings that you have, right?

24  **A.**   Yes.

25  **Q.**   Endurance, correct?

1    **A.**   Yes.

2    **Q.**   You have the continued payout from the sale of items for

3    the business, right?

4    **A.**   Yes.

5    **Q.**   You have potentially if you make a collection on that

6    $5 million judgment against Mr. Reynolds, right?

7    **A.**   Yes.

8    **Q.**   And then counsel mentioned that you are part of a law

9    firm now?

10   **A.**   Yes.

11   **Q.**   And that law firm is that -- what is that law firm's

12   name?

13   **A.**   Capital Law Group.

14   **Q.**   And that's a law firm that you formed with

15   Mr. Kruckenberg, right?

16   **A.**   Yes.

17   **Q.**   And you are the CEO of that firm, right?

18   **A.**   I believe so, yes.

19   **Q.**   And isn't it true that you are expected to share with

20   the firm's clients the broad relationships you have built and

21   the practical hands-on experience you have earned during your

22   more than 30-year career in Global Capital Market Systems?

23   **A.**   Yes, I think that's accurate.

24   **Q.**   All right.  So you're going to provide your expertise to

25   the firm's clients, correct?

1    **A.**    Yes.

2    **Q.**    And that includes your securities expertise, right?

3    **A.**    Yes.

4    **Q.**    Now, you don't need to be affiliated with FINRA or the

5    SEC to do that, right?

6    **A.**    Depends on what -- what characterizes "doing that"

7    means.

8    **Q.**    Working at the firm.

9    **A.**    Working at that firm you are correct.

10   **Q.**    Have you earned any revenue from your work at the firm?

11   **A.**    Personally?

12   **Q.**    Yes, personally.

13   **A.**    No.

14   **Q.**    And how will you get compensated?

15   **A.**    I don't know.  I don't have that exactly, um, figured

16   out.  The firm has just been early stage embryonic so there

17   has been very little revenue.

18   **Q.**    Does the firm have employees?

19   **A.**    Um, no.  Other than myself, no.

20   **Q.**    Are you receiving a salary draw?

21   **A.**    No.

22   **Q.**    And how will -- if the firm earns -- let me rephrase.

23        Also, is there any fee sharing agreement for how

24   you get compensated from the firm's revenue?

25   **A.**    Between myself and the firm or between the lawyers that

 1    provide services?  I'm not sure what question you're asking.

 2    **Q.**   Any arrangement.  If you work for the firm how are you

 3    going to get paid?

 4    **A.**   I suppose if the firm becomes profitable then I would

 5    get some distribution at some point in the future.

 6    **Q.**   What's your ownership interest in the firm?

 7    **A.**   I own two-thirds of the firm.

 8    **Q.**   Who owns the rest?

 9    **A.**   Mr. Kruckenberg.

10    **Q.**   Is Mr. Dilley involved with the firm at all?

11    **A.**   No.

12    **Q.**   So that's another potential stream of income, right?

13    **A.**   Potential, yes.

14    **Q.**   This law firm, right?  And the firm is not a penny stock

15    company, right?

16    **A.**   That's correct.  It's an LLC.

17    **Q.**   And it doesn't make an offering of a penny stock, right?

18    **A.**   Correct.

19    **Q.**   So the penny stock bar doesn't impact your ability to

20    work at the firm, right?

21    **A.**   That's true.

22    **Q.**   Are there any other businesses that you're involved with

23    possibly that you haven't already mentioned today?

24    **A.**   I don't know, we had a lot of legacy companies that I

25    need to close down or are unwinding, so I can't -- I can't

 1  think of anything that's active or you know has a potential

 2  for revenue currently.

 3  **Q.**   Okay.  And have you made any attempts to shelter your

 4  assets from collection?

 5  **A.**   No.  Collection from whom?

 6  **Q.**   From a potential judgment?

 7  **A.**   No.

 8  **Q.**   And did you recently sell your home that you owned with

 9  your wife?

10  **A.**   Yes, in 20 -- two years ago I think.

11  **Q.**   July 2020, is that correct?

12  **A.**   Yes.

13  **Q.**   And you purchased a new home that same day, right?

14  **A.**   Yes, my wife did.  Yes.

15  **Q.**   Okay.  So the old home is titled in your name and your

16  wife's name, correct?

17  **A.**   Yes.

18  **Q.**   And the new home is titled only in your wife's name?

19  **A.**   Yes.

20  **Q.**   Why?

21  **A.**   Because the one that we bought at that time, it was a

22  personal loan, when we bought the first one.

23  **Q.**   Why wasn't her name only on the first title then?

24  **A.**   Because that's how she wanted to do that.

25  **Q.**   Isn't that, in fact, true that you titled that in your

1    wife's name in order to protect it from collection?

2    **A.**   I don't know.

3    **Q.**   Okay.  Let's turn to the financial records that the

4    Defendants, which are marked as 266 and 267?  265 and 266.

5            Mr. Eldred, do you have Exhibits 265 and 266?

6    **A.**   I do.

7    **Q.**   Now, you previously testified that many of the records

8    that you testified to are no longer in your possession, do

9    you remember that?

10   **A.**   Yes.

11   **Q.**   They are destroyed?

12   **A.**   Yes.

13   **Q.**   How were they destroyed and when?

14   **A.**   Where our records were retained and sent to come in

15   boxes and things likes that, and then I don't remember the

16   exact category of the destruction process, but some records

17   we had to retain for five years, some -- I think three years

18   and things like that, once it got to those points

19   periodically records would be taken and destroyed.

20   **Q.**   Are you talking about paper copy records or electronic

21   records?

22   **A.**   Paper.

23   **Q.**   What happened to the electronic records that you

24   maintained?

25   **A.**   Um, which ones specifically?

1    **Q.**   Related to the operation of Spartan and any business

2    expenses it might have?  I'm sorry, Island, related to Island

3    business expenses?

4    **A.**   Well, I don't know.  I wasn't really ever the user of

5    the accounting systems and things like that.  I know our

6    servers were shut down and things like that some time ago.  I

7    don't know what became of those records.

8    **Q.**   Could they still exist somewhere?

9    **A.**   I'm sure they could somewhere, yes.

10   **Q.**   What efforts did you take to try to locate any documents

11   that show business expenses related to Island during the time

12   period relevant to this case?

13   **A.**   I asked Mr. Dilley.  We're trying to find those records

14   on the server and the accounting systems.  So you would

15   probably be better off asking him what specifics he did.

16   **Q.**   You didn't take any efforts?

17   **A.**   Other than asking Mr. Dilley, no.  And I did, of course,

18   go to the storage facility and look through boxes and things

19   like that myself.

20   **Q.**   And was it your testimony that you found Exhibits 265

21   and 266 at your storage facility?

22   **A.**   I believe they were found on a server or something like

23   that, or accounting, or emails, or something like that.

24   **Q.**   So they weren't found at the storage facility, right?

25   **A.**   Correct.

1   **Q.**   Did you find anything at the storage facility related to

2   expenses of Island?

3   **A.**   Not really.  Mostly records.  I think my recollection,

4   most of those were, um, batch transfers and things like that,

5   boxes full of, like, transfer records.

6   **Q.**   Did you ask your accountant for records related to

7   Island business expenses?

8   **A.**   I did, yes.

9   **Q.**   Did he provide you with any backup documents?

10   **A.**   No.

11   **Q.**   Did you go to the vendors that Island may have paid and

12   ask for copies of receipts or invoices?

13   **A.**   No.

14   **Q.**   Did you go to your bank where Island kept its accounts

15   and ask for statements showing that payments or expenses were

16   made?

17   **A.**   No.

18   **Q.**   In fact, other than going to your storage facility which

19   resulted in the retrieval of no documents, did you do

20   anything to try to find documents or other evidence that

21   shows the expenses of Island?

22   **A.**   Like I said, I tasked Mr. Dilley with trying to find

23   those records.

24   **Q.**   You did nothing?

25   **A.**   Other than go to the storage facility and look at what

1   we had there, yes, that's correct.

2   **Q.**   Now, Exhibits 265 and 266 they're just a summary, right?

3   **A.**   Well, they are -- they are all the financial statements.

4   **Q.**   But it's a summary of income and expenses, right?

5   **A.**   Yes, correct.

6   **Q.**   It doesn't provide the supporting materials for any of

7   the calculations contained in the financial statement, right?

8   **A.**   Correct.

9   **Q.**   So there's -- there's no actual records provided in

10  Exhibits 265 and 266 that corroborate any of the expenses

11  that are itemized in the documents?

12  **A.**   Well, our auditor reviewed all of this and would have

13  passed on his opinion after reviewing it.  So obviously, um,

14  it's been looked at in great detail.

15  **Q.**   Did your auditor look at the actual invoices and

16  receipts or are they looking at whatever management system

17  you might be using like QuickBooks?

18  **A.**   I'm sure they looked at everything.  They look at

19  receipts.  They look at bank records.  They reconcile bank

20  records, to cash flow statements and everything.  So I don't

21  know what's the entire process but it's pretty extensive.

22  **Q.**   You don't know what documents they looked at, right?

23  **A.**   I just remember a year going through the audit process

24  and hearing our CEO and they essentially looked at

25  everything.

1   **Q.**   Did you contact the auditors and ask them for source

2   materials and what they looked at in performing these audits?

3   **A.**   I did not, no.

4   **Q.**   Now, if we turn to the fifth page of Exhibit 265, there

5   are six different categories of operating expenses, right?

6   **A.**   Yes.

7   **Q.**   And the first and largest number is compensation,

8   commission and benefits, right?

9   **A.**   Yes.

10   **Q.**   Is your compensation included within that figure?

11   **A.**   Yes.

12   **Q.**   Is Mr. Dilley's compensation included in that figure?

13   **A.**   I believe so, yes.

14   **Q.**   And how much of that compensation figure of $1.5 million

15   and change is your salary or your compensation and Mr.

16   Dilley's compensation?

17   **A.**   Um, well, my salary was $10,000 a month.  So that was my

18   take-home gross salary if you will for many, many, many

19   years, and I don't know what Mr. Dilley's compensation was of

20   that number.

21   **Q.**   And also included in there would be benefits to you and

22   Mr. Dilley, right?

23   **A.**   We received health insurance and I think that was

24   probably the only other benefit.

25   **Q.**   And then there's other administrative expenses which is

1    the second highest figure at $779,000, right?

2    **A.**    Yes.

3    **Q.**    And does that include the line item like meals and

4    entertainment, for example?

5    **A.**    I think that would be under business development.

6    **Q.**    Okay.  So meals and entertainment would be captioned but

7    under the business development category, right?

8    **A.**    That included travel, trade shows, you know, meals and

9    entertainment, everything that would be required to have a

10   sailboat organization, yes.

11   **Q.**    Okay.  How about any other perks of the business like

12   payment of your car, for example, anything like that?

13   **A.**    No.

14   **Q.**    So where on 265 and 266 would we find any information

15   about which of these expenses actually correspond to the 14

16   issuers involved in this case?

17   **A.**    You wouldn't be able to make any correlation between --

18   you couldn't say from business -- let's say business, um,

19   occupancy or equipment costs or IT, you couldn't say X amount

20   came or was attributed directly to those companies.  It all

21   went into a bucket and those are the roll-out numbers for the

22   year.

23   **Q.**    Right.  Because you were going to get paid the same

24   salary regardless of those 14 issuers, right?

25   **A.**    Assuming the company could afford it, yes.

1    Q.   And your employees were also going to receive the same

2    compensation, right?

3    A.   Generally, yes.

4    Q.   And the trade shows and the travel that didn't relate to

5    these 14 issuers, right?

6    A.   I don't know what marketing was done to, you know,

7    retain or get those clients.  I don't really know.

8    Q.   Okay.  So marketing expenses would be included in here,

9    right?

10   A.   Yeah.

11   Q.   Okay.  And for marketing you don't know what activities

12   were done to actually retain these 14 issuers, if anything?

13   A.   Specific -- specifically I don't know from those 14

14   issuers.

15   Q.   And what documents have you provided the SEC to show

16   that any expenses were actually paid?

17   A.   I believe the SEC has all the accounting records.  When

18   we -- when we were going through the production cycle I

19   believe we provided all the accounting records to the SEC.

20   If it was requested we gave it to them.

21   Q.   If it was requested you gave it?

22   A.   Yes.

23   Q.   And have you produced here today any accounting records

24   that show that expenses were actually paid by Island related

25   to any of these 14 issuers?

1    **A.**   Today?

2    **Q.**   During these proceedings.

3    **A.**   No.

4    **Q.**   And the same is true for Exhibit 266 which is the

5    financial statements for the year 2014, right?

6    **A.**   Yes.

7    **Q.**   You don't have any supporting materials for that

8    financial statement either, right?

9    **A.**   Right.

10   **Q.**   We don't know what expenses if any relate to the 14

11   issuers that we're talking about today, correct?

12   **A.**   Correct.

13   **Q.**   Now, you mentioned during your direct testimony that

14   while you haven't done a specific year-by-year analysis

15   typically your profit margin was 10 to 20 percent, right?

16   **A.**   That was more or less somewhere in there.

17   **Q.**   What documents do you have that support that figure?

18   **A.**   That's just based on my recollection of the

19   profitability of the business.  Some years were better, some

20   years we had losses.  That was typically the margins that we

21   generated.

22   **Q.**   But you haven't provided any corroborating evidence for

23   that, right?

24   **A.**   Right.

25   **Q.**   Now, in your Declaration you state that while it was in

1    operation Island made less than $8,000 in that from the 19

2    issuers listed in the Complaint?

3    **A.**   I believe that to be true, yes.

4    **Q.**   How did you come up with that number?

5    **A.**   Because basically how we tried to price the set-up fees

6    was, again, as I explained, the business is very competitive

7    so we can't just make up a number and charge what we want.

8    It has to be competitive with the industry.  We had a price,

9    set-up fees to include what our actual costs were going to

10    be, and then labor costs and all the other things to absorb

11    that.  So typically we set those fees so we make a little bit

12    of money and probably on average $500 a client on set-up fees

13    when everything was said and done.

14    **Q.**   So this $8,000 that you reference in your declaration is

15    referencing only the set-up fee, is that correct?

16    **A.**   Yes.

17    **Q.**   It's not referencing any other ongoing monthly fees that

18    may have been charged to the issuers?

19    **A.**   That I don't know.

20    **Q.**   And you're just making a guess or assumption because you

21    haven't done any real analysis, right?

22    **A.**   Well, that's my -- that's my analysis based upon my

23    experience with the business and running it for -- you know,

24    since its inception.

25    **Q.**   You haven't looked at any documents or done any type of

 1   financial accounting to determine the $8,000 figure that you

 2   put in your Declaration?

 3   **A.**   I hadn't -- hadn't prepared an exact reconciliation of

 4   that, no.

 5           MS. NESTOR:  Your Honor, I'm moving on now to the

 6   documents that I think are disputed with counsel.

 7           THE COURT:  Well, it's like a quarter to 5:00

 8   almost and so -- we normally close up around 5:00 o'clock

 9   simply because there are court security officers, court

10   employees, we just need to close down at a certain hour.  How

11   much time tomorrow do you all think that you will need?  I'm

12   just trying to plan ahead here because I've got those

13   criminal statuses and I think Ms. Lee, you think they may

14   take an hour at least, right?

15           MADAM CLERK:  At least.

16           THE COURT:  I'm starting those at 9:00 a.m.  So you

17   can probably count on until about let's just say

18   10:00 o'clock.  I'll try to go quickly but about

19   10:00 o'clock.  How long do you all think?

20           MS. NESTOR:  I'm almost done with Mr. Eldred.  I

21   just have like a series of documents with the bulk sale date

22   which we're not really getting into the weeds on, then we

23   have Mr. Dilley as well.

24           THE COURT:  So do you have an estimate of how long

25   with Mr. Dilley?

```
 1          MR. VECCHIONE:  I do, your Honor.  I'm trying not
 2   to recross any ground we've made right now.  I'm hoping to be
 3   done with him in 45 minutes.
 4          THE COURT:  Okay.  Terrific.  So let's plan on
 5   starting at 10:00.
 6          MR. VECCHIONE:  That's my part.
 7          THE COURT:  No, I understand.  I understand.  Be
 8   here at 10:00.  I'll be on the video Zoom.  I'll be sitting
 9   here in the courtroom.  As soon as I finish we just need to
10   take like a really short break and then we can continue with
11   the hearing.  I don't need to take more than half an hour for
12   lunch.  But we will need to take a short lunch break, maybe
13   at 12:30 p.m., something like that, and like I said, we
14   probably need to break around 2:00-ish, 2:00 something.  So
15   just plan accordingly and leave enough time for the oral
16   argument.  I think we ought to leave at least -- how long do
17   you think, an hour in total for oral argument, half hour for
18   each side?
19          MS. NESTOR:  I think so, your Honor.  A lot of
20   issues have been fairly briefed.  I hope we both answered
21   some of the questions you posed already during the testimony.
22          THE COURT:  Sounds good.  Why don't we go ahead and
23   recess for the day.  I'm going to stay here for a minute and
24   see you back here 10:00 a.m. tomorrow.  Thank you.
25          (Court adjourned at 4:43 p.m.)
```

```
 1                    CERTIFICATE OF REPORTER

 2

 3    COUNTY OF HILLSBOROUGH     )

 4                               )  SS.

 5    STATE OF FLORIDA           )

 6

 7    I, Melissa A. Pierson, Official Court Reporter, Registered

 8    Professional Reporter, in and for the United States District

 9    Court for the Middle District of Florida, do hereby certify

10    that I reported, stenographically, the foregoing proceedings

11    at the time and place hereinbefore set forth.  And I do

12    further certify that this is a true and correct transcription

13    of my stenographic/realtime notes.

14

15

16    DATED:  8/23/2022

17

18    S:/MELISSA A. PIERSON

19    MELISSA A. PIERSON, CA/CSR 12499

20    IL/CSR 084.003138, RPR

21    FEDERAL OFFICIAL COURT REPORTER

22

23

24

25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION, | : : : | |
| | : | CASE NO.: 8:19-cv-448-VMC-CPT |
| Plaintiff, | : : | |
| v. | : : : | |
| SPARTAN SECURITIES GROUP, LTD., ISLAND CAPITAL MANAGEMENT, CARL E. DILLEY, MICAH J. ELDRED and DAVID D. LOPEZ, | : : : : : | |
| Defendants. | : | |

**NOTICE OF APPEAL**

Defendants Spartan Securities Group, Ltd. ("Spartan"), Island Capital Management LLC d/b/a Island Stock Transfer ("Island"), Carl E. Dilley, and Micah J. Eldred (collectively "Defendants"), by and through their undersigned counsel, hereby appeals to the United States Court of Appeals for the Eleventh Circuit the Final Judgments entered in this action on August 10, 2022 (Docs. 298, 299, 300, 301). This includes all rulings merged into those final orders, including but not limited to the denial of summary judgment (Doc. 135). *See* Fed. R. App. P. 3(c)(4) ("The notice of appeal encompasses all orders that, for purposes of appeal, merge into the designated judgment or appealable order. It is not necessary to designate those orders in the notice of appeal.").

September 16, 2022

Respectfully Submitted,

*/s/ Kara Rollins*
Kara Rollins
Litigation Counsel

John J. Vecchione
Senior Litigation Counsel

New Civil Liberties Alliance
1225 19th St. NW, Suite 450
Washington, DC, 20036
Kara.Rollins@ncla.legal
(202) 869-5210
*Counsel for Defendants*
Appearing *Pro Hac Vice*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on September 16, 2022, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF system which sent notification of such filing to all counsel of

record.

Respectfully,

*/s/ Kara Rollins*
Kara Rollins
Litigation Counsel